MALHAR S. PAGAY (CA BAR NO. 189289)
VICTORIA A. NEWMARK (CA BAR NO. 183581)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:  mpagay@pszjlaw.com
　　　　 vnewmark@pszjlaw.com

Attorneys for Wynn Las Vegas, LLC d/b/a Wynn Las Vegas

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.: 2:13-bk-15130-SK |
| GGW BRANDS, LLC, | Chapter 11 |
| Debtor. | **DECLARATION OF MITCHELL J. LANGBERG IN SUPPORT OF MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE** |
| | **Hearing**<br>Date: [To be set]<br>Time: [To be set]<br>Place: Courtroom 1575<br>255 E. Temple Street<br>Los Angeles, CA  90012 |

I, Mitchell J. Langberg, declare as follows:

1.　　I am an attorney, duly admitted to practice law in the state of California.  I am a Shareholder in Brownstein Hyatt Farber Schreck LLP, counsel to Wynn Las Vegas, LLC d/b/a Wynn Las Vegas ("Wynn Las Vegas"), in connection with the legal disputes described herein between, on the one hand, Wynn Las Vegas and Stephen Wynn and, on the other hand, Joseph Francis ("Francis"), and debtors and debtors in possession GGW Brands, LLC ("GGW Brands"), GGW Direct, LLC ("GGW Direct"), GGW Events, LLC ("GGW Events") and GGW Magazine, LLC ("GGW Magazine", and together with GGW Brands, GGW Direct, and GGW Events, the "Debtors").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2.    I make this Declaration in support of the *Motion for Order Directing the Appointment of a Chapter 11 Trustee* (the "Motion"), filed by Wynn Las Vegas in the above-captioned case. Terms not otherwise defined herein shall have the same meaning as set forth in the Motion.

3.    On June 18, 2009, Wynn Las Vegas obtained a judgment against Francis in the District Court of Clark County, Nevada, arising from unpaid gambling debts (the "Nevada Marker Judgment"). The court awarded Wynn Las Vegas $2 million plus pre-judgment interest of $838,356.00 and post-judgment interest accruing at the rate of $986.30 per day. As of February 13, 2013, Wynn Las Vegas is owed $3,923,597.23 on account of the Nevada Marker Judgment. The Nevada Marker Judgment is a final, non-appealable order.

4.    On April 9, 2012, Wynn Las Vegas obtained a judgment against Francis in the District Court of Clark County, Nevada, on account of claims of defamation (the "Nevada Defamation Judgment"). The court awarded Wynn Las Vegas $7.5 million, consisting of $5 million in compensatory damages and $2.5 million in punitive damages. As of February 13, 2013, Wynn Las Vegas is owed $8,164,340.12 on account of the Nevada Defamation Judgment. The court denied Francis's motion to set aside the Nevada Defamation Judgment entered by default and Francis has appealed the court's denial of such motion.

5.    On April 18, 2012, Wynn Las Vegas also commenced an action in the District Court for Clark County, Nevada, against GGW Direct, GGW Brands, GGW Events, Francis, and certain other individuals and entities (the "Alter Ego Litigation"). In the Alter Ego Litigation, the court first issued a temporary restraining order freezing nearly $2 million of funds claimed to belong to GGW Brands and/or GGW Direct which were held in David Houston's client trust account. On July 20, 2012, after finding that Wynn Las Vegas had demonstrated a substantial likelihood of prevailing on its alter ego claims, the Nevada court issued a preliminary injunction, continuing to freeze the funds held by Houston. On November 15, 2012, Wynn Las Vegas filed a motion for summary judgment in the Alter Ego Litigation, based in large part on Francis's control of and financial dealings with the Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

6.     In the Alter Ego Litigation, Wynn Las Vegas conducted the equivalent of a Federal Rule of Civil Procedure 30(b)(6) deposition on the person designated by GGW Brands and GGW Direct to testify about their structure and their relationship with Francis.  The companies designated Robert Klueger ("Klueger"), former counsel to the Debtors.  True copies of excerpts of the transcript of the Deposition of Robert Klueger taken on June 22, 2012, are attached hereto as Exhibit A.  In addition, true copies of excerpts of the transcript of the Deposition of Robert Klueger taken on August 28, 2012, is attached hereto as Exhibit B.

7.     Wynn Las Vegas conducted a deposition of Christopher Dale on August 29, 2012 (the "Dale Depo.").  True copies of excerpts from the transcript of the Dale Depo. are attached hereto as Exhibit C.

8.     Wynn Las Vegas also conducted a deposition of the Debtors' acting "outside general counsel," attorney Brian Rayment, on June 29, 2012 (the "Rayment Depo.").  True copies of excerpts of the transcript of the Rayment Depo. are attached hereto as Exhibit D.

9.     Attached hereto as Exhibit E, is an American Express billing statement entitled "Platinum Card" for account ending 5-17003 in the name of Joseph R. Francis reflecting a closing date of October 18, 2011, and a balance of $38,441.59.  Exhibit E is a true copy of a document produced by the Debtors in response to certain requests for production of Wynn Las Vegas.

10.     Attached hereto as Exhibit F is a document entitled "GGW Direct LLC – Transactions by Account, All Blue Horse Transactions."  Exhibit F is a true copy of a document produced by the Debtors in response to the certain requests for production of Wynn Las Vegas.

11.     Wynn Las Vegas conducted an examination of David Houston on April 3, 2012 (the "Houston Exam").  True copies of excerpts of the transcript of the Houston Exam are attached hereto as Exhibit G.

12.     Wynn Las Vegas conducted an examination of attorney Peter E. Garrell of Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor, on April 2, 2012 (the "Garrell Exam").  True copies of excerpts of the transcript of the Garrell Exam are attached hereto as Exhibit H.

DOCS_LA:265665.1 93837/001

13.    An examination of attorney Aaron Aftergood ("Aftergood"), also was taken by Wynn Las Vegas (the "Aftergood Exam").  During 2012, attorney Aftergood represented Francis in connection with Wynn Las Vegas's efforts to collect on the Marker Judgment in California. Additionally, in 2012, Aftergood was Francis's attorney of record in Stephen Wynn's defamation action in California Superior Court, which included a nearly two week trial and post-trial motions. True copies of excerpts of the transcript of the Aftergood Exam are attached hereto as Exhibit I.

14.    Attached hereto as Exhibit J is a true copy of an email string between and among Francis, GGW Brands, and DirecTV, Inc. ("DirecTV"), which was produced by DirecTV to Wynn Las Vegas in response to a subpoena.

15.    Attached hereto as Exhibit K is a true copy of *Defendant, GGW Direct, LLC's Certificate of Compliance Re Responses to Plaintiff's Requests for Production of Documents* dated October 3, 2012.

16.    Attached hereto as Exhibit L is a true copy of that certain Supplemental Declaration of Christopher Dale, dated December 21, 2012.

I declare under penalty of perjury that the foregoing is true and correct and that if called upon as a witness, I could and would competently testify thereto.

Executed this 21st day of March, 2013, at Los Angeles, California.


_____

MITCHELL J. LANGBERG

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

1            DISTRICT COURT, CLARK COUNTY, NEVADA

2  WYNN LAS VEGAS LLC d/b/a/ WYNN LAS  )
    VEGAS, a Nevada limited liability   )
3  company,                     )
               Plaintiff,       )
4      vs.                  )   No. A-12-660288-B
                             )
5  GGW DIRECT, LLC, a Delaware      )
    limited liability company; GGW    )
6  BRANDS, LLC, a Delaware limited   )
    liability company; GGW EVENTS,    )
7  LLC, a Delaware limited liability  )
    company; MANTRA FILMS, INC., a     )
8  suspended Oklahoma corporation;    )
    BLUE HORSE TRADING, LLC, a       )
9  California limited liability      )
    company; PEPE BUS, LLC, an        )
10  inactive Montana limited liability )
    company; SANDS MEDIA, INC., a     )
11  revoked Nevada domestic         )
    corporation; JOSEPH R. FRANCIS, an )
12  individual, DAVID R. HOUSTON, an   )
    individual; and DAVID R. HOUSTON,  )
13  LTD., a Nevada professional      )
    corporation, doing business as THE )
14  LAW OFFICE OF DAVID R. HOUSTON,   )
                             )
15             Defendants.      )
    ————————————————————————————————)
16

      DEPOSITION OF PERSON MOST KNOWLEDGEABLE OF
17
      KLUEGER & STEIN, LLP AND 30(b)(6) DESIGNEE OF
18
        GGW DIRECT, LLC AND GGW BRANDS, LLC
19
           ROBERT F. KLUEGER, ESQ.
20
             ENCINO, CALIFORNIA
21
              JUNE 22, 2012
22

23  ATKINSON-BAKER, INC.
    COURT REPORTERS
    (800) 288-3376
24  www.depo.com
    REPORTED BY:  SUSAN ANN GRAHAM, CSR NO. 4885, RPR
25  FILE NO.:  A6062BB

```
 1              DISTRICT COURT, CLARK COUNTY, NEVADA

 2                        - - -

 3   WYNN LAS VEGAS LLC d/b/a/ WYNN LAS )
     VEGAS, a Nevada limited liability )
 4   company,                          )
                     Plaintiff,        )
 5        vs.                          )     No. A-12-660288-B
                                       )
 6   GGW DIRECT, LLC, a Delaware       )
     limited liability company; GGW    )
 7   BRANDS, LLC, a Delaware limited   )
     liability company; GGW EVENTS,    )
 8   LLC, a Delaware limited liability )
     company; MANTRA FILMS, INC., a    )
 9   suspended Oklahoma corporation;   )
     BLUE HORSE TRADING, LLC, a        )
10   California limited liability      )
     company; PEPE BUS, LLC, an        )
11   inactive Montana limited liability)
     company; SANDS MEDIA, INC., a     )
12   revoked Nevada domestic           )
     corporation; JOSEPH R. FRANCIS, an)
13   individual, DAVID R. HOUSTON, an  )
     individual; and DAVID R. HOUSTON, )
14   LTD., a Nevada professional       )
     corporation, doing business as THE)
15   LAW OFFICE OF DAVID R. HOUSTON,   )
                                       )
16                   Defendants.       )
     _____)
17                                     )

18

19        Deposition of ROBERT F. KLUEGER, ESQ., taken on

20   behalf of Plaintiff, at 16000 Ventura Boulevard,

21   Suite 1000, Encino, California, commencing at 9:00 a.m.,

22   Friday, June 22, 2012, before Susan Ann Graham, CSR

23   No. 4885, RPR.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4   BROWNSTEIN HYATT FARBER SCHRECK
     BY:   MITCHELL J. LANGBERG, ESQ.
 5   BY:   ANDREW KONG, ESQ.
     2029 Century Park East
 6   Suite 2100
     Los Angeles, California 90067-3007
 7
     FOR THE DEFENDANTS GGW DIRECT, LLC; GGW BRANDS, LLC; GGW
 8   EVENTS, LLC AND BLUE HORSE TRADING, LLC:

 9   ECOFF BLUT LLP.
     BY:   ELLIOT S. BLUT, ESQ.
10   300 South Fourth Street
     Suite 701
11   Las Vegas, California 89101

12   FOR THE DEFENDANT JOSEPH R. FRANCIS:

13   LAW OFFICES OF AARON AFTERGOOD
     BY:   AARON AFTERGOOD, ESQ.
14   1875 Century Park East
     Suite 2230
15   Los Angles, California 90067

16

17

18

19

20

21

22

23

24

25
```

3

```
1                        I N D E X

2   WITNESS:  ROBERT F. KLUEGER, ESQ.

3   EXAMINATION:                                    PAGE

4      BY MR. LANGBERG                                7

5

6

7   EXHIBITS:
                              PLAINTIFF'S
8   NUMBER                    DESCRIPTION           PAGE

9   1 -    Documents Bates stamped CHASE03017-03022   94
           and CHASE 03039-03065
10
    2 -    Documents Bates stamped RAYMENT0211-0213  104
11
    3 -    State of California, Secretary of State,  109
12         Statement of Information, five pages

13  4 -    Collection of documents, ten pages        137

14  5 -    Letter dated March 12, 2012, two pages    138

15  6 -    E-mail dated April 10, 2012               148

16  7 -    Collection of checks, four pages          154

17

18  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

19                     PAGE          LINE

20                     143            15

21                     143            18

22

    INFORMATION TO BE SUPPLIED:
23

24                     (None)

25
```

1    Q    Okay.  Did you ever -- Strike that.  Do you

2  represent Joe Francis?

3    A    I did, yes.

4    Q    -- individually?

5    A    Yes.

6    Q    Did you have an engagement letter with him?

7    A    I did not have a separate engagement letter, no.

8    Q    Was your --  Was your representation of him in

9  your mind a -- just a natural consequence of your

10  representation of GGW Direct and Brands?

11    A    I think that would be a fair characterization,

12  yes.

13    Q    Were you ever an officer of GGW Direct or

14  Brands?

15    A    Remember that limited liability companies don't

16  have officers; they have managers and members.

17    Q    Fair enough.  Were you --  Did you ever have any

18  title with GGW Direct or Brands?

19    A    Not that I recall, no.

20    Q    I think you referenced October, I'm presuming of

21  2011, as the time that you began your representation?

22    A    Correct.

23    Q    And again, I do want to be careful.  Let me --

24  Let me admonish you that we're in an obviously awkward

25  position in that I'm asking you questions that tie to

13

1   your representation.   So I'm going to sometimes be very

2   careful to avoid even the appearance that I'm asking you

3   for privileged matter.

4        A    Thank you.

5        Q    I'm sure that Mr. Blut will object because his

6   view of the line might be different than mine.   But I

7   might belabor my questions sometimes for that purpose.

8        A    I understand.

9        Q    So without -- without telling me any

10  communications you had regarding your representation, can

11  you tell me who it was that first approached you to

12  represent GGW Direct or Brands?

13       A    Mr. Francis....

14       Q    And again without any communications, can you

15  tell me who signed the engagement letter with you on

16  behalf of GGW Direct or GGW Brands?

17       A    I believe that was Mr. Francis.

18       Q    Can you tell me, is there any other person from

19  GGW Direct or GGW Brands that you have interacted with

20  for the purposes of the representation that you had from

21  October of 2011 until about four weeks ago?

22       A    Yes.

23       Q    Who are those people?

24       A    Well, there were any number of people.   There

25  was -- When I first started the engagement, there was a

1   CFO.  Her name was Sarah something.  I don't recall her

2   last name.  She was the CFO, and I dealt with her fairly

3   extensively.

4         And then around Christmas, she left and her

5   replacement I believe as CFO was Kevin Westberg.  I dealt

6   with him fairly extensively.  But there are --  You know,

7   I would be in meetings with people and there were other

8   people there, a lot of people who worked there and I

9   dealt with them.

10   Q    Okay.  When you were dealing with these people,

11   again without telling me the communications you had, was

12   your purpose to -- were these people supporting you in

13   doing the work you needed to do or were these people --

14   were you taking direction from these people?

15   A    That's a --  That's a tough question.  I mean,

16   we're sitting around a table having a discussion.  Am

17   I --

18         Say that again.

19   Q    Well, as a --  I'm going to give you just a

20   hypothetical that's unrelated to this case that just

21   might help clarify the purpose of the question.

22         So I might represent a corporate client and I

23   take direction from the -- the chief -- the general

24   counsel.  But in order to execute what the general

25   counsel has asked me to accomplish, I will have to speak

1               THE WITNESS:  For example, there are --

2               MR. BLUT:  -- let him ask.  If we both

3    missed the point, he'll reask it.

4    BY MR. LANGBERG:

5        Q    All right.  Without --  So --  So while I'm

6    certainly not going to ask you about what the substance

7    of communications were, maybe it would help if you gave

8    me some examples of subject matters --

9        A    Correct.

10       Q    -- which are not privileged.

11       A    Right.  There are --  There are --  There were

12   tax issues that resulted from prior litigation.  Okay?

13   And in order --

14               MR. BLUT:  I think other than tax issues --

15               THE WITNESS:  Well, that's an example I can

16   think of.

17               MR. BLUT:  Okay.  I understand, but I

18   don't -- we don't want you to reveal what -- what they --

19   they were.  He can get the umbrella category.  That, he's

20   entitled to.

21               THE WITNESS:  Okay.

22               MR. BLUT:  But you can't tell him the

23   substance because that's the privileged information.

24   BY MR. LANGBERG:

25       Q    Was --  Was most of your work tax-related or

                                                          20

1  were there --

2      A    No.

3      Q    -- other business matters?

4      A    Most --  Only a minority of it was tax-related.

5      Q    Can you tell me some of the subject matters

6  of -- of what you would consider general business matters

7  that you assisted on?

8      A    Sure.

9      Q    Thank you.

10     A    One that comes to mind, I'm in a long meeting --

11     Q    Just the subject matter.

12          MR. BLUT:  He can only know about the

13  subject.  He's not entitled to know anything else.

14          THE WITNESS:  The subject matter was

15  required disclosure on a -- a website.

16  BY MR. LANGBERG:

17     Q    Was Mr. Francis involved in that meeting?

18     A    Yes.

19     Q    Can you give me another subject matter?

20     A    -- another subject matter other than -- other

21  than -- other than tax matters?

22     Q    Yes, sir.

23     A    -- and other than litigation?

24     Q    Yes, sir.  What you would consider your -- what

25  sounds like your primary role as kind of an outside

21

1   business legal advisor.

2      A    I assisted in the establishment of banking

3   relationships.

4      Q    And was Mr. Francis involved in -- in that

5   process?

6      A    Yes.

7      Q    Was he the final decision maker in that process?

8   Again, without communicating the substance, I'm going to

9   presume -- tell me if I'm wrong -- you would either make

10  recommendations that would be accepted or you would

11  follow somebody's instructions and execute them -- is

12  that correct? -- regarding the making of banking

13  relations.

14     A    I dealt with Joe Francis on -- on establishing

15  the bank accounts.  I mean --

16     Q    Okay.  Who picked which banks?

17     A    I made suggestions for the -- for the bank and

18  they were accepted.

19     Q    -- by Mr. Francis?

20     A    Yes.

21     Q    And this meeting regarding website disclosures,

22  from the business-person perspective, who was the final

23  decision maker to accept or reject your recommendations?

24     A    There were no recommendations.  It was a long

25  meeting with a -- with a room full of people kicking

1    around what needed to be disclosed.

2        Q    Too much.

3        A    Sorry.

4        Q    No, no.  I don't want to get anybody in trouble.

5    Well, only one person.

6             Who was leading that meeting, if anybody?

7        A    Nobody....

8        Q    Mr. Francis was actively involved?

9        A    Yeah.

10       Q    Okay.  So besides banking relationships --

11   establishing banking relationships and this meeting

12   regarding web disclosures, can you give me another

13   example of a business-attorney-related subject matter

14   that you were involved in?

15       A    -- that didn't involve taxes or litigation.

16   I'll probably think about 12 at 2:00 in the morning.

17       Q    We won't be here quite that late.

18       A    No.  I don't know why I'm drawing a blank.  Why

19   don't you go on and I'll think of more.

