1  ROBERT M. YASPAN, SBN 51867
   JOSEPH G. McCARTY, SBN 151020
2  LAW OFFICES OF ROBERT M. YASPAN
   21700 Oxnard Street, Suite 1750
3  Woodland Hills, CA 91367
   Telephone: (818) 774-9929
4  Facsimile: (818) 774-9989

5
   [Proposed] General Counsel for Debtor-in-Possession
6

7

8            UNITED STATES BANKRUPTCY COURT

9    CENTRAL DISTRICT OF CALIFORNIA - FOR THE COUNTY OF LOS ANGELES

10

11  In re:                          ) Case No.: 2:13-bk-15130-SK
                                    )
12  GGW BRANDS, LLC,                )
                                    )
13                                  ) **OPPOSITION OF DEBTOR-IN-**
                    Debtor          ) **POSSESSION TO MOTION TO DIRECT**
14                                  ) **THE APPOINTMENT OF A CHAPTER 11**
                                    ) **TRUSTEE**
15                                  )
                                    )
16                                  ) Date:  April 10, 2013
                                    ) Time:  10:30 a.m.
17                                  ) Place: Courtroom 1575
                                    )        255 E. Temple Street
18  _____ )        Los Angeles, CA 90017
                                    )
19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

I.      INTRODUCTION............................................................................ 2

II.     STATEMENT OF FACTS.............................................................. 4

        A.  Movant's Alleged Facts Distort or Misrepresent the
            Facts of the Case............................................................... 7

III.    ANY PURPORTED REVERSE ALTER EGO LITIGATION WOULD BE
        PURSUANT TO DELAWARE LAW........................................... 11

IV.     STANDARDS FOR THE APPOINTMENT OF A CHAPTER 11
        TRUSTEE   ..................................................................................... 12

        A.  The Stringent Standards for the Appointment of a Trustee................. 12

            1.  A Strong Presumption Favors a Debtor Retaining Possession........... 13

            2.  A Proponent Must Show the Extraordinary Situation
                with Clear and Convincing Evidence...................................... 14

            3.  "Cause" for Appointment of a Trustee Requires
                Extreme Circumstances.................................................... 14

                a.  Only Egregious Wrongdoing Amounts to "Cause"...................... 14

                b.  "Cause" Require that the Debtor Present a Danger to
                    the Estate or to Creditors............................................. 18

        B.  Appointment of a Trustee would be Contrary to the
            Interests of Creditors........................................................ 20

V.      CONCLUSION............................................................................. 21

TABLE OF AUTHORITIES

Cases

Dalkon Shield Claimants v. A.H. Robins Co., Inc., 828 F.2d 239 (4th Cir. 1987)..... 15, 17

In re Alt Hotel, LLC, 479 B.R. 781 (Bankr. N.D. Ill. 2012)………………………….. 11

In re Anchorage Boat Sales, Inc., 4 B.R. 645 (Bankr. E.D.N.Y. 1980)……………… 20

In re BAJ Corp., 42 B.R. 595, 597 (Bankr. D. Conn. 1984)…………………………. 13

In re Clinton Subterfuge, 72 B.R. 900 (Bankr. E.D. PA 1987)…………………….. 17

In re Eichorn, 5 B.R. 755, 757 (Bankr. D. Mass 1980)………………………………. 15

In re G-1 Holdings, Inc., 295 B.R. 502 (D. N.J. 2003) aff'd 385 F.3d 313 (ed Cir 2004)  13

In re Gen. Oil Distributors, Inc., 42 B.R. 408-09 (Bankr. E.D.N.Y. 1984)…………  13,15,17

In re Hotel Associates, 3 B.R. 343 (Bankr. E.D. Pa. 1980)…………………………  20

In re the Liberal Market, Inc., 13 B.R. 748 (Bankr. S.D. Ohio 1981)………………  18

In re Parker Grande Development, Inc., 64 B.R. 557 (Bankr. S.D. Ind. 1986)………  20

In re Sharon Steel Corp., 871 F.2d 1217 (3d Cir. 1989)……………………………  13,14,19

In re Sletteland, 260 B.R. 657 (Bankr. S.D.N.Y. 2001)……………………………  19

In re Sundale, Ltd., 400 B.R. 890, 901……………………………………………  17,16

In re William A. Smith Construction Co., 77 B.R. 124, 126 (Bankr. N.D. Ohio 1987).  18

Wehlage v. EmpRes Healthcare Inc., 821 F. Supp. 2d 1122, 1128 (N.D. Cal. 2011)..  11


Statutes

11 U.S.C. Section 541(a)…………………………………………………………  12

11 U.S.C. Section 1104………………………………………………………...  14, 18, 20

11 U.S.C. Section 1104(a)(1)……………………………………………………  12, 14

11 U.S.C. Section 1104(a)(2)……………………………………………………  12,

11 U.S.C. Section 1111....................................................................... 14

11 U.S.C. Section 1112....................................................................... 14

The herein Debtor in Possession, GGW Brands, LLC ("Debtor") hereby opposes the Motion ("Motion" or "MOTION") of Wynn Las Vegas, LLC ("Wynn" or "Movant") For Order Directing the Appointment of a Chapter 11 Trustee as follows:

## I.
## INTRODUCTION

The Court should recognize the Motion for what it is - an attempt to drive Debtor out of business by an alleged creditor with a disputed claim. Unfortunately, Debtor has been caught up in a vendetta that Wynn, a very wealthy Las Vegas business concern, and its individual founder, Stephen Wynn, have against Mr. Joseph Francis ("Francis"). Francis stated the Girls Gone Wild brand many years ago but no longer has any official role with the brand. (Dale Dec., paragraph 6; Declaration of Joseph Francis ("Francis Dec."), paragraphs 1 and 2). The Motion distorts and misrepresents the facts of this case and fails to provide any competent evidence that could support appointment of a Chapter 11 Trustee at this time. The extensive quotes from depositions in other cases are incomplete; subject to objection (See, Evidentiary Objections filed herewith); and/or leave out significant facts set forth in the same depositions and/or herein. Most notably, the alleged evidence fails to establish that any creditor has been harmed by any of the alleged actions of Debtor or anyone else.