20       Q    Okay.  I'll come back after a break or something

21   to the same question.

22       A    Okay.

23       Q    And Mr. Blut will object that it's asked and

24   answered, but it's okay.

25             It -- What subject matters did you represent

1    A    Well, technic- --

2              MR. BLUT:  I'll just object.  I think that

3    calls for the substance of the representation by --

4    because by asking -- by saying he wasn't doing the

5    companies', I think you're asking him, What specific tax

6    things was he doing?

7              MR. LANGBERG:  Well, I'm not asking what the

8    specific taxes --  I just want to know, When he was

9    dealing with tax things, that were they Mr. Francis's tax

10   things or not?

11             THE WITNESS:  Well, as you said --

12             MR. LANGBERG:  Subject matter.

13             THE WITNESS:  As you said, they are

14   pass-through entities.  And so --

15             MR. LANGBERG:  Okay.

16             MR. BLUT:  But I guess just before you

17   indicate what was internally in that --  If there's a

18   determination, for example, of something as a business

19   expense, that's the specific -- that would be the

20   specific representation of the specific work that he's

21   doing.  And I think that's getting into attorney/client

22   or taxpayer privilege.  I --  I --

23             MR. LANGBERG:  I don't understand it, but

24   I'm going to move on.

25             MR. BLUT:  Okay.

1          MR. LANGBERG:  I don't need to understand.

2     Q    Would you -- Are you -- Are you the person

3 that would have the most knowledge regarding the

4 formation and setup of GGW Direct, LLC?

5     A    I don't know.  You're asking me, Is there

6 somebody else who might have knowledge superior to mine?

7 I don't know.

8     Q    Is there -- Is there anybody that you're aware

9 of that has knowledge superior to yours?

10    A    No.

11    Q    And with regard to GGW Brands, is there anybody

12 that has knowledge superior to yours about the formation

13 and setup of the company?

14    A    Not that I know of.

15    Q    And the knowledge that you have is knowledge

16 that you've accumulated after the fact.  Correct?  That

17 is, you weren't involved in the actual setups?

18    A    That is correct.

19    Q    When you were -- What does -- What does GGW

20 Direct do?

21    A    GGW Direct is an operating company.  It produces

22 videos.

23    Q    And what -- what does GGW Brands do?

24    A    GGW Brands is a holding company that owns

25 GGW Direct, GGW Events, and GGW Magazine.

26

1    Q    Does GGW Brands own any other companies?

2    A    Well, at one point it owned GGW Marketing.  But

3  I think it's essentially a defunct entity.  I don't think

4  it does any business.

5    Q    Any other companies that Brands owns?

6    A    Not that I recall.

7    Q    And when you say "owns," just to be -- to be

8  clear, Brands is an LLC.  Correct?

9    A    Correct.

10    Q    And Brands is the sole member of GGW Direct and

11  the other companies you say that it owns.  Correct?

12    A    That's correct.

13    Q    And it's also the sole manager of those

14  companies.  Correct?

15    A    No.  They have no managers there.  They're

16  member-managed companies.

17    Q    Oh, right.  Thank you.

18        And who --  Is GGW Brands also a member-managed

19  company?

20    A    It is.  Is --  GGW Brands is a member-managed

21  company.

22    Q    And how many -- how many -- how many members

23  manage it?

24    A    One.

25    Q    And who is the member manager of GGW Brands?

27.

1    A    It's a company that I established, Pablo

2  Holdings, LLC.

3    Q    And Pablo Holdings, LLC, is an LLC of some

4  country that I can never pronounce correctly.    What

5  country is that?

6    A    "Nevis."

7    Q    "Nevis."  Have you been?

8    A    No.

9    Q    And is that a member-managed company as well?

10    A    It is not.   It is a manager-managed company.

11    Q    Okay.   Who is the manager of Pablo?

12    A    Mr. Francis is....

13    Q    And who are the members of Pablo?

14    A    Who is the owner of --  Who is the member of

15  Pablo?  It is a trust.

16    Q    Do you happen to know the name of the trust?

17    A    It's the Ridgewood Global Trust.

18    Q    And --  Boy, now you're testing my gifts, wills,

19  and trusts right now.   The trust had a --  Well, what

20  country is the trust in?

21    A    Under what law is the trust established?

22    Q    Yes.

23    A    -- under the laws of the Cook Islands.

24    Q    I don't know how far gifts, wills, and trusts is

25  going to get me.

1          So we've got beneficiaries because there is a

2    trust.

3       A    Yes.

4       Q    Who are the beneficiaries of that trust?

5       A    I can tell you who the -- Going back to your

6    knowledge of wills and trusts, I can recall who was the

7    the settler of the trust.  I can recall who was the

8    trustee of the trust.  As I sit here, I don't recall who

9    the beneficiaries are.

10      Q    Who is the settler?

11      A    Mr. Francis....

12      Q    Who are the trustees?

13      A    There is only one trustee.

14      Q    Who is that?

15      A    It's a trust company in the Cook Islands, Asia

16   Trust Limited.

17      Q    But you don't remember who the beneficiary is?

18      A    Off the top of my head, no.

19      Q    Do you know if it's an entity, trust, or person?

20      A    I -- I -- I -- I mean, I would assume that

21   Mr. Francis is -- is at least one beneficiary of the

22   trust.

23      Q    Do you know what kind of trust it is?

24      A    Yes.

25      Q    What kind?

1    A    It's a grantor trust.

2         (Discussion held off the record.)

3  BY MR. LANGBERG:

4    Q    Has -- Does GGW Direct --  Sorry.

5         Do the various LLCs owned by GGW Brands make

6  distributions to GGW Brands?

7         Strike that.

8    A    No, no, no.  I --

9    Q    Yeah.  Don't strike that.  I want to make sure

10  that's the proper language for your world.  Right?

11   A    No, you -- you --  The answer is --  If your --

12  If your question is, Do they make a physical distribution

13  by handing somebody a check?  No, but the distribution is

14  made by -- by means of a book entry.

15   Q    Okay.  And then has Brands made distributions to

16  Pablo?

17   A    No.  Pablo was only created in October of 2011.

18   Q    Who was or were, depending, the managers and

19  members of Brands immediately prior to your creation of

20  Pablo?

21   A    Don't say "managers."  There were no managers.

22  Okay?

23   Q    Well, but I didn't know that --

24   A    Oh, okay.

25   Q    Right?

1    knew what the objective was.  And we had -- we had a goal

2    to fulfill.  We were having difficulties with these two

3    distributors and they needed to be ironed out.

4        Q    Was there ultimately a contract with these two

5    distributors?

6        A    I don't know.  I mean, I think that Aaron --  I

7    think I was counseling to Aaron, I think it's fair to

8    say; and I think he may have had more of the laboring oar

9    than I did.  I don't -- As I sit here, I don't know.

10       Q    So you don't know whether a documented was

11   executed?

12       A    I don't.

13       Q    Okay.  With regard to the fulfillment house

14   issue that you dealt with for a short period of time, was

15   that a -- was that bringing a fulfillment house in,

16   terminating a fulfillment house, or something different?

17       A    I have to tell you my -- my dealing with that

18   was so tangential I don't even remember.

19       Q    Okay.

20       A    It could have been, you know, one or two

21   telephone calls.

22       Q    Focusing back on this idea of acting as the

23   business attorney for the company and how you had

24   dealings with various people at the company, tell me

25   other subject matters that you dealt with Mr. Francis on.

1    A    Well, again, I -- I -- You know, it's

2  interesting.  You --  You bring up these areas and you

3  refresh my recollection.

4    Q    That's my job.  We can come back to it if you

5  don't remember.

6    A    Yeah.  As we go through this, I'll probably --

7  I'll probably think of -- of -- of more.

8    Q    I might even help.  You never know.

9    A    That would be good.

10    Q    As it relates to --  Going back to the

11  operational aspects of the companies, as it relates to

12  the hiring and firing of employees, are you the person

13  most knowledgeable about that process?

14    A    No.

15    Q    Have you been involved in the hiring or firing

16  of any employees at any of GGW Direct, Brands, Events,

17  Magazine?

18    A    No.

19    Q    Do you know who does hire and fire people?

20    A    I don't.

21    Q    Okay.  Have you ever heard about Joe hiring --

22  Sorry.  Have you ever heard about Mr. Francis hiring or

23  firing anybody at GGW Direct or Magazine or Brands or

24  Events?

25    A    Yes.

50

1      Q      What did you hear about?

2      A      I know that he hired Kevin Westberg.  And I know

3   that he terminated his predecessor.

4      Q      Okay.  And when you say --

5             MR. BLUT:  I'm just saying, How do you know

6   that?  Do you know that from a client communication?

7             THE WITNESS:  Oh, I'm sorry.  Yes.

8             MR. LANGBERG:  He's been --  Again, he's

9   been designated.

10            THE WITNESS:  That's --  Yes.

11            MR. LANGBERG:  Keep thinking about the

12   designations.  We'll come back to it.

13                  Make a list of the things we're

14   coming back to so I can come back to it as we talk about

15   it.

16            MR. BLUT:  Belated motion to strike subject

17   to further conversation on attorney/client privilege.

18   BY MR. LANGBERG:

19     Q      Have you ever observed Mr. Francis hire or fire

20   somebody?

21     A      No.

22     Q      As it relates to the marketing aspects of GGW

23   Brands, Direct, Magazine, or Events, are you involved

24   with that operational aspect of the companies?

25     A      Tangentially, yes.  Certainly, when you're

1  dealing with contractual relationships with two major

2  distributors, the answer is yes, I was.

3      Q    By the way, during your tenure as counsel, are

4  there any agreements that you've been involved with that

5  were executed by either GGW Brands, Direct, Magazine, or

6  Events?

7      A    Do you mean was I -- did I see any of those

8  entities execute an agreement?  Is that your --  Is that

9  your question?

10     Q    Yeah.  I don't literally mean that you actually

11  saw the person signing it; but yes, that you -- you were

12  around and maybe involved in the company entering into

13  agreements with anybody.

14     A    Well, as -- as I said, I'm not sure if they came

15  to a final resolution with those two distributors.  Aaron

16  would know that.  But I was involved in the negotiations.

17  I mean I was personally involved in the negotiations.

18     Q    Any others?

19     A    Well, yeah.  I'll think about it at 2:00 in the

20  morning.  I mean, I wouldn't have thought of those --

21  those two vendors -- those two distributors if you hadn't

22  reminded me.  Let me think about it.

23     Q    Okay.  While you're thinking about it, maybe

24  I'll ask a different question that might refresh your

25  recollection.

1   personal bills to be paid?

2       A     Not that I recall.

3               MR. LANGBERG:  Okay.  Shall we --  Perhaps

4   just --  If you don't want to, we don't have to.  But

5   perhaps we should take a 10-minute break because we've

6   been going for a while.

7               MR. BLUT:  Sure.  That's fine.

8               (A short break was taken.)

9               MR. LANGBERG:  All right.  Back on the

10  record whenever --

11              THE REPORTER:  Ready.

12              MR. LANGBERG:  Thanks.  Can you just read me

13  back whatever the last answer was?

14              THE REPORTER:  Sure.

15          (The reporter read the record as follows:

16          "A   Not that I recall.")

17              MR. LANGBERG:  Okay.  Can you read me the

18  question?

19          (The reporter read the record as follows:

20          "Q   Have you ever arranged for Mr. Francis's

21          personal bills to be paid?")

22  BY MR. LANGBERG:

23      Q     Okay.  Going back to something you mentioned,

24  Mr. Klueger, I asked you if Brands had made any

25  distributions to Pablo and you said, "Not yet.  It was

1   just formed in October."  Is --  Is the timing of

2   distributions defined in  --  Well, strike that.  Is the

3   timing of distributions an annual basis?

4        A    It's not an easy question to answer.  Again, as

5   I said, if you -- if a distribution is defined by you as

6   somebody handing him a check, I doubt very much that that

7   would ever happen.  Okay?  It would be a book entry that

8   a distribution had been made for his account.

9        Q    Okay.  I --  Maybe I --  Either I'm confused or

10  I misspoke.  I understand that for distributions from

11  Direct, for example, to Brands it's a book entry.  From

12  Brands to its member Pablo, that would be a physical

13  transaction, wouldn't it?

14       A    No.  It doesn't need to be because, remember,

15  both Brands and Pablo are disregarded entities.

16  Ultimately, Mr. Francis has to pick up the income of

17  these entities, the net income whether they are

18  distributed to him or not.  So there certainly does not

19  have to be a -- and as I suspect would not be -- a

20  physical distribution to him.

21       Q    Forgive my ignorance in this business matter.

22  How --  In this entity or any entity, how does the

23  ultimate owner get access to the money if the company is

24  profitable and distributing?

25             MR. BLUT:  I'm just going to object.  I

1  don't think he's designated as an expert.   Maybe confine

2  it to this for me, please.

3              MR. LANGBERG:   Sure.

4              MR. BLUT:   I'm sure you can.

5  BY MR. LANGBERG:

6      Q    In this --   In this case, how does the ultimate

7  owner, which is the trust or the beneficiary of the trust

8  that owns Pablo which owns Brands which owns Direct,

9  access the money if it's a profitable endeavor?

10     A    I -- I -- I think I can answer that.   And again,

11 this is done by virtue of book entries that are -- that

12 are kept.   Okay?   The owner is designated as receiving a

13 notional salary.   Okay?

14              I used to know --   I think it's --   Oh, don't

15 hold me to this.   I think it's something like 40,000 a

16 month or 50,000 a month and so forth.   Okay?

17              As distributions are made for his benefit, there

18 is a ledger that is kept that says this -- this is --

19 this payment has been made, this payment has been made,

20 this payment has been made.   It's done fairly common in

21 the entertainment business.   Okay?   And at the end of the

22 year, you take that ledger -- the individual takes that

23 ledger and that's how he pays his taxes.   It is --

24 It's --   It's people in the entertainment business, they

25 have loan-out companies -- right? -- and the studio will

1   make payments for, you know, an individual that the

2   studio engages through their loan-out company.  And at

3   the end of the year, you get a statement from which you

4   pay your taxes.

5       Q    Yes, but -- Wow, Charlie Sheen --

6       A    That's a good example.

7       Q    But Charlie Sheen can access --  You know, his

8   loan-out company gets paid by the studio and then he can

9   access cash to go buy a car if he wants to.  Okay?  So

10  the question is, How in the chain of the owners and

11  sub-owners of GGW Direct and GGW Brands does the ultimate

12  owner get money?

13      A    Like I said, you used a good example of an

14  actor.  You know, Charlie Sheen, you know, if he -- if he

15  has a loan-out company --  I personally don't know if he

16  does; but if he has a loan-out company, you know, and the

17  studio will, you know --  If there's a plane ticket that

18  has to be purchased, you know, the studio purchased the

19  plane ticket, you know, put it on a ledger.  You know, at

20  the end of the quarter or at the end of the year, they'll

21  send a ledger to the loan-out company and the individual

22  will pick it up as income.  It's fairly common.

23      Q    And the same thing if -- Okay.  Got it.  So --

24  So the reconciliation, for lack of a better word, that --

25  Strike that.

1    A    No, that is -- that's a good word because that's

2  what's done.

3                MR. BLUT:  Let him ask.

4  BY MR. LANGBERG:

5    Q    Well, there's -- there's --  First, you used a

6  term that I wasn't familiar with.  You didn't say

7  "nominal income."  You said...?

8    A    -- the notional income.

9    Q    "Notional."  What's "notional"?

10   A    Well, I believe that -- that Mr. Francis has a

11 salary -- is salaried by GGW Brands.  Okay?  Let's say

12 it's --  I don't recall.  I think it's either 40,000 or

13 50,000 a month.  Okay?

14         So let's assume it is 40,000 a month.  Okay?

15 During --  Let us assume that during the year --  Let's

16 assume it's 40,000 a month or 480,000 a year.  Okay?  If

17 the company makes payments of $479,000 during the year

18 for his benefit, they will owe him a thousand dollars at

19 the end of the year.  If they make payments for his

20 benefit of $481,000, he will owe the company a thousand

21 dollars at the end of the year.

22         Obviously, they're not going to dun him for the

23 thousand dollars; they'll carry it over to the next

24 reporting period.  It's done by a ledger that the company

25 keeps on his behalf.

1     Q    Now, if they owe $50,000 at the end of the year,

2  how do they reconcile that or pay it?

3     A    Well, again, I -- I -- I'm assuming that they

4  would simply carry it over for the next year.  They're

5  not going to dun him for it.

6     Q    No, if they owed him $50,000 at the end of the

7  year...?  So if --

8     A    If the company --  If the company owed him

9  $50,000 a year, would he demand that they send him a

10  check?  I don't think so, as a practical matter.

11     Q    Okay.  I got it.  Okay.  All right.

12          Do you know what Mantra Films is?

13          MR. BLUT:  -- other than what he already

14  said?

15          MR. LANGBERG:  I'm sorry.  I don't --  I

16  honestly don't remember that we discussed Mantra Films.

17  I apologize.

18          THE WITNESS:  I do have a -- some knowledge

19  of Mantra Films.

20  BY MR. LANGBERG:

21     Q    Oh, I do remember.  By the time you came around,

22  it was already a nonoperating entity.  Correct?

23     A    I believe that's true, yes.

24     Q    Do you know what its status is with the State of

25  California?

1     Q     Right.

2     A     No.

3           MR. BLUT:   No guessing.

4  BY MR. LANGBERG:

5     Q     By the time that you came on the scene --  Well,

6  strike that.

7           I'm trying to save some pain for you because I

8  can just ask them perhaps.  Do you know who somebody

9  named Regina Jones is?

10    A     Regina Jones, is she somebody who works at

11 Boulevard Management?

12    Q     She does.  That's my understanding.  Do you know

13 of her?

14    A     She's someone who works at Boulevard Management.

15    Q     Do you know what relationship she had with GGW

16 Brands or its subsidiaries, if any?

17    A     No.

18    Q     There is a house that Mr. Francis lives in

19 located on 1111 -- that is, 11-11 -- Bel Air Place.  You

20 knew that.  Correct?

21    A     Correct.

22    Q     Do you know who owns that house?

23    A     I do.

24    Q     Who owns that house?

25    A     Blue Horse Trading, LLC.

1    Q    And how did you come to that understanding?

2    A    When I was initially engaged, they sent over a

3 file of the incorporation, the organizational documents

4 of Blue Horse Trading, and I read them.

5    Q    Do you know who the members and/or managers of

6 Blue Horse Trading are?

7    A    Mr. Francis....

8    Q    And do you know what Blue Horse Trading is or

9 does?

10    A    Yes.  It holds his personal assets.

11    Q    Does it hold assets other than the 1111 Bel Air

12 Place home?

13    A    Well, if he had --  I -- I --  As I recall from

14 that file, I believe it owns his securities.  You know,

15 if you have a brokerage account like if you have an

16 ETrade account or whatever it's in its name.

17    Q    Do you know how --  From your review of the

18 files, do you know how those assets got to Blue Horse

19 Trading?

20    A    No.

21    No, wait.  I take it back.  I do.  I do.

22    Q    Oh, okay.

23    A    With respect to the house, I -- I recall seeing

24 the -- that Blue Horse Trading acquired the house.