Primarily, it should be noted that Wynn is not an actual creditor of Debtor. The judgments held by Wynn are against Francis, and are not against Debtor. Attempts by Wynn to convert these judgments into claims against Debtor are disputed and should ultimately be disallowed. The Nevada state court injunction freezing monies of GGW Direct, LLC on deposit in Nevada and the order for a special limited receiver for Francis referred to by Wynn in its Motion are interlocutory provisional remedies that have no precedential or collateral estoppel value. Indeed, the Nevada court denied a motion by Wynn for Summary Judgment on its claims. The order for a special limited receiver was

for a receiver for Francis (not Debtor) that would examine the books of Debtor to determine if

Francis was receiving income that should be attached to satisfy judgments against him. The alleged

Alter Ego claims of Wynn, and the sought after remedy of outside piercing of the corporate veil, are

not supported by the facts or the applicable law, and if any such Alter Ego claims did exist they

would belong to the Debtor in Possession as trustee for the bankruptcy estate, and not to Wynn.

(Declaration of Ron Tym ("Tym Dec."), paragraph 2).

Notably, the Motion concentrates on alleged conduct of Francis rather than the actual Debtor

in Possession.  Debtor GGW Brands, LLC is managed by Christopher Dale ("Dale").  GGW Brands,

LLC is the Manager for GGW Direct, LLC, GGW Events, LLC and GGW Brands, LLC (the "GGW

Entities").  The GGW Entities are each acting as debtors-in-possession in its respective bankruptcy.

(Declaration of Christopher Dale ("Dale Dec."), paragraph 1).  Dale began to work for GGW

Brands, LLC when it was formed and is now its Manager.  Francis is not and has never been an

owner or manager of Debtor. (Francis Dec., paragraph 3).   Debtor has and is maintaining proper

books and records and is paying its bills and meeting its obligations.  The GGW Entities collectively

employ about 17 people full time and many more on a project by project basis. (Dale Dec.,

paragraph 2).

The only alleged "mismanagement" asserted in the Motion is payment of Francis' expenses

by one or more of the GGW Entities.  However, as discussed herein, each such payment was a

legitimate and important business expense necessary to protect the assets of the GGW Entities and to

protect and increase their business.  In the past, Debtor has paid expenses related to Francis' lifestyle

because Francis' image helps sell Debtor's products and services.  Francis' "bad boy" lifestyle and

image are inextricably identified with the Girls Gone Wild brand just as Hugh Hefner is identified

with Playboy Magazine.   The public image projected by Francis and his use of  houses in California

3

and Mexico; and prestige automobiles (the expenses of which were in the past supported in part by

the GGW Entities), is a critical part of the public relations image that Debtor's business wishes to

project. Since there are many FREE sources of adult entertainment available to consumers on the

internet, the principal thing that causes consumers to PAY for the same adult entertainment services

offered by the GGW Entities is the desire by the consumer to identify with Francis and his lifestyle

by being a paid subscription member of the brand he is responsible for starting.

       Ultimately, Debtor's continued existence relies on Francis's informal involvement with the

company through him allowing his image to be used to sell memberships and other goods and

services; and consulting services provided by Francis. In addition, the lifeline of the GGW Entities

are the licenses from a third party to use the "Girls Gone Wild" and "GGW" name on services and

products, and those licenses that are based on a short term agreement that expires in a matter of

months. In short, if a Chapter 11 Trustee is appointed, Francis would likely no longer permit his

image to be used with the GGW Entities, and the licenses likely would not be renewed, and the

Chapter 11 Trustee would simply be presiding over the end of Debtor's business and liquidation of a

few remaining assets. (Dale Dec., paragraph 3).

       In contrast, Debtor is currently a profitable business that is paying its bills and meeting its

obligations. Debtor fully expects to continue in business and pay all of its legitimate debts and

obligations. As such, the appointment of a Chapter 11 Trustee cannot be in the best interest of the

creditors and the Motion should be denied. Dale Dec., paragraph 4.

## II.
## STATEMENT OF FACTS

       In 1998, Francis started the Girls Gone Wild brand by the formation of Mantra Films, Inc.,

("Mantra") of which Francis was an officer and a shareholder. Mantra, through the direction of

Francis, made the films of young women on spring break and the phrase "Girls Gone Wild" part of

the cultural landscape of America in the first decade of the 21st century.  Francis Dec., paragraph 4).

In 2007 and 2008, Francis was incarcerated for about 11 months in Reno, Nevada on federal tax charges.  During his period of incarceration, Francis had no involvement in the business.  After he was released, Francis discovered that the business had been looted by the other officers of Mantra. This left the Girls Gone Wild brand struggling for survival.  (Francis Dec., paragraph 5).

Then, in late 2009, only hours after the criminal tax charges against Francis had been settled, the IRS took virtually all of Francis' assets, and also took operating cash needed by Mantra. This left the company unable to operate and it effectively ceased to exist in 2010.  (Francis Dec., paragraph 6).