25    Q    Did you notice from the file that there had been

1   a transfer of the house from Blue Horse Trading to

2   Mr. Francis and then back again at some point?

3       A    No.

4       Q    Do you know anything about Mr. Francis taking --

5   Strike that.  Yes.  I'm sorry.

6           Do you know anything about Mr. Francis taking

7   out a mortgage in his own name on the house on Bel Air

8   Place?

9       A    I'm aware that there is a mortgage, a deed of

10  trust on -- on -- on the residence.

11      Q    Okay.  Do you understand that the deed of trust

12  is --

13          Hang on.  I've got to think of the names, the

14  mortgagee?

15      A    No, the mortgagor.

16      Q    "Mortgagor."  Do you understand the mortgagee is

17  currently Chase Bank?

18      A    Oh, yeah.  The lender is the mortgagee, Chase

19  Bank.

20      Q    And the mortgagor is Joe Francis?

21      A    I'm not surprised because most banks will not

22  lend to a limited liability company, which would explain

23  why he took it out of the limited liability company in

24  order to close the loan and then put it back.

25               MR. BLUT:  If he did, although you haven't

                                                            92

REPORTER'S CERTIFICATE

I, SUSAN ANN GRAHAM, CSR No. 4885, RPR, a
Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken
before me at the time and place therein set forth, at
which time the witness was put under oath by me;

That the testimony of the witness, the
questions propounded, and all objections and
statements made at the time of the examination were
recorded stenographically by me and were thereafter
transcribed;

That the foregoing is a true and correct
transcript of my shorthand notes so taken.

I further certify that I am not a relative
or employee of any attorney of the parties, nor
financially interested in the action.

I declare under penalty of perjury under
the laws of California that the foregoing is true and
correct.

Dated this 25th day of June _____, 2012.


_____
SUSAN ANN GRAHAM, CSR No. 4885, RPR

1    REPORTER'S CERTIFICATE OF CERTIFIED COPY

2

3

4

5        I, SUSAN GRAHAM, CSR No. 4885, RPR, a

6   Certified Shorthand Reporter in the State of

7   California, certify that the foregoing pages, _1_

8   through ____, constitute a true and correct copy of

9   the original deposition of *Robert F. Klueger, Esq.*, taken on

10  _June 22_, 2012.

11        I declare under penalty of perjury under

12  the laws of California that the foregoing is true and

13  correct.

14

15        Dated this _25th_ day of _June_, 2012.

16

17

18       _Susan Ann Graham_
          SUSAN ANN GRAHAM, CSR No. 4885, RPR

19

20

21

22

23

24

25

# **EXHIBIT B**

Deposition of Robert Klueger                                    Wynn vs. Francis

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                     COUNTY OF LOS ANGELES

 3

 4     STEPHEN A. WYNN,                  )
                                         )
 5                    Plaintiff,         )
                                         )
 6     vs.                               )     No. BC438884
                                         )
 7     JOSEPH RAYMOND FRANCIS, an        )
       individual,                       )
 8                                       )
                      Defendant.         )
 9     _____)

10

11

12

13

14        VIDEOTAPED DEPOSITION OF ROBERT KLUEGER

15                 Encino, California

16            Tuesday, August 28, 2012

17

18

19

20

21

22     REPORTED BY:
       MICHELLE M. CADWELL
23     CSR NO. 11261
       JOB NO. 585450

24

25
```

1              VIDEOTAPED DEPOSITION OF ROBERT KLUEGER, taken

2      by plaintiff at 16000 Ventura Boulevard, Suite 1000,

3      Encino, California, on Tuesday, the 28th day of August

4      2012, at 10:38 a.m., before MICHELLE M. CADWELL, Certified

5      Shorthand Reporter for the State of California.

6                              * * *

7      APPEARANCES:

8      FOR PLAINTIFF:

9              BROWNSTEIN HYATT FARBER & SCHRECK
               BY MITCHELL J. LANGBERG, ESQ.
10                ANDREW KONG, ESQ.
               2029 Century Park East, Suite 2100
11             Los Angeles, California 90067
               (310) 500-4600
12

13     FOR DEFENDANT:

14             THE AFTERGOOD LAW FIRM
               BY AARON AFTERGOOD, ESQ.
15             1875 Century Park East, Suite 2230
               Los Angeles, California 90067
16             (310) 551-5221

17

       ALSO PRESENT:
18
               Chuck Perry, Videographer
19

20

21

22

23

24

25

```
1                        I N D E X

2      Witness:   Robert Klueger

3

4      EXAMINATION:                                      PAGE

5      By Mr. Langberg                                      5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   shorter proceeding than last time.  What I intend to do

2   is ask you questions.  Generally, a lot of them will be

3   the same as the prior proceeding; it's just we need to

4   preserve the record here.  Some of it will be to refresh

5   your recollection or my recollection on issues.

6          And then I'll come back and kind of go over

7   them in a way that is consistent with testimony that

8   might be presented to a jury.  I think that's going to

9   be the way to get us out of here the quickest.

10         Do you understand?

11     A    Okay.

12     Q    All right.  Do you understand that Mr. Francis

13  is -- well, strike that.

14         Your representation of GGW entities ended

15  earlier this year; correct?

16     A    It did.

17     Q    All right.  Do you recall approximately what

18  month?

19     A    I believe approximately May of this year.

20     Q    Okay.  And based on your relationship with

21  those entities and Mr. Francis, do you know whether

22  Mr. Francis was compensated by either GGW Direct or GGW

23  Brands?

24     A    In what period of time?

25     Q    At any time.

1          A    He was.

2          Q    Okay.  And how was he compensated by either of

3    those entities?

4          A    The usual procedure was that one or more of

5    the entities would pay his expenses.  He would run up

6    credit card bills, and the entities would directly pay

7    his credit card bills or other similar personal

8    expenses.  He would run up the bills.  The entities

9    would pay it.  And at the end of the year, they would

10   add it up.  And the extent to which they had paid his

11   expenses, that would constitute compensation to him, and

12   he would pay taxes based on his compensation.

13         Q    Okay.  You said "the usual way."  Were there

14   other ways that they compensated him?

15         A    Not that I'm aware of.

16         Q    Okay.  Which entities that you know of paid

17   Mr. Francis compensation in that manner?

18         A    I can't -- I can't say that I know.  I believe

19   it's GGW Direct, but don't hold me to that.

20         Q    Okay.  Do you remember recently signing a

21   declaration for use in some injunction proceedings in

22   Nevada?

23         A    Yes.

24         Q    And at the time that you signed that

25   declaration, did you believe that the contents were

1    true?

2        A    Of course.

3        Q    Did -- was that declaration prepared for you

4    and then you reviewed it to determine if it was

5    accurate, or did you prepare it yourself?

6        A    It's the former.

7        Q    Somebody else prepared it and you reviewed it?

8        A    Yes.

9        Q    And when it was prepared for you and you first

10   reviewed it, did you have to make some changes to it at

11   all?

12       A    I believe I did, yes.

13       Q    Do you recall the nature of the changes that

14   you made?

15       A    No.

16       Q    Okay.  If I showed you the document that

17   ultimately was filed, would you be able to identify

18   which areas of inquiry or testimony were changed?

19       A    No.

20       Q    Was information provided to you for you to

21   become knowledgeable so that you could sign the

22   declaration?

23       A    You mean did I have to look at documents in

24   order to sign the declaration?

25       Q    That's a better question.  That it's not

1      A    Yes.

2      Q    And do you understand that to be a true fact?

3      A    I have no reason to contradict it.  I just --

4  it's whether he was compensated by GGW Brands or GGW

5  Direct is now outside of my recollection.  I just don't

6  recall.

7      Q    Okay.  Other than GGW Brands and/or GGW

8  Direct, are there any other entities that you know of

9  that pay Mr. Francis compensation?

10     A    No.

11     Q    And for clarity, the time period I mean is

12 ever.

13     A    The answer is no.

14     Q    Okay.  From your description today, do I

15 understand correctly that his compensation for the year

16 would typically be determined at the end of the year;

17 that is, this is how much expenses were paid and that

18 amounts to what his compensation is?

19     A    By the way, I need to go back.  I just

20 reminded myself of something in one of your previous

21 questions.

22          I believe -- I believe that the company also

23 paid his -- the home expenses, the home mortgage.  I'm

24 not certain of that, but I believe that to be true.  You

25 probably know this better than I do.  But I believe that

1    to be true.

2         Q    If I could testify to the jury on the subject,

3    then we would have an easier time with it.

4         A    Right.

5         Q    Your understanding is that either GGW Direct

6    or GGW Brands pays the mortgage directly?

7         A    I believe so.

8         Q    Okay.  And that would also be accounted for as

9    an expense?

10        A    As a form of compensation.

11        Q    Okay.

12        A    Right.

13        Q    So is the situation that at the end of the

14   year -- strike that.

15             At least as you understood it was set up, was

16   the situation that at the end of the year, as an

17   accounting matter, somebody would go back, look at what

18   expenses were paid over the course of the year, and that

19   would determine what the compensation for the year was

20   and what taxes would be paid on?

21        A    That's essentially correct.

22        Q    As opposed to it being a set amount?

23        A    It was -- it was represented to me that there

24   actually was an amount of compensation but that the

25   expenses that they paid exceeded that amount so the

1    amount became irrelevant.  His compensation was what

2    they paid.

3        Q    As far as you know, did those companies, for

4    lack of a better word -- I don't mean this in the most

5    artful form -- retain any earnings on an annual basis?

6        A    Well, it is an inartful way of putting it --

7        Q    Let me ask --

8        A    -- because I'm not so sure a limited liability

9    company can have retained earnings.

10       Q    So let me ask a better question --

11       A    Yeah.

12       Q    -- in the form of an LLC.

13            But let me -- for background -- and we'll

14   clean this up later.

15            But your representation began in October 2011?

16       A    Correct.

17       Q    Okay.  And these being LLCs, I'm presuming

18   they operated on a normal calendar year; correct?

19       A    They did.

20       Q    Fiscal calendar year?

21       A    They did.

22       Q    So you were involved in these companies

23   through closing calendar year 2011; correct?

24       A    I was involved in them through May of 2012.

25       Q    Right.  So at the time of the closing of

1  calendar 2011, the fiscal aspect of it, you were

2  involved in the companies, just by --

3       A    Yes.

4       Q    Okay.  As LLCs, GGW Direct and GGW Brands,

5  they distributed -- strike that.

6            At the end of 2011, did either of those

7  companies have any money to distribute to its members?

8       A    I don't know that, because those entities

9  would not have to file the tax returns -- or the tax

10 attributable to the earnings would not have to be

11 reported until Mr. Francis has to complete his personal

12 return on October 15th of 2012.

13      Q    You understood him to get an extension?

14      A    I'm pretty certain of that, yes.

15      Q    Okay.  But you were familiar with --

16 generally, with the books and records of GGW Direct and

17 Brands, the financial books and records; correct?

18      A    To a certain extent, yes.  Because I was

19 involved in the preparation of the returns that were due

20 October 15th, 2011.

21      Q    Okay.  Well, then let's go back to the ones

22 that were due on October of 2011, which pertained to

23 fiscal and calendar year 2010.

24      A    Right.

25      Q    Were there any monies that were distributed to

```
 1    members of GGW Direct?  Let's start with that -- well,

 2    let's back up.

 3              GGW Brands was the sole member of GGW Direct;

 4    correct?

 5         A    Correct.

 6         Q    Was any money distributed to GGW Brands in

 7    year 2010?

 8         A    I doubt it very much.

 9         Q    Okay.  Because your understanding was that

10    whatever money that there would have been to distribute

11    was paid to Mr. Francis in the form of compensation

12    which was offset by expenses; correct?

13         A    No, no.  The reason that they would not have

14    made a distribution is that Mr. Francis is subject to

15    the profits, the net profits, of the entities whether

16    they're distributed or not.  So there's no need to

17    distribute it.  I mean, if there is a net profit, it's

18    allocated to him and reported on his taxes.

19         Q    Okay.  Let's try this then.  Was there a net

20    profit for GGW Direct in calendar year 2010?

21         A    I don't recall.

22         Q    Okay.  Let me help.  To the extent that they

23    paid compensation, that would come out of income before

24    the determination and net profits; correct?

25         A    Of course.
```

1      Q    Okay.  So if the company had made a million

2   dollars but paid a million dollars in compensation,

3   there would be zero net profit?

4      A    Correct.

5      Q    So is your understanding that after all of

6   their expenses, GGW Direct distributed -- sorry, had

7   paid all of its income in the form of compensation to

8   Mr. Francis leaving it with zero net profit?

9      A    No, I understand the question.  I just don't

10  know the answer.

11     Q    I was just trying to remind you.

12     A    No, I don't know the answer --

13     Q    Okay.

14     A    -- whether on -- whether his personal taxes

15  would reveal an allocation of net income, I don't know.

16     Q    We're going to get to the corporate form,

17  because ultimately it wouldn't be Mr. Francis's personal

18  taxes that would reveal any net profits for GGW Direct;

19  correct?

20     A    Yes, it would.  It would be only his personal

21  taxes.

22     Q    Well, who's the member -- the sole member of

23  GGW Direct is GGW Brands; correct?

24     A    The sole member of GGW Direct is GGW Brands.

25     Q    The sole member of GGW Brands is a company

1   as business expenses or personal expenses?

2       A    I don't recall.

3       Q    Okay.  So this compensation that Mr. Francis

4   received from GGW Direct or GGW Brands, that was -- I

5   guess we could put together your testimony -- more than

6   40- or $50,000 a month, since you say expenses exceeded

7   what the designation was.

8            Do you know what he was being compensated for?

9       A    Do you mean what was his job title?

10      Q    I'm asking what -- do you know what the reason

11  these companies were compensating him?

12      A    You know, I forgot that title at the prior

13  deposition, and you reminded me of it, and I've

14  forgotten it now.

15      Q    Forget about titles for a minute.  Do you know

16  whether -- do you know what the purpose of him being

17  compensated was?  It could range anywhere from -- well,

18  "I don't know" could be one answer.  But it could range

19  anywhere from he was an employee providing services to

20  the company to it was the manner of distributing the

21  profits of the companies to somebody.

22      A    I -- I do not believe that his distributions

23  were distributions with respect to an ownership interest

24  in a limited liability company.  He was being paid

25  compensation for services.

1      Q    How -- in your review of the books and

2   records, how was his compensation tied to the services

3   that he performed?

4      A    Well, like I said, he would present the

5   company with personal expenses that he had incurred, and

6   the company would pay them.

7      Q    So as far as you know, basically he was

8   self-determining his compensation based on his spending?

9      A    I think that's a fair characterization, yes.

10     Q    And based on what you know, there wasn't any

11  determination of what he could spend based on, for

12  example, how many hours he worked that month?

13     A    There is -- there is no one who could have

14  vetoed an item of compensation.

15     Q    And there was nothing in the rules or any --

16  in the LLC documents or in any employment agreement, as

17  far as you know, or any other thing that bound him that

18  limited his spending based on the number of hours that

19  he worked in a given month; correct?

20     A    Well, remember this, I -- part of my duties

21  was to determine whether these expenses were deductible

22  and -- as business expenses, so -- because we were

23  serious about preparing an accurate tax return.  So to

24  that extent, there was a limitation on what was

25  deductible or not.

1      Q     Well, there was a limitation about what was

2    permitted to be deducted as a business expense versus a

3    personal expense --

4      A     Correct.

5      Q     -- that was compensation.

6            But there was no limit as to the amount of

7    personal expenses he could make except for the

8    wherewithal of the company; correct?

9      A     Correct.

10     Q     That is --

11     A     I understand -- I understand your point.

12     Q     I've got to make sure a jury does though.

13     A     Oh, okay.

14     Q     As long as he didn't spend more money than the

15   company had after he paid his other expenses, there was

16   really no limit to the expenses that Mr. Francis could

17   personally make and take as his compensation?

18     A     That's correct.  But remember, to a certain

19   extent, it's not relevant, because as the ultimate sole

20   owner, whether he is compensated as an employee or

21   compensated from the profits of the business is the same

22   income subject to the same level of tax.  It's

23   irrelevant.

24     Q     And are you speaking of 2010 or 2011 now?

25     A     It would have been true in both -- in both

1   years.

2        Q     Okay.  So basically -- this is what I was

3   asking you before.

4             At the end of the day, while he may be

5   providing services to the company as an employee or as a

6   creative consultant, the money that he was taking as

7   compensation was not tied to the nature and scope of the

8   services he was performing; correct?

9        A     The money that he could earn from the

10  operation of the business was not -- ultimately not tied

11  to the level of services that he performed.

12       Q     But it was tied instead to the successful

13  running of the business and its profitability?

14       A     Absolutely correct.

15       Q     And do you know anything about what the

16  profitability of GGW Direct or GGW Brands was in 2010 or

17  2011?

18       A     Well, I once did because I reviewed

19  the returns that were prepared and filed on

20  October 15th, 2011, but I don't now.

21       Q     To the best of your recollection, was the

22  profitability -- can you make some estimate of the

23  profitability even if it's tens of thousands, hundreds

24  of thousands, millions, tens of millions?

25       A     I can't.  Because, remember, when you prepare

1        A     Correct.

2        Q     Okay.  It's Mr. Francis who is related to the

3   Ridgewood Global Trust; correct?

4        A     Correct.

5        Q     And Ridgewood Global Trust is the ultimate

6   beneficiary of all these companies?

7        A     The ultimate owner.

8        Q     The ultimate owner of all these companies who,

9   if there was any income to distribute, would end up

10  going to the global trust, correct, Ridgewood Global

11  Trust?

12       A     Absolutely correct.

13       Q     Unless all of the income was taken out by way

14  of a compensation expense?

15       A     Which would have the same effect.

16       Q     As settlor, Mr. Francis would be responsible

17  for the income taxes that would have to be paid for the

18  membership interest that ultimately flowed to the

19  Ridgewood Global Trust?

20       A     Well, it gets a little complicated, but the

21  reason that all of the taxes are the responsibility of

22  the owner is because of how the trust is drafted.  It is

23  drafted to be what is called a grantor trust for income

24  tax purposes, which means that the settlor is

25  responsible for all of the income and the income tax,

1    whether it's distributed to him or not.

2        Q    And as far as you know, at least through the

3    time that you ended your representation, that the

4    Ridgewood Global Trust never received any money other

5    than its initial formation; correct?

6        A    Correct.

7        Q    All right.  Blue Horse Trading.  Let's turn to

8    Blue Horse Trading.

9            Did you do anything to change the membership

10   interest in Blue Horse Trading starting October of 2011?

11       A    I may have.  I -- but I really -- I really

12   don't recall.  You know, if you have the paperwork, you

13   know it better than I do.  But I really don't recall.

14       Q    Okay.  And Path Media, I understand that

15   you -- if I understand just what you said a few moments

16   ago, that's something that you created; correct?