In 2010, GGW Direct, LLC obtained the license from a third party to use the Girls Gone Wild intellectual property.  Thereafter, the other GGW Entities were also formed to conduct portions of the Girls Gone Wild business.  GGW Events, LLC was formed to sponsor events at which filming could take place. GGW Magazine, LLC was formed to produce a magazine covering the GGW events and young woman.  GGW Brands, LLC was formed as the holding company for the other GGW Entities.  (Dale Dec., paragraph 5).

Francis was not, and never has been, an officer or owner of any of the GGW Entities. (Francis Dec., paragraph 3).  However, because of his past association with the products, Francis has provided informal consultation services regarding the operation of the GGW Entities.  Furthermore, because Francis was the founder of the Girls Gone Wild brand, his name and face are forever associated with the brand in the minds of the public.  His "bad boy" image and playboy lifestyle make him the brand icon to customers and potential customers of Girls Gone Wild products.  The association of Girls Gone Wild and Francis sells products.  In today's culture, where soft-core videos (and hard core pornography) are available free on the internet, a business such as Girls Gone Wild

1  that sells only soft-core videos needs to distinguish itself from the companies offering free products

2  on the internet to survive.  The GGW Entities are able to distinguish their products by their

3  association with Francis.  (Dale Dec., paragraph 6).

4  Thus, GGW Entities continued to use Francis as the "face" of the Girls Gone Wild brand.

5
   However, Francis, other than as a consultant, has no actual power or control over the GGW Entities.
6
7  Francis' strong outgoing personality is such that, as a consultant, he often loudly voices opinions or

8  recommendations to staff and others regarding whether someone should be hired or fired or on other

9  aspects of the business, but Francis holds no actual power or authority at the GGW Entities. He has

10
    never been an officer of the GGW Entities.   Francis is, in effect, a figurehead of the Girls Gone
11
    Wild brand, which enabled the companies to benefit from business generated by Francis' persona
12
13  and the publicity surrounding his lifestyle.  The use of Francis' facsimile signature on company

14  checks simply provided an appearance of continuity with third party suppliers.  Francis is not a

15  signatory on any of Debtor's DIP accounts.  (Dale Dec., paragraph 7).

16
    The IRS issues, legal disputes and the dispute with Wynn have not harmed Francis' image
17
18  since it is based upon a bad boy image and playboy lifestyle.  As such, the GGW Entities have in the

19  past paid for some of the legal expenses, which payments were determined to be legitimate business

20  expenses by a tax expert hired by the GGW Entities in 2011 to look at the issue.  However a

21
    substantial reduction in Francis' public lifestyle would harm his image and the Girls Gone Wild
22
    brand.  Thus, the GGW Entities voluntarily chose to support the lifestyle of Mr. Francis by paying
23
24  certain expenses of that lifestyle and making certain luxury company cars available for his use.

25  (Dale Dec., paragraph 8).

26  While this pre-petition payment of expenses made perfect business sense, the GGW Entities

27
    do not intend to, and have not, continued to pay any Francis expenses' following the filing of the
28

petition in bankruptcy.  However, Francis will continue to be allowed use of company vehicles to help maintain the brand.  (Dale Dec., paragraph 9).

The GGW Entities are professionally managed. The Controller has years of experience as controller of companies, and is supported by three bookkeepers in accounting.  Executive functions are performed by Dale.  The current business of the GGW Entities involves the sales of memberships to the online website of Girls Gone Wild, which website offers members streaming videos and other content. In addition, on demand videos are sold through pay per view providers.  (Dale Dec., paragraph 10).

The intellectual property rights required by the GGW Entities to operate their businesses include the right to use the Girls Gone Wild trademarked name in connection with the website, the online videos and the pay per view videos. These intellectual property rights are licensed to the GGW Entities by an unaffiliated company, Path Media Holdings, LLC ("Path Media"), pursuant to a license agreement that expires on May 31, 2013 unless affirmatively renewed monthly by both Path Media and the GGW Entities.  If a Chapter 11 Trustee were appointed, it is highly likely that the licensing agreement would not be renewed by Path Media. This would spell economic death to the GGW Entities.  (Dale Dec., paragraph 11).

Debtor contends that the Motion will not be in the interest of the creditors and, in fact, the appointment of a Chapter 11 Trustee would quickly cause the economic collapse of the GGW Entities and harm to their creditors.

A.    **Movant's Alleged Facts Distort or Misrepresent the Facts of the Case**

Wynn dedicates a large part of it argument regarding Section 1104(a)(2) citing to various deposition transcripts and other documents regarding Francis' alleged management of Debtor.  However, Wynn distorts and/or misrepresents the context and/or meaning of the alleged evidence.

7

Even more importantly, Movant has failed to prove that the alleged mismanagement or other alleged

wrongful acts has prejudiced or caused harm to anyone.  In fact, since the alleged mismanagement

appears to be based upon the alleged payment of Francis' expenses, it would appear to be to

Movant's advantage since it is alleged to be a creditor of Francis.

The following will, point by point, address the most pertinent issues regarding the alleged

evidence submitted by Movant:

1.    At page 7 of the Motion at Footnote 30, Movant contends that Francis hired the

deponent, Robert F. Klueger ("Klueger").  However, it should be noted that , as set forth on page 74,

lines 4-12 of the  Second Klueger Transcript, that the trustee of the trust, not Francis, had the

ultimate say regarding the management of the companies and on page 164, lines 8-11 of the Klueger

Transcript, that Francis was a creative consultant.  Additionally, as set forth throughout the transcript

of Klueger's deposition dated June 22, 2012 (the "Klueger Transcript") and the transcript of

Klueger's deposition dated August 28, 2012 (the "Second Klueger Transcript"), Klueger performed

work for Francis personally and  many other  entities related to Francis or the Girls Gone Wild

brand.   Furthermore, as set forth on page 26, lines 22-25 and page 27, lines 1-5 of the Klueger

Transcript, Klueger conducted an audit of the legal expenses of Francis to determine whether they

were legitimate business expenses.  Copies of the pertinent portions of the Klueger Trascript are

attached to the Tym Declaration as Exhibits 1 and 2 respectively.