17       A    Correct.

18       Q    So does Path Media LLC hold any membership

19   interest in other companies, as far as you know?

20       A    As far as I know, it does not. ...

21       Q    And who -- I'm sorry if you told me, and I

22   don't have it on my very detailed notes here.  Who owns

23   the membership interest of Path Media?

24       A    Ridgewood Global Trust.

25       Q    Okay.  Sole member; correct?

1        A     Sole member.

2        Q     And what is the function of Path Media LLC, to

3   your understanding?

4        A     It was created for the sole purpose of owning

5   rights to intellectual property, namely trademarks and

6   copyrights.

7        Q     Okay.  And these are the trademarks and

8   copyrights that relate to the GGW companies?

9        A     Yes.

10       Q     Any others?

11       A     As I recall, it owns some of the trademarks

12   related to the cosmetics.

13       Q     Okay.  The brand name that -- we're not sure

14   what it is, but the brand name that relates to the

15   cosmetics for the company that Mr. Francis indirectly

16   owns a portion of with the Kardashians?

17       A     Correct.

18       Q     Okay.  And prior -- strike that.

19             In addition to the formation of Path Media,

20   were you involved in the transfers of the intellectual

21   property?

22       A     I was.

23       Q     Okay.  And then for the benefit of somebody

24   that might be listening to this that doesn't get to do

25   this every day with us, a copyright or a trademark is

1       Q     Is he the manager at the time that you left

2    the representation?

3       A     I believe he -- I believe he was.

4       Q     So ultimately as the manager of Pablo Holding

5    LLC, which is the sole member who manages GGW Brands,

6    which is the sole member that manages the other GGW

7    entities, he's got control of those companies; correct?

8       A     In a manner of speaking, but remember,

9    ultimately, the owner of Pablo Holdings is the trust

10   which is controlled by the trustee of the trust, not

11   Mr. Francis.

12      Q     Well, then perhaps for those that are going to

13   be listening to this, you could briefly describe the

14   difference between a manager and a member of an LLC.

15      A     A manager -- a manager manages.  A member is

16   an owner with respect to LLCs.  Member is synonymous

17   with owner.  It is the equivalent of a shareholder of a

18   corporation.

19      Q     And the member of the Pablo Holding LLC, which

20   is the Ridgewood Global Trust, doesn't get to

21   participate in the management of the company; correct?

22      A     I'm sorry.  Say that again.

23      Q     Let's back up.  Did you -- did you prepare the

24   operating agreement for Pablo Holding LLC?

25      A     I did.

1      Q     And did you prepare a new operating agreement

2   for GGW Brands when you came on, an amended operating

3   agreement?

4      A     Possibly I did.

5      Q     Okay.  The operating agreement for Pablo

6   Holding LLC identifies the powers and responsibilities

7   of the managers and the members; correct?

8      A     Of the managers, yes.

9      Q     Okay.  The members do not manage the company;

10  correct?

11     A     Which company?

12     Q     Pablo Holdings LLC.

13     A     Members -- the members do not manage, correct.

14  The members could terminate a manager.

15     Q     Okay.  So the members of Pablo -- the member

16  of Pablo Holding, being Ridgewood Global, has the power

17  to terminate the manager?

18     A     Correct.

19     Q     And that would be done through the trustee?

20     A     Absolutely correct.

21     Q     Okay.  Until that's done, the manager of Pablo

22  Holdings is the ultimate manager of GGW Brands and

23  thereby Magazine, Direct, Events, and Marketing, if it's

24  still operating?

25     A     I think that's a fair characterization, yes.

1       MR. LANGBERG:  Okay.  I have no further questions.

2       MR. AFTERGOOD:  None from my end.

3       THE WITNESS:  Not on my end.

4       MR. LANGBERG:  This is your deposition.  You do

5  have the right to -- even though its most likely use is

6  at trial, you have the right to review the deposition

7  and make any changes, et cetera.  But trial is set to

8  start one day from today -- tomorrow.

9       A    That would be tomorrow.

10      MR. LANGBERG:  The witness testimony probably won't

11 start until Friday or possibly even Tuesday.

12           And I think, Aaron, it's fair to say, it would

13 be several days thereafter that this testimony would be

14 relevant if it becomes relevant?

15      MR. AFTERGOOD:  Correct.

16      MR. LANGBERG:  So if I get you a very expedited

17 transcript, do you think you'd be able to review and

18 make any changes to it in, say, three days?

19      THE WITNESS:  Yes.

20      MR. LANGBERG:  Okay.  I will order -- I'll order a

21 transcript very expedited.  We'll do that off the

22 record.

23           So with that, I propose the following

24 stipulation --

25

Deposition of Robert Klueger                                                    Wynn vs. Francis

```
 1
 2
 3                    *      *      *
 4          I declare under penalty of perjury under the
 5   laws of the State of California that the foregoing is
 6   true and correct.
 7          Executed this  30   day of  August      ,
 8   2012, at  Los Angeles       , California.
 9
10
11                              _____
12                              Robert Klueger
13
14
15
16
17
18
19
20
21
22
23
24
25
```

M&C Corporation (Sousa Court Reporters)                                   Page: 79

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

\*   \*   \*   \*   \*

I, MICHELLE M. CADWELL, CERTIFIED SHORTHAND REPORTER, IN AND
FOR THE STATE OF CALIFORNIA, CERTIFICATE NO. 11261, DO HEREBY CERTIFY:

THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME AT THE
TIME AND PLACE THEREIN SET FORTH, AT WHICH TIME THE WITNESS WAS DULY
ADMINISTERED AN OATH IN ACCORDANCE WITH THE CODE OF CIVIL PROCEDURE,
SECTION 2094; THAT THE TESTIMONY OF THE WITNESS AND PROCEEDINGS WERE
REPORTED STENOGRAPHICALLY BY ME AND WERE THEREAFTER TRANSCRIBED UNDER
MY DIRECTION; THAT THE FOREGOING IS A TRUE RECORD OF THE TESTIMONY AND
PROCEEDINGS TAKEN AT THAT TIME.

I FURTHER CERTIFY THAT I AM A DISINTERESTED PERSON AND AM IN
NO WAY INTERESTED IN THE OUTCOME OF SAID ACTION OR CONNECTED WITH OR
RELATED TO ANY OF THE PARTIES IN SAID ACTION OR TO THEIR RESPECTIVE
COUNSEL.

THE DISMANTLING, UNSEALING OR UNBINDING OF THE ORIGINAL
TRANSCRIPT WILL RENDER THE REPORTER'S CERTIFICATE NULL AND VOID.

IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON THIS

DATE:    AUG 30 2012

MICHELLE M. CADWELL, CSR 11261

# **EXHIBIT C**

```
 1                    DISTRICT COURT

 2                CLARK COUNTY, NEVADA

 3                     - - -

 4
    WYNN LAS VEGAS, LLC d/b/a WYNN      )
 5  LAS VEGAS, a Nevada limited        )
    liability company,                 )
 6                                     )
                        Plaintiff,     )
 7                                     )
           vs.                         )  Case No.
 8                                     )
    GGW DIRECT, LLC, a Delaware        )  A-12-660288-B
 9  limited liability company, et al., )
                                       )
10                      Defendants.    )
                                       )
11
    (Complete caption on next page.)
12

13

14

15          CONFIDENTIAL DEPOSITION OF

16             CHRISTOPHER DALE

17          LOS ANGELES, CALIFORNIA

18         WEDNESDAY, AUGUST 29, 2012

19

20

21  ATKINSON-BAKER, INC.
22  COURT REPORTERS
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  MARY FERGUSON, CSR NO. 8769

25  FILE NO:  A6080EE
```

```
 1                      DISTRICT COURT

 2                 CLARK COUNTY, NEVADA

 3                       - - -

 4
    WYNN LAS VEGAS, LLC d/b/a WYNN    )
 5  LAS VEGAS, a Nevada limited       )
    liability company,                )
 6                                    )
                        Plaintiff,    )
 7                                    )
           vs.                        )  Case No.
 8                                    )
    GGW DIRECT, LLC, a Delaware       )  A-12-660288-B
 9  limited liability company; GGW    )
    BRANDS, LLC, a Delaware limited   )
10  liability company; GGW EVENTS, LLC,)
    a Delaware limited liability      )
11  company; MANTRA FILMS, INC., a    )
    suspended Oklahoma corporation;   )
12  BLUE HORSE TRADING, LLC, a        )
    California limited liability      )
13  company; PEPE BUS, LLC, an inactive)
    Montana limited liability company; )
14  SANDS MEDIA, INC., a revoked Nevada)
    domestic corporation; JOSEPH R.   )
15  FRANCIS, an individual; DAVID R.  )
    HOUSTON, an individual; and       )
16  DAVID R. HOUSTON, LTD., a Nevada  )
    professional corporation, doing   )
17  business as THE LAW OFFICE OF     )
    DAVID R. HOUSTON,                 )
18                                    )
                        Defendants.   )
19                                    )

20

21  CONFIDENTIAL DEPOSITION of CHRISTOPHER DALE, taken on

22  behalf of Plaintiff, at 2029 Century Park East,

23  21st Floor, Los Angeles, California, commencing at

24  10:07 a.m., Wednesday, August 29, 2012, before Mary

25  Ferguson, CSR No. 8769.
```

Page 2

```
 1                        A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    BROWNSTEIN HYATT FARBER SCHRECK, LLP
      BY:   MITCHELL J. LANGBERG, ESQUIRE
 5          ANDREW KONG, ESQUIRE
      100 North City Parkway
 6    Suite 1600
      Las Vegas, Nevada  89106
 7    (702) 382-2101

 8

 9    FOR DEFENDANTS GGW DIRECT, LLC; GGW BRANDS, LLC; GGW
      EVENTS, LLC; BLUE HORSE TRADING, LLC:
10
      ECOFF BLUT, LLP
11    BY:  ELLIOT S. BLUT, ESQUIRE
      300 South Fourth Street
12    Suite 701
      Las Vegas, Nevada  89101
13    (702) 384-1050

14

15    FOR DEFENDANT JOSEPH R. FRANCIS (Present
      telephonically):
16
      PARKER SCHEER, LLP
17    BY:  JACOB LEAVITT, ESQUIRE
      9555 South Eastern Avenue
18    Suite 210
      Las Vegas, Nevada  89123
19    (702) 383-2864

20

21

22

23

24

25
```

Page 3

```
 1                        I N D E X

 2
    WITNESS:    CHRISTOPHER DALE
 3
    EXAMINATION                                    PAGE
 4
          BY MR. LANGBERG                            5
 5

 6

 7  EXHIBITS
                        PLAINTIFF'S
 8  NUMBER       DESCRIPTION                        PAGE

 9  1       Declaration of Chris Dale, 2 page       30

10  2       Signature page of a declaration, 1
            page                                    40
11
12  3       Various e-mail chains, 7 pages          46

    4       Privilege log provided by Brian
13          Rayment, 6 pages                        69

14  5       Declaration of Christopher Dale
            re arbitration agreement, 1 page        85
15
    6       Statement of Information for Perfect
16          Science Labs filed December 12, 2011,
            1 page                                  87
17
    7       Printout of a job posting on website
18          entertainmentcareers.net by GGW Brands
            for Controller/CFO, 8/1/12, 2 pages     99
19

20

21  QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:

22                       (NONE)

23

24  INFORMATION TO BE SUPPLIED:

25                       (NONE)
```

1      Q.   And she literally walked off the job, no notice

2   or anything, correct?

3      A.   Correct.

4      Q.   And it was close in time, to your

5   understanding, with a dispute that she had or an

6   argument that she had with Mr. Francis, right?

7      A.   Yes.

8      Q.   How did you learn about this dispute or

9   argument?

10      A.   I don't remember.  I might have been present,

11   even.  I don't remember.

12      Q.   And your recollection is that it was a

13   disagreement or dispute that was conducted in a

14   professional tone and tenor, or it was a loud, arguing

15   fight?

16      A.   Between those; I wouldn't say one or the

17   other.

18      Q.   How would you characterize it?

19      A.   A lively discussion.

20      Q.   Do you know the subject matter of the dispute?

21      A.   I don't remember.

22      Q.   Mr. Francis didn't fire her?

23      A.   No, not that I recall.

24      Q.   Mr. Francis didn't threaten to fire her?

25      A.   He may have.

1     Q.   When you say "he may have," is that that you

2   are speculating or you have some general recollection

3   that he said something of that nature?

4     A.   I believe he said something of that nature.

5     Q.   What do you recall him saying?

6     A.   I don't remember.

7     Q.   Could he fire her?

8     A.   Depends, I guess, on how you define "fire."

9          I would eventually probably have been the one

10  to provide her a final check and those type of things.

11    Q.   Could Mr. Francis have directed you to

12  terminate her employment?

13    A.   Yes.

14    Q.   Could Mr. Francis direct you to fire

15  Mr. Westburg?

16    A.   Yes.

17    Q.   Could Mr. Francis direct you to fire anybody he

18  wanted to at GGW Direct?

19    A.   Yes.

20    Q.   What do you base that on?

21    A.   You are asking me if it's possible, so I think

22  it's possible.

23    Q.   Your understanding is that he has the power and

24  authority to direct you to fire people at the company,

25  correct?

1     A.    Yes.

2     Q.    Other than you and Mr. Francis, does anybody

3  else have the authority to fire somebody at the

4  company?

5     A.    No.

6     Q.    Have you ever seen Mr. Francis fire anybody?

7     A.    I don't recall.

8     Q.    Have you ever been instructed by Mr. Francis to

9  terminate somebody?

10    A.    I can't remember an example.

11    Q.    Have you ever been instructed by Mr. Francis to

12 hire somebody?

13    A.    No.

14    Q.    Do you know about Mr. Francis ever firing or

15 terminating somebody or instructing somebody to fire or

16 terminate somebody?

17    A.    No.

18    Q.    Either at Mantra or GGW, there was a person

19 that served as general counsel at one time named Dennis

20 Russell.

21        Do you recall that?

22    A.    I have heard his name.

23    Q.    Were you employed at the time he was?

24    A.    No.

25    Q.    There was another person that served as

1    A.    Yes.

2    Q.    And are there people that work at GGW that are

3    independent contractors?

4    A.    Yes.

5    Q.    Do you maintain files for them?

6    A.    Yes.

7    Q.    To the extent that there are employment

8    agreements with employees or independent contractors, do

9    you maintain those?

10    A.    Yes.

11    Q.    But there's nothing that you have for

12    Mr. Francis?

13    A.    Correct.

14    Q.    I think that Mr. Francis has testified that he

15    has an employment agreement that includes indemnity

16    provisions in it.

17        If that's true, it's nothing you have ever

18    seen, correct?

19    A.    Correct.

20    Q.    Maybe I am making a mistake about what he

21    testified about, but you have never seen an agreement

22    between Mr. Francis and any GGW entity that has any

23    indemnity provisions in it?

24    A.    Correct.

25    Q.    Is Mr. Francis compensated by any of the GGW

1  entities?

2       A.   I don't know.

3       Q.   With the exception of Mr. Francis, any other --

4  any employee or independent contractor that provides

5  services to the companies, you are responsible for their

6  compensation ultimately, correct?

7       A.   Correct.

8       Q.   I don't mean paying it out of your pocket, but

9  the logistics and bureaucracy of it, correct?

10      A.   Correct.

11      Q.   At tax time, are you responsible -- not

12  necessarily for preparing, but logistically getting

13  whatever tax-reporting documents there are to the

14  employees and the independent contractors?

15      A.   Yes.

16      Q.   So employees get W-2s?

17      A.   Sounds right, yeah.

18      Q.   And independent contractors get 1099s?

19      A.   Correct.

20      Q.   As far as you know, have the companies issued

21  either of those to Mr. Francis?

22      A.   Which companies?

23      Q.   The GGW entities.

24      A.   I believe he received a W-2 from GGW Direct,

25  and I believe I have seen a W-2 at one time from Mantra

1    Films.

2        Q.   Do you know what year he got this W-2 from GGW

3    Direct?

4        A.   2011 or for the 2011 tax year.

5        Q.   Based on your experience, a W-2 typically goes

6    along with having a traditional employee/employer

7    relationship, doesn't it?

8            MR. BLUT:  Object to the extent it calls for a

9    legal opinion.

10   BY MR. LANGBERG:

11       Q.   I am asking based on your experience in Human

12   Resources.

13           MR. BLUT:  Same objection.

14           You can answer, if you understand it.

15           THE WITNESS:  Yes, yes.

16   BY MR. LANGBERG:

17       Q.   When you saw the GGW for Mr. Francis from GGW

18   Direct, you said --

19       A.   I believe it was Direct.  It could have been

20   Brands.  I don't remember.  I think it was Direct.

21       Q.   When you saw the W-2 from a GGW entity for

22   Mr. Francis for tax year 2011, did it strike you as odd,

23   knowing that he was not an employee?

24           MR. BLUT:  Object, it may call -- calls for

25   speculation.  Might be --

1           You can answer, if you understand it.

2           THE WITNESS:  No.

3    BY MR. LANGBERG:

4       Q.   Have you ever, ever before seen a W-2 from a

5    company that you worked for, for somebody who is not an

6    employee of the company?

7       A.   I don't think before this role, I have not

8    handled W-2s and 1099s, so no.

9       Q.   Have you ever seen a W-2 for any GGW entity

10   that went to somebody who was not an employee?

11      A.   No.

12      Q.   Why did you have this W-2 or why did you see

13   it?

14      A.   ADP sent it, sends all the tax records for

15   employees and independent contractors to me, to my

16   attention.

17      Q.   Did you see it just in a sealed envelope or did

18   you actually see the W-2, itself?

19      A.   Sealed envelope.

20      Q.   So you don't know what the numbers were on it?

21      A.   No.

22      Q.   You never saw them, let alone don't remember

23   what they are?

24      A.   Correct.

25      Q.   How do you know it was a W-2?

1        Q.    So you don't know if Mr. Francis has any direct

2    or indirect interest in either of these companies?

3        A.    No.

4        Q.    I want to be clear.

5              The reason that you prepared this is because a

6    lawyer asked you to -- who you understood worked for GGW

7    entities asked you to do it?

8        A.    Correct.

9        Q.    At the time that you signed it, you didn't

10   know whether University of Dermatology and Tower Lane

11   Productions had any interest in the company or not,

12   correct?

13       A.    Correct.

14       Q.    Do you understand that you have signing

15   authority on any bank accounts for any of the GGW

16   entities?

17       A.    No.

18       Q.    Did you know that there was something called a

19   unanimous written consent of member for GGW Events,

20   LLC, that identified you as a key executive of GGW

21   Events?

22       A.    No.

23       Q.    Did you know that there was a unanimous written

24   consent of member of GGW Events, LLC, that stated that

25   the company authorized you to have signing authority on

1     certain bank accounts?

2         A.    No.

3         Q.    Who signs the paychecks at GGW Brands?

4         A.    No one.

5         Q.    Do the paychecks bear a signature?

6         A.    Yes.

7         Q.    Whose signature do they bear?

8         A.    Joe Francis's.

9         Q.    How is that accomplished?

10        A.    I think it was an electronic imprint given at

11   one time to ADP.