2.    At page 7 of the Motion at Footnote 34, Movant contends that Francis was the

manager of the Ridgeway Global Trust.  However, it should be noted that, as set forth on page 74,

lines 4-12 of the Klueger Transcript, the trustee of the trust, not Francis, had the ultimate say

regarding the management of the companies.  See, Tym Dec., Exhibit 1.

3.    At page 7 of the Motion at Footnote 36, Movant contends that Francis had direct

control over Debtor.  However, it should be noted that , as set forth on page 74, lines 4-12 of the Second Klueger Transcript, the trustee of the trust, not Francis, had the ultimate say regarding the management of the companies and on page 164, lines 8-11 of the Klueger Transcript Francis was a creative consultant.  See, Tym Dec., Exhibits 1 and 2.

4.       At page 8 of the Motion at Footnote 37, Movant contends that Francis was in charge of the production of intellectual property.  However, it should be noted that, the cited reference to page 135 of the Klueger Transcript does not appear to have been included in Exhibit A to the Langberg Decl.

5.       At page 8 of the Motion at Footnote 38, Movant contends that Francis hired Kevin Westberg and terminated his predecessor.  However, it should be noted that, as set forth on page 74, lines 4-12 of the Second Klueger Transcript, that the trustee of the trust, not Francis, had the ultimate say regarding the management of the companies and on page 164, lines 8-11 of the Klueger Transcript, that Francis was a creative consultant. Additionally, as set forth on page 165, lines 18-22 of the Klueger Transcript, Klueger had never seen Francis hire or fire anyone.  See, Tym Dec., Exhibits 1 and 2.

6.       At page 8 of the Motion at Footnote 39, Movant contends that Francis had the ultimate authority to approve the banking relationships for Debtor.  However, it should be noted that the referenced section in the Klueger Transcript does not use the word "ultimate".  Furthermore, as set forth on page 74, lines 4-12 of the Second Klueger Transcript, the trustee of the trust, not Francis, had the ultimate say regarding the management of the companies.  See, Tym Dec., Exhibit 2.

7.       At page 8 of the Motion at Footnote 40, Movant contends that Francis was the "ultimate sole owner" of the Debtors.  However, it should be noted that, the question and answer are referencing compensation and tax matters and not the ownership of Debtor.

1    8.    At page 7 of the Motion at Footnote 41, Movant contends that Francis could direct

2    Dale to fire anyone he wanted.  However, it should be noted that , as set forth on page 165, lines 18-

3    22 of the Klueger Transcript, Klueger had never seen Francis hire or fire anyone.  Furthermore, as

4    set forth on page 74, lines 4-12 of the Second Klueger Transcript, the trustee of the trust, not Francis,

5    had the ultimate say regarding the management of the companies.  See, Tym Dec., Exhibit 1.

6

7    9.    At page 8 of the Motion at Footnotes 44 and 45, Movant contends that Francis was

8    the manager of GGW Brands based upon cites to the transcript of the Brian Rayment Depositions

9    (the "Rayment Transcript").  However, it should be noted that , as set forth on page 74, lines 4-12 of

10   the Second Klueger Transcript, the trustee of the trust, not Francis, had the ultimate say regarding the

11   management of the companies.  See, Tym Dec., Exhibit 2.

12

13   10.    At page 9 of the Motion at Footnotes 50 and 51, Movant contends that there was no

14   control over the compensation to Francis.  However, it should be noted that , as set forth on page 74,

15   lines 4-12 of the Second Klueger Transcript, the trustee of the trust, not Francis, had the ultimate say

16   regarding the management of the companies.   See, Tym Dec., Exhibit 2.

17

18   11.    At pages 11 and 12 of the Motion at Footnotes 58-69, Movant complaints that the

19   companies had paid personal legal expenses of Francis.  However, it should be noted that, as set

20   forth on page 26, lines 22-25 and page 27, lines 1-5 of the Second Klueger Transcript,page 120, lines

21   12-25, and page 121 lines 1-6 of the Klueger Transcript, Klueger conducted an audit of the legal

22   expenses of Francis and determined that they were legitimate business expenses.  See, Tym Dec.,

23   Exhibits 1 and 2.

24

25   12.    At page 12 of the Motion at Footnotes 73 & 74, Movant contends that Francis'

26   alleged attempt to change the licensor was somehow improper because of the use of the term "red

27   flag."  The "red flag" is about exclusive rights to the materials not an alleged improper transfer.  The

28

most reasonable interpretation of the email is that the party was concerned that the change could trigger a review and/or renegotiation of the contract by Direct TV because their deal might not be exclusive.  There is no reference to any suspicion on the part of DirectTV that the transfer was improper.

## III.

### <u>ANY PURPORTED REVERSE ALTER EGO LITIGATION WOULD BE PURSUANT TO DELAWARE LAW</u>

It is questionable whether or not Movant even has standing to bring this Motion as a creditor of Debtor since it is merely pursuing a "reverse alter ego" claim against Debtors.  Debtor contends that Delaware law applies, and does not support the reverse alter ego claims being alleged against Debtor.

Courts are required to apply the law of the state of incorporation to corporate veil issues.  Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.  Wehlage v. EmpRes Healthcare Inc., 821 F. Supp. 2d 1122, 1128 (N.D. Cal. 2011).   Debtor is a Delaware corporation (See, Petition, Docket No. 1), and as such Delaware law should apply to any alleged corporate veil issues.