12        Q.    So ADP causes the signatures to be on it?

13        A.    Right, right.

14        Q.    Do you know about checks to vendors and

15   suppliers and such; do you know who signs those?

16        A.    No.

17        Q.    Are you aware of any kind of signature stamp

18   bearing Mr. Francis's signature?

19        A.    I have heard that there is a stamp, yeah.

20        Q.    What have you heard about that?

21        A.    I just know that a stamp exists or heard that

22   a stamp exists.

23        Q.    Have you heard that he carries it around in a

24   bag with him?

25        A.    No.

1        Q.    Do you know who possesses that stamp?

2        A.    No.

3        Q.    Are you a key -- have you ever heard that you

4   were a key executive for GGW Direct, LLC, that term,

5   "key executive"?

6        A.    No.

7        Q.    Do you know anything about having signature

8   authority on certain bank accounts for GGW Direct?

9        A.    No.

10       Q.    As far as you know, you have no signature

11  authority?

12       A.    Correct.

13       Q.    If you have such authority, nobody ever told

14  you?

15       A.    Right.

16       Q.    Now, in your capacity as legal manager and the

17  HR manager for GGW Direct, were you ever served with

18  wage garnishments pertaining to Mr. Francis?

19       A.    Yes.

20       Q.    On how many occasions have you received wage

21  garnishments pertaining to Mr. Francis for GGW Direct?

22       A.    Twice, maybe.

23       Q.    Do you know who were the plaintiffs or

24  judgment creditors that served those wage garnishments?

25       A.    No, I don't remember.

REPORTER'S CERTIFICATE

I, MARY FERGUSON, CSR No. 8769, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this _10th_ day of _September_, 2012.


MARY FERGUSON, RPR
C.S.R. No. 8769

# **EXHIBIT D**

1

BRIAN RAYMENT, 6-19-12

```
 1        IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
                   STATE OF OKLAHOMA
 2

 3

 4   WYNN LAS VEGAS, LLC, d/b/a   )
     WYNN LAS VEGAS,              )
 5                               )
                  Plaintiff,     )
 6                               )
     vs.                         ) No. CV 2012-00021
 7                               )
     JOSEPH FRANCIS,             )
 8                               )
                  Defendant.     )
 9

10

11

12   - - - - - - - - - - - - - - - - - - - - - - - -

13

14

15        DEPOSITION OF BRIAN RAYMENT, produced as a

16   witness on behalf of the Plaintiff in the above

17   styled and numbered cause, taken on the 19th day of

18   June, 2012, in the City of Tulsa, County of Tulsa,

19   State of Oklahoma, before me, Karla E. Barrow, a

20   Certified Shorthand Reporter, duly certified under

21   and by virtue of the laws of the State of Oklahoma.

22

23

24

25
```

2

BRIAN RAYMENT, 6-19-12

```
 1            A P P E A R A N C E S

 2

 3

 4   FOR THE PLAINTIFF:        MS. RACHEL C. MATHIS
                               Attorney at Law
 5                             320 South Boston
                               Suite 200
 6                             Tulsa, Oklahoma 74103
                                     and
 7                             MR. FRANK HAGEDORN
                               Attorney at Law
 8                             1323 East 71st Street
                               Suite 100
 9                             Tulsa, OK 74136

10   FOR THE DEFENDANT:        MR. JOHN W. ANDERSON, JR.
                               Attorney at Law
11                             4444 East 66th Street
                               Suite 102
12                             Tulsa, OK 74136

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 13

1    the course of his representation, it's protected by

2    the attorney-client privilege.

3             MS. MATHIS:  Are we just going to have to

4    stop the deposition now and ask the judge to have

5    it --                                                   10:22

6             MR. ANDERSON:  You tell me.  You start

7    asking questions that don't invade privilege --

8             MS. MATHIS:  How does this invade

9    privilege?

10            MR. ANDERSON:  You're asking him for          10:22

11   information he learned while he was in the course of

12   representation.

13            MS. MATHIS:  Let's just -- we'll get back

14   to this then.  We're going to make it difficult.

15            MR. HAGEDORN:  Ask your question again.  I    10:22

16   want his response on the record.

17   A     Well, let me state this right now.  If there's

18   an objection for attorney-client privilege from Mr.

19   Francis's counsel, I'm not going to answer until the

20   court addresses that.                                  10:22

21            MR. HAGEDORN:  Is that on the record?

22            MS. MATHIS:  Yes.

23   A     I believe it is.

24            MS. MATHIS:  Yes, she just put that on the

25   record.                                                10:22

BRIAN RAYMENT, 6-19-12

1   A     I have been threatened by Mr. Francis and I'm

2   not going to expose myself to liability to him, so

3   I'm going to let the court resolve any objections of

4   that nature before I'm compelled to respond.

5           MS. MATHIS:  Certify the question.          10:23

6   Q     (By Ms. Mathis)  Your representation of Mr.

7   Francis, you indicated that he terminated that

8   relationship?

9   A     Yes.

10  Q     Why did he terminate that relationship?        10:23

11          MR. ANDERSON:  If you can answer that

12  question without invading privilege.

13  A     Mr. Francis made demands upon me to take

14  action with regard to a trust, which I refused to

15  take, and it terminated the relationship.            10:23

16  Q     (By Ms. Mathis)  The trust that we're

17  referring to, is that the Francis trust?

18  A     Indeed it is.

19  Q     And you were a protector of the Francis trust;

20  correct?                                             10:24

21  A     Correct.

22  Q     What other companies in which Mr. Francis had

23  an interest, I'm not saying what the interest was or

24  whatever, what other companies in which Mr. Francis

25  had an interest did you provide legal representation  10:24

15

BRIAN RAYMENT, 6-19-12

1  to Mr. Francis?

2  A     Sands Media, there was GGW Brands, GGW

3  Marketing, GGW Direct.

4  Q     Perfect Science Labs?

5  A     I covered Mantra already.  There was -- this        10:25

6  goes back a while now, there was a joint venture

7  between Mandalay, Mantra and Playboy, which

8  theoretically was a different entity, if you will.

9  Q     When was that?

10  A     That was back in the early 2000s.                   10:25

11  Q     Perfect Science Labs?

12  A     I did provide services for Perfect Science

13  Labs, and I'd have to go back and look at the

14  documentation because I know there are other

15  entities involved there, but I'd have to look at it       10:26

16  to see.

17  Q     What is GGW KYC, do you know what that is?

18  A     Don't know what that one is.

19  Q     GGW Events?

20  A     I do recall GGW Events, but I don't recall it       10:26

21  being an entity that did a lot, and I don't recall

22  doing a whole lot for it or anything for it,

23  frankly.  There may be some things, but I just don't

24  recall.

25  Q     PSL Nutritionals, is that the same thing as         10:26

BRIAN RAYMENT, 6-19-12

Page 16

1    Perfect Science Labs?

2    A      Yes.

3    Q      It just dawned on me that that was the same

4    abbreviation.

5    A      Yes.                                              10:27

6    Q      University of Dermatology?

7    A      Yes.

8    Q      Any others you can think of?

9    A      Not without looking at the documents.  Not off

10   the top of my head.                                     10:27

11   Q      Did you provide any legal services to him

12   individually outside of the corporations?

13   A      Yes.

14   Q      How about Pepe Bus?

15   A      I didn't provide any legal services for Pepe     10:27

16   Bus.

17   Q      I'm going to hand you a document that I'm

18   going to mark as --

19          MS. MATHIS:  Off the record.

20          (Whereupon, a discussion was held off the        10:28

21   record.)

22   Q      (By Ms. Mathis)  I'm going to give you your

23   own set of documents here, that will be easier, and

24   you may have to share or something because at the

25   time we had these copies made I didn't know you were    10:28

BRIAN RAYMENT, 6-19-12

Page 57

1    to or from an employee of a client, I put them on

2    the privilege log list, and the different lists are

3    based upon the different words that I searched to

4    come up with it.

5    Q    Tell me what words you searched.                        11:25

6    A    GGW, Mantra, Perfect Science, let's see if

7    there's anything else here, there may have been one

8    other and I may have done a general search on Joe

9    Francis also, and I don't recall -- I could get that

10   information for you by going back and looking at       11:26

11   what I used to compile my list, but I don't have

12   that off the top of my head.

13   Q    All right.  Were there times when you would be

14   performing work for one GGW entity when you were

15   actually representing another entity?  For instance,  11:27

16   you know, you've got the GGW Brands, you've got GGW

17   Direct, you've GGW Marketing.  Were there times when

18   those representations of one entity would actually

19   be work being performed for another entity?

20            MR. ANDERSON:  Object to the form.            11:27

21   A    From the billing standpoint?

22   Q    (By Ms. Mathis)  Yes, we can do it from the

23   billing standpoint if you want, to begin with.

24   A    From a billing standpoint, there were times

25   when the companies' work overlapped and I was         11:27

TULSA  FREELANCE  REPORTERS
918-587-2878

58

BRIAN RAYMENT, 6-19-12

1   billing one for work that may have been done for

2   another, or at least in part.

3   Q    Were there times that you were representing

4   both entities at the same time?

5   A    Well --                                          11:28

6   Q    In relation to a matter?

7   A    Yeah.  My position was somewhat as a general

8   counsel, outside general counsel position, so if a

9   question came up as to one entity or another, that

10  would dictate who I was dealing with.                 11:28

11  Q    And I understand that, but you might be

12  handling negotiations on behalf of more than one

13  entity at a time; is that correct?

14  A    Yes.

15  Q    I can tell you why I asked.  Your timekeeping   11:28

16  for the work that was performed for the GGW

17  companies or entities, did you keep track of it in

18  relation to the particular entity that you were

19  doing the work for or was there just a general log

20  or entry for just work for Joe Francis or work for   11:29

21  GGW?

22          MR. ANDERSON:  Object to the form.

23  A    That would depend on the time that you're

24  asking about.  Over roughly a 12, 13 year period it

25  changed.                                              11:29

BRIAN RAYMENT, 6-19-12

Page 59

1    Q      Okay.  How did it change?

2    A      Initially, there was primarily just Mantra on

3    the scene.  The GGW entities came into play later in

4    the game, as I said before, I don't remember

5    specifically when, but the grouping of those GGW          11:29

6    entities was something that was not distinguished by

7    me on the billing aspects of the matter.

8    Q      You didn't distinguish, you would just put

9    GGW?

10   A      Correct.                                           11:30

11   Q      Would there be a description in your time

12   entry as to the matter worked on?

13   A      Yes.

14   Q      How detailed are your descriptions?

15   A      More than some other people and less than some    11:30

16   others.  They're not highly, highly detailed.

17   Q      Would you be able to tell from your entry as

18   to which entity you were performing work for?

19   A      Sometimes the entry would reveal that.

20   Sometimes you'd have to go back to like the              11:30

21   individual e-mails or the documentation.

22   Q      A couple of different checks were produced.

23   There's another one in this stack here.  I'm going

24   to mark this as Exhibit No. 3.  We already talked

25   about the check that was written on Pepe Bus, LLC's      11:31

BRIAN RAYMENT, 6-19-12

Page 84

1    on behalf of both of these entities in relation to

2    his e-mails and negotiations or termination of

3    Moulton?

4            MR. ANDERSON:  And if you know that, if

5    you know that as a result of a communication with        12:18

6    your client.

7    A    Well, my answer would be going to the very top

8    e-mail message from Moulton where it references

9    Mantra and Perfect Science Labs.

10   Q    (By Ms. Mathis)  Do you know if any litigation     12:18

11   ever arose out of the termination of this contract?

12   A    Not that I'm aware of.  I'll put it this way,

13   not that I recall today.

14   Q    Were you involved in this at all where you

15   would have any additional knowledge regarding this       12:18

16   relationship between Moulton and Mantra and Girls

17   Gone Wild and Perfect Science Labs?

18   A    Well, as you see, this e-mail chain ended

19   December 23rd of '10, and my services lasted roughly

20   another two months.  So there's nothing more than        12:18

21   what is in here that I have any recollection of

22   happening.

23   Q    Okay.

24   A    Just an exchange of e-mails.

25   Q    Were you involved as legal counsel in entering      12:19

85

BRIAN RAYMENT, 6-19-12

1  into the original contract with Moulton?

2  A     No.  Let me put it this way.  Not that I

3  recall.  I mean, it could have been old enough that

4  maybe I did do it, but I don't have any recollection

5  of doing it.                                          12:19

6  Q     I'm going to hand you what I'm going to mark

7  as Exhibit 9.  These are some more e-mails between

8  Larry Moulton, it looks like, and Joe Francis.

9  These are Bates numbered Rayment 727 through 731.

10 This is dated December 28th --                        12:20

11 A     This was?

12 Q     No, I'm looking at No. 9 and I was going to

13 compare it to No. 8.  No. 8 was dated December 23rd,

14 so it looks like this was five days later.  Let me

15 just ask you this.  Do you know what -- let me see    12:20

16 if my question can be clearer than it was earlier.

17 Do you know what position Joe Francis held with

18 Perfect Science Labs?

19         MR. ANDERSON:  Object to the form.

20 A     Joe was either individually or through an       12:20

21 entity acting as the manager.

22 Q     (By Ms. Mathis)  Okay.  He was the person in

23 charge, either individually or through an entity?

24 A     Correct.

25 Q     Okay.  With regards to GGW Brands, LLC, how     12:21

TULSA FREELANCE REPORTERS
918-587-2878

86

BRIAN RAYMENT, 6-19-12

1    was he operating?  Was he an employee of GGW Brands,

2    LLC or was he the manager?

3              MR. ANDERSON:  Object to the form.

4    Q    (By Ms. Mathis)  Either individually or

5    through an entity?                              12:21

6    A    I don't know.  Timing, I don't know

7    specifically at every point in time what his

8    relationship was.

9    Q    How about at the end of 2010?

10   A    I will tell you he is the individual with whom   12:21

11   I dealt.

12   Q    Okay.

13   A    For all the GGW entities.

14   Q    Other than what's contained in these e-mails

15   that I have relating to the termination of the    12:22

16   contract with Moulton, do you have any -- and I'm

17   not asking you to disclose what that information is

18   yet, do you have any other information with regards

19   to the termination of the contract with Moulton?

20   A    Not other than what I've produced.           12:22

21   Q    Okay.  You produced some ledgers regarding

22   what appears to be the transfer of some cars.  Your

23   journal entries, they're Bates numbered 211 through

24   213.  I'll just generally mark them all as Exhibit

25   No. 10.  In fact, if you would put that paper clip   12:23

Page 87

1    on them after you look at them.  Why did you have

2    this document in your possession?

3    A      It -- well, to get into the details of that,

4    I'd have to get into communication with a client.

5    Q      Did you provide legal representation -- well,          12:23

6    for instance, did you provide legal representation

7    to GGW Events in relation to the transfer of some of

8    these vehicles?

9    A      After the fact I had discussions with the

10   client about this issue.                                       12:24

11   Q      Okay.  After the transfer had already been

12   conducted, then you had discussions with the client;

13   is that correct?

14   A      Correct.

15   Q      Do you have any idea who prepared these             12:24

16   journal entries?

17   A      I don't know.

18   Q      And I am not asking you for your discussions

19   with your client, okay --

20   A      Okay.                                                    12:24

21   Q      -- with my next question.  This indicates

22   dates of 1-1, 2010 on the document titled Mantra

23   Films, Inc. journal entries.

24   A      Yes.

25   Q      Is that the date on which Mantra Films           12:25

Page 117

1            MR. ANDERSON:  That you remember --

2    A    At the time that that was being requested, I

3    was still an attorney for Mr. Francis.  So at the

4    time that was addressed to me, there was an

5    attorney-client relationship, and I'd have to take      01:08

6    the privilege on that communication.

7            MS. MATHIS:  And we want to certify that,

8    in case I didn't earlier.

9            MR. ANDERSON:  I think we did.

10   Q    (By Ms. Mathis)  What is Girls Gone Wild       01:08

11   Brands?  Does it sell videos, does it market stuff

12   or does it -- and I'm talking GGW Brands?

13   A    GGW Brands, what it does is something that I

14   would have learned from discussions with Mr. Francis

15   when I was his and the entity's attorney, and I        01:09

16   would have to say that that's a privileged

17   communication.

18   Q    Does GWW Brands not do anything with third

19   parties where they're holding themselves out to sell

20   videos or anything of that nature?                     01:09

21   A    Sure, they do, but when you ask me what do

22   they do, I don't know how I can give all the

23   information I have without invading the

24   attorney-client privilege in response to that

25   question.                                              01:09

118

BRIAN RAYMENT, 6-19-12

```
1              MS. MATHIS:  Certify that question.

2   Q    (By Ms. Mathis)  Who are the members of

3   Brands?

4   A    I don't know.

5   Q    Is there a Pablo Holdings, LLC that might be a    01:09

6   member?  Do you know anything about that?

7   A    No.

8   Q    Are you familiar at all with Pablo Holdings?

9   A    No.

10  Q    What's his role -- what is Joe Francis's role    01:09

11  at Brands, GGW Brands?

12  A    My understanding -- well, again, that would

13  come from my discussions with him.

14  Q    There are court filings which indicate he's

15  the manager of GGW Brands, is that your              01:10

16  understanding?

17  A    Yes, that's my understanding.

18  Q    I was really hoping to be wrapped up by 1:00

19  and I know you're going to kill me, but I'm not.

20  A    I'm happy to go as long as you want.  I mean,    01:10

21  it's up to you.

22            MS. MATHIS:  I've got to have an okay

23  from --

24            MR. ANDERSON:  How much longer do you

25  have?                                                01:10
```

Page 119

1          MS. MATHIS:  I'm actually getting close,

2    but I would anticipate that I would be through no

3    later than 2:00.  If you can hang on for another --

4          MR. ANDERSON:  Hour?

5          MS. MATHIS:  Well, I'm not sure that it          01:10

6    will take another hour, but I don't want to say 1:30

7    and it take longer than that.

8          MR. HAGEDORN:  Let's go.  We don't want to

9    recess and come back.

10   Q    (By Ms. Mathis)  I'm going to hand you some       01:11

11   e-mails marked as Rayment 792 to 794.  We're going

12   to mark these as Exhibit No. 18, if you would take a

13   look at those, please.  Let's start back at the

14   beginning of the chain, which is going to start on

15   Page 2, I believe.  This is an e-mail from Douglas     01:12

16   Fine to Joe Francis.  Do you know who Douglas Fine

17   is?

18   A    Yes.

19   Q    Who is he?

20   A    I believe he's the property -- he's employed      01:12

21   by the property manager of the building in which

22   Joe's entities officed.

23   Q    All the entities officed there?

24   A    I don't know the answer to that.

25   Q    Which entities officed there that you know of?    01:12

```
 1                 C E R T I F I C A T E

 2

 3    STATE OF OKLAHOMA    )
                           )  ss.
 4    COUNTY OF TULSA      )

 5              I, Karla E. Barrow, Certified Shorthand

 6    Reporter within and for Tulsa County, State of

 7    Oklahoma, do hereby certify that the above named

 8    witness was by me first duly sworn to testify to the

 9    truth, the whole truth and nothing but the truth in

10    the case aforesaid, and that I reported in

11    stenograph his deposition; that my stenograph notes

12    were thereafter transcribed and reduced to

13    typewritten form under my supervision, as the same

14    appears herein.