As recently analyzed by the Court in In re Alt Hotel, LLC , 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012), the Court granted a motion to dismiss the alter ego count.  The Court stated in its analysis:

> "Delaware itself has never recognized any form of reverse piercing. Only four decisions, none of them published, even mention the theory. Of these, two note without comment that a party is attempting to employ reverse piercing. See *Abbey v. Skokos,* No. Civ.A. 2207–N, 2006 WL 2987006, at *1 (Del.Ch. Oct. 10, 2006); *IM2 Merchandising & Mfg., Inc. v. Tirex Corp.,* No. CIV.A.18077, 2000 WL 1664168, at *4 n. 11 (Del.Ch. Nov. 02, 2000). One specifically declines to say whether Delaware would recognize reverse piercing. See *MicroStrategy Inc. v. Acacia Research Corp.,* No. 5735–VCP, 2010 WL 5550455, at *12 n. 90 (Del.Ch. Dec. 30, 2010). And the fourth observes that the plaintiff "seems to be trying to pierce its own corporate veil, which would be unusual to say the least." See *Case Fin., Inc. v.*

*Alden,* No. 1184–VCP, 2009 WL 2581873, at *4 (Del.Ch. Aug. 21, 2009).

Not only has Delaware never accepted reverse piercing, but the general tenor of Delaware corporate law suggests its acceptance would be doubtful. Delaware has an exceptionally strong policy of respecting the corporate form. *Alliance Data Sys. Corp. v. Blackstone Capital Partners V.L.P.,* 963 A.2d 746, 769 (Del.Ch.), *aff'd without op.,* 976 A.2d 170 (Del.2009); *see also Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.),* 493 F.3d 345, 371 (3d Cir.2007) (calling this "a bedrock principle of corporate law in Delaware"); *Case Fin.,* 2009 WL 2581873, at *4 (declaring that "Delaware courts take the corporate form and corporate formalities very seriously"). "The courts of Delaware" therefore "do not easily pierce the corporate veil," even when the piercing claim is a conventional one. *In re Phillips Petroleum Sec. Litig.,* 738 F.Supp. 825, 838 (D.Del.1990); *see also Wallace,* 752 A.2d at 1183 (noting that convincing a Delaware court to pierce the corporate veil is "a difficult task" (internal quotation omitted)). Reverse piercing, a step beyond the conventional, would cut against the grain of what has rightly been called "[t]he conservative nature of Delaware veilpiercing law." Presser, *supra,* § 2:8 at 211 n. 1.

The piercing claim here requires this court to predict how the Delaware Supreme Court would rule, faced not only with a claim for reverse piercing but for inside reverse piercing. (cites omitted). When prediction is difficult or impossible, however, a federal court should hesitate before venturing beyond the frontiers of established state law, *J.S. Sweet Co. v. Sika Chem. Corp.,* 400 F.3d 1028, 1034 (7th Cir.2005); *King v. Damiron Corp.,* 113 F.3d 93, 97 (7th Cir.1997), and in the absence of guidance should generally adopt an interpretation that restricts liability rather than expands it, *Home Valu,* 213 F.3d at 965; *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1412 (7th Cir.1994) (footnote omitted).

Even if reverse alter ego was allowable against Debtor, such claim would belong to the debtor-in-possession as property of the estate.  11 U.S.C. Section 541(a).

As such, Debtor contends that Wynn is not a creditor and therefore has no standing to bring this Motion.

## IV.
## THE MOTION FAILS TO MEET THE STANDARDS FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

### A.    The Stringent Standards for the Appointment of a Trustee

The Motion fails under both 11 U.S.C. Section 1104 (a)(1) ("Section 1104(a)(1)") and 11 U.S.C. Section 1104 (a)(2) ("Section 1104(a)(2)").  Section 1104(a)(1) provides in pertinent part for appointment of a Chapter 11 Trustee:

"(1) for **cause**, including **fraud, dishonesty, incompetence, or gross**

**mismanagement**, of the affairs of the debtor by **current management**, either before or after the commencement of the case, or similar cause, . . . [emphasis added]."

As set forth more fully below, none of these factors are present in this case.

### 1.    A Strong Presumption Favors a Debtor Retaining Possession

Courts have consistently recognized that the Bankruptcy Code contains a strong presumption in favor of maintaining the debtor in possession, and that the appointment of a trustee is an extraordinary remedy.  See, In re G-1 Holdings, Inc., 295 B.R. 502 (D. N.J. 2003) aff'd 385 F.3d 313 (3d Cir. 2004) (there is a presumption against the appointment of a trustee and favoring the continuation of current management, and the showing of cause to overcome the presumption must be clear and convincing).

As set forth in In re Sharon Steel Corp., 871 F.2d. 1217, 1225-26 (3d Cir. 1989):

"It is settled that appointment of a trustee should be the exception, rather than the rule. *E.g.,* *In re McCorhill Publishing, Inc.,* 73 B.R. 1013, 1016-17 (Bankr.S.D.N.Y.1987) (citing 11 U.S.C. § 1108 (1982 & Supp. IV 1986)); ***1226** *In re General Oil Distribs., Inc.,* 42 B.R. 402, 408 (Bankr.E.D.N.Y.1984); *In re Main Line Motors,* 9 B.R. 782, 784 (Bankr.E.D.Pa.1981); *see* 11 U.S.C. § 1108 (1982 & Supp. IV 1986); H.R.Rep. No. 595, 95th Cong., 1st Sess. 233 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6192 ("[V]ery often the creditors will be benefitted by continuation of the debtor-in-possession, both because the expense of a trustee will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case.")