15              I further certify that the foregoing 146

16    pages contain a full, true and correct transcript of

17    the deposition taken at such time and place.

18              I further certify that I am not attorney

19    for or relative to either of said parties, or

20    otherwise interested in the event of said action.

21              WITNESS MY HAND this _____ day of June,

22    2012.

23

24    KARLA E. BARROW, CSR           Karla E. Barrow
      CSR No. 113                    State of Oklahoma
25                                   Certified Shorthand Reporter
                                     CSR # 113
                                     My Certificate Expires 12.31.13
```

## TULSA FREELANCE REPORTERS
918-587-2878

# EXHIBIT E

**DUPLICATE COPY**

**Platinum Card®**                                                                 p. 1/10

JOSEPH R FRANCIS
Closing Date 10/18/11                                          Account Ending 5-17003

| New Balance | **$38,441.59** |
|---|---|
| Includes the past due amount of $21,910.80 | |
| **Please Pay By** | **11/02/11** |

**Membership Rewards® Points**
As of 10/18/11
**1,059,866**

➡ For details, please see your Membership Rewards page.

➡ See page 2 for important information about your account.

▽ Your account is past due. Pay the past due amount **immediately.**

➡ **See Page 7   for an Important Change to the $200 Airline Fee Credit Benefit and Other Important Information About Your Account**

## Get this statement to go.

Check your balance, view recent transactions and pay your bills right on your phone with the American Express® App.

Get started at:
americanexpress.com/mobilestatement



Get the app for your:
• IPHONE®
• iPOD TOUCH®
• ANDROID™
• MOBILE WEB

### Account Summary

| Previous Balance | $21,950.69 |
|---|---|
| Payments/Credits | -$39.89 |
| New Charges | +$16,530.79 |
| Fees | +$0.00 |
| **New Balance** | **$38,441.59** |

Days in Billing Period: 32

### Customer Care

| Pay by Computer | |
|---|---|
| americanexpress.com/pbc | |

| Customer Care | Pay by Phone |
|---|---|
| 1-800-525-3355 | 1-800-472-9297 |

➡ See Page 2 for additional information.

---

⬇ Please fold on the perforation below, detach and return with your payment ⬇

**Payment Coupon** 
Do not staple or use paper clips

**Pay by Computer**
americanexpress.com/pbc

**Pay by Phone** 
1-800-472-9297

Account Ending 5-17003

Enter account number on all documents.
Make check payable to American Express.

JOSEPH R FRANCIS
PO BOX 150
HOLLYWOOD CA 90078-0150

| Please Pay By |
|---|
| **11/02/11** |
| Amount Due |
| **$38,441.59** |

☐ Check here if your address or phone number has changed. Note changes on reverse side.

AMERICAN EXPRESS
BOX 0001
LOS ANGELES CA 90096-8000

0000349990991290133  0038441590038441591 14  A

**DUPLICATE COPY**

JOSEPH R FRANCIS                                 Account Ending 5-17003                                    p. 2/10

**Payments:** Your payment must be sent to the payment address shown on your statement and must be received by 5 p.m. local time at that address to be credited as of the day it is received. Payments we receive after 5 p.m. will not be credited to your Account until the next day. Payments must also: (1) include the remittance coupon from your statement; (2) be made with a single check drawn on a US bank and payable in US dollars, or with a negotiable instrument payable in US dollars and clearable through the US banking system; and (3) include your Account number. If your payment does not meet all of the above requirements, crediting may be delayed and you may incur late payment fees and additional interest charges. Electronic payments must be made through an electronic payment method payable in US dollars and clearable through the US banking system. If we accept payment in a foreign currency, we will convert it into US dollars at a conversion rate that is acceptable to us, unless a particular rate is required by law. Please do not send post-dated checks as they will be deposited upon receipt. Any restrictive language on a payment we accept will have no effect on us without our express prior written approval. We will re-present to your financial institution any payment that is returned unpaid.

**Permission for Electronic Withdrawal:** (1) When you send a check for payment, you give us permission to electronically withdraw your payment from your deposit or other asset account. We will process checks electronically by transmitting the amount of the check, routing number, account number and check serial number to your financial institution, unless the check is not processable electronically or a less costly process is available. When we process your check electronically, your payment may be withdrawn from your deposit or other asset account as soon as the same day we receive your check, and you will not receive that cancelled check with your financial account statement. If we cannot collect the funds electronically we may issue a draft against your deposit or other asset account for the amount of the check. (2) By using Pay By Computer, Pay By Phone or any other electronic payment service of ours, you give us permission to electronically withdraw funds from the deposit or other asset account you specify in the amount you request. Payments using such services of ours received after 8:00 p.m. MST may not be credited until the next day.

**How We Calculate Your Balance:** We use the Average Daily Balance (ADB) method (including new transactions) to calculate the balance on which we charge interest for Pay Over Time balances on your Account. Call the Customer Service number listed below for more information about this balance computation method and how resulting interest charges are determined. *The method we use to figure the ADB and interest results in daily compounding of interest.*

**Paying Interest:** If you have a Pay Over Time balance, your due date is at least 25 days after the close of each billing period. We will not charge you interest on charges added automatically to a Pay Over Time balance, or to charges that were added to a Pay Over Time balance at your request in prior billing periods, if you pay the Account Total New Balance by the next Closing Date.

**Foreign Currency Charges:** If you make a Charge in a foreign currency, we will convert it into US dollars on the date we or our agents process it. We will choose a conversion rate that is acceptable to us for that date, unless a particular rate is required by law. The conversion rate we use is no more than the highest official rate published by a government agency or the highest interbank rate we identify from customary banking sources on the conversion date or the prior business day. This rate may differ from rates in effect on the date of your charge. Charges converted by establishments will be billed at the rates such establishments use.

**Credit Balance:** A credit balance (designated CR) shown on this statement represents money owed to you. If within the six-month period following the date of the first statement indicating the credit balance you do not request a refund or charge enough to use up the credit balance, we will send you a check for the credit balance within 30 days if the amount is $1.00 or more.

**Credit Reporting:** We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

**New York residents** may contact the New York Banking Department to obtain a comparative listing of credit card rates, fees and grace periods by calling 1-800-518-8866.

| | | |
|---|---|---|
| Customer Care & Billing Inquiries | 1-800-525-3355 | **Hearing Impaired** |
| International Collect | 1-336-393-1111 | TTY: 1-800-221-9950 |
| Large Print & Braille Statements | 1-800-525-3355 | FAX: 1-800-695-9090 |
| Car Rental Loss and Damage Insurance | 1-800-338-1670 | In NY: 1-800-522-1897 |
| Travel Emergency, Worldwide Personal | 1-800-345-AMEX | |
| Assistance and Fine Dining | | |
| Platinum Card Travel Service and | 1-800-443-7672 | |
| Fine Hotels, Resorts & Spas | | |
| By Invitation Only | 1-800-321-RSVP | |

**Website:** americanexpress.com
**Mobile Site:** amexmobile.com

**Customer Care & Billing Inquiries**
P.O. BOX 981535
EL PASO, TX
79998-1535

**Payments**
BOX 0001
LOS ANGELES CA
90096-8000

**Change of Address**
If correct on front, do not use.

* To change your address online, visit www.americanexpress.com/updatecontactinfo
* For Name, Company Name, and Foreign Address or Phone changes, please call Customer Care.
* Please print clearly in blue or black ink only in the boxes provided.

Street Address

City, State

Zip Code

Area Code and
Home Phone

Area Code and
Work Phone

Email

**Pay Your Bill with AutoPay**

* Avoid late fees
* Save time

Deduct your payment from your bank account automatically each month

Visit **americanexpress.com/autopay** today to enroll.

For information on how we protect your privacy and to set your communication and privacy choices, please visit www.americanexpress.com/privacy.

**DUPLICATE COPY**

**Platinum Card®**                                                                                              p. 3/10

JOSEPH R FRANCIS
Closing Date 10/18/11                                                          Account Ending 5-17003

## Payments and Credits

### Summary

|  | Total |
| --- | --- |
| Payments | $0.00 |
| Credits | |
| JOSEPH R FRANCIS 5-17003 | -$39.89 |
| Total Payments and Credits | -$39.89 |

### Detail

| Credits | | | | | Amount |
| --- | --- | --- | --- | --- | --- |
| 10/12/11 | JOSEPH R FRANCIS | AMAZON.COM   AMZN.COM/BILL   WA<br>DIRECT MKTG MISC | | | -$39.89 |

## New Charges

### Summary

|  | Total |
| --- | --- |
| JOSEPH R FRANCIS 5-17003 | $14,544.20 |
| ZOILA RIVAS 5-13036 | $1,986.59 |
| Total New Charges | $16,530.79 |

### Detail

**JOSEPH R FRANCIS**
Card Ending 5-17003

|  | | Amount |
| --- | --- | --- |
| 09/18/11 | ALASKA AIR IN FLIGHTALASKA AIR IN FLIG<br>ALASKA AIR IN FLIGHT<br>ORD ;REQ REQUESTER NAME<br>IT1 PURCHASE ;UPI 6.0000;QTY1<br>IT2 ;UPI 0.0000;QTY<br>FRT 0.00;HDL 0.00;ITM1 | $6.00 |
| 09/19/11 | BANANA REPUBLIC #825LOS ANGELES    CA<br>MEN'S/WOMEN'S CLOTHNG | $20.12 |
| 09/20/11 | TRADER JOE'S #215  QLOS ANGELES    CA<br>626-599-3700<br>Description<br>GROCERIES/SUND | $37.40 |
| 09/20/11 | GARY LONDON, M.D., A310-270-4500<br>310-270-4500 | $4,650.00 |
| 09/21/11 | SUNNIN LEBANESE CAFELOS ANGELES    CA<br>3104772358<br>FOOD/BEVERAGE           $72.32 | $72.32 |
| 09/21/11 | MEDQUEST PHARMACY 00NORTH SALT LA   UT<br>801-294-1400<br>Description<br>DRUG STORE/PHA | $653.01 |
| 09/23/11 | LADWP IVR       LOS ANGELES    CA<br>800-342-5397<br>Description<br>UTILITIES | $6,622.10 |

Continued on reverse

JOSEPH R FRANCIS

**DUPLICATE COPY**
Account Ending 5-17003

p. 4/10

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 09/26/11 | RALPHS #0292 0000002SANTA MONICA   CA<br>3108844272<br>Description   Price<br>GROCERY STORES   $50.00 | | | $50.00 |
| 09/27/11 | RALPHS #0292 0000002SANTA MONICA   CA<br>3108844272<br>Description   Price<br>GROCERY STORES   $473.89 | | | $473.89 |
| 09/30/11 | IMAGE CLEANERS 17400LOS ANGELES   CA<br>3108201299<br>Description   Price<br>DRY CLEANERS   $782.00 | | | $782.00 |
| 09/30/11 | BIO REFERENCE LAB INELMWOOD PARK   NJ<br>201-791-2600 | | | $27.31 |
| 09/30/11 | WHY COOK 65000000295LOS ANGELES   CA<br>3102783955<br>Description   Price<br>CATERERS   $194.50 | | | $194.50 |
| 10/01/11 | UNIVERSAL STUDIOS FOUNIVERSAL CIT   CA<br>888-340-4840<br>Description<br>FOOD/BEVERAGE | | | $9.65 |
| 10/03/11 | RALPHS #0292 00000023108844272<br>3108844272<br>GROCERY STORES | | | $169.63 |
| 10/04/11 | TOTAL HEALTH NUTRIENSKILLMAN   NJ<br>609-466-9105 | | | $100.39 |
| 10/05/11 | PLACE FOR ACHIEVING NEW YORK   NY<br>2122136155<br>Description   Price<br>DOCTOR   $400.00 | | | $400.00 |
| 10/05/11 | PAYPAL *FAR INC   4029357733   CA<br>402-935-7733<br>Description<br>EXERCISE EQUIP | | | $58.90 |
| 10/07/11 | IBI*DERMSTORE.COM   800-213-3376   CA<br>800-213-3376 | | | $56.81 |
| 10/11/11 | RALPHS #0292 0000002SANTA MONICA   CA<br>3108844272<br>Description   Price<br>GROCERY STORES   $10.00 | | | $10.00 |
| 10/11/11 | BROOKSTONE 249 00249SANTA MONICA   CA<br>MISC HOME FURNISHINGS | | | $38.23 |
| 10/11/11 | MEDQUEST PHARMACY 00NORTH SALT LA   UT<br>801-294-1400<br>Description<br>DRUG STORE/PHA | | | $111.94 |

**ZOILA RIVAS**
Card Ending 5-13036

| | | Amount |
|---|---|---|
| | | Amount |
| 09/26/11 | VONS   Store  2261LOS ANGELES   CA<br>GROCERY STORE | $21.81 |

Continued on next page

**DUPLICATE COPY**

Platinum Card®                                                                        p. 5/10

JOSEPH R FRANCIS
Closing Date 10/18/11                                              Account Ending 5-17003

---

## Detail Continued

| | | Amount |
|---|---|---|
| 09/26/11 | WHOLEFDS FFX 10177 0LOS ANGELES CA<br>3239646800<br>Description    Price<br>GROCERY STORES   $89.43 | $89.43 |
| 09/26/11 | TRADER JOE'S #234 QLOS ANGELES CA<br>626-599-3700<br>Description<br>GROCERY STORES | $29.92 |
| 09/27/11 | RALPHS #0039 00000003108844272<br>3108844272<br>GROCERY STORES | $330.14 |
| 09/27/11 | PINKBERRY #22 LOS ANGELES CA<br>FAST FOOD RESTAURANT<br>FOOD/BEVERAGE   $32.95 | $32.95 |
| 09/27/11 | WHOLEFDS BRT 10074 03108264433<br>3108264433<br>GROCERY STORES | $100.83 |
| 09/28/11 | WHOLEFDS FFX 10177 0LOS ANGELES CA<br>3239646800<br>Description    Price<br>GROCERY STORES   $19.91 | $19.91 |
| 09/29/11 | RALPHS #0039 00000003108844272<br>3108844272<br>GROCERY STORES | $248.17 |
| 09/30/11 | VONS Store 2261LOS ANGELES CA<br>GROCERY STORE | $19.43 |
| 09/30/11 | PINKBERRY #22 LOS ANGELES CA<br>FAST FOOD RESTAURANT<br>FOOD/BEVERAGE   $28.45 | $28.45 |
| 09/30/11 | WHOLEFDS FFX 10177 03239646800<br>3239646800<br>GROCERY STORES | $86.28 |
| 09/30/11 | WHOLEFDS BRT 10074 03108264433<br>3108264433<br>GROCERY STORES | $52.43 |
| 10/03/11 | WHOLEFDS BRT 10074 03108264433<br>3108264433<br>GROCERY STORES | $83.16 |
| 10/03/11 | VONS Store 2261LOS ANGELES CA<br>GROCERY STORE | $7.08 |
| 10/03/11 | PINKBERRY #22 LOS ANGELES CA<br>FAST FOOD RESTAURANT<br>FOOD/BEVERAGE   $23.95 | $23.95 |
| 10/04/11 | TRADER JOE'S #234 QLOS ANGELES CA<br>626-599-3700<br>Description<br>GROCERY STORES | $55.35 |
| 10/05/11 | WHOLEFDS FFX 10177 03239646800<br>3239646800<br>GROCERY STORES | $106.40 |

Continued on reverse

**DUPLICATE COPY**

JOSEPH R FRANCIS                          Account Ending 5-17003                          p. 6/10

## Detail Continued

|          |                                                                    | Amount   |
|----------|--------------------------------------------------------------------|----------|
| 10/06/11 | VONS   Store 2261LOS ANGELES     CA<br>GROCERY STORE               | $13.58   |
| 10/10/11 | WHOLEFDS FFX 10177 03239646800<br>3239646800<br>GROCERY STORES    | $73.76   |
| 10/10/11 | VONS   Store 2261LOS ANGELES     CA<br>GROCERY STORE               | $21.31   |
| 10/11/11 | RALPHS #0039 00000003108844272<br>3108844272<br>GROCERY STORES    | $249.60  |
| 10/12/11 | TRADER JOE'S #234 QLOS ANGELES     CA<br>626-599-3700<br>Description<br>GROCERY STORES | $50.71 |
| 10/13/11 | VONS   Store 2261LOS ANGELES     CA<br>GROCERY STORE               | $7.91    |
| 10/14/11 | WHOLEFDS FFX 10177 03239646800<br>3239646800<br>GROCERY STORES    | $124.09  |
| 10/17/11 | VONS   Store 2261LOS ANGELES     CA<br>GROCERY STORE               | $16.42   |
| 10/17/11 | WHOLEFDS FFX 10177 03239646800<br>3239646800<br>GROCERY STORES    | $93.52   |

## Fees

|                              | Amount  |
|------------------------------|---------|
| Total Fees for this Period   | $0.00   |

## 2011 Fees and Interest Totals Year-to-Date

|                         | Amount   |
|-------------------------|----------|
| Total Fees in 2011      | $495.85  |
| Total Interest in 2011  | $0.00    |

---

### Important Notice

**Information on Pay Over Time Features**

You may have access to one or more Pay Over Time Features as part of your Card account. The following are the current Annual Percentage Rates (APRs) for Pay Over Time Features. (v) indicates variable rate.

For Sign & Travel, the APR is 15.24% (v).

For Sign & Travel, the APR is 15.24% (v).

Please refer to page  2 for further important information regarding your account

Platinum Card®                    **DUPLICATE COPY**                    p. 7/10

JOSEPH R FRANCIS                                            Account Ending 5-17003
Closing Date 10/18/11

## Important Change to the $200 Airline Fee Credit Benefit

We're writing to tell you about a change to the $200 Airline Fee Credit benefit. This is an annual benefit that can apply to a variety of incidental airline fees including baggage fees, itinerary change fees, in-flight food, and airport lounge day passes. To get this benefit you must enroll and select your airline of choice. *If after enrolling you want to change your airline choice for a calendar year, you must now do so during January of that year.* To enroll in this benefit, make or change your airline choice, or get more information, visit **americanexpress.com/PlatinumAirlineChoice**. No action is needed if you are enrolled and don't want to change your airline choice.

## The Importance of Paying on Time

We'd also like to share information to help you manage your account and to emphasize the importance of paying on time each month.

Paying late has consequences, including:

- If you pay late, you will be charged a late fee of up to $35 or 2.99% of the past due amount.
- Your account will be reported as past due to credit reporting agencies if you fail to pay the minimum amount due for two billing periods in a row.
- If you use a pay over time feature, paying late can trigger the penalty APR.
- Paying late can result in restrictions on earning and redeeming rewards.

To help you make payments on time, every time, we offer a suite of account management tools:

- Pay online or by phone 24/7 – Login to your account online or call 1-800-I-PAY-AXP (1-800-472-9297).
- AutoPay – Have your payment automatically deducted from your bank account each month.
- Account alerts – Get email or text alerts when your payment due date is approaching.
- Mobile services – View and manage your Card account from anywhere.

Go to **financialtools.americanexpress.com/alerts** to learn more.

We hope you find this information helpful. Thank you.

*See reverse side for the changes to Terms and Conditions.*

S10O1                                            BP/CCSPLCT/1011

**DUPLICATE COPY**

JOSEPH R FRANCIS                    Account Ending 5-17003                              p. 8/10

## Notice of Important Changes to the $200 Airline Fee Credit Terms and Conditions

We are making certain changes to the Terms and Conditions governing the $200 Airline Fee Credit benefit. Any language in the Terms and Conditions contrary to or conflicting with terms amended below is replaced fully and completely. All terms of the Terms and Conditions not amended herein remain in full force and effect. We urge you and any Additional Cardmembers on your Account to read the below notice carefully and file it in a safe place for future reference.

**$200 Airline Fee Credit Benefit**

Effective immediately, the reference to "December" in the sixth sentence of the Terms and Conditions is deleted and replaced with "January." The revised Terms and Conditions are shown below in their entirety with this change highlighted in bold for clarity.

"Benefit is available to Consumer and Business Platinum Card® and Centurion® members only. To receive statement credits of up to $200 a year toward incidental air travel fees, Card member must enroll and choose a qualifying airline at www.americanexpress.com/PlatinumAirlineChoice. Only the Basic Card member or Authorized Account Manager(s) on the Card account can enroll and select the qualifying airline. Card members who have not chosen a qualifying airline will be able to do so at any time. It can take up to 48 hours post enrollment and airline choice for the benefit to be effective. Card members who have already selected a qualifying airline will not be able to change their choice until **January** of each calendar year at which time they may change their airline choice for that calendar year. Card members who do not change their airline selection will remain with their current airline. Statement Credits: Incidental air travel fees must be charged on the enrolled Card account for the benefit to apply. Incidental air travel fees must be separate charges from airline ticket charges. Fees not charged by the Card member's airline of choice (e.g. wireless internet and fees incurred with airline alliance partners) do not qualify for statement credits. Upgrade charges are not deemed to be incidental fees. The airline must submit the incidental air travel fees under the appropriate merchant code, industry code, or required service or product identifier for the charge to be eligible. Purchases made by both the Basic and Additional Card members on the enrolled Card account are eligible for statement credits. Each Card Account is eligible for up to a total of $200 a year in statement credits, regardless of the number of Cards on the Account. Please allow 2-4 weeks after the qualifying incidental air travel fee is charged to your Card account for statement credit(s) to be posted to the account. Card members can call the number on the back of the Card if statement credits have not posted after 4 weeks from the date of purchase. Card members are responsible for payment of all charges until the statement credit(s) posts to the account. To be eligible for this benefit, Card account(s) must be active and not in default at the time of statement credit fulfillment. If a charge for any incidental air travel fee is included in a Pay Over Time feature balance on your Card account (for example, Sign & Travel), the statement credit associated with that charge will not be applied to that Pay Over Time feature balance. Instead, the statement credit will be applied to your Pay In Full balance. For additional information about this benefit, call the number on the back of your Card."

S10O1                                                        BP/CCSPLCT/1011

| Membership Rewards First® | DUPLICATE COPY | MEMBERSHIP |
|---|---|---|
| Monthly Statement and Program News | | rewards |
| | | FIRST™    p. 9/10 |

**Prepared for JOSEPH R FRANCIS**    Account Number 1M15485523

| | | Questions About Your Account? |
|---|---|---|

| Total Points Balance | 1,059,866 |
|---|---|

📧 membershiprewards.com

| Points Earned this Period | 84,077 |
|---|---|

**1-800-297-1300**
**International Collect: 305-816-2799**

### Account Summary    September 1, 2011 - September 30, 2011

**Did You Know?**

| | |
|---|---|
| Opening Points Balance | 975,789 |
| Points Earned this Period | +84,077 |
| Points Used this Period | 0 |
| Reinstated Points and Adjustments | 0 |
| Total Points Balance | 1,059,866 |

**Use Points For Everyday Charges**
Use your Card for everyday purchases like groceries, gas, phone bills and more, then go online and use the points you earned to cover those charges. Learn more at membershiprewards.com/everydaycharges

**Points Earned this Period** are pending until charges are paid in full and all your accounts are in good standing. Points Earned this Period may include Bonus Points.

**Where To Stop Before You Shop**
Earn up to 10X points on 300+ brands at membershiprewards.com/earn

### Points Transaction Detail    September 1, 2011 - September 30, 2011

| Points Earned this Period | Points Activity On Eligible Charges | Bonus Points Awarded | Total Points Activity Per Card |
|---|---|---|---|
| **Platinum**<br>XXXX-XXXXX5-17003 | 20,216 | 0 | 20,216 |
| **Add'l Platinum**<br>XXXX-XXXXX5-13036 | 1,738 | 0 | 1,738 |
| **Business Green Rewards**<br>XXXX-XXXXX6-21000 | 215 | 0 | 215 |
| **Business Centurion**<br>XXXX-XXXXX6-54007 | 24,079 | 0 | 24,079 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-55046 | 0 | 0 | 0 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-51078 | 0 | 0 | 0 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-52100 | 8,368 | 0 | 8,368 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-52118 | 22,906 | 0 | 22,906 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-52126 | 6,555 | 0 | 6,555 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-51136 | 0 | 0 | 0 |
| **Add'l Business Centurion**<br>XXXX-XXXXX6-51144 | 0 | 0 | 0 |
| **Total** | **84,077** | **0** | **84,077** |

Membership Rewards points earned may be transferred or redeemed as long as all enrolled Card accounts are in good standing. Points transferred or redeemed cannot be reversed back into the program. **Forfeited points can be reinstated for a fee by calling the number provided below or visiting membershiprewards.com.** Terms and Conditions of the Membership Rewards® program apply. For more information, visit membershiprewards.com/terms or call 1-800-297-1300. From overseas, call collect 305-816-2799.

*Continued on reverse*

Prepared for **DUPLICATE COPY**
**JOSEPH R FRANCIS**
Membership Rewards® Account Number
**1M15485523**

MEMBERSHIP
**rewards**
FIRST·

p. 10/10

### The Hottest Deals for the Hottest Products



Find great deals on rewards like electronics, home, fashion and accessories and sporting goods.

Save 10% or more.

Terms and conditions for the Membership Rewards® program apply. Visit **membershiprewards.com/terms** or call **1-800-AXP-EARN (297-3276)** for more information. Participating partners and available rewards are subject to change without notice.

Visit **membershiprewards. com/merchandise specials** or call **1-800-AXP-EARN (297-3276)** and redeem points for hot rewards.

(MR Message 7553)

### Redeem Membership Rewards® Points for Facebook Ad Credits to Connect with Your Customers



Facebook allows you to create rich social experiences, build lasting relationships, and amplify the most powerful type of marketing--word of mouth. Facebook Ads can help you reach your audience and make it easy for people to spread the word about your business. Redeem Membership Rewards® points for FacebookAds credits, a new form of payment for Facebook Ads.

The offer is subject to ad approval, valid registration and acceptance of the generally applicable Facebook Advertising Terms and Conditions: www.facebook.com/terms_ads.php and all Terms and Conditions found here www.facebook.com/OpenTek=app_184738568891886. Terms and Conditions for the Membership Rewards First® program apply. Visit membershiprewards.com/terms or call 1-800-297-1300 for more information. Participating partners and available rewards are subject to change without notice.

To start redeeming your Membership Rewards points for Facebook Ads Credits today, log on to **membershiprewards. com**, visit the American Express OPEN Facebook page or call **1-800-297-1300.**

(MR Message 7578)

### Redeem Membership Rewards® Points for Virgin America Flights with Elevate



Take a breath of fresh airline. Fly in a mood-lit cabin with WiFi and nonstop entertainment. Virgin America's cabins give you three levels of service to choose from, plush leather seats and mood lighting to help you unwind. And with reward travel starting at 2,500 Elevate points, Membership Rewards points can get you even farther.

Terms and conditions for the Membership Rewards First® program apply. Visit **membershiprewards.com/terms** or call **1-800-297-1300** for more information. Participating partners and available rewards are subject to change without notice.

To preview this reward and to redeem points, visit **membershiprewards. com** or call **1-800-297-1300.**

(MR Message 7546)

### Redeem Membership Rewards® Points for Restoration Hardware's Timeless Home Furnishings



There are pieces that furnish a home. And those that define it. Restoration Hardware's passion for design and quality begins with the artisans they work with around the world. It's why they source the finest Italian bedding, Thai silk and Belgian linen, as well as distinctive furniture, bathware and lighting. It's a story about heritage and authenticity, and the pieces that define their home.

Terms and conditions for the Membership Rewards First® program apply. Visit **membershiprewards.com/terms** or call **1-800-297-1300** for more information. Participating partners and available rewards are subject to change without notice.

To start redeeming Membership Rewards points today, log on to **membershiprewards. com** or call **1-800-297-1300.**

(MR Message 7579)

**Offers are made only to Cardmembers who meet certain qualifying criteria. By responding you will be disclosing to the merchant that you meet these criteria.**

**EXHIBIT F**

**GGW Direct LLC**
## Transactions by Account
### All Blue Horse Transactions

| Account | Date | Memo | Amount |
|---------|------|------|--------|
| Blue Horse | | | |
| | 03/25/2010 | Amex other Credit Card Paid By Direct | 5,218.34 |
| | 04/14/2010 | To record payment of 2010 state LLC tax by Direct | 800.00 |
| | 08/11/2010 | AMEX payment 8/11/10: paid from Direct for other AMEX expenses | 15,531.79 |
| | 08/20/2010 | AMEX payment 8/20/10: paid from Direct for other AMEX expenses | 3,157.72 |
| | 08/28/2010 | AMEX payment 8/28/10: paid from Direct for other AMEX expenses | 1,703.27 |
| | 08/31/2010 | AMEX payment 8/31/10: paid from Direct for other AMEX expenses | 3,455.88 |
| | 01/03/2011 | AMEX payment 1/3/11: paid from Direct for other AMEX expenses | 20,760.28 |
| | 03/07/2011 | AMEX payment 3/7/11: paid from Direct for other AMEX expenses | 4,456.35 |
| | 05/25/2011 | Blue Horse Bill paid by GGW Direct | 5,202.70 |
| | 05/27/2011 | AMEX payment 5/27/11: paid from Direct for other AMEX expenses | 5,321.06 |
| | 08/01/2011 | Payment from GGW Direct to Blue Horse Trading | 50,000.00 |
| | 08/08/2011 | Payment from GGW Direct to Blue Horse Trading | 50,000.00 |
| | 08/10/2011 | Payment from GGW Direct to Blue Horse Trading | 50,000.00 |
| | 09/02/2011 | AMEX payment 9/2/11: paid from Direct for other AMEX expenses | 15,898.34 |
| | 09/19/2011 | Blue Horse Insurance paid by Direct | 1,434.51 |
| | 09/30/2011 | Payment from GGW Direct to Blue Horse Trading | 100,000.00 |
| | 11/03/2011 | AMEX payment 11/3/11: paid from Direct for other AMEX expenses | 38,441.59 |
| | 12/20/2011 | AMEX payment 12/20/11: paid from Direct for other AMEX expenses | 11,709.39 |
| | 01/25/2012 | AMEX payment 01/25/12: paid from Direct for other AMEX expenses | 4,097.53 |
| | 02/01/2012 | Payment from GGW Direct to Blue Horse Trading | 30,000.00 |
| | 02/17/2012 | Payment from GGW Direct to Blue Horse Trading | 40,000.00 |
| | 04/17/2012 | To record payment of 2012 state LLC tax by Direct | 921.00 |
| | 04/17/2012 | To record payment of 2012 state LLC tax by Direct | 800.00 |
| | 05/04/2012 | Payment from GGW Direct to Blue Horse Trading | 5,000.00 |
| | 05/14/2012 | Payment from GGW Direct to Blue Horse Trading | 10,000.00 |
| | 05/24/2012 | Payment from GGW Direct to Blue Horse Trading | 35,000.00 |
| | 06/14/2012 | Payment from GGW Direct to Blue Horse Trading | 10,000.00 |
| | 06/26/2012 | Payment from GGW Direct to Blue Horse Trading | 20,000.00 |
| | 06/29/2012 | Payment from GGW Direct to Blue Horse Trading | 90,000.00 |
| | 07/02/2012 | Payment from GGW Direct to Blue Horse Trading | 10,000.00 |
| | 07/19/2012 | Payment from GGW Direct to Blue Horse Trading | 10,000.00 |
| | 08/02/2012 | Payment from GGW Direct to Blue Horse Trading | 50,000.00 |
| | 09/04/2012 | Payment from GGW Direct to Blue Horse Trading | 45,000.00 |
| | 09/10/2012 | Payment from GGW Direct to Blue Horse Trading | 5,000.00 |
| Total Blue Horse | | | 748,909.75 |

# **EXHIBIT G**