The appointment of a trustee is an extraordinary remedy because the trustee displaces the debtor and assumes decision-making functions.  In re Gen. Oil Distributors. Inc., 42 B.R. 408-09 (Bankr. E.D.N.Y. 1984) (the appointment of a trustee under Section 1104 of the Code is an extraordinary remedy which should not be taken lightly; there is a strong presumption that a debtor remain in possession absent a showing of need); In re BAJ Corp., 42 B.R. 595, 597 (Bankr. D. Conn. 1984) ("case law on this subject supports the view that the appointment of a trustee in a Chapter 11 case is an extraordinary remedy and that interpretation is consisting with the design of Chapter 11

which mandates management by the debtor unless a party in interest is able to prove that the appointment of a trustee is warranted).

The passage of Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which amended Sections 1104 and 1112 of the Code, does not alter the presumptions in favor of maintaining a debtor in possession of its affairs and property.  For instance, Section 1104 added paragraph (a)(3) to provide that the court shall order the appointment of a trustee if grounds exist to convert to or dismiss the case but appointment of a trustee or examiner is in the best interests of creditors and the estate.  In addition, Section 1111 added paragraph (b)(3) to define what may constitute amendments to Sections 1104 and 1112 provide courts more discretion in determining when, and under what circumstances, to appoint a trustee or examiner, the fundamental presumption against imposing such extraordinary relief, and the threshold that must be attained before such relief is granted, has not changed.

### 2. **A Proponent Must Show the Extraordinary Situation with Clear and Convincing Evidence**

The presumption in favor of the debtor retaining possession places a "substantial burden" on the party seeking the appointment of a trustee.  Not only does the party seeking appointment of a trustee have the burden of proof, but also the evidence supporting the motion for an appointment of a trustee must be <u>clear and convincing</u>.  <u>See</u>, <u>In re Sharon Steel</u>, <u>supra</u> at 1226 ("The Movant ... must prove the need for a trustee by clear and convincing evidence.).

### 3. **"Cause" for Appointment of a Trustee Requires Extreme Circumstances**

### (a) **Only Egregious Wrongdoing Amounts to "Cause"**

In determining whether there is incompetence, dishonesty, gross mismanagement, or fraud for purposes of Section 1104(a)(1), the question is "whether the conduct shown rises to a level

1    sufficient to warrant the appointment of a trustee.  Obviously, to require the appointment of a trustee,

2    regardless of the consequences, in the event of an act of dishonesty by the debtor, however slight or

3    immaterial, could frustrate the purpose of the Bankruptcy Code." Dalkon Shield Claimants v. A.H.

4    Robins Co., Inc., 828 F.2d 239 (4th Cir. 1987). See also, Gen. Oil Distributors. Inc., supra at 409.

5
     Thus, the courts have consistently refused to appoint a trustee simply because the debtor has
6
7    experienced severe financial problems, is insolvent, or has even made imprudent business decisions;

8    these are not "conclusive of the debtor's lack of integrity or his inability to superintend the

9    reorganization." In re Eichorn, 5 B.R. 755, 757 (Bankr. D. Mass 1980).

10
          Moreover, trustee did not replace debtors in other cases involving egregious conduct; courts
11
12   will exercise their discretion to appoint a trustee unless it is clear that the debtor will continue its

13   misconduct.  For example, in Gen. Oil Distributors, Inc., the debtor's principals engaged in

14   countless pre-petition transactions not even colorably defensible, including transferring and selling

15   assets of the debtor and then using the proceeds to benefit a personal business, and taking personal

16
     positions in the oil futures market opposition to those of the debtor taken under such principal's
17
18   supervision. Id at 404-05.  Despite such blatantly inappropriate transaction, the court exercised its

19   discretion to deny the motion to appoint a trustee, stating:

20          The findings show numerous instances of conduct approaching gross mismanagement,
            violations of fiduciary obligations, incompetence and dishonesty on behalf of Gerald, and
21          more so on behalf of Allen. Under the circumstances herein, the court must find that their
22          conduct does not constitute that which would mandate the appointment of a trustee.

23   Id at 410.

24        The court in In re Gen. Oil Distributors, Inc. further noted that, "[t]he success of current

25   management and the lack of any evidence of post-petition misconduct demonstrates that Gerald has
26
     learned a hard lesson. Id at 410.
27
28        In the present case, there is no evidence presented of any misconduct pre-petition or post-

petition. Even if one were to assume for the sake of argument that there had been mismanagement

sometime in the past, Debtor has a new management team since the time of the alleged

mismanagement claimed by Movant. (Dale Dec., paragraphs 2, 8 and 10).

Even more on point, is the case of In re Sundale, Ltd., 400 B.R. 890, 901, where the movants

contended in that case that the principal operated the hotel property and handled the finances of the

joint debtors in an incompetent, gross mismanagement and fraudulent manner. The movants cited,

among other grounds to the principal's apparent total disregard pre-petition for corporate formalities

amongst the various entities he controlled, including the debtors; the principal's failure to pay real

estate and personal property taxes; the principal's failure to transfer the liquor license such that the

hotel property was operating post-petition without a liquor license (and consequently cannot sell

alcohol); that the hotel might be illegally selling liquor; the hotel's abysmal profit record; and the

imminent loss of the franchise flag. In addition, the movants cited as cause the principal's apparent

conflict of interest in marketing of properties; the principal's decision to cease rental and franchise

payments until the court ordered the debtors to do so, the failure of the debtors to propose

reorganization plans after almost a year in bankruptcy, and the inaccuracy of the debtors' schedules.

Finally, the movants contended that there was a total lack of confidence in debtors' management, i.e.

the principal at question.