```
 1   Case No. A566286

 2   Dept. No. XII

 3

 4

 5

 6                    DISTRICT COURT

 7             CLARK COUNTY, NEVADA

 8                    --o0o-

 9   WYNN LAS VEGAS LLC, d/b/a WYNN
     LAS VEGAS,
10
               Plaintiff,
11
          vs.
12
     JOSEPH FRANCIS,
13
               Defendant.
14   _____
     JOSEPH FRANCIS,
15
               Counterclaimant,
16
          vs.
17
     WYNN LAS VEGAS LLC, d/b/a WYNN
18   LAS VEGAS,

19             Counterdefendant.
     _____/
20

21                 DEPOSITION OF

22            DAVID R. HOUSTON, ESQ.

23            April 3, 2012; Tuesday

24               Reno, Nevada

25   Reported by:       LORI URMSTON, CCR #51, RPR, RMR
                        CALIF. CCR #3217
```

David R. Houston, Esq.                Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

```
 1     APPEARANCES:

 2     For the Plaintiff and Counterdefendant:

 3             MITCHELL J. LANGBERG, ESQ.
               LAURA E. BIELINSKI, ESQ.
 4             Brownstein, Hyatt, Farber, Schreck, LLP
               100 North City Parkway
 5             Suite 1600
               Las Vegas, Nevada  89106
 6

 7     For the Deponent:

 8             DAVID R. GRUNDY, ESQ.
               Lemons, Grundy & Eisenberg
 9             6005 Plumas Street
               Third Floor
10             Reno, Nevada 89519

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

David R. Houston, Esq.                    Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

1   have produced what you had requested.  In reference to

2   any other party, not a judgment debtor or a named party

3   to the litigation, I would only have provided that

4   which was allowed by that client.

5       Q   Okay.  With your counsel we discussed that it

6   wasn't necessary, for example, to produce the detailed

7   billing records.

8       A   Correct.

9       Q   And, frankly, I don't know how detailed you

10  keep your billing records.  But--

11      I apologize; I lost my train of thought.

12      A   That's all right.

13      Q   So we agreed that you wouldn't be producing the

14  detailed billing records.  However, is it fair to say

15  that you provided all of the payment records that you

16  have that relate to all of the billing records that you

17  would have for Mr. Francis?

18      A   Yes, sir.

19      Q   During the timeframe that went back to sometime

20  around February of '07, correct?

21      A   Yes, sir.

22      Q   Okay.  Could you please describe your

23  relationship with Mr. Francis, how you know him?

24      A   Historical perspective?

25      Q   Yes, sir.

1     A     I was first retained by a Los Angeles firm,

2     specifically an attorney by the name of Aaron Dyer, as

3     a consequence of Mr. Francis being indicted by the

4     Internal Revenue Service, United States Attorney's

5     Office, Department of Justice, as it pertained to tax

6     matters in the District of Nevada.

7           As a consequence of that representation, I worked

8     with Mr. Francis for an extended period of time in the

9     federal defense, finally culminating to a plea in

10    Los Angeles in reference to the Central District

11    Federal for a misdemeanor tax offense.  During that

12    period of time of representing Mr. Francis, he was

13    incarcerated at the Washoe County Jail at 911 Parr

14    Boulevard.

15          I was more or less then made aware as to other

16    issues and problems, both in the state of California,

17    the state of Nevada and the state of Florida.  As a

18    consequence of the problems in the state of Florida, I

19    worked with Roy Black to attempt to resolve those, and

20    we were successful in that resolution.

21          The consequence of the problems in the state of

22    Nevada had to do with various allegations as to

23    improprieties at the jail which we were successfully

24    able to resolve as well.  And then finally, of course,

25    the tax matter, which, as I indicated, had been

David R. Houston, Esq.                    Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

1    resolved in the Central District of California as well.

2        Q    Thank you.

3        And when I mention "the case," you also understand

4    that your subpoena was issued in conjunction with the

5    judgment collection efforts in the case that we

6    previously discussed?

7        A    Yes.

8        Q    Okay.  And just because, you know, I try to

9    have most of my cards on the table, I keep one or two

10   occasionally, my intent is to discuss with you a couple

11   things.  One is some of the financial information

12   regarding your representation of Mr. Francis, and then

13   to the extent that you may have personal knowledge

14   relating to Mr. Francis's assets or sources of income,

15   typical debt collection kind of stuff.

16       A    Sure.

17       Q    I intend to make this go as quickly as I can--

18       A    Okay.

19       Q    --to balance the minimization of inconvenience

20   to you with representing my client.

21       A    I appreciate that.

22       Q    From your description and, frankly, from things

23   that I've seen in the media and from our prior

24   conversations once or twice, is it fair to say that you

25   have taken on a kind of general representation of

David R. Houston, Esq.          *Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis*

```
 1   Mr. Francis in various different kinds of matters?

 2      A   And that's correct.

 3      Q   Okay.  Kind of in some ways like a consulting

 4   attorney?

 5      A   Correct.

 6      Q   And would you consider you and Mr. Francis

 7   friends at this point or are you purely professional?

 8      A   I consider him a friend actually.

 9      Q   Have you been to his house in Los Angeles?

10      A   Yes, I have.

11      Q   Can you identify for me what matters, if any,

12   you currently represent Mr. Francis on?

13      A   Yes.  Well, there are several.  Currently there

14   are a number of issues, frankly, as it concerns the

15   Wynn matter that most recently I've been asked to

16   become involved in referencing the Supreme Court as far

17   as the default judgments that have been entered.  I

18   believe one default was taken by virtue of the Fifth

19   Amendment incorporation at the time of the deposition.

20   And then I believe there was a subsequent default taken

21   for nonappearance, most recently, for a defamation

22   case.  Other than that, I'm not very familiar with it.

23   That would have been the request most recently.

24      Other than that, we handle a number of different

25   issues in a consulting basis.  One recently would have
```

1   involved Madonna and what we believe to be the

2   misappropriation of a trademark.  There have been a

3   number of other cases in reference to issues that

4   surround Mr. Francis where I've offered opinions to his

5   in-house counsel as well as to criminal counsel in the

6   state of California concerning another matter that is

7   somewhat dated but nonetheless still alive.