Despite all of these purported allegations, the Sundale court denied the motion to appoint a

trustee. The Sundale court stated at 902:

> "While the movants have certainly illustrated at best a sloppiness, and, at least a cavalier
> attitude, in the manner in which Mr. Scutieri has operated the affairs of the Debtors, I find
> that none of the conduct, even when viewed collectively, rises to such a level as to require the
> appointment of a trustee".

With regard to the claim of lack of corporate formalities, the Sundale court at 903 found that

16

there was no evidence that the manner in which the principal operated his entities' cash pre-petition defrauded any creditors.   Movant has a judgment, not against Debtors, but against Francis.   It has not been finally adjudicated whether or not the Movant is even a creditor of Debtor.

Indeed, Movant's motion is not about Francis alleged stealing money.   The Motion does not contend that the Debtors are not operating successfully.   The Motion does not contend that the pre-petition payments have negatively impacted the value of the Debtors' assets.   The reason why is because none of these acts have occurred.   As in <u>Sundale,</u> this case involves alleged "victimless" mistakes, and any purported pre-petition acts have not damaged any alleged creditor, including Movant.

Other cases also support the denial of appointing a Chapter 11 Trustee, including:

- In <u>A.H. Robins</u>, <u>supra</u>, the debtor (i) utilized its subsidiaries as conduits for making charitable contributions, investments, and payments of pre-petition indebtedness, (ii) paid pre-petition claims of present and former executives and pre-petition claims arising under unassumed executory contracts, and (iii) made payments to settle an employee's pre-petition lawsuit. <u>Id</u> at 240.   The court determined that debtor's conduct did not constitute "cause" for appointment of a trustee.   The court stated: "[a] determination of cause, therefore, is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding." <u>Id</u> at 242.

- In <u>In re Clinton Subterfuge</u>, 72 B.R. 900 (Bankr. E.D. PA 1987), the court denied the appointment of a trustee despite the debtor's fraudulent conveyance, the debtor's formation of a corporation for the purpose of shielding assets from execution by the fraudulent conveyance judgment creditor, and the debtor's unauthorized execution of numerous pre-petition lease agreement with the newly formed corporation. <u>Id</u> at 981-82.   The court stated

"whether cause exists to appoint a trustee is largely a matter of degree. In most bankruptcy cases there will be some display of mismanagement, some disregard or oversight of statutory provisions, and some legitimate concerns raised by creditors that creditor interests would be better served by replacing current management. The questions becomes whether these concerns rise to a level justifying the extraordinary relief." Id. at 987.

- In In re the Liberal Market, Inc., 13 B.R. 748 (Bankr. S.D. Ohio 1981), the court refused to appoint a trustee despite the fact that the debtor's president had transferred funds from the debtor to a family corporation and to salaried employees for "vacation pay." The court found that even though these transfers indicated a "callous disregard for the fiduciary duties incumbent upon the officers of the Debtor-in-Possession," they did not demonstrate fraud or dishonesty sufficient to establish cause for the appointment of a trustee." Id. at 750-51.

### (b)    "Cause" Require that the Debtor Present a Danger to the Estate or to Creditors

The result of the foregoing cases illustrates the prophylactic principle underlying Section 1104. Congress did not intend to punish an estate on the basis of prior history or financial difficulty. Rather, Congress provided courts with a mechanism to protect creditors and the estate where such protection was so necessary as to warrant the excessive costs involved upon the appointment of a trustee.

> **"The appointive power of the court is to be exercised only where the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded.** This test ... requires the court to be mindful of any additional costs or expenses to the estate which would result from the appointment of a trustee. (H.Rept. No. 95-595 t accompany H.R. 8200, 95th Cong. 1st Sess. (1977) pp 402, 403, U.S. Code Cong. & Admin New 1978, p 5787)."

See, In re William A. Smith Construction Co., 77 B.R. 124, 126 (Bankr. N.D. Ohio 1987) (emphasis

18

added).  Where no danger to the estate persists, no justification exists for the burden and expense of the displacement of the debtor and the appointment of a trustee.

The cases cited by Movant, including the Third Circuit's decision in <u>Sharon Steel</u> illustrates that which is lacking in this case – clear and convincing evidence of a level of conduct so severe as to lead to the inescapable conclusion that the appointment of a trustee is essential to the debtor's reorganization.  In <u>Sharon Steel</u>, the debtor engaged in numerous transactions on the eve of bankruptcy in a patently systematic attempt to siphon assets to affiliate companies to the detriment of the debtor, including several million dollars of payments.  <u>Id</u> at 1120, n. 9.

Based upon these transactions, the <u>Sharon Steel</u> court concluded that the "discretionary determination of cause required by subsection (a)(1) … the [lower] court acted within its discretion in concluding that the totality of the circumstances signaled the need for a trustee."  <u>Id</u> at 1228.

Furthermore, in considering whether to appoint a trustee, the court's focus must be on whether the debtor's management engaged in post-petition misconduct, rather than alleged pre-petition acts. As the Court in <u>In re Sletteland</u>, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) stated:

> "[O]n motion for the appointment of a trustee, the focus in on the debtor's current activities, not past misconduct.  Speculation that the debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional cost of a trustee.

As set forth more above below, the only "mismanagement" or other action alleged in the Motion as grounds for establishing cause (payment of Francis' expenses), is actually a legitimate and important component of Debtor's business.   Wynn's extensive discussion of Francis' alleged management or mismanagement of Debtor is to no effect since there is no evidence that any alleged action by Francis has caused or will cause detriment to Debtor or any of its creditors.  In the past, one or more of the GGW Entities have paid expenses related to his "bad boy" lifestyle because Francis  promotes and ultimately helps sell Debtor's products and services.  After the filing of this

1    case, the GGW Entities have not continued to pay any Francis expenses' other than the continued

2    use of company vehicles to help maintain the brand.