8       Q   Okay.  And I want to break these down, because

9   there's no-- no secret.  There's the issue that we've

10  seen in correspondence, which we'll get in the record

11  later, that one GGW entity had put money in your trust

12  account.  And, you know, I'm just going to ferret stuff

13  out to make clear for my purposes that's GGW's money

14  versus money that you've been paid for representation.

15      A   Sure.

16      Q   You mentioned two Nevada state court cases

17  involving Wynn.  There's the Fifth Amendment-- the case

18  where there was a summary judgment entered after

19  assertions of the Fifth Amendment, which I refer to as

20  the marker case, it was the Wynn Las Vegas attempting

21  to collect on the marker, correct?

22      A   Correct.

23      Q   And you've represented Mr. Francis--  Let me

24  correct that.

25      You've provided legal services to Mr. Francis in

David R. Houston, Esq.                    Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

1    relation to that action?

2        A    Actually I represented Mr. Francis in reference

3    to the criminal portion of that action and got the

4    criminal case dismissed as it pertained to the marker.

5    As far as the marker case itself, I've not had much

6    involvement, save and except a request to become

7    involved as it pertains to any litigation before the

8    Supreme Court.

9        Q    Okay.  Again, just to make the record clear,

10   you correctly added one matter, that there had been a

11   criminal case, Mr. Francis had been indicted on a

12   criminal charge relating to the unpaid marker and you

13   represented him in that where ultimately the case was

14   dismissed?

15       A    That's correct, by writ.

16       Q    And you represented Mr. Francis personally in

17   that matter?

18       A    Yes, I did.

19       Q    Okay.  Then with regard to the civil case that

20   pertained to the Wynn marker, have you provided

21   services to Mr. Francis for which you've been paid,

22   whether you appeared in court or otherwise?

23       A    If so, it's negligible.  That was more handled

24   by civil counsel than myself.

25       Q    Were you not the one that made the--  And I

David R. Houston, Esq.          Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

1   matter?

2      A    There can be.  There has not been up until this

3   point.  However, if there is ever a direct nexus

4   between the criminal issue versus the civil where I am

5   of assistance, then certainly that's what I will be

6   providing in reference to service.

7      Q    With regard to Mr. Francis personally, are

8   there--  This is a yes/no question.

9      Are there engagement letters or an engagement

10  letter that underlies your relationship?

11     A    There has been in the past, yes.

12     Q    And is it--  The engagement letters that I have

13  say words to the effect of:  This engagement letter

14  covers this case and any other services you might

15  provide for me in the future.

16     MR. GRUNDY:  You mean--  You said the engagement

17  letters that you have.  Do you mean involving

18  Mr. Francis or the ones you use?

19     MR. LANGBERG:  Bad question.  Let me withdraw the

20  question.

21  BY MR. LANGBERG:

22     Q    By way of example, the ones that my firm uses

23  with its clients incorporate a provision that basically

24  says it's going to cover any future services you

25  request if we don't enter into a new engagement letter.

David R. Houston, Esq.          Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

1        Withdraw the question.

2        Is there an engagement letter that you believe

3    covers the services that you currently provide to

4    Mr. Francis?

5        A    Which services?

6        Q    Any services.

7        A    Any and all, no.

8        Q    Okay.  So you're operating under a gentleman's

9    agreement at this point?

10       A    Correct.

11       Q    It's not covered by an existing written

12   agreement?

13       A    Correct.  There have been written agreements in

14   the past, but there are not written agreements at the

15   present.

16       Q    Okay.  Do you have any engagement letters with

17   any of the entities that we have discussed?

18       A    No.

19       Q    Having, I think, exhausted the California and

20   Nevada matters for which you represent Mr. Francis, can

21   you identify other matters during the timeframe that we

22   are covering to the best of your ability in which

23   you've represented Mr. Francis?  And I do know that in

24   your introduction you articulated some of them in your

25   history of him, but--

David R. Houston, Esq.              Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

1      A   I think we've spoken of most of them, save and

2   except the Florida litigation.  Other than that, no.

3      Q   Okay.  So the Florida litigation was what?

4      A   The Florida litigation was where the state's

5   attorney in Panama City, Florida brought a criminal

6   case initially against Mr. Francis, and there are

7   related forfeiture actions against some of his entities

8   as it concerned allegations of prostitution, child

9   pornography, a number of other counts in reference to

10  alleged drug possession, leading initially to a

11  121-count indictment, wherein I think 114 of the counts

12  were fairly immediately dismissed, with the final

13  resolution in that case again being a plea to a

14  misdemeanor offense.

15     Q   Who did you represent in that action?

16     A   Actually I was working with Roy Black who was

17  counsel of record.  And the consequence of my

18  involvement again was more as an advisor as opposed to

19  an individual appearing in court.

20     Q   Breaking those actions into the criminal

21  complaint against Mr. Francis and the civil forfeiture

22  matters against the entities, were you consulting on

23  both-- in both regards?

24     A   No, criminal.

25     Q   Just the criminal matter against Mr. Francis

David R. Houston, Esq.                Wynn Las Vegas LLC, d/b/a Wynn Las Vegas v. Joseph Francis

```
 1   personally?

 2       A    Correct.

 3       Q    And were you compensated for your services in

 4   that matter?

 5       A    Yes.

 6       Q    Are there any other criminal matters that we

 7   haven't touched upon in which you've represented

 8   Mr. Francis?

 9       A    No, none that I can think of at the moment.

10       Q    Have you at times served as an interphase

11   between Mr. Francis and law enforcement when there have

12   been threats of criminal matters?

13       A    Yes, I have.

14       Q    Okay.  For example, I can't remember the

15   woman's name, but there was a bar incident, a fight in

16   a bar, I think there was a drink and there was a video.

17   I don't want to characterize the event.  Do you know

18   what I'm talking about?

19       A    I do know what you're speaking about.

20       Q    The woman's name was Jade, Jada?

21       A    Jade.

22       Q    Did you provide any services to Mr. Francis in

23   relation to that matter for which you were paid?

24       A    Discussion, advisement and consulting.

25       Q    Were you paid for that to your recollection?
```

|  | 2012 To Date | |
| Date | Billed Amount | Amount Received |
| 1.31.12 | $    812.50 | |
| 12.31.11 | $    875.00 | $    1,687.50 |
| 1.31.12 | $    4,035.56 | $    4,035.56 |
| 1.24.12 | $    1,000.00 | $    1,000.00 |
| 2.29.12 | $    937.73 | pending payment |





REDACTED



**GGW Direct**
PO Box 150
Los Angeles, CA 90078
310-405-0200

National Bank Of California
145 S Fairfax
Los Angeles, CA 90036-2106
323-655-6001

**1379**

Date _2/23/2012_

Pay to the
Order of    **Law Offices of David R. Houston**    $    **\*\*4,035.56**

*FOUR-THOUSAND THIRTY-FIVE AND 56/100* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*    Dollars

Law Offices of David R. Houston
432 Court Street
Reno, Nevada 89501

Memo _January 2012_

REDACTED

GGW Direct                                                                    1379

Law Offices of David R. Houston                    2/23/2012

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 1/31/2012 | Bill | 1447 | 4,035.56 | 4,035.56 | | 4,035.56 |
| | | | | | Check Amount | 4,035.56 |

National Bank  GGW   January 2012

# NEVADA STATE BANK

### THE DOOR TO YOUR FUTURE

## Previous Day/Posted Transactions

Use this screen to review transactions for a specific period of time. You can select a different account or period of time.

### IOLTA - xxx-xx699-8

Today Is: 01/24/2012
Ledger date: 01/23/2012

Prior Day Balance: $
Current Balance: $
Available Balance: $
Prior Year Interest Paid:
Interest Rate: 0.750%
Annual Percentage Yield: For your Annual Percentage Yield (APY), please refer to your current account statement.

View Account:
IOLTA - xxx-xx699-8

View Transactions:
01/23/2012   to   01/23/2012

Display _____ days

View: Current Day | Previous Day

### Transactions on 01/23/2012

| Date | Transaction | Description | Credits | Debits | Balance |
|------|-------------|-------------|---------|--------|---------|
| 01/23/2012 | Wire Credit 433 | WIRE/IN-2012012300005292;ORG GGW DIRECT LLC (DELAWARE LLC) | $ 1,000.00 | $ | |

© 2007 Nevada State Bank. All rights reserved

|  | 2011 | |
| Date | Billed Amount | Amount Received |
| --- | --- | --- |
| 5.31.11 | $ 646.80 | $ 646.80 |
| 7.20.11 | $ 739.60 | $ 739.60 |
| 6.8.11 | $ 734.59 | $ 734.59 |
| 8.31.11 | $ 659.41 | $ 659.41 |
| 10.31.11 | $ 6,375.00 | $ 6,375.00 |





**GGW Direct, LLC**
1601 Cloverfield Blvd
Suite 420S
Santa Monica, CA 90404
(424) 217-8800

**JPMorgan Chase Bank, N.A.**
15260 Ventura Blvd
Sherman Oaks, CA 91403

90-7462

3635

6/10/2011

PAY    Law Offices of David R. Houston    $    **646.80**

SIX HUNDRED FORTY-SIX AND 80/100****************************************    DOLLARS

TO THE
ORDER
OF    Law Offices of David R. Houston

Memo    5-18-11    REDACTED



GGW Direct, LLC    3635

Law Offices of David R. Houston    6/10/2011

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 5/31/2011 | Bill | 1320 | 646.80 | 646.80 | | 646.80 |
| | | | | | Check Amount | 646.80 |

Checking - GGW Direct Account    646.80



THIS DOCUMENT HAS A COLORED BACKGR... NO HIGH RESOLUTION BORDER. THE REVERSE SIDE OF THIS DOC... HAS AN ARTIFICIAL WATERMARK

**GGW Direct, LLC**
P.O. Box 150
Los Angeles, CA 90078
(424) 217-8800

JPMorgan Chase Bank, N.A.
15260 Ventura Blvd.
Sherman Oaks, CA 91403    90-7162

6286
8/5/2011

PAY    Law Offices of David R. Houston    $    **739.60

*SEVEN HUNDRED THIRTY NINE AND 60/100************************************* DOLLARS*

TO THE
ORDER
OF:    Law Offices of David R. Houston
432 Court Street
Reno, Nevada 89501

Memo    Court travel charges for 7-20-11

REDACTED

GGW Direct, LLC    6286

Law Offices of David R. Houston    8/5/2011

| Date | Type | Reference | Original Amt | Balance Due | Discount | Payment |
|------|------|-----------|--------------|-------------|----------|---------|
| 7/20/2011 | Bill | 1354 | 739.60 | 739.60 | | 739.60 |
| | | | | | Check Amount | 739.60 |

Checking - GGW Dire    Court travel charges for 7-20-11    739.60

THIS DOCUMENT HAS A COLORED BACKGROUND AND HIGH RESOLUTION BORDER. THE REVERSE SIDE OF THIS DOCUMENT HAS AN ARTIFICIAL WATERMARK.

**GGW Direct, LLC**
1601 Cloverfield Blvd
Suite 420S
Santa Monica, CA 90404
(424) 217-8800

**JPMorgan Chase Bank, N.A.**
15260 Ventura Blvd
Sherman Oaks, CA 91403

90-7162

**5299**

*6/23/2011*

PAY    **Law Offices of David R. Houston**                          $   **734.59**

*SEVEN-HUNDRED-THIRTY-FOUR AND 59/100*************************************  DOLLARS

TO THE
ORDER
OF
**Law Offices of David R. Houston**
432 Court Street
Reno, Nevada 89501

Memo   Travel expenses

REDACTED

---

GGW Direct, LLC                                                                  5299

Law Offices of David R. Houston

| Date | Type | Reference | Original Amt. | Balance Due | 6/23/2011 Discount | Payment |
|------|------|-----------|---------------|-------------|--------------------|---------|
| 6/8/2011 | Bill | 1322 | 734.59 | 734.59 | | 734.59 |
| | | | | | Check Amount | 734.59 |

Checking - GGW Dire   Travel expenses                                           734.59

GGW Direct, LLC
P.O. Box 150
Los Angeles, CA 90078
(424) 217-8800

JPMorgan Chase Bank, N.A.
15260 Ventura Blvd
Sherman Oaks, CA 91403
90-7162

6362

9/8/2011

PAY     Law Offices of David R. Houston                          $   **659.41

SIX-HUNDRED-FIFTY-NINE AND 41/100************************************************************   DOLLARS

TO THE
ORDER
OF
Law Offices of David R. Houston
432 Court Street
Reno, Nevada 89501

Memo    Vegas Trip-Writ Hearing

REDACTED

GGW Direct, LLC                                                      6362

        Law Offices of David R. Houston              9/8/2011
Date        Type    Reference       Original Amt.    Balance Due    Discount       Payment
8/31/2011   Bill    1353            659.41           659.41                        659.41
                                                                    Check Amount   659.41

Checking - GGW Dire   Vegas Trip-Writ Hearing                                      659.41



**GGW Direct**
P.O. Box 150
Los Angeles, CA 90078
310-405-0200

National Bank Of California
145 S Fedora Ave
Los Angeles, CA 90036-2106
323-655-6001

1117

Date    11/21/2011

Pay to the
Order of    Law Offices of David R. Houston    $    **6,375.00

SIX THOUSAND THREE HUNDRED SEVENTY FIVE AND 00/100 *********************************************    Dollars

Law Offices of David R. Houston
432 Court Street
Reno, Nevada 89501

REDACTED

GGW Direct    1117

Law Offices of David R. Houston    11/21/2011

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 10/26/2011 | Bill | 1400 | 6,375.00 | 6,375.00 | | 6,375.00 |
| | | | | | Check Amount | 6,375.00 |

National Bank GGW    6,375.00

| Date | 2009 Billed Amount | Amount Received |
|------|--------------------|-----------------|
| 10.22.08 | $ 9,042.29 | |
| 2.5.09 | $ 127.95 | |
| 3.30.09 | $ 380.00 | |
| 5.1.09 | $ 5,000.00 | |
| 7.9.09 | $ 5,000.00 | |
| 10.6.09 | $ 1,127.20 | |
| 10.6.09 | $ 2,341.18 | |
| 12.4.09 | $ 1,981.38 | |
| | | $ 25,000.00 |
| 11.5.09 | $ 3,000.00 | |
| | | $ 3,000.00 |



2009

Feb

May

July

Sept thru Nov

# Law Office of David R. Houston

432 Court Street
Reno, NV 89501

# Invoice

| DATE | INVOICE # |
|---|---|
| 10/7/2008 | 728 |

| BILL TO |
|---|
| Joseph Francis<br>GGW Brands / GGW Direct, LLC<br>P.O. Box 150<br>Los Angeles, CA. 90078 |

| COURT DATE | BILLED ON |
|---|---|
|  | 12/4/2009 |

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/7/2008 | DEP into Trust Account $25000.00 #13372 | 25,000.00 |
| 10/22/2008 | Paid INVOICE #725 to DRH $(9042.29) | -9,042.29 |
| 2/5/2009 | Paid INVOICE #775 to DRH $(127.95) | -127.95 |
| 3/30/2009 | Paid INVOICE #814 to DRH $(380.00) | -380.00 |
| 5/19/2009 | Paid INVOICE #858 to DRH $(5000.00) | -5,000.00 |
| 7/9/2009 | Paid INVOICE #882 to DRH $(5000.00) | -5,000.00 |
| 10/6/2009 | Paid INVOICE # 918 to DRH $(1127.20) | -1,127.20 |
| 10/6/2009 | Paid INVOICE #924 to DRH $(2341.18) | -2,341.18 |
| 12/4/2009 | Fees paid to DRH - Per DRH $(1981.38) | -1,981.38 |

| Balance Due | $0.00 |
|---|---|

DUE UPON RECEIPT

13372

**MANTRA FILMS INC.**
1601 CLOVERFIELD BLVD., STE. 420S
SANTA MONICA, CA 90404-4082

WASHINGTON MUTUAL BANK
RANCHO PARK FINANCIAL CENTER 892
LOS ANGELES, CA 90084
90-7162-3222

10/6/2008

PAY TO THE
ORDER OF    David R Houston/Trust Account                          **$**    $25,000.00

Twenty Five Thousand Dollars and 00 Cents                          DOLLARS

David R Houston/Trust Account

*Joe Franco*

MEMO

REDACTED

---

**MANTRA FILMS INC.**                                              13372

| Vendor ID | Name | Payment Number | Check Date | Document Number |
|---|---|---|---|---|
| DAVI009 | David R Houston/Trust Account | 0006082 | 10/6/2008 | 13372 |

| Our Voucher Number | Date | Amount | Amount Paid | Discount | Net Amount Paid |
|---|---|---|---|---|---|
| 10052008 | 10/6/2008 | $25,000.00 | $25,000.00 | $0.00 | $25,000.00 |
| | | $25,000.00 | $25,000.00 | $0.00 | $25,000.00 |

14892

**MANTRA FILMS INC.**
1601 CLOVERFIELD BLVD., STE. 420S
SANTA MONICA, CA 90404-4082

JPMORGAN CHASE BANK, N.A.
RANCHO PARK FINANCIAL CENTER
LOS ANGELES, CA 90064
WASHINGTON MUTUAL BRANCH
90-7162-3222

11/5/2009

PAY TO THE David R. Houston
ORDER OF

$     $3,000.00

Three Thousand Dollars and 00 Cents

DOLLARS

David R. Houston
The Law office of David R Houston
432 Court Street
Reno Nevada 89501

AUTHORIZED SIGNATURE

MEMO

REDACTED

**MANTRA FILMS INC.**

14892

| Vendor ID | Name | Payment Number | Check Date | Document Number |
|-----------|------|----------------|------------|-----------------|
| DAVI008 | David R. Houston | 000000000000001032 | 11/5/2009 | 14892 |

| Your Voucher Number | Date | Amount | Amount Paid | Discount | Net Amount Paid |
|---------------------|------|--------|-------------|----------|-----------------|
| 941 | 11/5/2009 | $3,000.00 | $3,000.00 | $0.00 | $3,000.00 |
| | | $3,000.00 | $3,000.00 | $0.00 | $3,000.00 |

| Date | 2008 Billed Amount | | Amount Received | |
|------|-----|-----|-----|-----|
| 1.16.08 | $ | 18,000.00 | | |
| 1.16.08 | $ | 11,266.30 | | |
| 1.16.08 | $ | 5,733.70 | | |
| | | | $ 35,000.00 | jan |
| 2.6.08 | $ | 3,892.50 | | |
| 2.6.08 | $ | 6,107.50 | | |
| | | | $ 10,000.00 | feb |
| 4.8.08 | $ | 10,000.00 | | |
| 5.1.08 | $ | 15,408.00 | | |
| | | | $ 15,408.00 | apr |
| | | | $ 10,000.00 | may |
| 8.31.08 | $ | 696.55 | | |
| | | | $ 69.55 | aug |