3        In this case, the purported creditor is not even a creditor of Debtor.  Instead, Movant is the

4    creditor of the "face" of the Girls Gone Wild brand, Francis.  Francis does not have access to the

5
     debtor-in-possession accounts (Dale Dec., paragraph ); is not (and was not) an owner of Debtors, and
6
7    any payment to Francis or on his behalf was to increase the brand recognition of Girls Gone Wild.

8    As such, it is evident that Movant has failed to demonstrate that any of the Debtors exhibited any

9    conduct even remotely approaching the fraud, dishonesty, incompetence, and gross mismanagement

10
     exemplified in the cases cited by Movant.
11
12        The request for a trustee should be denied and the Debtor should be allowed to proceed as

13    debtor in possession and without the unnecessary costs and burdens of a chapter 11 trustee.

14        **B.**    **Appointment of a Trustee would be Contrary to the Interests of Creditors**

15        A court's appointment of a trustee under Section 1104 requires a finding by the court that

16
     clear and convincing evidence has been presented showing that the appointment of a trustee is in the
17
18    best interests of creditors, equity security holders and other interests of the estate.   In re Parker

19    Grande Development, Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986, citing In re Hotel Associates, 3

20    B.R. 343 (Bankr. E.D. Pa. 1980).

21        "[U]nder subsection (a)(2), the Court may utilize its broad equity powers to engage in a cost-
22        benefit analysis in order to determine whether the appointment of a trustee will be in the best
          interests of creditors, equity security holders, and other interests of the estate."
23
24        See, In re Anchorage Boat Sales, Inc., 4 B.R. 645, 647 (Bankr. E.D.N.Y. 1980), citing In re

25    Hotel Associates, 3 B.R. 343 (Bankr. E.D. Pa. 1980).

26        In the instant case, the costs associated with hastily appointing a chapter 11 Trustee before

27
     the case is even six-weeks old, while the Debtor is intending to pay all legitimate claimants in full,
28

clearly outweighs any alleged benefit to creditors. In fact, there is no justification for the appointment of a Chapter 11 Trustee, since Wynn has failed to establish cause. Francis is not managing Debtor, and Debtor is being professionally managed with an accounting staff and experienced Controller. In contrast, Debtor contends that the appointment of a Chapter 11 Trustee would quickly cause the economic collapse of the GGW Entities since they will lose the right to use of the Girls Gone Wild brand. (Dale Dec., paragraph 11). A trustee would not have the same motivation as the Debtor's management to reorganize the business, and preserve its enterprise value.

In fact, rather than trying to preserve the assets of Debtor, Movant is attempting to poach them for its own benefit, even though it has not been finally determined that Movant is a creditor. The appointment of a Chapter 11 Trustee and a disassociation with Francis as the face of the Girls Gone Wild brand will almost certainly lead to Debtor's demise. This will harm all creditors of the Debtor.

## V.
## CONCLUSION

Appointment of a Chapter 11 Trustee is not warranted and would serve no useful purpose, but rather a detrimental one to Debtor and its creditors. Furthermore, there is no evidence that Movant is even a legitimate creditor of Debtor. Debtor should have the opportunity to reorganize itself and restructure its business affairs so that all allowed creditors can be paid the highest potential.

Dated: March 29, 2013                    LAW OFFICES OF ROBERT M. YASPAN


By _____
ROBERT M. YASPAN
JOSEPH G. McCARTY
[Proposed] General Counsel for Debtor-in-Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 21700 Oxnard Street, Suite 1750, Woodland Hills CA 91367.

A true and correct copy of the foregoing document entitled: **OPPOSITION OF DEBTOR-IN-POSSESSION TO MOTION TO DIRECT THE APPOINTMENT OF A CHAPTER 11 TRUSTEE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On March 29, 2013, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Dare Law dare.law@usdoj.gov
- Malhar S Pagay mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ronald N Richards ron@ronaldrichards.com
- Ronald D Tym RTym@Tymfirm.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
- Andy C Warshaw awarshaw@lawcenter.com, mstevens@lawcenter.com
- Robert M Yaspan court@yaspanlaw.com, tmenachian@yaspanlaw.com

**2. SERVED BY UNITED STATES MAIL**:
On March 29, 2013, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Please see attached service list.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/29/13 | Tatyana Menachian | /s/ Tatyana Menachian |
|---------|-------------------|------------------------|
| _Date_  | _Printed Name_    | _Signature_            |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

The Hon. Sandra R. Klein
United States Bankruptcy Court
255 E. Temple Street, Suite 1582 /
Courtroom 1575
Los Angeles, CA 90012

Office of the United States Trustee
725 S. Figueroa St., 26th Flr
Los Angeles, CA 90017

Allen Michael Wade
c/o Law Office of Shane M. Mallett
Board of Trade Building
80 Twelfth Street, Suite 100
Wheeling, WV 26003

Brian J Rayment
c/o Dana L. Kurtz, Esq.
32 Blaine St.
Hinsdale, IL 60521

Ecoff Blut, LLP
300 S. Fourth Street, Suite 701
Las Vegas, NV 89101

Etagz, Inc.
Pia Anderson Dorius Reynard & Moss
222 So. Main St, Suite 1830
Salt Lake City, UT 84101

Mitchell J. Langberg
Brownstein Hyatt et. al.
2029 Century Park East, Suite 2100
Los Angeles, CA 90067

Tamara Favazza
c/o Jerry P. Medler
Medler and Roither, PC
8000 Maryland Ave., Suite 640
Clayton, MO 63105

Attorney for Wynn Las Vegas
Malhar S Pagay
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003