MALHAR S. PAGAY (CA BAR NO. 189289)
VICTORIA A. NEWMARK (CA BAR NO. 183581)
STEVEN J. KAHN (CA BAR NO. 76933)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90067
Telephone:    310/277-6910
Facsimile:    310/201-0760
Email:    mpagay@pszjlaw.com
          vnewmark@pszjlaw.com
          skahn@pszjlaw.com

MITCHELL J. LANGBERG (CA BAR NO. 17192)
LAURA E. BIELINSKI (CA BAR NO. 264115)
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone:    702/382-2101
Facsimile:    702/382-8135
Email:    mlangberg@bhfs.com
          lbielinski@bhfs.com

Attorneys for Wynn Las Vegas, LLC d/b/a Wynn Las Vegas

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GGW BRANDS, LLC,<br><br>                   Debtor. | Case No.: 2:13-bk-15130-SK<br>Chapter 11<br><br>***EX PARTE* EMERGENCY APPLICATION FOR ORDER AUTHORIZING WYNN LAS VEGAS, LLC D/B/A WYNN LAS VEGAS TO FILE (I) SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE; (II) NOTICE OF LODGMENT OF TRANSCRIPT OF 341(A) MEETING OF CREDITORS OF DEBTORS; AND (III) PERTINENT EXCERPTS OF THE 341(A) MEETING OF CREDITORS OF DEBTORS; DECLARATION OF MALHAR S. PAGAY IN SUPPORT THEREOF**<br><br>**Hearing**<br>Date:    April 10, 2012<br>Time:    10:30 a.m.<br>Place:   Courtroom 1575<br>           255 E. Temple Street<br>           Los Angeles, CA  90012 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE SANDRA KLEIN, UNITED STATES BANKRUPTCY JUDGE AND ALL PARTIES IN INTEREST AND THEIR ATTORNEYS OF RECORD:**

Wynn Las Vegas, LLC d/b/a Wynn Las Vegas ("Wynn Las Vegas"), a creditor in the bankruptcy cases of debtors and debtors in possession GGW Brands, Inc. ("GGW Brands"), GGW Direct, LLC ("GGW Direct"), GGW Events, LLC ("GGW Events"), and GGW Magazine, LLC ("GGW Magazine" and together with GGW Brands, GGW Direct, and GGW Events, the "Debtors"), hereby submits this emergency *ex parte* application (the "Application") for an order that authorizes Wynn Las Vegas to file a: (i) *Supplemental Request for Judicial Notice* ("Supplemental RFJN") in support of the relief requested by Wynn Las Vegas in its *Motion for Order Directing the Appointment of a Chapter 11 Trustee* (the "Wynn Trustee Motion"), which has been filed with this Court and has been set for hearing *tomorrow*, on April 10, 2013; (ii) a *Notice of Lodgment of Transcript of 341(a) Meeting of the Creditors of the Debtors* ("Notice of Lodgment"); and (iii) *Pertinent Excerpts of the Transcript of 341(a) Meeting of the Creditors of the Debtors* ("Excerpts"). In support of this Application, Wynn Las Vegas respectfully states as follows:

## I.

## INTRODUCTION

On April 8, 2013, two days before the hearing regarding the Wynn Trustee Motion, the Office of the United States Trustee (the "US Trustee") conducted meetings of creditors of the Debtors in accordance with 11 U.S.C. § 341(a) (the "Creditors' Meeting"). Information obtained during the Creditors' Meeting directly relates to the Wynn Trustee Motion. Today, on April 9, 2013, on or around 3:40 p.m., the afternoon before the hearing regarding the Wynn Trustee Motion, the US Trustee filed its own *Motion to Appoint Trustee or in the Alternative for the Appointment of an Examiner* (the "US Trustee's Motion"), also seeking the appointment of a trustee in the Debtors' cases. Information contained in the US Trustee's Motion also has a direct bearing on the Wynn Trustee Motion.

The US Trustee's conducting of the Creditors' Meeting and the subsequent filing of the US Trustee's Motion both occurred after the close of briefing regarding the Wynn Trustee Motion, but the evidence presented in both the Creditors' Meeting and the US Trustee's Motion bear directly on

DOCS_LA:266449.1 93837/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the relief requested in, and the Court's consideration of, the Wynn Trustee Motion.  Therefore, Wynn Las Vegas requests that it be allowed to file a *Supplemental Request for Judicial Notice*, pursuant to Rule 201 of the Federal Rules of Evidence, requesting that the Court take judicial notice of the transcript of the Creditors' Meeting (the "<u>Transcript</u>") and of the US Trustee's Motion.  Wynn Las Vegas further requests that it be allowed to file a *Notice of Lodgment of Transcript of 341(a) Meeting of the Creditors of the Debtors*; and *Pertinent Excerpts of the Transcript of 341(a) Meeting of the Creditors of the Debtors*.

This Application is being filed on an emergency basis because neither the Transcript nor the US Trustee's Motion was available until the day before the hearing regarding the Wynn Trustee Motion.  True and correct copies of the Supplemental RFJN, Notice of Lodgment and Excerpts are attached as **Exhibits "A"**, **"B"** and **"C"**, respectively, to the Declaration of Malhar S. Pagay, annexed hereto.

## II.

## <u>DISCUSSION</u>

By allowing the Court to take judicial notice of the US Trustee's Motion and of the pertinent excerpts of the Transcript, the Court will have the benefit of the US Trustee's perspective in connection with the Wynn Trustee Motion.  The Transcript and US Trustee's Motion contain evidence which bears directly on the relief sought in the Wynn Trustee Motion; in fact, through the US Trustee's Motion, the US Trustee is also seeking the appointment of a chapter 11 trustee in the Debtors' cases.  Such evidence was not previously available to Wynn Las Vegas at the time of filing their motion or otherwise during the briefing schedule set by the Court in connection with the Wynn Trustee Motion.

The US Trustee's Motion is set to be heard on May 9, 2013.  Allowing the Court an opportunity to review the evidence contained in the Transcript and the US Trustee's Motion in connection with the Wynn Motion would provide the Court with substantial information necessary to rule on the matter and protect the interests of the creditors of the estates without delay.  Were the Court not to have this additional pertinent information available to it at the time of the hearing on the

DOCS_LA:266449.1 93837/001

1  Wynn Trustee Motion, the estates' creditors could suffer irreparable harm from the delay of the

2  appointment of a chapter 11 trustee.

3                                          **III.**

4                                  <u>**CONCLUSION**</u>

5         For all of the reasons set forth herein, the Court should issue its Order:

6         (a)      Granting this Application;

7         (b)      Authorizing Wynn Las Vegas to file (i) a Supplemental Request for Judicial Notice in

8                  Support of Motion for Order Directing the Appointment of a Chapter 11 Trustee; (ii)

9                  a Notice of Lodgment of Transcript of 341(a) Meeting of the Creditors of the

10                 Debtors; and (iii) Pertinent Excerpts of the Transcript of 341(a) Meeting of the

11                 Creditors of the Debtors; and

12        (c)      Granting Wynn Las Vegas such other relief as is just and proper.

13   Dated: April 9, 2013                PACHULSKI STANG ZIEHL & JONES LLP

14

15                                       By:    */s/ Malhar S. Pagay*
                                                Malhar S. Pagay
16                                              Victoria A. Newmark

17                                       BROWNSTEIN HYATT FARBER
                                         SCHRECK, LLP
18

19

20                                              Mitchell J. Langberg
                                                Laura E. Bielinski
21
                                         Attorneys for Wynn Las Vegas, LLC, d/b/a Wynn
22                                       Las Vegas

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:266449.1 93837/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### DECLARATION OF MALHAR S. PAGAY

I, Malhar S. Pagay, declare as follows:

1.      I am an attorney with Pachulski Stang Ziehl & Jones LLP ("PSZJ"), duly admitted to practice law before the courts of the State of California, the United States Court of Appeals for the Ninth Circuit, the United States District Courts for the Central, Eastern, Northern and Southern Districts of California and this Court and am counsel to Wynn Las Vegas, LLC d/b/a Wynn Las Vegas, in connection with the bankruptcy cases of GGW Brands, LLC, GGW Direct, LLC, GGW Events, LLC, and GGW Magazine, LLC.

2.      I make this Declaration in support of the *Ex Parte Emergency Application for Order Authorizing Wynn Las Vegas, LLC d/b/a Wynn Las Vegas to File (I) Supplemental Request for Judicial Notice in Support of Motion for Order Directing the Appointment of a Chapter 11 Trustee; (II) Notice of Lodgment of Transcript of 341(a) Meeting of Creditors of Debtors; and (III) Pertinent Excerpts of the 341(a) Meeting of Creditors of Debtors* (the "Application"), filed in connection with the *Motion for Order Directing the Appointment of a Chapter 11 Trustee* (the "Wynn Trustee Motion"), filed by Wynn Las Vegas in the above-captioned case and scheduled for hearing on April 10, 2013, at 10:30 a.m. (the "Hearing").  Terms not otherwise defined herein shall have the same meaning as set forth in the Application.

3.      The Application is being filed on an emergency basis because neither the Transcript nor the US Trustee's Motion was available until the day before the hearing regarding the Wynn Trustee Motion.

4.      True and correct copies of the Supplemental RFJN, Notice of Lodgment and Excerpts are attached hereto as Exhibits **"A", "B"** and **"C"**, respectively.

I declare under penalty of perjury that the foregoing is true and correct and that if called upon as a witness, I could and would competently testify thereto.

Executed this 9th day of April, 2013, at Los Angeles, California.

*/s/Malhar S. Pagay*
Malhar S. Pagay

DOCS_LA:266449.1 93837/001

# EXHIBIT A

1  MALHAR S. PAGAY (CA BAR NO. 189289)
   VICTORIA A. NEWMARK (CA BAR NO. 183581)
2  STEVEN J. KAHN (CA BAR NO. 76933)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, California 90067
4  Telephone:    310/277-6910
   Facsimile:    310/201-0760
5  Email:        mpagay@pszjlaw.com
                 vnewmark@pszjlaw.com
6                skahn@pszjlaw.com

7  MITCHELL J. LANGBERG (CA BAR NO. 17192)
   LAURA E. BIELINSKI (CA BAR NO. 264115)
8  BROWNSTEIN HYATT FARBER SCHRECK, LLP
   100 North City Parkway, Suite 1600
9  Las Vegas, Nevada 89106
   Telephone:    702/382-2101
10 Facsimile:    702/382-8135
   Email:        mlangberg@bhfs.com
11               lbielinski@bhfs.com

12 Attorneys for Wynn Las Vegas, LLC d/b/a Wynn Las Vegas

13              UNITED STATES BANKRUPTCY COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                  LOS ANGELES DIVISION

16 In re:                              Case No.: 2:13-bk-15130-SK

17 GGW BRANDS, LLC,                    Chapter 11

18                      Debtor.        SUPPLEMENTAL REQUEST FOR
                                       JUDICIAL NOTICE IN SUPPORT OF
19                                     MOTION FOR ORDER DIRECTING
                                       THE APPOINTMENT OF A
20                                     CHAPTER 11 TRUSTEE

21                                     **Hearing**
                                       Date:     April 10, 2012
22                                     Time:     10:30 a.m.
                                       Place:    Courtroom 1575
23                                               255 E. Temple Street
                                                 Los Angeles, CA 90012

24         Pursuant to Rule 201 of the Federal Rules of Evidence, Wynn Las Vegas, LLC d/b/a Wynn

25 Las Vegas, a creditor of debtors and debtors in possession GGW Brands, Inc. ("GGW Brands"),

26 GGW Direct, LLC ("GGW Direct"), GGW Events, LLC ("GGW Events"), and GGW Magazine,

27 LLC ("GGW Magazine"), hereby requests that the Court take judicial notice of *the Motion to*

28 *Appoint Trustee or in the Alternative for the Appointment of an Examiner; Memorandum of Points*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  PETER C. ANDERSON
   UNITED STATES TRUSTEE
2  Jill M. Sturtevant, State Bar No. 089395
   Assistant United States Trustee
3  Dare Law, State Bar No. 155714
   Trial Attorney
4  OFFICE OF THE UNITED STATES TRUSTEE
   725 South Figueroa Street, Suite 2600
5  Los Angeles, California 90017-5418
   (213) 894-4925 telephone
6  (213) 894-2603 facsimile
   Email: dare.law@usdoj.gov
7

8              UNITED STATES BANKRUPTCY COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                   LOS ANGELES DIVISION

11

12  In re:                    ) Case No.: 2:13-bk-151320 SK
                              )
13                            ) Chapter 11
    **GGW BRANDS, LLC**       )
14                            ) MOTION FOR THE APPOINTMENT OF A
            Debtor.           ) CHAPTER 11 TRUSTEE OR IN THE
15                            ) ALTERNATIVE, FOR THE APPOINTMENT
                              ) OF AN EXAMINER; MEMORANDUM OF
16                            ) POINTS AND AUTHORITIES;
                              ) DECLARATION OF JACK ARUTYUNYAN
17                            ) IN SUPPORT THEREOF
                              )
18                            ) Date:  May 09, 2013
                              ) Time:  8:30 a.m.
19                            ) Ctrm:  1545
                              ) 255 E. Templel Street
20                            ) Los Angeles, CA  90012
                              )
21  _____

22        TO THE HONORABLE SANDRA KLEIN, UNITED STATES BANKRUPTCY JUDGE,

23  DEBTOR, AND OTHER INTERESTED PARTIES:

24        PLEASE TAKE NOTICE that on the above date and time and in the indicated courtroom,

25  the United States Trustee will move the Court for an Order appointing a Chapter 11 Trustee, or in

26  the alternative, for the appointment of an Examiner in above captioned cases under 11 U.S.C. §

27  1104 for cause described in detail herein.

28                                    1

1    PLEASE TAKE FURTHER NOTICE that if you wish to oppose this motion, you must file

2   a written response with the Bankruptcy Court and serve a copy of it upon the United States Trustee

3   at the address set forth in the upper left-hand corner of this document, and upon the Debtors and the

4   Debtors' attorney no less than 14 days prior to the above hearing date.  Failure to timely file and

5   serve such opposition may be considered consent to the granting of the Motion.

6

7   Dated: April 09, 2013                    PETER C. ANDERSON
                                            UNITED STATES TRUSTEE

8

9                                           By: _____

10                                              Dare Law

11                                          Attorney for the United States Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                              2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## INTRODUCTION

4       The United States Trustee for Region 16 (hereinafter "United States Trustee"), through the

5    undersigned counsel, moves this Court to order the appointment of a chapter 11 trustee in these

6    cases, based on 11 U.S.C. § 1104(a). In support of the motion, the United States Trustee provides

7    the following points and authorities.

8       The United States Trustee submits that the record in this case establishes both that cause

9    exists for the appointment of a Trustee, and that the appointment of a Trustee is in the best interest

10   of creditors.

11      An ample record of mismanagement is present in this case. The recently appointed

12   Manager of this LLC is not an appropriate fiduciary in these cases and prejudice to creditors will

13   occur unless a Trustee is appointed.

14

## II.

15

## JURISDICTION

16      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is

17   a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for relief are sections 1104(a)

18   and 105(a) of title 11 of the United States Code ("Bankruptcy Code").

19

20

## III.

21

## STATEMENT OF FACTS

22      On February 27, 2013, *GGW Brands, LLC*, Case No. 2:13-BK-15130-SK; *GGW Direct,*

23   *LLC*, Case No. 2:13-BK-15132-SK; *GGW Events, LLC*, Case No. 2:13-BK-15134-SK; and <u>*GGW*</u>

24   *Magazine, LLC*, Case No. 2:13-BK-15137-SK ("Related Debtors') filed voluntary chapter 11

25   bankruptcy petitions. These Related Debtors work as one unit without respect to separate corporate

26   identities.   Declaration of Jack Arutyunyan (hereinafter "Arutyunyan Decl.") para. 9. The Related

27

28                                          3

1   Debtors produce and market videos under the licensed brand of "Girls Gone Wild".[1]  According to

2   the Related Debtors, the public face of this brand is Joseph Francis, the creator of "Girls Gone

3   Wild.[2]"  All four of the related debtors have the same Manager, Christopher Dale, who is charged

4   with operating and making decisions on behalf of the Debtors.  Mr. Dale was appointed as manager

5   sometime in October/November 2012.  Arutyunyan Decl., para. 9.

6          The first meeting of creditors in accordance with 11 U.S.C. §341(a) was conducted on April

7   08, 2013.  Mr. Dale appeared to testify on behalf of the Related Debtors.  He testified at this

8   meeting that he had not applied for the Manager position, but rather was informed by Ronald Tym,

9   Esq.[3] through a telephone call, that he was to be manager for the Related Debtors.  Arutyunyan

10  Decl., para. 9.  Mr. Dale further testified at the 341(a) meeting that he spends approximately $4 - 5$

11  hours per week in total working for the Related Debtors and that he is employed by another

12  unrelated company named "Movie Clips."  He receives $1000 per week as Manager of the Related

13  Debtors.  Prior to his employment by Movie Clips, Mr. Dale was in the human resources

14  department of Debtor.  Arutyunyan Decl., para. 9.

15         The United States Trustee conducted a site visit to the Debtor's premises on April 03, 2013.

16  Present at this meeting were representatives of the United States Trustee, Related Debtors  proposed

17  bankruptcy counsel, outside counsel, and the heads of Human Resources and the Controller.  Mr.

18  Dale was not present at this meeting.  After discussion, the United States Trustee requested copies

---

[1] Mr. Dale testified that the brand "Girls Gone Wild" is licensed through an entity called Path Media.  The license agreement is made between Path Media and GGW Direct, LLC.  The original licensing agreement was terminated by Path Media prior to the bankruptcy filing, and GGW Direct entered into a new licensing agreement with Path Media, which agreement expires in May 2013.  GGW Direct's Schedule F lists Path Media as owed $1.5 million in royalties.  Mr. Dale testified that he did not negotiate the new licensing agreement as that function was performed by Mr. Tym and he signed the agreement thereafter.

[2] See, Debtor's opposition to creditor Wynn's Motion for the Appointment of a Chapter 11 Trustee, attached to the Request for Judicial Notice as Exhibit "2."

[3] Mr. Tym has identified himself as outside non-bankruptcy counsel for the debtor.

4

1   of the Debtor's general ledger and two years of American Express credit card statements which was

2   provided by the Related Debtors by e-mail on April 04, 2013.

3          During the 341(a) meeting, Mr. Dale testified that Mr. Francis is not involved in the

4   operations of the Debtor nor is he a member or manager of the Debtor.   Arutyunyan Decl., para. 9.

5   Although Mr. Francis was neither a Manager, nor a member or employee, he was provided an

6   American Express card along with several other individuals.  An analysis of the AMEX card shows

7   the following usage for the period covering January 1, 2011 through March 31, 2013 :

8

**AMEX   Jan 2011 - Dec 2011**

| User | Card # | TOTAL | % of Total |
|---|---|---|---|
| Joseph R. Francis | 6-54007 | $372,932.77 | 53.4% |
| Sergio Bravo | 6-52100 | $40,589.51 | 5.8% |
| Clayton McKinney | 6-53157 | $30,372.37 | 4.3% |
| Roxana Loera | 6-52118 | $40,955.23 | 5.9% |
| Larry Hancock | 6-53132 | $17,936.83 | 2.6% |
| Alicia Serrano | 6-52126 | $58,506.48 | 8.4% |
| Dorota Anoszkiewicz | 6-51011 | $49,894.26 | 7.1% |
| Ymell Villegas | 6-53033 | $24,328.78 | 3.5% |
| Salvador Castellon | 6-51086 | $24,100.08 | 3.4% |
| Sara Schulte | 6-52142 | $19,818.18 | 2.8% |
| Jessica G. Pineda | 6-51060 | $11,399.70 | 1.6% |
| Eric Deutsch | 6-51029 | $8,004.46 | 1.1% |
| **TOTAL** | | **$698,838.65** | **100.0%** |

**AMEX   Jan 2012 - Dec 2012**

| User | Card # | TOTAL | % of Total |
|---|---|---|---|
| Joseph R. Francis | 6-54007 | $434,993.52 | 41.6% |
| Sergio Bravo | 6-52100 | $259,825.17 | 24.9% |
| Ron Villanueva | 6-52191 | $97,248.67 | 9.3% |
| Bryan Lord | 6-52167 | $69,794.98 | 6.7% |
| Larry Hancock | 6-53132 | $58,438.28 | 5.6% |
| Clayton McKinney | 6-53157 | $52,498.98 | 5.0% |
| Roxana Loera | 6-52118 | $31,054.88 | 3.0% |
| Thomas J. Studder | 6-52225 | $11,942.90 | 1.1% |
| Gregory Harrison | 6-52175 | $11,936.00 | 1.1% |
| Heather Brook | 6-52233 | $9,512.47 | 0.9% |
| Christopher Rudin | 6-51185 | $7,500.68 | 0.7% |
| Sara Schulte | 6-52142 | $9.99 | 0.0% |
| **TOTAL** | | **$1,044,756.52** | **100.0%** |

5

**AMEX Jan 2013 – March 2013**

| User | Card # | Jan-13 | Feb-13 | Mar-13 | TOTAL | % of Total |
|------|--------|--------|--------|--------|-------|------------|
| Sergio Bravo | 6-52100 | $26,029.41 | $30,574.03 | $38,641.94 | $95,245.38 | 45.9% |
| Joseph R. Francis | 6-54007 | $11,507.71 | $12,172.68 | $7,896.53 | $31,576.92 | 15.2% |
| Heather Brook | 6-52233 | $7,607.05 | $14,002.62 | $8,335.30 | $29,944.97 | 14.4% |
| Ron Villanueva | 6-52191 | $8,096.38 | $12,066.05 | $7,309.87 | $27,472.30 | 13.3% |
| Bryan Lord | 6-52167 | $4,869.42 | $6,061.13 | $7,582.55 | $18,513.10 | 8.9% |
| Roxana Loera | 6-52118 | $1,170.20 | $1,345.28 | $2,045.25 | $4,560.73 | 2.2% |
| | | $59,280.17 | $76,221.79 | $71,811.44 | $207,313.40 | 100.0% |

The United States Trustee also reviewed the Debtor's account number 15000 entitled "Affiliate Receivables" in the General Ledger ("G/L") for GGW Direct. According to the G/L, between January 1, 2012 and November 2012, GGW Direct booked over $356,007.30 in receivables from Blue Horse according to the journal entries. Mr. Dale testified at the 341(a) meeting that Blue Horse was a "Joseph Francis entity" and that Debtor made payments to Blue Horse for use of real property in Bel Air, California. `Listed below are the transactions by date and amount for use of the Bel Air property:

| Date | Debit | Credit |
|------|-------|--------|
| 02/01/12 | $30,000.00 | |
| 02/17/12 | $40,000.00 | |
| 04/18/12 | | $50,000.00 |
| 05/04/12 | $5,000.00 | |
| 05/14/12 | $10,000.00 | |
| 05/24/12 | $35,000.00 | |
| 06/14/12 | $10,000.00 | |
| 06/26/12 | $20,000.00 | |
| 06/29/12 | $90,000.00 | |
| 07/02/12 | $10,000.00 | |
| 07/19/12 | $10,000.00 | |
| 08/02/12 | $50,000.00 | |
| 09/04/12 | $45,000.00 | |
| 09/10/12 | $5,000.00 | |
| 10/10/12 | $35,000.00 | |
| 10/18/12 | $5,000.00 | |
| 10/24/12 | | $6,702.30 |
| 11/13/12 | $1,996.33 | |
| 11/16/12 | $10,713.27 | |
| **NET $356,007.30** | | |

6

1    Mr. Dale testified that the property is used by Joseph Francis.

2    In addition to the G/L entries which relate to the Bel Air property, the following are G/L

3  entries for GGW Direct with a specific emphasis on account 81000 entitled "Film Location

4  Specialists" for the period covering January 1, 2012 through March 31, 2013.  Mr. Dale testified

5  that the following G/L entries relate to use of a Mexico property:

| GGW Direct G/L Transaction for 01/01/2012 – 03/31/2013 | | | |
|---|---|---|---|
| Account Description | Debit | Credit | Balance |
| 81100 Food and Beverage (Alcohol, bottled water, fresh fish and groceries) | $258,704.30 | $304.04 | $258,400.26 |
| 82000 Telephone (Internet, local and vonage) | $7,470.77 | $0 | $7,470.77 |
| 83000 Utilities (Electricity, satellite TV, water  and propane / gas) | $146,058.77 | $0 | $146,058.77 |
| 84000 Property Services (Spa, security, gardening, golf club, HOA dues, and property taxes) | $127,583.19 | $0 | $127,583.19 |
| 85000 Payroll & management | $309,678.06 | $0 | $309,678.06 |
| 87000 Maintenance (Auto, building, watercrafts, scooters, pool, technology and other) | $202,597.71 | $620.01 | $201,977.70 |
| 88000 General (Gas, guest entertainment, household supplies, equipment & appliances and transportation) | $106,662.61 | $8,494.62 | $96,167.99 |
| 89000 Legal | $545,870.44 | $0 | $545,870.44 |
| 89100 Insurance | $3,380.32 | 0 | $3,380.32 |
| 81000 Film Location Specialists Other | $330,251.97 | $0 | $330,251.97 |
| **TOTAL** | **$2,038,258.14** | **$9,418.67** | **$2,028,839.47** |

20    These entries appear to be related to the maintenance and upkeep of real property in Punta

21  de Mita, Nayarit, Mexico.  According to the Related Debtors Schedules of Assets and Liabilities,

22  none of the Related Debtors own any real property.  *See* Request for Judicial Notice ("RFJN"),

23  Exhibit '1" filed concurrently.

24    When questioned about the AMEX charges by various persons, including usage by Mr.

25  Francis, Mr. Dale testified that he was unaware of any policies or procedures regarding limitations

26  of usage for the credit cards.  Furthermore, Mr. Dale testified at the 341(a) meeting that he did not

27  implement any policies or procedures regarding AMEX usage or any other expenditures of the

28  Debtor after he was appointed Manager of the Debtor.

1    Mr. Dale also testified that he relies on the heads of department to make staffing decisions,

2  including but not limited to employees and expenditures, and that he is consulted thereafter for his

3  approval.  He was unaware of the production schedule, if any.

4                                              **IV.**

5                                          **ARGUMENT**

6  **A. APPOINTMENT OF A CHAPTER 11 TRUSTEE IS IN THE BEST INTEREST OF**

7  **CREDITORS.**

8    The United States Trustee submits that it is in the best interest of creditors and the estate to

9  appoint a Trustee pursuant to §1104(a)(1) and (2).

10    Section 1104(a)(1) provides that a trustee shall be appointed

11    (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the

12        affairs of the debtor by current management, either before or after the commencement of

13        the case, or similar cause, but not including the number of holders of securities of the

14        debtor or the amount of assets or liabilities of the debtor; or

15    (2) if such appointment is in the interests of creditors, any equity security holders, and other

16        interests of the estate, without regard to the number of holders of securities of the debtor

17        or the amount of assets or liabilities of the debtor.

18    A chapter 11 debtor and its managers owe fiduciary duties to the estate.  *Hirsch v.*

19  *Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612

20  (Bankr.S.D.N.Y.1998). Where they suffer from material conflicts of interest, an independent trustee

21  should be appointed under § 1104(a)(2). E.g., *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666,

22  676 (Bankr.W.D.Tenn.1989)(chapter 11 trustee appointed where debtor was not in a "strong

23  position" to pursue possible claims due to a conflict of interest and fraudulent transfers, and "a

24  trustee would likely be able to investigate claims that could result in additional sums of money

25  coming into the estate"); *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr.S.D.N.Y.1987)

26  (conflicting interest in various related entities held by the debtor's directors warranted the

27  appointment of a trustee); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 176-177

28  (Bankr.Pa.1984) (an independent trustee was needed to protect the interests of creditors when "an

1   obvious conflict of interest exists in the management of the two corporations because the officers

2   and principals of the parent corporation are the same individuals as the officers and the principals of

3   the debtor."); *In re Great Northeastern Lumber & Millwork Corp.*, 20 B.R. at 611-12 (the

4   "appointment of a trustee to investigate the circumstances of the debtor and its relationship to other

5   entities" was in the interest of all of the debtor's creditors pursuant to § 1104(a)(2)); *In re*

6   *Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62-63 (Bankr.Pa.1981)(appointing a trustee in the best

7   interests of the creditors when the principals of the debtor occupied conflicting positions in

8   transferee companies); *Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*, 11 B.R. 552, 554

9   (Bankr.W.Va.1981) (appointment of a trustee was justified where loyalty of debtor's current

10  management was called into question due to competing business interests and potential for

11  intercompany dealings); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr.W.Va.1980) (appointing

12  trustee under § 1104(a)(2) where "[t]he magnitude of the number of intercompany transactions

13  places current management [of the debtor] in a position of having grave potential conflicts of

14  interest and the presumption arises that the current management of [the debtor] will be unable to

15  make the impartial investigations and decisions demanded in evaluating and pursuing inter-

16  company claims on behalf of [the debtor].")

17          The court in Professional Accountants did find in dicta that it could not appoint a trustee

18  pursuant to §1104(a)(2) because an equity holder objected and the statute is written in the

19  conjunctive requiring that all three prongs (the best interest of creditors, the estate and equity) be

20  present.  But this reading of the statute would give equity a veto power when the conduct of those

21  very individuals may require the appointment of a trustee to protect creditors and the estate.

22  Colliers analyzed the conjunctive requirements of §1104(a)(2) and determined that equity holders

23  acting in good faith may make it difficult to appoint a trustee under the best interest standard.

24  Collier on Bankruptcy, ¶ 1104.02[3][d][i] (emphasis added).  The United States Trustee submits

25  that the appointment of a Trustee is in the best interests of all constituencies that are acting in good

26  faith in these cases.

27          On this record, the Court should find that the appointment of a chapter 11 trustee is in the

28  best interest of creditors and the estate.  Disbursements have been made that do not inure to the

1  benefit of creditors.  The legal consideration for such transfer is unclear.  Standard corporate

2  operating procedures apparently do not exist in these Related Debtors.  The establishment of the

3  multiple corporate entities and their consolidated operations by itself is likely "cause" to appoint a

4  chapter 11 trustee.

5  **B. THERE IS CAUSE TO APPOINT A TRUSTEE PURSUANT TO SECTION 1104.**

6      This Court should appoint a Chapter 11 trustee in this case pursuant to § 1104.

7      Section 1104(a)(1) of the Bankruptcy Code provides that:

8      "(a) At any time after the commencement of the case but before confirmation of a plan, on

9  request of a party in interest or the United States Trustee, and after notice and a hearing, the court

10 shall order the appointment of a trustee -

11     (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the

12 affairs of the debtor by current management, either before or after the commencement of the case,

13 or similar cause, but not including the number of holders of securities of the debtor or the amount of

14 assets or liabilities of the debtor;"

15     11 U.S.C. § 1104(a)(1) (emphasis added).

16     The four bases upon which "cause" may be found under section 1104(a)(1) are not

17 exclusive.  A finding of "cause" may be based on other factors as well.  *In re Marvel Entertainment*

18 *Group, Inc.*, 140 F.3d 463, 472 (3rd Cir. 1998) (section 1104(a)(1) does not define the term "cause"

19 but merely notes that "cause" includes "frauds, dishonesty, incompetence, or gross mismanagement

20 of the affairs of the debtor by current management.")  "Once the Court has found that 'cause' exists

21 under § 1104, it has no discretion but must appoint a trustee." *In re Oklahoma Refining Co.*, 838

22 F.2d 1133, 1136 (10th Cir. 1988). *Accord, In re Colorado-Ute Electrical Ass'n., Inc.*, 120 B.R. 164

23 (Bankr. D. Colo. 1990); *In re Savino Oil & Heating Co.*, Inc., 99 B.R. 518, 525 (Bankr. E.D.N.Y.

24 1989). As is set forth in full below, cause clearly exists for the appointment of a Chapter 11 Trustee

25 in these cases.  Because cause exists for the appointment of a trustee, such an appointment is

26 mandatory under 11 U.S.C. § 1104(a)(1).

27     The United States Trustee submits that cause exists pursuant to §1104(a)(1) for the

28 appointment of a Chapter 11 Trustee based upon evidence of mismanagement and incompetent

1  management as set forth in the Statement of Facts in support of this Motion.  It is imperative that an

2  independent fiduciary be appointed so that the assets of estates can be marshaled and creditors

3  treated in accordance with the requirements of the Bankruptcy Code.  Only a Trustee can serve this

4  function and the Bankruptcy Code mandates that a Trustee be appointed if cause is established.

5        WHEREFORE, the United States Trustee requests that the Court direct the appointment of a

6  Chapter 11 trustee for Related Debtors.

7

8  Dated: April 09, 2013                              PETER C. ANDERSON
                                                      UNITED STATES TRUSTEE
9

10                                                    By: _____

11                                                        Dare Law
                                                      Attorney for the United States Trustee
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                      11

# Declaration of Jack Arutyunyan

Declaration of Jack Arutyunyan

## DECLARATION OF JACK ARUTYUNYAN

I, Jack Arutyunyan, declare and state as follows:

1. I am over the age of eighteen years, and if called upon to testify I could and would do so competently. I am employed as a Bankruptcy Analyst by the Office of the United States Trustee for the Central District of California, in the Los Angeles Field Office. I have been so employed since September 2009. I am the Analyst assigned to *In Re GGW Brands, LLC*, Case No. 2:13-BK-15130-SK; *In Re GGW Direct, LLC*, Case No. 2:13-BK-15132-SK; *In Re GGW Events, LLC*, Case No. 2:13-BK-15134-SK; and *In Re GGW Magazine, LLC*, Case No. 2:13-BK-15137-SK ("Related Debtors'). I have personal knowledge of the facts set forth herein, and based on that personal knowledge I assert that all such facts are true and correct to the best of my knowledge.

2. According to the PACER dockets obtained for each of the cases above, I noted that on February 27, 2013, each of the related Debtor entities filed voluntary Chapter 11 cases in the Central District of California. On or about March 20, 2013, I conducted an Initial Debtor Interview ("IDI") for all four cases with Debtors' Manager, Christopher Dale, Debtors' non-bankruptcy counsel, Ronald Tym and Debtors' bankruptcy counsel Robert Yaspan.

3. On April 3, 2013, I also visited Debtors' place of business at 10940 Wilshire Blvd, Los Angeles, CA along with my colleagues Dare Law, Trial Attorney for the United States Trustee and Gary B. Baddin, Bankruptcy Analyst for the United States Trustee to examine Debtors' books and records. We met with Amy Johnson, Head of Human Resources, Mandy Isaac, Head of Accounting, Ronald Tym and Robert Yaspan. Mr. Dale was not present at the meeting.

4. At the conclusion of the site visit, I requested production of various documents, including but not limited to the following: (1) the General Ledgers ("G/Ls") for each of the Related Debtors for the period covering January 1, 2012 through March 31, 2013; and (2) any and all American Express ("AMEX") credit card statements for the period covering January 1, 2011 through March 31, 2013 for the Related Debtors. The Related Debtors, through Mandy Isaac, submitted the documents to me by e-mail on evening of April 03, 2013.

12

5.    Using the information provided to me by the Related Debtors, the following is an excerpt of the G/L for GGW Direct with a specific emphasis on account 81000 entitled "Film Location Specialists" for the period covering January 1, 2012 through March 31, 2013.

| GGW Direct G/L Transaction for 01/01/2012 – 03/31/2013 | | | |
|---|---|---|---|
| **Account Description** | **Debit** | **Credit** | **Balance** |
| 81100 Food and Beverage (Alcohol, bottled water, fresh fish and groceries) | $258,704.30 | $304.04 | $258,400.26 |
| 82000 Telephone (Internet, local and vonage) | $7,470.77 | $0 | $7,470.77 |
| 83000 Utilities (Electricity, satellite TV, water and propane / gas) | $146,058.77 | $0 | $146,058.77 |
| 84000 Property Services (Spa, security, gardening, golf club, HOA dues, and property taxes) | $127,583.19 | $0 | $127,583.19 |
| 85000 Payroll & management | $309,678.06 | $0 | $309,678.06 |
| 87000 Maintenance (Auto, building, watercrafts, scooters, pool, technology and other) | $202,597.71 | $620.01 | $201,977.70 |
| 88000 General (Gas, guest entertainment, household supplies, equipment & appliances and transportation) | $106,662.61 | $8,494.62 | $96,167.99 |
| 89000 Legal | $545,870.44 | $0 | $545,870.44 |
| 89100 Insurance | $3,380.32 | 0 | $3,380.32 |
| 81000 Film Location Specialists Other | $330,251.97 | $0 | $330,251.97 |
| **TOTAL** | **$2,038,258.14** | **$9,418.67** | **$2,028,839.47** |

My analysis identified that these above transactions appear to be primarily related to the maintenance and upkeep of real property in Punta de Mita, Nayarit, Mexico. A true and correct summary from the Debtor's own G/L is also attached as Exhibit "1" and is incorporated herein by this reference as if set forth in full. I obtained the information to prepare Exhibit "1" from the Debtor's G/L which was e-mailed to me as stated in paragraph 4 above.

6.    I attended and participated in the first meeting of creditors held in accordance with 11 U.S.C. §341(a) ("341(a) meeting") held on April 8, 2013. During this meeting for GGW Direct, Mr. Dale testified that the Mexican real property is used by Debtors to host various GGW events. Mr. Dale also testified that none of the Related Debtors have a direct interest in the ownership of the real property in Mexico.

7.     I also reviewed account number 15000 entitled "Affiliate Receivables" in the G/L for GGW Direct. According to this G/L, between February, 2012 and November 2012, GGW Direct booked over $356,007.30 in receivables from Blue Horse in journal entries. At the 341(a), Mr. Dale testified that Blue Horse was a "Joseph Francis entity" which owns real property in Bel Air, California. Mr. Dale testified that the monies paid to Blue Horse were for GGW's use of the Bel Air property. However, according to GGW Direct's G/L, the journal entries show the amounts are accounts receivables from "Affiliate" companies. The G/L shows the following transactions by date and amount:

| Date | Debit | Credit |
|------|-------|--------|
| 02/01/12 | $30,000.00 | |
| 02/17/12 | $40,000.00 | |
| 04/18/12 | | $50,000.00 |
| 05/04/12 | $5,000.00 | |
| 05/14/12 | $10,000.00 | |
| 05/24/12 | $35,000.00 | |
| 06/14/12 | $10,000.00 | |
| 06/26/12 | $20,000.00 | |
| 06/29/12 | $90,000.00 | |
| 07/02/12 | $10,000.00 | |
| 07/19/12 | $10,000.00 | |
| 08/02/12 | $50,000.00 | |
| 09/04/12 | $45,000.00 | |
| 09/10/12 | $5,000.00 | |
| 10/10/12 | $35,000.00 | |
| 10/18/12 | $5,000.00 | |
| 10/24/12 | | $6,702.30 |
| 11/13/12 | $1,996.33 | |
| 11/16/12 | $10,713.27 | |
| **NET $356,007.30** | | |

A true and correct copy of transaction detail from the GGW Direct G/L is also attached hereto as Exhibit "2" and is incorporated herein by this reference as if set forth in full. I obtained the G/L information from the Debtor by e-mail on April 03, 2013 as stated in paragraph 4 above.

8.     Finally, I reviewed the AMEX credit card statements for the period covering January 1, 2011 through March 31, 2013. The AMEX cards were billed to GGW Brands LLC. Mr. Dale did not know why GGW Brands issued the AMEX cards instead of GGW Direct, the

14

1  post-production company of the Related Debtors.  Based upon my review of the AMEX

2  statements, I prepared the following summary by year.

**AMEX  Jan 2011 - Dec 2011**

| User | Card # | TOTAL | % of Total |
|---|---|---|---|
| Joseph R. Francis | 6-54007 | $372,932.77 | 53.4% |
| Sergio Bravo | 6-52100 | $40,589.51 | 5.8% |
| Clayton McKinney | 6-53157 | $30,372.37 | 4.3% |
| Roxana Loera | 6-52118 | $40,955.23 | 5.9% |
| Larry Hancock | 6-53132 | $17,936.83 | 2.6% |
| Alicia Serrano | 6-52126 | $58,506.48 | 8.4% |
| Dorota Anoszkiewicz | 6-51011 | $49,894.26 | 7.1% |
| Ymell Villegas | 6-53033 | $24,328.78 | 3.5% |
| Salvador Castellon | 6-51086 | $24,100.08 | 3.4% |
| Sara Schulte | 6-52142 | $19,818.18 | 2.8% |
| Jessica G. Pineda | 6-51060 | $11,399.70 | 1.6% |
| Eric Deutsch | 6-51029 | $8,004.46 | 1.1% |
| **TOTAL** | | **$698,838.65** | **100.0%** |

**AMEX  Jan 2012 - Dec 2012**

| User | Card # | TOTAL | % of Total |
|---|---|---|---|
| Joseph R. Francis | 6-54007 | $434,993.52 | 41.6% |
| Sergio Bravo | 6-52100 | $259,825.17 | 24.9% |
| Ron Villanueva | 6-52191 | $97,248.67 | 9.3% |
| Bryan Lord | 6-52167 | $69,794.98 | 6.7% |
| Larry Hancock | 6-53132 | $58,438.28 | 5.6% |
| Clayton McKinney | 6-53157 | $52,498.98 | 5.0% |
| Roxana Loera | 6-52118 | $31,054.88 | 3.0% |
| Thomas J. Studder | 6-52225 | $11,942.90 | 1.1% |
| Gregory Harrison | 6-52175 | $11,936.00 | 1.1% |
| Heather Brook | 6-52233 | $9,512.47 | 0.9% |
| Christopher Rudin | 6-51185 | $7,500.68 | 0.7% |
| Sara Schulte | 6-52142 | $9.99 | 0.0% |
| **TOTAL** | | **$1,044,756.52** | **100.0%** |

**AMEX Jan 2013 – March 2013**

| User | Card # | Jan-13 | Feb-13 | Mar-13 | TOTAL | % of Total |
|---|---|---|---|---|---|---|
| Sergio Bravo | 6-52100 | $26,029.41 | $30,574.03 | $38,641.94 | $95,245.38 | 45.9% |
| Joseph R. Francis | 6-54007 | $11,507.71 | $12,172.68 | $7,896.53 | $31,576.92 | 15.2% |
| Heather Brook | 6-52233 | $7,607.05 | $14,002.62 | $8,335.30 | $29,944.97 | 14.4% |
| Ron Villanueva | 6-52191 | $8,096.38 | $12,066.05 | $7,309.87 | $27,472.30 | 13.3% |
| Bryan Lord | 6-52167 | $4,869.42 | $6,061.13 | $7,582.55 | $18,513.10 | 8.9% |
| Roxana Loera | 6-52118 | $1,170.20 | $1,345.28 | $2,045.25 | $4,560.73 | 2.2% |
| | | $59,280.17 | $76,221.79 | $71,811.44 | $207,313.40 | 100.0% |

A true and correct copy of my summary of the AMEX activity in further detail is attached hereto as Exhibit "3" and is incorporated herein by this reference as if set forth in full. I created Exhibit "3" from the American Express statements provided by the Debtor via e-mail on April 08, 2013 as indicated in paragraph 4 above.

9.      I note that the related Debtors allowed usage of the AMEX cards post-petition as the AMEX statements show transactions during March 2013. Additionally, the March 2013 AMEX statement shows payment of the February 2013 AMEX statement in the amount of $74,831.97. A true and correct copy of the summary page of the March 2013 AMEX statement is attached hereto as Exhibit "4" and is incorporated herein by this reference as if set forth in full.

10.     At the 341(a) meeting, Mr. Dale testified that he was appointed as Manager of GGW Brands, GGW Direct, GGW Events and GGW Magazine around late October 2012  early November 2012. He testified that he works approximately 4 to 5 hours per week for all four Debtors combined. Mr. Dale testified that he learned about his appointment as Manager from Ronald Tym in a telephone call and that he had not formally applied for the position. He testified that he receives $1,000 per week for his Manager position. He also testified that prior to his appointment as Manager for the Related Debtors, and prior to his employment by Movie Clips, he was previously employed by the Related Debtors in their Human Resources department. He also testified that Joseph Francis was not an employee, manager, or member of the Related Debtors.

11.     Mr. Dale also testified that he currently maintains outside employment with an unrelated entity called "Movie Clips." He testified that he is the decision maker for all four entities, however he relies on the department heads to make day to day operation decisions, including, but not limited to staffing allocation decisions.

12      Mr. Dale testified at the 341(a) meeting that the business of the Related Debtors are intertwined as GGW Brands is the holding company, GGW Events holds the events and

1    creates the raw footage of the film, GGW Direct is the post-production arm using the footage

2    created by GGW Events.[2]

3        13.    Mr. Dale also testified that he was unaware of any written policies and procedures

4    regarding usage of the AMEX cards issued and that he did not implement any changes to any of

5    the Debtors' policies upon his appointment as manager for the Debtor entities.

6        I declare under penalty of perjury that the forgoing facts are known by me to be true and

7    correct and based upon my personal knowledge or, if based upon information or belief or other

8    admissible evidence, I declare that said facts are true and correct to the best of my knowledge.

9        Executed this 9th day in April, 2013 in Los Angeles, California.

Jack Arutyunyan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    [2] The 341(a) meeting for GGW Brand LLC was concluded but due to the lateness of the hour,
the 341(a) meeting for GGW Direct, GGW Events, and GGW Magazine were continued to April

28    22, 2013. No testimony was provided for GGW Events or GGW magazine as those 341(a)
meetings have to be commenced.

17

# Exhibit "1"

# Exhibit "1"

GCW Direct, LLC
Transaction Detail By Account
January 2012 through March 2013

| Type | Date | Num | Name | Split | Debit | Credit | Balance |
|------|------|-----|------|-------|-------|--------|---------|
| **81000 · Film Location Specialists** | | | | | | | |
| **81100 · Food and Beverage** | | | | | | | |
| Total 81200 · Alcoholic Beverages | | | | | 2,422.16 | 0.00 | 2,422.16 |
| Total 81300 · Bottled Water | | | | | 1,048.57 | 0.00 | 1,048.57 |
| Total 81400 · Fresh Fish | | | | | 12,231.23 | 0.00 | 12,231.23 |
| Total 81500 · Groceries | | | | | 243,002.34 | 304.04 | 242,698.30 |
| | | | | | | | |
| Total 81100 · Food and Beverage | | | | | 258,704.30 | 304.04 | 258,400.26 |
| | | | | | | | |
| **82000 · Telephone** | | | | | | | |
| Total 82100 · Telephone - Internet | | | | | 3,338.35 | 0.00 | 3,338.35 |
| Total 82200 · Telephone - Local | | | | | 977.00 | 0.00 | 977.00 |
| Total 82300 · Telephone - Vonage | | | | | 3,155.42 | 0.00 | 3,155.42 |
| | | | | | | | |
| Total 82000 · Telephone | | | | | 7,470.77 | 0.00 | 7,470.77 |
| | | | | | | | |
| **83000 · Utilities** | | | | | | | |
| Total 83100 · Electricity | | | | | 76,901.55 | 0.00 | 76,901.55 |
| Total 83200 · Satellite TV | | | | | 16,294.68 | 0.00 | 16,294.68 |
| Total 83300 · Water | | | | | 22,780.78 | 0.00 | 22,780.78 |
| Total 83400 · Propane/Gas | | | | | 30,081.76 | 0.00 | 30,081.76 |
| | | | | | | | |
| Total 83000 · Utilities | | | | | 146,058.77 | 0.00 | 146,058.77 |
| | | | | | | | |
| **84000 · Property Services** | | | | | | | |
| Total 84100 · Spa Services | | | | | 21,477.55 | 0.00 | 21,477.55 |
| Total 84200 · Security | | | | | 23,726.26 | 0.00 | 23,726.26 |
| Total 84300 · Gardening | | | | | 15,970.74 | 0.00 | 15,970.74 |
| Total 84400 · Golf Club | | | | | 13,010.35 | 0.00 | 13,010.35 |
| Total 84500 · HOA Dues | | | | | 38,323.82 | 0.00 | 38,323.82 |
| Total 84700 · Property Tax | | | | | 15,074.47 | 0.00 | 15,074.47 |
| | | | | | | | |
| Total 84000 · Property Services | | | | | 127,583.19 | 0.00 | 127,583.19 |
| | | | | | | | |
| **85000 · Payroll & Management** | | | | | | | |
| Total 85100 · Management | | | | | 27,849.05 | 0.00 | 27,849.05 |
| Total 85200 · Employees | | | | | 281,829.01 | 0.00 | 281,829.01 |
| | | | | | | | |
| Total 85000 · Payroll & Management | | | | | 309,678.06 | 0.00 | 309,678.06 |
| | | | | | | | |
| **87000 · Maintenance** | | | | | | | |
| Total 87100 · Automobiles | | | | | 13,962.34 | 558.78 | 13,403.56 |
| Total 87200 · Building | | | | | 85,261.76 | 61.23 | 85,200.53 |
| Total 87400 · Watercrafts | | | | | 77,785.19 | 0.00 | 77,785.19 |
| Total 87500 · Motor Scooters | | | | | 4,962.79 | 0.00 | 4,962.79 |
| Total 87600 · Pool | | | | | 6,100.33 | 0.00 | 6,100.33 |
| Total 87700 · Technology | | | | | 14,504.99 | 0.00 | 14,504.99 |
| Total 87000 · Maintenance - Other | | | | | 20.31 | 0.00 | 20.31 |
| | | | | | | | |
| Total 87000 · Maintenance | | | | | 202,597.71 | 620.01 | 201,977.70 |
| | | | | | | | |
| **88000 · General** | | | | | | | |
| Total 88100 · Gasoline | | | | | 33,569.01 | 240.00 | 33,329.01 |
| Total 88200 · Guest Entertainment | | | | | 13,557.57 | 1,056.35 | 12,501.22 |
| Total 88300 · Household Supplies | | | | | 33,036.37 | 1,693.66 | 31,342.71 |
| Total 88400 · Equipment & Appliances | | | | | 19,725.82 | 5,504.61 | 14,221.21 |

18

BSW Direct, LLC

**Transaction Detail By Account**

January 2012 through March 2013

| Type | Date | Num | Name | Split | Debit | Credit | Balance |
|------|------|-----|------|-------|-------|--------|---------|
| Total 88500 · Transportation | | | | | 6,773.84 | 0.00 | 6,773.84 |
| | | | | | | | |
| Total 88000 · General | | | | | 106,662.61 | 8,494.62 | 98,167.99 |
| Total 89000 · Legal | | | | | 545,870.44 | 0.00 | 545,870.44 |
| Total 89100 · Insurance | | | | | 3,380.32 | 0.00 | 3,380.32 |
| | | | | | | | |
| **81000 · Film Location Specialists - Other** | | | | | | | |
| General Journal | 01/15/2012 | F.Assets | | 18300 · Improve | 330,251.97 | | 330,251.97 |
| Total 81000 · Film Location Specialists - Other | | | | | 330,251.97 | 0.00 | 330,251.97 |
| | | | | | | | |
| Total 81000 · Film Location Specialists | | | | | 2,038,258.14 | 9,418.67 | 2,028,839.47 |
| TOTAL | | | | | 2,038,258.14 | 9,418.67 | 2,028,839.47 |

19

# Exhibit "2"

# Exhibit "2"

GGW Direct, LLC
**Transactions by Account**
As of March 31, 2013

| Type | Date | Num | Name | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| **15000 · Affiliate Receivables** | | | | | | | 1,036,922.94 |
| 15070 · Affiliate Blue Horse - 8000 | | | | | | | 382,074.22 |
| Check | 01/25/2012 | | American Express | 10000 · National Bank - GGW Direct | 4,097.53 | | 386,171.75 |
| General Journal | 01/31/2012 | Legal Fees | | 62100 · Legal Fees - Company | | 1,012.50 | 385,159.25 |
| Transfer | 02/01/2012 | | | 10000 · National Bank - GGW Direct | 30,000.00 | | 415,159.25 |
| General Journal | 02/17/2012 | Transfer | | 10000 · National Bank - GGW Direct | 40,000.00 | | 455,159.25 |
| Bill | 04/16/2012 | taxes | Aftergood Law Firm | 20000 · Accounts Payable | 921.00 | | 456,080.25 |
| Bill | 04/18/2012 | taxes | Aftergood Law Firm | 20000 · Accounts Payable | 800.00 | | 456,880.25 |
| General Journal | 04/18/2012 | Transfer | | 10000 · National Bank - GGW Direct | | 50,000.00 | 406,880.25 |
| General Journal | 05/04/2012 | Transfer | | 10000 · National Bank - GGW Direct | 5,000.00 | | 411,880.25 |
| General Journal | 05/14/2012 | Transfer | | 10000 · National Bank - GGW Direct | 10,000.00 | | 421,880.25 |
| General Journal | 05/24/2012 | Transfer | | 10000 · National Bank - GGW Direct | 35,000.00 | | 456,880.25 |
| General Journal | 06/14/2012 | Transfer | | 10000 · National Bank - GGW Direct | 10,000.00 | | 466,880.25 |
| General Journal | 06/26/2012 | Transfer | | 10000 · National Bank - GGW Direct | 20,000.00 | | 486,880.25 |
| General Journal | 06/29/2012 | Transfer | | 10000 · National Bank - GGW Direct | 90,000.00 | | 576,880.25 |
| General Journal | 07/02/2012 | Transfer | | 10000 · National Bank - GGW Direct | 10,000.00 | | 586,880.25 |
| General Journal | 07/19/2012 | Transfer | | 10000 · National Bank - GGW Direct | 10,000.00 | | 596,880.25 |
| General Journal | 08/02/2012 | Transfer | | 10000 · National Bank - GGW Direct | 50,000.00 | | 646,880.25 |
| General Journal | 09/04/2012 | Transfer | | 10000 · National Bank - GGW Direct | 45,000.00 | | 691,880.25 |
| General Journal | 09/10/2012 | Transfer | | 10000 · National Bank - GGW Direct | 5,000.00 | | 696,880.25 |
| General Journal | 10/10/2012 | Transfer | | 10000 · National Bank - GGW Direct | 35,000.00 | | 731,880.25 |
| General Journal | 10/18/2012 | Transfer | | 10000 · National Bank - GGW Direct | 5,000.00 | | 736,880.25 |
| General Journal | 10/24/2012 | Transfer | | 10000 · National Bank - GGW Direct | | 6,702.30 | 730,177.95 |
| General Journal | 11/13/2012 | Transfer | | 10000 · National Bank - GGW Direct | 1,996.33 | | 732,174.28 |
| General Journal | 11/16/2012 | Transfer | | 10000 · National Bank - GGW Direct | 10,713.27 | | 742,887.55 |
| Credit Card Charge | 11/20/2012 | | Petco | 20200 · AMEX Credit Card | 17.92 | | 742,905.47 |
| Credit Card Charge | 11/20/2012 | | Petco | 20200 · AMEX Credit Card | 142.58 | | 743,048.05 |
| Credit Card Charge | 11/21/2012 | | PayPal *SelectExoti | 20200 · AMEX Credit Card | 4,000.00 | | 747,048.05 |
| Bill | 11/21/2012 | Exp Reimb | Jamie Frizzi | 20000 · Accounts Payable | 13.03 | | 747,061.08 |
| Check | 11/26/2012 | 1016 | Pac 8 Orchids | 10010 · Wells Fargo - #5158 | 322.00 | | 747,383.08 |
| Check | 11/26/2012 | 1017 | Patrick Bonette | 10010 · Wells Fargo - #5158 | 270.00 | | 747,653.08 |
| Credit Card Credit | 11/26/2012 | | Petco | 20200 · AMEX Credit Card | | 33.91 | 747,619.17 |
| Bill | 12/05/2012 | 3275 | Mulberry Row, LLC | 20000 · Accounts Payable | 596.88 | | 748,216.05 |
| Check | 12/13/2012 | ATM | GGW Direct, LLC | 10010 · Wells Fargo - #5158 | 208.88 | | 748,424.93 |
| Credit Card Charge | 12/14/2012 | | The Kennel Club at LAX | 20200 · AMEX Credit Card | 100.00 | | 748,524.93 |
| Check | 12/20/2012 | 1135 | Greentree Landscaping, Inc. | 10010 · Wells Fargo - #5158 | 1,150.25 | | 749,675.18 |
| Check | 12/20/2012 | 1136 | Keiko Cronin | 10010 · Wells Fargo - #5158 | 600.00 | | 750,275.18 |
| Check | 12/20/2012 | 1137 | Pac 8 Orchids | 10010 · Wells Fargo - #5158 | 298.00 | | 750,573.18 |
| Check | 12/20/2012 | 1138 | Patrick Bonette | 10010 · Wells Fargo - #5158 | 270.00 | | 750,843.18 |
| Check | 12/20/2012 | 1139 | The Gas Company | 10010 · Wells Fargo - #5158 | 372.78 | | 751,215.96 |
| Bill | 01/04/2013 | 3304 | Mulberry Row, LLC | 20000 · Accounts Payable | 257.00 | | 751,472.96 |
| Total 15070 · Affiliate Blue Horse - 8000 | | | | | 427,147.45 | 57,748.71 | 751,472.96 |
| | | | | | | | |
| 15071 · Affiliate Blue Horse Blvd Mgmt | | | | | | | 654,848.72 |
| Total 15071 · Affiliate Blue Horse Blvd Mgmt | | | | | | | 654,848.72 |
| | | | | | | | |
| Total 15000 · Affiliate Receivables | | | | | 427,147.45 | 57,748.71 | 1,406,321.68 |
| | | | | | | | |
| **TOTAL** | | | | | 427,147.45 | 57,748.71 | 1,406,321.68 |

# Exhibit "3"

Exhibit "3"

AMEX CREDIT CARD ACTIVITY

| User | Card # | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | TOTAL | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Joseph R. Francis | 6-54007 | $13,788.80 | $23,408.69 | $38,125.25 | $49,242.74 | $21,563.74 | $39,156.37 | $39,670.37 | $32,009.62 | $24,095.70 | $39,830.71 | $23,060.86 | $28,979.92 | $372,932.77 | 53.4% |
| Sergio Bravo | 6-52100 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $6,241.42 | $8,431.43 | $16,152.41 | $6,128.84 | $3,635.41 | $40,589.51 | 5.8% |
| Clayton McKinney | 6-53157 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,988.53 | $25,383.84 | $30,372.37 | 4.3% |
| Roxana Loera | 6-52118 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,425.10 | $147.09 | $22,904.70 | $9,351.76 | $1,274.84 | $5,851.74 | $40,955.23 | 5.9% |
| Larry Hancock | 6-53132 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $771.30 | $6,199.62 | $10,965.91 | $17,936.83 | 2.6% |
| Alicia Serrano | 6-52126 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,545.32 | $10,858.73 | $6,555.30 | $5,871.56 | $1,082.29 | $0.00 | $58,506.48 | 8.4% |
| Dorota Anoszkiewicz | 6-51011 | $27,079.97 | $19,972.19 | $2,842.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $49,894.26 | 7.1% |
| Ymell Villegas | 6-53033 | $0.00 | $0.00 | $13,866.49 | $10,462.29 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $24,328.78 | 3.5% |
| Salvador Castellon | 6-51086 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,067.46 | $14,434.74 | $4,597.88 | $0.00 | $0.00 | $0.00 | $0.00 | $24,100.08 | 3.4% |
| Sara Schulte | 6-52142 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,975.60 | $9,207.85 | $1,634.73 | $19,818.18 | 2.8% |
| Jessica G. Pineda | 6-51060 | $0.00 | $0.00 | $0.00 | $0.00 | $11,164.26 | $235.44 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $11,399.70 | 1.6% |
| Eric Deutsch | 6-51029 | $5,552.36 | $2,452.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,004.46 | 1.1% |
| | | $46,421.13 | $45,832.98 | $54,833.84 | $66,706.87 | $38,222.78 | $58,555.93 | $63,075.53 | $53,854.74 | $61,987.13 | $80,953.34 | $51,942.83 | $76,451.55 | $698,838.65 | 100.0% |

| User | Card # | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | TOTAL | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Joseph R. Francis | 6-54007 | $44,664.82 | $21,474.69 | $20,161.95 | $20,372.05 | $14,470.66 | $32,226.16 | $35,273.61 | $33,144.79 | $62,477.99 | $44,052.62 | $92,181.62 | $14,492.56 | $434,993.52 | 41.6% |
| Sergio Bravo | 6-52100 | $22,421.80 | $12,458.06 | $29,363.53 | $24,453.08 | $22,201.02 | $17,698.12 | $30,220.54 | $14,884.83 | $13,638.79 | $37,929.62 | $7,702.16 | $26,853.62 | $259,825.17 | 24.9% |
| Ron Villanueva | 6-52191 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $175.00 | $13,708.64 | $13,966.32 | $13,180.11 | $16,088.90 | $21,325.68 | $18,804.02 | $97,248.67 | 9.3% |
| Bryan Lord | 6-52167 | $0.00 | $7,255.68 | $9,840.96 | $3,609.25 | $3,451.03 | $3,120.20 | $931.17 | $855.49 | $1,347.71 | $15,939.40 | $7,117.65 | $16,326.44 | $69,794.98 | 6.7% |
| Larry Hancock | 6-53132 | $9,947.15 | $10,340.93 | $9,079.03 | $10,071.59 | $10,251.40 | $6,777.06 | $1,971.12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $58,438.28 | 5.6% |
| Clayton McKinney | 6-53157 | $6,494.44 | $25,098.83 | $9,181.93 | $7,538.77 | $4,181.02 | $0.00 | $0.00 | $3.99 | $0.00 | $0.00 | $0.00 | $0.00 | $52,498.98 | 5.0% |
| Roxana Loera | 6-52118 | $9,353.32 | $165.58 | $927.12 | $510.98 | $664.41 | $1,206.93 | $271.50 | $492.73 | $1,098.13 | $3,868.22 | $6,821.05 | $5,674.91 | $31,054.88 | 3.0% |
| Thomas J. Studder | 6-52225 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,732.88 | $10,210.02 | $0.00 | $11,942.90 | 1.1% |
| Gregory Harrison | 6-52175 | $0.00 | $0.00 | $0.00 | $5,525.20 | $6,410.80 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $11,936.00 | 1.1% |
| Heather Brook | 6-52233 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $160.50 | $9,351.97 | $9,512.47 | 0.9% |
| Christopher Rudin | 6-51185 | $0.00 | $0.00 | $0.00 | $0.00 | $1,460.50 | $5,781.79 | $258.39 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,500.68 | 0.7% |
| Sara Schulte | 6-52142 | $9.99 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9.99 | 0.0% |
| | | $92,891.52 | $76,793.77 | $78,554.52 | $72,080.92 | $63,090.84 | $66,985.26 | $82,634.97 | $63,348.15 | $91,742.73 | $119,611.64 | $145,518.68 | $91,503.52 | $1,044,756.52 | 100.0% |

| User | Card # | Jan-13 | Feb-13 | Mar-13 | TOTAL | % of Total |
|---|---|---|---|---|---|---|
| Sergio Bravo | 6-52100 | $26,029.41 | $30,574.03 | $38,641.94 | $95,245.38 | 45.9% |
| Joseph R. Francis | 6-54007 | $11,507.71 | $12,172.68 | $7,896.53 | $31,576.92 | 15.2% |
| Heather Brook | 6-52233 | $7,607.05 | $14,002.62 | $8,335.30 | $29,944.97 | 14.4% |
| Ron Villanueva | 6-52191 | $8,096.38 | $12,066.05 | $7,309.87 | $27,472.30 | 13.3% |
| Bryan Lord | 6-52167 | $4,869.42 | $6,061.13 | $7,582.55 | $18,513.10 | 8.9% |
| Roxana Loera | 6-52118 | $1,170.20 | $1,345.28 | $2,045.25 | $4,560.73 | 2.2% |
| | | $59,280.17 | $76,221.79 | $71,811.44 | $207,313.40 | 100.0% |

# Exhibit "4"

Exhibit "4"



**Business Centurion® Card**
GGW BRANDS LLC
JOSEPH R FRANCIS
Closing Date 03/24/13



p. 1/21

Account Ending 6-54007

| New Balance | $72,979.78 |
|---|---|
| **Please Pay By** | **04/08/13** |

→ See page 2 for important information about your account.

### Membership Rewards® Points
Available and Pending as of 02/28/13
**86,333**
For up to date point balance and full program details, visit **membershiprewards.com**

### Account Summary

| | |
|---|---|
| Previous Balance | $78,067.08 |
| Payments/Credits | -$76,898.74 |
| New Charges | +$71,811.44 |
| Fees | +$0.00 |
| **New Balance** | **$72,979.78** |

Days in Billing Period: 31

### Customer Care

**Pay by Computer**
open.com/pbc

| **Customer Care** | **Pay by Phone** |
|---|---|
| 1-800-297-3333 | 1-800-472-9297 |

→ See page 2 for additional information.

---

✂ Please fold on the perforation below, detach and return with your payment ✂

**Payment Coupon**
Do not staple or use paper clips

**Pay by Computer**
open.com/pbc

**Pay by Phone**
1-800-472-9297

**Account Ending 6-54007**

Enter account number on all documents.
Make check payable to American Express.

JOSEPH R FRANCIS
GGW BRANDS LLC
PO BOX 150
HOLLYWOOD CA 90078-0150

Please Pay By
**04/08/13**

Amount Due
**$72,979.78**

☐ Check here if your address or phone number has changed. Note changes on reverse side.

AMERICAN EXPRESS
BOX 0001
LOS ANGELES CA 90096-8000

Illdilludluulluulldilulllullludlualladllullulllllluullluullludluull

22

JOSEPH R FRANCIS                    Account Ending 6-54007                           p. 2/21

**Payments:** Your payment must be sent to the payment address shown on your statement and must be received by 5 p.m. local time at that address to be credited as of the day it is received. Payments we receive after 5 p.m. will not be credited to your Account until the next day. Payments must also: (1) include the remittance coupon from your statement; (2) be made with a single check drawn on a US bank and payable in US dollars, or with a negotiable instrument payable in US dollars and clearable through the US banking system; and (3) include your Account number. If your payment does not meet all of the above requirements, crediting may be delayed and you may incur late payment fees and additional interest charges. Electronic payments must be made through an electronic payment method payable in US dollars and clearable through the US banking system. If we accept payment in a foreign currency, we will convert it into US dollars at a conversion rate that is acceptable to us, unless a particular rate is required by law. Please do not send post-dated checks as they will be deposited upon receipt. Any restrictive language on a payment we accept will have no effect on us without our express prior written approval. We will re-present to your financial institution any payment that is returned unpaid.

**Permission for Electronic Withdrawal:** (1) When you send a check for payment, you give us permission to electronically withdraw your payment from your deposit or other asset account. We will process checks electronically by transmitting the amount of the check, routing number, account number and check serial number to your financial institution, unless the check is not processable electronically or a less costly process is available. When we process your check electronically, your payment may be withdrawn from your deposit or other asset account as soon as the same day we receive your check, and you will not receive that cancelled check with your financial account statement. If we cannot collect the funds electronically we may issue a draft against your deposit or other asset account for the amount of the check. (2) By using Pay By Computer, Pay By Phone or any other electronic payment service of ours, you give us permission to electronically withdraw funds from the deposit or other asset account you specify in the amount you request. Payments using such services of ours received after 8:00 p.m. MST will not be credited until the next day.

**How We Calculate Your Balance:** We use the Average Daily Balance (ADB) method (including new transactions) to calculate the balance on which we charge interest for Pay Over Time balances on your Account. Call the Customer Service number listed below for more information about this balance computation method and how resulting interest charges are determined. *The method we use to calculate the ADB and interest results in daily compounding of interest.*

**How to Avoid Paying Interest:** If you have a Pay Over Time balance, your due date is at least 25 days after the close of each billing period. We will not charge interest on charges added to a Pay Over Time balance if you pay the Account Total New Balance by the due date each month.

**Foreign Currency Charges:** If you make a Charge in a foreign currency, we will convert it into US dollars on the date we or our agents process it. We will choose a conversion rate that is acceptable to us for that date, unless a particular rate is required by law. The conversion rate we use is no more than the highest official rate published by a government agency or the highest interbank rate we identify from customary banking sources on the conversion date or the prior business day. This rate may differ from rates in effect on the date of your charge. Charges converted by establishments will be billed at the rates such establishments use.

**Credit Balance:** A credit balance (designated CR) shown on this statement represents money owed to you. If within the six-month period following the date of the first statement indicating the credit balance you do not request a refund or charge enough to use up the credit balance, we will send you a check for the credit balance within 30 days if the amount is $1.00 or more.

**Credit Reporting:** We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report.

---

**Customer Care & Billing Inquiries**       1-800-297-3333     **Hearing Impaired**
**International Collect**                    1-954-503-8905     **TTY:** 1-800-221-9950
**Large Print and Braille Statements**      1-800-297-3333     **FAX:** 1-800-695-9090
**Lost or Stolen Card**                     1-800-297-3333     **In NY:** 1-800-522-1897
**Express Cash**                            1-800-CASH-NOW

**Website:** americanexpress.com
**Mobile Site:** amexmobile.com

**Customer Care**
**& Billing Inquiries**        **Payments**
P.O. BOX 981535               BOX 0001
EL PASO, TX                   LOS ANGELES CA
79998-1535                    90096-8000

---

**Change of Address**
If correct on front, do not use.

• To change your address online, visit www.americanexpress.com/updatecontactinfo
• For Name, Company Name, and Foreign Address or Phone changes, please call Customer Care.
• Please print clearly in blue or black ink only in the boxes provided.



Street Address

City, State

Zip Code

Area Code and
Home Phone

Area Code and
Work Phone

Email

---

## Pay Your Bill with AutoPay

• Avoid late fees
• Save time

Deduct your payment from your bank
account automatically each month

Visit **americanexpress.com/autopay**
today to enroll.

For information on how we protect your
privacy and to set your communication
and privacy choices, please visit
**www.americanexpress.com/privacy.**

23

 **Business Centurion® Card**
GGW BRANDS LLC
JOSEPH R FRANCIS
Closing Date 03/24/13

 p. 3/21

Account Ending 6-54007

## Payments and Credits

### Summary

| | Total |
|---|---|
| **Payments** | -$74,831.97 |
| **Credits** | |
| JOSEPH R FRANCIS 6-54007 | -$220.00 |
| BRYAN LORD 6-52167 | -$11.66 |
| HEATHER BROOK 6-53231 | -$1,835.11 |
| **Total Payments and Credits** | **-$76,898.74** |

### Detail   *Indicates posting date

| **Payments** | | | | | | | Amount |
|---|---|---|---|---|---|---|---|
| 03/22/13* | JOSEPH R FRANCIS | ONLINE PAYMENT - THANK YOU | | | | | -$74,831.97 |

| **Credits** | | | | | | | Amount |
|---|---|---|---|---|---|---|---|
| 02/28/13 | JOSEPH R FRANCIS | ALASKA AIRLINES REFUSEATTLE  WA | | | | | -$220.00 |
| | | ALASKA AIRLINES INC. | | | | | |
| | | From: | To: | | Carrier: | Class: | |
| | | N/A | N/A | | YY | 00 | |
| | | | N/A | | YY | 00 | |
| | | | N/A | | YY | 00 | |
| | | | N/A | | YY | 00 | |
| | | Ticket Numb | | | | | |
| | | Passenger Name: FRANCIS, JOSEPH | | | | | |
| | | Document Type: ADDITIONAL COLLECTION | | | | | |
| 03/18/13* | BRYAN LORD | RESIDENCE INN BY MARRIOTT | | | | | -$11.66 |
| | | 5% OPEN Savings | | | | | |
| | | RESIDENCE INN 769 $233.12 03/15/2013 | | | | | |
| 03/20/13 | HEATHER BROOK | SONY STORE CENTURY CLOS ANGELES  CA | | | | | -$1,835.11 |
| | | 805-338-4940 | | | | | |
| | | Description | | | | | |
| | | APPAREL/HOUSEWARES/ | | | | | |

## New Charges

### Summary

| | Total |
|---|---|
| JOSEPH R FRANCIS 6-54007 | $7,896.53 |
| SERGIO BRAVO 6-52100 | $38,641.94 |
| ROXANA LOERA 6-52118 | $2,045.25 |
| BRYAN LORD 6-52167 | $7,582.55 |
| RON VILLANUEVA 6-52191 | $7,309.87 |
| HEATHER BROOK 6-53231 | $8,335.30 |
| **Total New Charges** | **$71,811.44** |

Continued on reverse

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**725 South Figueroa Street, Suite 2600, Los Angeles, California 90017-1574**

A true and correct copy of the foregoing document entitled (*specify*): **Motion for the Appointment of a Chapter 11 Trustee or in the Alternative, for The Appointment of an Examiner; Memorandum of Points and Authorities; Declaration of Jack Arutyunyan in Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **April 9, 2013**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒  Service information continued on attached page

2.  **SERVED BY UNITED STATES MAIL**:  On **April 9, 2013**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒  Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 9, 2013**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 9, 2013 | Stephanie Hill | *Stephanie Hill* |
|---|---|---|
| Date | Print Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

## ADDITIONAL SERVICE INFORMATION

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

| Name | Capacity | Email Address |
|------|----------|---------------|
| Dare Law | Attorney for U.S. Trustee's | dare.law@usdoj.gov |
| Ronald N Richards | Interested Party | ron@ronaldrichards.com |
| Ronald D Tym | Other Professional | RTym@Tymfirm.com |
| United States Trustee (LA) | | ustpregion16.la.ecf@usdoj.gov |
| Andy C Warshaw | Interested Party | awarshaw@lawcenter.com, mstevens@lawcenter.com |
| Robert M Yaspan | Attorney for Debtor | court@yaspanlaw.com, tmenachian@yaspanlaw.com |

*SEE NEF FOR CONFIRMATION OF ELECTRONIC TRANSMISSION TO THE U.S. TRUSTEE AND ANY TRUSTEE IN THIS CASE, AND TO ANY ATTORNEYS WHO RECEIVE SERVICE BY NEF.*

2. **SERVED BY U.S. MAIL**

**Debtor:**
**GGW Brands, LLC**
1601 Cloverfield Blvd.
Santa Monica, CA 90404

**Debtor's Counsel:**
**Robert M Yaspan**
Law Offices of Robert M Yaspan
21700 Oxnard St Ste 1750
Woodland Hills, CA 91367

3. **SERVED BY FEDERAL EXPRESS OVERNIGHT MAIL** (Pursuant to the UST's agreement with the Bankruptcy Judge's Courtesy Copy was mailed Federal Express overnight mail to the following address.)

Judge's Copy
Honorable Sandra Klein
U.S. Bankruptcy Court
255 E. Temple Street, Room 940
Los Angeles, CA 90012
Attn: Mail Room Clerk-Judges Copies

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

*and Authorities, Declaration of Jack Arutyunyan in Support Thereof*, filed by the Office of the United States Trustee on April 9, 2013 [Docket No. 63], a true and correct copy of which is attached hereto.

Dated: April 9, 2013

PACHULSKI STANG ZIEHL & JONES LLP

By:  */s/ Malhar S. Pagay*
Malhar S. Pagay
Victoria A. Newmark

BROWNSTEIN HYATT FARBER
SCHRECK, LLP

Mitchell J. Langberg
Laura E. Bielinski

Attorneys for Wynn Las Vegas, LLC, d/b/a Wynn Las Vegas

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

# EXHIBIT B

1  MALHAR S. PAGAY (CA BAR NO. 189289)
   VICTORIA A. NEWMARK (CA BAR NO. 183581)
2  STEVEN J. KAHN (CA BAR NO. 76933)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, California  90067
4  Telephone:    310/277-6910
   Facsimile:    310/201-0760
5  E-mail:       mpagay@pszjlaw.com
                 vnewmark@pszjlaw.com
6
7  MITCHELL J. LANGBERG (CA BAR NO. 17192)
   LAURA E. BIELINSKI (CA BAR NO. 264115)
8  BROWNSTEIN HYATT FARBER SCHRECK, LLP
   100 North City Parkway, Suite 1600
9  Las Vegas, Nevada 89106
   Telephone:    702/382-2101
10 Facsimile:    702/382-8135
   Email:        mlangberg@bhfs.com
                 lbielinski@bhfs.com
11
12 Attorneys for Wynn Las Vegas, LLC d/b/a Wynn Las Vegas

13                 UNITED STATES BANKRUPTCY COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15                      LOS ANGELES DIVISION

15 In re:                              Case No.: 2:13-bk-15130-SK

16 GGW, BRANDS LLC,                    Chapter 11

17                      Debtor.        **NOTICE OF LODGMENT OF
                                       TRANSCRIPT OF 341(A) MEETING
18                                     OF CREDITORS OF DEBTORS**

19                                     **Hearing**
                                       Date:     April 10, 2013
20                                     Time:     10:30 a.m.
                                       Place:    Courtroom 1575
21                                               255 E. Temple Street
                                               Los Angeles, CA  90017
22

23

24 **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE,**

25 **AND ALL PARTIES IN INTEREST AND THEIR ATTORNEYS OF RECORD:**

26        **PLEASE TAKE NOTICE** that Wynn Las Vegas, LLC d/b/a Wynn Las Vegas ("Wynn Las

27 Vegas"), herein lodges a Certified Copy of the Transcript of Proceedings of 341(a) Meeting of

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Creditors conducted April 8, 2013, which Wynn Las Vegas intends to offer as evidence at the

2    hearing on its *Motion for Order Directing the Appointment of a Chapter 11 Trustee*.

3

4    Dated: April 9, 2013                    PACHULSKI STANG ZIEHL & JONES LLP

5

6                                           By:    */s/ Malhar S. Pagay*
                                                   Malhar S. Pagay
7                                                  Victoria A. Newmark

8                                           BROWNSTEIN HYATT FARBER
                                            SCHRECK, LLP
9

10                                                 Mitchell J. Langberg
                                                   Laura E. Bielinski
11
                                            Attorneys for Wynn Las Vegas, LLC, d/b/a Wynn
12                                          Las Vegas

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES TRUSTEE

REGION 16

LOS ANGELES, CALIFORNIA

TRANSCRIPT OF PROCEEDINGS OF

341 (A) MEETING OF THE CREDITORS

April 8, 2013

Lisa Day, CSR No. 12960

356395




barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains      (312) 379-5566 Chicago          (702) 366-0500 Las Vegas
             +33 1 70 72 65 26 Paris       +971 4 8137744 Dubai        +852 3693 1522 Hong Kong

1     DEPARTMENT OF JUSTICE

2   OFFICE OF THE UNITED STATES TRUSTEE

3      REGION 16

4    LOS ANGELES, CALIFORNIA

5

6

7

8

9

10   TRANSCRIPT OF PROCEEDINGS OF

11   341(a) Meeting of the Creditors

12     April 8, 2013

13      Room 2610

14

15

16

17

18

19

20

21

22

23

24    Transcribed by Lisa Day

25  Certified Shorthand Reporter No. 12960

2

BARKLEY
Court Reporters

1                       TRANSCRIPT OF PROCEEDINGS

2                                 * * *

3

4              DARE LAW:  Good morning.  Today's April 8th,

5     2013.  My name is Dare Law.  I'm an attorney with the

6     Office of the United States Trustees of the Central

7     District of California.  This is the first meeting of

8     creditors held pursuant to 11 USC 341(a) of the

9     bankruptcy code.  The debtor's name is GGW Brands, LLC,

10    case number 213BK15130SK.  The case was filed on

11    February 27th, 2013.

12             Counsel, may I have an appearance please?

13             ROBERT YASPAN:  Robert Mr. Yaspan proposed

14    counsel for debtor in possession.

15             DARE LAW:  And other counsel?

16             RONALD TYM:  Ronald Tim, T-y-m.  I'm outside

17    non-bankruptcy counsel for the debtor.

18             DARE LAW:  And, sir, would you state your name

19    for the record please?

20             CHRISTOPHER DALE:  Yes, it's Christopher Dale.

21             DARE LAW:  And in what capacity do you

22    represent the debtor?

23             CHRISTOPHER DALE:  I'm the manager of the

24    debtor.

25             DARE LAW:  Mr. Dale, I need to administer the

                                 3

BARKLEY
Court Reporters

1   oath.  Would you raise your right hand?

2          Do you solemnly swear to testify to the whole

3   truth and nothing but the truth so help you God?

4          CHRISTOPHER DALE:  I do.

5   BY DARE LAW:

6     Q    Mr. Dale, the other I've administered is the

7   same oath given in a court of law.  The same penalties

8   of perjury apply.  Do you understand that?

9     A    Yes.

10    Q    Is there any reason medically or physically

11  that you're not able to provide your truthful testimony

12  today?

13    A    No.

14    Q    As we go through the proceedings, if at any

15  time you do not understand my question, please let me

16  know that you do not understand and I will try to

17  rephrase the question in a manner that's more clear to

18  you.  Do you understand that?

19    A    Yes.

20    Q    Also, as we go through the proceedings, as you

21  provide your testimony, if you are guessing, please

22  tell me it is a guess and then we will deal with it

23  accordingly.  Otherwise if it's not from your personal

24  knowledge, I need to know that as well.  Otherwise I'm

25  assuming it's from your personal knowledge and that you

4

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    are testifying and answering to the questions asked, is

2    that clear?

3        A    Yes.

4        Q    Did you review the bankruptcy petition before

5    it was filed with the court?

6        A    Yes.

7        Q    Did you sign those documents?

8        A    Yes.

9        Q    And do you understand that those documents are

10   also signed under penalty of perjury?

11       A    Yes.

12       Q    I noticed on the summary of schedules where

13   you signed, you did not date those documents?

14       A    Uh-huh.

15       Q    Why didn't they contain a date?

16       A    There are a lot of signatures.  I must have

17   missed it.

18       Q    Okay.  Do you recall when you might have

19   signed those documents?

20            ROBERT YASPAN:  If it was filed on the 27th.

21            DARE LAW:  No, the schedules were filed on

22   March 13th.

23            ROBERT YASPAN:  Okay.  Then we're talking

24   about March 13th date.  Do you remember when you signed

25   that?

5

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          THE WITNESS:  Either that day or the day

2     before I would imagine.

3     BY DARE LAW:

4          Q     Okay.  Close to the time that they were filed?

5          A     Uh-huh, yeah.

6          Q     All right.  If there are any errors contained

7     in the schedules, would you let me know what those

8     errors are and then we can talk about how they may be

9     corrected?

10         A     Sure.

11         DARE LAW:  Okay.  Counsel, could I just have a

12    very brief summary about what GGW Brands is about?

13         ROBERT YASPAN:  GGW Brands is primarily a

14    holding company and it holds three other companies that

15    are also in chapter 11.  There is activity under GGW

16    Brands, but it is in essence the sub license -- sub

17    licensee of the intellectual property and the parent

18    company of the other three debtors.

19         DARE LAW:  And those three debtors would be

20    GGW Direct, LLC, GGW Events, LLC, and GGW Magazine,

21    LLC; correct?

22         ROBERT YASPAN:  Yes.  Not much to say in

23    connection with Brands.

24         DARE LAW:  Yeah, most of it's going to be

25    indirect, I understand.

6

BARKLEY
Court Reporters

1    BY DARE LAW:

2        Q     Okay.  Now, Mr. Dale, you've heard what your

3    attorney has said.  Is there anything he said that you

4    believe to be inaccurate that you'd like to correct at

5    this point?

6        A     No.

7              ROBERT YASPAN:  Feel free.

8              THE WITNESS:  No.

9    BY DARE LAW:

10       Q     Okay.  According to the Schedule A, there is

11   no real property owned by GGW Brands; is that correct?

12   Feel free to look at the documents?

13       A     Okay.  Thanks.  Yeah, I think that is correct.

14       Q     For convenience sake, I'm actually going to

15   refer to this debtor as Brands because the other

16   debtors also have GGW in their names, so I'm going to

17   refer to those by the shortened names of either Direct,

18   Events, or Magazines, can we agree to that?

19       A     Yes.

20       Q     So Brands does not own any real property?

21       A     That's my understanding, yes.

22       Q     How long have you been manager of the debtor?

23       A     Six or seven months I want to say.

24       Q     And were you working for the debtor prior to

25   that?

7

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1        A      Yes.

2        Q      And what was your capacity before you were

3    named manager?

4        A      Director of human resources.

5        Q      And how long did you hold that position?

6        A      For nearly two years.

7        Q      And did you have a position with the company

8    prior to that?

9        A      No.

10       Q      Were you working for another company?

11       A      Yes.

12       Q      And was that company somehow affiliated,

13   related, did business with Brands?

14       A      No.

15       Q      When was the company formed?

16       A      It was either late October, early

17   November 2010.

18       Q      And who is -- let's see, it's an LLC so it

19   would be shareholder?  No?

20              ROBERT YASPAN:  Member.

21   BY DARE LAW:

22       Q      Member.  Thank you.  Who is the member of

23   Brands?

24              ROBERT YASPAN:  Who owns it?

25              THE WITNESS:  Pablo Holdings.

8

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   BY DARE LAW:

2        Q     And what is Pablo Holdings?

3              ROBERT YASPAN:   What does that mean, "what

4   is"?

5   BY DARE LAW:

6        Q     Is it a corporation?   Is it an LLC?   Is --

7   what sort of entity is it?

8        A     It's an LLC.

9        Q     And do you know what Pablo Holdings does in

10  terms of its business?

11       A     No.

12       Q     And who is the member of Pablo Holdings?   Do

13  you know?

14       A     I -- I don't know.   I don't know.

15       Q     Do you have any ownership interest in GGW

16  Brands, LLC?

17       A     No.

18       Q     Who do you take direction from with respect to

19  the members of Brand?

20       A     No one.

21       Q     So is it fair to say that with respect to the

22  management of Brands, you are the ultimate

23  decision-maker?

24       A     Yes.

25       Q     And why did Brands file bankruptcy?

9

BARKLEY
Court Reporters

1      A    I think it was a matter of finances and -- and

2   debt to income and asset ratio.

3      Q    Well, according to the schedule, there has

4   been no income to this debtor for the past three years,

5   so I'm going to get into that in a little while.

6           What do you mean by debt to income ratio?

7      A    I -- I -- I don't know.  I don't know if it

8   had to because the other entities that it is the parent

9   company of filed.  I'm not certain how to answer that.

10     Q    Are you going to be testifying for Direct,

11  Events, and Magazine?

12     A    Yes.

13     Q    So what caused the bankruptcy filing in

14  general for Brands and to the other companies?

15     A    I think it's a matter of debt to income.

16  I'm -- not being able to pay bills.

17     Q    What bills was it not able to pay?

18     A    Various.

19          ROBERT YASPAN:  Did it have anything to do

20  with --

21          DARE LAW:  Counsel, I -- I want to ask the

22  questions.  So if he doesn't understand, please let him

23  tell me he doesn't understand my question.  Let him

24  answer and then if we need a clarification, we can have

25  either some colloquy or I can re-ask -- rephrase the

10

BARKLEY
Court Reporters

1  question for Mr. Dale.

2         THE WITNESS:  Yeah, I don't understand the

3  question.

4  BY DARE LAW:

5     Q    Well, the debtor filed bankruptcy.  Was there

6  a precipitating factor that caused the debtor to file

7  bankruptcy?

8     A    I think legal concerns.

9     Q    Like what?  What do you mean by legal

10  concerns?

11    A    I don't know exactly how to answer that to --

12  to make sense.

13    Q    Was there some sort of lawsuit pending at the

14  time?

15    A    I think it's -- it's a series of lawsuits and

16  the legal expenses defending those suits are

17  significant.

18    Q    What was the nature of the lawsuits?

19    A    Some had to do with people that were filmed at

20  one time or another.  Some had to do with Joe Francis

21  and Steve Wynn.

22    Q    Okay.  Let's talk about the filming.  What

23  lawsuits were either pending or had been concluded or

24  were potential lawsuits with respect to filming.  What

25  does that mean?

11

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  That's like a bunch of

2     questions.

3     BY DARE LAW:

4          Q    Okay.  Let me break it down.  Was there any

5     pending lawsuits with respect to filming that the

6     debtor had done?

7               ROBERT YASPAN:  The debtor here is brands.

8               DARE LAW:  Right.  Right.  The debtor -- this

9     debtor is Brands.

10               THE WITNESS:  No.

11     BY DARE LAW:

12          Q    So there was no --

13          A    Not relating to Brands.

14          Q    Not against Brands?

15          A    I don't think so.

16          Q    And -- and I thought I saw on the schedules.

17     There was a couple new lawsuits, excuse me, by a Dana

18     Curtz is the attorney and there was -- no, that's for

19     services.  I only see -- all right.  Let me go through

20     them one at a time.  Let me start there.

21               On -- on Schedule F, if you take a look at

22     Schedule F --

23               ROBERT YASPAN:  You don't want him to look at

24     the statement of affairs --

25               DARE LAW:  Huh-uh.

12

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1           ROBERT YASPAN:  -- that has the -- the

2    lawsuits?

3           DARE LAW:  I'm going to go through Schedule F

4    first and then I'll come back to the statement of

5    financial affairs.

6           ROBERT YASPAN:  Okay.  Oh, F, that was in the

7    earlier file.

8           DARE LAW:  Right.  It's the -- it was filed

9    on --

10          ROBERT YASPAN:  27th.

11          DARE LAW:  -- February 27th along with the

12   initial petition.

13          ROBERT YASPAN:  Sorry.

14   BY DARE LAW:

15     Q    Okay.  For Schedule F there was the first

16   claim for Alan Michael Wade care of the Law Offices of

17   Shane M. Malade or Malade.  It says, "(inaudible)

18   pending litigation re personal injury."  What is that

19   debt about?

20     A    I don't know.

21     Q    Well, where did you get this information to

22   include this debt on the petition?

23     A    Possibly from counsel or the accounting

24   department.

25     Q    When you say possibly counsel, which counsel?

13

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    You have several counsel at the table?

2          ROBERT YASPAN:  A couple.

3    BY DARE LAW:

4        Q    A couple?

5        A    (Inaudible) can I ask a question to my

6    counsel?

7        Q    Yes, sure.

8        A    Do you know what this is or remember what this

9    is.

10          RONALD TYM:  Yeah, I provided the information.

11          THE WITNESS:  Okay.

12   BY DARE LAW:

13       Q    So Mr. Tym provided it to you?

14       A    Yes.

15       Q    And you had discussion about this claim with

16   Mr. Tym?  I don't really want to know the -- the nature

17   of the discussion.  I just want to know if you talked

18   to him about it.

19       A    If -- if at all, it was brief.  I don't

20   remember much about it.

21       Q    Who provides direction to counsel with respect

22   to lawsuits that might be pending?

23       A    I do.

24       Q    So you're the interface with counsel if

25   there's a lawsuit, what's happening in the lawsuit,

14

BARKLEY
Court Reporters

1   giving direction about a position the company might

2   want to take?

3       A    Typically, yeah, there are several people

4   including myself.

5       Q    Who would the other people be?

6       A    The company has an in-house -- well, it could

7   be a human resources person.

8       Q    And who would that be?

9       A    Amy Johnson.

10      Q    And she's HR director right now?

11      A    I think that's her title.

12      Q    And who else?

13      A    Occasionally managers of -- of different

14  departments.

15      Q    What departments?

16      A    Could be production department.

17      Q    Any others?

18      A    I think that's it.

19      Q    So to recap, you say you are the ultimate

20  decision-maker with respect to what happens with

21  litigation for the company?

22      A    I'd say yes.

23      Q    Okay.  And you say you don't know what this

24  personal injury suit is about?

25      A    It doesn't ring any bells, no.

15

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Q    Now, what about the claim of Brian J. Rayment?

2  It says, "for services rendered to others."  What is

3  the nature of this debt?

4    A    Brian Rayment is a former attorney, I think of

5  either Rayment Francis -- Joe Francis or other entities

6  he's had connection with in the past and I think there

7  is a debt between himself, Joe Francis, and Brian

8  Raiment, that he raiment is seeking to have satisfied

9  by the -- one of these entities.  I guess Brands in

10 this case.

11   Q    Did he represent Brands?

12   A    I don't know that he did.

13   Q    But you're saying you believe he was the

14 former attorney for Mr. Francis personally?

15   A    I think so.

16   Q    How long ago was this debt incurred?  It says

17 2011 to 2012.

18   A    I -- I guess that's right.  I don't know.

19   Q    And why is the debt disputed?

20   A    Well, I think it's a debt that doesn't -- it

21 has nothing to do with services that were provided to

22 Brands.

23   Q    Has he sent an invoice to Brands?

24   A    I don't believe so.

25   Q    Then why would Brands list it if he hasn't

16

BARKLEY
Court Reporters

1   sent an invoice to Brands?

2        A    I don't know.

3        Q    You don't know?

4        A    I'm not certain.

5        Q    Well, when you reviewed the schedules with

6   your attorney as you believe that -- I believe you said

7   at the beginning of the case that you did, did you see

8   that this debt was on there?

9        A    Yes.

10       Q    And if you don't believe that belongs to the

11  debtor and the debtor may not owe it, why would you

12  list it?

13            ROBERT YASPAN:  Objection.  Calls for a legal

14  conclusion.  The -- the claims that are listed include

15  claims that are asserted and disputed and any claim

16  whatsoever that's out there so that they get notice, he

17  would not know that.

18  BY DARE LAW:

19       Q    Okay.  What is Eckhoff Blutt, LLP?

20       A    This is an attorney who did -- provided

21  services to Brands.

22       Q    So the services were actually provided to

23  Brands?

24       A    I believe so.

25       Q    And what sort of services were provided?

17

BARKLEY
Court Reporters

1      A      Legal representation.

2      Q      Was it along the lines of litigation or

3  contracts?

4      A      It was litigation.

5      Q      What was the nature of the litigation?

6      A      I believe this was related to one of the Steve

7  Wynn cases.

8      Q      With the Steve Wynn cases?  You mean the Wynn

9  claim against Mr. Francis?

10     A      I think there -- there's so many aspects of

11  the Wynn case, I don't know.  I believe some of them

12  crossed over at least on paper or were attempted to be

13  crossed over into Brands by Wynn.

14     Q      So when was Eckhoff Blutt hired?

15     A      Sometime in 2012.

16     Q      And were you the contact person that dealt

17  with Eckhoff Blutt?

18     A      One of them, yeah.

19     Q      And who were the other people?

20     A      Well, I'd be the one who dealt with on the --

21  for the most part.

22     Q      And has Eckhoff Blutt submitted a bill to

23  Brands for legal services?

24     A      I believe so.

25     Q      So then why is their claim disputed?

18

BARKLEY
Court Reporters

1        A     I don't believe -- I -- I would say that we

2    don't believe the services were provided that were

3    billed.

4        Q     Does that mean -- for clarification purposes,

5    does that mean that you don't believe that the debtor

6    owes $75,796, like that specific amount?  They may owe

7    more?  They may owe less?

8        A     I'd say that's right, yeah.

9        Q     Do you dispute that there's some money owed to

10   Eckhoff Blutt?

11       A     No.

12       Q     And who signed the retainer agreement with

13   Eckhoff Blutt if Brands was being represented by them?

14       A     I don't know.

15       Q     It wouldn't be yourself?

16       A     Well, I don't believe I was manager at the

17   time that the counsel was originally retained.

18       Q     Who was manager prior to yourself?

19       A     I believe it was Rafael Bernardino.

20       Q     And is Mr. Bernardino still with the company?

21       A     No.

22       Q     Is he with any of the GGW companies?

23       A     No.

24       Q     Is he with any company that does business or

25   is related to or affiliated with any of the GGW

19

BARKLEY
Court Reporters

1    companies?

2        A    No.

3        Q    So he's not working with the companies at all?

4        A    Right.

5        Q    Whether it's Brands, Direct, Events, or

6    magazine?

7        A    That's right.

8        Q    And what is -- I'm probably going to miss

9    pronounce this.  E-gats?

10       A    I think it's E-Tags.

11       Q    Oh, E-Tags.  Okay.

12       A    Yeah.

13       Q    Okay.  What is E-Tags?

14            ROBERT YASPAN:  Just like it's spelled.

15            THE WITNESS:  Yeah, E-Tags is -- is -- is a

16   term I learned if I can use it here called patent

17   trolling where folks will go out and try to find

18   something that exists in the common world that has yet

19   to be patented.  In this case E-Tags claims that just

20   about anything you can imagine, this binder, would it

21   have a computer readable component along with it, that

22   that is their patent.  So they claimed that because

23   there was -- where in the past physical GGW magazines

24   for Girls Gone Wild, magazines that had DVDs in them

25   and those could be read by a computer, that infringed

20

BARKLEY
Court Reporters

1    on their patent.

2    BY DARE LAW:

3        Q    So did they file a lawsuit?

4        A    Yes.

5        Q    And what's the status of that lawsuit?

6        A    I'm not certain at this point.  I -- I think

7    it's -- it -- there were -- there were motions for this

8    to be dismissed and those were fought.  I don't know

9    where it stands as we sit here today.  I think it's

10   still active.

11       Q    Who is the contact person for the attorney

12   handling this lawsuit?

13       A    For GGW?

14       Q    Yes.

15       A    I believe it's -- oh, goodness gracious.  I

16   can't think of -- can you think it was that piece?

17            ROBERT YASPAN:  (Inaudible) help.

18            THE WITNESS:  I'm sorry.  Can I --

19   BY DARE LAW:

20       Q    I need an answer first.  If you know --

21       A    Yes, I don't -- I don't know.

22       Q    -- you know, if you don't know, tell me you

23   don't know --

24       A    I don't know.

25       Q    -- and then I'll -- I may ask counsel.

                        21

BARKLEY
Court Reporters

1    A    Yeah, I do not remember the gentleman's name.

2    Q    Who is the attorney handling this lawsuit, if

3 you know?

4         ROBERT YASPAN:  For Brands?

5 BY DARE LAW:

6    Q    For Brands.

7    A    I thought -- isn't that what you just asked

8 me?

9    Q    No, I wanted to know the internal person.  Was

10 it you who interfaces with the outside attorney?

11   A    Oh, got it.  Got it.  Got it.  Got it.  I

12 think generally it's Mr. Tym who interfaces with them

13 to answer your last question.  I don't recall the name,

14 which is what I thought you were asking in the first

15 place, of the attorney who's handling this directly for

16 Brands.

17   Q    So who on the inside works with Mr. Tym to

18 provide Brands' point of view?  Because attorneys don't

19 make decisions on their own without client input.

20   A    Generally myself.

21   Q    Okay.  So you work with Mr. Tym regarding

22 litigation?

23   A    That's right.

24   Q    At least this particular litigation.  So

25 Mr. Tym, do you know who outside counsel is for the

22

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   debtor other than yourself?

2          RONALD TYM:  I believe the name is Pete

3   Chazman with Winston Strawn.

4   BY DARE LAW:

5       Q    And Winston and Strawn represented Brands?

6       A    Yeah, they -- there were a number of

7   defendants, even some outside of the GGW family and so

8   they represented all the defendants and costs were

9   apportioned.

10      Q    When you say GGW family, does that also mean

11  companies that work with GGW on Girls Gone Wild

12  products or --

13      A    No, I just meant --

14      Q    -- similar products?

15      A    I just meant the four debtors here, GGW

16  Events, Magazine, and Direct.

17      Q    Right.  But did Winston and Strawn also work

18  with other companies that may interface --

19      A    No.

20      Q    -- that have the same parent holding company?

21      A    No.

22      Q    So is Winston and Strawn owned any money?  I

23  don't see them as listed as a creditor.  Mr. Dale, do

24  you know?

25      A    I don't know.

23

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    Counsel, I need you to look into that to see

2  whether in fact they are a creditor if they had

3  represented Brands.

4           And do you know, Chris, may have signed the

5  retainer agreement on behalf of Brands?

6      A    I don't know.

7      Q    Was this litigation pending when you became

8  manager?

9      A    Yes.

10     Q    Okay.  And then there is the attorney for

11 Wynn, it says notice only but no dollar amount owed.

12 That -- does this relate to the litigation that Wynn

13 has against Joe Francis?

14     A    Yes.

15     Q    And then there is the Tamara Favazah claim?

16     A    Yeah.

17     Q    What is that for?

18     A    I believe it has to do with someone who was

19 filmed who was not 18.  I don't remember directly

20 though.

21     Q    And who was handling this litigation on behalf

22 of the debtor?

23     A    I don't remember.

24     Q    The attorney?  You don't know the outside

25 attorney?

                          24

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1       A    Right.  I can't remember the name.

2            DARE LAW:  Counsel, do you recall who the

3    outside attorney might be?

4            ROBERT YASPAN:  I believe the name -- the name

5    of the firm was Barry and Maxim, but they have

6    withdrawn -- they withdrew shortly the filing of the

7    petition.

8    BY MS. LAW:

9       Q    And what is the status of the litigation with

10   Ms. Favazah?

11      A    As concerns these entities, it's stayed,

12   but --

13      Q    Right, but at -- before it got stayed, where

14   were we?

15      A    It was still determining whether proper

16   service had been made and whether there was personal

17   jurisdiction over GGW Brands.

18      Q    Where is the lawsuit pending?

19      A    In federal court in St. Louis.

20      Q    And then the Wynn Las Vegas, there's just over

21   $10 million claim.  It says, "Alter ego claim against

22   debtor for judgment suffered by Joe Francis."

23           And what is that claim about?

24      A    I believe it's an attempt to collect on the

25   judgment that is against Mr. Francis.

25

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Q    And is there a lawsuit against the debtor

2   pending on this?

3    A    Don't know.

4    Q    Since you became manager, have you interfaced

5   with any attorney on behalf of Brand with respect to

6   this Wynn claim?

7    A    If at all, only Mr. Tym.

8    Q    According to your Schedule B, you can turn to

9   it if you like, it says that --

10        ROBERT YASPAN:  B as in --

11        THE WITNESS:  Is it in this same section?

12   BY DARE LAW:

13    Q    Right, B, personal property.  It says that the

14   debtor holds 100 percent membership interest in GGW

15   Direct, LLC, and you value that interest at

16   3.3 million.  How did you term that value?

17    A    As a, I believe, combined assets of the other

18   three entities you mentioned.

19    Q    Well, it says here Direct is 3.3 million by

20   itself, Magazine is valued at 100,000, and Events is

21   valued at $336,000.  How did you determine these

22   values?

23    A    Based on sales, assets.

24    Q    Is it book value or liquidation value?

25    A    I don't know the difference of that actually.

26

BARKLEY
Court Reporters

1      Q    Now, it says here that there's $4,000 due from

2   affiliates.  What would that be from?

3      A    Due from affiliates, due to -- maybe amounts

4   that are due back that were over paid.  I'm not

5   certain.

6           ROBERT YASPAN:  There's a due from due to

7   chart and this is the net number as of some date before

8   the filing.

9   BY DARE LAW:

10     Q    Did you provide a due from due to chart?

11          ROBERT YASPAN:  I believe we gave you the

12   balance sheet.  Those numbers are on the balance sheet.

13   BY DARE LAW:

14     Q    On Schedule B number 23 it says licensees,

15   franchises, and other general intangibles but it says

16   none.  Does Brands have any interest in any

17   intellectual property?

18     A    I don't believe so.

19     Q    I believe earlier there was a comment that

20   Brands was a licensee of some intellectual property.

21   Did I hear that earlier?

22          ROBERT YASPAN:  You heard sub licensee.

23   BY DARE LAW:

24     Q    Sub licensee.  Okay.  What is the intellectual

25   property for that sub licensee?

27

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A    I believe the use of -- I think it's Girls

2    Gone Wild.

3      Q    The brand name Girls Gone Wild?

4      A    I believe so, yeah.

5            ROBERT YASPAN:  Yeah, that'll have to be

6    amended.  Go ahead.

7            RONALD TYM:  Technically it's correct that all

8    licenses to Brands were terminated prior to the filing

9    of this bankruptcy.  There's a new trademark agreement,

10   but that is with Direct.

11           DARE LAW:  So who terminated the agreement on

12   the sub licensee.

13           ROBERT YASPAN:  You're right.  It's with

14   Direct.  Thank you.

15   BY DARE LAW:

16     Q    Mr. Dale, who terminated the agreement with

17   the licensor?

18     A    I'm not certain.  I think -- I don't know.

19     Q    Who was the licensor if Brands was the sub

20   licensor?

21     A    I don't know.

22           ROBERT YASPAN:  Mr. Tym might know.

23   BY DARE LAW:

24     Q    Can you explain to me what you're duties are

25   as a manager?  Because every organization works a

28

TRANSCRIPT OF PROCEEDINGS



1   little bit differently, so can you explain to me what

2   you do as a manager?

3       A    Make decisions on hiring and firing, sign

4   checks when there's a bill to be paid, general

5   direction of the business.

6       Q    And what is your day-to-day like?

7       A    Working with the department heads to run the

8   business.

9       Q    And how many hours do you normally work a

10  week?

11      A    Pretty limited.

12      Q    Why would it be limited?

13      A    I don't know.  Maybe just a couple hours a

14  week.

15      Q    For Brands or for all the four debtors?

16      A    All four.

17      Q    Do you hold a job outside of being manager for

18  whether it's Brands or the other three entities?

19      A    Yes.

20      Q    Oh, what is it that you do outside of working

21  for Brands and -- and the other three entities?

22      A    Human resources work for another company.

23      Q    And what is that other company?

24      A    Movie Clips.

25      Q    And Movie Clips in any way affiliated with

29

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  Brands, Direct, Events, Magazine, or Perfect Science

2  Lab?

3      A    No.

4      Q    So it's a third party totally unaffiliated

5  with Joe Francis or any of these other entities?

6      A    That's right.

7      Q    And what is your salary for Brands or the

8  three debtor entities?

9      A    It's $24,000 a year.

10     Q    I thought I saw something that said you were

11 making about 75,000, whether it's for Brands or one of

12 the other entities?

13     A    I had at one time, but not as manager.

14     Q    So when you say you work a few hours, can you

15 quantify that a little bit more?

16     A    Maybe four or five hours a week.

17     Q    So if somebody needs something on a particular

18 day because something is happening with the company,

19 who would they go to?

20     A    Their manager potentially or to me.  I'm

21 always available via cell phone or e-mail.

22     Q    So can you explain to me the structure of the

23 business?  Let's say you're at the top, and then how

24 does the structure flow from you?

25     A    There are a couple of VPs over the main

30

BARKLEY
Court Reporters

1    departments.

2        Q    And what are the main departments?

3        A    The online team.

4        Q    Uh-huh.

5        A    The production team and probably the

6    accounting team.  Those probably comprise the main

7    aspects.

8        Q    Can you tell me is there different divisions

9    or departments for people who only work for Brands?

10   And I know that -- that the employees are leased

11   through Perfect Science.  So when I say work, I know

12   that they come from Perfect Science Labs, but in terms

13   of the debtor entities, are there people that only do

14   Brands and then only work for Direct and only work for

15   Events and only work for Magazine?

16       A    Don't think so, no.

17       Q    So then how do you allocate time for each

18   separate entity in terms of making payments to Perfect

19   Science so those people could be paid for their time?

20            ROBERT YASPAN:  That assumes something not in

21   evidence, that he's the one that actually allocates

22   that.

23            DARE LAW:  Well, he can tell me whether he is

24   or not.

25   ///

31

1    BY DARE LAW:

2       Q    Are you the one who allocates those people to

3    those different tasks and different companies?

4       A    If allocations are done, either myself or the

5    accounting department.

6       Q    I'm sorry, I didn't hear what you said.

7       A    If any allocations are done, it would either

8    be myself or the accounting department in some

9    capacity.

10      Q    Well, who makes the decision of Direct needs

11   more people, Events may need for people, Brands may

12   need more people?  Who makes that decision?

13      A    The department heads with myself.

14      Q    So do they consult you on that decision?

15      A    Yes.

16      Q    And -- and when you say there's various

17   department heads, are they working for Brands or Direct

18   or Events or Magazines?  Who do they work for?

19           ROBERT YASPAN:  Gotta be compound.  So you

20   mean who do they work for?

21   BY DARE LAW:

22      Q    Yeah, like is there a division head, a VP,

23   that is in Brands that only does production for

24   example?

25      A    Yes, but it crosses over a lot, so I don't

32

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    think there's anyone strictly dedicated or the VP level

2    to one of these entities.

3        Q    So when -- and please speak up a little bit

4    because I'm told that other people can't hear you.

5            So how is it allocated in terms of making

6    payment to Perfect Science Lab when the debtors have to

7    make payment for employee time for whatever the

8    agreement is with Perfect Science, how do you decide

9    which debtor pays how much?

10       A    I don't know.

11       Q    Well, who would know that?

12       A    Our accounting department.

13       Q    So what is your role in determining, if any,

14   allocation of human resources among the four entities?

15       A    Well, if one of the entities needs a new

16   employee for example, I'd be involved in that decision.

17   But in terms of figuring out percentages of who does

18   that time for which, if that's part of your question, I

19   don't --

20       Q    Yes, that's part of my question.

21       A    Yeah, I don't make decisions like that.

22       Q    Well, who makes that decision?

23       A    I'd say the accounting department.

24       Q    And do they have to ask you as manager, this

25   is what we want to do?  Is it okay?  Or do they have

33

BARKLEY
Court Reporters

1    authority to just go ahead and do it on their own?

2        A    I -- I'd say between the accounting and the

3    department heads, they have authority to make decisions

4    of that nature.

5            ROBERT YASPAN:  We have brought with us a

6    director of accounting, director of human resources

7    that are in the room here should --

8            DARE LAW:  Yes, I can see them.

9            ROBERT YASPAN:  I know, but it's not on the

10   record that they're here.

11           DARE LAW:  Yeah, that's fine.  Okay.  Because

12   they're not managers, I'm not going to take testimony

13   from them even though they may have knowledge.  I'm

14   only going to take testimony from an authorized

15   representative of the debtor in terms of managers or

16   members.  So since Mr. Dale is the only one here who's

17   a manager, I'm only going to take the testimony from

18   Mr. Dale.

19           Now, I may ask you to provide information

20   which you can give to me in written form later to

21   answer some of these questions if Mr. Dale doesn't

22   know.  So for example, in this line of questioning, I

23   would like to know who are these VPs of production,

24   accounting, online, and what -- how many personnel are

25   staffed for each one because when we get to a

34

BARKLEY
Court Reporters

1  disclosure statement, if there's payroll and those

2  sorts of things, I want to know how that's allocated to

3  each individual debtor, particularly because right now

4  they still are four separate debtors, four separate

5  legal entities.

6          ROBERT YASPAN:  All right.  So you want names

7  first?

8          DARE LAW:  Yes, I want names first and then

9  number of personnel under each debtor.

10         ROBERT YASPAN:  Do you understand what she

11 wants?

12         THE WITNESS:  Yes.

13         ROBERT YASPAN:  Okay.

14         THE WITNESS:  I -- I think it -- just to sort

15 of help clarify, right now as I think we've indicated

16 in prior meetings, the four companies don't really act

17 like four different companies.  So the leasing is

18 leasing of employees from Perfect Science Labs to GGW

19 Direct.  So you have those employees of GGW direct and

20 then there's no real allocation among the other

21 entities.  You know, I think part of the confusion was,

22 you know, they may be assigned tasks that have to do

23 with the Magazine or Events, but technically they're

24 all just leased by Direct and paid by Direct.

25 ///

35

BARKLEY
Court Reporters

1    BY DARE LAW:

2        Q    So if fair to say, Mr. Dale, that there really

3    is no strict separation of Brands, Direct, Magazines,

4    Events?

5        A    Yes.

6             ROBERT YASPAN:  That's a legal conclusion.

7    BY DARE LAW:

8        Q    Well, let me -- let me ask it a different way.

9    Because --

10            ROBERT YASPAN:  Give me a chance to say

11   something.

12            THE WITNESS:  Sure.

13   BY DARE LAW:

14       Q    If you don't understand my question, let me

15   know, but with -- in terms of how the separate debtors

16   operate among themselves, your attorney has told me

17   that there's not a strict delineation, most of the

18   people work for Direct or doing what Direct needs, but

19   there's no strict allocation for Brands, Events, and

20   Magazine.

21            So how and when is it decided that people are

22   going to do things for either Brands, Events, or

23   Magazines if they're mostly working for Direct?

24       A    I think it's a decision made by department

25   heads.

36

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          DARE LAW:  Okay.  And, Counsel, you're going

2   to provide me who those department heads are.

3          ROBERT YASPAN:  You didn't --

4          DARE LAW:  I asked --

5          ROBERT YASPAN:  Do you know the names?

6   BY DARE LAW:

7      Q    Do you know the names of your department

8   heads?  Like who's the online VP?  And who is that?

9          ROBERT YASPAN:  You have to say yes or no.

10          THE WITNESS:  Yes.

11   BY DARE LAW:

12      Q    And who is the online VP?

13      A    Ron Villanueva.

14      Q    And who is the VP of production?

15      A    Brian Lord.

16      Q    And who is the VP of accounting?  I'm using

17   the term VP because that's what you said.

18      A    Yeah, I don't think that's probably the right

19   title for -- for accounting.

20      Q    And who is head of accounting?

21      A    Mandy Isaac.

22      Q    Are there any other heads of departments?

23      A    Those are the main ones.

24      Q    And who do these people report to?

25      A    Me.

37

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     Q     Do they report to any other persons?

2     A     No, among -- among each other, but no, not

3  directly.

4     Q     Now, according to your Schedule B, this debtor

5  Brands does not own any cars, trucks, trailers,

6  vehicles, things like that?

7     A     That's correct.

8     Q     And there are no secured creditors in this

9  case?

10    A     I don't believe so.

11    Q     Now, let's go back to the licensing agreement.

12 Who decided to terminate that sub licensing agreement

13 for the brand Girls Gone Wild?

14    A     I learned about it through counsel, but I'm

15 not sure who made that decision.

16    Q     Was it made during your tenure as manager?

17    A     May I speak with counsel?

18    Q     Sure (inaudible) your counsel.

19    A     Yeah, yeah, yeah, that's what I thought.

20 That's what I thought.  Yeah, the decision was not made

21 by me.  It was terminated by the holder of the

22 intellectual property rights.

23    Q     And who holds that property right?

24    A     Path Media.

25    Q     And is Path Media somehow affiliated, related

38

BARKLEY
Court Reporters

1   to, works with other than the renting of the licensing

2   agreement with the parent company of the debtor?  The

3   Path Media -- wait, hold on.  Let me see.

4           Who's Path Media again?  Tell me who Path

5   Media is again.

6           ROBERT YASPAN:  I don't think we're at again.

7   BY DARE LAW:

8      Q    First time.  Does the parent -- oh, Pablo

9   Company is the holding company.

10          Does Pablo Company have any interest in Path

11  Media?  Do you know?

12     A    I don't know.

13     Q    Is Path Media related to any of the members of

14  either Brands, Direct, Events, or Magazine?

15          ROBERT YASPAN:  Well, he's the member of

16  Brands.

17          DARE LAW:  Right.

18          ROBERT YASPAN:  And Brands is the member of

19  the other three.

20          DARE LAW:  Yes.

21          ROBERT YASPAN:  So you're either asking

22  whether he or Brands has a relationship with Path.

23          DARE LAW:  Member, not manager.  Member.

24          ROBERT YASPAN:  Member, that's right.

25          DARE LAW:  Yeah.  So do --

39

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Oh, manager, that's right.

2          DARE LAW:  Yeah, he's the manager.

3          ROBERT YASPAN:  Right.

4          DARE LAW:  But I'm asking do any members own

5     Path Media?

6          THE WITNESS:  I don't know.

7     BY DARE LAW:

8      Q    Do you know who owns Path Media?

9      A    No.

10     Q    And why did Path Media terminate the sub

11    licensing agreement?

12     A    I don't know.

13     Q    They didn't notify you that they were going to

14    make the termination?

15     A    I learned about it through counsel, but I'm

16    not certain of the reasons for it.

17     Q    Did they send a letter of termination?

18     A    That we received a letter for, yes.

19     Q    Did you see it personally?

20     A    I believe so.

21     Q    Did they state a reason why they were

22    terminating?

23     A    May I speak with counsel again?

24     Q    Well, if -- I want you to let me know if you

25    recall first or not.


                        40

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1       A     I -- I don't -- I don't -- no, I do not.

2       Q     Okay.  Then go ahead and speak with your

3   counsel.

4       A     Yeah, yeah, there was no reason given.

5       Q     Was there a written sub licensing agreement?

6   Yeah, can you speak up a little bit?  Was there a -- a

7   written licensing agreement?

8       A     I don't think there had been.

9       Q     It was oral?

10      A     I don't know.

11      Q     Do you know what the terms of the licensing

12  agreement were?

13      A     No.

14      Q     Do you know if there were royalty payments due

15  under that licensing agreement?

16      A     I don't.

17      Q     I'm sorry, I can't --

18      A     I do not know.

19      Q     Who would know that information?

20      A     Possibly counsel or accounting department.

21      Q     And which counsel would it be when you say

22  "counsel"?

23      A     I imagine potentially Mr. Tym, if -- if

24  anyone.  I don't know.

25      Q     I'm sorry, you're very soft spoken and we have

41

BARKLEY
Court Reporters

1    like people sitting way in the back.  We have people

2    sitting on the -- so please speak up.  I know it's --

3    you're normally soft spoken, but I'm asking you to

4    speak up a little bit.

5         A    If -- the counsel I'm referring to is Mr. Tym.

6         Q    Would there be any other counsel involved

7    other than bankruptcy counsel?

8         A    Possibly.

9         Q    Do you know how long that licensing agreement

10   would have lasted prior to termination?

11        A    No.

12             ROBERT YASPAN:  But for termination.

13   BY DARE LAW:

14        Q    But for termination.  Prior to termination.

15   Same thing.  I mean, before termination, how long was

16   it supposed to go?

17        A    I don't know.

18        Q    How long ago did you -- when I say you, I mean

19   Brands -- get the termination letter?

20        A    I don't remember.  It was -- if I may ask

21   counsel.

22        Q    You don't know, you don't know?

23        A    I don't know.

24        Q    So I recall your counsel saying that there was

25   a new agreement.  Is that with Path Media?

                              42

TRANSCRIPT OF PROCEEDINGS                    

1      A     I believe so.

2      Q     Who negotiated the new agreement?

3      A     Counsel.

4      Q     Were you involved in that negotiation?

5      A     To a limited degree.

6      Q     Why limited?

7      A     I trust the folks working with me to make

8  decisions.

9      Q     But who made the ultimate decision of what the

10  terms of that new agreement might be?

11     A     Myself and counsel.

12     Q     And what are the terms of that new agreement?

13     A     I don't remember the specifics.

14           ROBERT YASPAN:  But we did deliver that to

15  you.

16           DARE LAW:  Okay.  I'm just trying to get some

17  background.

18           ROBERT YASPAN:  Fair enough.  But you have the

19  agreement.

20  BY DARE LAW:

21     Q     Okay.  And who signed the agreement on behalf

22  of the debtor?

23     A     I did.

24     Q     And do you know how long that agreement goes

25  to?

43

BARKLEY
Court Reporters

1     A    I believe it's through the end of May this

2  year.

3     Q    Is it -- I don't have the agreement in front

4  of me.  Is it at least a one-year term that you signed

5  for?

6     A    I don't think so.

7     Q    Why so short?

8     A    I -- I think it was the only terms that Path

9  would allow.

10    Q    And who at Path were you negotiating with?

11    A    It was done through counsel.  I don't know.

12    Q    Who was their counsel?  Do you know?

13    A    I don't remember.

14         ROBERT YASPAN:  Their counsel or his counsel?

15  BY DARE LAW:

16    Q    Path's counsel, if you know?

17    A    No, I don't know.

18         ROBERT YASPAN:  I -- the record should say

19  it's getting close to 10:00.  The questions you're

20  asking go beyond Brands and of course you're being --

21         DARE LAW:  I thought the sub licensing

22  agreement was with Brands?

23         ROBERT YASPAN:  Well, hold on.  Let me finish.

24  The -- the questions you're asking are being, of

25  course, led by the answers, which indicate that there's

44

BARKLEY
Court Reporters

 1   a great deal of commonality.  I would like you to --

 2   for the record -- call Direct and start the Direct

 3   341(a) as well.

 4           DARE LAW:  No, I'm going to run long on this

 5   because I don't think I'm going to go much longer on

 6   Brands.  I think the parties here -- does anybody mind

 7   me going a little bit longer on Brands that you want me

 8   to immediately start Direct?  I mean, it's --

 9           ROBERT YASPAN:  No, I want to run them

10   concurrently.

11           DARE LAW:  Oh, no, I'm not going to run them

12   concurrently.  I'm going to do something with Brands

13   and then I'm going to call Direct and if I need to

14   continue this and then call Direct, I will.  And if we

15   somehow later want to merge them, we will.  But right

16   now, since they're still separate corporate entities, I

17   need to make separate records.

18           ROBERT YASPAN:  You may have to make separate

19   records, but I don't want to give creditors four

20   different chances to ask questions.  They get one

21   chance.

22           DARE LAW:  No, they get four chances.  It's

23   four separate entities, they get four separate chances.

24   It's -- because they're not substantively consolidated,

25   they're not even jointly administered, but even in

45

BARKLEY
Court Reporters

1   joint administration, they're four separate entities.

2   I could have set these one week apart and they would

3   have had -- so I set them back to back because that's

4   convenient for me, but they're four separate legal

5   entities.  I have to give them an opportunity to ask if

6   they're creditors in each individual case.

7          ROBERT YASPAN:  I understand what you're

8   saying, but I do have to leave after the morning so --

9          DARE LAW:  Well, the last one is scheduled for

10  12:00 and normally they're scheduled an hour apart.  I

11  will continue these if we run out of time and you need

12  to go, but --

13         ROBERT YASPAN:  That's fair.

14         CHRISTOPHER DALE:  -- I don't expect Events

15  and Magazine to take that much -- that much time

16  because, as you say, they weren't that --

17         ROBERT YASPAN:  Active --

18         DARE LAW:  -- busy and -- and active; right?

19  Because they had very limited business.  Direct had a

20  lot of business so I think that's going to run a little

21  bit long, but I expect Magazines and Events not to go

22  that long.

23         ROBERT YASPAN:  Fair enough.

24         DARE LAW:  Okay.  Did anybody want me to start

25  Direct or can I continue with Brands for a little bit?

46

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   Okay.  I don't hear any objections for me to go a

2   little bit longer on Brands, so I'm just going to try

3   to move this along.

4   BY DARE LAW:

5       Q    Okay.  So the IT with Path Media, did you know

6   who that counsel for Path Media was?

7       A    I think IP or IT, I --

8       Q    The counsel for -- the attorney for Path Media

9   who you were --

10      A    No.

11      Q    -- negotiating with?

12      A    The no.

13      Q    Did you ever meet them?

14      A    No.

15      Q    And -- and in terms of the rights that you

16  have under the licensing agreement, is it similar to

17  the previous sub licensing agreement?

18      A    I don't have knowledge of the -- that previous

19  agreement, so I don't know.

20      Q    What are the terms of the new agreement?  You

21  say it goes until May, but what about payments and

22  those sorts of things, royalty payments?

23      A    I don't remember the specifics.

24      Q    Do you know if payments are due monthly or

25  quarterly or some other period?

47

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A    I don't remember.

2      Q    Have any payments been made to Path Media for

3   use of the intellectual property?

4      A    I don't recall.

5           ROBERT YASPAN:  He may not recall, but we've

6   given you the agreement and it lists it at page 2 what

7   payments were made.

8   BY DARE LAW:

9      Q    Okay.  And that agreement was made before --

10   sorry, after the bankruptcy filing so it doesn't show

11   up on the executory contract and the previous agreement

12   you say was terminated prior to the filing; is that

13   correct?

14      A    I think that's right if I --

15      Q    Okay.  But executory contracts should still

16   include the employee agreement with Perfect Science

17   Lab, shouldn't it?  This is for counsel.

18           ROBERT YASPAN:  The what?

19           DARE LAW:  The executory contracts and

20   unexpired leases, you have an employee agreement with

21   Perfect Science Labs, so shouldn't that be on this

22   Schedule G?

23           RONALD TYM:  Well, again, that agreement is

24   just with GGW Direct.

25           DARE LAW:  But not with Brands?

48

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          RONALD TYM:  Correct.  And also the trademark

2    agreement is just for GGW Direct, not with Brands.

3          DARE LAW:  Oh, okay.

4    BY DARE LAW:

5      Q    Is that correct, Mr. Dale, if you know?

6      A    I trust that that's correct.

7      Q    So does Brand have any employees at all or

8    anybody --

9          ROBERT YASPAN:  Leased --

10   BY DARE LAW:

11     Q    -- leased specifically just for Brands?

12     A    I don't think so.  I don't think so.

13     Q    Now, with respect to co-debtors, does any --

14   any other persons or entities owe any of this -- the

15   debts on behalf of Brands because your Schedule H says

16   none.

17     A    I don't think so.

18     Q    It says on the statement of financial affairs

19   in 2011 there was no revenues whatsoever for Brands; is

20   that correct?

21     A    I believe so.

22     Q    Were tax returns filed or were they required?

23     A    I don't believe they were required.

24     Q    And it says in 2012 there's no revenues on

25   behalf of Brands; is that correct?

49

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A     I believe so.

2      Q     And as of the beginning of the year to the

3  time of filing, there was no revenue in 2013 on behalf

4  of Brands; is that correct?

5      A     I believe so.

6      Q     Does Brands have office space or expenses?

7      A     I don't think so.

8      Q     So there's no expenses affiliated with Brands?

9      A     I don't believe so.

10      Q     So there's no rent payment or sub rent payment

11  owed by Brands either?

12      A     I believe that's correct.

13      Q     And we've already talked -- at least touched

14  upon the statement of financial affairs because I went

15  through it actually through Schedule F, so I don't need

16  to ask that.

17          The payment to your attorney Mr. Yaspan, that

18  was paid by Direct.  Does -- is it expected that Brands

19  is going to have to pay that money back to Direct?

20      A     Huh, I don't believe so.

21      Q     And I see Mr. Tym here also, is he going to be

22  employed by the debtor to continue his work?

23          ROBERT YASPAN:  We have not yet discussed

24  that, so I'm not going to let him answer that question

25  right now.

50

BARKLEY
Court Reporters

1          DARE LAW:  Okay.  Well, Mr. --

2          ROBERT YASPAN:  Because that's between the two

3     of them.

4          DARE LAW:  Okay.  But Mr. Tym apparently is

5     spending time working whether it's for Brands or any of

6     the other three cases because he met us at the initial

7     debtor interview, you were at the site visit, you're

8     here today.

9          Is it expected that either this debtor or any

10    of the other three debtors are going to have to pay for

11    Mr. Tym's time for appearing at these meetings?

12          THE WITNESS:  Likely, yes.

13          ROBERT YASPAN:  Whether or not it's expected,

14    they will only be paid, you can be assured, with an

15    order of court.

16          DARE LAW:  Right.  But I'm concerned.  Is

17    Mr. Tym going to file an employment application?

18    Mr. Tym?

19          RONALD TYM:  I think I mentioned at our last

20    meeting that I'm ramp -- ramping down my

21    representation.  I'm just sort of here as a resource.

22    Mr. Yaspan and his firm --

23          DARE LAW:  Are you charging time to be here

24    though?

25          RONALD TYM:  No.

51

BARKLEY
Court Reporters

1          DARE LAW:  So you're not expecting payment for

2    the initial debtor interview, being at the site visit,

3    or here today?

4          RONALD TYM:  (Inaudible).

5          DARE LAW:  Okay.  I have to think about that

6    one, whether he actually still needs to even if he's

7    working for free.

8          ROBERT YASPAN:  By the time you think about

9    it, he will no longer be --

10          RONALD TYM:  So unusual.

11    BY DARE LAW:

12      Q    And how long has Brands been using Mr. Tym's

13    services, if you know?

14      A    I don't remember exactly.

15      Q    Was it an hourly arrangement or was it a

16    monthly retainer?

17      A    A monthly retainer.

18      Q    Like a flat amount per month?  And how much

19    was it per month?

20      A    I believe it was 10,000; is that correct?

21      Q    And which of the entities paid that?

22      A    I think Direct.

23      Q    Okay.  On the statement of financial affairs

24    number 11 it has three bank accounts, Wells Fargo,

25    National Bank of California.

TRANSCRIPT OF PROCEEDINGS



1       Why did the debtor have bank accounts if it

2   had no income or expenses?

3       A    Well, I think an example of any (inaudible)

4   would be like it's -- it's actual filings with the

5   state or -- or like parasite corporation, that kind of

6   thing.  So it had super limited expenses but for -- for

7   that reason.

8       Q    And the National Bank of California, it had a

9   closing balance of $26,308.  What happened to that

10  money?

11      A    I don't know.

12      Q    And where would the source of that money be

13  from?

14           ROBERT YASPAN:  Of these exact dollars?

15  BY DARE LAW:

16      Q    Well, the monies that are in this account,

17  where would the money come from?

18           ROBERT YASPAN:  That's a different question.

19  Okay.

20           THE WITNESS:  I'm not certain.

21  BY DARE LAW:

22      Q    Yeah, the source of the money, where'd it come

23  from?  You don't know?

24      A    I don't know.

25      Q    And who was the signatory on these accounts?

53

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     A    I believe just the Wells Fargo was myself.

2     Q    And what about the national bank of

3  California?

4     A    I'm not certain.

5     Q    That was closed, it says, on November 26th,

6  2012.  Do you know that to be true?

7     A    It sounds right, but I can't say that it was

8  that precise date.

9     Q    And what was your start date as manager?  You

10  said around October or November?

11     A    Yeah; right around that time.

12     Q    So was this closed when you were manager or

13  when somebody else was manager?

14     A    I think when I was manager.

15     Q    And did you sign the documents to close that

16  account?

17     A    I believe it was closed -- the bank itself

18  closed the account.  It's not the other way around.

19     Q    Why would the bank close the account if there

20  was a positive balance in there?

21     A    I don't know.

22     Q    Okay.  Counsel, I'm going to ask you for

23  information on that account.  Where did the proceeds go

24  from that account?

25          ROBERT YASPAN:  Okay.  So this is Brands?

54

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          DARE LAW:  Yes.

2          ROBERT YASPAN:  National Bank.

3          DARE LAW:  Because Mr. Dale testified that the

4   bank closed the account and I'd like to know why they

5   closed it and where the proceeds went.

6          ROBERT YASPAN:  I'm sorry, you want me to find

7   out from the bank why it closed it?

8          DARE LAW:  Well, usually in the letter it says

9   something, you know, that we're closing your account.

10  And I've never seen them close an account with a

11  positive balance in it.

12         ROBERT YASPAN:  Depends on the -- well, fine.

13  BY DARE LAW:

14     Q    Okay.  Did Brands have any credit cards issued

15  under that corporate name for any individuals?

16     A    I'd have to ask our accounting department.  I

17  don't know off the top of my head.

18     Q    Because I know after the American Express, I

19  think that was all under Direct (inaudible).

20     A    I think so.

21         ROBERT YASPAN:  We produced the American

22  Express records and it's -- it says Brands on it.

23         DARE LAW:  Does it say Brands?

24         THE WITNESS:  Yes.

25         DARE LAW:  Oh, why would it say Brands if

55

BARKLEY
Court Reporters

1    Brands has -- has no income?

2           THE WITNESS:  I don't know.

3    BY DARE LAW:

4       Q    And then was it paid by Brands or one of the

5    other entities?

6       A    I'm not certain.

7           ROBERT YASPAN:  Who would know?

8           THE WITNESS:  The accounting department.

9    BY DARE LAW:

10      Q    Okay.  How long, if you know, has American

11   Express cards been issued to Brands?

12      A    I don't know.

13      Q    Okay.

14          ROBERT YASPAN:  This particular account's been

15   around for 15, 20 years.

16   BY DARE LAW:

17      Q    Okay.  Now, on the American Express cards

18   there --

19          ROBERT YASPAN:  As based on just looking at

20   the statement of American Express.

21          DARE LAW:  Yeah, because I asked for two

22   years' worth and they went back the two years.

23          ROBERT YASPAN:  Yeah.

24   BY DARE LAW:

25      Q    So -- now, there was cards issued to Joe

56

BARKLEY
Court Reporters

1    Francis.  Was he ever acting as member for Brands, if

2    you know?

3        A    I don't believe so.

4        Q    And with respect to his American Express card,

5    was there a limit given to him with respect to how much

6    he could spend in any given time?

7            ROBERT YASPAN:  I'm going to ask you to

8    rephrase.  His American Express card --

9            DARE LAW:  Mr. Francis.  I'm only talking

10   about Mr. Francis right now.

11           ROBERT YASPAN:  The card within the Brands'

12   account?

13           DARE LAW:  Yes.

14           ROBERT YASPAN:  Or are you talking about

15   Francis' own credit card account?

16           DARE LAW:  No, I'm only talking about the

17   American Express issued to GGW Brands that Mr. Francis

18   used.

19           ROBERT YASPAN:  Right, do you understand that?

20           THE WITNESS:  Okay.  Yes.

21   BY DARE LAW:

22       Q    So there was American Express card issued to

23   Mr. Francis under the GGW Brands Joe Francis user.  Was

24   there ever a limit given to Mr. Francis of how much he

25   can spend at any given time?

57

BARKLEY
Court Reporters

1        A      Nothing formal to my knowledge.

2        Q      What, if any, was the agreement for

3   Mr. Francis' use of that American Express card?

4   Because he didn't show up on the employee list and he

5   wasn't a member or a manager.

6        A      I don't think there's any formal agreement.

7        Q      Was there an informal agreement?

8        A      Not to my knowledge.

9        Q      Why would Mr. Francis be given an American

10  Express card?

11       A      I don't know.

12       Q      Was it before you were a manager?

13       A      I believe he had the card before I was

14  manager, yes.

15       Q      And when you became manager, did you ever have

16  discussion with Mr. Francis about limiting the use of

17  that card?

18       A      No.

19       Q      Did you have any discussion at all with

20  Mr. Francis about the use of that card?

21       A      No.

22       Q      Was there any decisions during your tenure as

23  manager about his use of the American Express card?

24       A      No.

25       Q      And what, if any, is Mr. Francis' role with

58

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   respect to the GGW Brand?  And when I say "Brand," I

2   mean the four corporate entities and his being, you

3   know, possibly the face or however else you want to

4   characterize it.  What is his role with respect to the

5   debtors?

6       A    I think that you said it, and that is the face

7   of Girls Gone Wild and the creator of Girls Gone Wild.

8       Q    Why wouldn't the -- strike that.

9            Do you know if at any time there was any sort

10  of agreement between this debtor or any of the other

11  debtors with respect to his roles or duties about

12  the -- being the face of Girls Gone Wild and if I'm

13  mischaracterizing it, feel free to re-characterize it.

14      A    I don't know that there's any formal

15  agreement.

16      Q    Has Mr. Francis been using the American

17  Express card since the filing of the case, if you know?

18      A    I don't know.

19      Q    Have you asked him not to use the card?

20      A    No.

21      Q    Do you know if anybody in the companies have

22  asked him not to use the card?

23      A    I don't know.

24      Q    Counsel, do you know if he's still using the

25  card?

59

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Card's been cancelled -- oh,

2     I'm sorry.

3          DARE LAW:  Okay.  So American Express --

4          ROBERT YASPAN:  Card's been cancelled.

5          DARE LAW:  By the debtor or by American

6     Express?

7          ROBERT YASPAN:  By the debtor I believe.

8     BY DARE LAW:

9        Q    Do you know, Mr. Dale?

10       A    No, I don't know.

11       Q    Okay.  So to your knowledge, as far as the

12    time that you've been manager, there's been no

13    curtailing of the use of the American Express card?

14    If -- if there was an agreement, you don't know about

15    it?

16         ROBERT YASPAN:  Wait a minute.  Try that

17    again.

18         DARE LAW:  Okay.

19         ROBERT YASPAN:  That's compound and it's --

20    BY DARE LAW:

21       Q    All right.  Do you know if there was an

22    agreement about Mr. Francis' use of the American

23    Express card?

24       A    No.

25       Q    And you've had no discussion with him during

60

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

 1   your tenure as manager about his use of the American

 2   Express card?

 3        A    Correct.

 4        Q    Do you know if anybody, whether it's for

 5   Brands or any of the other entities, have discussions

 6   with Mr. Francis about the use of his American Express

 7   card?

 8        A    I don't know.

 9             ROBERT YASPAN:  You're talking about during

10   the administration?

11             DARE LAW:  During Mr. Dale's administration as

12   manager.

13             ROBERT YASPAN:  Well, part of that went

14   through the administrative proceeding starting on

15   February 27th.

16             DARE LAW:  No, I mean he became manager

17   October, November last year he said.

18   BY DARE LAW:

19        Q    So from whenever you became manager, whether

20   it was October or November, to today, has there been

21   any discussion by yourself with Mr. Francis with

22   respect to use of that American Express card?

23        A    No.

24        Q    And since October, November, whenever you

25   became manager, do you know if any of your staff had

                           61

BARKLEY
Court Reporters

1   discussions with Mr. Francis about his use of the

2   American Express card?

3       A    I don't know.

4       Q    Do you know how much he was incurring per

5   month on his American Express card since the time

6   you've been manager?

7            ROBERT YASPAN:  And prior to the 11 or are

8   you --

9   BY DARE LAW:

10      Q    Since October, November 2012 you became

11  manager?

12      A    Right.

13           ROBERT YASPAN:  All right.  Let's divide --

14  that's an important question.  So let's divide that up

15  to the time of the filing and then after the filing if

16  you could.

17  BY DARE LAW:

18      Q    Okay.  So between October, November 2012 to

19  February 27th when the debtor filed, did you or if you

20  know of any of your staff had discussions with

21  Mr. Francis about the use of the American Express card?

22      A    I don't think so.

23      Q    And do you know if any of your staff talked to

24  him about the use of the American Express card?

25      A    I don't believe so.  I don't know.

62

BARKLEY
Court Reporters

1    Q    And then from the filing February 27th until

2  today, have you discussed with Mr. Francis the use or

3  cancellation of that American Express card?

4    A    I have not personally, but I don't know when

5  the card was closed to know the date of the card having

6  been closed.

7    Q    Who issued the directive from the debtor to

8  cancel that American Express card?  Was it yourself?

9    A    I don't know.  I don't believe so.

10    Q    It wasn't you who said cancel all American

11  Express cards?  Are there -- can you give me a verbal

12  answer?

13    A    No.

14    Q    This only does verbal, not nods of heads or

15  shakes of heads.

16    A    No.

17    Q    Do you know if any of your staff discussed

18  with Mr. Francis the cancellation of his American

19  Express card?

20    A    I don't know.

21    Q    There were others that had --

22        ROBERT YASPAN:  But some of his attorneys

23  might have.

24        DARE LAW:  Yeah, but I'm asking if he knows.

25        ROBERT YASPAN:  That's correct.

TRANSCRIPT OF PROCEEDINGS

1          DARE LAW:  And his answer was no, he didn't

2    know.

3          ROBERT YASPAN:  Let me turn that off.  Thank

4    you.

5          DARE LAW:  Thank you.

6    BY DARE LAW:

7      Q    There were other American Express cards issued

8    to other individuals.  Who would have an American

9    Express card and why?

10     A    A handful of other people for business related

11   expenses.

12     Q    Business related to Brands or Direct or one of

13   the other entities?

14     A    Probably mainly Direct or one of the other

15   entities.

16     Q    Do you know why the American Express cards

17   were issued to Brands rather than Direct?

18     A    I don't.

19     Q    Okay.  And do you know if any of the other

20   American Express cards other than Mr. Francis are still

21   being used after the filing of the case?

22     A    I don't know.

23     Q    So you don't know if they're still open or if

24   they've been cancelled?

25     A    I'm not certain.

64

BARKLEY
Court Reporters

1    Q    Who would know and -- who would know?

2    A    Our accounting department would know.

3    Q    And if any of the American Express cards were

4  cancelled, do you know who would make that decision to

5  cancel them?

6    A    Either counsel or myself, but I don't know of

7  any cancel cancelled at this time.

8    Q    Which counsel?  Do you mean Mr. Yaspan or

9  Mr. Tym?

10    A    Both.

11    Q    Okay.  Does anybody want to ask any questions

12  on Brands?  Please come up to my right.  State your

13  name for the record, who you represent, and then you

14  can proceed with your questions.

15        MR. PAGAY:  Good morning.  My name is Malhar

16  Pagay, M-a-l-h-a-r, last name P-a-g-a-y.  I'm with the

17  law firm of Pechulski, Stang, Zieh & Jones.  We

18  represent Wynn Las Vegas, a creditor in this case.

19        I'm going to give you a binder of documents so

20  I can refer to it pretty quickly because I -- I

21  understand we've been here for a while and I want to

22  make sure I don't duplicate what Ms. Law has already

23  asked, so this will be an easy way for me to reference

24  things so this doesn't take too long.

25        ROBERT YASPAN:  Just give me a minute.

65

BARKLEY
Court Reporters

```
 1              MR. PAGAY:  Sure.

 2              (Pause in recording.)

 3              MR. PAGAY:  Ready?  Thanks.

 4    BY MR. PAGAY:

 5         Q    Turning first to tab one, Mr. Dale.

 6         A    All right.  Let me get rid of --

 7         Q    First page of tab one, do you recognize it?

 8         A    Yes.

 9         Q    What is it?

10         A    I believe it's part of a -- our -- the

11    company's petition.

12         Q    Okay.  And do you see the address there listed

13    on the petition?

14         A    Yes.

15              DARE LAW:  Can you speak up a little bit

16    because even standing here, I can barely hear you.

17              ROBERT YASPAN:  You're on your way out?

18              DARE LAW:  No, I'm just getting something out

19    the printer.  Jack can continue the conducting and I

20    will be --

21              ROBERT YASPAN:  Thank you.

22              DARE LAW:  -- right back.

23    BY MR. PAGAY:

24         Q    Do you see the address of 1601 Clover Field

25    Boulevard, Santa Monica, California?
```

66

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1        A    Yes.

2        Q    Is that the address of GGW Brands?

3        A    No.

4        Q    Then why was it indicated on the petition you

5    signed as the address?

6        A    I think -- I believe it's since been amended,

7    but --

8        Q    Well, was 1601 Clover Field Boulevard ever the

9    address of GGW Brands?

10       A    Yes.

11       Q    When?

12       A    For a brief period I think in -- I don't

13   remember exact dates.

14       Q    When did it stop being the address of GGW

15   brand?

16       A    I think around November of 2011.

17       Q    So years before the petition was filed?

18            ROBERT YASPAN:   Objection.   It's

19   argumentative.   Direct him not to answer.

20   BY MR. PAGAY:

21       Q    Whose decision was it to file the bankruptcy

22   case?   And when I say -- this bankruptcy case?

23       A    Collective.   Myself, attorneys.

24       Q    So the decision to file was made by yourself

25   and attorneys?

67

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A     Correct.

2      Q     Which attorneys?

3            ROBERT YASPAN:  Objection.  Goes into the

4  attorney-client privilege.

5            MR. PAGAY:  I'm asking for the identity of the

6  attorneys, not the -- any communications that were

7  divulged.

8            THE WITNESS:  Mr. Tym.

9  BY MR. PAGAY:

10     Q     Anybody else?

11     A     No.

12     Q     Did you speak at all with Joe Francis

13  regarding the filing of this case?

14     A     No.

15     Q     Okay.  Mr. Dale, who hired you for your

16  current job?

17     A     For the manager position?

18     Q     Yes.

19     A     I learned about my appointment through

20  Mr. Tym.

21     Q     You learned about your appointment?  So did

22  you interview?

23     A     No.

24     Q     Did you apply for the position?

25     A     No.

68

TRANSCRIPT OF PROCEEDINGS                    BARKLEY
                                        Court Reporters

1    Q    Were you surprised to learn that you'd been

2    appointed the manager of this business?

3         ROBERT YASPAN:  Objection.  Not relevant.  You

4    can answer.

5         THE WITNESS:  No.

6    BY MR. PAGAY:

7    Q    Since your appointment as manager, have you

8    had any interaction with your company's owner, Pablo

9    Holdings?

10   A    No.

11   Q    Do you feel you have any responsibilities to

12   Pablo Holdings as the owner of your company?

13   A    No, I --

14        ROBERT YASPAN:  That's the right answer.

15        THE WITNESS:  No.

16   BY MR. PAGAY:

17   Q    I'm sorry, I didn't hear.  It's a little loud?

18   A    No.

19   Q    Thank you.  Okay.  What does the GGW Brands

20   hope to achieve in its chapter 11 case?

21        ROBERT YASPAN:  Objection.  That goes to

22   attorney-client and that's not something we know yet.

23   BY MR. PAGAY:

24   Q    So you're answering on behalf of the company

25   that's not -- you don't know why you're in chapter 11?

69

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  I'm not being interrogated.

2    You could ask a better question.  You know how to do

3    that.

4          MR. PAGAY:  Okay.  So I asked what does he

5    hope to achieve in chapter 11.

6          ROBERT YASPAN:  That's a question for counsel

7    and counsel is not prepared to answer that right yet.

8    If you look at the debtor's status report, which I'm

9    sure you have since it's in the tabs here, you'll get a

10   better fix on that.

11         MR. PAGAY:  Okay.  So you're directing him not

12   to answer my question that I should refer to the status

13   report; is that accurate?

14         ROBERT YASPAN:  I said what I said.

15         MR. PAGAY:  Okay.  But he is not going to

16   answer the question --

17         ROBERT YASPAN:  That's enough.  If you have

18   questions of the witness, that's fine.

19         MR. PAGAY:  I do.

20         ROBERT YASPAN:  Go ask questions of the

21   witness or I'll just shut this off.  You don't get to

22   ask me questions.

23         MR. PAGAY:  No, I'm asking him as the person

24   who put this company in bankruptcy --

25         ROBERT YASPAN:  No, you're asking me.

70

BARKLEY
Court Reporters

1          MR. PAGAY:  -- what he hopes to achieve.

2          ROBERT YASPAN:  You were asking me.

3          MR. PAGAY:  Oh, I'm sorry, I'll ask him again.

4     Q    As the person who put GGW Brands in

5    bankruptcy, what goal was he hoping to achieve?

6          ROBERT YASPAN:  Asked and answered.  I've

7    already told you, we are not going to answer that

8    question yet.  It's a question of proposing a plan and

9    what we do.  You don't get to know our strategy yet.

10          MR. PAGAY:  I'm not asking for strategy.  I'm

11    just asking for the purpose of the file, is that okay?

12          ROBERT YASPAN:  No, you asked what do we hope

13    to gain.  That's a different question.

14          DARE LAW:  Maybe you want to rephrase it in a

15    different (inaudible) way.

16          MR. PAGAY:  I may rephrase it later.  How

17    about that?  If I pause right now, it's because I'm

18    trying to make sure I don't go over the same issues

19    that she did.  It's not that I'm finished.  I just

20    don't want to duplicate questions.

21          ROBERT YASPAN:  Thank you.

22    BY MR. PAGAY:

23     Q    Could you turn to, and also in tab one, the

24    first page of Schedule F?

25          ROBERT YASPAN:  We're there.

71

TRANSCRIPT OF PROCEEDINGS

**BARKLEY**
Court Reporters

1    BY MR. PAGAY:

2        Q    The very, very first claim of Alan Michael

3    Wade, could you describe what that relates to?

4            ROBERT YASPAN:  You just said you're not going

5    to duplicate questions.  We went through 15 minutes of

6    him saying he didn't know what this was about.

7            MR. PAGAY:  I'm just making sure.  So this

8    was -- so you didn't -- it was this or the Raiment when

9    he didn't know what it was about.

10           ROBERT YASPAN:  It was Wade.

11           MR. PAGAY:  It was wait you're talking about.

12   Okay.  Just making sure.

13       Q    Mr. Dale, do you perform any functions for

14   Pablo Holdings?

15       A    No.

16       Q    None?  Do you know who owns -- I'm sorry, do

17   you know if Mr. Francis is related to Pablo Holdings?

18   I'm sorry, I mean Joseph Francis?

19       A    I don't know.

20       Q    You don't know.  Okay.  Do you know what kind

21   of business Pablo Holdings is in?

22       A    No.

23       Q    Okay.  Let's go to tab two, Schedule B.  And

24   this question, Ms. -- Ms. Law did ask you, but I have

25   two different answers in my notes and I want to make

72

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    sure I'm clear.  What's the basis of the valuation of

2    the 100 percent member interest in GGW Direct?  How did

3    you calculate that?

4          ROBERT YASPAN:  Starts down here and goes up

5    here.

6          THE WITNESS:  I believe it's just based on

7    assets held by those entities.

8    BY MR. PAGAY:

9      Q    It's based on the assets you said?

10     A    I believe so.

11     Q    And it's the same methodology you used with

12   respect to Magazine and events; is that accurate?

13     A    Yes.

14     Q    Okay.  And on that same page where it says due

15   from affiliates and net of due to affiliates, who

16   exactly are the affiliates?

17     A    I believe it's folks doing work for the

18   company.

19     Q    And who would that include?

20     A    I don't know.

21     Q    Do you know how this amount of $4,000 in that

22   line item 16 accounts receivable, how it was

23   calculated?

24     A    I believe it was referred to earlier as a net

25   of due to and from.

73

TRANSCRIPT OF PROCEEDINGS



1      Q     But you're note sure who the affiliates are?

2      A     Right.

3      Q     Understood.  So I believe you said earlier

4   that GGW Brands currently has no employees itself; is

5   that correct?

6      A     Yes.

7      Q     Did it ever have any employees?

8            ROBERT YASPAN:  During his tenure or prior?

9            MR. PAGAY:  At any time in the past to his

10  knowledge.

11           ROBERT YASPAN:  Okay.

12           THE WITNESS:  I'm not certain.

13  BY MR. PAGAY:

14     Q     But at least during your tenure, you're not

15  aware of any -- of any employees?

16     A     Correct.

17     Q     Thank you.  Turning out of Schedule G just a

18  few pages past, and again I have two different

19  indications in my notes which is why I want to clarify.

20           Is GGW Brands a sub licensor or sub licensee

21  of any intellectual property?

22           ROBERT YASPAN:  Today?

23           MR. PAGAY:  As of petition date.

24           ROBERT YASPAN:  All right.  As of

25  February 27th?

                            74

BARKLEY
Court Reporters

1            MR. PAGAY:  Yes, thank you.

2            THE WITNESS:  I don't know.  I don't remember

3     the exact dates.

4     BY MR. PAGAY:

5        Q    When you say exact dates, exact dates of what?

6        A    Actually, I -- I think it was not -- Brands

7     was not.

8        Q    So the statement earlier regarding Brands

9     being a sub licensor or sub licensee, I'm not sure

10    which, that isn't accurate to your knowledge?

11           ROBERT YASPAN:  That was a statement made by

12    counsel, not a statement made by the witness.  So --

13    but you can answer the question.

14           MR. PAGAY:  Understood.

15           THE WITNESS:  I think we came to the

16    conclusion that the agreement's with Direct, but I

17    don't remember now.

18    BY MR. PAGAY:

19       Q    Turning the page now to Schedule H,

20    co-debtors, I think under Ms. Law's questioning you

21    indicated that you weren't aware of any creditors that

22    were common to GGW Brands and any other entity; is that

23    accurate?

24       A    I believe so.  That the own -- the only

25    thing -- I don't know if this makes sense.  It's just a

75

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    general question, but if all of the entities had been

2    named for example in a suit, would that be something

3    that should be listed on Schedule H?  I don't know.

4        Q    So you're saying for example a lawsuit might

5    be a situation where more than one of the entities

6    might be liable or -- or asserted to be liable for

7    something?

8        A    Right.

9        Q    Okay.  But other than that, there aren't any

10   other obligations of which you're aware?

11       A    No.

12       Q    That might fall within this co-debtor's

13   category?

14       A    Nothing I can think of beyond that.

15       Q    Thank you.

16       A    You're welcome.

17            ROBERT YASPAN:  Good.

18   BY MR. PAGAY:

19       Q    When was GGW Brands organized?  I think you

20   said -- was it 2010?

21       A    Late 2010, yeah.

22       Q    Okay.  I'm looking now at tab three, the

23   statement of financial affairs, where it talks about no

24   revenues in 2011, 2012, and 2013.  To your knowledge,

25   did they have any revenues in 2010?

76

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A    I don't believe so, no.  It was literally a

2    month, so I don't know.

3      Q    Okay.  Still on the statement of financial

4    affairs turning to page 3 of that -- of that document,

5    it says $35,000 was paid on the 28th of December to GGW

6    Direct.  Why would there be a payment from Brands to

7    GGW Direct?

8      A    I don't recall.  I don't remember why that

9    amount was paid.

10          ROBERT YASPAN:  But once again, it's something

11   we can provide for you.  We have the resource available

12   in the room.

13   BY MR. PAGAY:

14     Q    Okay.  Turning now to page 10 of the statement

15   of financial affairs, looking at item 19, looking first

16   at sub item A, does GGW Brands have any accountants or

17   bookkeepers?

18          ROBERT YASPAN:  Wait a minute.  Right here.

19          THE WITNESS:  Yeah, I don't believe so.

20   BY MR. PAGAY:

21     Q    So is there any entity of which you're aware

22   that provides bookkeeping or accounting services for

23   GGW Direct?

24          DARE LAW:  We're on Brands.

25          MR. PAGAY:  I'm sorry, Brands.  Thank you.

77

BARKLEY
Court Reporters

 1            THE WITNESS:  I don't believe so.

 2            MR. PAGAY:  It's happening already.

 3    BY MR. PAGAY:

 4       Q    So does GGW Brands have financial and business

 5    records?

 6       A    Yes.

 7       Q    What individual might -- might be in

 8    possession of those financial and business records?

 9       A    I don't know that there's any individual.

10    It's that -- if -- if anything exists, it's at the

11    office.  I don't know any individual has it.  Like

12    accounting would have accounting records, for example.

13       Q    Okay.  So would it be accurate to say that

14    your accounting department has all of the books and

15    records of the -- of GGW Brands?

16       A    They should, yeah.

17       Q    And the head of that department is who?

18       A    Mandy Isaac.

19       Q    Okay.  Turning now to tab four which is the

20    status report that counsel referred to a minute or two

21    ago, turning to page 2, beginning at line five.  The

22    status report there talks about how GGW Brands is a sub

23    licensor of IP used by the three other companies.  Is

24    that accurate or inaccurate?

25       A    I don't know.

                            78

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    Okay.

2           ROBERT YASPAN:  That was wrong.  You can say

3      it.  Who's the guy over there?

4           THE WITNESS:  I don't know.  I think Wynn

5      counsel also, but I'm not certain.

6           MR. PAGAY:  Again, I'm pausing to make sure I

7      don't duplicate what Ms. Law's already asked.

8           ROBERT YASPAN:  I think that's (inaudible) GGW

9      Direct is a licensee so it lets GGW Brands use it so

10     GGW Brands would be a sub license (inaudible) --

11     BY MR. PAGAY:

12     Q    Mr. Dale, do you ever speak with Joseph

13     Francis about the business of GGW Brands?

14          ROBERT YASPAN:  That's a broad question.

15     He's -- he's been an employee there or a manager for

16     two years.

17          MR. PAGAY:  So I asked has he ever.

18          ROBERT YASPAN:  Just.

19          MR. PAGAY:  Spoken with -- with Joe Francis

20     regarding the business of GGW Brands.

21          ROBERT YASPAN:  That goes back to your HR time

22     the way the question was writ -- is posed.

23          THE WITNESS:  I would ask to just clarify the

24     business in what respect.

25     BY MR. PAGAY:

79

BARKLEY
Court Reporters

1      Q    Okay.  First let's go beyond your HR time.

2   Let's start when you were appointed the manager.  Did

3   you have any discussions regarding the business of GGW

4   Brands since you've been manager?

5      A    No.

6      Q    Not one?

7           DARE LAW:  You need to speak up.  It doesn't

8   pick up shakes of head.

9           MR. PAGAY:  Yeah.

10           THE WITNESS:  I said no.

11           DARE LAW:  Okay.

12           MR. PAGAY:  No.

13   BY MR. PAGAY:

14      Q    So in managing GGW Brands, who do you speak to

15   on a regular basis?

16      A    Accounting department, a couple of the VPs.

17      Q    Anybody else?

18      A    No.

19      Q    Okay.  So in managing GGW Brands, you speak

20   with Ms. Isaac and people in her department; is that

21   correct?

22      A    Yes.

23           ROBERT YASPAN:  Go ahead.

24   BY MR. PAGAY:

25      Q    And you said other VPs.  Do you mean

80

BARKLEY
Court Reporters

1    Mr. Villanueva and I'm sorry, the head of production is

2    Mr. --

3         A    Lord.

4         Q    -- Lord.  Is that who you mean?

5         A    Yes.

6         Q    Anybody else?

7         A    Mr. Tym.

8         Q    And one last thing, and this may be just a --

9    a miswritten note on my part, are there any other

10   people in management other than Mr. Villanueva,

11   Mr. Lord, and Ms. Isaac?  I have a note here something

12   about additional VPs above them.  Are there such

13   people?

14        A    No.

15        Q    No.  So that's a negative.  That's all I have

16   on GGW Brands.

17             DARE LAW:  I think I have a few more

18   questions.

19   BY DARE LAW:

20        Q    Are you familiar with the name all Blue Horse

21   transactions?

22        A    No.

23        Q    You don't know who that is?  Or might be also

24   known as Blue Horse?

25        A    Blue Horse trading I believe, yeah.

81

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     Q     Blue Horse trading?

2     A     Yeah.

3     Q     What is that?

4     A     It's another entity that I believe has

5  something to do with Joe Francis.

6     Q     So you think it might be a Joe Francis entity?

7     A     Maybe, I don't know.

8     Q     Do you know if that entity has any dealings

9  with the GGW Brands or entities?

10    A     Dealings in what respect.

11          ROBERT YASPAN:  That's a broad question

12  beyond --

13  BY DARE LAW:

14    Q     Does -- does business with them.  Does -- does

15  Brands do business with Blue Horse trading?

16    A     I don't believe so.

17    Q     Okay.  So it's not this endeavor.  Are you

18  familiar with the name Robert Kluger?

19    A     Yes.

20    Q     Who is that gentleman?

21    A     I believe he's former counsel for the entities

22  in some capacity.

23    Q     Is he still working for any of the entities

24  including brand?

25    A     No.

82



1    Q    And how about the name David Houston or

2    Houston?

3    A    I believe he's counsel for Mr. Francis.

4    Q    Personally?

5    A    I believe.  I don't know.  I know that I've

6    heard the name.

7    Q    Has -- has he represented Brands before?

8    A    I don't know.

9    Q    And are you familiar with the name Peter E.

10   Garrell?

11        ROBERT YASPAN:  Spell it.

12        DARE LAW:  G-a-r-r-e-l-l.

13        THE WITNESS:  Yes.

14   BY DARE LAW:

15   Q    And who is he?

16   A    He's an attorney.

17   Q    For whom?

18   A    I believe he has his own practice.

19   Q    Yeah, who does he represent?

20   A    Oh, I don't know.

21   Q    Has he represented Brands or any of the other

22   entities?

23   A    I think he did through an old firm he worked

24   with really early in the company's inception.

25   Q    What sort of services?  Was it litigation?

83

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Contracts?

2        A    Like a kind of general legal services.  Would

3    have included those things though.  It would have

4    included litigation and contracts I believe.

5        Q    Almost done.  On the venue disclosure form, it

6    says the principle office of the debtor currently on

7    file with the secretary of state, it uses a Canoga Park

8    address.  What is that address?  It's got a unit number

9    263.

10       A    I believe it's Mr. Tym's address.

11            DARE LAW:  Is that your address, Mr. Tym?  Is

12   that your office?

13            RONALD TYM:  Yes.

14   BY DARE LAW:

15       Q    Why would the debtor use your office as its

16   principle address office with the secretary of state?

17            RONALD TYM:  That's just a legal address with

18   the secretary of state.  It's mainly where people can

19   come, there are certain filings that need to be made by

20   adult entertainment organizations, so we want to make

21   sure the people come to me for those filings and I have

22   those rather than come to the business itself.

23            DARE LAW:  Now, I thought you said earlier

24   you're probably going to be phasing out of representing

25   the debtor, so what's going to happen with the address?

84

BARKLEY
Court Reporters

1   Are you still going to receive mailings and information

2   from -- for secretary of state purposes?

3           RONALD TYM:  We hadn't thought that -- that

4   all the way through, but I would say probably no, we

5   will have to go to whoever will take my place as

6   counsel for the entities.

7           DARE LAW:  And counsel, is there an exit

8   strategy and a timing for filing of a plan?

9           ROBERT YASPAN:  Yes.

10          DARE LAW:  And what might that be?

11          ROBERT YASPAN:  We believe that the

12   companies -- putting aside litigation -- are solvent

13   and can run a business, that they can pay their

14   creditors.  The issue has to do with litigation as

15   opposed to anything else.  We will be creating -- we

16   will be filing a plan pretty quickly that will have the

17   effect of putting aside a reserve for litigation if it

18   turns out to be important as a creditor claim and as

19   the creditor claimants prove themselves, they'll be

20   able to participate in the reserve fund.  As to when

21   the plan would be filed, I put it in the status report

22   what we recommended.  We recommended a bar date and

23   then the plan be filed within a month or two after the

24   bar date.

25          DARE LAW:  What was the bar date?  Do you

85

BARKLEY
Court Reporters

1  recall.

2           ROBERT YASPAN:  If I could look at Mr. --

3           THE WITNESS:  You want to look at this one or

4  that?  This is the one that --

5           ROBERT YASPAN:  They're here.

6           RONALD TYM:  You got the status report.

7           ROBERT YASPAN:  Here, I got -- we suggested a

8  bar date of June 30th.

9           DARE LAW:  So --

10          ROBERT YASPAN:  Because the hearing --

11          DARE LAW:  -- (inaudible) by 730?

12          ROBERT YASPAN:  And the -- actually, yeah,

13  August 1st.

14          DARE LAW:  Okay.  Do the other gentlemen want

15  to ask any questions?  I don't want to close you out?

16  (Inaudible) do I need to keep (inaudible) I actually

17  was going to ask some questions about the American

18  Express charges.  The charges are actually charged to

19  brand but they may relate more to Direct.  Do you want

20  me to ask them in brand's time or do you want me to

21  hold them to Direct?

22          ROBERT YASPAN:  Well, what I'd like to do is

23  first take a break.

24          DARE LAW:  We are going to take a break.

25          ROBERT YASPAN:  And then I don't care where

86

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   you ask it.

2          DARE LAW:  That's why I'm asking you.  So I

3   will take a break.  So do you want me to ask it during

4   Brands' case or do you want me to ask during Direct?

5          ROBERT YASPAN:  Well, let's go to Direct.

6          DARE LAW:  Okay.  Anybody need me to hold this

7   341(a) open?  No.  Okay.  I did ask for some

8   information from you.  When do you think you can

9   provide that information to me and you can give it to

10  me in written form.

11         ROBERT YASPAN:  What did you ask?

12         DARE LAW:  I asked for --

13         ROBERT YASPAN:  Is this other than the

14  documents that you talked about to -- with --

15         RONALD TYM:  For the national bank account.

16         DARE LAW:  Yeah, the national bank account.

17         ROBERT YASPAN:  Oh, that, in here.

18         DARE LAW:  Where did the money go and why was

19  it closed.

20         ROBERT YASPAN:  You're talking about what you

21  asked for in this hearing?

22         DARE LAW:  In Brands, yeah.

23         ROBERT YASPAN:  Yeah.

24         DARE LAW:  I asked for some --

25         ROBERT YASPAN:  By Friday maybe.

87

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          DARE LAW:  Okay.  So documents by Friday.

2    Okay.  Mr. Dale, I do have one question.

3    BY DARE LAW:

4        Q    You indicated earlier that you worked for an

5    outside company and you spend a few hours per week,

6    four to five hours per week.  Did you mean that's only

7    on brand or did you mean for all the GGW entities?

8        A    It varies, but combined for all.

9        Q    So combined.  Four to five hours a week

10   combined entities?

11       A    Correct.

12          ROBERT YASPAN:  Yeah, he did testify to that.

13          DARE LAW:  I just wanted to clarify because my

14   notes (inaudible).

15   BY DARE LAW:

16       Q    Did you file a notice of insider compensation

17   for Mr. Dale?

18          RONALD TYM:  No, he's not getting paid by

19   GGW --

20          ROBERT YASPAN:  There's your answer.

21          RONALD TYM:  -- debtors at this time.

22          DARE LAW:  Well, who's paying -- if any --

23   Mr. Dale's manager compensation?  Mr. Dale, do you

24   know?  Are you getting compensation for being manager

25   of the GGW entities whether it's brand, Direct, or any

                          88

BARKLEY
Court Reporters

1   of the other ones?

2           THE WITNESS:  Yes.

3       Q    So who is providing the compensation to you?

4       A    I believe it's been three Perfect Science

5   Labs, but I'm not certain.

6       Q    And who's funding Perfect Science Labs for

7   your compensation?

8       A    That, I don't know.

9       Q    Do you know if it's any of the GGW Direct,

10  Brand, Events, or Magazine entities?

11      A    I'm not certain.

12      Q    That I want to know, who is --

13          ROBERT YASPAN:  That's not being funded

14  through any of the GGW entities.  That's a cost by

15  Perfect Science Labs itself.

16          DARE LAW:  I'd like a declaration with respect

17  to where Mr. Dale's compensation is coming from, the

18  source of that compensation so --

19          ROBERT YASPAN:  Science Labs.

20          DARE LAW:  So I'd like the source and the

21  amount.  Okay.  Any other last minute opportunities to

22  ask questions before I close?  No.  Okay.  Mr. Dale, I

23  want to remind you that you need to file your monthly

24  operating reports on time.  If they are not filed on

25  time, the U.S. trustee will file a motion to dismiss or

89

BARKLEY
Court Reporters

1   convert.  Do you understand that?

2             THE WITNESS:  Yes.

3             DARE LAW:  You also need to make sure you pay

4   us trustee quarterly fees on time.  They're based on

5   disbursements of the debtor of -- it's kind of like

6   taxes.  The more you disburse, the more you pay.  So

7   it's self calculating.  If those are not paid on time,

8   the U.S. trustee will file a motion to dismiss or

9   convert.  Do you understand that.

10            THE WITNESS:  Yes.

11            DARE LAW:  Is I want included in those monthly

12  operating reports and in the disbursement calculations

13  any monies paid on or behalf of the debtors, so that

14  would include Mr. Dale's compensation with respect to

15  his time as manager for the GGW entities because it's

16  paid on behalf, even if the source is not the debt.

17  That needs to be included in the monthly operating

18  reports and the disbursement calculations.

19            Lastly, the debtor needs to make sure that all

20  copies of current business licenses are provided to the

21  U.S. Trustee.  If they expire during the pendency of

22  the case, it is your duty to make sure we get renewed

23  copies of that.  The same applies for insurance.  If

24  any of the debtor's insurance expires during the

25  pendency of the case, we do not send reminders.  It is

90

BARKLEY
Court Reporters

1    your responsibility to provide it to counsel who will

2    send it to the U.S. trustee through the electronic

3    method that is required.  And if we do not have current

4    insurance, we will file a motion to dismiss or convert.

5    Do you understand that.

6              THE WITNESS:  Yes.

7              DARE LAW:  Okay.  There being no further

8    questions, this meeting is concluded.  Thank you.

9              (End of recording number one.)

10             DARE LAW:  Good morning.  Today's date is

11   May 8th, 2013.  My name is Dare Law.

12             ROBERT YASPAN:  It's -- it's still April.

13             DARE LAW:  Sorry, April 8th, 2013.  My name's

14   Dare Law.  I'm an attorney with the office of the

15   United States trustee for the central district of

16   California.  This is the first meeting of creditors

17   held pursuant to 11 us c 341(a) of the bankruptcy code.

18   The debtor's name is GGW Direct, LLC, case number 213

19   BK15132SK.  The case was filed on February 27th, 2013.

20             Counsel, may I have an appearance, please?

21             ROBERT YASPAN:  Robert Yaspan, proposed

22   counsel for the debtor.

23             DARE LAW:  And the other counsel.

24             RONALD TYM:  Ron -- Ronald Tym, outside non

25   bankruptcy counsel for the debtor.

91

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

 1        DARE LAW:  And, sir, would you state your name

 2   for the record please?

 3        CHRISTOPHER DALE:  Sure.  Christopher Dale.

 4        DARE LAW:  And what capacity do you represent

 5   the debtor?

 6        CHRISTOPHER DALE:  As manager.

 7        ROBERT YASPAN:  That's right.

 8        CHRISTOPHER DALE:  I -- I'm trying to figure

 9   out how -- how Brands and all those things relate.  I

10   assume (inaudible) --

11        DARE LAW:  Yeah, we're on Direct now.

12        CHRISTOPHER DALE:  Got it.  No, I know.  I

13   just --

14        DARE LAW:  We're talking about Direct.

15        CHRISTOPHER DALE:  I hear you.  As manager.

16        DARE LAW:  And are you the only manager of the

17   Direct?

18        CHRISTOPHER DALE:  Yes.

19        DARE LAW:  Okay.  And when I say Direct, I

20   mean GGW Direct, LLC.

21        CHRISTOPHER DALE:  Got it.

22        DARE LAW:  Will you agree to that?

23        CHRISTOPHER DALE:  Yes.

24        DARE LAW:  I need to put you under oath again,

25   so would you raise your right hand?

                         92

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          Do you solemnly swear to testify to the whole

2     truth and nothing but the truth so help you God?

3          CHRISTOPHER DALE:  Yes.

4     BY DARE LAW:

5     Q    Mr. Dale, the oath I've administered is the

6     same oath given in a court of law.  The same penalties

7     of perjury apply.  Do you understand that?

8     A    Yes.

9     Q    Is there any reason medically or physically

10    that you're not able to provide your truthful testimony

11    today?

12    A    No.

13    Q    As we go through the proceedings, if at any

14    time you do not understand my question, please let me

15    know and I will try to rephrase the question in a

16    manner that is more clear to you.  Do you understand

17    that?

18    A    Yes.

19    Q    If you are guessing about an answer or

20    estimating, please tell me it is a guess or an

21    estimate.

22    A    Okay.

23    Q    Can you do that?

24    A    Yes.

25    Q    Did you review the bankruptcy documents before

93

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   they were filed with the court?

2       A    Yes.

3       Q    And is this your signature on the document?

4   I'm showing you a copy of the petition, lower left.

5       A    Yes.

6       Q    And also you signed the summary of schedules

7   of statements of assets and liabilities; correct?

8       A    Yes.

9       Q    And do you understand that these documents are

10  also signed under penalty of perjury?

11      A    Yes.

12      Q    Counsel, could I have five --

13          ROBERT YASPAN:  I was still showing him the

14  signature pages, but that's okay.

15          DARE LAW:  If he needs to look at it some

16  more, I can hand it back.

17          ROBERT YASPAN:  Did you --

18          THE WITNESS:  No, that's fine.  Thanks.

19          DARE LAW:  Okay.  Counsel, could I just have a

20  very brief summary of this case please?

21          ROBERT YASPAN:  GGW Direct is the main

22  operating case.  It is the entity that contracts out

23  for let us say production services.  It is the entity

24  that most outsiders, including creditors, have contact

25  with.  It is a subsidiary of Brands.  As the main

94

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   operating entity, it is the one in which most assets

2   reside.

3   BY DARE LAW:

4       Q    Mr. Dale, you've heard what your counsel has

5   said.  Is there anything he said that you believe to be

6   incorrect that you'd like to correct at this point?

7       A    No.

8       Q    Okay.  As we go through the petition, if there

9   are any errors in the petition, would you let me know?

10      A    Yes.

11      Q    Now, I am referring on the record to those who

12  are not here today that a lot of testimony has been

13  given in GGW Brands, case number 213BK15130SK.  So

14  sometimes we will be referring to either -- we may make

15  reference to testimony that happened already in Brands

16  that relates to Direct and that's for the record for

17  those who are not here today that want to review the

18  record.

19          Now, again, why did Direct file bankruptcy?

20  Was there some precipitating factor that caused it to

21  file bankruptcy?

22      A    I would say similar to Brands.  Legal issues

23  and attorneys' fees related to defending those issues.

24      Q    Now, legal issues, do you mean the allegation

25  by, I believe, two women who said that they appeared in

95

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    production that were not 18 of age at the time?

2       A    I don't know for certain, but --

3       Q    What litigation do you refer to then?

4       A    I believe that may be one, but I don't know

5    off the bat.  I -- I have to hear a case name to jar my

6    memory, but --

7       Q    Okay.  We'll go through it then --

8       A    Okay.  Yeah.

9       Q    -- when we get to the cases.

10      A    All right.

11      Q    Now, your counsel has said that this is the

12   main operating arm of the GGW Brands and entities?

13           ROBERT YASPAN:  Well, of these debtors.

14   BY DARE LAW:

15      Q    Right, of these debtors.  So can you explain

16   to me in layperson's terms what Direct does?

17      A    Direct, particularly lately mostly does

18   business online and sells memberships, streaming video,

19   and other online material.

20      Q    And the material that it streams, is it all

21   under the Girls Gone Wild brand?

22      A    I believe so.

23      Q    Now, does it own the videos that are produced

24   by Direct?

25      A    Does who?

96

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     Q    So -- so let -- let me backtrack.  Does Direct

2  create videos?

3          ROBERT YASPAN:  Now or before?

4          DARE LAW:  No, before.

5          ROBERT YASPAN:  Okay.

6  BY DARE LAW:

7     Q    Before the bankruptcy, was Direct creating

8  videos of material to either stream or sell DVDs?

9     A    I don't know that -- I'd say yes, generally

10 speaking --

11    Q    So --

12    A    -- because there's a lot that goes into the

13 production of a video, so like the editing of the video

14 for example.

15    Q    Is that through Direct or one of the other

16 entities?

17    A    I believe Direct.

18    Q    So explain to me if there is a event in Palm

19 Springs for example, and from what little I know of the

20 company, because I had to educate myself about what the

21 debtors do, explain to me how that would work.

22         So there may be something that the debtor

23 wants to film, what happens and which entity does that?

24    A    Typically we would have been done the filming

25 through Events.

97

BARKLEY
Court Reporters

1      Q     Uh-huh.

2      A     And --

3      Q     So Events does the bookings?

4      A     Had.

5            ROBERT YASPAN:  You're confusing present and

6      past.

7      BY DARE LAW:

8      Q     Past.  Before the filing.  Would it be Events

9      that would do the bookings?

10     A     Yes.

11     Q     And then what happens?  Which entity comes

12     into play where Direct would be involved?

13     A     I --

14     Q     Explain to me the flow of -- from concept to

15     end production and which entity is involved and then I

16     will try to ask my questions with respect to how Direct

17     deals with that.

18     A     I think the filming would be done.  The

19     booking of the event -- the actually filming would be

20     done by Events and then the raw footage would be handed

21     off to Direct to make a story out of it so to speak and

22     produce a video.

23     Q     So Direct takes the raw footage and makes a

24     finished product out of it?

25     A     I'd say that's right.

98

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  We're talking about the past?

2          THE WITNESS:  Right.

3          DARE LAW:  Pre filing.

4          ROBERT YASPAN:  Pre filing.

5          DARE LAW:  Right.  Prepetition.  Pre filing.

6    BY DARE LAW:

7      Q    And then once Direct makes a finished product

8    out of it, who markets it?

9      A    Direct.

10     Q    And when events creates the raw footage, who

11   incurs the charges related to the actual activities,

12   the space, any food, and any other production related

13   costs to make the raw footage?  Who incurs that cost?

14     A    Who had, I'd say probably a combination of

15   Events and sometimes Direct.

16     Q    Now, there were a number of American Express

17   cards.  I know that American Express cards were mostly

18   issued or maybe all issues in the name of Brands, like

19   GGW Brands, were those cards used for the making of the

20   raw footage prepetition?

21     A    They could have been.  I don't know.  I mean,

22   if -- I guess if an Am Ex charge was used, it would

23   have come from Brands and used for Events in the case

24   that a charge was used and a check wasn't issued or

25   something like that.

99

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    And what sort of things would the American

2   Express be normally used for in incurring expenses for

3   the production of that raw footage?

4      A    It'd be pretty limited.  Potentially maybe

5   food and that type of thing.

6      Q    Would -- and I know I'm -- I'm crossing

7   between Events and Direct, but you said sometimes

8   Direct picks up the costs.  So how would that

9   delineation be made if Events would pay for it or if

10  Direct would pay for it?

11     A    I don't think there is a scientific method.  I

12  think it was more out of convenience or some other --

13  no -- I don't know that anyone sat down and said this

14  should be paid by this and that.  That -- by that,

15  generally, I would say expenses were paid by Events for

16  those productions.

17     Q    And I know that during our various meetings,

18  whether it was initial debtor interview or when we came

19  to the site visit, there was a time when like bar

20  owners or facility owners would approach the debtor and

21  say I'd like to have something filmed at my location.

22  Was there a location fee paid prepetition?

23     A    Sometimes.

24     Q    And would that come from Events or Direct?

25     A    Probably Events I would say.

100

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Are you talking about the fees

2   paid to the Events or from the -- or by Events?

3          DARE LAW:  By Events.

4          ROBERT YASPAN:  All right.  Was there a fee

5   paid by?  Was that your answer?

6          THE WITNESS:  No, I -- I thought you meant

7   that they received a fee, but I --

8   BY DARE LAW:

9      Q    No, was there a location fee paid to the owner

10  of the premise?

11     A    Actually, I'm not certain.

12     Q    And -- or -- or was it the other way around?

13  Did the owner of the premise pay either Events or

14  Direct to say, hey, I own this bar, come and film here,

15  I'll pay you X number of dollars to film here?

16     A    I'm not certain.  I -- I just don't know.

17     Q    Who would -- who would have negotiated that

18  sort of arrangement for filming at a particular

19  location?

20     A    We had an Events manager or I forget what the

21  title was, but something along those lines.  Someone

22  coordinating that.

23     Q    And is that person still working on behalf of

24  either Direct or Events?

25     A    No.

101

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q     What happened to them?

2      A     I believe he left on his own volition.

3      Q     Now, according to the bankruptcy schedules,

4   the debtor also owns no real property; is that correct?

5      A     Correct.

6      Q     I'm looking at Schedule A?

7            ROBERT YASPAN:  Let me give him a minute to

8   get there.

9            DARE LAW:  Okay.

10            ROBERT YASPAN:  That's B.

11   BY DARE LAW:

12      Q     It says no?

13      A     Correct.

14      Q     Okay.  If you'll turn the page and look at

15   Schedule B.  At the time of filing which was

16   February 27th, it said that there was cash with

17   attorney.

18            Which attorney are we speaking of on that cash

19   with attorney?

20      A     David Houston.

21      Q     Why would money be deposited with David

22   Houston in the amount of just over 1.8 million?

23      A     I believe it was set aside for potential costs

24   related to the defense of one or more of the aspects of

25   the Steve Wynn case I believe.

102

BARKLEY
Court Reporters

1      Q    So you -- did I hear you say it was set aside

2   for costs of legal fees?

3      A    I believe -- I -- I believe so but I'm not

4   certain.

5      Q    Do you know what the money was deposited with

6   Attorney Houston?

7      A    No.

8      Q    Was it before you became manager?

9      A    I believe so, yeah.

10     Q    Is Mr. Houston still holding the money?

11     A    I believe it's still being held, yeah.

12          DARE LAW:  Counsel; is that right?

13          ROBERT YASPAN:  Yes.

14          DARE LAW:  He's still holding the money?  Why

15   hasn't it been turned over to the estate to deposit

16   into the (inaudible) accounts?

17          ROBERT YASPAN:  He wants a court order because

18   it is subject to a state court injunction and there is

19   a dispute as to whether or not the injunction restrains

20   him in the bankruptcy over the turn over of the funds;

21   however, we -- we -- I think we may even have put into

22   the status conference report, we expect today or

23   tomorrow to file a motion to have a turn over leaving

24   all rights in tact for the present time.

25          DARE LAW:  So if it's turned over to the

103

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   debtor, do you intend to put it in the general account

2   or do you intent to put it in a segregated account?

3        ROBERT YASPAN:  A segregated account that I

4   can sign on as well.

5   BY DARE LAW:

6        Q    Do you know if the full amount is still being

7   held by Attorney Houston or whether there have been any

8   offsets for his costs or fees?

9        ROBERT YASPAN:  Are you asking him or me?

10  BY DARE LAW:

11       Q    Yes, Mr. Dale?

12       A    I don't know.

13       ROBERT YASPAN:  And answer is that -- the

14  answer is that Mr. Houston does not make a claim to any

15  part of the funds for his fees or otherwise.

16  BY DARE LAW:

17       Q    Do you know if Mr. Houston is owed any money,

18  Mr. Dale?

19       A    I don't know.

20       DARE LAW:  Mr. Yaspan, do you know?

21       ROBERT YASPAN:  No, he's not owed any money

22  according to Mr. Houston when I talked to him.

23  BY DARE LAW:

24       Q    Okay.  So if the money comes into the

25  bankruptcy estate, it should be $1,846,577.96 or a

104

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    little bit more depending on interest; is that right?

2         ROBERT YASPAN:  We can all hope.

3         THE WITNESS:  Well, it's in (inaudible)

4    account so I don't think there will be any interest.

5         DARE LAW:  Okay.  So it should be that amount.

6         ROBERT YASPAN:  We expect -- we expect -- yes,

7    we expect that.

8    BY DARE LAW:

9         Q    Okay.  There is a certificate of deposit.  Is

10   that with American Express or with somebody else,

11   $20,000?

12        A    I believe it's with American Express.

13        ROBERT YASPAN:  Yes.

14   BY DARE LAW:

15        Q    And is that still valid, that there's a

16   $20,000 CD with American Express?

17        ROBERT YASPAN:  This is a petition date

18   answer.

19        DARE LAW:  Yes, that's why I'm asking.

20        ROBERT YASPAN:  Okay.  Go ahead.

21        THE WITNESS:  I believe so.

22   BY DARE LAW:

23        Q    And do you know as of today whether there's

24   still a CD with American Express?

25        A    I don't know.

105

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Q    And the tax deposit is fine.  This security

2  deposit with landlord, which landlord?

3    A    I don't know the name of the landlord, but the

4  landlord of that space on Wilshire.

5    Q    So it's deposited with Perfect Science Labs,

6  that's what it says.  How do you know it's actually

7  paid to the landlord by Perfect Science Lab?  How do

8  you know that?

9    A    I believe that's according to Perfect Science

10  Labs.

11    Q    And do you know when the deposit was paid to

12  Perfect Science Lab?

13    A    By you mean?

14    Q    Like when was the money given to Perfect

15  Science Lab for deposit for the facilities?

16    A    I'm not certain.

17    Q    Do you know if it was before your becoming

18  manager or after?

19    A    Before.

20    Q    Do you know if that deposit is still intact?

21    A    I don't know.

22    Q    How much rent does Direct pay to Perfect

23  Science Lab, because you're a sub tenant; is that

24  correct?

25    A    Right.

106

BARKLEY
Court Reporters

1      Q    So how much rent does the Direct --

2      A    I believe --

3      Q    -- pay?

4      A    -- it's -- is it -- I'd have to -- I believe

5   it's 30,000 a month-ish.

6      Q    Is there a written lease?

7      A    Not that I've seen.

8      Q    Is the debtor current on its payment for rent?

9      A    I believe so.

10          DARE LAW:  Counsel, I need you to look into

11   whether there is a written lease or not because I

12   thought the executory contracts also said (inaudible).

13          ROBERT YASPAN:  I --

14          RONALD TYM:  There's no written lease.  In the

15   real property questionnaire, it indicates it was just

16   an oral sub lease.

17          ROBERT YASPAN:  By -- by your questions,

18   you're talking not about the master lease, the PSL.

19          DARE LAW:  No.

20          ROBERT YASPAN:  You're talking about the sub

21   lease?

22          DARE LAW:  Yes.

23          ROBERT YASPAN:  Okay.

24          DARE LAW:  Whether Direct has a sub lease with

25   Perfect Science Lab PSL.


                        107


TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1           ROBERT YASPAN:  Right, and we answered that in

2    the real property questionnaire.  Do you need something

3    else?

4           DARE LAW:  No.

5           ROBERT YASPAN:  Thank you.

6           DARE LAW:  Just wanted to clarify.

7    BY DARE LAW:

8       Q    And it says prepaid deposits for legal fees

9    $16,000.  Who were prepaid deposits made to?

10      A    A handful of different attorneys.  I don't

11   know where it stands however.

12      Q    Can you identify the attorneys?

13      A    Not off the top of my head, but --

14      Q    And this was at the time of filing.  Do you

15   know if the attorneys have used any of those deposit

16   monies?

17      A    I don't know for sure.

18           DARE LAW:  Okay.  Counsel, I'm going to ask

19   you for a list of who those attorneys are that were

20   paid prepaid legal fee deposits and whether they are,

21   in fact, still in tact or not.  They should be because

22   this was at the time of filing; right?

23           ROBERT YASPAN:  We answered this as of the

24   time of filing.

25           DARE LAW:  Right.


108

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  But it may not be that we used

2     a current balance sheet.

3          DARE LAW:  Okay.

4          ROBERT YASPAN:  We used the best one

5     available, but we'll give you the answer.

6          DARE LAW:  Yeah, if the number is different,

7     then I'd like to know.

8          ROBERT YASPAN:  Well, by now we may find out

9     to be different because it's a month or two later.

10          DARE LAW:  But they shouldn't have off set or

11     incurred --

12          ROBERT YASPAN:  Yeah, but money could have

13     been spent in the month of February, for example.

14          DARE LAW:  Yes, I understand.  So I'm saying

15     if at the time of filing of the 27th it was $16,000,

16     then I need to know the identity of the attorney and

17     how much each one has and something to tell me that

18     they, in fact, still have it because no one's

19     employment application has been approved, nor has any

20     fees been applied for.  So if at the time of filing

21     this was the deposit for legal fees, then it should

22     still be there; right?

23     BY DARE LAW:

24     Q    Okay.  Accounts receivable, $523,879, who

25     would it receivable from since it says from affiliates?

109

BARKLEY
Court Reporters

1      A    I believe this is for various affiliates from

2   some online deals to some pay per view networks and

3   that kind of thing.  I believe that's what this is

4   referring to.

5      Q    Well, when you say "affiliates," what do you

6   mean by "affiliates"?

7      A    I'm not sure how the accounting department's

8   defining this precisely, but I believe this is

9   referring to like a Direct TV that has -- we have a

10  deal with.

11     Q    So --

12     A    That type of thing.

13     Q    -- it's not necessarily referring to Events,

14  Magazines --

15     A    Huh-uh.

16     Q    -- or Brands?

17     A    I don't think so.  I'm not certain.

18     Q    So how would they be affiliates of the debtor?

19          ROBERT YASPAN:  Well, we have the resource

20  here available to answer the question.  It may be --

21          DARE LAW:  But I want to know what Mr. Dale

22  knows.

23          ROBERT YASPAN:  But he already -- you've

24  already established he probably doesn't know.

25  ///

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   BY DARE LAW:

2       Q    Do you know?

3       A    No.

4       Q    Okay.

5            ROBERT YASPAN:  But we can give you the

6   answer, the accounting.

7            DARE LAW:  You can give it to me in writing.

8   Much easier that way rather than --

9            ROBERT YASPAN:  Okay.  I'm just --

10           DARE LAW:  Yeah.

11           ROBERT YASPAN:  Okay.

12  BY DARE LAW:

13      Q    Okay.  So I'd like to know what you mean by

14  affiliate.  And then also, do you know how much of that

15  523879 has been collected to date?

16      A    No.

17      Q    Okay.

18      A    Is that the difference?

19           RONALD TYM:  Clarify, yeah, there's accounts

20  receivable which is not affiliate related and then

21  there's receivables --

22           DARE LAW:  Right.  Right.

23           RONALD TYM:  -- from affiliates.

24           DARE LAW:  53000.

25           RONALD TYM:  523 is not from affiliates.

111

BARKLEY
Court Reporters

1    BY DARE LAW:

2        Q    Okay.  So the affiliates, I want to know what

3    you mean by affiliates for the 53,542 and then the

4    accounts receivable, the 523,879, I'd like to know how

5    much is collected to date and what the aging is?

6            ROBERT YASPAN:  That's going to be on the MOR.

7    Do you want it before that?

8            DARE LAW:  Well, the February MOR already

9    should have been filed, right, because that's due

10   March 15th --

11           ROBERT YASPAN:  Right.

12           DARE LAW:  -- and then March is due

13   April 15th, that's not until next week.  If the

14   information is contained in the MOR, then you don't

15   need to provide it to me separately.  But if it's not,

16   then you need to amend your MOR and provide it to me

17   separately.

18           ROBERT YASPAN:  Okay.

19           DARE LAW:  Okay.  Because you should have had

20   two MORs --

21           ROBERT YASPAN:  No, we should have had --

22           DARE LAW:  February -- did you file the

23   February MOR?

24           ROBERT YASPAN:  No.

25           RONALD TYM:  That would just be one day so it

112

BARKLEY
Court Reporters

1    wouldn't be in the --

2           DARE LAW:  Yes, I still need one day.

3           RONALD TYM:  I understand, but the --

4           DARE LAW:  Two days.  The 27th and 28th has to

5    cover two days.

6           ROBERT YASPAN:  Actually, it was filed in the

7    evening so you get one day.

8           RONALD TYM:  In any event (inaudible) how much

9    receivables (inaudible).

10          DARE LAW:  Well, whatever February will show

11   and then March will be due April 15th so that should

12   have some information on there.

13   BY DARE LAW:

14      Q    So who is normally paying the receivables?  I

15   heard you say something about Direct TV; is that right?

16      A    All -- all kinds of different larger and

17   smaller payments, yeah.  I don't know.

18      Q    So what is the source of the receivables?

19   Like online streaming to debtor membership or is that a

20   pay as you go?

21      A    Both, yeah.

22      Q    So how does the membership work?

23      A    There -- there's kind of a surface website and

24   then members get access to all kinds of different

25   material for all -- all variety of offers.  We've done

113

BARKLEY
Court Reporters

1   some that are $0.99 for the first month up to $9.99 a

2   month to kind of different pay structures or pay for a

3   full year for a certain amount.  All types of different

4   promotions.

5       Q    And then is there also an ability to do a one

6   off view, you just pay to view that one particular

7   video?

8       A    Yes.

9       Q    Is this due through people's home computer or

10  throughout some other source?

11      A    The home computer typically, yeah, almost like

12  iTunes where it's -- if you --

13      Q    I'm sorry?

14      A    Almost like iTunes if you -- you know, you can

15  rent --

16      Q    Yes, I see.

17      A    That type of deal.

18      Q    Okay.  And then -- so how much in terms of

19  percentage of business is from either membership or

20  like this i tune model pay as you want versus like

21  hotel streaming pay per view?

22      A    If -- this would be an indicated one of the

23  times I would be using your suggestion earlier, your

24  guidelines in terms of guessing, it would be a pure

25  guess, so I -- I can't --

114

BARKLEY
Court Reporters

1    Q    And what would your guess be in terms of

2  quantity of business?

3    A    Maybe like 60/40, 60 being the hotels and that

4  kind of pay per view and 40 online, but that's a -- a

5  guess and only a guess.

6    Q    And who negotiates the contract with the hotel

7  pay per view people?

8    A    I believe they've -- they're established, so I

9  don't know who negotiated them initially.

10    Q    Do you know what the terms are?  First of all,

11  who is the, if you know, the company that you do the

12  hotel pay per view?  Do you know what they're called?

13    A    I'm not --

14        ROBERT YASPAN:  Just a minute.  Just a minute.

15  I haven't gone into this kind of detail with him.  We

16  don't want to be anti competitive here and list the

17  debtor's customers.  I -- I have to think this through.

18  BY DARE LAW:

19    Q    Okay.  So -- all right.  Without identifying

20  who they are, is there a term contract with them for

21  specific amount of time, like a year, two years,

22  six months, one month?

23    A    I'm not certain.

24    Q    Who would have negotiated on behalf of the

25  debtor with this outside company?

115

BARKLEY
*Court Reporters*

1      A     Probably the VP of production.

2            ROBERT YASPAN:  The VP online?

3            THE WITNESS:  I don't know.  I'm not sure if

4    it would be the -- yeah, maybe the online person.  I'm

5    not certain.

6    BY DARE LAW:

7      Q     And who holds that contract?  Is it Direct,

8    Brands, Events, Magazine?

9      A     I believe it's Direct.

10     Q     So the payments are made to Direct from

11   whoever is the hotels pay per view provider?

12     A     I think that's right.

13     Q     And are they paid monthly, quarterly, some

14   other period?

15     A     I think monthly.

16     Q     Does the debtor get some sort of reporting

17   system of how many views there were in that particular

18   month?

19     A     I don't know.  I'm not sure.

20     Q     Is it a consistent pricing, somebody in -- a

21   guest may view one and -- and you get paid that same

22   amount or is there a variable pricing structure?

23     A     I don't know.

24     Q     And then online content, is there an outside

25   servicing company that manages the server and accepts

116

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  payment?

2      A    I think so.

3      Q    And who is that outside company?

4      A    I actually don't know.  I'm not sure who

5  houses it.

6      Q    Is there a cost for this out -- if there is an

7  outside company who maintains the server provides

8  content, is there -- what is the fee structure for

9  that?

10     A    I don't know.

11     Q    Who would know that?

12     A    I would imagine the accounting department.

13     Q    And who negotiates if you use an outside

14  server, who negotiates with that company to manage your

15  content for that?

16     A    The online VP.

17     Q    And who is the online VP now?

18     A    Ron Villanueva.

19     Q    Do you know for the online content if there is

20  an outside company with -- how long that contract may

21  be, whether it's a year, two years, five years,

22  six months?

23     A    No, I don't know.

24     Q    Who has authority to sign those contracts?

25     A    VPs.

117

BARKLEY
Court Reporters

1    Q    Do you get involved at all in reviewing those

2   contracts and deciding whether it's actually a good

3   deal for the company or not?

4    A    I don't believe a contract has come up in my

5   time.

6    Q    And do you know if the prior manager had been

7   involved in -- in the negotiation and review of those

8   contracts and authorization to go ahead with them?

9    A    I don't know.

10    Q    So you don't know who the signatory to those

11   contracts are?

12    A    Right.

13         ROBERT YASPAN:  However the contracts are in

14   the company offices and we can get you that

15   information.

16         DARE LAW:  Okay.  But I just want to sit here

17   today whether he knew or not.

18         ROBERT YASPAN:  Correct.

19   BY DARE LAW:

20    Q    Intellectual property.  What intellectual

21   property does Direct own that's worth $37,420?

22    A    I believe that is referring to the Girls Gone

23   Wild, the use of that name.

24         ROBERT YASPAN:  Actually, that number came

25   from the books so we don't quite know what that is.

118

BARKLEY
Court Reporters

1          THE WITNESS:  Which -- which one?

2          ROBERT YASPAN:  The 37.

3          THE WITNESS:  I think that's why it's saying

4    subject issues regarding (inaudible).

5          ROBERT YASPAN:  This is a book number.

6    BY DARE LAW:

7       Q    What does it mean on the debtor's books that

8    this number's there?

9          ROBERT YASPAN:  I can ask the accountant.

10          DARE LAW:  Well (inaudible) --

11          ROBERT YASPAN:  But I can't ask --

12          THE WITNESS:  I -- I don't know.

13    BY DARE LAW:

14       Q    Okay.  Does Direct have any intellectual

15    property agreement with Path Media or any other

16    companies for use of Girls Gone Wild name or any other

17    name it might use to promote its materials?

18       A    I think -- I believe it does today.  That's

19    the agreement we were referring to.

20       Q    So Direct now has the agreement?

21       A    I believe so.

22       Q    And who negotiated that agreement?

23       A    I would say Mr. Tym if anybody, I'm not

24    certain though.

25       Q    And did he run it by you for approval before

119

BARKLEY
Court Reporters

1  it was ultimately signed?

2      A    Yes.

3      Q    And was it you who signed that agreement?

4      A    Yes.

5      Q    And it only goes to May?

6      A    That's what I recall, yes.

7      Q    So what happens if Path Media pulls it in May?

8  What does the debtor have to sell or to use if it

9  doesn't have the rights to its name?

10     A    That would be a significant issue.

11     Q    Is there a game plan if -- if Path Media

12 decides to not renew the use of the Girls Gone Wild

13 name?

14          ROBERT YASPAN:  The answer is yes, there's a

15 game plan; however, it may not be as effective as we

16 want.

17 BY DARE LAW:

18     Q    Well, Mr. Dale; is that true.

19     A    I think it's an evolving game plan.  I can't

20 say that, you know, I can hand you a book that has A to

21 Z precisely what the company's going to do though.

22     Q    But there is some sort of strategy -- I'm not

23 going to ask you what the strategy is.  I'm just

24 saying, is there a strategy that if Path Media says,

25 you know what, I don't really want you to use Girls

120

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Gone Wild any more, you're on your own?

2         ROBERT YASPAN:  We would have to negotiate an

3    exit strategy because we -- we still have content.

4    BY DARE LAW:

5         Q    Right.  What happens to all of that stuff?

6         ROBERT YASPAN:  By content I meant recordings

7    of content, DVDs.

8         DARE LAW:  Right.

9         ROBERT YASPAN:  There's product out there in

10   the marketplace.  There are industry standards for

11   the -- for such exit strategies.

12   BY DARE LAW:

13        Q    Is it built into the licensing agreement, some

14   sort of exit strategy?

15        A    I don't think -- not in the existing agreement

16   as far as I recall.  I don't remember.

17        Q    And I'm sure I asked you during Brands, since

18   the renegotiation of the intellectual property, do you

19   know if the debtor is current on payments of any

20   royalties that may be due under that intellectual

21   property content agreement?

22        A    I'm not certain.

23        ROBERT YASPAN:  The debtor is current to the

24   best of my knowledge.  It paid the upfront fee.

25        DARE LAW:  How much was the upfront fee?

121

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          THE WITNESS:  I don't know.

2          ROBERT YASPAN:  It's in the agreement.

3    BY DARE LAW:

4      Q    Okay.  There's --

5          ROBERT YASPAN:  That we have delivered and we

6    have filed with the court.

7    BY DARE LAW:

8      Q    Okay.  There's a tangible assets, furniture,

9    fixtures, et cetera, book value $109,449.  I've been to

10   your offices.  Does that cover like all the stuff

11   that's in the office that belongs to Direct and not to

12   some other company?

13     A    I believe so, yeah.

14     Q    And then the computer equipment, does that

15   include any server that may house online consent?

16     A    I don't think so.  I think it's referring to

17   just servers in-house.

18     Q    Where do you maintain the masters of the

19   productions that have happened that -- that Events gave

20   to Direct to edit?  So usually my understanding is

21   there's like either a master disc or a master film or a

22   master something.  Where do you house that?

23     A    I believe it's at an off-site storage

24   facility.

25     Q    Okay.  And do you know if the payments to that

                         122

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    off-site storage facility are current?

2        A    I don't know.

3        Q    When was the last time Direct had anything to

4    edit and make into a final product?

5        A    I don't know.

6        Q    Has Direct done any editing for the goal of a

7    final product since the filing of the case?

8        A    I believe so.  I'm not certain.

9        Q    What's in production?  One film?  Two films?

10       A    I don't know.  Very little.

11       Q    Who would know that information?

12       A    Probably the online VP.

13       Q    How many productions or finalized product does

14   Direct make per year because it's -- the company's not

15   that old.  It's only since 2010.  So how many owe

16   ultimate products did it make each year?

17       A    I could -- I could offer you a guess if you'd

18   like one.

19       Q    Okay.

20       A    Maybe two a month, so 20 to 24 a year is a --

21   just a guess.

22       Q    So the online library or the content library

23   should be pretty large.  I mean, for three years times

24   let's say even just 20 a year, there should be 60

25   finalized products; right?  For online library or

123

BARKLEY
Court Reporters

1   whatever -- not online.  The library should be about 60

2   films?

3        A    If you are going off that guess I gave you,

4   yes.

5             ROBERT YASPAN:  If you go to the website,

6   you'll find them.  There's dozens there.

7             DARE LAW:  I'd love to look at the website.

8   It's blocked.

9             ROBERT YASPAN:  I'm just saying.  Just saying.

10  If you look there, they say --

11            DARE LAW:  Yeah, just saying --

12            ROBERT YASPAN:  -- all these names, you could

13  do it at home with your kids in the other room.

14  BY DARE LAW:

15       Q    Now, what are the prepaid deposits for various

16  technology vendors?  What sort of vendors are we

17  talking about?

18       A    I'm not certain.

19            ROBERT YASPAN:  Yeah, I know.  That's a book

20  item.

21  BY DARE LAW:

22       Q    Yes, but do you know if that has been used

23  since the filing, because they're vendors so --

24       A    I don't know.

25       Q    How old is your post production equipment?

124

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A     I don't know.

2      Q     Is it more than three years old?  Because this

3  LLC's only three years old?

4      A     Well, if it was used when it was originally

5  purchased, it could be.  I -- I'm not certain though.

6  I think it's a mix of, you know, six months old and

7  older, but I don't know how old it gets so to speak.

8      Q     Is it digital or film?

9          ROBERT YASPAN:  You mean analog?

10  BY DARE LAW:

11      Q     Yes, analog or -- or digital?

12      A     Well, it's a combination because it's

13  taking -- well, I guess it would all be digital

14  recently.

15      Q     Was there a -- for better terminology, like a

16  precursor company before GGW Direct, LLC?  Was there

17  some sort of entity before that that morphed into

18  Direct, LLC?

19      A     No.

20          ROBERT YASPAN:  Vague as to the meaning of the

21  term "morphed."

22          THE WITNESS:  Morphed.

23          ROBERT YASPAN:  But you could answer it if you

24  understand it.

25          THE WITNESS:  Not sure.

125

TRANSCRIPT OF PROCEEDINGS

BARKLEY
*Court Reporters*

1   BY DARE LAW:

2       Q    Was there a company that existed that did this

3   sort of thing, same people, same equipment, same assets

4   that later became GGW Direct, LLC?

5       A    I don't know that it had all the same

6   equipment and assets and people and that kind of thing.

7       Q    Was GGW Direct being used as either an Inc. or

8   a partnership or a DBA?

9       A    No.

10      Q    Before it became LLC?

11      A    I don't believe so.

12      Q    And do you know if any of the other related

13  companies, Brands, Magazine, or Events used GGW Brands,

14  Events, Direct, Magazine, not LLC but some other

15  entity?

16      A    I don't believe so.

17           DARE LAW:  Counsel, did you ever file the

18  Schedule G?  I don't recall seeing it because it says

19  to come.

20           THE WITNESS:  We did not.  Oh, wait a minute.

21  No, we did not.

22           DARE LAW:  When is that going to come?

23           ROBERT YASPAN:  Soon.  I can -- I had written

24  that down as with respect to Brands.  I think that

25  we'll get that to you by Friday.

126

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          DARE LAW:  Okay.  That --

2          ROBERT YASPAN:  Well, at the end of these

3   four, I'm going to reserve the right to move it to

4   Monday.

5          DARE LAW:  That's fine.  But this needs to be

6   filed with the court.

7          ROBERT YASPAN:  Yes, I understand.

8          DARE LAW:  Okay.

9   BY DARE LAW:

10     Q    And there are -- with respect to the

11  co-debtors, are there no other entities or persons that

12  owe any of the debts of Direct?

13     A    Not to my knowledge.  I -- I think it -- the

14  only thing I could refer to is what I referred to

15  earlier.  If, for example, all four entities were named

16  in a legal matter, if that is something that would

17  apply in this instance which I don't know, that's the

18  only instance I would imagine.

19     Q    Only caveat?

20     A    Yeah.

21     Q    There is a pending litigation re personal

22  injury suit by Alan Michael Wade hereof law offices of

23  Shane M. Malad or Malade, do you know what that's

24  about?

25     A    We talked about that in Brands.  I do not.

127

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          DARE LAW:  And, Counsel, if you can give me

2    some information about that litigation.

3    BY DARE LAW:

4      Q    All right.  I see David Houston is owed $250

5    on your Schedule F, because we talked about him

6    earlier?

7          ROBERT YASPAN:  That's right.  Look at that.

8    We'll see what he says when he gets the -- the motion.

9    BY DARE LAW:

10     Q    Dorsey and Whitney, what did they do for the

11   debtor?  Debtor meaning Direct.

12     A    I don't recall.  It was some legal services I

13   believe related to litigation, but I don't remember

14   which case or cases.

15     Q    And Eckhoff Blutt?

16         ROBERT YASPAN:  You've already asked about

17   this.

18         THE WITNESS:  Yeah, we talked about him.

19   BY DARE LAW:

20     Q    Same answer as brand?

21     A    Yes.

22     Q    And what about Hockman, Saken, Sepick, Soaker

23   and Perez, it says legal services.  What sort of legal

24   services might they have provided?

25     A    I don't recall.

128

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Q    There is industrial relations division of

2   labor standards, it says unknown claim, claim of

3   Clayton Mc Kinney.  Who is Clayton Mc Kinney?  What did

4   he do for the company?

5    A    Former employee.

6    Q    When did you again go to contract with Perfect

7   Science Lab to have all your employees through that

8   company?

9    A    Fairly recently.  I don't remember the exact

10  date.

11   Q    And so this Clayton Mc Kinney was an employee

12  before Perfect Science Lab contract?

13   A    Yes.

14   Q    So did the debtor have its own Direct

15  contracts where it paid its wages of its employees?

16   A    Yes.

17   Q    Did the company use an outside service for

18  payroll, like ADP?

19   A    Yes.

20   Q    And -- and is this an hourly or wage dispute

21  or -- or some other sort of claim, like a personal

22  injury claim?

23   A    I believe it's like an hourly wage claim.

24   Q    And Mitchell Lambert and Bronsen Hyatt for the

25  Wynn, is that the same for the information that you

129

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    provided in Brands?

2        A    I believe so, yes.

3        Q    And then it says here, Path Media is owed

4    1.5 million.  What is that for?  It says unpaid

5    licensing fee?

6        A    I believe it is for that reason.

7        Q    How long of a period does this cover?  It says

8    incurred 2010 to 2012.  That's a long time.

9        A    I believe it's for that period of time.  I

10   don't know the exact dates.

11       Q    Were any licensing fees paid to Path Media

12   holding?

13       A    I don't know.

14       Q    Who would know that answer?

15            ROBERT YASPAN:  Well, the answer is the

16   accounting department would, but let me check

17   something.

18   BY DARE LAW:

19       Q    Did Path Media file any collection action for

20   the 1.5 million?

21       A    I don't know.

22       Q    You don't know if they've ever filed any

23   collection action for that?

24       A    I'm not certain.

25       Q    Do you want me to wait, Counsel?

130

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Yeah, if you could.

2          DARE LAW:  While you look.

3          ROBERT YASPAN:  What I'm thinking -- here it

4    is.  Brands.  What I'm thinking is, is that Path

5    Media's on the wrong chapter.  It should be listed in

6    Brands rather than Direct, Mr. Tym?

7          DARE LAW:  Was Brands the license holder

8    before?

9          RONALD TYM:  My understanding it was Direct,

10   but could be wrong.

11         ROBERT YASPAN:  It was Direct?  Okay.  That's

12   an accounting question, not a legal one.  I'll have to

13   research where that Path Media belongs.

14   BY DARE LAW:

15       Q    Is the debtor the exclusive rights' holder to

16   use the Girls Gone Wild brand?

17       A    I don't know.

18       Q    So when you negotiate a new licensing contract

19   to use it, don't you want to know whether you're the

20   100 percent rights' holder or something else could be

21   using the name as well?

22         ROBERT YASPAN:  Counsel, why don't you just

23   show him the agreement that we've provided to you.  If

24   he doesn't remember, he doesn't remember.

25         DARE LAW:  I don't have the agreement with me.

131

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  But we have it in --

2          DARE LAW:  I got a pile of paper back -- back

3   at the office.

4          ROBERT YASPAN:  Okay.

5   BY DARE LAW:

6      Q    So you don't know if the debtor is the

7   exclusive rights' holder to use the name?

8      A    I agree with you, that that would be

9   favorable.  I just can't remember if that language is

10  in that precise contract.

11     Q    What is the pending litigation with Phil

12  Anagos?

13     A    It's synonymous.  It's also, I think wage an

14  hour type of claim.

15     Q    And what sort of services did Robinson Belasta

16  view (inaudible) provide for the debtor?  It says legal

17  services?

18     A    I'm not certain.  I would imagine litigation

19  support.  I'm not certain though.

20     Q    And is Tamara Favazah the claimant who's

21  saying she was under age at the time of filming?

22     A    I believe so.  I think that this is the same

23  person I think we referred to in Brands.  I believe so.

24     Q    Now, with respect to the revenue of the

25  debtor, it says in 2011 the debtor made $8,066,864 in

132

BARKLEY
Court Reporters

1   2011.  Is that the gross amount of revenue?

2           ROBERT YASPAN:  That's what the request asks

3   for.

4           DARE LAW:  Yes, but not everybody answers it

5   correctly.

6           ROBERT YASPAN:  Okay.

7           THE WITNESS:  I would say yes.

8   BY DARE LAW:

9       Q    Yeah, you -- I can't tell you how many times I

10  get negative numbers there.

11          ROBERT YASPAN:  (Inaudible).

12  BY DARE LAW:

13      Q    And then in 2012 the debtor made $6,655,914;

14  is that correct?

15      A    Yes.

16      Q    And to date from the January to the date of

17  filing of the petition, the debtor made $727,904 is

18  that correct?

19      A    Yes.

20      Q    Who signs the tax returns on behalf of the

21  debtor?

22      A    I'm not certain.

23      Q    Are you going to sign them this year?

24      A    I would imagine while I'm manager and for any

25  that are required.

133

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Q    Do you intend not to be manager any time soon?

2    A    No, I'm just saying.

3         DARE LAW:  Counsel, statement of financial

4   affairs number three, it says payment to creditors,

5   none; is that right?  Oh, no, you're on the second half

6   here down below.  Okay.  And where is the attachment?

7   It says see attached.

8         ROBERT YASPAN:  It should be.  All these --

9   that's -- yeah.  It's at the back.

10        DARE LAW:  Oh, wait, that's insiders --

11        ROBERT YASPAN:  Pages 14 through --

12        DARE LAW:  Got it.  Okay.  Way in the back.

13  Okay.  I got it.

14  BY DARE LAW:

15   Q    What are the alleged illegal employment

16  practices by GGW?  I'm looking at the statement of

17  financial affairs number four, Phil Anagos versus GGW

18  Direct, says seeks class action certification for

19  illegal employment practices.  What is he alleging?

20   A    I believe he's alleging that he was miss

21  categorized as a 1099 employee versus a W-2 employee.

22   Q    How many 1099 persons were there prior to

23  going over to using Perfect Science Lab as the

24  employer?

25   A    I'd have to guess.  Mostly it was for

134

BARKLEY
Court Reporters

1    productions, Events, and that kind of thing.  Kind of

2    on a case-by-case basis.

3        Q    When they were not filming and producing an

4    event on location, were those people then brought

5    in-house to do post production?

6        A    No.

7        Q    Is that the same crew?

8        A    No.

9        Q    Different crew?

10        A    Different crew typically.

11        Q    And how many W-2 employees did the debtor have

12    in the year prior to going to use Perfect Science Lab?

13        A    Maybe 20ish, 21, 22, something like that.

14        Q    So there were some regular W-2 employees?

15        A    Certainly, yeah.

16        Q    There's a personal injury claim by Michael --

17    Alan Michael Wade.  What is that -- the nature of that

18    claim?

19        A    That's the one we talked about a half a dozen

20    times and I don't know.

21        Q    Okay.  And then Clayton Mc Kinley versus -- Mc

22    Kinney, labor and wage.  Is that hourly or also the

23    1099 issue?

24        A    Hourly, more of a -- as far as I recall.

25        Q    What is VCI, they were paid prepetition within

135

BARKLEY
Court Reporters

1  the 90-day period?

2      A    VCI is a payroll company in Mexico.

3      Q    What sort of filming was done in Mexico?

4      A    Some of the -- a TV show, some of the spring

5  break type of videos.

6      Q    What is Equity Office?

7      A    I believe that's the --

8            ROBERT YASPAN:  Oh, that's the name of the

9  landlord.

10           THE WITNESS:  I think that's the landlord,

11  yeah.

12  BY DARE LAW:

13     Q    I'm sorry, who?

14     A    The landlord, the owner of the space or the --

15     Q    Landlord for the offices on Wilshire?

16     A    Correct, I believe so.

17     Q    And who or what is rt law?

18           RONALD TYM:  That's me.

19           DARE LAW:  Is that you?  Okay.

20  BY DARE LAW:

21     Q    What is the transfer of GGW Direct to

22  University of Dermatology and then it says savings?

23  What is that?  It's on January 2nd, 2013?

24     A    $300?  I'm not certain.

25     Q    And then D. Houston, is that Attorney Houston

136

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  that got $10,000 on 1/9?

2      A    Most likely.

3      Q    Were you in production in January in Mexico?

4  Because I see several VCI payments.

5      A    I don't recall.  I don't remember.

6           ROBERT YASPAN:  Well, they may have been in

7  production in December.

8  BY DARE LAW:

9      Q    Okay.  In December, January, that time period,

10 do you recall whether you were filming in Mexico?

11     A    I don't remember.

12          DARE LAW:  Counsel, can you find out and let

13 me know?

14          ROBERT YASPAN:  Yes.

15 BY DARE LAW:

16     Q    PR Law, who is that or what is that?

17          ROBERT YASPAN:  Where are you looking?

18          DARE LAW:  On 1/13/2013.

19          THE WITNESS:  I -- I'm not certain.  I think

20 it may be Pross Kower Law Firm.

21 BY DARE LAW:

22     Q    And what is PM Tax on 1/31?

23     A    PM Tax.

24          ROBERT YASPAN:  Where is it?

25          THE WITNESS:  Here, PM Tax.

137

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  BY DARE LAW:

2     Q    1/31/2013, like a (inaudible) maybe two inches

3  up.

4     A    I do not know.

5          ROBERT YASPAN:  I would -- I'd point out that

6  that's the date the (inaudible) taxes are due for 941s,

7  but I have no idea if that's relevant.

8          DARE LAW:  I don't know.  I'm asking.

9          THE WITNESS:  It might be.  Yeah, I'm not

10  certain.

11          DARE LAW:  Okay.  Can you find out what that

12  is and let me know?

13  BY DARE LAW:

14     Q    And then let's see.  What is Argyle online?

15          ROBERT YASPAN:  And you are at?

16  BY DARE LAW:

17     Q    219 and the amount is $209,250 and then

18  another one for $500,000 -- I'm sorry, 50 -- $5,000.

19     A    I believe that Argyle is a company that's

20  doing some production work for the company now, but I'm

21  not certain.  I don't remember exactly.

22     Q    So am I to infer correctly that if they're

23  doing some production work, that you have something in

24  production?

25          ROBERT YASPAN:  Your questions earlier were

138

BARKLEY
Court Reporters

1  related to whether or not Direct was producing.

2          DARE LAW:  Yeah.  But if this is a current

3  something to produce --

4  BY DARE LAW:

5      Q    Was this for license fees?  What does that

6  mean?

7      A    I don't remember exactly.  I can ask -- if I

8  may ask Mr. Tym?

9      Q    I wanted to know if you knew.

10     A    Yeah, I'm not certain.

11     Q    Do you know who JG Marzen, $100,000, is that a

12 person or is that an entity?

13     A    I believe it's an attorney in Mexico.

14     Q    What are you using an attorney in Mexico for?

15     A    I believe it was a settlement of a case in

16 Mexico.

17         ROBERT YASPAN:  The judge asked about this too

18 so it's on the report that we filed on Friday.

19         DARE LAW:  So I'll say see status report, but

20 if you could just let me know briefly, what was the

21 underlying litigation.

22         RONALD TYM:  Did you want to know what the

23 Argyle online payment was or you just wanted to know if

24 he knew?

25         DARE LAW:  Well, I wanted to know if Mr. Dale

139

BARKLEY
Court Reporters

1    knew or not.  I will come back to the Argyle and yes I

2    do want to know, but I wanted to know what he knew.

3            RONALD TYM:  Okay.

4    BY DARE LAW:

5        Q    And what was the underlying litigation in

6    Mexico that the company paid $100,000?

7        A    I believe it was a claim of individuals that

8    claimed to have worked for a property in Mexico, some

9    sort of like labor claim.

10       Q    What do you mean worked for a property?

11       A    Well, there's a property in Mexico that's used

12   for filming and corporate retreat and that kind of

13   thing and I believe these individuals claimed to have

14   worked there at one time.

15       Q    Who owns the property?

16       A    I believe it's owned by a couple of Mexican

17   corporations.  I don't know.

18       Q    And is there a fee paid when the debtor uses

19   it for filming or corporate retreats?

20       A    Yes.

21       Q    Mr. Martin got paid two days in a row.  He got

22   paid -- it looks -- he got paid $100,000 on

23   February 20th and then he got another 46277 -- $46,277

24   on February 21st.  What was that payment for?

25       A    I believe it was related to the settlement.

140

BARKLEY
Court Reporters

1    Q    Okay.  And I definitely want to know what

2  Argyle online is because there's another licensing fee

3  for $60,000 about a week after the first two payments

4  that I see?

5         MR. TYM:   Those -- the trademark agreement

6  with Path Media says that the license fees due to Path

7  Media are paid argyle so these three are for the

8  three-month license agreement fees.

9  BY DARE LAW:

10   Q    What is KiKi Entertainment for film location

11 specialists and spent $65,000 on 2/27?

12        ROBERT YASPAN:   That was again asked by the

13 judge and you have the accounting department figure

14 that out and it's part of the declaration of Mr. Tym.

15 BY DARE LAW:

16   Q    Okay.  Mr. Dale, do you know what it is?

17   A    I believe it was an expense that -- that PSL

18 requested payment.  I don't remember the nature of it

19 exactly.

20   Q    Now, there were a number of American Express

21 cards which I referred to earlier that were issued to

22 brand but looked like -- my understanding was most of

23 it was used for Direct in -- in production and other

24 expenses.  So I want to ask a few questions about that.

25        How is it determined who gets an American

141

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   Express card?

2      A    Case by case basis, but there are very few

3   cards.

4      Q    How many cards do you think were issued the

5   year prior to filing?

6      A    Maybe three, something like that.

7      Q    Three?  Would you be surprised to know that

8   there is, let's see, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

9   12, 14 cards?

10         ROBERT YASPAN:  Well, you asked him what was

11   issued prior year, not how many were outstanding.

12   BY DARE LAW:

13      Q    Okay.  Do you know that there were 14 cards

14   that were issued and open accounts with American

15   Express?

16      A    At one time or another in the company's

17   history essentially, is that what you're asking?

18      Q    Yes.  Who reviews those American Express bills

19   when -- when the bills come in?

20      A    The card holder and then the accounting

21   department.

22      Q    Do you ever review those American Express

23   bills to make sure that they're actually used for

24   company purposes?

25      A    Very rarely if at all.

142

BARKLEY
Court Reporters

1    Q    Is there company policy and procedure with

2  respect to use of those cards?

3    A    I don't belief there's any written procedure,

4  no.

5    Q    No written procedure?  Other than having an

6  American Express card, did Mr. Joe Francis have any

7  access to any checks or bank accounts during the --

8  since the company was formed in 2010?

9    A    I don't know.  I can speak to the time since

10  I've been manager and the answer is no.

11    Q    So you only know about the time that you've

12  been manager and has there been any during the time

13  that you've been manager, that he's had access to

14  checks or bank accounts?

15    A    No, well, not related to these entities in any

16  event.

17    Q    What do you mean?

18    A    Well, he's -- if you're just saying whether he

19  has access to checks or bank accounts in his life, I

20  don't know.

21    Q    No, I mean with related to these debtors.

22    A    Yeah, no.

23    Q    And I thought you said there was no written

24  policy with respect to the American Express cards;

25  right?

143

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A    I don't believe I've seen one, no.

2      Q    When you became manager, did you issue any

3   policies with respect to the use of the American

4   Express card?

5      A    Not that I recall.

6      Q    Were there any persons who had American

7   Express cards issued to them under -- whether it's

8   Brands or Direct -- that were not an employee or under

9   the category of a 1099-person?

10     A    Could have been, yes.

11     Q    And in what circumstances would those persons

12  be issued an American Express card?

13     A    Define under what circumstances a little

14  better, if you don't mind.

15     Q    Why would they be issued an American Express

16  card if they weren't an employee or 1099 worker?

17     A    I can't think of a good example, but I -- I

18  just -- I can't say it wasn't -- it didn't occur.

19     Q    I'm sorry, you can't say that it didn't occur?

20     A    I can't say that one was not issued to a

21  1099-person.  I can't give you a good example of why

22  that would have happened however.

23     Q    Do you know of any persons who may have been

24  American Express card that were not 1099 employees

25  or --

144

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  We're -- we're still before

2     the 11; right?

3          DARE LAW:  Yeah, since the beginning of the

4     company when the LLC was formed to now.

5          ROBERT YASPAN:  Okay.  Well --

6          DARE LAW:  It's only a three-year period.

7          ROBERT YASPAN:  True, but the last two months

8     there haven't been the cards.

9     BY DARE LAW:

10        Q    Right, but before were there any circumstances

11    where non employees or 1099 employees were given

12    American Express cards?

13        A    I don't know.

14        Q    You don't know?  You don't know or you don't

15    know of any employees or you don't know their identity?

16    What does I don't know refer to?

17        A    I don't -- well, I mean, prior to becoming

18    manager, I didn't have any insight into, nor decision

19    making, related to Am Ex cards.  Since then, I don't

20    know that one has been issued to a non-employee, so --

21        Q    So when you became manager in October,

22    November 2012, did you close all the American Express

23    cards?  Like cancelled them, no longer in use?

24        A    No.

25        Q    Did you review who might have been issued an

145

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   American Express card?

2       A    No.

3       Q    Did -- did anybody review who might have been

4   issued American Express cards?

5       A    I don't know.

6       Q    You don't know.  What sort of controls, if

7   any, were placed over the expenses of the debtor?

8            ROBERT YASPAN:  At what time period?

9   BY DARE LAW:

10      Q    Well, since you've become manager.

11           ROBERT YASPAN:  And before the 11 or after the

12  11?

13  BY DARE LAW:

14      Q    Since you became manager from October,

15  November 2012 until now, what sort of cost controls, if

16  any, have been placed on the debtor?

17      A    Nothing I can put my finger on.

18      Q    And have any cost controls been put in place

19  since the filing of the bankruptcy petition?

20      A    Nothing formal.

21      Q    Nothing formal?

22      A    No.

23      Q    Anything informal?

24      A    No.

25      Q    The last American Express bill that we were

146

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    looking at, there were a number of people who had

2    American Express cards.  If I say the name, would you

3    recognize who they were?  For example, Alicia Serrano,

4    do you know who that is?

5        A    Yes.

6        Q    What is her position?

7        A    She is a former controller.

8        Q    Is she still with the company?

9        A    No.

10       Q    Do you know when she was no longer with the

11   company?

12       A    It's been a little while.  Probably almost two

13   years since they left.

14       Q    And Brian Lord, I believe you said he was one

15   of the VPs?

16       A    Correct.

17       Q    And is he still with the company?

18       A    Yes.

19       Q    And Christopher Rudin or Rudin, R-u-d-i-n?

20       A    Former driver kind of head of the touring.  I

21   don't believe he's with the company longer.

22       Q    No longer with the company?

23       A    Right.

24       Q    When did he leave?

25       A    Probably a year ago.

147

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    And Clayton Mc Kinney?

2      A    That's the same individual with the labor

3   claim.  Former IT person.

4      Q    When did he leave?

5      A    Maybe a year ago also if I had to guess.

6      Q    And sorry if I pronounce -- mispronounce the

7   name, Dorota, let's see, Anoskiewicz, sorry?

8      A    Doesn't -- I don't --

9      Q    A-n-o-s-z-k-i-e-w-i-c-z?

10      A    I don't recognize that name.

11      Q    What about Eric Deutsche?

12      A    Had been head of production.

13      Q    Is he still there?

14      A    No.

15      Q    When did he leave?

16      A    Probably around two years ago.

17      Q    And what about Gregory Harrison?

18      A    I think he took the place of or vice versa of

19   Chris Rudin, so kind of head of touring.

20      Q    Is he still with the company?

21      A    I don't believe so, no.

22      Q    No?

23      A    No.

24      Q    When did he leave?

25      A    Also probably a year ago.

148

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q     And Heather Brook?

2      A     She's an executive assistant with the company.

3      Q     What is -- who is she executive assistant to?

4      A     Various managers.

5      Q     Is she still with the company?

6      A     Yes.

7      Q     And Jessica Pineda?

8      A     I don't know that name.

9      Q     And we know about Mr. Francis has one.  And

10   what about Larry Hancock?

11         ROBERT YASPAN:  We don't know that he has one.

12         DARE LAW:  Had one.

13         ROBERT YASPAN:  Because you --

14         DARE LAW:  Had one.  Sorry, had.  Had.

15         ROBERT YASPAN:  Thank you.

16   BY DARE LAW:

17     Q     And Larry Hancock, who is he?

18     A     I don't remember his exact title, but

19   assistant VP or director of online, something along

20   those lines.

21     Q     Is he still with the company?

22     A     Yes.

23     Q     And Ron Villanueva we said is VP and still

24   with the company?

25     A     Correct.


149

TRANSCRIPT OF PROCEEDINGS

**BARKLEY**
*Court Reporters*

1      Q    Why would the debtor pay an American Express

2   bill for gardening for $15,000, almost $16,000?

3           ROBERT YASPAN:  You have to talk to him and

4   tell him where it is.

5   BY DARE LAW:

6      Q    I don't know.  I think it's on the (inaudible)

7   I'm pulling from Jack's notes.

8   BY DARE LAW:

9      Q    Is it from Mexico property or somewhere else?

10     A    I'm not certain.  Are there any notes with it

11  or more information or just says --

12     Q    I don't know.  Jack stepped out so I'll have

13  to --

14     A    Yeah, I'm not -- I'm not --

15     Q    -- I'll have to come back around to this.

16     A    -- I'm not certain.

17          ROBERT YASPAN:  Here he is.

18          DARE LAW:  Here he is.

19  BY DARE LAW:

20     Q    What is -- what relation, if any, are these

21  companies, BN Media?

22     A    BN Media.

23     Q    Uh-huh, BN Media, LLC?

24     A    I'm not familiar with it.

25     Q    And what about either a company or a person

150

BARKLEY
Court Reporters

1    named Alex Croft?

2         A    I don't know that name.

3         Q    And David Orinski or -- or sorry, David

4    Ostrinski?

5         A    I don't know.

6         Q    Advanced -- Advanced Marketing Group?

7              ROBERT YASPAN:  Speak up.  Speak up.

8              THE WITNESS:  Sorry.  I don't know.

9    BY DARE LAW:

10        Q    Renx.com?

11        A    I imagine some online service, but nothing

12   that I'm familiar with otherwise.

13        Q    Buddha Best Holding, that name familiar to

14   you?

15        A    Don't know.

16        Q    SE Rosin, R-o-s-i-n, is that name familiar?

17        A    No.

18        Q    How about cycle fish?

19        A    No.

20        Q    Asaidnet Synergy?

21             ROBERT YASPAN:  Now, there's a name that tells

22   you something.

23   BY DARE LAW:

24        Q    Does that have any --

25        A    No.

151

BARKLEY
Court Reporters

1      Q    Okay.  And Mc Kale -- Mikhalin,

2   M-i-k-h-a-l-i-n?

3      A    No.

4      Q    Justin Huang?

5      A    No.

6      Q    Andrew Vicspurt?

7      A    No.

8      Q    Mr. Todd Inc.?

9      A    No.

10     Q    All Pro Publishing?

11     A    No.

12     Q    J-d-e-s-k-o LLC?

13     A    No.

14          DARE LAW:  He wants to know where this expense

15   came from because I didn't know (inaudible).

16          UNIDENTIFIED MALE:  Those are all from the

17   general ledger and they're under the 8100 account.

18          DARE LAW:  (Inaudible).

19          UNIDENTIFIED MALE:  For the film location

20   specialist.

21          DARE LAW:  Okay.  That was Jack, our attorney

22   and for the record (inaudible) for the U.S. Trustees'

23   Office.  So are these all related to that?

24          UNIDENTIFIED MALE:  Yes.

25          DARE LAW:  So --

152

BARKLEY
Court Reporters

1          UNIDENTIFIED MALE:  They have specific account

2    numbers for a specific category.

3          DARE LAW:  Okay.

4          UNIDENTIFIED MALE:  But it's under the 8100 --

5    81000 I should say.

6          DARE LAW:  Account.

7    BY DARE LAW:

8      Q    So what sort of -- why were these paid like

9    gardening, HOA fees, property taxes?

10     A    I'm not certain what those are -- relate to.

11         ROBERT YASPAN:  Are they paid with the

12    American Express?

13         DARE LAW:  No, from the -- your general ledger

14    checking account.

15         UNIDENTIFIED MALE:  Some -- some charges were

16    made with American Express cards.

17         DARE LAW:  Why don't you ask specifically

18    since you actual pulled it out.  So I'm here.

19         UNIDENTIFIED MALE:  Okay.

20    BY DARE LAW:

21     Q    So for example, there is a property tax of

22    $15,074.47.  Why would the debtor pay property tax on a

23    property it's using for filming location?

24     A    I'm not sure what property that's referring

25    to.

153

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     Q    Would you know why the debtor would pay HOA

2   dues of $38,323.82?

3     A    I would need more information.  I don't know

4   what's that related to.

5          UNIDENTIFIED MALE:  That's for the period of

6   January 1st, 2004, through March 31st, 2013.

7          ROBERT YASPAN:  Do you know what property that

8   relates to?

9          UNIDENTIFIED MALE:  From what I gathered from

10  our meetings from -- on site meeting, it appears to be

11  for the Mexico property.

12         THE WITNESS:  Okay.

13  BY DARE LAW:

14    Q    Why would the debtor pay HOA dues for Mexico

15  property that it doesn't own?

16    A    For use of the property I would imagine.

17    Q    I'm sorry?

18    A    For use of the property I would figure.  I'm

19  not certain though.

20    Q    Does the debtor pay a fee for every time it

21  uses the property, whether or filming or for its

22  business retreats?

23    A    I think it's more of an ongoing fee, but I'm

24  not sure.

25    Q    Why would the debtor have an ongoing fee for

154

BARKLEY
Court Reporters

1    property it doesn't own?

2        A    For use of the property.

3        Q    Is it used exclusively for the Girls Gone Wild

4    entities, whether it's any of the four bankruptcy

5    debtors?

6        A    I don't know.

7        Q    Well, since you became manager, have you

8    looked at the debtor's relationship with respect to

9    that property and its expenses related to that property

10   that the debtor is paying for?

11       A    Some of the expenses, not the relationship.

12       Q    What expenses have you reviewed for that

13   property?

14       A    Some of the ones that you've highlighted, for

15   example the payments made to VCI.

16       Q    But what about like properties more specific

17   expenses like HOA, property tax, gardening?

18       A    No.

19       Q    You haven't reviewed that or you -- you don't

20   know about it or what's the no relate to?

21       A    I have not reviewed this.

22       Q    Who, if anybody in your company, would review

23   these expenses?

24       A    The accounting department.

25       Q    And who approves payment of those expenses

155

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   since you've become manager?

2       A     Actually, I would in most cases I believe.

3       Q     Were these paid by check?

4       A     I don't know.

5             ROBERT YASPAN:  What is the question relating

6   to?

7             DARE LAW:  Well, the -- like the gardening and

8   the HOA and the property tax specifically.

9             ROBERT YASPAN:  Okay.

10  BY DARE LAW:

11      Q     So would you normally sign those checks to

12  make those payments?

13      A     Yes, or it could have been done via wire

14  transfer.

15      Q     Okay.  But you would normally approve that?

16      A     Right.

17      Q     And again, do you know if that property is

18  used exclusively for the Girls Gone Wild four debtors

19  or it may be used for other purposes?  Do you know?

20      A     I'm not -- I don't know.

21      Q     Now, which of the companies owns the Bentley?

22      A     I believe it's Events.

23      Q     Events.  Okay.  We'll get there.  Because I

24  didn't see it on Brands and Direct and those were the

25  operating entities or filming entities, but my

156

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   understanding is Events did it all, and as you say gave

2   the raw footage to Direct.  So Direct doesn't own it?

3        UNIDENTIFIED MALE:  In October of 2012 there's

4   a payment from the film location specialist account

5   categories 87,000 which is maintenance.  87100

6   automobiles of $4,750 to Mercedes Benz of Beverly

7   Hills.

8        Does Direct or any other related entity own a

9   Mercedes Benz?

10        THE WITNESS:  I think Events might.  I'm not

11   sure.  I don't know.

12        UNIDENTIFIED MALE:  I didn't see a Mercedes

13   Benz listed on the insurance declaration pages.

14        DARE LAW:  Yeah, it wasn't on the insurance

15   declaration page so who's covering the insurance on --

16   on those cars.

17        ROBERT YASPAN:  Wait a minute.  Wait a minute.

18   Just because it goes to Mercedes Benz doesn't mean it's

19   a Benz.  They -- they do work for other cars.

20        DARE LAW:  Okay.  Well, let's -- let's find

21   out.

22        ROBERT YASPAN:  That's right.  So --

23        There is a Mercedes Benz on the rider to

24   Schedule B, the GGW Events.

25        DARE LAW:  So Events has the car?

157

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Yes.

2     BY DARE LAW:

3        Q    Okay.  We'll get to that when we get to Events

4     then.  Now, the Mexican attorney, Mr. Marzen looks like

5     he was getting almost monthly payments of varied

6     amounts.

7          UNIDENTIFIED MALE:  It was approximately

8     262,000 if I'm not mistaken that was paid during that

9     January 2012 to March 2013 period.

10          ROBERT YASPAN:  Let's go back to the Mercedes.

11    Mercedes is listed on events.

12          DARE LAW:  Okay.

13          ROBERT YASPAN:  On Schedule B.

14          DARE LAW:  Okay.  That's fine.

15          ROBERT YASPAN:  Sorry.

16          DARE LAW:  Are we done with the car for now?

17          ROBERT YASPAN:  Well, it took me longer to get

18    there than -- you just went on and I figured --

19          DARE LAW:  Well, because you said it was in

20    Events so I was saving it for Events.

21    BY DARE LAW:

22        Q    Now, Mr. Marzen, you said he was Mexican legal

23    counsel with respect to some litigation on Mexican

24    filming.  Was he on general retainer or was he just

25    hired for that one specific litigation?

158

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A     I'm not sure.

2      Q     Because there's payments made to him from

3   January 2012 all the way through December 2012?

4            ROBERT YASPAN:  And what are you looking at?

5            DARE LAW:  A transaction detail for -- for

6   your general account.

7            UNIDENTIFIED MALE:  It's the general category

8   under the film location specialist expense.  It's under

9   actually legal 89000, account number 89000, the legal

10  expenses.

11           ROBERT YASPAN:  Okay.  And so the question is.

12  BY DARE LAW:

13     Q     Was he like Mr. Tym's like general outside

14  counsel handle whatever the debtor needed or was he

15  hired just for one litigation?

16     A     Probably something between that.  I -- I -- so

17  I don't know that he was on a retainer as far as I

18  know, but he handled that big case.

19     Q     So who would approve his bills when they came

20  in they needed approval at all?

21     A     Any bills since I became manager, probably me.

22  I don't know before.

23     Q     Well, if you became manager somewhere between

24  October or November, there was a significant wire

25  transfer made to him for $240,000 and then there have

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   been like five other payments or transfers made to him

2   during that time.  Did you approve all of those?

3       A    I believe so.

4           ROBERT YASPAN:  The judge asked about

5   Mr. Marzen, Marzen, whatever his name is.

6           DARE LAW:  Right.

7           ROBERT YASPAN:  But she only asked for the

8   90 days.

9           DARE LAW:  Right.  But since I have the

10  whole --

11          ROBERT YASPAN:  But since you have it --

12          DARE LAW:  The benefit of the whole thing, and

13  also since I was asking from October, so that's during

14  Mr. Dale's tenure as manager so --

15          ROBERT YASPAN:  Well, I think we're all

16  entitled to take a look at this.  We'll get to this

17  information.

18          DARE LAW:  Okay.

19          RONALD TYM:  My understanding is a large,

20  large bulk of that is the settlement that Mr. Dale

21  talked about earlier.  It's about 200-some thousand.

22          DARE LAW:  Okay.  This is the company.

23          ROBERT YASPAN:  But if it's a settlement, it

24  may be preferential.

25          RONALD TYM:  Yeah, (inaudible).

160

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Yeah, so we need to --

2          DARE LAW:  I'm sorry, I missed that last part.

3          ROBERT YASPAN:  If it was in the settlement

4     paid within the 90 days --

5          DARE LAW:  Uh-huh.

6          ROBERT YASPAN:  -- it might be preferential.

7          DARE LAW:  Might be.  We can take a look at

8     that and see if, you know, it needs a claw back or

9     whatever happens to it.  You can -- you can figure that

10    out.  Okay.

11         UNIDENTIFIED MALE:  There's a film location

12    specialist other category account 81000, there's a

13    general journal -- journal adjustment of $330,251.97 as

14    an adjustment and it was I guess noted as improvements.

15         Do you know what that is about?

16         ROBERT YASPAN:  You've got to give us some

17    time frames and --

18         UNIDENTIFIED MALE:  January 15, 2012.

19         ROBERT YASPAN:  Do you -- don't have any

20    knowledge of $300,000 general, general adjustment in

21    2012?

22         THE WITNESS:  No.

23         UNIDENTIFIED MALE:  Okay.

24         ROBERT YASPAN:  Thank you.

25    ///

161

BARKLEY
Court Reporters

1   BY DARE LAW:

2       Q    Okay.  I gave you some names with respect to

3   American Express cards and I asked you who they were,

4   if you knew.  There's actually some other names that I

5   don't think that I mentioned.  For example, Roxanna

6   Loria, is that person still an employee and what does

7   she do?  When I say "employee," I use that term

8   loosely.  I know it's now through Perfect Science?

9       A    I believe she coordinates things for the

10  Mexican house, the property in Mexico.

11      Q    Is she local here or is she in Mexico?

12      A    In Mexico.

13      Q    And is she an employee through Perfect

14  Science?

15      A    No.

16      Q    And Sergio Bravo?  Did I ask about him?  I

17  don't think so.  Who is -- who is Mr. Bravo?

18          ROBERT YASPAN:  You did not ask about him.

19          THE WITNESS:  I think he works with Roxanna in

20  Mexico.

21  BY DARE LAW:

22      Q    What is his relation to the company?

23      A    Bless you.

24          ROBERT YASPAN:  Thank you.

25          THE WITNESS:  Assistant manager, something

162

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    along those lines.

2    BY DARE LAW:

3        Q    What does he do for the debtor?

4        A    I think coordinates affairs at the property

5    when it's used in Mexico.

6        Q    So -- so what I would like to know from the

7    debtor, during the past year, what -- when and what did

8    the debtor use the Mexican property for?  So for

9    example, did they film there and what month and if they

10   had an event, what month?  And if they had a corporate

11   retreat, what month?

12            ROBERT YASPAN:  Okay.  If I might have a

13   Kleenex?

14            DARE LAW:  Yes, help yourself.

15            Okay.  If -- (inaudible) okay.  Get back to

16   it.  If at any time the creditor would like to ask any

17   questions, please come up to my right.  You can state

18   your name for the record, who you represent and you can

19   proceed with your questioning.

20            ROBERT YASPAN:  Time passes.

21            MR. PAGAY:  Good afternoon, again.  I'm Malhar

22   Pagay from Pechulski, Stang, Zieh & Jones representing

23   Wynn Las Vegas.  If you give me a moment to pause, I

24   again want to make sure that I -- I try not to

25   duplicate what Ms. Law's already gone over with you.

163

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   BY MR. PAGAY:

2       Q    Turning to tab five in the binder that I

3   previously gave you, with respect to the prior debtor

4   that we discussed, GGW Brands, you indicated that

5   that -- that debtor had moved from Clover Field a

6   couple of years ago.  Is that the same situation with

7   respect to this debtor?

8       A    Yes.

9       Q    So they're not -- they were not at the Clover

10  Field Boulevard location as of the petition date;

11  correct?

12      A    That's correct.

13      Q    Could you turn in the same tab to Schedule F?

14           ROBERT YASPAN:  There you go.

15  BY MR. PAGAY:

16      Q    I don't know if Ms. Law asked this, but if she

17  did I apologize.  What services does -- if any or what

18  products does Flying Crocodile, Inc. provide to the

19  debtor?

20      A    I'm not certain.

21      Q    And turning to the last page of Schedule F,

22  there's a creditor there just above Wynn called Work

23  Bridge Associates.  Do you know what services or

24  products Work Bridge provides to the debtor?

25      A    Recruiting services.

164

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    Recruiting what?

2      A    Pardon?

3      Q    Recruiting what?

4      A    Personnel.

5      Q    I apologize if this was asked already, do you

6  have any role or responsibilities with respect to

7  Perfect Science Labs?

8      A    No.

9      Q    In tab 6, Schedule B, item number 23, it says

10  it's subject to issues regarding default of agreements.

11  Do you know what issues these are?

12      A    I believe that relates to the fact that the

13  current agreement is set to expire I believe in the

14  month of May.

15      Q    Ms. Law asked all my questions about that

16  already.

17           DARE LAW:  Way ahead of you.

18  BY MR. PAGAY:

19      Q    Turning to Schedule G just a few pages down.

20  I believe counsel indicated that this list would be --

21  would be filed perhaps by Friday if not Monday, what

22  are some of the major contract -- contractual

23  relationships that GGW Direct has?  And by major, I

24  mean tied to its -- it's revenue stream.

25      A    I -- I don't -- I mean, I'd rather just let

165

BARKLEY
Court Reporters

1   those documents come forth, you know, at the end of the

2   week rather than just --

3           ROBERT YASPAN:  Well, are there contracts with

4   the customers?

5           THE WITNESS:  Yes, if you consider a

6   membership a contract.

7           ROBERT YASPAN:  Are there ongoing contracts

8   with hotels?

9           THE WITNESS:  With pay per view outlets in

10  hotels, yes.

11          ROBERT YASPAN:  Any other -- any other

12  employment contracts?  I mean written employment

13  agreements.

14          THE WITNESS:  Yes, I think.

15          ROBERT YASPAN:  Okay.

16  BY MR. PAGAY:

17      Q    With whom would those employment agreements

18  be?

19      A    I don't know.

20      Q    But to the extent that member is a contract,

21  those would be among the major contracts of the

22  company, GGW Direct?

23      A    Yes.

24      Q    And you also -- I think either you or your

25  counsel mentioned pay per view; is that correct?

166

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A     Correct.

2      Q     Okay.

3            RONALD TYM:  Well --

4            MR. PAGAY:  Any other --

5            RONALD TYM:  It's not that company per se, but

6      companies that do pay per view.

7            MR. PAGAY:  I'm not sure I understand the

8      clarification.  What do you mean?  Not the -- not the

9      company called pay per view, but companies that perform

10     that service.  I understand.  Thank you for the

11     clarification.

12     BY MR. PAGAY:

13     Q     Any other categories of contracts other than

14     membership interest, possibly employment contracts and

15     pay per view contracts?

16     A     No.

17     Q     Turning to the next page, Schedule H, I think

18     we've already gone over with respect to GGW Brands how

19     you have listed Wynn and Ms. Favazah on -- with respect

20     to being a liability owed by all the debtors; right?

21     A     Correct, yeah.

22     Q     Okay.  If tab seven, the statement of

23     financial affairs, item 19, it says there are no

24     bookkeepers or accountants that kept or supervised the

25     books of the account.  Is that accurate?  GGW Direct

167

BARKLEY
Court Reporters

1  has no outside bookkeepers or accountants of any kind?

2      A    Not to my knowledge.

3      Q    So in your capacity as manager, you don't deal

4  with any accounting firms whatsoever?

5      A    Not related to Direct, no.

6      Q    Related to what then?

7      A    None of these entities I would say.

8      Q    Okay.  Well, I asked how you dealt with them

9  in your capacity as manager for this entity.

10     A    Oh, yeah, sorry, so I do not.

11     Q    So --

12     A    I don't.

13     Q    So there are none?

14     A    Yeah; correct.

15     Q    Okay.

16     A    Sorry.

17     Q    In item 19B it asks about all individuals who

18  have either audited or prepared a financial statement

19  to the debtor.  With respect to GGW Direct's vendor and

20  other business relationships, have they ever had to

21  provide a financial statement?

22     A    I don't know.

23         ROBERT YASPAN:  Well, during your period of

24  time.

25         THE WITNESS:  Not to my knowledge.

168

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    BY MR. PAGAY:

2        Q    Okay.  19C, asking for individuals and firms

3    that are in possession of the books to the account of

4    the debtor.  I believe with respect to Brands, you

5    indicated Ms. Isaacs.  Is that the same answer for this

6    debtor?

7        A    Yes.

8        Q    Is there anybody else?

9             ROBERT YASPAN:  Anybody else who?

10            MR. PAGAY:  Anybody else who qualifies as an

11   individual who is in possession of the books of account

12   of the debtors.

13            THE WITNESS:  I don't think so.

14   BY MR. PAGAY:

15       Q    Okay.  And where are those books and records

16   kept, at what address?

17       A    At the Wilshire address.

18       Q    The 10940; correct?

19       A    Correct, yeah.

20       Q    Thanks.  Turning now to attachment 3B to the

21   statement of financial affairs just a few pages down,

22   do you know how this report was produced?

23            ROBERT YASPAN:  Wait a minute.

24            MR. PAGAY:  Sorry.

25            ROBERT YASPAN:  3B.  Okay.  He's there.

169

BARKLEY
Court Reporters

1    BY MR. PAGAY:

2        Q    Do you know how this report was produced?

3        A    I believe it was pulled from accounting

4    software we use.  I don't know though.

5        Q    What accounting software do you use?

6        A    QuickBooks.

7        Q    Okay.  You're not sure who prepared this or

8    how it was produced?

9        A    No.

10       Q    Okay.  On page 14 of 19 of that report it

11   identifies on January 3rd a transfer from Direct to

12   Magazine of $2,500?

13       A    Oh, okay.

14            ROBERT YASPAN:  All right.  We're having a

15   confusion.

16   BY MR. PAGAY:

17       Q    Oh, I'm sorry.  I can either -- it's either

18   page 14 of 19 at the bottom or document page 17 of 26

19   at the top?

20       A    Got it.

21            ROBERT YASPAN:  And you're asking about the

22   transfer to GGW Magazine?

23            MR. PAGAY:  Correct.

24   BY MR. PAGAY:

25       Q    Do you know what the purpose of -- why would

170

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   GGW Direct be transferring money to Magazine?

2       A    No.

3       Q    Ms. Law covered a lot of these already.  On

4   page 18 of 19 and that's document page 21 of 26 at the

5   top, Ms. Law discussed with you some transfers from

6   Direct to argyle online for license fees.  I can't

7   recall if she asked, do you have any rule or

8   responsibilities with argyle online?

9       A    No.

10      Q    Have you had any dealings or discussions with

11  argyle online?

12      A    No.

13      Q    And on the last page of that report, page 19

14  of 19, document page 22 of 26 it says there that

15  $50,000 were paid to the law offices of Robert Yaspan.

16  Just so I'm clear, so did Direct pay to Mr. Yaspan

17  amounts on behalf of all of the entities or some of the

18  entities or just Direct?

19      A    You know, I'm not certain.  May I ask -- do

20  you know that answer?

21           ROBERT YASPAN:  He's asking you.

22           THE WITNESS:  Yeah, I don't know.  I'm not

23  certain.

24  BY MR. PAGAY:

25      Q    I'm now looking at document page 4 of 26,

171

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    attachment three c to the statement of financial

2    affairs.  It says payments to insider Chris Dale from

3    2/27/12 to 2/27/13.  Do you see where I'm looking?

4        A    Yes.

5        Q    Okay.

6             ROBERT YASPAN:  You can switch them.

7             THE WITNESS:  That's all right.

8    BY MR. PAGAY:

9        Q    It shows from March 9, 2012, through

10   November 16, 2012, numbers and varying amounts from

11   around 2000 to 3000 and then November of about 6000.

12   Do you know why the jump in November of 2012?  Why you

13   would have received the jump in payments?

14       A    I -- I don't remember exactly.  I think that

15   that was when I transitioned into the management role.

16       Q    And then subsequent to that 6688.80 payment

17   your payments then became all these round numbers of a

18   thousand, a thousand, $2,500 throughout the period up

19   to February 22nd, 2013.  Why now all these sort of

20   perfect round numbers?

21       A    That related to my change over in transition

22   to the management position.

23       Q    Okay.  So the prior to -- to let's say

24   November 30, 2012, when these sort of round number

25   payments started, were you serving as human resources

172

TRANSCRIPT OF PROCEEDINGS                BARKLEY
                                    Court Reporters

1  director?

2      A    Yes.

3      Q    And then when you changed to your manager

4  position, your pay was dramatically cut it looks like;

5  is that accurate?

6      A    Yes.

7      Q    And how would you -- why would you get a

8  thousand versus 2000 versus 500?  Do you know what

9  would determine your payments?

10     A    I don't remember exactly why.  It should

11 generally be a thousand.  I don't know if maybe they're

12 recorded in a different fashion in here for some

13 reason.

14     Q    So you should be receiving $1,000 every two

15 weeks, is that --

16     A    Correct, yeah.

17     Q    I'm sorry?

18     A    Yes.

19     Q    Okay.  We turn another tab number nine, it's

20 the status report, this one filed on the GGW Direct

21 case.  It says at the bottom at lines 26 to 28 that GGW

22 Direct was distributed on the internet and otherwise

23 such as Dish TV and the hospitality industry.

24         Are there any other distribution channels

25 besides the internet, Dish, and hotels for GGW Direct

173

BARKLEY
Court Reporters

1    products?

2            ROBERT YASPAN:  Are there now?

3            MR. PAGAY:  Good point.

4    BY MR. PAGAY:

5        Q    Yes, are there now?

6        A    I don't believe so.

7        Q    Were there before?

8        A    Nothing that I'm aware of.

9        Q    So since you've become manager, GGW Direct's

10   product and service offering has remained constant?

11           ROBERT YASPAN:  Split that apart.

12           MR. PAGAY:  Okay.  Oh, you mean by the

13   petition date?

14           ROBERT YASPAN:  Yeah.

15   BY MR. PAGAY:

16       Q    Okay.  So let's say from the time you became

17   manager to the petition date --

18           ROBERT YASPAN:  Thank you.

19   BY MR. PAGAY:

20       Q    -- was there any change in GGW Direct's

21   product -- or service offerings to customers?

22       A    I don't believe so.

23       Q    Okay.  What about from the petition date to

24   now?

25       A    Not that I'm aware of.

174

BARKLEY
Court Reporters

1      Q    Okay.  Turn now to tab number 11, this is the

2  declaration of Mr. Tym regarding the court's order

3  regarding various items I think on identifying the

4  schedules and statement of financial affairs.  In -- on

5  page 2 in the second paragraph two and I understand you

6  are not Mr. Tym although he's sitting next to you, it

7  says that -- that true and correct copies of the

8  American Express bills were produced except for certain

9  textural material not relevant to the making of the

10  payment.  Do you have knowledge of what was excluded,

11  what constitutes this textural material not relevant to

12  the making --

13        ROBERT YASPAN:  He doesn't.  I excluded it and

14  those were the text things that appear with the bill,

15  the page 2 of the bill typically has non-financial

16  stuff.  Pages 10 and 11 for example of an 11-page bill

17  has non financial stuff that are part of their

18  disclosures to you required by federal law.  The judge

19  only asked for financial documents not textural things,

20  so I took them out.

21        DARE LAW:  Do you mean like boiler plate

22  language or what do you mean?

23        ROBERT YASPAN:  Yes.  Exactly.

24  BY MR. PAGAY:

25      Q    Okay.  So that was the only -- so it was your

175

BARKLEY
Court Reporters

1    decision to exclude it and you said it was this boiler

2    plate information?

3          ROBERT YASPAN:  Right, it had to do with this

4    instructions from the judge.

5    BY MR. PAGAY:

6       Q    Okay.  So turning to Exhibit 1 to that

7    declaration, the first page of that is the opening page

8    of a statement that says GGW Brands, LLC Joseph R.

9    Francis with a closing date of November 23rd, 2012.

10   And then it shows on that page, says payments slash

11   credits, negative 124304.34.

12         How does GGW Brands pay these bills without

13   revenues?

14         ROBERT YASPAN:  Objection.  Calls for a fact

15   not in evidence.

16   BY MR. PAGAY:

17      Q    Okay.  Who paid these bills?

18      A    I'm not certain.

19      Q    Did -- so you don't know whether GGW Brands

20   paid these bills or I'm sorry, paid this bill?

21      A    I'm not sure.

22      Q    Okay.  It says at the bottom that the address

23   for this statement is P.O. Box 150 Hollywood,

24   California.  Is this P.O. Box used by any of the other

25   debtors?

176

BARKLEY
Court Reporters

1    A    I don't know.  Maybe.

2    Q    Do you know when this P.O. Box was opened?

3    A    No.

4    Q    Do you know what GGW Brands, LLC uses this

5  P.O. Box for?

6    A    I believe for billing purposes if anything.

7    Q    You mean receiving bills or issuing bills

8  or -- or receiving payments?

9    A    Maybe -- maybe both, probably -- I was

10 thinking of receiving.

11   Q    Do you know what Joseph R. Francis uses P.O.

12 Box 150 Hollywood, California for?

13        ROBERT YASPAN:  Again, assumes a fact not in

14 evidence that he uses it?

15

16 BY MR. PAGAY:

17   Q    Do you know if he uses it?

18   A    I don't know.

19        DARE LAW:  Let me follow-up with that.

20        MR. PAGAY:  Sure.

21 BY DARE LAW:

22   Q    Who collects the mail from that P.O. Box?

23   A    Office assistants, different people.

24   Q    Do you know if it's used for -- by any other

25 persons or entities other than GGW Brands or any of the

177

BARKLEY
Court Reporters

1   other three debtors?

2       A    I don't believe so.

3       Q    Why is there a P.O. Box?  Why do you need a

4   P.O. Box?

5       A    Just to -- like any business would use a P.O.

6   Box rather than its physical location for billing and

7   that kind of thing.

8       Q    And -- and I believe you said it was only used

9   for accounts payables, receipts of --

10           ROBERT YASPAN:  He said both.

11           THE WITNESS:  It could be -- it could be --

12  BY DARE LAW:

13      Q    You may use it for other purposes?

14      A    Receivables or payables I would say in some

15  cases.

16      Q    That's (inaudible) turn it pack to you?

17           ROBERT YASPAN:  I mean, Citi Bank uses a P.O.

18  Box, why didn't --

19           DARE LAW:  I'm just asking why.

20           THE WITNESS:  Am Ex themselves uses a P.O. Box

21  I can see, so --

22           DARE LAW:  Yeah, just wanted to know why.

23  That's all.

24  BY MR. PAGAY:

25      Q    Turning to page 2 of that same Am Ex

178

BARKLEY
Court Reporters

1  statement.  I recall that Ms. Law asked you -- listed a

2  bunch of names and asked you about them.  The one that

3  I'm having trouble finding in my notes is -- and I

4  apologize if it was asked already, is who is Thomas J.

5  Studer or Studder?

6          ROBERT YASPAN:  I don't think you did.  That

7  was the second one.

8          THE WITNESS:  Thomas.

9          ROBERT YASPAN:  Well, maybe (inaudible).

10          THE WITNESS:  I'm -- this is a guess, I

11  believe he was a -- one of the tour manager drivers,

12  like the Chris Rudins of the world.

13  BY MR. PAGAY:

14      Q    And as a tour manager driver, would he be --

15  would he have been working for GGW Events or a

16  different entity?

17      A    Most likely Events.

18      Q    Okay.  So it's accurate to say that -- that

19  this business (inaudible) and card account that has

20  names of GGW Brands, LLC and Joseph R. Francis on it

21  was used by -- with respect to -- to people related to

22  multiple of the entities?

23          ROBERT YASPAN:  Try that again.

24          MR. PAGAY:  Yeah.

25          ROBERT YASPAN:  The real objection is vague.

179

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   BY MR. PAGAY:

2       Q    Multiple of the debtors, I'm sorry.  I was

3   trying to compose the question as I kind of looked back

4   and forth and said all that stuff, so I apologize for

5   the question.  I'll try it again.

6            So is it accurate to say that this business

7   and (inaudible) account listed under the name of GGW

8   Brands and Joseph Francis was utilized for persons with

9   respect to more than one of the debtors?  That's

10  probably better.

11      A    Yes.

12      Q    At the bottom of this exhibit, there are

13  handwritten numbers.  Can you turn to -- to number 22.

14  It's also document number 13 of 56.

15           ROBERT YASPAN:  22.

16  BY DARE LAW:

17      Q    It's page 13 of 27 of the statement:  There

18  are a number of charges on October 26th, 2012, that are

19  all Pay Pal related.  How does -- do any of the debtors

20  utilize Pay Pal in their business if at all?

21      A    I don't know.

22      Q    So is Pay Pal used in any -- we'll start with

23  GGW Direct -- as part of its -- of its business

24  operations in any way?

25      A    I don't believe so.

180

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          Q     Okay.

2                ROBERT YASPAN:  Actually, these are payments

3    for use of license songs.

4                MR. PAGAY:  I'm sorry, license songs?

5                ROBERT YASPAN:  Yeah, that go out to the

6    various holders of the copyrights for the --

7    BY DARE LAW:

8          Q     The reason that I'm asking is if you turn to

9    the next pages, 24 and 25, you'll see more use of Pay

10   Pal for things like non fiction shopping services,

11   general software, I was just wondering are there

12   reasons why certain costs are being run through Pay Pal

13   and then being charged here rather than being charged

14   in some other way?

15         A     Nothing in that I'm aware of.

16               DARE LAW:  I'm sorry, what was that?

17               THE WITNESS:  Nothing I'm aware of and nothing

18   that strikes me, no.

19               MR. PAGAY:  Okay.

20               ROBERT YASPAN:  Well, you can buy things from

21   Pay Pal.

22   BY MR. PAGAY:

23         Q     Again, I'm asking just because of the use of

24   it through these accounts is quite extensive.  For

25   example --

                              181

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Right.

2     BY MR. PAGAY:

3          Q    -- on page 27 there's Pay Pal for fiverr.com.

4     Are you familiar with fiverr.com, F-i-v-e-r-r?

5          A    No.

6          Q    To my knowledge -- for what it's worth, it's a

7     place where you can pay somebody a minimum of five

8     bucks to perform some service for you, so I was just

9     curious as to what -- if that had anything to do with

10    GGW's business.

11          Turning now to page 29 handwritten at the

12    bottom, document page 20 of 56.  This is the last page

13    of this statement before it goes to a new exhibit and

14    it seems that we're missing pages 21 through 27.  Was

15    this all boiler plate that was redacted, do you know?

16          ROBERT YASPAN:  Yep.

17          MR. PAGAY:  Six pages of boiler plate?  Okay.

18          DARE LAW:  What number is that?

19          MR. PAGAY:  It's the first statement --

20          THE WITNESS:  Seven, it doesn't look like

21    there's no (inaudible).

22          MR. PAGAY:  It's the first exhibit.

23          ROBERT YASPAN:  He's not talking about that.

24          MR. PAGAY:  It's for --

25          ROBERT YASPAN:  He's talking about the 20 of

182

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   56.

2          MR. PAGAY:  November -- looks like the

3   November -- no, I'm sorry, let me (inaudible) -- it's

4   for the closing date of November 23rd, 2012.

5          ROBERT YASPAN:  And I got -- they deliver ads

6   to you.  You can (inaudible) the ads.

7          UNIDENTIFIED MALE:  I think the U.S. Trustee

8   has the complete (inaudible).

9          DARE LAW:  (Inaudible).

10          MR. PAGAY:  Yeah, I was just curious.  I mean,

11   a couple pages, I just didn't know what six pages of

12   missing (inaudible) okay.  Sure.  And again, I'm trying

13   to pause so I don't ask you the same thing because

14   Ms. Law stole my thunder.

15   BY MR. PAGAY:

16      Q    So if we can turn now to -- this might be a

17   new exhibit -- it's Exhibit 2 to the declaration.  It's

18   handwritten bottom of the page 36 document page 28 of

19   56?

20          ROBERT YASPAN:  Just give us the page at the

21   bottom.

22          MR. PAGAY:  Sure.  36.

23   BY MR. PAGAY:

24      Q    That lists a number of charges by a Sergio

25   Bravo who I believe you indicated in prior testimony

183

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    had something to do with activities in Mexico; is that

2    right?

3        A    Right.

4        Q    And I see charges for Mega Costco, Home Depot,

5    Electrica Leon it looks like.  Do you know what those

6    charges relate to?

7        A    No.

8        Q    Do you -- to your knowledge, do those charges

9    have anything to do with GGW Direct's business?

10       A    I don't know.

11       Q    What about any of the other debtors?

12       A    I don't know.

13       Q    Okay.

14            ROBERT YASPAN:  Well, you're -- you are asking

15   about transactions that are shown in Spanish.

16            MR. PAGAY:  True.

17            ROBERT YASPAN:  And you haven't asked him

18   whether or not he understands Spanish.

19            MR. PAGAY:  Well, I didn't think that -- let's

20   see, there's a Wal-Mart, there's Costco, Home Depot.

21            ROBERT YASPAN:  I got that part.

22            MR. PAGAY:  Those -- those aren't in Spanish

23   at least.

24            ROBERT YASPAN:  I got that part.

25   BY MR. PAGAY:

184

BARKLEY
Court Reporters

1      Q    Okay.  Turning again handwritten pages at the

2    bottom 41 and 42.  There again, a -- quite a number of

3    Pay Pal related charges.

4           Do you know what when Neo Points is that's

5    listed on one of the Pay Pal charges on the top of

6    page 42?

7      A    No.

8      Q    Okay.  And again on handwritten page 46, it

9    looks like it's page 18 or 19, I assume again that the

10   page 19 was -- was redacted.

11          ROBERT YASPAN:  Yes.

12          DARE LAW:  If I can interrupt, there's about

13   six pages of boiler plate and then there is an open

14   savings summary page which should have been included.

15   I don't know if that's the last page; but that --

16   that's the opening summary page has financial data, not

17   boiler plate.

18          ROBERT YASPAN:  Yeah, but they're in the $10

19   range.  It's less than $100 worth of -- and it has --

20   it's not --

21          DARE LAW:  No, there's a transaction for 350

22   on it.

23          ROBERT YASPAN:  $3.50?

24          DARE LAW:  No, $350 residence in Marriot, but

25   it looks like it's some sort of rewards program open

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   savings (inaudible) rewards program.

2           MR. PAGAY:  Does the document indicate -- not

3   that I should be asking you questions but for whose

4   benefit those rewards are -- are reflected?

5           DARE LAW:  Because you're looking at the

6   statement November 23rd, 2012, right.

7           MR. PAGAY:  Right.

8           DARE LAW:  The top of that page says, GGW

9   Brands, LLC, Joseph R. Francis.

10           MR. PAGAY:  Okay.  So to ask you, Mr. Dale,

11  the question is --

12           DARE LAW:  Page 27 of 27 of that statement,

13  that's the only one that actually has financial

14  information.  The boiler plate starts on -- one second.

15  The boiler plate starts on page 21 of 27.  So 21, 22,

16  23, 24, 25, 26 is boiler plate, 27 of 27 is that

17  summary that I just mentioned.

18  BY MR. PAGAY:

19      Q    Okay.  So Mr. Dale, to your knowledge, do you

20  know who utilizes the membership reward points with

21  respect to this card?

22      A    No.

23      Q    No.  Do you know if GGW Brands keeps records

24  of who -- of how these points are used?

25      A    I don't know.

186

BARKLEY
Court Reporters

1    Q    Do you know if any of the other debtors keep

2  track of how these points are used?

3    A    I don't know.

4    Q    Okay.  Same with handwritten payable 63, I

5  note that it's page 18 of 19 of the statement closing

6  January 24th, 2013, and it looks like page 19 is again

7  omitted.  I assume it's boiler plate or something else.

8         And if I could ask Ms. Law to confirm, page 2

9  I assume is boiler plate?  There's no other substantive

10  information on --

11         DARE LAW:  On the November statement?

12         MR. PAGAY:  On any statement.  They're missing

13  page 2s from all -- all of the documents filed with the

14  court.

15         DARE LAW:  Let me see.  Page 2 just has a name

16  on the left-hand corner, account ending number, and the

17  rest is boiler plate.  It actually looks like it has a

18  chain of address form.

19         MR. PAGAY:  Okay.

20         DARE LAW:  So yes, that's pretty much boiler

21  plate.

22  BY MR. PAGAY:

23    Q    So looking at handwritten bottom of page 66,

24  document page 4 of 46, which is a statement at the top

25  says Joseph R. Francis and it relates to a closing date

187

BARKLEY
Court Reporters

 1    of February 21, 2013, so just prior to the bankruptcy

 2    being filed, on page 66 there are two Alaska Airline

 3    charges, one for Joseph Francis, one for an Abby

 4    Wilson.

 5          Do you know what -- whether or not those

 6    charges relate to the business of GGW Brands?

 7    A     I don't know.

 8    Q     Do you know what the purpose of those changes?

 9    A     No.

10    Q     Do you know whether they relate to the

11    business of any of the debtors?

12    A     I don't know.

13    Q     Okay.  And same on handwritten page 86.  It's

14    24 of 25, page 25 is missing of the February 21, 2013,

15    statement.

16          Now, looking at Exhibit 5 which begins on

17    handwritten page 87 and that's document page 26 of 46,

18    this states that business green reward cards Perfect

19    Science Labs Joseph R. Francis.  What does this have to

20    do with the business of GGW Direct?

21          ROBERT YASPAN:  Excuse me?

22    BY MR. PAGAY:

23    Q     What does this -- this charge account have to

24    do with the business of GGW Direct?

25          ROBERT YASPAN:  Nothing.

188

BARKLEY
Court Reporters

1          THE WITNESS:  I don't know.

2          ROBERT YASPAN:  No, it has nothing to do with

3    it.  It has to do with the court order which talks

4    about certain things and the backup for the making of

5    the payments.

6    BY MR. PAGAY:

7        Q    Okay.  So -- but I understand you testified

8    earlier Perfect Science Labs is a -- is a tenant with

9    respect to property that's utilized by one or more of

10   the debtors; is that right?

11       A    Yes.

12       Q    So what -- what role does Perfect Science Labs

13   have with respect to -- to any of these debtors?

14       A    I don't fully --

15       Q    I'm sorry, so what -- I'm sorry, what business

16   relationship does Perfect Science Labs have with

17   respect to any of these debtors?

18       A    I think an employee lease agreement and sub

19   lease.  I don't know anything beyond that.

20       Q    So the employee lease agreement and a sub

21   lease you say are the only two basis for relationship

22   between Perfect Science Labs and any of the debtors to

23   your knowledge?

24       A    At this moment, that's all I can think of.

25       Q    Okay.  Do you know whether Perfect Science

189

BARKLEY
Court Reporters

1    Labs operates any business?

2           ROBERT YASPAN:  Before we get to that, how

3    much longer are we going to go?  Because I'm getting

4    tired and I need to have lunch if we're going to go and

5    I have to cancel a group of meetings and people are

6    already on their way because the meetings were at 2:00

7    which are reasonable.

8           DARE LAW:  Understand.  Counsel, how much more

9    do you think you've got?

10          MR. PAGAY:  Well, let me just -- on this

11   debtor?

12          DARE LAW:  This debtor.

13          MR. PAGAY:  All right.  Let me just check.  I

14   have questions about -- once we're finished with this

15   particular statement, the only other questions I have

16   with respect to this debtor relate to the trademark

17   license agreement.

18          ROBERT YASPAN:  I don't know about --

19          DARE LAW:  Time wise, how much time do you

20   think you might need?  Trying to give counsel an

21   estimate.

22          MR. PAGAY:  Maybe a half hour or so?

23          DARE LAW:  Half hour.

24          MR. PAGAY:  At the most.  At the most.

25          DARE LAW:  Okay.  Because I have about maybe

190

BARKLEY
Court Reporters

1  five minutes' worth of questions more --

2          MR. PAGAY:  Yeah, my half hour might be high

3  because I think he's already answered some questions

4  that you posed to him about the trademark license

5  agreement.

6          DARE LAW:  Right.

7          MR. PAGAY:  So it may be as short as 15,

8  20 minutes.

9          ROBERT YASPAN:  Well, I would request that

10  this be continued.

11          DARE LAW:  We can do that.

12          ROBERT YASPAN:  Because we have to come back

13  for Events.

14          DARE LAW:  Yes, we're going to come back for

15  the other two.  How about we let him go for like

16  another ten minutes?

17          MR. PAGAY:  Sure.  And might -- might even end

18  then.

19          DARE LAW:  Can you go for another ten

20  minutes --

21          ROBERT YASPAN:  Yes.

22          DARE LAW:  -- before I continue?  Okay.  Go

23  ahead for now.

24          ROBERT YASPAN:  You okay?  You need to take a

25  break?

191

BARKLEY
Court Reporters

1          THE WITNESS:  No thanks.

2          DARE LAW:  Oh, we're going to break soon

3    anyway so -- regardless, so go ahead.

4    BY MR. PAGAY:

5      Q    Okay.  I think the last question I asked you

6    and I can't remember was whether or not you were aware

7    of what type of business Perfect Science Labs was

8    engaged in?

9      A    I believe it's sold or sells skin care

10   products.

11     Q    And you'll see on the statement has a

12   statement address of P.O. Box 25000, Beverly Hills

13   90210.  To your knowledge, does any other -- do any of

14   the debtors use that address?

15     A    No.

16     Q    Do you know any other businesses that use that

17   address?

18     A    No.

19     Q    Do you know why GGW Direct would have paid a

20   charge on a Perfect Science Lab statement?

21     A    No.

22     Q    Okay.  Turning now to Exhibit 6 to the

23   declaration.  Do you recognize Exhibit 6?

24     A    Yes.

25     Q    What is it?

192

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     A    I believe it is the license agreement that

2  takes the license of the (inaudible) up through May of

3  this year that we referred to earlier.

4     Q    And you're looking at handwritten page 96 at

5  the bottom which is the last page at least of the

6  agreement part of this license.  Is that your

7  signature?

8     A    Yes.

9     Q    Do you remember when you signed this?

10    A    I don't recall exactly.  I think it was early

11 February.  I don't remember exactly though.

12    Q    You think it was early February?

13    A    I don't know.  Probably around the time that

14 the agreement went into effect.  February 25th.

15    Q    Are you guessing or do you remember?

16    A    I'm guessing.

17    Q    Okay.

18         DARE LAW:  Do you know if it was before or

19 after the filing of the bankruptcy?

20         THE WITNESS:  I think before if the filing was

21 on the 27th.

22 BY MR. PAGAY:

23    Q    Okay.  Looking at page of the agreement which

24 is handwritten page 91, it says in consideration for

25 such license, licensee has paid argyle online, LLC a

193

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   license fee in the amount of 274250.52.  Do you see

2   where it says that?

3       A   Yes.

4       Q   Do you know how that license fee was

5   calculated?

6       A   No.

7       Q   Did you have a role in setting that license

8   fee?

9       A   No.

10      Q   Do you know what it's based on?

11      A   No.

12      Q   Did you authorize the payment of that license

13  fee?

14      A   I believe so.

15      Q   And I apologize if I asked you this before, do

16  you have any role or responsibilities with respect to

17  argyle online, LLC?

18      A   You did ask before and I said no.

19      Q   Okay.  Do you have the names of any persons

20  affiliated with argyle online, LLC?

21      A   No.

22      Q   So you've never dealt with anybody in

23  connection with argyle online, lack?

24      A   I don't think so.

25      Q   Okay.  So going back to the signature page,

194

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   page 96, handwritten page 96, have you ever had any

2   communications with Asia Trust Limited since you've

3   become manager of the debtor?

4       A    No.

5       Q    Do you know the names of any individuals

6   associated with Asia Trust Limited?

7       A    I've seen that name of the individual that

8   signed this before, but that's it.

9       Q    I'm sorry, what's that individual's name?

10      A    Angela Pope.

11      Q    Is that P-o-p-e?

12      A    I believe so.

13      Q    Okay.  Because you can hardly read it.  That

14  says -- and there's a second name.  Do you know who

15  that second name is?

16      A    No.

17      Q    Have you ever dealt with Ms. Pope?

18      A    No.

19      Q    Have you ever dealt with anybody else

20  representing Asia Trust Limited?

21      A    No.

22      Q    What about Hammer Smith Trust?  Do you see it

23  says by Asia trust limited as trustee of the hammer

24  Smith trust manager?

25      A    Yes.

195

BARKLEY
Court Reporters

1      Q     Have you ever had any dealings with the Hammer

2    Smith Trust?

3      A     No.

4      Q     Do you know what the Hammer Smith Trust is?

5      A     No.

6      Q     Do you know who its beneficiaries are?

7      A     No.

8      Q     Looking at handwritten page 98 it says pay per

9    view distributors.   To your knowledge, is that a

10   complete list of those service providers that do pay

11   per view services with which GGW Direct does business

12   with?

13     A     Looks complete.

14     Q     So none of them are omitted from this list?

15     A     I don't think so.

16     Q     Okay.   Does GGW Direct use the Girls Gone Wild

17   name for anything other than providing pay per view --

18     A     Or --

19     Q     -- distributions?

20     A     Well, for other videos that are offered

21   online, yes.

22     Q     And they're offered online through what --

23   through what method?

24     A     Through girlsgonewild.com streamable videos,

25   membership area, that kind of thing.

196

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q     But only through the girlsgonewild.com

2   website, no other means?

3      A     I don't think so, not with Direct.

4            MR. PAGAY:  That's all I have.

5   BY DARE LAW:

6      Q     Who manages the Girls Gone Wild website?

7      A     There's an online team, but the VP of online

8   would be the main person if you're asking for an

9   individual.

10     Q     Is that for Direct?

11     A     Yes.

12     Q     Done in-house?

13     A     Uh-huh.

14           ROBERT YASPAN:  Yes?  No.

15           THE WITNESS:  Yes.

16   BY DARE LAW:

17     Q     I believe you testified earlier that Blue

18   Horse is a Joe Francis entity?

19     A     I -- I think so.  I don't really know about

20   that Blue Horse.

21     Q     In reviewing the debtor's books and records,

22   there was a number of transfers to Blue Horse.  For

23   example, May 2012 there was a $50,000 transfer.

24   June 2012 there was $120,000 transfer.  July of 2012

25   there was a $20,000 transfer.  August 2012 there was a

197

BARKLEY
Court Reporters

1   $50,000 transfer.  September 2012, there was a $50,000

2   transfer and October 2012 there was a $40,000 transfer.

3   Why would those sums be transferred to Blue Horse?

4       A    I believe Blue Horse owns a property in Bel

5   Air and I would imagine those may be related to

6   expenses at that property or something along those

7   lines.

8       Q    Does somebody live at that property?

9       A    Mr. Francis uses the property, Joe Francis.

10      Q    Do you know if he lives there full time?

11      A    I don't know.

12      Q    I'm sorry?

13      A    I don't know whether he lives there full time

14  or not.

15      Q    Does anybody else to your knowledge use that

16  property?

17      A    I don't know.

18      Q    And what, if any, purpose does the debtor

19  entities of the Girls Gone Wild entities have to do

20  with that Bel Air property?

21      A    I think it's been used as a film location at

22  times.

23      Q    So for example, in 2012 to your knowledge how

24  many times, if any, has that location been used for

25  filming?

198

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A    I don't know.  I mean, if we're talking

2   November, December, I don't know whether it was -- and

3   I don't know before that.

4      Q    Is there some sort of formula to arrive at how

5   much should be paid to Blue Horse for use of their

6   property?

7      A    I don't know of one.

8      Q    Do you know if there's any formal agreement

9   with Blue Horse written for some calculation of

10  compensation for use of the property?

11     A    I don't believe so.

12     Q    Who approves these transfers of funds to Blue

13  Horse?

14         ROBERT YASPAN:  Are there any after November?

15         DARE LAW:  Well, there's one October and

16  Mr. Dale says he came in somewhere around October,

17  November, so there's one at least in October.

18         THE WITNESS:  Yeah, I don't remember.

19  BY DARE LAW:

20     Q    Do you know if there's been any payments since

21  to Blue Horse?

22     A    I don't know.

23     Q    Is any of the debtor entities still using the

24  Bel Air property for any purposes?

25     A    Not the entities I don't think.

199

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Q    So none of the Girls Gone Wild entities are

2    still using Bel Air house for any purpose?

3    A    I don't think so unless there's been filming

4    recently that I'm not aware of, but I don't think so.

5    Q    And is there any intent to use the Bel Air

6    property going forward for any purpose?

7    A    Potentially, yeah.

8    Q    I'm sorry?

9    A    I mean, potentially, but you know, nothing

10   set.

11   Q    And if the property is used going forward, how

12   would any monies, if any, be determined to be paid to

13   Blue Horse or any other entity who uses that property?

14       ROBERT YASPAN:  I have no idea what that

15   question means.  Could I ask that you rephrase?

16   BY DARE LAW:

17   Q    Yeah, sure.  If the debtor is going to use the

18   Bel Air property for any purposes going forward, do you

19   expect them to have to pay for the usage of that

20   property?

21   A    Potentially.

22   Q    And so if -- if monies were to be paid to be

23   used for that property, how would that be determined?

24       ROBERT YASPAN:  How would the amount be

25   determined?

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   BY DARE LAW:

2       Q    Yes, how would the dollar amount be

3   determined?

4       A    I don't know.

5       Q    So --

6            ROBERT YASPAN:  You're asking about something

7   that might occur in the future, so it'll be determined

8   when it gets determined.

9   BY DARE LAW:

10      Q    Has the debtor used the Bel Air property since

11  October 2012 to your knowledge?

12      A    I don't know.

13      Q    Has it used the property since the filing?

14      A    Don't know.

15           ROBERT YASPAN:  Well, we can find out if there

16  are any payments since the filing because we have that

17  resource here, but you don't want to ask that question

18  so I'll get you the information.

19           RONALD TYM:  And there have been no payments.

20           DARE LAW:  Yes, but if they used the property

21  and there's an expectation of payment, I want to know

22  that too.

23           RONALD TYM:  There's been no use, no payments,

24  and just because of the nature of it and trying to, you

25  know, stay as far away from the line as possible,

201

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   there's no intend to use or pay anything to people post

2   bankruptcy.

3   BY DARE LAW:

4      Q   Do you know what Blue Horse does?  I mean you

5   said it's a Joe Francis entity, but I don't -- that's

6   all I know about it.

7      A   I believe it's a Joe Francis entity.  I don't

8   know what it does.

9          MR. PAGAY:  Can I ask once follow-up?

10         DARE LAW:  Yeah, go ahead.

11         MR. PAGAY:  (Inaudible).

12   BY MR. PAGAY:

13      Q   Were you involved at all in -- in discussions

14   regarding agreements between any of the debtors and

15   Bell, one of the pay per view distributors?

16      A   No.

17      Q   Were you involved in any discussions

18   between -- regarding the relationship between any of

19   the debtors and Direct TV?

20      A   No.

21      Q   And what about --

22         ROBERT YASPAN:  He's already testified to

23   this.  He said nothing has come up since he started in

24   terms of a new agreement, these were all in place.

25   BY MR. PAGAY:

202

BARKLEY
Court Reporters

1    Q    So same answer, you weren't involved in any

2    discussions regarding the relationship with the debtors

3    and Dish Network, Lodge Net, or Viewer's Choice Canada?

4    A    Correct.

5    Q    Have you negotiated any transactions on behalf

6    of the debtors since becoming manager?

7    A    No new substantive contracts of any kind.

8    Q    I'm sorry, say that again.  I didn't hear you?

9    A    Nothing of substance in terms of a contract

10   that I would put against these things listed on

11   handwritten page 90.

12   Q    No, I'm not -- I'm talking about anything.

13   A    Oh.

14   Q    No?

15   A    Nothing substantive.

16   Q    Well, what do you -- what is non substantive

17   then?

18   A    Well, yeah, I'd say no.

19   Q    I'm sorry?

20   A    No, I have not.

21   Q    Nothing.  Okay.  Got it.

22        ROBERT YASPAN:  All right.  I really do have

23   to call.

24        DARE LAW:  I just have two names and then I'm

25   going to take a break whether we conclude or whether we

203

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   do something else.

2   BY DARE LAW:

3       Q     Who is Abby Wilson?

4       A     I believe she -- there's a TV show called "The

5   Hottest Girl in America" and I think she won a season

6   of that TV show.

7       Q     And who is Anatoli Pogorela?

8       A     An IT person for the company.

9       Q     Okay.  Since we're in the middle and

10  Mr. Yaspan needs to go, I'm actually going to continue

11  this.  I need to get a date so I need my calendar, and

12  then we will reconvene at that same date for the other

13  two debtors which we didn't get to.

14          Do you want to come back today or do you want

15  to come back another day?

16          ROBERT YASPAN:  There's no way I can come back

17  today.

18          DARE LAW:  Okay.  So if you give me two

19  minutes, I will actually go get my calendar, and I will

20  give you a date that will work for everybody.  Okay.

21  Okay.  Let me just get my --

22          (Pause in recording.)

23          DARE LAW:  Okay.  Back on the record.  The

24  341(a) meeting for GGW Direct case number 213BK15132SK

25  is continued to April 22nd at 9:00 and then GGW Events

204

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   will be continued to April 22nd at 9:00, case number

2   213BK15134SK.  GGW Magazines will be continued to

3   August (sic) 22nd at 9:00.  We're going to go

4   consecutive on the cases.  GGW Magazine is case number

5   13 -- 213Bk13 -- sorry, 15137SK.  So they're all

6   continued to February (sic) 22nd at 9:00.

7            ROBERT YASPAN:  April.

8            DARE LAW:  I will put the continuance on --

9            ROBERT YASPAN:  April.

10           DARE LAW:  Sorry, I don't know why I keep on

11   doing that.  April 22nd at 9:00 and I will put the

12   continuance on the docket.  Thank you.

13           (End of recording.)

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1              COURT REPORTERS CERTIFICATE

2    STATE OF CALIFORNIA        )
                                )   ss.
3    COUNTY OF ORANGE           )
     _____)

4

5

6         I, LISA DAY, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate Number CSR 12960 issued by the Court

10   Reporters Board of California and which is in full

11   force and effect.

12        I am not financially interested in this

13   action and am not a relative or employee of any

14   attorney of the parties, or of any of the parties.

15        I am the reporter that stenographically

16   recorded the testimony in the foregoing

17   proceeding and the foregoing transcript is a true

18   record of the testimony given.

19

20   Dated: April 8, 2013

21

22

23        _____Lisa Day_____

24

25


                        206

BARKLEY
Court Reporters

## $

**$0.99 (1)**
114:1
**$1,000 (1)**
173:14
**$1,846,577.96 (1)**
104:25
**$10 (2)**
25:21;185:18
**$10,000 (1)**
137:1
**$100 (1)**
185:19
**$100,000 (3)**
139:11;140:6,22
**$109,449 (1)**
122:9
**$120,000 (1)**
197:24
**$15,000 (1)**
150:2
**$15,074.47 (1)**
153:22
**$16,000 (3)**
108:9;109:15;150:2
**$2,500 (2)**
170:12;172:18
**$20,000 (3)**
105:11,16;197:25
**$209,250 (1)**
138:17
**$24,000 (1)**
30:9
**$240,000 (1)**
159:25
**$250 (1)**
128:4
**$26,308 (1)**
53:9
**$3.50 (1)**
185:23
**$300 (1)**
136:24
**$300,000 (1)**
161:20
**$330,251.97 (1)**
161:13
**$336,000 (1)**
26:21
**$35,000 (1)**
77:5
**$350 (1)**
185:24
**$37,420 (1)**
118:21
**$38,323.82 (1)**
154:2
**$4,000 (2)**
27:1;73:21
**$4,750 (1)**
157:6
**$40,000 (1)**
198:2
**$46,277 (1)**
140:23
**$5,000 (1)**
138:18
**$50,000 (4)**
171:15;197:23;198:1,
1
**$500,000 (1)**
138:18
**$523,879 (1)**
109:24
**$6,655,914 (1)**
133:13
**$60,000 (1)**
141:3
**$65,000 (1)**
141:11
**$727,904 (1)**
133:17
**$75,796 (1)**
19:6
**$8,066,864 (1)**
132:25
**$9.99 (1)**
114:1

## /

**/// (4)**
31:25;35:25;110:25;
161:25

## 1

**1 (1)**
176:6
**1.5 (2)**
130:4,20
**1.8 (1)**
102:22
**1/13/2013 (1)**
137:18
**1/31 (1)**
137:22
**1/31/2013 (1)**
138:2
**1/9 (1)**
137:1
**10 (3)**
77:14;142:8;175:16
**10,000 (1)**
52:20
**10:00 (1)**
44:19
**100 (3)**
26:14;73:2;131:20
**100,000 (1)**
26:20
**10940 (1)**
169:18
**1099 (6)**

134:21,22;135:23;
144:16,24;145:11
**1099-person (2)**
144:9,21
**11 (14)**
3:8;6:15;52:24;62:7;
69:20,25;70:5;91:17;
142:8;145:2;146:11,12;
175:1,16
**11-page (1)**
175:16
**12 (1)**
142:9
**12:00 (1)**
46:10
**124304.34 (1)**
176:11
**13 (3)**
180:14,17;205:5
**13th (2)**
5:22,24
**14 (5)**
134:11;142:9,13;
170:10,18
**15 (4)**
56:15;72:5;161:18;
191:7
**150 (2)**
176:23;177:12
**15137SK (1)**
205:5
**15th (3)**
112:10,13;113:11
**16 (2)**
73:22;172:10
**1601 (2)**
66:24;67:8
**17 (1)**
170:18
**18 (5)**
24:19;96:1;171:4;
185:9;187:5
**19 (11)**
77:15;167:23;170:10,
18;171:4,13,14;185:9,
10;187:5,6
**19B (1)**
168:17
**19C (1)**
169:2
**1st (2)**
86:13;154:6

## 2

**2 (9)**
48:6;78:21;142:8;
175:5,15;178:25;
183:17;187:8,15
**2/27 (1)**
141:11
**2/27/12 (1)**
172:3

**2/27/13 (1)**
172:3
**2:00 (1)**
190:6
**20 (6)**
56:15;123:20,24;
182:12,25;191:8
**2000 (2)**
172:11;173:8
**2004 (1)**
154:6
**200-some (1)**
160:21
**2010 (7)**
8:17;76:20,21,25;
123:15;130:8;143:8
**2011 (6)**
16:17;49:19;67:16;
76:24;132:25;133:1
**2012 (33)**
16:17;18:15;49:24;
54:6;62:10,18;76:24;
130:8;133:13;145:22;
146:15;157:3;158:9;
159:3,3;161:18,21;
172:9,10,12,24;176:9;
180:18;183:4;186:6;
197:23,24,24,25;198:1,
2,23;201:11
**2013 (14)**
3:5,11;50:3;76:24;
91:11,13,19;136:23;
154:6;158:9;172:19;
187:6;188:1,14
**20ish (1)**
135:13
**20th (1)**
140:23
**21 (7)**
135:13;171:4;182:14;
186:15,15;188:1,14
**213 (1)**
91:18
**213Bk13 (1)**
205:5
**213BK15130SK (2)**
3:10;95:13
**213BK15132SK (1)**
204:24
**213BK15134SK (1)**
205:2
**219 (1)**
138:17
**21st (1)**
140:24
**22 (5)**
135:13;171:14;
180:13,15;186:15
**22nd (6)**
172:19;204:25;205:1,
3,6,11
**23 (3)**
27:14;165:9;186:16

**23rd (3)**
176:9;183:4;186:6
**24 (4)**
123:20;181:9;186:16;
188:14
**24th (1)**
187:6
**25 (4)**
181:9;186:16;188:14,
14
**25000 (1)**
192:12
**25th (1)**
193:14
**26 (7)**
170:18;171:4,14,25;
173:21;186:16;188:17
**262,000 (1)**
158:8
**263 (1)**
84:9
**26th (2)**
54:5;180:18
**27 (8)**
180:17;182:3,14;
186:12,12,15,16,16
**274250.52 (1)**
194:1
**27th (13)**
3:11;5:20;13:10,11;
61:15;62:19;63:1;74:25;
91:19;102:16;109:15;
113:4;193:21
**28 (2)**
173:21;183:18
**28th (2)**
77:5;113:4
**29 (1)**
182:11
**2nd (1)**
136:23
**2s (1)**
187:13

## 3

**3 (2)**
77:4;142:8
**3.3 (2)**
26:16,19
**30 (1)**
172:24
**30,000 (1)**
107:5
**3000 (1)**
172:11
**30th (1)**
86:8
**31st (1)**
154:6
**341a (5)**
3:8;45:3;87:7;91:17;
204:24

**350 (2)**
185:21
**36 (2)**
183:18,22
**37 (1)**
119:2
**3B (2)**
169:20,25
**3rd (1)**
170:11

**4**

**4 (3)**
142:8;171:25;187:24
**40 (1)**
115:4
**41 (1)**
185:2
**42 (2)**
185:2,6
**46 (3)**
185:8;187:24;188:17
**46277 (1)**
140:23

**5**

**5 (2)**
142:8;188:16
**50 (1)**
138:18
**500 (1)**
173:8
**523 (1)**
111:25
**523,879 (1)**
112:4
**523879 (1)**
111:15
**53,542 (1)**
112:3
**53000 (1)**
111:24
**56 (4)**
180:14;182:12;183:1,
19

**6**

**6 (4)**
142:8;165:9;192:22,
23
**60 (3)**
115:3;123:24;124:1
**60/40 (1)**
115:3
**6000 (1)**
172:11
**63 (1)**
187:4
**66 (2)**
187:23;188:2

**6688.80 (1)**
172:16

**7**

**7 (1)**
142:8
**730 (1)**
86:11
**75,000 (1)**
30:11

**8**

**8 (1)**
142:8
**8100 (2)**
152:17;153:4
**81000 (2)**
153:5;161:12
**86 (1)**
188:13
**87 (1)**
188:17
**87,000 (1)**
157:5
**87100 (1)**
157:5
**89000 (2)**
159:9,9
**8th (3)**
3:4;91:11,13

**9**

**9 (2)**
142:8;172:9
**9:00 (5)**
204:25;205:1,3,6,11
**90 (3)**
160:8;161:4;203:11
**90210 (1)**
192:13
**90-day (1)**
136:1
**91 (1)**
193:24
**941s (1)**
138:6
**96 (3)**
193:4;195:1,1
**98 (1)**
196:8

**A**

**Abby (2)**
188:3;204:3
**ability (1)**
114:5
**able (2)**
4:11;10:16,17;85:20;
93:10

**above (2)**
81:12;164:22
**accepts (1)**
116:25
**access (4)**
113:24;143:7,13,19
**According (7)**
7:10;10:3;26:8;38:4;
102:3;104:22;106:9
**accordingly (1)**
4:23
**account (32)**
53:16;54:16,18,19,23,
24;55:4,9,10;57:12,15;
87:15,16;104:1,2,3;
105:4;152:17;153:1,6,
14;157:4;159:6,9;
161:12;167:25;169:3,
11;179:19;180:7;
187:16;188:23
**accountant (1)**
119:9
**accountants (3)**
77:16;167:24;168:1
**accounting (32)**
13:23;31:6;32:5,8;
33:12,23;34:2,6,24;
37:16,19,20;41:20;
55:16;56:8;65:2;77:22;
78:12,12,14;80:16;
110:7;111:6;117:12;
130:16;131:12;141:13;
142:20;155:24;168:4;
170:3,5
**accounts (14)**
52:24;53:1,25;73:22;
103:16;109:24;111:19;
112:4;142:14;143:7,14,
19;178:9;181:24
**account's (1)**
56:14
**accurate (10)**
70:13;73:12;75:10,23;
78:13,24;167:25;173:5;
179:18;180:6
**achieve (4)**
69:20;70:5;71:1,5
**act (1)**
35:16
**acting (1)**
57:1
**action (3)**
130:19,23;134:18
**active (3)**
21:10;46:17,18
**activities (2)**
99:11;184:1
**activity (1)**
6:15
**actual (3)**
53:4;99:11;153:18
**actually (26)**
7:14;17:22;26:25;

31:21;50:15;52:6;75:6;
86:12,16,18;98:19;
101:11;106:6;113:6;
117:4;118:2,24;142:23;
156:2;159:9;162:4;
181:2;186:13;187:17;
204:10,19
**additional (1)**
81:12
**address (20)**
66:12,24;67:2,5,9,14;
84:8,8,10,11,16,17,25;
169:16,17;176:22;
187:18;192:12,14,17
**adjustment (3)**
161:13,14,20
**administer (1)**
3:25
**administered (3)**
4:6;45:25;93:5
**administration (3)**
46:1;61:10,11
**administrative (1)**
61:14
**ADP (1)**
129:18
**ads (2)**
183:5,6
**adult (1)**
84:20
**Advanced (2)**
151:6,6
**affairs (15)**
12:24;13:5;49:18;
50:14;52:23;76:23;77:4,
15;134:4,17;163:4;
167:23;169:21;172:2;
175:4
**affiliate (2)**
111:14,20
**affiliated (6)**
8:12;19:25;29:25;
38:25;50:8;194:20
**affiliates (15)**
27:2,3;73:15,15,16;
74:1;109:25;110:1,5,6,
18;111:23,25;112:2,3
**afternoon (1)**
163:21
**again (28)**
39:4,5,6;40:23;48:23;
60:17;71:3;74:18;77:10;
79:6;92:24;95:19;129:6;
141:12;156:17;163:21,
24;177:13;179:23;
180:5;181:23;183:12;
185:1,2,8,9;187:6;203:8
**against (7)**
12:14;18:9;24:13;
25:21,25;26:1;203:10
**age (2)**
96:1;132:21
**aging (1)**

112:5
**ago (8)**
16:16;42:18;78:21;
147:25;148:5,16,25;
164:6
**agree (3)**
7:18;92:22;132:8
**agreement (66)**
19:12;24:5;28:9,11,
16;33:8;38:11,12;39:2;
40:11;41:5,7,12,15;42:9,
25;43:2,10,12,19,21,24;
44:3,22;47:16,17,19,20;
48:6,9,11,16,20,23;49:2;
58:2,6,7;59:10,15;60:14,
22;119:15,19,20,22;
120:3;121:13,15,21;
122:2;131:23,25;141:5,
8;165:13;189:18,20;
190:17;191:5;193:1,6,
14,23;199:8;202:24
**agreements (4)**
165:10;166:13,17;
202:14
**agreement's (1)**
75:16
**ahead (10)**
28:6;34:1;41:2;80:23;
105:20;118:8;165:17;
191:23;192:3;202:10
**Air (7)**
198:5,20;199:24;
200:2,5,18;201:10
**Airline (1)**
188:2
**Alan (2)**
13:16;72:2;127:22;
135:17
**Alaska (1)**
188:2
**Alex (1)**
151:1
**Alicia (1)**
147:3
**allegation (1)**
95:24
**alleged (1)**
134:15
**alleging (2)**
134:19,20
**allocate (1)**
31:17
**allocated (2)**
33:5;35:2
**allocates (2)**
31:21;32:2
**allocation (3)**
33:14;35:20;36:19
**allocations (2)**
32:4,7
**allow (1)**
44:9
**Almost (6)**

84:5;114:11,14;
147:12;150:2;158:5

**along (8)**
13:11;18:2;20:21;
47:3;101:21;149:19;
163:1;198:6

**Alter (1)**
25:21

**although (1)**
175:6

**always (1)**
30:21

**amend (1)**
112:16

**amended (2)**
28:6;67:6

**America (1)**
204:5

**American (64)**
55:18,21;56:10,17,20;
57:4,8,17,22;58:3,9,23;
59:16;60:3,5,13,22;61:1,
6,22;62:2,5,21,24;63:3,
8,10,18;64:7,8,16,20;
65:3;86:17;99:16,17;
100:1;105:10,12,16,24;
141:20,25;142:14,18,22;
143:6,24;144:3,6,12,15,
24;145:12,22;146:1,4,
25;147:2;150:1;153:12,
16;162:3;175:8

**among (6)**
33:14;35:20;36:16;
38:2,2;166:21

**amount (17)**
19:6;24:11;52:18;
73:21;77:9;89:21;
102:22;104:6;105:5;
114:3;115:21;116:22;
133:1;138:17;194:1;
200:24;201:2

**amounts (4)**
27:3;158:6;171:17;
172:10

**Amy (1)**
15:9

**Anagos (2)**
132:12;134:17

**analog (2)**
125:9,11

**Anatoli (1)**
204:7

**Andrew (1)**
152:6

**Angela (1)**
195:10

**Anoskiewicz (1)**
148:7

**A-n-o-s-z-k-i-e-w-i-c-z (1)**
148:9

**answered (4)**
71:6;108:1,23;191:3

**anti (1)**

115:16

**apart (3)**
46:2,10;174:11

**apologize (5)**
164:17;165:5;179:4;
180:4;194:15

**apparently (1)**
51:4

**appear (1)**
175:14

**appearance (2)**
3:12;91:20

**appeared (1)**
95:25

**appearing (1)**
51:11

**appears (1)**
154:10

**application (2)**
51:17;109:19

**applied (1)**
109:20

**applies (1)**
90:23

**apply (4)**
4:8;68:24;93:7;127:17

**appointed (2)**
69:2;80:2

**appointment (3)**
68:19,21;69:7

**apportioned (1)**
23:9

**approach (1)**
100:20

**approval (2)**
119:25;159:20

**approve (3)**
156:15;159:19;160:2

**approved (1)**
109:19

**approves (2)**
155:25;199:12

**approximately (1)**
158:7

**April (10)**
3:4;91:12,13;112:13;
113:11;204:25;205:1,7,
9,11

**area (1)**
196:25

**argumentative (1)**
67:19

**Argyle (13)**
138:14,19;139:23;
140:1;141:2,7;171:6,8,
11;193:25;194:17,20,23

**arm (1)**
96:12

**around (11)**
54:10,11,18;56:15;
67:16;101:12;148:16;
150:15;172:11;193:13;
199:16

**arrangement (2)**
52:15;101:18

**arrive (1)**
199:4

**Asaidnet (1)**
151:20

**Asia (4)**
195:2,6,20,23

**aside (4)**
85:12,17;102:23;
103:1

**aspects (3)**
18:10;31:7;102:24

**asserted (2)**
17:15;76:6

**asset (1)**
10:2

**assets (9)**
26:17,23;73:7,9;94:7;
95:1;122:8;126:3,6

**assigned (1)**
35:22

**assistant (4)**
149:2,3,19;162:25

**assistants (1)**
177:23

**associated (1)**
195:6

**Associates (1)**
164:23

**assume (4)**
92:10;185:9;187:7,9

**assumes (2)**
31:20;177:13

**assuming (1)**
4:25

**assured (1)**
51:14

**attached (1)**
134:7

**attachment (3)**
134:6;169:20;172:1

**attempt (1)**
25:24

**attempted (1)**
18:12

**attorney (32)**
3:5;7:3;12:18;16:4,14;
17:6,20;21:11;22:2,10,
15;24:10,24,25;25:3;
26:5;36:16;47:8;50:17;
83:16;91:14;102:17,18,
19;103:6;104:7;109:16;
136:25;139:13,14;
152:21;158:4

**attorney-client (2)**
68:4;69:22

**attorneys (10)**
22:18;63:22;67:23,25;
68:2,6;108:10,12,15,19

**attorneys' (1)**
95:23

**audited (1)**

168:18

**August (3)**
86:13;197:25;205:3

**authority (3)**
34:1,3;117:24

**authorization (1)**
118:8

**authorize (1)**
194:12

**authorized (1)**
34:14

**automobiles (1)**
157:6

**available (4)**
30:21;77:11;109:5;
110:20

**aware (10)**
74:15;75:21;76:10;
77:21;174:8,25;181:15,
17;192:6;200:4

**away (1)**
201:25

**B**

**back (28)**
13:4;27:4;38:11;42:1;
46:3,3;50:19;56:22;
66:22;79:21;94:16;
132:2,2;134:9,12;140:1;
150:15;158:10;161:8;
163:15;180:3;191:12,
14;194:25;204:14,15,16,
23

**background (1)**
43:17

**backtrack (1)**
97:1

**backup (1)**
189:4

**balance (6)**
27:12,12;53:9;54:20;
55:11;109:2

**bank (16)**
52:24,25;53:1,8;54:2,
17,19;55:2,4,7;87:15,16;
143:7,14,19;178:17

**bankruptcy (27)**
3:9;5:4;9:25;10:13;
11:5;7;28:9;42:7;48:10;
67:21,22;70:24;71:5;
91:17,25;93:25;95:19,
21;97:7;102:3;103:20;
104:25;146:19;155:4;
188:1;193:19;202:2

**bar (6)**
85:22,24,25;86:8;
100:19;101:14

**barely (1)**
66:16

**Barry (1)**
25:5

**Based (6)**

26:23;56:19;73:6,9;
90:4;194:10

**basis (5)**
73:1;80:15;135:2;
142:2;189:21

**bat (1)**
96:5

**became (18)**
24:7;26:4;58:15;
61:16,19,25;62:10;
103:8;126:4,10;144:2;
145:21;146:14;155:7;
159:21,23;172:17;
174:16

**become (4)**
146:10;156:1;174:9;
195:3

**becoming (3)**
106:17;145:17;203:6

**beginning (4)**
17:7;50:2;78:21;145:3

**begins (1)**
188:16

**behalf (15)**
24:5,21;26:5;43:21;
49:15,25;50:3;69:24;
90:13,16;101:23;
115:24;133:20;171:17;
203:5

**Bel (7)**
198:4,20;199:24;
200:2,5,18;201:10

**Belasta (1)**
132:15

**belief (1)**
143:3

**Bell (1)**
202:15

**bells (1)**
15:25

**belongs (3)**
17:10;122:11;131:13

**below (1)**
134:6

**beneficiaries (1)**
196:6

**benefit (2)**
160:12;186:4

**Bentley (1)**
156:21

**Benz (5)**
157:6,9,13,18,19,23

**Bernardino (2)**
19:19,20

**besides (1)**
173:25

**best (3)**
109:4;121:24;151:13

**better (5)**
70:2,10;125:15;
144:14;180:10

**Beverly (2)**
157:6;192:12

Case 2:13-bk-15130-SK Doc 65 Filed 04/09/13 Entered 04/09/13 22:16:17 Desc
Main Document Page 252 of 359

TRANSCRIPT OF PROCEEDINGS
341(a) Meeting of the Creditors

TRANSCRIPT OF PROCEEDINGS
April 8, 2013

**beyond (5)**
44:20;76:14;80:1;
82:12;189:19

**big (1)**
159:18

**bill (8)**
18:22;29:4;146:25;
150:2;175:14,15,16;
176:20

**billed (1)**
19:3

**billing (2)**
177:6;178:6

**bills (13)**
10:16,17;142:18,19,
23;159:19,21;175:8;
176:12,17,20;177:7,7

**binder (3)**
20:20;65:19;164:2

**bit (11)**
29:1;30:15;33:3;41:6;
42:4;45:7;46:21,25;
47:2;66:15;105:1

**BK15132SK (1)**
91:19

**Bless (1)**
162:23

**blocked (1)**
124:8

**Blue (16)**
81:20,24,25;82:1,15;
197:17,20,22;198:3,4;
199:5,9,12,21;200:13;
202:4

**Blutt (7)**
17:19;18:14,17,22;
19:10,13;128:15

**BN (3)**
150:21,22,23

**boiler (13)**
175:21;176:1;182:15,
17;185:13,17;186:14,15,
16;187:7,9,17,20

**book (5)**
26:24;119:5;120:20;
122:9;124:19

**booking (1)**
98:19

**bookings (2)**
98:3,9

**bookkeepers (3)**
77:17;167:24;168:1

**bookkeeping (1)**
77:22

**books (8)**
78:14;118:25;119:7;
167:25;169:3,11,15;
197:21

**Both (4)**
65:10;113:21;177:9;
178:10

**bottom (10)**
170:18;173:21;

176:22;180:12;182:12;
183:18,21;185:2;
187:23;193:5

**Boulevard (3)**
66:25;67:8;164:10

**Box (12)**
176:23,24;177:2,5,12,
22;178:3,4,6,18,20;
192:12

**Brand (17)**
9:19;26:5;28:3;38:13;
49:7;59:1,1;67:15;
82:24;86:19;88:7,25;
89:10;96:21;128:20;
131:16;141:22

**Brands (162)**
3:9;6:12,13,16,23;
7:11,15,20;8:13,23;9:16,
22,25;10:14;12:7,9,13,
14;16:9,11,22,23,25;
17:1,21,23;18:13,23;
19:13;20:5;22:4,6,16;
23:5;24:3,5;25:17;
27:16,20;28:8,19;29:15,
18,21;30:1,7,11;31:9,14;
32:11,17,23;36:3,19,22;
38:5;39:14,16,18,22;
42:19;44:20,22;45:6,7,
12;46:25;47:2;48:25;
49:2,11,15,19,25;50:4,6,
8,11,18;51:5;52:12;
54:25;55:14,22,23,25;
56:1,4,11;57:1,17,23;
61:5;64:12,17;65:12;
67:2,9;69:19;71:4;74:4,
20;75:6,8,22;76:19;77:6,
16,24,25;78:4,15,22;
79:9,10,13,20;80:4,14,
19;81:16;82:9,15;83:7,
21;87:22;92:9;94:25;
95:13,15,22;96:12;
99:18,19,23;110:16;
116:8;121:17;126:13,13,
24;127:25;130:1;131:4,
6,7;132:23;144:8;
156:24;164:4;167:18;
169:4;176:8,12,19;
177:4,25;179:20;180:8;
186:9,23;188:6

**brand's (1)**
86:20

**Brands' (3)**
22:18;57:11;87:4

**Bravo (3)**
162:16,17;183:25

**break (8)**
12:4;86:23,24;87:3;
136:5;191:25;192:2;
203:25

**Brian (5)**
16:1,4,7;37:15;147:14

**Bridge (2)**
164:23,24

**brief (4)**
6:12;14:19;67:12;
94:20

**briefly (1)**
139:20

**broad (2)**
79:14;82:11

**Bronsen (1)**
129:24

**Brook (1)**
149:1

**brought (2)**
34:5;135:4

**bucks (1)**
182:8

**Buddha (1)**
151:13

**built (1)**
121:13

**bulk (1)**
160:20

**bunch (2)**
12:1;179:2

**business (44)**
8:13;9:10;19:24;29:5,
8;30:23;46:19,20;64:10,
12;69:2;72:21;78:4,8;
79:13,20,24;80:3;82:14,
15;84:22;85:13;90:20;
96:18;114:19;115:2;
154:22;168:20;178:5;
179:19;180:6,20,23;
182:10;184:9;188:6,11,
18,20,24;189:15;190:1;
192:7;196:11

**businesses (1)**
192:16

**busy (1)**
46:18

**buy (1)**
181:20

**C**

**calculate (1)**
73:3

**calculated (2)**
73:23;194:5

**calculating (1)**
90:7

**calculation (1)**
199:9

**calculations (2)**
90:12,18

**calendar (2)**
204:11,19

**California (8)**
3:7;52:25;53:8;54:3;
66:25;91:16;176:24;
177:12

**call (4)**
45:2,13,14;203:23

**called (5)**

20:16;115:12;164:22;
167:9;204:4

**Calls (2)**
17:13;176:14

**came (6)**
75:15;100:18;118:24;
152:15;159:19;199:16

**can (78)**
6:8;7:18;10:24,25;
14:5;20:16,20;21:16,18;
26:8;28:24;29:1;30:14,
22;31:8,23;34:8,20;
41:6;46:25;51:14;57:25;
63:11;65:14,20;66:15,
16,19;69:4;75:13;76:14;
77:11;79:2;84:18;85:13,
13;87:8,9;93:23;94:16;
96:15;104:4;105:2;
108:12;111:5,7;114:14;
118:14;119:9;120:20;
126:23;128:1;137:12;
138:11;139:7;143:9;
146:17;161:7,9,9;
163:17,18;170:17;
172:6;178:21;180:13;
181:20;182:7;183:6,16;
185:12;189:24;191:11,
19;195:13;201:15;
202:9;204:16

**Canada (1)**
203:3

**cancel (5)**
63:8,10;65:5,7;190:5

**cancellation (2)**
63:3,18

**cancelled (6)**
60:1,4;64:24;65:4,7;
145:23

**Canoga (1)**
84:7

**capacity (7)**
3:21;8:2;32:9;82:22;
92:4;168:3,9

**car (2)**
157:25;158:16

**card (40)**
57:4,8,11,15,22;58:3,
10,13,17,20,23;59:17,19,
22,25;60:13,23;61:2,7,
22;62:2,5,21,24;63:3,5,
5,8,19;64:9;142:1,20;
143:6;144:4,12,16,24;
146:1;179:19;186:21

**cards (29)**
55:14;56:11,17,25;
63:11;64:7,16,20;65:3;
99:17,17,19;141:21;
142:3,4,9,13;143:2,24;
144:7;145:8,12,19,23;
146:4;147:2;153:16;
162:3;188:18

**Card's (1)**
60:1,4

**care (2)**
13:16;86:25;192:9

**cars (3)**
38:5;157:16,19

**case (36)**
3:10,10;16:10;17:7;
18:11;20:19;38:9;46:6;
59:17;64:21;65:18;
67:22,22;68:13;69:20;
87:4;90:22,25;91:18,19;
94:20,22;95:13;96:5;
99:23;102:25;123:7;
128:14;139:15;142:2,2;
159:18;173:21;204:24;
205:1,4

**case-by-case (1)**
135:2

**cases (8)**
18:7;8;51:6;96:9;
128:14;156:2;178:15;
205:4

**cash (2)**
102:16,18

**categories (2)**
157:5;167:13

**categorized (1)**
134:21

**category (5)**
76:13;144:9;153:2;
159:7;161:12

**caused (3)**
10:13;11:6;95:20

**caveat (1)**
127:19

**CD (2)**
105:16,24

**cell (1)**
30:21

**Central (2)**
3:6;91:15

**certain (49)**
10:9;17:4;21:6;27:5;
28:18;40:16;53:20;54:4;
56:6;64:25;74:12;79:5;
84:19;89:5,11;96:2;
101:11,16;103:4;
106:16;110:17;114:3;
115:23;116:5;119:24;
121:22;123:8;124:18;
125:5;130:24;132:18,
19;133:22;136:24;
137:19;138:10,21;
139:10;150:10,16;
153:10;154:19;164:20;
171:19,23;175:8;
176:18;181:12;189:4

**Certainly (1)**
135:15

**certificate (1)**
105:9

**certification (1)**
134:18

**cetera (1)**

122:9

**chain (1)**
187:18

**chance (2)**
36:10;45:21

**chances (3)**
45:20,22,23

**change (2)**
172:21;174:20

**changed (1)**
173:3

**changes (1)**
188:8

**channels (1)**
173:24

**chapter (5)**
6:15;69:20,25;70:5;
131:5

**characterize (1)**
59:4

**charge (4)**
99:22,24;188:23;
192:20

**charged (3)**
86:18;181:13,13

**charges (13)**
86:18,18;99:11;
153:15;180:18;183:24;
184:4,6,8;185:3,5;188:3,
6

**charging (1)**
51:23

**chart (2)**
27:7,10

**Chazman (1)**
23:3

**check (4)**
99:24;130:16;156:3;
190:13

**checking (1)**
153:14

**checks (5)**
29:4;143:7,14,19;
156:11

**Choice (1)**
203:3

**Chris (4)**
24:4;148:19;172:2;
179:12

**Christopher (16)**
3:20,20,23;4:4;46:14;
92:3,3,6,8,12,15,18,21,
23;93:3;147:19

**circumstances (3)**
144:11,13;145:10

**Citi (1)**
178:17

**claim (25)**
13:16;14:15;16:1;
17:15;18:9,25;24:15;
25:21,21,23;26:6;72:2;
85:18;104:14;129:2,2,
21,22,23;132:14;135:16,

18;140:7,9;148:3

**claimant (1)**
132:20

**claimants (1)**
85:19

**claimed (3)**
20:22;140:8,13

**claims (3)**
17:14,15;20:19

**clarification (4)**
10:24;19:4;167:8,11

**clarify (6)**
35:15;74:19;79:23;
88:13;108:6;111:19

**class (1)**
134:18

**claw (1)**
161:8

**Clayton (5)**
129:3,3,11;135:21;
148:1

**clear (5)**
4:17;5:2;73:1;93:16;
171:16

**client (1)**
22:19

**Clips (2)**
29:24,25

**Close (8)**
6:4;44:19;54:15,19;
55:10;86:15;89:22;
145:22

**closed (10)**
54:5,12,17,18;55:4,5,
7;63:5,6;87:19

**closing (6)**
53:9;55:9;176:9;
183:4;187:5,25

**Clover (4)**
66:24;67:8;164:5,9

**code (2)**
3:9;91:17

**co-debtors (3)**
49:13;75:20;127:11

**co-debtor's (1)**
76:12

**collect (1)**
25:24

**collected (2)**
111:15;112:5

**collection (2)**
130:19,23

**Collective (1)**
67:23

**collects (1)**
177:22

**colloquy (1)**
10:25

**combination (2)**
99:14;125:12

**combined (4)**
26:17;88:8,9,10

**coming (1)**

89:17

**comment (1)**
27:19

**common (2)**
20:18;75:22

**commonality (1)**
45:1

**communications (2)**
68:6;195:2

**companies (19)**
6:14;10:14;19:22;
20:1,3;23:11,18;32:3;
35:16,17;59:21;78:23;
85:12;119:16;126:13;
150:21;156:21;167:6,9

**company (67)**
6:14,18;8:7,10,12,15;
10:9;15:1,6,21;19:20,24;
23:20;29:22,23;30:18;
39:2,9,9,10;69:12,24;
70:24;73:18;88:5;97:20;
115:11,25;116:25;117:3,
7,14,20;118:3,14;
122:12;125:16;126:2;
129:4,8,17;136:2;
138:19,20;140:6;
142:24;143:1,8;145:4;
147:8,11,17,21,22;
148:20;149:2,5,21,24;
150:25;155:22;160:22;
162:22;166:22;167:5,9;
204:8

**company's (6)**
66:11;69:8;83:24;
120:21;123:14;142:16

**compensation (9)**
88:16,23,24;89:3,7,17,
18;90:14;199:10

**competitive (1)**
115:16

**complete (3)**
183:8;196:10,13

**component (1)**
20:21

**compose (1)**
180:3

**compound (2)**
32:19;60:19

**comprise (1)**
31:6

**computer (5)**
20:21,25;114:9,11;
122:14

**concept (1)**
98:14

**concerned (1)**
51:16

**concerns (3)**
11:8,10;25:11

**conclude (1)**
203:25

**concluded (2)**
11:23;91:8

**conclusion (3)**
17:14;36:6;75:16

**concurrently (2)**
45:10,12

**conducting (1)**
66:19

**conference (1)**
103:22

**confirm (1)**
187:8

**confusing (1)**
98:5

**confusion (2)**
35:21;170:15

**connection (3)**
6:23;16:6;194:23

**consecutive (1)**
205:4

**consent (1)**
122:15

**consider (1)**
166:5

**consideration (1)**
193:24

**consistent (1)**
116:20

**consolidated (1)**
45:24

**constant (1)**
174:10

**constitutes (1)**
175:11

**consult (1)**
32:14

**contact (3)**
18:16;21:11;94:24

**contain (1)**
5:15

**contained (2)**
6:6;112:14

**content (9)**
116:24;117:8,15,19;
121:3,6,7,21;123:22

**continuance (2)**
205:8,12

**continue (7)**
45:14;46:11,25;50:22;
66:19;191:22;204:10

**continued (5)**
191:10;204:25;205:1,
2,6

**contract (14)**
48:11;115:6,20;116:7;
117:20;118:4;129:6,12;
131:18;132:10;165:22;
166:6,20;203:9

**contracts (21)**
18:3;48:15,19;84:1,4;
94:22;107:12;117:24;
118:2,8,11,13;129:15;
166:3,7,12,21;167:13,
14,15;203:7

**contractual (1)**

165:22

**controller (1)**
147:7

**controls (3)**
146:6,15,18

**convenience (2)**
7:14;100:12

**convenient (1)**
46:4

**convert (3)**
90:1,9;91:4

**coordinates (2)**
162:9;163:4

**coordinating (1)**
101:22

**copies (3)**
90:20,23;175:7

**copy (1)**
94:4

**copyrights (1)**
181:6

**corner (1)**
187:16

**corporate (6)**
45:16;55:15;59:2;
140:12,19;163:10

**corporation (2)**
9:6;53:5

**corporations (1)**
140:17

**corrected (1)**
6:9

**correctly (2)**
133:5;138:22

**cost (5)**
89:14;99:13;117:6;
146:15,18

**Costco (2)**
184:4,20

**costs (7)**
23:8;99:13;100:8;
102:23;103:2;104:8;
181:12

**Counsel (80)**
3:12,14,15,17;6:11;
10:21;13:23,25;14:1,
6,21,24;19:17;21:25;
22:25;24:1;25:2;37:1;
38:14,17,18;40:15,23;
41:3,20,21,22;42:5,6,7,
21,24;43:3,11;44:11,12,
14,14,16;47:6,8;48:17;
54:22;59:24;65:6,8;
70:6,7;75:12;78:20;
79:5;82:21;83:3;85:6,7;
91:1,20,22,23,25;94:12,
19;95:4;96:11;103:12;
107:10;108:18;126:17;
128:1;130:25;131:22;
134:3;137:12;158:23;
159:14;165:20;166:25;
190:8,20

**couple (9)**

12:17;14:2,4;29:13;
30:25;80:16;140:16;
164:6;183:11
**course (2)**
44:20,25
**court (12)**
4:7;5:5;25:19;51:15;
93:6;94:1;103:17,18;
122:6;127:6;187:14;
189:3
**court's (1)**
175:2
**cover (3)**
113:5;122:10;130:7
**covered (1)**
171:3
**covering (1)**
157:15
**create (1)**
97:2
**creates (1)**
99:10
**creating (2)**
85:15;97:7
**creator (1)**
59:7
**credit (2)**
55:14;57:15
**creditor (7)**
23:23;24:2;65:18;
85:18,19;163:16;164:22
**creditors (9)**
3:8;38:8;45:19;46:6;
75:21;85:14;91:16;
94:24;134:4
**credits (1)**
176:11
**crew (3)**
135:7,9,10
**Crocodile (1)**
164:18
**Croft (1)**
151:1
**crossed (2)**
18:12,13
**crosses (1)**
32:25
**crossing (1)**
100:6
**curious (2)**
182:9;183:10
**current (10)**
68:16;90:20;91:3;
107:8;109:2;121:19,23;
123:1;139:2;165:13
**currently (2)**
74:4;84:6
**curtailing (1)**
60:13
**Curtz (1)**
12:18
**customers (3)**
115:17;166:4;174:21

**cut (1)**
173:4
**cycle (1)**
151:18

# D

**DALE (49)**
3:20,20,23,25;4:4,6;
7:2;11:1;23:23;28:16;
34:16,18,21;36:2;46:14;
49:5;55:3;60:9;66:5;
68:15;72:13;79:12;88:2,
17,23;89:22;92:3,3,6,8,
12,15,18,21,23;93:3,5;
95:4;104:11,18;110:21;
120:18;139:25;141:16;
160:20;172:2;186:10,
19;199:16
**Dale's (5)**
61:11;88:23;89:17;
90:14;160:14
**Dana (1)**
12:17
**DARE (393)**
3:4,5,15,18,21,25;4:5;
5:21;6:3,11,19,24;7:1,9;
8:21;9:1,5;10:21;11:4;
12:3,8,11,25;13:3,8,11,
14;14:3,12;17:18;21:2,
19;22:5;23:4;25:2;
26:12;27:9,13,23;28:11,
15,23;31:23;32:1,21;
34:8,11;35:8;36:1,7,13;
37:1,4,6,11;39:7,17,20,
23,25;40:2,4,7;42:13;
43:16,20;44:15,21;45:4,
11,22;46:9,18,24;47:4;
48:8,19,25;49:3,4,10;
51:1,4,16,23;52:1,5,11;
53:15,21;55:1,3,8,13,23,
25;56:3,9,16,21,24;57:9,
13,16,21;60:3,5,8,18,20;
61:11,16,18;62:9,17;
63:24;64:1,5,6;66:15,18,
22;71:14;77:24;80:7,11;
81:17,19;82:13;83:12,
14;84:11,14,23;85:7,10,
25;86:9,11,14,24;87:2,6,
12,16,18,22,24;88:1,3,
13,15,22;89:16,20;90:3,
11;91:7,10,11,13,14,23;
92:1,4,11,14,16,19,22,
24;93:4;94:15,19;95:3;
96:14;97:4,6;98:7;99:3,
5,6;101:3,8;102:9,11;
103:12,14,25;104:5,10,
16,20,23;105:5,8,14,19,
22;107:10,19,22,24;
108:4,6,7,18,25;109:3,6,
10,14,23;110:21;111:1,
7,10,12,22,24;112:1,8,
12,19,22;113:2,4,10,13;
115:18;116:6;118:16,
19;119:6,10,13;120:17;
121:4,8,12,25;122:3,7;
124:7,11,14,21;125:10;
126:1,17,22;127:1,5,8,9;
128:1,3,9,19;130:18;
131:2,7,14,25;132:2,5;
133:4,8,12;134:3,10,12,
14;136:12,19,20;137:8,
12,15,18,21;138:1,8,11,
13,16;139:2,4,19,25;
140:4;141:9,15;142:12;
145:3,6,9;146:9,13;
149:12,14,16;150:5,8,
18,19;151:9,23;152:14,
18,21,25;153:3,6,7,13,
17,20;154:13;156:7,10;
157:14,20,25;158:2,12,
14,16,19,21;159:5,12;
160:6,9,12,18,22;161:2,
5,7;162:1,21;163:2,14;
165:17;175:21;177:19,
21;178:12,19,22;180:16;
181:7,16;182:18;183:9;
185:12,21,24;186:5,8,
12;187:11,15,20;190:8,
12,19,23,25;191:6,11,14,
19,22;192:2;193:18;
197:5,16;199:15,19;
200:16;201:1,9,20;
202:3,10;203:24;204:2,
18,23;205:8,10
**data (1)**
185:16
**date (30)**
5:13,15,24;27:7;54:8,
9;63:5;74:23;85:22,24,
25;86:8;91:10;105:17;
111:15;112:5;129:10;
133:16,16;138:6;
164:10;174:13,17,23;
176:9;183:4;187:25;
204:11,12,20
**dates (5)**
67:13;75:3,5,5;130:10
**David (6)**
83:1;102:20,21;128:4;
151:3,3
**day (7)**
6:1,1;30:18;112:25;
113:2,7;204:15
**days (5)**
113:4,5;140:21;160:8;
161:4
**day-to-day (1)**
29:6
**DBA (1)**
126:8
**deal (6)**
4:22;45:1;110:10;
114:17;118:3;168:3
**dealings (4)**
82:8,10;171:10;196:1

**deals (2)**
98:17;110:2
**dealt (6)**
18:16,20;168:8;
194:22;195:17,19
**debt (12)**
10:2,6,15;13:19,22;
16:3,7,16,19,20;17:8;
90:16
**debtor (104)**
3:14,17,22,24;7:15,22,
24;10:4;11:5,6;12:6,7,8,
9;17:11,11;19:5;23:1;
24:22;25:22;26:1,14;
30:8;31:13;33:9;34:15;
35:3,9;38:4;39:2;43:22;
50:22;51:7,9;52:2;53:1;
59:10;60:5,7;62:19;
63:7;84:6,15,25;90:5,19;
91:22,25;92:5;97:22;
100:18,20;102:4;104:1;
107:8;110:18;113:19;
115:25;116:16;120:8;
121:19,23;128:11,11;
129:14;131:15;132:6,16,
25,25;133:13,17,21;
135:11;140:18;146:7,
16;150:1;153:22;154:1,
14,20,25;155:10;159:14;
163:3,7,8;164:3,5,7,19,
24;168:19;169:4,6;
190:11,12,16;195:3;
198:18;199:23;200:17;
201:10
**debtors (39)**
6:18,19;7:16;23:15;
29:15;33:6;35:4;36:15;
51:10;59:5,11;88:21;
90:13;96:13,15;97:21;
143:21;155:5;156:18;
167:20;169:12;176:25;
178:1;180:2,9,19;
184:11;187:1;188:11;
189:10,13,17,22;192:14;
202:14,19;203:2,6;
204:13
**debtor's (8)**
3:9;70:8;90:24;91:18;
115:17;119:7;155:8;
197:21
**debts (2)**
49:15;127:12
**December (5)**
77:5;137:7,9;159:3;
199:2
**decide (1)**
33:8
**decided (2)**
36:21;38:12
**decides (1)**
120:12
**deciding (1)**
118:2

**decision (14)**
32:10,12,14;33:16,22;
36:24;38:15,20;43:9;
65:4;67:21,24;145:18;
176:1
**decision-maker (2)**
9:23;15:20
**decisions (6)**
22:19;29:3;33:21;
34:3;43:8;58:22
**declaration (8)**
89:16;141:14;157:13,
15;175:2;176:7;183:17;
192:23
**dedicated (1)**
33:1
**default (1)**
165:10
**defendants (2)**
23:7,8
**defending (2)**
11:16;95:23
**defense (1)**
102:24
**Define (1)**
144:13
**defining (1)**
110:8
**definitely (1)**
141:1
**degree (1)**
43:5
**delineation (2)**
36:17;100:9
**deliver (2)**
43:14;183:5
**delivered (1)**
122:5
**department (26)**
13:24;15:16;29:7;
32:5,8,13,17;33:12,23;
34:3;36:24;37:2,7;
41:20;55:16;56:8;65:2;
78:14,17;80:16,20;
117:12;130:16;141:13;
142:21;155:24
**departments (6)**
15:14,15;31:1,2,9;
37:22
**department's (1)**
110:7
**depending (1)**
105:1
**Depends (1)**
55:12
**deposit (9)**
103:15;105:9;106:1,2,
11,15,20;108:15;109:21
**deposited (3)**
102:21;103:5;106:5
**deposits (2)**
108:8,9,20;124:15
**Depot (2)**

184:4,20
**Dermatology (1)**
136:22
**describe (1)**
72:3
**detail (2)**
115:15;159:5
**determine (2)**
26:21;173:9
**determined (7)**
141:25;200:12,23,25;
201:3,7,8
**determining (2)**
25:15;33:13
**Deutsche (1)**
148:11
**difference (2)**
26:25;111:18
**different (24)**
15:13;31:8;32:3,3;
35:17;36:8;45:20;53:18;
71:13,15;72:25;74:18;
108:10;109:6,9;113:16,
24;114:2,3;135:9,10;
173:12;177:23;179:16
**differently (1)**
29:1
**digital (3)**
125:8,11,13
**Direct (138)**
6:20;7:17;10:10;20:5;
23:16;26:15,19;28:10,
14;30:1;31:14;32:10,17;
35:19,19,24,24;36:3,18,
18,23;39:14;45:2,2,8,13,
14;46:19,25;48:24;49:2;
50:18,19;52:22;55:19;
64:12,14,17;67:19;73:2;
75:16;77:6,7,23;79:9;
86:19,21;87:4,5;88:25;
89:9;91:18;92:11,14,17,
19,20;94:21;95:16,19;
96:16,17,24;97:1,7,15,
17;98:12,16,21,23;99:7,
9,15;100:7,8,10,24;
101:14,24;106:22;107:1,
24;110:9;113:15;116:7,
9,10;118:21;119:14,20;
122:11,20;123:3,6,14;
125:16,18;126:4,7,14;
127:12;128:11;129:14;
131:6,9,11;134:18;
136:21;139:1;141:23;
144:8;156:24;157:2,2,8;
165:23;166:22;167:25;
168:5;170:11;171:1,6,
16,18;173:20,22,25;
180:23;188:20,24;
192:19;196:11,16;197:3,
10;202:19;204:24
**directing (1)**
70:11
**direction (4)**

9:18;14:21;15:1;29:5
**directive (1)**
63:7
**directly (3)**
22:15;24:19;38:3
**Director (6)**
8:4;15:10;34:6,6;
149:19;173:1
**Direct's (4)**
168:19;174:9,20;
184:9
**disburse (1)**
90:6
**disbursement (2)**
90:12,18
**disbursements (1)**
90:5
**disc (1)**
122:21
**disclosure (2)**
35:1;84:5
**disclosures (1)**
175:18
**discussed (5)**
50:23;63:2,17;164:4;
171:5
**discussion (6)**
14:15,17;58:16,19;
60:25;61:21
**discussions (8)**
61:5;62:1,20;80:3;
171:10;202:13,17;203:2
**Dish (3)**
173:23,25;203:3
**dismiss (3)**
89:25;90:8;91:4
**dismissed (1)**
21:8
**dispute (3)**
19:9;103:19;129:20
**disputed (3)**
16:19;17:15;18:25
**distributed (1)**
173:22
**distribution (1)**
173:24
**distributions (1)**
196:19
**distributors (2)**
196:9;202:15
**District (2)**
3:7;91:15
**divide (2)**
62:13,14
**division (2)**
32:22;129:1
**divisions (1)**
31:8
**divulged (1)**
68:7
**docket (1)**
205:12
**document (12)**

77:4;94:3;170:18;
171:4,14,25;180:14;
182:12;183:18;186:2;
187:24;188:17
**documents (14)**
5:7,9,13,19;7:12;
54:15;65:19;87:14;88:1;
93:25;94:9;166:1;
175:19;187:13
**dollar (2)**
24:11;201:2
**dollars (2)**
53:14;101:15
**done (14)**
12:6;32:4,7;44:11;
84:5;97:24;98:18,20;
113:25;123:6;136:3;
165:13;158:16;197:12
**Dorota (1)**
148:7
**Dorsey (1)**
128:10
**down (8)**
12:4;51:20;73:4;
100:13;126:24;134:6;
165:19;169:21
**dozen (1)**
135:19
**dozens (1)**
124:6
**dramatically (1)**
173:4
**driver (2)**
147:20;179:14
**drivers (1)**
179:11
**due (20)**
27:1,3,3,4,6,6,10,10;
41:14;47:24;73:14,15,
25;112:9,12;113:11;
114:9;121:20;138:6;
141:6
**dues (2)**
154:2,14
**duplicate (5)**
65:22;71:20;72:5;
79:7;163:25
**during (20)**
38:16;58:22;60:25;
61:9,11;74:8,14;87:3,4;
90:21,24;100:17;
121:17;143:7,12;158:8;
160:2,13;163:7;168:23
**duties (2)**
28:24;59:11
**duty (1)**
90:22
**DVDs (3)**
20:24;97:8;121:7

**E**

**earlier (17)**

13:7;27:19,21;73:24;
74:3;75:8;84:23;88:4;
114:23;127:15;128:6;
138:25;141:21;160:21;
189:8;193:3;197:17
**early (2)**
8:16;83:24;193:10,12
**easier (1)**
111:8
**easy (1)**
65:23
**Eckhoff (7)**
17:19;18:14,17,22;
19:10,13;128:15
**edit (2)**
122:20;123:4
**editing (2)**
97:13;123:6
**educate (1)**
97:20
**effect (2)**
85:17;193:14
**effective (1)**
120:15
**E-gats (1)**
20:9
**ego (1)**
25:21
**Either (26)**
6:1;7:17;8:16;10:25;
11:23;16:5;32:4,7;
36:22;39:14,21;50:11;
51:9;65:6;95:14;97:8;
101:13,24;114:19;
122:21;126:7;150:25;
166:24;168:18;170:17,
17
**Electrica (1)**
184:5
**electronic (1)**
91:2
**else (18)**
15:12;54:13;59:3;
68:10;80:17;81:6;85:15;
105:10;108:3;131:20;
150:9;169:8,9,10;187:7;
195:19;198:15;204:1
**e-mail (1)**
30:21
**employed (1)**
50:22
**employee (17)**
33:7,16;48:16,20;
58:4;79:15;129:5,11;
134:21,21;144:8,16;
162:6,7,13;189:18,20
**employees (15)**
31:10;35:18,19;49:7;
74:4,7,15;129:7,15;
135:11,14;144:24;
145:11,11,15
**employer (1)**
134:24

**employment (8)**
51:17;109:19;134:15,
19;166:12,12,17;167:14
**end (7)**
44:1;91:9;98:15;
127:2;166:1;191:17;
205:13
**endeavor (1)**
82:17
**ending (1)**
187:16
**engaged (1)**
192:8
**enough (3)**
43:18;46:23;70:17
**entertainment (2)**
84:20;141:10
**entities (59)**
10:8;16:5,9;25:11;
26:18;29:18,21;30:5,8,
12;31:13;33:2,14,15;
35:5,21;45:16,23;46:1,5;
49:14;52:21;56:5;59:2;
61:5;64:13,15;73:7;
76:1,5;82:9,21,23;83:22;
85:6;88:7,10,25;89:10,
14;90:15;96:12;97:16;
127:11,15;143:15;
155:4;156:25,25;168:7;
171:17,18;177:25;
179:22;198:19,19;
199:23,25;200:1
**entitled (1)**
160:16
**entity (23)**
9:7;31:18;75:22;
77:21;82:4,6,8;94:22,23;
95:1;97:23;98:11,15;
125:17;126:15;139:12;
157:8;168:9;179:16;
197:18;200:13;202:5,7
**equipment (4)**
122:14;124:25;126:3,
6
**Equity (1)**
136:6
**Eric (1)**
148:11
**errors (3)**
6:6,8;95:9
**essence (1)**
6:16
**essentially (1)**
142:17
**established (2)**
110:24;115:8
**estate (2)**
103:15;104:25
**estimate (2)**
93:21;190:21
**estimating (1)**
93:20
**et (1)**

122:9

**E-Tags (5)**
20:10,11,13,15,19

**even (10)**
23:7;34:13;45:25,25;
52:6;66:16;90:16;
103:21;123:24;191:17

**evening (1)**
113:7

**event (6)**
97:18;98:19;113:8;
135:4;143:16;163:10

**Events (57)**
6:20;7:18;10:11;20:5;
23:16;26:20;30:1;31:15;
32:11,18;35:23;36:4,19,
22;39:14;46:14,21;
73:12;89:10;97:25;98:3,
8,20;99:10,15,23;100:7,
9,15,24,25;101:2,2,3,13,
20,24;110:13;116:8;
122:19;126:13,14;
135:1;156:22,23;157:1,
10,24,25;158:3,11,20,
20;179:15,17;191:13;
204:25

**everybody (2)**
133:4;204:20

**evidence (3)**
31:21;176:15;177:14

**evolving (1)**
120:19

**Ex (4)**
99:22;145:19;178:20,
25

**exact (8)**
53:14;67:13;75:3,5,5;
129:9;130:10;149:18

**exactly (11)**
11:11;52:14;73:16;
138:21;139:7;141:19;
172:14;173:10;175:23;
193:10,11

**example (22)**
32:24;33:16;34:22;
53:3;76:2,4;78:12;
97:14,19;109:13;
127:15;144:17,21;
147:3;153:21;155:15;
162:5;163:9;175:16;
181:25;197:23;198:23

**except (1)**
175:8

**exclude (1)**
176:1

**excluded (2)**
175:10,13

**exclusive (2)**
131:15;132:7

**exclusively (2)**
155:3;156:18

**excuse (2)**
12:17;188:21

**executive (2)**
149:2,3

**executory (4)**
48:11,15,19;107:12

**Exhibit (9)**
176:6;180:12;182:13,
22;183:17,17;188:16;
192:22,23

**existed (1)**
126:2

**existing (1)**
121:15

**exists (2)**
20:18;78:10

**exit (4)**
85:7;121:3,11,14

**expect (7)**
46:14,21;103:22;
105:6,6,7;200:19

**expectation (1)**
201:21

**expected (3)**
50:18;51:9,13

**expecting (1)**
52:1

**expense (3)**
141:17;152:14;159:8

**expenses (18)**
11:16;50:6,8;53:2,6;
64:11;100:2,15;141:24;
146:7;155:9,11,12,17,
23,25;159:10;198:6

**expire (2)**
90:21;165:13

**expires (1)**
90:24

**explain (7)**
28:24;29:1;30:22;
96:15;97:18,21;98:14

**Express (64)**
55:18,22;56:11,17,20;
57:4,8,17,22;58:3,10,23;
59:17;60:3,6,13,23;61:2,
6,22;62:2,5,21,24;63:3,
8,11,19;64:7,9,16,20;
65:3;86:18;99:16,17;
100:2;105:10,12,16,24;
141:20;142:1,15,18,22;
143:6,24;144:4,7,12,15,
24;145:12,22;146:1,4,
25;147:2;150:1;153:12,
16;162:3;175:8

**extensive (1)**
181:24

**extent (1)**
166:20

**F**

**face (3)**
59:3,6,12

**facilities (1)**
106:15

**facility (3)**
100:20;122:24;123:1

**fact (6)**
24:2;108:21;109:18;
165:12;176:14;177:13

**factor (2)**
11:6;95:20

**fair (5)**
9:21;36:2;43:18;
46:16,23

**Fairly (1)**
129:9

**fall (1)**
76:12

**familiar (8)**
81:20;82:18;83:9;
150:24;151:12,13,16;
182:4

**family (2)**
23:7,10

**far (5)**
60:11;121:16;135:24;
159:17;201:25

**Fargo (2)**
52:24;54:1

**fashion (1)**
173:12

**Favazah (4)**
24:15;25:10;132:20;
167:19

**favorable (1)**
132:9

**February (22)**
3:11;13:11;61:15;
62:19;63:1;74:25;91:19;
102:16;109:13;112:8,22,
23;113:10;140:23,24;
172:19;188:1,14;193:11,
12,14;205:6

**federal (2)**
25:19;175:18

**fee (18)**
100:22;101:4,7,9;
108:20;117:8;121:24,
25;130:5;140:18;141:2;
154:20,23,25;194:1,4,8,
13

**Feel (4)**
7:7,12;59:13;69:11

**fees (15)**
90:4;95:23;101:1;
103:2;104:8,15;108:8;
109:20,21;130:11;
139:5;141:6,8;153:9;
171:6

**few (8)**
30:14;74:18;81:17;
88:5;141:24;142:2;
165:19;169:21

**fiction (1)**
181:10

**Field (4)**
66:24;67:8;164:5,10

**figure (4)**
92:8;141:13;154:18;
161:9

**figured (1)**
158:18

**figuring (1)**
33:17

**file (20)**
9:25;11:6;13:7;21:3;
51:17;67:21,24;71:11;
84:7;88:16;89:23,25;
90:8;91:4;95:19,21;
103:23;112:22;126:17;
130:19

**filed (26)**
3:10;5:5,20,21;6:4;
10:9;11:5;13:8;49:22;
62:19;67:17;85:21,23;
89:24;91:19;94:1;112:9;
113:6;122:6;127:6;
130:22;139:18;165:21;
173:20;187:13;188:2

**filing (34)**
10:13;25:6;27:8;28:8;
48:10,12;50:3;59:17;
62:15,15;63:1;64:21;
68:13;85:8,16;98:8;
99:3,4,5;102:15;108:14,
22,24;109:15,20;123:7;
124:23;133:17;142:5;
146:19;193:19,20;
201:13,16

**filings (3)**
53:4;84:19,21

**film (13)**
97:23;101:14,15;
122:21;123:9;125:8;
141:10;152:19;157:4;
159:8;161:11;163:9;
198:21

**filmed (3)**
11:19;24:19;100:21

**filming (19)**
11:22,24;12:5;97:24;
98:18,19;101:18;
132:21;135:3;136:3;
137:10;140:12,19;
153:23;154:21;156:25;
158:24;198:25;200:3

**films (2)**
123:9;124:2

**final (2)**
123:4,7

**finalized (2)**
123:13,25

**finances (1)**
10:1

**financial (21)**
13:5;49:18;50:14;
52:23;76:23;77:3,15;
78:4,8;134:3,17;167:23;
168:18,21;169:21;
172:1;175:4,17,19;

**figure (4)**

**find (8)**
20:17;55:6;109:8;
124:6;137:12;138:11;
157:20;201:15

**finding (1)**
179:3

**fine (7)**
34:11;55:12;70:18;
94:18;106:1;127:5;
158:14

**finger (1)**
146:17

**finish (1)**
44:23

**finished (4)**
71:19;98:24;99:7;
190:14

**firing (1)**
29:3

**firm (5)**
25:5;51:22;65:17;
83:23;137:20

**firms (2)**
168:4;169:2

**first (23)**
3:7;13:4,15;21:20;
22:14;35:7,8;39:8;
40:25;66:5,7;71:24;
72:2;77:15;80:1;86:23;
91:16;114:1;115:10;
141:3;176:7;182:19,22

**fish (1)**
151:18

**five (10)**
30:16;78:21;88:6,9;
94:12;117:21;160:1;
164:2;182:7;191:1

**F-i-v-e-r-r (1)**
182:4

**fiverrcom (2)**
182:3,4

**fix (1)**
70:10

**fixtures (1)**
122:9

**flat (1)**
52:18

**flow (2)**
30:24;98:14

**Flying (1)**
164:18

**folks (3)**
20:17;43:7;73:17

**follow-up (2)**
177:19;202:9

**food (2)**
99:12;100:5

**footage (7)**
98:20,23;99:10,13,20;
100:3;157:2

**forget (1)**
101:20

**form (4)**
    34:20;84:5;87:10;
    187:18
**formal (6)**
    58:1,6;59:14;146:20,
    21;199:8
**formed (3)**
    8:15;143:8;145:4
**former (7)**
    16:4,14;82:21;129:5;
    147:7,20;148:3
**formula (1)**
    199:4
**forth (2)**
    166:1;180:4
**forward (3)**
    200:6,11,18
**fought (1)**
    21:8
**four (24)**
    23:15;29:15,16;30:16;
    33:14;35:4,4,16,17;
    45:19,22,23,23;46:1,4;
    59:2;78:19;88:6,9;
    127:3,15;134:17;155:4;
    156:18
**frames (1)**
    161:17
**franchises (1)**
    27:15
**Francis (51)**
    11:20;16:5,5,7,14;
    18:9;24:13;25:22,25;
    30:5;57:1,9,10,17,23,23,
    24;58:9,16,20;59:16;
    61:6,21,62:1,21;63:2,18;
    64:20;68:1,2;72:17,18;
    79:13,19;82:5,6;83:3;
    143:6;149:9;176:9;
    177:11;179:20;180:8;
    186:9;187:25;188:3,19;
    197:18;198:9,9;202:5,7
**Francis' (4)**
    57:15;58:3,25;60:22
**free (4)**
    7:7,12;52:7;59:13
**Friday (5)**
    87:25;88:1;126:25;
    139:18;165:21
**front (1)**
    44:3
**full (4)**
    104:6;114:3;198:10,
    13
**fully (1)**
    189:14
**functions (1)**
    72:13
**fund (1)**
    85:20
**funded (1)**
    89:13
**funding (1)**

89:6
**funds (3)**
    103:20;104:15;199:12
**furniture (1)**
    122:8
**further (1)**
    91:7
**future (1)**
    201:7

**G**

**gain (1)**
    71:13
**game (3)**
    120:11,15,19
**gardening (4)**
    150:2;153:9;155:17;
    156:7
**Garrell (1)**
    83:10
**G-a-r-r-e-l-l (1)**
    83:12
**gathered (1)**
    154:9
**gave (6)**
    27:11;122:19;124:3;
    157:1;162:2;164:3
**general (2)**
    10:14;27:15;29:4;
    76:1;84:2;104:1;152:17;
    153:13;158:24;159:6,7,
    13;161:13,20,20;181:11
**generally (5)**
    22:12,20;97:9;100:15;
    173:11
**gentleman (1)**
    82:20
**gentleman's (1)**
    22:1
**gentlemen (1)**
    86:14
**gets (4)**
    125:7;128:8;141:25;
    201:8
**GGW (109)**
    3:9;6:12,13,15,20,20,
    20;7:11,16;9:15;19:22,
    25;20:23;21:13;23:7,10,
    11,15;25:17;26:14;
    35:18,19;48:24;49:2;
    57:17,23;59:1;67:2,9,14;
    69:19;71:4;73:2;74:4,
    20;75:22;76:19;77:5,7,
    16,23;78:4,15,22;79:8,9,
    10,13,20;80:3,14,19;
    81:16;82:9;88:7,19,25;
    89:9,14;90:15;91:18;
    92:20;94:21;95:13;
    96:12;99:19;125:16;
    126:4,7,13;134:16,17;
    136:21;157:24;164:4;
    165:23;166:22;167:18,

25;168:19;170:22;
    171:1;173:20,21,25;
    174:9,20;176:8,12,19;
    177:4,25;179:15,20;
    180:7,23;184:9;186:8,
    23;188:6,20,24;192:19;
    196:11,16;204:24,25;
    205:2,4
**GGW's (1)**
    182:10
**Girl (1)**
    204:5
**Girls (20)**
    20:24;23:11;28:1,3;
    38:13;59:7,7,12;96:21;
    118:22;119:16;120:12,
    25;131:16;155:3;
    156:18;196:16;197:6;
    198:19;200:1
**girlsgonewildcom (2)**
    196:24;197:1
**given (12)**
    4:7;41:4;48:6;57:5,6,
    24,25;58:9;93:6;95:13;
    106:14;145:11
**giving (1)**
    15:1
**goal (2)**
    71:5;123:6
**God (2)**
    4:3;93:2
**goes (10)**
    43:24;47:21;68:3;
    69:21;73:4;79:21;97:12;
    120:5;157:18;182:13
**Good (9)**
    3:4;65:15;76:17;
    91:10;118:2;144:17,21;
    163:21;174:3
**goodness (1)**
    21:15
**Gotta (1)**
    32:19
**gracious (1)**
    21:15
**great (1)**
    45:1
**green (1)**
    188:18
**Gregory (1)**
    148:17
**gross (1)**
    133:1
**Group (2)**
    151:6;190:5
**guess (17)**
    4:22;16:9,18;93:20;
    99:22;114:25;115:1,5,5;
    123:17,21;124:3;
    125:13;134:25;148:5;
    161:14;179:10
**guessing (5)**
    4:21;93:19;114:24;

193:15,16
**guest (1)**
    116:21
**guidelines (1)**
    114:24
**guy (1)**
    79:3

**H**

**half (5)**
    134:5;135:19;190:22,
    23;191:2
**Hammer (4)**
    195:22,23;196:1,4
**Hancock (2)**
    149:10,17
**hand (4)**
    4:1;92:25;94:16;
    120:20
**handed (1)**
    98:20
**handful (2)**
    64:10;108:10
**handle (1)**
    159:14
**handled (1)**
    159:18
**handling (4)**
    21:12;22:2,15;24:21
**handwritten (14)**
    180:13;182:11;
    183:18;185:1,8;187:4,
    23;188:13,17;193:4,24;
    195:1;196:8;203:11
**happen (1)**
    84:25
**happened (5)**
    53:9;95:15;102:1;
    122:19;144:22
**happening (3)**
    14:25;30:18;78:2
**happens (6)**
    15:20;97:23;98:11;
    120:7;121:5;161:9
**hardly (1)**
    195:13
**Harrison (1)**
    148:17
**head (10)**
    32:22;37:20;55:17;
    78:17;80:8;81:1;108:13;
    147:20;148:12,19
**heads (10)**
    29:7;32:13,17;34:3;
    36:25;37:2,8,22;63:14,
    15
**hear (10)**
    27:21;32:6;33:4;47:1;
    66:16;69:17;92:15;96:5;
    103:1;203:8
**heard (5)**
    7:2;27:22;83:6;95:4;

113:15
**hearing (2)**
    86:10;87:21
**Heather (1)**
    149:1
**held (5)**
    3:8;73:7;91:17;
    103:11;104:7
**help (5)**
    4:3;21:17;35:15;93:2;
    163:14
**hereof (1)**
    127:22
**hey (1)**
    101:14
**high (1)**
    191:2
**highlighted (1)**
    155:14
**Hills (2)**
    157:7;192:12
**himself (1)**
    16:7
**hired (4)**
    18:14;68:15;158:25;
    159:15
**hiring (1)**
    29:3
**history (1)**
    142:17
**HOA (5)**
    153:9;154:1,14;
    155:17;156:8
**Hockman (1)**
    128:22
**hold (5)**
    8:5;29:17;39:3;44:23;
    86:21;87:6
**holder (6)**
    38:21;131:7,15,20;
    132:7;142:20
**holders (1)**
    181:6
**holding (7)**
    6:14;23:20;39:9;
    103:10,14;130:12;
    151:13
**Holdings (9)**
    8:25;9:2,9,12;69:9,12;
    72:14,17,21
**holds (4)**
    6:14;26:14;38:23;
    116:7
**Hollywood (2)**
    176:23;177:12
**home (5)**
    114:9,11;124:13;
    184:4,20
**hope (4)**
    69:20;70:5;71:12;
    105:2
**hopes (1)**
    71:1

**hoping (1)**
71:5
**Horse (16)**
81:20,24,25;82:1,15;
197:18,20,22;198:3,4;
199:5,9,13,21;200:13;
202:4
**hospitality (1)**
173:23
**hotel (3)**
114:21;115:6,12
**hotels (5)**
115:3;116:11;166:8,
10;173:25
**Hottest (1)**
204:5
**hour (5)**
46:10;132:14;190:22,
23;191:2
**hourly (5)**
52:15;129:20,23;
135:22,24
**hours (7)**
29:9,13;30:14,16;
88:5,6,9
**house (4)**
122:15,22;162:10;
200:2
**houses (1)**
117:5
**Houston (13)**
83:1,2;102:20,22;
103:6,10;104:7,14,17,
22;128:4;136:25,25
**HR (3)**
15:10;79:21;80:1
**Huang (1)**
152:4
**Huh (1)**
50:10
**Huh-uh (2)**
12:25;110:15
**human (6)**
8:4;15:7;29:22;33:14;
34:6;172:25
**Hyatt (1)**
129:24

**I**

**idea (2)**
138:7;200:14
**identifies (1)**
170:11
**identify (1)**
108:12
**identifying (2)**
115:19;175:3
**identity (3)**
68:5;109:16;145:15
**illegal (2)**
134:15,19
**imagine (10)**

6:2;20:20;41:23;
117:12;127:18;132:18;
133:24;151:11;154:16;
198:5
**immediately (1)**
45:8
**important (2)**
62:14;85:18
**improvements (1)**
161:14
**inaccurate (2)**
7:4;78:24
**inaudible (45)**
13:17;14:5;21:17;
38:18;52:4;53:3;55:19;
71:15;79:8,10;86:11,16,
16;88:14;92:10;103:16;
105:3;107:12;113:8,9;
119:4,10;132:16;
133:11;138:2,6;150:6;
152:15,18,22;160:25;
163:15;178:16;179:9,
19;180:7;182:21;183:3,
6,8,9,12;186:1;193:2;
202:11
**Inc (3)**
126:7;152:8;164:18
**inception (1)**
83:24
**inches (1)**
138:2
**include (6)**
13:22;17:14;48:16;
73:19;90:14;122:15
**included (5)**
84:3,4;90:11,17;
185:14
**including (3)**
15:4;82:24;94:24
**income (6)**
10:2,4,6,15;53:2;56:1
**incorrect (1)**
95:6
**incurred (3)**
16:16;109:11;130:8
**incurring (2)**
62:4;100:2
**incurs (2)**
99:11,13
**indicate (2)**
44:25;186:2
**indicated (9)**
35:15;67:4;75:21;
88:4;114:22;164:4;
165:20;169:5;183:25
**indicates (1)**
107:15
**indications (1)**
74:19
**indirect (1)**
6:25
**individual (9)**
35:3;46:6;78:7,9,11;

148:2;169:11;195:7;
197:9
**individuals (7)**
55:15;64:8;140:7,13;
168:17;169:2;195:5
**individual's (1)**
195:9
**industrial (1)**
129:1
**industry (2)**
121:10;173:23
**infer (1)**
138:22
**informal (2)**
58:7;146:23
**information (21)**
13:21;14:10;34:19;
41:19;54:23;85:1;87:8,
9;112:14;113:12;
118:15;123:11;128:2;
129:25;150:11;154:3;
160:17;176:2;186:14;
187:10;201:18
**infringed (1)**
20:25
**in-house (4)**
15:6;122:17;135:5;
197:12
**initial (4)**
13:12;51:6;52:2;
100:18
**initially (1)**
115:9
**injunction (2)**
103:18,19
**injury (5)**
13:18;15:24;127:22;
129:22;135:16
**input (1)**
22:19
**inside (1)**
22:17
**insider (2)**
88:16;172:2
**insiders (1)**
134:10
**insight (1)**
145:18
**instance (2)**
127:17,18
**instructions (1)**
176:4
**insurance (6)**
90:23,24;91:4;157:13,
14,15
**intact (1)**
106:20
**intangibles (1)**
27:15
**intellectual (12)**
6:17;27:17,20,24;
38:22;48:3;74:21;
118:20,20;119:14;

121:18,20
**intend (3)**
104:1;134:1;202:1
**intent (2)**
104:2;200:5
**interaction (1)**
69:8
**interest (9)**
9:15;26:14,15;27:16;
39:10;73:2;105:1,4;
167:14
**interface (2)**
14:24;23:18
**interfaced (1)**
26:4
**interfaces (2)**
22:10,12
**internal (1)**
22:9
**internet (2)**
173:22,25
**interrogated (1)**
70:1
**interrupt (1)**
185:12
**interview (4)**
51:7;52:2;68:22;
100:18
**into (17)**
10:5;18:13;24:1;68:3;
97:12;98:12;103:16,21;
104:24;107:10;115:15;
121:13;123:4;125:17;
145:18;172:15;193:14
**invoice (2)**
16:23;17:1
**involved (10)**
33:16;42:6;43:4;
98:12,15;118:1,7;
202:13,17;203:1
**IP (2)**
47:7;78:23
**Isaac (4)**
37:21;78:18;80:20;
81:11
**Isaacs (1)**
169:5
**issue (4)**
85:14;120:10;135:23;
144:2
**issued (21)**
55:14;56:11,25;57:17,
22;63:7;64:7,17;99:18,
24;141:21;142:4,11,14;
144:7,12,15,20;145:20,
25;146:4
**issues (8)**
71:18;95:22,23,24;
99:18;119:4;165:10,11
**issuing (1)**
177:7
**item (7)**
73:22;77:15,16;

124:20;165:9;167:23;
168:17
**items (1)**
175:3
**iTunes (2)**
114:12,14

**J**

**Jack (3)**
66:19;150:12;152:21
**Jack's (1)**
150:7
**January (10)**
133:16;136:23;137:3,
9;154:6;158:9;159:3;
161:18;170:11;187:6
**jar (1)**
96:5
**J-d-e-s-k-o (1)**
152:12
**Jessica (1)**
149:7
**JG (1)**
139:11
**job (2)**
29:17;68:16
**Joe (17)**
11:20;16:5,7;24:13;
25:22;30:5;56:25;57:23;
68:12;79:19;82:5,6;
143:6;197:18;198:9;
202:5,7
**Johnson (1)**
15:9
**joint (1)**
46:1
**jointly (1)**
45:25
**Jones (2)**
65:17;163:22
**Joseph (10)**
72:18;79:12;176:8;
177:11;179:20;180:8;
186:9;187:25;188:3,19
**journal (1)**
161:13,13
**judge (5)**
139:17;141:13;160:4;
175:18;176:4
**judgment (2)**
25:22,25
**July (1)**
197:24
**jump (2)**
172:12,13
**June (2)**
86:8;197:24
**jurisdiction (1)**
25:17
**Justin (1)**
152:4

Case 2:13-bk-15130-SK   Doc 65   Filed 04/09/13   Entered 04/09/13 22:16:17   Desc
Main Document    Page 259 of 359

TRANSCRIPT OF PROCEEDINGS
341(a) Meeting of the Creditors

TRANSCRIPT OF PROCEEDINGS
April 8, 2013

# K

**Kale (1)**
152:1
**keep (3)**
86:16;187:1;205:10
**keeps (1)**
186:23
**kept (2)**
167:24;169:16
**kids (1)**
124:13
**KiKi (1)**
141:10
**kind (20)**
53:5;72:20;84:2;90:5;
110:3;113:23;114:2;
115:4,15;126:6;135:1,1;
140:12;147:20;148:19;
168:1;178:7;180:3;
196:25;203:7
**kinds (2)**
113:16,24
**Kinley (1)**
135:21
**Kinney (5)**
129:3,3,11;135:22;
148:1
**Kleenex (1)**
163:13
**Kluger (1)**
82:18
**knew (6)**
118:17;139:9,24;
140:1,2;162:4
**knowledge (25)**
4:24,25;34:13;47:18;
58:1,8;60:11;74:10;
75:10;76:24;121:24;
127:13;161:20;168:2,
25;175:10;182:6;184:8;
186:19;189:23;192:13;
196:9;198:15,23;201:11
**known (1)**
81:24
**knows (2)**
63:24;110:22
**Kower (1)**
137:20

# L

**Lab (13)**
30:2;33:6;48:17;
106:7,12,15,23;107:25;
129:7,12;134:23;
135:12;192:20
**labor (4)**
129:2;135:22;140:9;
148:2
**Labs (17)**
31:12;35:18;48:21;
89:5,6,15,19;106:5,10;
165:7;188:19;189:8,12,
16,22;190:1;192:7
**lack (1)**
194:23
**Lambert (1)**
129:24
**landlord (9)**
106:2,2,3,4,7;136:9,
10,14,15
**language (2)**
132:9;175:22
**large (3)**
123:23;160:19,20
**larger (1)**
113:16
**Larry (2)**
149:10,17
**Las (3)**
25:20;65:18;163:23
**last (17)**
22:13;46:9;51:19;
61:17;65:16;81:8;89:21;
123:3;145:7;146:25;
161:2;164:21;171:13;
182:12;185:15;192:5;
193:5
**lasted (1)**
42:10
**Lastly (1)**
90:19
**late (2)**
8:16;76:21
**lately (1)**
96:17
**later (5)**
34:20;45:15;71:16;
109:9;126:4
**LAW (413)**
3:4,5,15,18,21,25;4:5,
7;5:21;6:3,11,19,24;7:1,
9;8:21;9:1,5;10:21;11:4;
12:3,8,11,25;13:3,8,11,
14,16;14:3,12;17:18;
21:2,19;22:5;23:4;25:2,
8;26:12;27:9,13,23;
28:11,15,23;31:23;32:1,
21;34:8,11;35:8;36:1,7,
13;37:1,4,6,11;39:7,17,
20,23,25;40:2,4,7;42:13;
43:16,20;44:15,21;45:4,
11,22;46:9,18,24;47:4;
48:8,19,25;49:3,4,10;
51:1,4,16,23;52:1,5,11;
53:15,21;55:1,3,8,13,23,
25;56:3,9,16,21,24;57:9,
13,16,21;60:3,5,8,18,20;
61:11,16,18;62:9,17;
63:24;64:1,5,6;65:17,22;
66:15,18,22;71:14;
72:24;77:24;80:7,11;
81:17,19;82:13;83:12,
14;84:11,14,23;85:7,10,
25;86:9,11,14,24;87:2,6,
12,16,18,22,24;88:1,3,
13,15,22;89:16,20;90:3,
13,15,22;89:16,20;90:3,
12,16,18,22,24;94:15,19;
95:3;96:14;97:4,6;98:7;
99:3,5,6;101:3,8;102:9,
11;103:12,14,25;104:5,
10,16,20,23;105:5,8,14,
19,22;107:10,19,22,24;
108:4,6,7,18,25;109:3,6,
10,14,23;110:21;111:1,
7,10,12,22,24;112:1,8,
12,19,22;113:2,4,10,13;
115:18;116:6;118:16,
19;119:6,10,13;120:17;
121:4,8,12,25;122:3,7;
124:7,11,14,21;125:10;
126:1,17,22;127:1,5,8,9,
22;128:1,3,9,19;130:18;
131:2,7,14,25;132:2,5;
133:4,8,12;134:3,10,12,
14;136:12,17,19,20;
137:8,12,15,16,18,20,21;
138:1,8,11,13,16;139:2,
4,19,25;140:4;141:9,15;
142:12;145:3,6,9;146:9,
13;149:12,14,16;150:5,
8,18,19;151:9,23;
152:14,18,21,25;153:3,
6,7,13,17,20;154:13;
156:7,10;157:14,20,25;
158:2,12,14,16,19,21;
159:5,12;160:6,9,12,18,
22;161:2,5,7;162:1,21;
163:2,14;164:16;165:15,
17;171:3,5,15;175:18,
21;177:19,21;178:12,19,
22;179:1;180:16;181:7,
16;182:18;183:9,14;
185:12,21,24;186:5,8,
12;187:8,11,15,20;
190:8,12,19,23,25;
191:6,11,14,19,22;
192:2;193:18;197:5,16;
199:15,19;200:16;201:1,
9,20;202:3,10;203:24;
204:2,18,23;205:8,10
**Law's (3)**
75:20;79:7;163:25
**lawsuit (10)**
11:13;14:25,25;21:3,
5,12;22:2;25:18;26:1;
76:4
**lawsuits (8)**
11:15,18,23,24;12:5,
17;13:2;14:22
**layperson's (1)**
96:16
**learn (1)**
69:1
**learned (5)**
25;86:9,11,14,24;87:2,6,
12,16,18,22,24;88:1,3,
13,15,22;89:16,20;90:3,
13,15,22;89:16,20;90:3,
12,16,18,22,24;94:15,19;
95:3;96:14;97:4,6;98:7;

**leave (5)**
46:8;147:24;148:4,15,
24
**leaving (1)**
103:23
**led (1)**
44:25
**ledger (2)**
152:17;153:13
**left (3)**
94:4;102:2;147:13
**left-hand (1)**
187:16
**legal (26)**
11:8,9,16;17:13;18:1,
23;35:5;36:6;46:4;84:2,
17;95:22,24;103:2;
108:8,20;109:21;
127:16;128:12,23,23;
131:12;132:16;158:22;
159:9,9
**Leon (1)**
184:5
**less (2)**
19:7;185:19
**lets (1)**
79:9
**letter (4)**
40:17,18;42:19;55:8
**level (1)**
33:1
**liabilities (1)**
94:7
**liability (1)**
167:20
**liable (2)**
76:6,6
**library (4)**
123:22,22,25;124:1
**license (19)**
6:16;79:10;131:7;
139:5;141:6,8;171:6;
181:3,4;190:17;191:4;
193:1,2,6,25;194:1,4,7,
12
**licensee (10)**
6:17;27:20,22,24,25;
28:12;74:20;75:9;79:9;

20:16;38:14;40:15;
68:19,21
**lease (11)**
107:6,11,14,16,18,21,
24;189:18,19,20,21
**leased (4)**
31:10;35:24;49:9,11
**leases (1)**
48:20
**leasing (2)**
35:17,18
**least (8)**
18:12;22:24;44:4;
50:13;74:14;184:23;
193:5;199:17

193:25
**licensees (1)**
27:14
**licenses (2)**
28:8;90:20
**licensing (17)**
38:11,12;39:1;40:11;
41:5,7,11,15;42:9;44:21;
47:16,17;121:13;130:5,
11;131:18;141:2
**licensor (6)**
28:17,19,20;74:20;
75:9;78:23
**life (1)**
143:19
**Likely (3)**
51:12;137:2;179:17
**limit (2)**
57:5,24
**limited (11)**
29:11,12;43:5,6;
46:19;53:6;100:4;195:2,
6,20,23
**limiting (1)**
58:16
**line (4)**
34:22;73:22;78:21;
201:25
**lines (6)**
18:2;101:21;149:20;
163:1;173:21;198:7
**liquidation (1)**
26:24
**list (8)**
16:25;17:12;58:4;
108:19;115:16;165:20;
196:10,14
**listed (12)**
17:14;23:23;66:12;
76:3;131:5;157:13;
158:11;167:19;179:1;
180:7;185:5;203:10
**lists (2)**
48:6;183:24
**literally (1)**
77:1
**litigation (27)**
13:18;15:21;18:2,4,5;
22:22,24;24:7,12,21;
25:9;83:25;84:4;85:12,
14,17;96:3;127:21;
128:2,13;132:11,18;
139:21;140:5;158:23,
25;159:15
**little (17)**
10:5;29:11;30:15;33:3;
41:6;42:4;45:7;46:20,
25;47:2;66:15;69:17;
97:19;105:1;123:10;
144:13;147:12
**live (1)**
198:8
**lives (2)**

Case 2:13-bk-15130-SK   Doc 65   Filed 04/09/13   Entered 04/09/13 22:16:17   Desc
Main Document   Page 260 of 359
TRANSCRIPT OF PROCEEDINGS
341(a) Meeting of the Creditors

TRANSCRIPT OF PROCEEDINGS
April 8, 2013

198:10,13

**LLC (26)**
3:9;6:20,20,21;8:18;
9:6,8,16;26:15;91:18;
92:20;125:16,18;126:4,
10,14;145:4;150:23;
152:12;176:8;177:4;
179:20;186:9;193:25;
194:17,20

**LLC's (1)**
125:3

**LLP (1)**
17:19

**local (1)**
162:11

**location (15)**
100:21,22;101:9,19;
135:4;141:10;152:19;
153:23;157:4;159:8;
161:11;164:10;178:6;
198:21,24

**Lodge (1)**
203:3

**long (16)**
7:22;8:5;16:16;42:9,
15,18;43:24;45:4;46:21,
22;52:12;56:10;65:24;
117:20;130:7,8

**longer (10)**
45:5,7;47:2;52:9;
145:23;147:10,21,22;
158:17;190:3

**look (17)**
7:12;12:21,23;24:1;
70:8;86:2,3;94:15;
102:14;107:10;124:7,
10;128:7;131:2;160:16;
161:7;182:20

**looked (3)**
141:22;155:8;180:3

**looking (17)**
56:19;76:22;77:15,15;
102:6;134:16;137:17;
147:1;159:4;171:25;
172:3;186:5;187:23;
188:16;193:4,23;196:8

**looks (10)**
140:22;158:4;173:4;
183:2;184:5;185:9,25;
187:6,17;196:13

**loosely (1)**
162:8

**Lord (5)**
37:15;81:3,4,11;
147:14

**Loria (1)**
162:6

**lot (6)**
5:16;32:25;46:20;
95:12;97:12;171:3

**loud (1)**
69:17

**Louis (1)**

25:19

**love (1)**
124:7

**lower (1)**
94:4

**lunch (1)**
190:4

## M

**Magazine (20)**
6:20;10:11;20:6;
23:16;26:20;30:1;31:15;
35:23;36:20;39:14;
46:15;73:12;89:10;
116:8;126:13,14;170:12,
22;171:1;205:4

**Magazines (9)**
7:18;20:23,24;32:18;
36:3,23;46:21;110:14;
205:2

**mail (1)**
177:22

**mailings (1)**
85:1

**main (8)**
30:25;31:2,6;37:23;
94:21,25;96:12;197:8

**mainly (2)**
64:14;84:18

**maintain (1)**
122:18

**maintains (1)**
117:7

**maintenance (1)**
157:5

**major (3)**
165:22,23;166:21

**makes (6)**
32:10,12;33:22;75:25;
98:23;99:7

**making (10)**
30:11;31:18;33:5;
72:7,12;99:19;145:19;
175:9,12;189:4

**Malad (1)**
127:23

**Malade (3)**
13:17,17;127:23

**MALE (17)**
152:16,19,24;153:1,4,
15,19;154:5,9;157:3,12;
158:7;159:7;161:11,18,
23;183:7

**Malhar (2)**
65:15;163:21

**M-a-l-h-a-r (1)**
65:16

**manage (1)**
117:14

**management (4)**
9:22;81:10;172:15,22

**manager (77)**

3:23;7:22;8:3;19:16,
18;24:8;26:4;28:25;
29:2,17;30:13,20;33:24;
34:17;38:16;39:23;40:1,
2;54:9,12,13,14;58:5,12,
14,15,23;60:12;61:1,12,
16,19,25;62:6,11;68:17;
69:2,7;79:15;80:2,4;
88:23,24;90:15;92:6,15,
16;101:20;103:8;
106:18;118:6;133:24;
134:1;143:10,12,13;
144:2;145:18,21;146:10,
14;155:7;156:1;159:21,
23;160:14;162:25;
168:3,9;173:3;174:9,17;
179:11,14;195:3,24;
203:6

**managers (4)**
15:13;34:12,15;149:4

**manages (2)**
116:25;197:6

**managing (2)**
80:14,19

**Mandy (2)**
37:21;78:18

**manner (2)**
4:17;93:16

**many (12)**
18:10;29:9;34:24;
116:17;123:13,15;
133:9;134:22;135:11;
142:4,11;198:24

**March (8)**
5:22,24;112:10,12;
113:11;154:6;158:9;
172:9

**Marketing (1)**
151:6

**marketplace (1)**
121:10

**markets (1)**
99:8

**Marriot (1)**
185:24

**Martin (1)**
140:21

**Marzen (5)**
139:11;158:4,22;
160:5,5

**master (4)**
107:18;122:21,21,22

**masters (1)**
122:18

**material (6)**
96:19,20;97:8;113:25;
175:9,11

**materials (1)**
119:17

**matter (3)**
10:1,15;127:16

**Maxim (1)**
25:5

**may (52)**
3:12;6:8;17:11;19:6,7;
21:25;23:18;24:4;32:11,
11;34:13,19;35:22;
38:17;40:23;42:20;44:1;
45:18;47:21;48:5;71:16;
81:8;86:19;91:11,20;
95:14;96:4;97:22;
103:21;109:1,8;110:20;
116:21;117:20;120:5,7,
15;121:20;122:15;
137:6,20;139:8;144:23;
156:19;160:24;165:14;
171:19;178:13;191:7;
193:2;197:23;198:5

**maybe (22)**
27:3;29:13;30:16;
71:14;82:7;87:25;99:18;
100:4;115:3;116:4;
123:20;135:13;138:2;
142:6;148:5;173:11;
177:1,9,9;179:9;190:22,
25

**Mc (7)**
129:3,3,11;135:21,21;
148:1;152:1

**mean (49)**
9:3;10:6;11:9,25;18:8;
19:4,5;23:10;32:20;
42:15,18;45:8;59:2;
61:16;65:8;72:18;80:25;
81:4;88:6,7;92:20;
95:24;99:21;106:13;
110:6;111:13;112:3;
119:7;123:23;125:9;
139:6;140:10;143:17,
21;145:17;157:18;
165:24,25;166:12;
167:8;174:12;175:21,
22;177:7;178:17;
183:10;199:1;200:9;
202:4

**meaning (2)**
125:20;128:11

**means (2)**
197:2;200:15

**meant (7)**
23:13,15;101:6;121:6

**Media (28)**
38:24,25;39:3,4,5,11,
13;40:5,8,10;42:25;47:5,
6,8;48:2;119:15;120:7,
11,24;130:3,11,19;
131:13;141:6,7;150:21,
22,23

**Media's (1)**
131:5

**medically (2)**
4:10;93:9

**meet (1)**
47:13

**meeting (6)**
3:7;51:20;91:8,16;

154:10;204:24

**meetings (6)**
35:16;51:11;100:17;
154:10;190:5,6

**Mega (1)**
184:4

**Member (13)**
8:20,22,22;9:12;
39:15,18,23,23,24;57:1;
58:5;73:2;166:20

**members (5)**
9:19;34:16;39:13;
40:4;113:24

**membership (8)**
26:14;113:19,22;
114:19;166:6;167:14;
186:20;196:25

**memberships (1)**
96:18

**memory (1)**
96:6

**mentioned (5)**
26:18;51:19;162:5;
166:25;186:17

**Mercedes (7)**
157:6,9,12,18,23;
158:10,11

**merge (1)**
45:15

**met (1)**
51:6

**method (3)**
91:3;100:11;196:23

**methodology (1)**
73:11

**Mexican (6)**
140:16;158:4,22,23;
162:10;163:8

**Mexico (19)**
136:2,3;137:3,10;
139:13,14,16;140:6,8,
11;150:9;154:11,14;
162:10,11,12,20;163:5;
184:1

**Michael (5)**
13:16;72:2;127:22;
135:16,17

**middle (1)**
204:9

**might (30)**
5:18;14:22;15:1;25:3;
28:22;43:10;63:23;76:4,
6,12;78:7,7;81:23;82:6;
85:10;119:17;128:24;
138:9;145:25;146:3;
157:10;161:6,7;163:12;
183:16;190:20;191:2,17,
17;201:7

**Mikhalin (1)**
152:1

**M-i-k-h-a-l-i-n (1)**
152:2

**million (6)**

25:21;26:16,19;
102:22;130:4,20
**mind (2)**
45:6;144:14
**minimum (1)**
182:7
**minute (12)**
60:16;65:25;77:18;
78:20;89:21;102:7;
115:14,14;126:20;
157:17,17;169:23
**minutes (5)**
72:5;191:8,16,20;
204:19
**minutes' (1)**
191:1
**mischaracterizing (1)**
59:13
**mispronounce (1)**
148:6
**miss (2)**
20:8;134:20
**missed (2)**
5:17;161:2
**missing (4)**
182:14;183:12;
187:12;188:14
**mistaken (1)**
158:8
**miswritten (1)**
81:9
**Mitchell (1)**
129:24
**mix (1)**
125:6
**model (1)**
114:20
**moment (2)**
163:23;189:24
**Monday (2)**
127:4;165:21
**money (18)**
19:9;23:22;50:19;
53:10,12,17,22;87:18;
102:21;103:5,10,14,
104:17,21,24;106:14;
109:12;171:1
**Monica (1)**
66:25
**monies (5)**
53:16;90:13;108:16;
200:12,22
**month (16)**
52:18,19;62:5;77:2;
85:23;109:9,13;114:1,2;
115:22;116:18;123:20;
163:9,10,11;165:14
**month-ish (1)**
107:5
**monthly (9)**
47:24;52:16,17;89:23;
90:11,17;116:13,15;
158:5

**months (5)**
7:23;115:22;117:22;
125:6;145:7
**MOR (5)**
112:6,8,14,16,23
**more (27)**
4:17;19:7;30:15;
32:11,12;76:5;81:17;
86:19;90:6,6;93:16;
94:16;100:12;102:24;
105:1;121:1;125:2;
135:24;150:11;154:3,
23;155:16;180:9;181:9;
189:9;190:8;191:1
**morning (4)**
3:4;46:8;65:15;91:10
**morphed (3)**
125:17,21,22
**MORs (1)**
112:20
**most (11)**
6:24;18:21;36:17;
94:24;95:1;137:2;
141:22;156:2;179:17;
190:24,24
**mostly (4)**
36:23;96:17;99:17;
134:25
**motion (5)**
89:25;90:8;91:4;
103:23;128:8
**motions (1)**
21:7
**move (2)**
47:3;127:3
**moved (1)**
164:5
**Movie (2)**
29:24,25
**much (24)**
6:22;14:20;33:9;45:5;
46:15,15;52:18;57:5,24;
62:4;106:22;107:1;
109:17;111:8,14;112:5;
113:8;114:18;121:25;
187:20;190:3,8,19;199:5
**multiple (2)**
179:22;180:2
**must (1)**
5:16
**myself (10)**
15:4;22:20;32:4,8,13;
43:11;54:1;65:6;67:23;
97:20

**N**

**name (50)**
3:5,9,18;22:1,13;23:2;
25:1,4,4;28:3;55:15;
65:13,15,16;81:20;
82:18;83:1,6,9;91:11,18;
92:1;96:5;99:18;106:3;

118:23;119:16,17;120:9,
13;131:21;132:7;136:8;
147:2;148:7,10;149:8;
151:2,13,16,21;160:5;
163:18;180:7;187:15;
195:7,9,14,15;196:17
**named (4)**
8:3;76:2;127:15;151:1
**names (14)**
7:16,17;35:6,8;37:5,7;
124:12;162:2,4;179:2,
20;194:19;195:5;203:24
**name's (1)**
91:13
**National (6)**
52:25;53:8;54:2;55:2;
87:15,16
**nature (8)**
11:18;14:16;16:3;
18:5;34:4;135:17;
141:18;201:24
**nearly (1)**
8:6
**necessarily (1)**
110:13
**need (32)**
3:25;4:24;10:24;
21:20;24:1;32:11,12;
45:13,17;46:11;50:15;
80:7;84:19;86:16;87:6;
89:23;90:3;92:24;
107:10;108:2;109:16;
112:15,16;113:2;154:3;
161:1;178:3;190:4,20;
191:24;204:11,11
**needed (2)**
159:14,20
**needs (11)**
30:17;32:10;33:15;
36:18;52:6;90:17,19;
94:15;127:5;161:8;
204:10
**negative (3)**
81:15;133:10;176:11
**negotiate (2)**
121:2;131:18
**negotiated (6)**
43:2;101:17;115:9,24;
119:22;203:5
**negotiates (3)**
115:6;117:13,14
**negotiating (2)**
44:10;47:11
**negotiation (2)**
43:4;118:7
**Neo (1)**
185:4
**net (4)**
27:7;73:15,24;203:3
**Network (1)**
203:3
**networks (1)**
110:2

**new (13)**
12:17;28:9;33:15;
42:25;43:2,10,12;47:20;
131:18;182:13;183:17;
202:24;203:7
**next (4)**
112:13;167:17;175:6;
181:9
**nine (1)**
173:19
**nods (1)**
63:14
**non (5)**
91:24;145:11;175:17;
181:10;203:16
**non-bankruptcy (1)**
3:17
**none (8)**
27:16;49:16;72:16;
134:5;168:7,13;196:14;
200:1
**non-employee (1)**
145:20
**non-financial (1)**
175:15
**nor (2)**
109:19;145:18
**normally (7)**
29:9;42:3;46:10;
100:2;113:14;156:11,15
**note (4)**
74:1;81:9,11;187:5
**noted (1)**
161:14
**notes (6)**
72:25;74:19;88:14;
150:7,10;179:3
**notice (3)**
17:16;24:11;88:16
**noticed (1)**
5:12
**notify (1)**
40:13
**November (25)**
8:17;54:5,10;61:17,
20,24;62:10,18;67:16;
145:22;146:15;159:24;
172:10,11,12,24;176:9;
183:2,3,4;186:6;187:11;
199:2,14,17
**number (35)**
3:10;23:6;27:7,14;
35:9;52:24;84:8;91:9,
18;95:13;99:16;101:15;
109:6;118:24;119:5;
134:4,17;141:20;147:1;
159:9;165:9;172:24;
173:19;175:1;180:13,14,
18;182:18;183:24;
185:2;187:16;197:22;
204:24;205:1,4
**numbers (7)**
27:12;133:10;153:2;

172:10,17,20;180:13
**number's (1)**
119:8

**O**

**oath (5)**
4:1,7;92:24;93:5,6
**Objection (7)**
17:13;67:18;68:3;
69:3,21;176:14;179:25
**objections (1)**
47:1
**obligations (1)**
76:10
**Occasionally (1)**
15:13
**occur (3)**
144:18,19;201:7
**October (18)**
8:16;54:10;61:17,20,
24;62:10,18;145:21;
146:14;157:3;159:24;
160:13;180:18;198:2;
199:15,16,17;201:11
**off (9)**
55:17;64:3;70:21;
96:5;98:21;108:13;
100:10;114:6;124:3
**offer (1)**
123:17
**offered (2)**
196:20,22
**offering (1)**
174:10
**offerings (1)**
174:21
**offers (1)**
113:25
**Office (13)**
3:6;50:6;78:11;84:6,
12,15,16;91:14;122:11;
132:3;136:6;152:23;
177:23
**Offices (6)**
13:16;118:14;122:10;
127:22;136:15;171:15
**offsets (1)**
104:8
**off-site (2)**
122:23;123:1
**old (7)**
83:23;123:15;124:25;
125:2,3,6,7
**older (1)**
125:7
**omitted (1)**
187:7;196:14
**once (4)**
77:10;99:7;190:14;
202:9
**one (79)**
9:20;11:20;12:20;

16:9;18:6,18,20;30:11,
13;31:21;32:2;33:2,15;
34:16,25;45:20;46:2,9;
52:6;56:4;64:12,14;
66:5,7;71:23;76:5;80:6;
81:8;86:3,4;88:2;91:9;
95:1;96:4;97:15;102:24;
109:4,17;112:25;113:2,
7;114:5,6,22;115:22;
116:21;119:1;123:9,18;
131:12;135:19;138:18;
140:14;142:16;144:1,
20;145:20;147:14;
149:9,11,12,14;158:25;
159:15;173:20;179:2,7,
11;180:9;185:5;186:13,
14;188:3,3;189:9;199:7,
15,17;202:15

**ones (3)**
37:23;89:1;155:14

**one's (1)**
109:18

**one-year (1)**
44:4

**ongoing (3)**
154:23,25;166:7

**online (36)**
31:3;34:24;37:8,12;
96:18,19;110:2;113:19;
115:4;116:2,4,24;
117:16,17,19;122:15;
123:12,22,25;124:1;
138:14;139:23;141:2;
149:19;151:11;171:6,8,
11;193:25;194:17,20,23;
196:21,22;197:7,7

**only (37)**
12:19;24:11;26:7;
31:9,13,14,14,15;32:23;
34:14,16,17;44:8;51:14;
57:9,16;63:14;75:24;
88:6;92:16;115:5;120:5;
123:15;125:3;127:14,18,
19;143:11;145:6;160:7;
175:19,25;178:8;
186:13;189:21;190:15;
197:1

**open (5)**
64:23;87:7;142:14;
185:13,25

**opened (1)**
177:2

**opening (2)**
176:7;185:16

**operate (1)**
36:16

**operates (1)**
190:1

**operating (7)**
89:24;90:12,17;94:22;
95:1;96:12;156:25

**operations (1)**
180:24

**opportunities (1)**
89:21

**opportunity (1)**
46:5

**opposed (1)**
85:15

**oral (2)**
41:9;107:16

**order (4)**
51:15;103:17;175:2;
189:3

**organization (1)**
28:25

**organizations (1)**
84:20

**organized (1)**
76:19

**originally (2)**
19:17;125:4

**Orinski (1)**
151:3

**Ostrinski (1)**
151:4

**others (3)**
15:17;16:2;63:21

**Otherwise (5)**
4:23,24;104:15;
151:12;173:22

**out (31)**
17:16;20:17;33:17;
46:11;55:7;66:17,18;
74:17;84:24;85:18;
86:15;92:9;94:22;98:21,
24;99:8;100:12;109:8;
117:6;121:9;137:12;
138:5,11;141:14;
150:12;153:18;157:21;
161:10;175:20;181:5;
201:15

**outlets (1)**
166:9

**outside (19)**
3:16;22:10,25;23:7;
24:24;25:3;29:17,20;
88:5;91:24;115:25;
116:24;117:3,7,13,20;
129:17;159:13;168:1

**outsiders (1)**
94:24

**outstanding (1)**
142:11

**over (20)**
18:12,13;25:17,20;
27:4;30:25;32:25;71:18;
79:3;102:22;103:15,20,
20,23,25;134:23;146:7;
163:25;167:18;172:21

**owe (6)**
17:11;19:6,7;49:14;
123:15;127:12

**owed (8)**
19:9;24:11;50:11;
104:17,21;128:4;130:3;

167:20

**owes (1)**
19:6

**own (18)**
7:20;22:19;34:1;38:5;
40:4;57:15;75:24;83:18;
96:23;101:14;102:2;
118:21;121:1;129:14;
154:15;155:1;157:2,8

**owned (3)**
7:11;23:22;140:16

**owner (5)**
69:8,12;101:9,13;
136:14

**owners (2)**
100:20,20

**ownership (1)**
9:15

**owns (7)**
8:24;40:8;72:16;
102:4;140:15;156:21;
198:4

# P

**Pablo (11)**
8:25;9:2,9,12;39:8,10;
69:8,12;72:14,17,21

**pack (1)**
178:16

**PAGAY (121)**
65:15,16;66:1,3,4,23;
67:20;68:5,9;69:6,16,23;
70:4,11,15,19,23;71:1,3,
10,16,22;72:1,7,11;73:8;
74:9,13,23;75:1,4,14,18;
76:18;77:13,20,25;78:2,
3;79:6,11,17,19,25;80:9,
12,13,24;163:21,22;
164:1,15;165:18;
166:16;167:4,7,12;
169:1,10,14,24;170:1,
16,23,24;171:24;172:8;
174:3,4,12,15,19;
175:24;176:5,16;177:16,
20;178:24;179:13,24;
180:1;181:4,19,22;
182:2,17,19,22,24;
183:2,10,15,22,23;
184:16,19,22,25;186:2,
7,10,18;187:12,19,22;
188:22;189:6;190:10,13,
22,24;191:2,7,17;192:4;
193:22;197:4;202:9,11,
12,25

**P-a-g-a-y (1)**
65:16

**page (66)**
48:6;66:7;71:24;
73:14;75:19;77:4,14;
78:21;102:14;157:15;
164:21;167:17;170:10,
18,18;171:4,4,13,13,14,

25;175:5,15;176:7,7,10;
178:25;180:17;182:3,11,
12,12;183:18,18,20;
185:6,8,9,10,14,15,16;
186:8,12,15;187:5,6,8,
13,15,23,24;188:2,13,14,
17,17;193:4,5,23,24;
194:25;195:1,1;196:8;
203:11

**pages (14)**
74:18;94:14;134:11;
157:13;165:19;169:21;
175:16;181:9;182:14,
17;183:11,11;185:1,13

**paid (49)**
27:4;29:4;31:19;
35:24;50:18;51:14;
52:21;56:4;77:5,9;
88:18;90:7,13,16;
100:14,15,22;101:2,5,9;
106:7,11;108:20;116:13,
21;121:24;129:15;
130:11;135:25;140:6,18,
21,22,22;141:7;153:8,
11;156:3;158:8;161:4;
171:15;176:7,10,20;
192:19;193:25;199:5;
200:12,22

**Pal (9)**
180:19,20,22;181:10,
12,21;182:3;185:3,5

**Palm (1)**
97:18

**paper (2)**
18:12;132:2

**paragraph (1)**
175:5

**parasite (1)**
53:5

**Pardon (1)**
165:2

**parent (5)**
6:17;10:8;23:20;39:2,
8

**Park (1)**
84:7

**part (15)**
18:21;33:18,20;35:21;
61:13;66:10;81:9;
104:15;141:14;161:2;
175:17;180:23;184:21,
24;193:6

**participate (1)**
85:20

**particular (7)**
22:24;30:17;56:14;
101:18;114:6;116:17;
190:15

**particularly (2)**
35:3;96:17

**parties (1)**
45:6

**partnership (1)**

126:8

**party (1)**
30:4

**passes (1)**
163:20

**past (9)**
10:4;16:6;20:23;74:9,
18;98:6,8;99:1;163:7

**patent (3)**
20:16,22;22:1

**patented (1)**
20:19

**Path (29)**
38:24,25;39:3,4,4,10,
13,22;40:5,8,10;42:25;
44:8;10:47:5,6,8;48:2;
119:15;120:7,11,24;
130:3,11,19;131:4,13;
141:6,6

**Path's (1)**
44:16

**Pause (5)**
66:2;71:17;163:23;
183:13;204:22

**pausing (1)**
79:6

**pay (53)**
10:16,17;50:19;51:10;
85:13;90:3,6;100:9,10;
101:13,15;106:22;
107:3;110:2;113:20;
114:2,2,6,20,21;115:4,7,
12;116:11;150:1;
153:22;154:1,14,20;
166:9,25;167:6,9,15;
171:16;173:4;176:12;
180:19,20,22;181:9,12,
21;182:3,7;185:3,5;
196:8,10,17;200:19;
202:1,15

**payable (1)**
187:4

**payables (2)**
178:9,14

**paying (3)**
88:22;113:14;155:10

**payment (19)**
33:6,7;50:10,10,17;
52:1;77:6;107:8;117:1;
134:4;139:23;140:24;
141:18;155:25;157:4;
172:16;175:10;194:12;
201:21

**payments (31)**
31:18;41:14;47:21,22,
24;48:2,7;113:17;
116:10;121:19;122:25;
137:4;141:3;155:15;
156:12;158:5;159:2;
160:1;172:2,13,17,25;
173:9;176:10;177:8;
181:2;189:5;199:20;
201:16,19,23

**payroll (3)**
  35:1;129:18;136:2
**pays (1)**
  33:9
**Pechulski (2)**
  65:17;163:22
**penalties (2)**
  4:7;93:6
**penalty (2)**
  5:10;94:10
**pendency (2)**
  90:21,25
**pending (10)**
  11:13,23;12:5;13:18;
  14:22;24:7;25:18;26:2;
  127:21;132:11
**people (32)**
  11:19;15:3,5;18:19;
  31:9,13,19;32:2,11,11,
  12;33:4;36:18,21;37:24;
  42:1,1;64:10;80:20;
  81:10,13;84:18,21;
  115:7;126:3,6;135:4;
  147:1;177:23;179:21;
  190:5;202:1
**people's (1)**
  114:9
**per (22)**
  52:18,19;62:4;88:5,6;
  110:2;114:21;115:4,7,
  12;116:11;123:14;
  166:9,25;167:5,6,9,15;
  196:8,11,17;202:15
**percent (3)**
  26:14;73:2;131:20
**percentage (1)**
  114:19
**percentages (1)**
  33:17
**Perez (1)**
  128:23
**Perfect (35)**
  30:1;31:11,12,18;
  33:6,8;35:18;48:16,21;
  89:4,6,15;106:5,7,9,12,
  14,22;107:25;129:6,12;
  134:23;135:12;162:8,
  13;165:7;172:20;
  188:18;189:8,12,16,22,
  25;192:7,20
**perform (3)**
  72:13;167:9;182:8
**perhaps (1)**
  165:21
**period (13)**
  47:25;67:12;116:14;
  130:7,9;136:1;137:9;
  145:6;146:8;154:5;
  158:9;168:23;172:18
**perjury (4)**
  4:8;5:10;93:7;94:10
**person (15)**
  15:7;18:16;21:11;

22:9;70:23;71:4;101:23;
116:4;132:23;139:12;
148:3;150:25;162:6;
197:8;204:8
**personal (9)**
  4:23,25;13:18;15:24;
  25:16;26:13;127:21;
  129:21;135:16
**personally (4)**
  16:14;40:19;63:4;83:4
**personnel (3)**
  34:24;35:9;165:4
**persons (10)**
  38:1;49:14;127:11;
  134:22;144:6,11,23;
  177:25;180:8;194:19
**Pete (1)**
  23:2
**Peter (1)**
  83:9
**petition (19)**
  5:4;13:12,22;25:7;
  66:11,13;67:4,17;74:23;
  94:4;95:8,9;105:17;
  133:17;146:19;164:10;
  174:13,17,23
**phasing (1)**
  84:24
**Phil (2)**
  132:11;134:17
**phone (1)**
  30:21
**physical (2)**
  20:23;178:6
**physically (2)**
  4:10;93:9
**pick (1)**
  80:8
**picks (1)**
  100:8
**piece (1)**
  21:16
**pile (1)**
  132:2
**Pineda (1)**
  149:7
**place (6)**
  22:15;85:5;146:18;
  148:18;182:7;202:24
**placed (2)**
  146:7,16
**plan (8)**
  71:8;85:8,16,21,23;
  120:11,15,19
**plate (13)**
  175:21;176:2;182:15,
  17;185:13,17;186:14,15,
  16;187:7,9,17,21
**play (1)**
  98:12
**please (14)**
  3:12,19;4:15,21;
  10:22;33:3;42:2;65:12;

91:20;92:2;93:14,20;
94:20;163:17
**PM (3)**
  137:22,23,25
**PO (12)**
  176:23,24;177:2,5,11,
  22;178:3,4,5,17,20;
  192:12
**Pogorela (1)**
  204:7
**point (6)**
  7:5;21:6;22:18;95:6;
  138:5;174:3
**Points (4)**
  185:4;186:20,24;
  187:2
**policies (1)**
  144:3
**policy (1)**
  143:1,24
**Pope (2)**
  195:10,17
**P-o-p-e (1)**
  195:11
**posed (2)**
  79:22;191:4
**position (8)**
  8:5,7;15:1;68:17,24;
  147:6;172:22;173:4
**positive (2)**
  54:20;55:11
**possession (4)**
  3:14;78:8;169:3,11
**possible (1)**
  201:25
**Possibly (6)**
  13:23,25;41:20;42:8;
  59:3;167:14
**post (3)**
  124:25;135:5;202:1
**potential (2)**
  11:24;102:23
**potentially (6)**
  30:20;41:23;100:4;
  200:7,9,21
**PR (1)**
  137:16
**practice (1)**
  83:18
**practices (2)**
  134:16,19
**Pre (3)**
  99:3,4,5
**precipitating (2)**
  11:6;95:20
**precise (2)**
  54:8;132:10
**precisely (2)**
  110:8;120:21
**precursor (1)**
  125:16
**preferential (2)**
  160:24;161:6

**premise (2)**
  101:10,13
**prepaid (4)**
  108:8,9,20;124:15
**prepared (3)**
  70:7;168:18;170:7
**Prepetition (4)**
  99:5,20;100:22;
  135:25
**present (2)**
  98:5;103:24
**Pretty (6)**
  29:11;65:20;85:16;
  100:4;123:23;187:20
**previous (3)**
  47:17,18;48:11
**previously (1)**
  164:3
**pricing (2)**
  116:20,22
**primarily (1)**
  6:13
**principle (2)**
  84:6,16
**printer (1)**
  66:19
**prior (20)**
  7:24;8:8;19:18;28:8;
  35:16;42:10,14;48:12;
  62:7;74:8;118:6;134:22;
  135:12;142:5,11;
  145:17;164:3;172:23;
  183:25;188:1
**privilege (1)**
  68:4
**Pro (1)**
  152:10
**probably (21)**
  20:8;31:5,6;37:18;
  64:14;84:24;85:4;99:14;
  100:25;110:24;116:1;
  123:12;147:12,25;
  148:16,25;159:16,21;
  177:9;180:10;193:13
**procedure (3)**
  143:1,3,5
**proceed (2)**
  65:14;163:19
**proceeding (1)**
  61:14
**PROCEEDINGS (4)**
  3:1;4:14,20;93:13
**proceeds (2)**
  54:23;55:5
**produce (2)**
  98:22;139:3
**produced (6)**
  55:21;96:23;169:22;
  170:2,8;175:8
**producing (2)**
  135:3;139:1
**product (8)**
  98:24;99:7;121:9;

123:4,7,13;174:10,21
**production (23)**
  15:16;31:5;32:23;
  34:23;37:14;81:1;94:23;
  96:1;97:13;98:15;99:12;
  100:3;116:1;123:9;
  124:25;135:5;137:3,7;
  138:20,23,24;141:23;
  148:12
**productions (4)**
  100:16;122:19;
  123:13;135:1
**products (8)**
  23:12,14;123:16,25;
  164:18,24;174:1;192:10
**program (2)**
  185:25;186:1
**promote (1)**
  119:17
**promotions (1)**
  114:4
**pronounce (2)**
  20:9;148:6
**proper (1)**
  25:15
**properties (1)**
  155:16
**property (65)**
  6:17;7:11,20;26:13;
  27:17,20,25;38:22,23;
  48:3;74:21;102:4;
  107:15;108:2;118:20,
  21;119:15;121:18,21;
  140:8,10,11,15;150:9;
  153:9,21,22,23,24;
  154:7,11,15,16,18,21;
  155:1,2,9,9,13,17;156:8,
  17;162:10;163:4,8;
  189:9;198:4,6,8,9,16,20;
  199:6,10,24;200:6,11,
  13,18,20,23;201:10,13,
  20
**proposed (2)**
  3:13;91:21
**proposing (1)**
  71:8
**Pross (1)**
  137:20
**prove (1)**
  85:19
**provide (15)**
  4:11,21;22:18;27:10;
  34:19;37:2;77:11;87:9;
  91:1;93:10;112:15,16;
  132:16;164:18;168:21
**provided (11)**
  14:10,13;16:21;17:20,
  22,25;19:2;90:20;
  128:24;130:1;131:23
**provider (1)**
  116:11
**providers (1)**
  196:10

**provides (4)**
14:21;77:22;117:7;
164:24
**providing (2)**
89:3;196:17
**PSL (3)**
107:18,25;141:17
**Publishing (1)**
152:10
**pulled (2)**
153:18;170:3
**pulling (1)**
150:7
**pulls (1)**
120:7
**purchased (1)**
125:5
**pure (1)**
114:24
**purpose (6)**
71:11;170:25;188:8;
198:18;200:2,6
**purposes (8)**
19:4;85:2;142:24;
156:19;177:6;178:13;
199:24;200:18
**pursuant (2)**
3:8;91:17
**put (12)**
70:24;71:4;85:21;
92:24;103:21;104:1,2;
146:17,18;203:10;205:8,
11
**putting (2)**
85:12,17

**Q**

**qualifies (1)**
169:10
**quantify (1)**
30:15
**quantity (1)**
115:2
**quarterly (3)**
47:25;90:4;116:13
**questionnaire (2)**
107:15;108:2
**QuickBooks (1)**
170:6
**quickly (2)**
65:20;85:16
**quite (3)**
118:25;181:24;185:2

**R**

**Rafael (1)**
19:19
**raiment (3)**
16:8,8;72:8
**raise (2)**
4:1;92:25

**ramp (1)**
51:20
**ramping (1)**
51:20
**range (1)**
185:19
**rarely (1)**
142:25
**rather (8)**
64:17;84:22;111:8;
131:6;165:25;166:2;
178:6;181:13
**ratio (2)**
10:2,6
**raw (7)**
98:20,23;99:10,13,20;
100:3;157:2
**Rayment (3)**
16:1,4,5
**re (2)**
13:18;127:21
**read (2)**
20:25;195:13
**readable (1)**
20:21
**Ready (1)**
66:3
**real (7)**
7:11,20;35:20;102:4;
107:15;108:2;179:25
**really (7)**
14:16;35:16;36:2;
83:24;120:25;197:19;
203:22
**re-ask (1)**
10:25
**reason (8)**
4:10;40:21;41:4;53:7;
93:9;130:6;173:13;
181:8
**reasonable (1)**
190:7
**reasons (2)**
40:16;181:12
**recall (21)**
5:18;22:13;25:2;
40:25;42:24;48:4,5;
77:8;86:1;120:6;121:16;
126:18;128:12,25;
135:24;137:5,10;144:5;
171:7;179:1;193:10
**recap (1)**
15:19
**receipts (1)**
178:9
**receivable (5)**
73:22;109:24,25;
111:20;112:4
**receivables (5)**
111:21;113:9,14,18;
178:14
**receive (1)**
85:1

**received (3)**
40:18;101:7;172:13
**receiving (4)**
173:14;177:7,8,10
**recently (3)**
125:14;129:9;200:4
**re-characterize (1)**
59:13
**recognize (4)**
66:7;147:3;148:10;
192:23
**recommended (2)**
85:22,22
**reconvene (1)**
204:12
**record (12)**
3:19;34:10;44:18;
45:2;65:13;92:2;95:11,
16,18;152:22;163:18;
204:23
**recorded (1)**
173:12
**recording (4)**
66:2;91:9;204:22;
205:13
**recordings (1)**
121:6
**records (10)**
45:17,19;55:22;78:5,
8,12,15;169:15;186:23;
197:21
**Recruiting (3)**
164:25;165:1,3
**redacted (2)**
182:15;185:10
**refer (7)**
7:15,17;65:20;70:12;
96:3;127:14;145:16
**reference (2)**
65:23;95:15
**referred (6)**
73:24;78:20;127:14;
132:23;141:21;193:3
**referring (10)**
42:5;95:11,14;110:4,
9,13;118:22;119:19;
122:16;153:24
**reflected (1)**
186:4
**regarding (12)**
22:21;68:13;75:8;
79:20;80:3;119:4;
165:10;175:2,3;202:14,
18;203:2
**regardless (1)**
192:3
**regular (2)**
80:15;135:14
**relate (9)**
24:12;86:19;92:9;
153:10;155:20;184:6;
188:6,10;190:16
**related (31)**

**8:13;18:6;19:25;**
38:25;39:13;64:10,12;
72:17;95:23;99:11,12;
102:24;111:20;126:12;
128:13;139:1;140:25;
143:15,21;145:19;
152:23;154:4;155:9;
157:8;168:5,6;172:21;
179:21;180:19;185:3;
198:5
**relates (5)**
72:3;95:16;154:8;
165:12;187:25
**relating (2)**
12:13;156:5
**relation (2)**
150:20;162:22
**relations (1)**
129:1
**relationship (7)**
39:22;155:8,11;
189:16,21;202:18;203:2
**relationships (2)**
165:23;168:20
**relevant (4)**
69:3;138:7;175:9,11
**remained (1)**
174:10
**remember (36)**
5:24;14:8,20;22:1;
24:19,23;25:1;42:20;
43:13;44:13;47:23;48:1;
52:14;67:13;75:2,17;
77:8;121:16;128:13;
129:9;131:24,24;132:9;
137:5,11;138:21;139:7;
141:18;149:18;172:14;
173:10;192:6;193:9,11,
15;199:18
**remind (1)**
89:23
**reminders (1)**
90:25
**rendered (1)**
16:2
**renegotiation (1)**
121:18
**renew (1)**
120:12
**renewed (1)**
90:22
**rent (6)**
50:10,10;106:22;
107:1,8;114:15
**renting (1)**
39:1
**Renxcom (1)**
151:10
**rephrase (7)**
4:17;10:25;57:8;
71:14,16;93:15;200:15
**report (16)**
37:24;38:1;70:8,13;

**78:20,22;85:21;86:6;**
103:22;139:18,19;
169:22;170:2,10;
171:13;173:20
**reporting (1)**
116:16
**reports (3)**
89:24;90:12,18
**represent (7)**
3:22;16:11;65:13,18;
83:19;92:4;163:18
**representation (2)**
18:1;51:21
**representative (1)**
34:15
**represented (6)**
19:13;23:5,8;24:3;
83:7,21
**representing (3)**
84:24;163:22;195:20
**request (2)**
133:2;191:9
**requested (1)**
141:18
**required (5)**
49:22,23;91:3;133:25;
175:18
**research (1)**
131:13
**reserve (3)**
85:17,20;127:3
**reside (1)**
95:2
**residence (1)**
185:24
**resource (4)**
51:21;77:11;110:19;
201:17
**resources (6)**
8:4;15:7;29:22;33:14;
34:6;172:25
**respect (44)**
9:18,21;11:24;12:5;
14:21;15:20;26:5;49:13;
57:4,5;59:1,4,11;61:22;
73:12;79:24;82:10;
89:16;90:14;98:16;
126:24;127:10;132:24;
143:2,24;144:3;155:8;
158:23;162:2;164:3,7;
165:6;167:18,19;
168:19;169:4;179:21;
180:9;186:21;189:9,13,
17;190:16;194:16
**responsibilities (4)**
69:11;165:6;171:8;
194:16
**responsibility (1)**
91:1
**rest (1)**
187:17
**restrains (1)**
103:19

**retained (1)**
  19:17
**retainer (6)**
  19:12;24:5;52:16,17;
  158:24;159:17
**retreat (2)**
  140:12;163:11
**retreats (2)**
  140:19;154:22
**returns (2)**
  49:22;133:20
**revenue (4)**
  50:3;132:24;133:1;
  165:24
**revenues (5)**
  49:19,24;76:24,25;
  176:13
**review (8)**
  5:4;93:25;95:17;
  118:7;142:22;145:25;
  146:3;155:22
**reviewed (4)**
  17:5;155:12,19,21
**reviewing (2)**
  118:1;197:21
**reviews (1)**
  142:18
**reward (2)**
  186:20;188:18
**rewards (3)**
  185:25;186:1,4
**rid (1)**
  66:6
**rider (1)**
  157:23
**right (101)**
  4:1;6:6;12:8,8,19;
  13:8;15:10;16:18;19:8;
  20:4,7;22:23;23:17;
  25:1,13;26:13;28:13;
  30:6;35:3,6,15;37:18;
  38:23;39:17,24;40:1,3;
  45:15;46:18;48:14;
  50:25;51:16;54:7,11;
  57:10,19;60:21;62:12,
  13;65:12;66:6,22;69:14;
  70:7;71:17;74:2,24;
  76:8;77:18;92:7,25;
  96:10,15;98:25;99:2,5;
  101:4;103:12;105:1;
  106:25;108:1,22,25;
  109:22;111:22,22;112:9,
  11;113:15;115:19;
  116:12;118:12;121:5,8;
  123:25;127:3;128:4,7;
  134:5;143:25;145:2,10;
  147:23;156:16;157:22;
  160:6,9;163:17;167:20;
  170:14;172:7;176:3;
  182:1;184:2,3;186:6,7;
  189:10;190:13;191:6;
  203:22
**rights (4)**
  38:22;47:15;103:24;
  120:9
**rights' (3)**
  131:15,20;132:7
**ring (1)**
  15:25
**Robert (362)**
  3:13,13;5:20,23;6:13,
  22;7:7;8:20,24;9:3;
  10:19;12:1,7,23;13:1,6,
  10,13;14:2;17:13;20:14;
  21:17;22:4;25:4;26:10;
  27:6,11,22;28:5,13,22;
  31:20;32:19;34:5,9;
  35:6,10,13;36:6,10;37:3,
  5,9;39:6,15,18,21,24;
  40:1,3;42:12;43:14,18;
  44:14,18,23;45:9,18;
  46:7,13,17,23;48:5,18;
  49:9;50:23;51:2,13;
  52:8;53:14,18;54:25;
  55:2,6,12,21;56:7,14,19,
  23;57:7,11,14,19;60:1,4,
  7,16,19;61:9,13;62:7,13;
  63:22,25;64:3;65:25;
  66:17,21;67:18;68:3;
  69:3,14,21;70:1,6,14,17,
  20,25;71:2,6,12,21,25;
  72:4,10;73:4;74:8,11,22,
  24;75:11;76:17;77:10,
  18;79:2,8,14,18,21;
  80:23;82:11,18;83:11;
  85:9,11;86:2,5,7,10,12,
  22,25;87:5,11,13,17,20,
  23,25;88:12,20;89:13,
  19;91:12,21,21;92:7;
  94:13,17,21;96:13;97:3,
  5;98:5;99:1,4;101:1,4;
  102:7,10;103:13,17;
  104:3,9,13,21;105:2,6,
  13,17,20;107:13,17,20,
  23;108:1,5,23;109:1,4,8,
  12;110:19,23;111:5,9,
  11;112:6,11,18,21,24;
  113:6;115:14;116:2;
  118:13,18,24;119:2,5,9,
  11;120:14;121:2,6,9,23;
  122:2,5;124:5,9,12,19;
  125:9,20,23;126:23;
  127:2,7;128:7,16;
  130:15;131:1,3,12,12;
  132:1,4;133:2,6,11;
  134:8,11;136:8;137:6,
  14,17,24;138:5,15,25;
  139:17;141:12;142:10;
  145:1,5,7;146:8,11;
  149:11,13,15;150:3,17;
  151:7,21;153:11;154:7;
  156:5,9;157:17,22;
  158:1,10,13,15,17;
  159:4,11;160:4,7,11,15,
  23;161:1,3,6,16,19,24;
  162:18,24;163:12,20;
  164:14;166:3,7,11,15;
  168:23;169:9,23,25;
  170:14,21;171:15,21;
  172:6;174:2,11,14,18;
  175:13,23;176:3,14;
  177:13;178:10,17;179:6,
  9,23,25;180:15;181:2,5,
  20;182:1,16,23,25;
  183:5,20;184:14,17,21,
  24;185:11,18,23;188:21,
  25;189:2;190:2,18;
  191:9,12,21,24;197:14;
  199:14;200:14,24;201:6,
  15;202:22;203:22;
  204:16;205:7,9
**Robinson (1)**
  132:15
**role (8)**
  33:13;58:25;59:4;
  165:6;172:15;189:12;
  194:7,16
**roles (1)**
  59:11
**Ron (4)**
  37:13;91:24;117:18;
  149:23
**Ronald (37)**
  3:16,16;14:10;23:2;
  28:7;48:23;49:1;51:19,
  25;52:4,10;84:13,17;
  85:3;86:6;87:15;88:18,
  21;91:24,24;107:14;
  111:19,23,25;112:25;
  113:3,8;131:9;136:18;
  139:22;140:3;160:19,
  25;167:3,5;201:19,23
**room (3)**
  34:7;77:12;124:13
**Rosin (1)**
  151:16
**R-o-s-i-n (1)**
  151:16
**round (3)**
  172:17,20,24
**row (1)**
  140:21
**Roxanna (2)**
  162:5,19
**royalties (1)**
  121:20
**royalty (2)**
  41:14;47:22
**rt (1)**
  136:17
**Rudin (3)**
  147:19,19;148:19
**R-u-d-i-n (1)**
  147:19
**Rudins (1)**
  179:12
**rule (1)**
  171:7
**run (9)**

**29:7;45:4,9,11;46:11,
  20;85:13;119:25;181:12**

**S**

**sake (1)**
  7:14
**Saken (1)**
  128:22
**salary (1)**
  30:7
**sales (1)**
  26:23
**same (30)**
  4:7,7;23:20;26:11;
  42:15;71:18;73:11,14;
  90:23;93:6,6;116:21;
  126:3,3,3,5;128:20;
  129:25;132:22;135:7;
  148:2;164:6,13;169:5;
  178:25;183:13;187:4;
  188:13;203:1;204:12
**Santa (1)**
  66:25
**sat (1)**
  100:13
**satisfied (1)**
  16:8
**saving (1)**
  158:20
**savings (3)**
  136:22;185:14;186:1
**saw (2)**
  12:16;30:10
**saying (14)**
  16:13;42:24;46:8;
  72:6;76:4;109:14;119:3;
  120:24;124:9,9,11;
  132:21;134:2;143:18
**Schedule (28)**
  7:10;10:3;12:21,22;
  13:3,15;26:8;27:14;
  38:4;48:22;49:15;50:15;
  71:24;72:23;74:17;
  75:19;76:3;102:6,15;
  126:18;128:5;157:24;
  158:13;164:13,21;165:9,
  19;167:17
**scheduled (2)**
  46:9,10
**schedules (8)**
  5:12,21;6:7;12:16;
  17:5;94:6;102:3;175:4
**Science (35)**
  30:1;31:11,12,19;
  33:6,8;35:18;48:16,21;
  89:4,6,15,19;106:5,7,9,
  12,15,23;107:25;129:7,
  12;134:23;135:12;
  162:8,14;165:7;188:19;
  189:8,12,16,22,25;
  192:7,20
**scientific (1)**

**100:11**
**SE (2)**
  151:16;167:5
**season (1)**
  204:5
**second (6)**
  134:5;175:5;179:7;
  186:14;195:14,15
**secretary (4)**
  84:7,16,18;85:2
**section (1)**
  26:11
**secured (1)**
  38:8
**security (1)**
  106:1
**seeing (1)**
  126:18
**seeking (1)**
  16:8
**seeks (1)**
  134:18
**seems (1)**
  182:14
**segregated (2)**
  104:2,3
**self (1)**
  90:7
**sell (2)**
  97:8;120:8
**sells (2)**
  96:18;192:9
**send (3)**
  40:17;90:25;91:2
**sense (2)**
  11:12;75:25
**sent (2)**
  16:23;17:1
**separate (11)**
  31:18;35:4,4;36:15;
  45:16,17,18,23,23;46:1,
  4
**separately (2)**
  112:15,17
**separation (1)**
  36:3
**Sepick (1)**
  128:22
**September (1)**
  198:1
**Sergio (2)**
  162:16;183:24
**series (1)**
  11:15
**Serrano (1)**
  147:3
**server (4)**
  116:25;117:7,14;
  122:15
**servers (1)**
  122:17
**service (8)**
  25:16;129:17;151:11;

Case 2:13-bk-15130-SK    Doc 65    Filed 04/09/13    Entered 04/09/13 22:16:17    Desc

TRANSCRIPT OF PROCEEDINGS
Main Document    Page 266 of 359
341(a) Meeting of the Creditors

TRANSCRIPT OF PROCEEDINGS
April 8, 2013

167:10;174:10,21;
182:8;196:10
**services (23)**
12:19;16:2,21;17:21,
22,25;18:23;19:2;52:13;
77:22;83:25;84:2;94:23;
128:12,23,24;132:15,17;
164:17,23,25;181:10;
196:11
**servicing (1)**
116:25
**serving (1)**
172:25
**set (7)**
46:2,3;102:23;103:1;
109:10;165:13;200:10
**setting (1)**
194:7
**settlement (5)**
139:15;140:25;
160:20,23;161:3
**seven (3)**
7:23;167:22;182:20
**several (3)**
14:1;15:3;137:4
**shakes (2)**
63:15;80:8
**Shane (2)**
13:17;127:23
**shareholder (1)**
8:19
**sheet (3)**
27:12,12;109:2
**shopping (1)**
181:10
**short (2)**
44:7;191:7
**shortened (1)**
7:17
**shortly (1)**
25:6
**show (7)**
48:10;58:4;113:10;
131:23;136:4;204:4,6
**showing (2)**
94:4,13
**shown (1)**
184:15
**shows (2)**
172:9;176:10
**shut (1)**
70:21
**sic (2)**
205:3,6
**sign (7)**
5:7;29:3;54:15;104:4;
117:24;133:23;156:11
**signatory (2)**
53:25;118:10
**signature (4)**
94:3,14;193:7;194:25
**signatures (1)**
5:16

**signed (15)**
5:10,13,19,24;19:12;
24:4;43:21;44:4;67:5;
94:6,10;120:1,3;193:9;
195:8
**significant (1)**
11:17;120:10;159:24
**signs (1)**
133:20
**similar (3)**
23:14;47:16;95:22
**sit (2)**
21:9;118:16
**site (4)**
51:7;52:2;100:19;
154:10
**sitting (3)**
42:1,2;175:6
**situation (2)**
76:5;164:6
**Six (7)**
7:23;115:22;117:22;
125:6;182:17;183:11;
185:13
**skin (1)**
192:9
**slash (1)**
176:10
**smaller (1)**
113:17
**Smith (4)**
195:22,24;196:2,4
**Soaker (1)**
128:22
**soft (2)**
41:25;42:3
**software (3)**
170:4,5;181:11
**sold (1)**
192:9
**solemnly (2)**
4:2;93:1
**solvent (1)**
85:12
**somebody (6)**
30:17;54:13;105:10;
116:20;182:7;198:8
**somehow (3)**
8:12;38:25;45:15
**someone (2)**
24:18;101:21
**Sometime (1)**
18:15
**sometimes (4)**
95:14;99:15;100:7,23
**somewhere (3)**
150:9;159:23;199:16
**songs (2)**
181:3,4
**Soon (3)**
126:23;134:1;192:2
**Sorry (46)**
13:13;21:18;32:6;

41:17,25;48:10;55:6;
60:2;69:17;71:3;72:16,
18;77:25;81:1;91:13;
114:13;136:13;138:18;
144:19;148:6,7;149:14;
151:3,8;154:17;158:15;
161:2;168:10,16;
169:24;170:17;173:17;
176:20;180:2;181:4,16;
183:3;189:15,15;195:9;
198:12;200:8;203:8,19;
205:5,10
**sort (27)**
9:7;11:13;17:25;
35:14;51:21;59:9;83:25;
100:1;101:18;116:16;
120:22;121:14;124:16;
125:17;126:3;128:23;
129:21;132:15;136:3;
140:9;146:6,15;153:8;
172:19,24;185:25;199:4
**sorts (2)**
35:2;47:22
**sounds (1)**
54:7
**source (7)**
53:12,22;89:18,20;
90:16;113:18;114:10
**space (4)**
50:6;99:12;106:4;
136:14
**Spanish (3)**
184:15,18,22
**speak (18)**
33:3;38:17;40:23;
41:2,6;42:2,4;66:15;
68:12;79:12;80:7,14,19;
98:21;125:7;143:9;
151:7,7
**speaking (2)**
97:10;102:18
**specialist (4)**
152:20;157:4;159:8;
165:12
**specialists (1)**
141:11
**specific (6)**
19:6;115:21;153:1,2;
155:16;158:25
**specifically (3)**
49:11;153:17;156:8
**specifics (2)**
43:13;47:23
**Spell (1)**
83:11
**spelled (1)**
20:14
**spend (3)**
57:6,25;88:5
**spending (1)**
51:5
**spent (2)**
109:13;141:11

**Split (1)**
174:11
**spoken (3)**
41:25;42:3;79:19
**spring (1)**
136:4
**Springs (1)**
97:19
**St (1)**
25:19
**staff (4)**
61:25;62:20,23;63:17
**staffed (1)**
34:25
**standards (2)**
121:10;129:2
**standing (1)**
66:16
**stands (2)**
21:9;108:11
**Stang (2)**
65:17;163:22
**start (7)**
12:20;45:2,8;46:24;
54:9;80:2;180:22
**started (2)**
172:25;202:23
**starting (1)**
61:14
**Starts (3)**
73:4;186:14,15
**state (11)**
3:18;40:21;53:5;
65:12;84:7,16,18;85:2;
92:1;103:18;163:17
**statement (38)**
12:24;13:4;35:1;
49:18;50:14;52:23;
56:20;75:8,11,12;76:23;
77:3,14;134:3,16;
167:22;168:18,21;
169:21;172:1;175:4;
176:8,23;179:1;180:17;
182:13,19;186:6,12;
187:5,11,12,24;188:15;
190:15;192:11,12,20
**statements (1)**
94:7
**States (3)**
3:6;91:15;188:18
**status (11)**
21:5;25:9;70:8,12;
78:20,22;85:21;86:6;
103:22;139:19;173:20
**stay (1)**
201:25
**stayed (2)**
25:11,13
**stepped (1)**
150:12
**Steve (4)**
11:21;18:6,8;102:25
**still (39)**

19:20;21:10;25:15;
35:4;45:16;48:15;52:6;
59:24;64:20,23;77:3;
82:23;85:1;91:12;94:13;
101:23;103:10,11,14;
104:6;105:15,24;
106:20;108:21;109:18,
22;113:2;121:3;145:1;
147:8,17;148:13,20;
149:5,21,23;162:6;
199:23;200:2
**stole (1)**
183:14
**stop (1)**
67:14
**storage (2)**
122:23;123:1
**story (1)**
98:21
**strategies (1)**
121:11
**strategy (8)**
71:9,10;85:8;120:22,
23,24;121:3,14
**Strawn (4)**
23:3,5,17,22
**stream (2)**
97:8;165:24
**streamable (1)**
196:24
**streaming (3)**
96:18;113:19;114:21
**streams (1)**
96:20
**strict (3)**
36:3,17,19
**strictly (1)**
33:1
**strike (1)**
59:8
**strikes (1)**
181:18
**structure (4)**
30:22,24;116:22;
117:8
**structures (1)**
114:2
**Studder (1)**
179:5
**Studer (1)**
179:5
**stuff (5)**
121:5;122:10;175:16,
17;180:4
**sub (26)**
6:16,16;27:22,24,25;
28:12,19;38:12;40:10;
41:5;44:21;47:17;50:10;
74:20,20;75:9,9;77:16;
78:22;79:10;106:23;
107:16,20,24;189:18,20
**subject (3)**
103:18;119:4;165:10

submitted (1)
  18:22
subsequent (1)
  172:16
subsidiary (1)
  94:25
substance (1)
  203:9
substantive (4)
  187:9;203:7,15,16
substantively (1)
  45:24
suffered (1)
  25:22
suggested (1)
  86:7
suggestion (1)
  114:23
suit (3)
  15:24;76:2;127:22
suits (1)
  11:16
summary (7)
  5:12;6:12;94:6,20;
  185:14,16;186:17
sums (1)
  198:3
super (1)
  53:6
supervised (1)
  167:24
support (1)
  132:19
supposed (1)
  42:16
Sure (41)
  6:10;14:7;36:12;
  38:15,18;65:22;66:1;
  70:9;71:18;72:7,12;
  73:1;74:1;75:9;79:6;
  84:21;90:3,19,22;92:3;
  108:17;110:7;116:3,19;
  117:4;121:17;125:25;
  142:23;153:24;154:24;
  157:11;159:1;163:24;
  167:7;170:7;176:21;
  177:20;183:12,22;
  191:17;200:17
surface (1)
  113:23
surprised (2)
  69:1;142:7
swear (2)
  4:2;93:1
switch (1)
  172:6
Synergy (1)
  151:20
synonymous (1)
  132:13
system (1)
  116:17

**T**

tab (12)
  66:5,7;71:23;72:23;
  76:22;78:19;164:2,13;
  165:9;167:22;173:19;
  175:1
table (1)
  14:1
tabs (1)
  70:9
tact (2)
  103:24;108:21
talk (3)
  6:8;11:22;150:3
talked (10)
  14:17;50:13;62:23;
  87:14;104:22;127:25;
  128:5,18;135:19;160:21
talking (17)
  5:23;57:9,14,16;61:9;
  72:11;87:20;92:14;99:1;
  101:1;107:18,20;
  124:17;182:23,25;
  199:1;203:12
talks (3)
  76:23;78:22;189:3
Tamara (2)
  24:15;132:20
tangible (1)
  122:8
tasks (2)
  32:3;35:22
tax (10)
  49:22;106:1;133:20;
  137:22,23,25;153:21,22;
  155:17;156:8
taxes (3)
  90:6;138:6;153:9
team (4)
  31:3,5,6;197:7
Technically (2)
  28:7;35:23
technology (1)
  124:16
tells (1)
  151:21
ten (2)
  191:16,19
tenant (2)
  106:23;189:8
tenure (6)
  38:16;58:22;61:1;
  74:8,14;160:14
term (7)
  20:16;26:16;37:17;
  44:4;115:20;125:21;
  162:7
terminate (2)
  38:12;40:10
terminated (2)
  28:8,11,16;38:21;

48:12
terminating (1)
  40:22
termination (8)
  40:14,17;42:10,12,14,
  14,15,19
terminology (1)
  125:15
terms (20)
  9:10;31:12,18;33:5,
  17;34:15;36:15;41:11;
  43:10,12;44:8;47:15,20;
  96:16;114:18,24;115:1,
  10;202:24;203:9
testified (4)
  55:3;189:7;197:17;
  202:22
testify (3)
  4:2;88:12;93:1
testifying (2)
  5:1;10:10
testimony (9)
  4:11,21;34:12,14,17;
  93:10;95:12,15;183:25
textural (3)
  175:9,11,19
Thanks (5)
  7:13;66:3;94:18;
  169:20;192:1
that'll (1)
  28:5
thinking (3)
  131:3,4;177:10
third (1)
  30:4
Thomas (2)
  179:4,8
though (11)
  24:20;34:13;51:24;
  84:3;119:24;120:21;
  125:5;132:19;154:19;
  170:4;193:11
thought (12)
  12:16;22:7,14;30:10;
  38:19,20;44:21;84:23;
  85:3;101:6;107:12;
  143:23
thousand (5)
  160:21;172:18,18;
  173:8,11
three (24)
  6:14,18,19;10:4;
  26:18;29:18,21;30:8;
  39:19;51:6,10;52:24;
  76:22;78:23;89:4;
  123:23;125:2,3;134:4;
  141:7;142:6,7;172:1;
  178:1
three-month (1)
  141:8
three-year (1)
  145:6
throughout (2)

114:10;172:18
thunder (1)
  183:14
tied (1)
  165:24
Tim (1)
  3:16
times (6)
  114:23;123:23;133:9;
  135:20;198:22,24
timing (1)
  85:8
tired (1)
  190:4
title (4)
  15:11;37:19;101:21;
  149:18
today (16)
  4:12;21:9;51:8;52:3;
  61:20;63:2;74:22;93:11;
  95:12,17;103:22;
  105:23;118:17;119:18;
  204:14,17
Today's (2)
  3:4;91:10
Todd (1)
  152:8
told (3)
  33:4;36:16;71:7
tomorrow (1)
  103:23
took (3)
  148:18;158:17;175:20
top (8)
  30:23;55:17;108:13;
  170:19;171:5;185:5;
  186:8;187:24
totally (1)
  30:4
touched (1)
  50:13
tour (2)
  179:11,14
touring (2)
  147:20;148:19
track (1)
  187:2
trademark (5)
  28:9;49:1;141:5;
  190:16;191:4
trading (3)
  81:25;82:1,15
trailers (1)
  38:5
transaction (2)
  159:5;185:21
transactions (3)
  81:21;184:15;203:5
TRANSCRIPT (1)
  3:1
transfer (11)
  136:21;156:14;
  159:25;170:11,22;

197:23,24,25;198:1,2,2
transferred (1)
  198:3
transferring (1)
  171:1
transfers (4)
  160:1;171:5;197:22;
  199:12
transition (1)
  172:21
transitioned (1)
  172:15
trolling (1)
  20:17
trouble (1)
  179:3
trucks (1)
  38:5
true (5)
  54:6;120:18;145:7;
  175:7;184:16
trust (10)
  43:7;49:6;195:2,6,20,
  22,23,24;196:2,4
trustee (8)
  89:25;90:4,8,21;91:2,
  15;183:7;195:23
Trustees (1)
  3:6
Trustees' (1)
  152:22
truth (4)
  4:3,3;93:2,2
truthful (2)
  4:11;93:10
try (9)
  4:16;20:17;47:2;
  60:16;93:15;98:16;
  163:24;179:23;180:5
trying (7)
  43:16;71:18;92:8;
  180:3;183:12;190:20;
  201:24
tune (1)
  114:20
turn (13)
  26:8;64:3;71:23;
  102:14;103:20,23;
  164:13;173:19;175:1;
  178:16;180:13;181:8;
  183:16
turned (2)
  103:15,25
Turning (17)
  66:5;74:17;75:19;
  77:4,14;78:19,21;164:2,
  21;165:19;167:17;
  169:20;176:6;178:25;
  181:11;185:1;192:22
turns (1)
  85:18
TV (7)
  110:9;113:15;136:4;

Case 2:13-bk-15130-SK   Doc 65   Filed 04/09/13   Entered 04/09/13 22:16:17   Desc
Main Document   Page 268 of 359
TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT OF PROCEEDINGS
341(a) Meeting of the Creditors

April 8, 2013

173:23;202:19;204:4,6
**two (33)**
  8:6;51:2;56:21,22;
  72:23,25;74:18;78:20;
  79:16;85:23;95:25;
  109:9;112:20;113:4,5;
  115:21;117:21;123:9,
  20;138:2;140:21;141:3;
  145:7;147:12;148:16;
  173:14;175:5;188:2;
  189:21;191:15;203:24;
  204:13,18
**TYM (62)**
  3:16;14:10,13,16;
  22:12,17,21,25;23:2;
  26:7;28:7,22;41:23;
  42:5;48:23;49:1;50:21;
  51:4,17,18,19,25;52:4,
  10;65:9;68:8,20;81:7;
  84:11,13,17;85:3;86:6;
  87:15;88:18,21;91:24,
  24;107:14;111:19,23,25;
  112:25;113:3,8;119:23;
  131:6,9;136:18;139:8,
  22;140:3;141:5,14;
  160:19,25;167:3,5;
  175:2,6;201:19,23
**T-y-m (1)**
  3:16
**Tym's (4)**
  51:11;52:12;84:10;
  159:13
**type (6)**
  100:5;110:12;114:17;
  132:14;136:5;192:7
**types (1)**
  114:3
**Typically (5)**
  15:3;97:24;114:11;
  135:10;175:15

---

## U

**ultimate (4)**
  9:22;15:19;43:9;
  123:16
**ultimately (1)**
  120:1
**unaffiliated (1)**
  30:4
**under (22)**
  5:10;6:15;35:9;41:15;
  47:16;55:15,19;57:23;
  75:20;92:24;94:10;
  96:21;121:20;132:21;
  144:7,8,13;152:17;
  153:4;159:8,8;180:7
**underlying (2)**
  139:21;140:5
**understands (1)**
  184:18
**Understood (2)**
  74:3;75:14

**unexpired (1)**
  48:20
**UNIDENTIFIED (17)**
  152:16,19,24;153:1,4,
  15,19;154:5,9;157:3,12;
  158:7;159:7;161:11,18,
  23;183:7
**unit (1)**
  84:8
**United (2)**
  3:6;91:15
**University (1)**
  136:22
**unknown (1)**
  129:2
**unless (1)**
  200:3
**unpaid (1)**
  130:4
**unusual (1)**
  52:10
**up (22)**
  33:3;41:6;42:2,4;
  48:11;58:4;62:14;65:12;
  66:15;73:4;80:7,8;
  100:8;114:1;118:4;
  138:3;151:7,7;163:17;
  172:18;193:2;202:23
**upfront (2)**
  121:24,25
**upon (1)**
  50:14
**usage (1)**
  200:19
**USC (1)**
  3:8
**use (57)**
  20:16;28:1;48:3;58:3,
  16,20,23;59:19,22;
  60:13,22;61:1,6,22;62:1,
  21,24;63:2;79:9;84:15;
  117:13;118:23;119:16,
  17;120:8,12,25;129:17;
  131:16,19;132:7;
  135:12;143:2;144:3;
  145:23;154:16,18;
  155:2;162:7;163:8;
  170:4,5;178:5,13;181:3,
  9,23;192:14,16;196:16;
  198:15;199:5,10;200:5,
  17;201:23;202:1
**used (37)**
  57:18;64:21;73:11;
  78:23;99:19,22,23,24;
  100:2;108:15;109:1,4;
  124:22;125:4;126:7,13;
  140:11;141:23;142:23;
  155:3;156:18,19;163:5;
  176:24;177:24;178:8;
  179:21;180:22;186:24;
  187:2;198:21,24;200:11,
  23;201:10,13,20
**user (1)**

57:23
**uses (11)**
  84:7;140:18;154:21;
  177:4,11,14,17;178:17,
  20;198:9;200:13
**using (11)**
  37:16;52:12;59:16,24;
  114:23;131:21;134:23;
  139:14;153:23;199:23;
  200:2
**usually (2)**
  55:8;122:20
**utilize (1)**
  180:20
**utilized (2)**
  180:8;189:9
**utilizes (1)**
  186:20

---

## V

**Vague (2)**
  125:20;179:25
**valid (1)**
  105:15
**valuation (1)**
  73:1
**value (5)**
  26:15,16,24,24;122:9
**valued (2)**
  26:20,21
**values (1)**
  26:22
**variable (1)**
  116:22
**varied (1)**
  158:5
**varies (1)**
  88:8
**variety (1)**
  113:25
**Various (8)**
  10:18;32:16;100:17;
  110:1;124:15;149:4;
  175:3;181:6
**varying (1)**
  172:10
**VCI (4)**
  135:25;136:2;137:4;
  155:15
**Vegas (3)**
  25:20;65:18;163:23
**vehicles (1)**
  38:6
**vendor (1)**
  168:19
**vendors (3)**
  124:16,16,23
**venue (1)**
  84:5
**verbal (2)**
  63:11,14
**versa (1)**

148:18
**versus (6)**
  114:20;134:17,21;
  135:21;173:8,8
**via (2)**
  30:21;156:13
**vice (1)**
  148:18
**Vicspurt (1)**
  152:6
**video (5)**
  96:18;97:13,13;98:22;
  114:7
**videos (6)**
  96:23;97:2,8;136:5;
  196:20,24
**view (20)**
  22:18;110:2;114:6,6,
  21;115:4,7,12;116:11,
  21;132:16;166:9,25;
  167:6,9,15;196:9,11,17;
  202:15
**Viewer's (1)**
  203:3
**views (1)**
  116:17
**Villanueva (5)**
  37:13;81:1,10;117:18;
  149:23
**visit (3)**
  51:7;52:2;100:19
**volition (1)**
  102:2
**VP (15)**
  32:22;33:1;37:8,12,
  14,16,17;116:1,2;
  117:16,17;123:12;
  149:19,23;197:7
**VPs (7)**
  30:25;34:23;80:16,25;
  81:12;117:25;147:15

---

## W

**W-2 (3)**
  134:21;135:11,14
**Wade (5)**
  13:16;72:3,10;127:22;
  135:17
**wage (4)**
  129:20,23;132:13;
  135:22
**wages (1)**
  129:15
**wait (10)**
  39:3;60:16;72:11;
  77:18;126:20;130:25;
  134:10;157:17,17;
  169:23
**Wal-Mart (1)**
  184:20
**wants (4)**
  35:11;97:23;103:17;

152:14
**way (18)**
  29:25;36:8;42:1;
  54:18;65:23;66:17;
  71:15;79:22;85:4;
  101:12;111:8;134:12;
  159:3;165:17;180:24;
  181:14;190:6;204:16
**website (5)**
  113:23;124:5,7;197:2,
  6
**week (10)**
  29:10,14;30:16;46:2;
  88:5,6,9;112:13;141:3;
  166:2
**weeks (1)**
  173:15
**welcome (1)**
  76:16
**Wells (2)**
  52:24;54:1
**weren't (4)**
  46:16;75:21;144:16;
  203:1
**what's (8)**
  14:25;21:5;73:1;
  84:25;123:9;154:4;
  155:20;195:9
**whatsoever (3)**
  17:16;49:19;168:4
**whenever (2)**
  61:19,24
**where'd (1)**
  53:22
**Whitney (1)**
  128:10
**whole (4)**
  4:2;93:1;160:10,12
**who's (9)**
  22:15;34:16;37:8;
  39:4;79:3;88:22;89:6;
  132:20;157:15
**Whose (2)**
  67:21;186:3
**Wild (20)**
  20:24;23:11;28:2,3;
  38:13;59:7,7,12;96:21;
  118:23;119:16;120:12;
  121:1;131:16;155:3;
  156:18;196:16;197:6;
  198:19;200:1
**Wilshire (3)**
  106:4;136:15;169:17
**Wilson (2)**
  188:4;204:3
**Winston (4)**
  23:3,5,17,22
**wire (2)**
  156:13;159:24
**wise (1)**
  190:19
**withdrawn (1)**
  25:6

Case 2:13-bk-15130-SK   Doc 65   Filed 04/09/13   Entered 04/09/13 22:16:17   Desc

TRANSCRIPT OF PROCEEDINGS
341(a) Meeting of the Creditors

Main Document   Page 269 of 359

TRANSCRIPT OF PROCEEDINGS
April 8, 2013

**withdrew (1)**
25:6
**within (5)**
57:11;76:12;85:23;
135:25;161:4
**without (3)**
22:19;115:19;176:12
**WITNESS (84)**
6:1;7:8;8:25;11:2;
12:10;14:11;20:15;
21:18;26:11;35:12,14;
36:12;37:10;40:6;51:12;
53:20;55:24;56:2,8;
57:20;68:8;69:5,15;
70:18,21;73:6;74:12;
75:2,12,15;77:19;78:1;
79:4,23;80:10;83:13;
86:3;89:2;90:2,10;91:6;
94:18;99:2;101:6;105:3,
21;116:3;119:1,3,12;
122:1;125:22,25;
126:20;128:18;133:7;
136:10;137:19,25;
138:9;151:8;154:12;
157:10;161:22;162:19,
25;166:5,9,14;168:25;
169:13;171:22;172:7;
178:11,20;179:8,10;
181:17;182:20;189:1;
192:1;193:20;197:15;
199:18
**women (1)**
95:25
**won (1)**
204:5
**wondering (1)**
181:11
**work (24)**
22:21;23:11,17;29:9,
22;30:14;31:9,11,14,14,
15;32:18,20;36:18;
50:22;73:17;97:21;
113:22;138:20,23;
157:19;164:22,24;
204:20
**worked (5)**
83:23;88:4;140:8,10,
14
**worker (1)**
144:16
**working (13)**
7:24;8:10;20:3;29:7,
20;32:17;36:23;43:7;
51:5;52:7;82:23;101:23;
179:15
**works (4)**
22:17;28:25;39:1;
162:19
**world (2)**
20:18;179:12
**worth (5)**
56:22;118:21;182:6;
185:19;191:1

**writ (1)**
79:22
**writing (1)**
111:7
**written (13)**
34:20;41:5,7;87:10;
107:6,11,14;126:23;
143:3,5,23;166:12;199:9
**wrong (3)**
79:2;131:5,10
**Wynn (17)**
11:21;18:7,8,8,11,13;
24:11,12;25:20;26:6;
65:18;79:4;102:25;
129:25;163:23;164:22;
167:19

## Y

**Yaspan (367)**
3:13,13;5:20,23;6:13,
22;7:7;8:20,24;9:3;
10:19;12:1,7,23;13:1,6,
10,13;14:2;17:13;20:14;
21:17;22:4;25:4;26:10;
27:6,11,22;28:5,13,22;
31:20;32:19;34:5,9;
35:6,10,13;36:6,10;37:3,
5,9;39:6,15,18,21,24;
40:1,3;42:12;43:14,18;
44:14,18,23;45:9,18;
46:7,13,17,23;48:5,18;
49:9;50:17,23;51:2,13,
22;52:8;53:14,18;54:25;
55:2,6,12,21;56:7,14,19,
23;57:7,11,14,19;60:1,4,
7,16,19;61:9,13;62:7,13;
63:22,25;64:3;65:8,25;
66:17,21;67:18;68:3;
69:3,14,21;70:1,6,14,17,
20,25;71:2,6,12,21,25;
72:4,10;73:4;74:8,11,22,
24;75:11;76:17;77:10,
18;79:2,8,14,18,21;
80:23;82:11;83:11;85:9,
11;86:2,5,7,10,12,22,25;
87:5,11,13,17,20,23,25;
88:12,20;89:13,19;
91:12,21,21;92:7;94:13,
17,21;96:13;97:3,5;
98:5;99:1,4;101:1,4;
102:7,10;103:13,17;
104:3,9,13,20,21;105:2,
6,13,17,20;107:13,17,20,
23;108:1,5,23;109:1,4,8,
12;110:19,23;111:5,9,
11;112:6,11,18,21,24;
113:6;115:14;116:2;
118:13,18,24;119:2,5,9,
11;120:14;121:2,6,9,23;
122:2,5;124:5,9,12,19;
125:9,20,23;126:23;
127:2,7;128:7,16;

130:15;131:1,3,11,22;
132:1,4;133:2,6,11;
134:8,11;136:8;137:6,
14,17,24;138:5,15,25;
139:17;141:12;142:10;
145:1,5,7;146:8,11;
149:11,13,15;150:3,17;
151:7,21;153:11;154:7;
156:5,9;157:17,22;
158:1,10,13,15,17;
159:4,11;160:4,7,11,15,
23;161:1,3,6,16,19,24;
162:18,24;163:12,20;
164:14;166:3,7,11,15;
168:23;169:9,23,25;
170:14,21;171:15,16,21;
172:6;174:2,11,14,18;
175:13,23;176:3,14;
177:13;178:10,17;179:6,
9,23,25;180:15;181:2,5,
20;182:1,16,23,25;
183:5,20;184:14,17,21,
24;185:11,18,23;188:21,
25;189:2;190:2,18;
191:9,12,21,24;197:14;
199:14;200:14,24;201:6,
15;202:22;203:22;
204:10,16;205:7,9
**year (20)**
30:9;44:2;50:2;61:17;
114:3;115:21;117:21;
123:14,16,20,24;133:23;
135:12;142:5,11;
147:25;148:5,25;163:7;
193:3
**years (15)**
8:6;10:4;56:15,22;
67:17;79:16;115:21;
117:21,21;123:23;125:2,
3;147:13;148:16;164:6
**years' (1)**
56:22
**Yep (1)**
182:16

## Z

**Zieh (2)**
65:17;163:22

**GZJ KDKV'E''**

1   MALHAR S. PAGAY (CA BAR NO. 189289)
    VICTORIA A. NEWMARK (CA BAR NO. 183581)
2   STEVEN J. KAHN (CA BAR NO. 76933)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 13th Floor
    Los Angeles, California 90067
4   Telephone:    310/277-6910
    Facsimile:    310/201-0760
5   E-mail:       mpagay@pszjlaw.com
                  vnewmark@pszjlaw.com
6
    MITCHELL J. LANGBERG (CA BAR NO. 17192)
7   LAURA E. BIELINSKI (CA BAR NO. 264115)
    BROWNSTEIN HYATT FARBER SCHRECK, LLP
8   100 North City Parkway, Suite 1600
    Las Vegas, Nevada 89106
9   Telephone:    702/382-2101
    Facsimile:    702/382-8135
10  Email:        mlangberg@bhfs.com
                  lbielinski@bhfs.com

11  Attorneys for Wynn Las Vegas, LLC d/b/a Wynn Las Vegas

12              UNITED STATES BANKRUPTCY COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                  LOS ANGELES DIVISION

15  In re:                          Case No.: 2:13-bk-15130-SK

16  GGW BRANDS, LLC,                Chapter 11

17                     Debtor.      **PERTINENT EXCERPTS OF THE
                                    TRANSCRIPT OF PROCEEDINGS OF
18                                  341(A) MEETING OF THE
                                    CREDITORS OF THE DEBTORS**

19

20                                  **Hearing**
                                    Date:     April 10, 2013
21                                  Time:     10:30 a.m.
                                    Place:    Courtroom 1575
22                                            255 E. Temple Street
                                              Los Angeles, CA 90017
23

24

25  **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE,**

26  **AND ALL PARTIES IN INTEREST AND THEIR ATTORNEYS OF RECORD:**

27          **PLEASE TAKE NOTICE** that Wynn Las Vegas, LLC d/b/a Wynn Las Vegas ("Wynn Las

28  Vegas"), herein submits pertinent excerpts from the Transcript of Proceedings of 341(a) Meeting of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Creditors conducted April 8, 2013, in support of its *Motion for Order Directing the Appointment of a*

2  *Chapter 11 Trustee*.

3

4

5  Dated: April 9, 2013                          PACHULSKI STANG ZIEHL & JONES LLP

6

7                                                By:    /s/ Malhar S. Pagay

8                                                       Malhar S. Pagay
                                                        Victoria A. Newmark

9                                                BROWNSTEIN HYATT FARBER
                                                 SCHRECK, LLP
10

11                                               Mitchell J. Langberg

12                                               Laura E. Bielinski

13                                               Attorneys for Wynn Las Vegas, LLC, d/b/a Wynn
                                                 Las Vegas
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:266435.1 93837/001                       2

# DEPARTMENT OF JUSTICE

## OFFICE OF THE UNITED STATES TRUSTEE

### REGION 16

### LOS ANGELES, CALIFORNIA

## TRANSCRIPT OF PROCEEDINGS OF

## 341 (A) MEETING OF THE CREDITORS

### April 8, 2013

Lisa Day, CSR No. 12960

356395




barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(916) 922-5777 Sacramento    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills    (212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains    (312) 379-5566 Chicago    (702) 366-0500 Las Vegas
+33 1 70 72 65 26 Paris    +971 4 8137744 Dubai    +852 3693 1522 Hong Kong

1          DEPARTMENT OF JUSTICE

2      OFFICE OF THE UNITED STATES TRUSTEE

3              REGION 16

4          LOS ANGELES, CALIFORNIA

5

6

7

8

9

10       TRANSCRIPT OF PROCEEDINGS OF

11       341(a) Meeting of the Creditors

12              April 8, 2013

13              Room 2610

14

15

16

17

18

19

20

21

22

23

24       Transcribed by Lisa Day

25   Certified Shorthand Reporter No. 12960

                      2

BARKLEY
Court Reporters

1   BY DARE LAW:

2       Q    And what is Pablo Holdings?

3            ROBERT YASPAN:   What does that mean, "what

4   is"?

5   BY DARE LAW:

6       Q    Is it a corporation?  Is it an LLC?  Is --

7   what sort of entity is it?

8       A    It's an LLC.

9       Q    And do you know what Pablo Holdings does in

10  terms of its business?

11      A    No.

12      Q    And who is the member of Pablo Holdings?  Do

13  you know?

14      A    I -- I don't know.  I don't know.

15      Q    Do you have any ownership interest in GGW

16  Brands, LLC?

17      A    No.

18      Q    Who do you take direction from with respect to

19  the members of Brand?

20      A    No one.

21      Q    So is it fair to say that with respect to the

22  management of Brands, you are the ultimate

23  decision-maker?

24      A    Yes.

25      Q    And why did Brands file bankruptcy?

9

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    A   I think it was a matter of finances and -- and

2 debt to income and asset ratio.

3    Q   Well, according to the schedule, there has

4 been no income to this debtor for the past three years,

5 so I'm going to get into that in a little while.

6       What do you mean by debt to income ratio?

7    A   I -- I -- I don't know.  I don't know if it

8 had to because the other entities that it is the parent

9 company of filed.  I'm not certain how to answer that.

10    Q   Are you going to be testifying for Direct,

11 Events, and Magazine?

12    A   Yes.

13    Q   So what caused the bankruptcy filing in

14 general for Brands and to the other companies?

15    A   I think it's a matter of debt to income.

16 I'm -- not being able to pay bills.

17    Q   What bills was it not able to pay?

18    A   Various.

19       ROBERT YASPAN:  Did it have anything to do

20 with --

21       DARE LAW:  Counsel, I -- I want to ask the

22 questions.  So if he doesn't understand, please let him

23 tell me he doesn't understand my question.  Let him

24 answer and then if we need a clarification, we can have

25 either some colloquy or I can re-ask -- rephrase the

10

TRANSCRIPT OF PROCEEDINGS

BARKLEY
*Court Reporters*

1   question for Mr. Dale.

2          THE WITNESS:  Yeah, I don't understand the

3   question.

4   BY DARE LAW:

WYNN

5      Q     Well, the debtor filed bankruptcy.  Was there

6   a precipitating factor that caused the debtor to file

7   bankruptcy?

8      A     I think legal concerns.

9      Q     Like what?  What do you mean by legal

10  concerns?

11     A     I don't know exactly how to answer that to --

12  to make sense.

13     Q     Was there some sort of lawsuit pending at the

14  time?

15     A     I think it's -- it's a series of lawsuits and

16  the legal expenses defending those suits are

17  significant.

18     Q     What was the nature of the lawsuits?

19     A     Some had to do with people that were filmed at

20  one time or another.  Some had to do with Joe Francis

21  and Steve Wynn.

22     Q     Okay.  Let's talk about the filming.  What

23  lawsuits were either pending or had been concluded or

24  were potential lawsuits with respect to filming.  What

25  does that mean?

11

BARKLEY
Court Reporters

1          ROBERT YASPAN:  -- that has the -- the

2    lawsuits?

3          DARE LAW:  I'm going to go through Schedule F

4    first and then I'll come back to the statement of

5    financial affairs.

6          ROBERT YASPAN:  Okay.  Oh, F, that was in the

7    earlier file.

8          DARE LAW:  Right.  It's the -- it was filed

9    on --

10          ROBERT YASPAN:  27th.

11          DARE LAW:  -- February 27th along with the

12    initial petition.

13          ROBERT YASPAN:  Sorry.

14    BY DARE LAW:

**WYNN**

15      Q    Okay.  For Schedule F there was the first

16    claim for Alan Michael Wade care of the Law Offices of

17    Shane M. Malade or Malade.  It says, "(inaudible)

18    pending litigation re personal injury."  What is that

19    debt about?

20      A    I don't know.

21      Q    Well, where did you get this information to

22    include this debt on the petition?

23      A    Possibly from counsel or the accounting

24    department.

25      Q    When you say possibly counsel, which counsel?

13

TRANSCRIPT OF PROCEEDINGS

**BARKLEY**
Court Reporters

WYNN

1    You have several counsel at the table?

2              ROBERT YASPAN:  A couple.

3    BY DARE LAW:

4         Q    A couple?

5         A    (Inaudible) can I ask a question to my

6    counsel?

WYNN

7         Q    Yes, sure.

8         A    Do you know what this is or remember what this

9    is.

10             RONALD TYM:  Yeah, I provided the information.

11             THE WITNESS:  Okay.

12   BY DARE LAW:

13        Q    So Mr. Tym provided it to you?

14        A    Yes.

15        Q    And you had discussion about this claim with

16   Mr. Tym?  I don't really want to know the -- the nature

17   of the discussion.  I just want to know if you talked

18   to him about it.

19        A    If -- if at all, it was brief.  I don't

20   remember much about it.

21        Q    Who provides direction to counsel with respect

22   to lawsuits that might be pending?

23        A    I do.

24        Q    So you're the interface with counsel if

25   there's a lawsuit, what's happening in the lawsuit,

14

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    Counsel, I need you to look into that to see

2    whether in fact they are a creditor if they had

3    represented Brands.

4           And do you know, Chris, may have signed the

5    retainer agreement on behalf of Brands?

6      A    I don't know.

7      Q    Was this litigation pending when you became

8    manager?

9      A    Yes.

WYNN  10      Q    Okay.  And then there is the attorney for

11   Wynn, it says notice only but no dollar amount owed.

12   That -- does this relate to the litigation that Wynn

13   has against Joe Francis?

14     A    Yes.

15     Q    And then there is the Tamara Favazah claim?

16     A    Yeah.

17     Q    What is that for?

18     A    I believe it has to do with someone who was

19   filmed who was not 18.  I don't remember directly

20   though.

21     Q    And who was handling this litigation on behalf

22   of the debtor?

23     A    I don't remember.

24     Q    The attorney?  You don't know the outside

25   attorney?

24

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1       A    Right.  I can't remember the name.

2            DARE LAW:  Counsel, do you recall who the

3    outside attorney might be?

4            ROBERT YASPAN:  I believe the name -- the name

5    of the firm was Barry and Maxim, but they have

6    withdrawn -- they withdrew shortly the filing of the

7    petition.

8    BY MS. LAW:

9       Q    And what is the status of the litigation with

10   Ms. Favazah?

11      A    As concerns these entities, it's stayed,

12   but --

13      Q    Right, but at -- before it got stayed, where

14   were we?

15      A    It was still determining whether proper

16   service had been made and whether there was personal

17   jurisdiction over GGW Brands.

18      Q    Where is the lawsuit pending?

19      A    In federal court in St. Louis.

20      Q    And then the Wynn Las Vegas, there's just over

21   $10 million claim.  It says, "Alter ego claim against

22   debtor for judgment suffered by Joe Francis."

23           And what is that claim about?

24      A    I believe it's an attempt to collect on the

25   judgment that is against Mr. Francis.

25

TRANSCRIPT OF PROCEEDINGS



1      Q    And is there a lawsuit against the debtor

2  pending on this?

3      A    Don't know.

4      Q    Since you became manager, have you interfaced

5  with any attorney on behalf of Brand with respect to

6  this Wynn claim?

7      A    If at all, only Mr. Tym.

8      Q    According to your Schedule B, you can turn to

9  it if you like, it says that --

10         ROBERT YASPAN:  B as in --

11         THE WITNESS:  Is it in this same section?

12  BY DARE LAW:

WYNN

13     Q    Right, B, personal property.  It says that the

14  debtor holds 100 percent membership interest in GGW

15  Direct, LLC, and you value that interest at

16  3.3 million.  How did you term that value?

17     A    As a, I believe, combined assets of the other

18  three entities you mentioned.

19     Q    Well, it says here Direct is 3.3 million by

20  itself, Magazine is valued at 100,000, and Events is

21  valued at $336,000.  How did you determine these

22  values?

23     A    Based on sales, assets.

24     Q    Is it book value or liquidation value?

25     A    I don't know the difference of that actually.

26

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1       Q    Now, it says here that there's $4,000 due from

2   affiliates.  What would that be from?

3       A    Due from affiliates, due to -- maybe amounts

4   that are due back that were over paid.  I'm not

5   certain.

6            ROBERT YASPAN:  There's a due from due to

7   chart and this is the net number as of some date before

8   the filing.

9   BY DARE LAW:

10      Q    Did you provide a due from due to chart?

11           ROBERT YASPAN:  I believe we gave you the

12  balance sheet.  Those numbers are on the balance sheet.

13  BY DARE LAW:

14      Q    On Schedule B number 23 it says licensees,

15  franchises, and other general intangibles but it says

16  none.  Does Brands have any interest in any

17  intellectual property?

18      A    I don't believe so.

19      Q    I believe earlier there was a comment that

20  Brands was a licensee of some intellectual property.

21  Did I hear that earlier?

22           ROBERT YASPAN:  You heard sub licensee.

23  BY DARE LAW:

24      Q    Sub licensee.  Okay.  What is the intellectual

25  property for that sub licensee?

27

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1     A     I believe the use of -- I think it's Girls

2     Gone Wild.

3         Q     The brand name Girls Gone Wild?

4     A     I believe so, yeah.

5             ROBERT YASPAN:   Yeah, that'll have to be

6     amended.   Go ahead.

7             RONALD TYM:   Technically it's correct that all

8     licenses to Brands were terminated prior to the filing

9     of this bankruptcy.   There's a new trademark agreement,

10    but that is with Direct.

11            DARE LAW:   So who terminated the agreement on

12    the sub licensee.

13            ROBERT YASPAN:   You're right.   It's with

14    Direct.   Thank you.

15    BY DARE LAW:

16        Q     Mr. Dale, who terminated the agreement with

17    the licensor?

18    A     I'm not certain.   I think -- I don't know.

19        Q     Who was the licensor if Brands was the sub

20    licensor?

21    A     I don't know.

22            ROBERT YASPAN:   Mr. Tym might know.

23    BY DARE LAW:

24        Q     Can you explain to me what you're duties are

25    as a manager?   Because every organization works a

28

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    little bit differently, so can you explain to me what

2    you do as a manager?

3        A    Make decisions on hiring and firing, sign

4    checks when there's a bill to be paid, general

5    direction of the business.

6        Q    And what is your day-to-day like?

7        A    Working with the department heads to run the

8    business.

9        Q    And how many hours do you normally work a

10   week?

11       A    Pretty limited.

12       Q    Why would it be limited?

13       A    I don't know.  Maybe just a couple hours a

14   week.

15       Q    For Brands or for all the four debtors?

16       A    All four.

17       Q    Do you hold a job outside of being manager for

18   whether it's Brands or the other three entities?

19       A    Yes.

20       Q    Oh, what is it that you do outside of working

21   for Brands and -- and the other three entities?

22       A    Human resources work for another company.

23       Q    And what is that other company?

24       A    Movie Clips.

25       Q    And Movie Clips in any way affiliated with

29

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    Brands, Direct, Events, Magazine, or Perfect Science

2    Lab?

3        A    No.

4        Q    So it's a third party totally unaffiliated

5    with Joe Francis or any of these other entities?

6        A    That's right.

7        Q    And what is your salary for Brands or the

8    three debtor entities?

9        A    It's $24,000 a year.

10       Q    I thought I saw something that said you were

11   making about 75,000, whether it's for Brands or one of

12   the other entities?

13       A    I had at one time, but not as manager.

14       Q    So when you say you work a few hours, can you

15   quantify that a little bit more?

16       A    Maybe four or five hours a week.

17       Q    So if somebody needs something on a particular

18   day because something is happening with the company,

19   who would they go to?

20       A    Their manager potentially or to me.  I'm

21   always available via cell phone or e-mail.

22       Q    So can you explain to me the structure of the

23   business?  Let's say you're at the top, and then how

24   does the structure flow from you?

25       A    There are a couple of VPs over the main

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   departments.

2        Q     And what are the main departments?

3        A     The online team.

4        Q     Uh-huh.

5        A     The production team and probably the

6   accounting team.   Those probably comprise the main

7   aspects.

WYNN    8        Q     Can you tell me is there different divisions

9   or departments for people who only work for Brands?

10   And I know that -- that the employees are leased

11   through Perfect Science.   So when I say work, I know

12   that they come from Perfect Science Labs, but in terms

13   of the debtor entities, are there people that only do

14   Brands and then only work for Direct and only work for

15   Events and only work for Magazine?

16        A     Don't think so, no.

17        Q     So then how do you allocate time for each

18   separate entity in terms of making payments to Perfect

19   Science so those people could be paid for their time?

20             ROBERT YASPAN:   That assumes something not in

21   evidence, that he's the one that actually allocates

22   that.

23             DARE LAW:   Well, he can tell me whether he is

24   or not.

25   ///

31

TRANSCRIPT OF PROCEEDINGS

1    think there's anyone strictly dedicated or the VP level

2    to one of these entities.

WYNN    3    Q    So when -- and please speak up a little bit

4    because I'm told that other people can't hear you.

5         So how is it allocated in terms of making

6    payment to Perfect Science Lab when the debtors have to

7    make payment for employee time for whatever the

8    agreement is with Perfect Science, how do you decide

9    which debtor pays how much?

10    A    I don't know.

11    Q    Well, who would know that?

12    A    Our accounting department.

13    Q    So what is your role in determining, if any,

14    allocation of human resources among the four entities?

15    A    Well, if one of the entities needs a new

16    employee for example, I'd be involved in that decision.

17    But in terms of figuring out percentages of who does

18    that time for which, if that's part of your question, I

19    don't --

20    Q    Yes, that's part of my question.

21    A    Yeah, I don't make decisions like that.

22    Q    Well, who makes that decision?

23    A    I'd say the accounting department.

24    Q    And do they have to ask you as manager, this

25    is what we want to do?  Is it okay?  Or do they have

33

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1   authority to just go ahead and do it on their own?

2       A    I -- I'd say between the accounting and the

3   department heads, they have authority to make decisions

4   of that nature.

5           ROBERT YASPAN:  We have brought with us a

6   director of accounting, director of human resources

7   that are in the room here should --

8           DARE LAW:  Yes, I can see them.

9           ROBERT YASPAN:  I know, but it's not on the

10  record that they're here.

WYNN

11          DARE LAW:  Yeah, that's fine.  Okay.  Because

12  they're not managers, I'm not going to take testimony

13  from them even though they may have knowledge.  I'm

14  only going to take testimony from an authorized

15  representative of the debtor in terms of managers or

16  members.  So since Mr. Dale is the only one here who's

17  a manager, I'm only going to take the testimony from

18  Mr. Dale.

19          Now, I may ask you to provide information

20  which you can give to me in written form later to

21  answer some of these questions if Mr. Dale doesn't

22  know.  So for example, in this line of questioning, I

23  would like to know who are these VPs of production,

24  accounting, online, and what -- how many personnel are

25  staffed for each one because when we get to a

34

BARKLEY
Court Reporters

WYNN

1   disclosure statement, if there's payroll and those

2   sorts of things, I want to know how that's allocated to

3   each individual debtor, particularly because right now

4   they still are four separate debtors, four separate

5   legal entities.

6          ROBERT YASPAN:  All right.  So you want names

7   first?

8          DARE LAW:  Yes, I want names first and then

9   number of personnel under each debtor.

10          ROBERT YASPAN:  Do you understand what she

11   wants?

12          THE WITNESS:  Yes.

13          ROBERT YASPAN:  Okay.

14          THE WITNESS:  I -- I think it -- just to sort

15   of help clarify, right now as I think we've indicated

16   in prior meetings, the four companies don't really act

17   like four different companies.  So the leasing is

18   leasing of employees from Perfect Science Labs to GGW

19   Direct.  So you have those employees of GGW direct and

20   then there's no real allocation among the other

21   entities.  You know, I think part of the confusion was,

22   you know, they may be assigned tasks that have to do

23   with the Magazine or Events, but technically they're

24   all just leased by Direct and paid by Direct.

25   ///

35

BARKLEY
Court Reporters

WYNN

1    BY DARE LAW:

2        Q    So if fair to say, Mr. Dale, that there really

3    is no strict separation of Brands, Direct, Magazines,

4    Events?

5        A    Yes.

6             ROBERT YASPAN:  That's a legal conclusion.

7    BY DARE LAW:

8        Q    Well, let me -- let me ask it a different way.

9    Because --

10            ROBERT YASPAN:  Give me a chance to say

11   something.

12            THE WITNESS:  Sure.

13   BY DARE LAW:

14       Q    If you don't understand my question, let me

15   know, but with -- in terms of how the separate debtors

16   operate among themselves, your attorney has told me

17   that there's not a strict delineation, most of the

18   people work for Direct or doing what Direct needs, but

19   there's no strict allocation for Brands, Events, and

20   Magazine.

21            So how and when is it decided that people are

22   going to do things for either Brands, Events, or

23   Magazines if they're mostly working for Direct?

24       A    I think it's a decision made by department

25   heads.

36

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    Do they report to any other persons?

2      A    No, among -- among each other, but no, not

3   directly.

4      Q    Now, according to your Schedule B, this debtor

5   Brands does not own any cars, trucks, trailers,

6   vehicles, things like that?

7      A    That's correct.

8      Q    And there are no secured creditors in this

9   case?

10     A    I don't believe so.

**WYNN**

11     Q    Now, let's go back to the licensing agreement.

12   Who decided to terminate that sub licensing agreement

13   for the brand Girls Gone Wild?

14     A    I learned about it through counsel, but I'm

15   not sure who made that decision.

16     Q    Was it made during your tenure as manager?

17     A    May I speak with counsel?

18     Q    Sure (inaudible) your counsel.

19     A    Yeah, yeah, yeah, that's what I thought.

20   That's what I thought.  Yeah, the decision was not made

21   by me.  It was terminated by the holder of the

22   intellectual property rights.

23     Q    And who holds that property right?

24     A    Path Media.

25     Q    And is Path Media somehow affiliated, related

38

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  to, works with other than the renting of the licensing

2  agreement with the parent company of the debtor?  The

3  Path Media -- wait, hold on.  Let me see.

4       Who's Path Media again?  Tell me who Path

5  Media is again.

6       ROBERT YASPAN:  I don't think we're at again.

7  BY DARE LAW:

8    Q   First time.  Does the parent -- oh, Pablo

9  Company is the holding company.

WYNN  10       Does Pablo Company have any interest in Path

11  Media?  Do you know?

12    A   I don't know.

13    Q   Is Path Media related to any of the members of

14  either Brands, Direct, Events, or Magazine?

15       ROBERT YASPAN:  Well, he's the member of

16  Brands.

17       DARE LAW:  Right.

18       ROBERT YASPAN:  And Brands is the member of

19  the other three.

20       DARE LAW:  Yes.

21       ROBERT YASPAN:  So you're either asking

22  whether he or Brands has a relationship with Path.

23       DARE LAW:  Member, not manager.  Member.

24       ROBERT YASPAN:  Member, that's right.

25       DARE LAW:  Yeah.  So do --

39

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1         ROBERT YASPAN:  Oh, manager, that's right.

2         DARE LAW:  Yeah, he's the manager.

3         ROBERT YASPAN:  Right.

4         DARE LAW:  But I'm asking do any members own

5    Path Media?

6         THE WITNESS:  I don't know.

7    BY DARE LAW:

8        Q    Do you know who owns Path Media?

9        A    No.

10       Q    And why did Path Media terminate the sub

11   licensing agreement?

12       A    I don't know.

13       Q    They didn't notify you that they were going to

14   make the termination?

15       A    I learned about it through counsel, but I'm

16   not certain of the reasons for it.

17       Q    Did they send a letter of termination?

18       A    That we received a letter for, yes.

19       Q    Did you see it personally?

20       A    I believe so.

21       Q    Did they state a reason why they were

22   terminating?

23       A    May I speak with counsel again?

24       Q    Well, if -- I want you to let me know if you

25   recall first or not.

40

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      A     I -- I don't -- I don't -- no, I do not.

2      Q     Okay.  Then go ahead and speak with your

3  counsel.

4      A     Yeah, yeah, there was no reason given.

5      Q     Was there a written sub licensing agreement?

6  Yeah, can you speak up a little bit?  Was there a -- a

7  written licensing agreement?

8      A     I don't think there had been.

9      Q     It was oral?

10      A     I don't know.

**WYNN**  11      Q     Do you know what the terms of the licensing

12  agreement were?

13      A     No.

14      Q     Do you know if there were royalty payments due

15  under that licensing agreement?

16      A     I don't.

17      Q     I'm sorry, I can't --

18      A     I do not know.

19      Q     Who would know that information?

20      A     Possibly counsel or accounting department.

21      Q     And which counsel would it be when you say

22  "counsel"?

23      A     I imagine potentially Mr. Tym, if -- if

24  anyone.  I don't know.

25      Q     I'm sorry, you're very soft spoken and we have

41

BARKLEY
Court Reporters

1   like people sitting way in the back.  We have people

2   sitting on the -- so please speak up.  I know it's --

3   you're normally soft spoken, but I'm asking you to

4   speak up a little bit.

5       A    If -- the counsel I'm referring to is Mr. Tym.

6       Q    Would there be any other counsel involved

7   other than bankruptcy counsel?

8       A    Possibly.

WYNN

9       Q    Do you know how long that licensing agreement

10  would have lasted prior to termination?

11      A    No.

12           ROBERT YASPAN:  But for termination.

13  BY DARE LAW:

14      Q    But for termination.  Prior to termination.

15  Same thing.  I mean, before termination, how long was

16  it supposed to go?

17      A    I don't know.

18      Q    How long ago did you -- when I say you, I mean

19  Brands -- get the termination letter?

20      A    I don't remember.  It was -- if I may ask

21  counsel.

22      Q    You don't know, you don't know?

23      A    I don't know.

24      Q    So I recall your counsel saying that there was

25  a new agreement.  Is that with Path Media?

42

BARKLEY
Court Reporters

WYNN

1      A      I believe so.

2      Q      Who negotiated the new agreement?

3      A      Counsel.

4      Q      Were you involved in that negotiation?

5      A      To a limited degree.

6      Q      Why limited?

7      A      I trust the folks working with me to make

8  decisions.

9      Q      But who made the ultimate decision of what the

10  terms of that new agreement might be?

11      A      Myself and counsel.

12      Q      And what are the terms of that new agreement?

13      A      I don't remember the specifics.

14             ROBERT YASPAN:  But we did deliver that to

15  you.

16             DARE LAW:  Okay.  I'm just trying to get some

17  background.

18             ROBERT YASPAN:  Fair enough.  But you have the

19  agreement.

20  BY DARE LAW:

21      Q      Okay.  And who signed the agreement on behalf

22  of the debtor?

23      A      I did.

WYNN

24      Q      And do you know how long that agreement goes

25  to?

43

BARKLEY
Court Reporters

WYNN

1    A    I believe it's through the end of May this

2    year.

3    Q    Is it -- I don't have the agreement in front

4    of me.  Is it at least a one-year term that you signed

5    for?

6    A    I don't think so.

7    Q    Why so short?

8    A    I -- I think it was the only terms that Path

9    would allow.

10    Q    And who at Path were you negotiating with?

11    A    It was done through counsel.  I don't know.

12    Q    Who was their counsel?  Do you know?

13    A    I don't remember.

14    ROBERT YASPAN:  Their counsel or his counsel?

15    BY DARE LAW:

16    Q    Path's counsel, if you know?

17    A    No, I don't know.

18    ROBERT YASPAN:  I -- the record should say

19    it's getting close to 10:00.  The questions you're

20    asking go beyond Brands and of course you're being --

21    DARE LAW:  I thought the sub licensing

22    agreement was with Brands?

23    ROBERT YASPAN:  Well, hold on.  Let me finish.

24    The -- the questions you're asking are being, of

25    course, led by the answers, which indicate that there's

44

BARKLEY
Court Reporters

1    Okay.  I don't hear any objections for me to go a

2    little bit longer on Brands, so I'm just going to try

3    to move this along.

4    BY DARE LAW:

5        Q    Okay.  So the IT with Path Media, did you know

6    who that counsel for Path Media was?

7        A    I think IP or IT, I --

8        Q    The counsel for -- the attorney for Path Media

9    who you were --

10       A    No.

11       Q    -- negotiating with?

12       A    The no.

13       Q    Did you ever meet them?

14       A    No.

WYNN    15       Q    And -- and in terms of the rights that you

16   have under the licensing agreement, is it similar to

17   the previous sub licensing agreement?

18       A    I don't have knowledge of the -- that previous

19   agreement, so I don't know.

20       Q    What are the terms of the new agreement?  You

21   say it goes until May, but what about payments and

22   those sorts of things, royalty payments?

23       A    I don't remember the specifics.

24       Q    Do you know if payments are due monthly or

25   quarterly or some other period?

47

BARKLEY
Court Reporters

WYNN

 1        A    I don't remember.

 2        Q    Have any payments been made to Path Media for

 3    use of the intellectual property?

 4        A    I don't recall.

 5             ROBERT YASPAN:  He may not recall, but we've

 6    given you the agreement and it lists it at page 2 what

 7    payments were made.

 8    BY DARE LAW:

 9        Q    Okay.  And that agreement was made before --

10    sorry, after the bankruptcy filing so it doesn't show

11    up on the executory contract and the previous agreement

12    you say was terminated prior to the filing; is that

13    correct?

14        A    I think that's right if I --

15        Q    Okay.  But executory contracts should still

16    include the employee agreement with Perfect Science

17    Lab, shouldn't it?  This is for counsel.

18             ROBERT YASPAN:  The what?

19             DARE LAW:  The executory contracts and

20    unexpired leases, you have an employee agreement with

21    Perfect Science Labs, so shouldn't that be on this

22    Schedule G?

23             RONALD TYM:  Well, again, that agreement is

24    just with GGW Direct.

25             DARE LAW:  But not with Brands?

48

BARKLEY
Court Reporters

1          Why did the debtor have bank accounts if it

2     had no income or expenses?

3          A    Well, I think an example of any (inaudible)

4     would be like it's -- it's actual filings with the

5     state or -- or like parasite corporation, that kind of

6     thing.  So it had super limited expenses but for -- for

7     that reason.

WYNN    8          Q    And the National Bank of California, it had a

8

9     closing balance of $26,308.  What happened to that

10    money?

11         A    I don't know.

12         Q    And where would the source of that money be

13    from?

14              ROBERT YASPAN:  Of these exact dollars?

15    BY DARE LAW:

16         Q    Well, the monies that are in this account,

17    where would the money come from?

18              ROBERT YASPAN:  That's a different question.

19    Okay.

20              THE WITNESS:  I'm not certain.

21    BY DARE LAW:

22         Q    Yeah, the source of the money, where'd it come

23    from?  You don't know?

24         A    I don't know.

25         Q    And who was the signatory on these accounts?

53

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Francis.  Was he ever acting as member for Brands, if

2    you know?

3         A    I don't believe so.

4         Q    And with respect to his American Express card,

5    was there a limit given to him with respect to how much

6    he could spend in any given time?

7              ROBERT YASPAN:  I'm going to ask you to

8    rephrase.  His American Express card --

9              DARE LAW:  Mr. Francis.  I'm only talking

10   about Mr. Francis right now.

11             ROBERT YASPAN:  The card within the Brands'

12   account?

13             DARE LAW:  Yes.

14             ROBERT YASPAN:  Or are you talking about

15   Francis' own credit card account?

16             DARE LAW:  No, I'm only talking about the

17   American Express issued to GGW Brands that Mr. Francis

18   used.

19             ROBERT YASPAN:  Right, do you understand that?

20             THE WITNESS:  Okay.  Yes.

21   BY DARE LAW:

22        Q    So there was American Express card issued to

23   Mr. Francis under the GGW Brands Joe Francis user.  Was

24   there ever a limit given to Mr. Francis of how much he

25   can spend at any given time?

WYNN

                              57

BARKLEY
Court Reporters

WYNN

1      A      Nothing formal to my knowledge.

2      Q      What, if any, was the agreement for

3   Mr. Francis' use of that American Express card?

4   Because he didn't show up on the employee list and he

5   wasn't a member or a manager.

6      A      I don't think there's any formal agreement.

7      Q      Was there an informal agreement?

8      A      Not to my knowledge.

9      Q      Why would Mr. Francis be given an American

10  Express card?

11     A      I don't know.

12     Q      Was it before you were a manager?

13     A      I believe he had the card before I was

14  manager, yes.

15     Q      And when you became manager, did you ever have

16  discussion with Mr. Francis about limiting the use of

17  that card?

18     A      No.

19     Q      Did you have any discussion at all with

20  Mr. Francis about the use of that card?

21     A      No.

22     Q      Was there any decisions during your tenure as

23  manager about his use of the American Express card?

24     A      No.

WYNN   25     Q      And what, if any, is Mr. Francis' role with

58

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1   respect to the GGW Brand?  And when I say "Brand," I

2   mean the four corporate entities and his being, you

3   know, possibly the face or however else you want to

4   characterize it.  What is his role with respect to the

5   debtors?

6       A    I think that you said it, and that is the face

7   of Girls Gone Wild and the creator of Girls Gone Wild.

8       Q    Why wouldn't the -- strike that.

9            Do you know if at any time there was any sort

10  of agreement between this debtor or any of the other

11  debtors with respect to his roles or duties about

12  the -- being the face of Girls Gone Wild and if I'm

13  mischaracterizing it, feel free to re-characterize it.

14      A    I don't know that there's any formal

15  agreement.

16      Q    Has Mr. Francis been using the American

17  Express card since the filing of the case, if you know?

18      A    I don't know.

19      Q    Have you asked him not to use the card?

20      A    No.

21      Q    Do you know if anybody in the companies have

22  asked him not to use the card?

23      A    I don't know.

24      Q    Counsel, do you know if he's still using the

25  card?

59

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  your tenure as manager about his use of the American

2  Express card?

3      A    Correct.

4      Q    Do you know if anybody, whether it's for

5  Brands or any of the other entities, have discussions

6  with Mr. Francis about the use of his American Express

7  card?

8      A    I don't know.

9          ROBERT YASPAN:  You're talking about during

10  the administration?

11          DARE LAW:  During Mr. Dale's administration as

12  manager.

13          ROBERT YASPAN:  Well, part of that went

14  through the administrative proceeding starting on

15  February 27th.

16          DARE LAW:  No, I mean he became manager

17  October, November last year he said.

18  BY DARE LAW:

19      Q    So from whenever you became manager, whether

20  it was October or November, to today, has there been

21  any discussion by yourself with Mr. Francis with

22  respect to use of that American Express card?

23      A    No.

24      Q    And since October, November, whenever you

25  became manager, do you know if any of your staff had

WYNN

61

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    discussions with Mr. Francis about his use of the

2    American Express card?

3        A    I don't know.

4        Q    Do you know how much he was incurring per

5    month on his American Express card since the time

6    you've been manager?

7             ROBERT YASPAN:  And prior to the 11 or are

8    you --

9    BY DARE LAW:

10       Q    Since October, November 2012 you became

11   manager?

12       A    Right.

13            ROBERT YASPAN:  All right.  Let's divide --

14   that's an important question.  So let's divide that up

15   to the time of the filing and then after the filing if

16   you could.

17   BY DARE LAW:

18       Q    Okay.  So between October, November 2012 to

19   February 27th when the debtor filed, did you or if you

20   know of any of your staff had discussions with

21   Mr. Francis about the use of the American Express card?

22       A    I don't think so.

23       Q    And do you know if any of your staff talked to

24   him about the use of the American Express card?

25       A    I don't believe so.  I don't know.

62

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1      Q    And then from the filing February 27th until

2   today, have you discussed with Mr. Francis the use or

3   cancellation of that American Express card?

4      A    I have not personally, but I don't know when

5   the card was closed to know the date of the card having

6   been closed.

7      Q    Who issued the directive from the debtor to

8   cancel that American Express card?  Was it yourself?

9      A    I don't know.  I don't believe so.

10     Q    It wasn't you who said cancel all American

11  Express cards?  Are there -- can you give me a verbal

12  answer?

13     A    No.

14     Q    This only does verbal, not nods of heads or

15  shakes of heads.

16     A    No.

17     Q    Do you know if any of your staff discussed

18  with Mr. Francis the cancellation of his American

19  Express card?

20     A    I don't know.

21     Q    There were others that had --

22         ROBERT YASPAN:  But some of his attorneys

23  might have.

24         DARE LAW:  Yeah, but I'm asking if he knows.

25         ROBERT YASPAN:  That's correct.

63

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1        A     Yes.

2        Q     Is that the address of GGW Brands?

3        A     No.

4        Q     Then why was it indicated on the petition you

5   signed as the address?

6        A     I think -- I believe it's since been amended,

7   but --

8        Q     Well, was 1601 Clover Field Boulevard ever the

9   address of GGW Brands?

10       A     Yes.

11       Q     When?

12       A     For a brief period I think in -- I don't

13  remember exact dates.

14       Q     When did it stop being the address of GGW

15  brand?

16       A     I think around November of 2011.

17       Q     So years before the petition was filed?

18            ROBERT YASPAN:  Objection.  It's

19  argumentative.  Direct him not to answer.

20  BY MR. PAGAY:

21       Q     Whose decision was it to file the bankruptcy

22  case?  And when I say -- this bankruptcy case?

23       A     Collective.  Myself, attorneys.

24       Q     So the decision to file was made by yourself

25  and attorneys?

67

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    A    Correct.

2    Q    Which attorneys?

3         ROBERT YASPAN:  Objection.  Goes into the

4    attorney-client privilege.

5         MR. PAGAY:  I'm asking for the identity of the

6    attorneys, not the -- any communications that were

7    divulged.

8         THE WITNESS:  Mr. Tym.

9    BY MR. PAGAY:

10   Q    Anybody else?

11   A    No.

12   Q    Did you speak at all with Joe Francis

13   regarding the filing of this case?

14   A    No.

15   Q    Okay.  Mr. Dale, who hired you for your

16   current job?

17   A    For the manager position?

18   Q    Yes.

19   A    I learned about my appointment through

20   Mr. Tym.

21   Q    You learned about your appointment?  So did

22   you interview?

23   A    No.

24   Q    Did you apply for the position?

25   A    No.

68

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    Q    Were you surprised to learn that you'd been

2  appointed the manager of this business?

3          ROBERT YASPAN:  Objection.  Not relevant.  You

4  can answer.

5          THE WITNESS:  No.

6  BY MR. PAGAY:

7    Q    Since your appointment as manager, have you

8  had any interaction with your company's owner, Pablo

9  Holdings?

10    A    No.

11    Q    Do you feel you have any responsibilities to

12  Pablo Holdings as the owner of your company?

13    A    No, I --

14          ROBERT YASPAN:  That's the right answer.

15          THE WITNESS:  No.

16  BY MR. PAGAY:

17    Q    I'm sorry, I didn't hear.  It's a little loud?

18    A    No.

19    Q    Thank you.  Okay.  What does the GGW Brands

20  hope to achieve in its chapter 11 case?

21          ROBERT YASPAN:  Objection.  That goes to

22  attorney-client and that's not something we know yet.

23  BY MR. PAGAY:

24    Q    So you're answering on behalf of the company

25  that's not -- you don't know why you're in chapter 11?

69

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   BY MR. PAGAY:

2       Q    The very, very first claim of Alan Michael

3   Wade, could you describe what that relates to?

4           ROBERT YASPAN:  You just said you're not going

5   to duplicate questions.  We went through 15 minutes of

6   him saying he didn't know what this was about.

7           MR. PAGAY:  I'm just making sure.  So this

8   was -- so you didn't -- it was this or the Raiment when

9   he didn't know what it was about.

10          ROBERT YASPAN:  It was Wade.

11          MR. PAGAY:  It was wait you're talking about.

12  Okay.  Just making sure.

WYNN   13       Q    Mr. Dale, do you perform any functions for

14  Pablo Holdings?

15      A    No.

16      Q    None?  Do you know who owns -- I'm sorry, do

17  you know if Mr. Francis is related to Pablo Holdings?

18  I'm sorry, I mean Joseph Francis?

19      A    I don't know.

20      Q    You don't know.  Okay.  Do you know what kind

21  of business Pablo Holdings is in?

22      A    No.

23      Q    Okay.  Let's go to tab two, Schedule B.  And

24  this question, Ms. -- Ms. Law did ask you, but I have

25  two different answers in my notes and I want to make

72

BARKLEY
Court Reporters

1      A    I don't believe so, no.  It was literally a

2    month, so I don't know.

WYNN    3      Q    Okay.  Still on the statement of financial

4    affairs turning to page 3 of that -- of that document,

5    it says $35,000 was paid on the 28th of December to GGW

6    Direct.  Why would there be a payment from Brands to

7    GGW Direct?

8      A    I don't recall.  I don't remember why that

9    amount was paid.

10         ROBERT YASPAN:  But once again, it's something

11   we can provide for you.  We have the resource available

12   in the room.

13   BY MR. PAGAY:

14     Q    Okay.  Turning now to page 10 of the statement

15   of financial affairs, looking at item 19, looking first

16   at sub item A, does GGW Brands have any accountants or

17   bookkeepers?

18         ROBERT YASPAN:  Wait a minute.  Right here.

19         THE WITNESS:  Yeah, I don't believe so.

20   BY MR. PAGAY:

WYNN    21     Q    So is there any entity of which you're aware

22   that provides bookkeeping or accounting services for

23   GGW Direct?

24         DARE LAW:  We're on Brands.

25         MR. PAGAY:  I'm sorry, Brands.  Thank you.

77

TRANSCRIPT OF PROCEEDINGS

**BARKLEY**
Court Reporters

WYNN    1           THE WITNESS:  I don't believe so.

2           MR. PAGAY:  It's happening already.

3   BY MR. PAGAY:

4       Q    So does GGW Brands have financial and business

5   records?

6       A    Yes.

7       Q    What individual might -- might be in

8   possession of those financial and business records?

9       A    I don't know that there's any individual.

10  It's that -- if -- if anything exists, it's at the

11  office.  I don't know any individual has it.  Like

12  accounting would have accounting records, for example.

13      Q    Okay.  So would it be accurate to say that

14  your accounting department has all of the books and

15  records of the -- of GGW Brands?

16      A    They should, yeah.

17      Q    And the head of that department is who?

18      A    Mandy Isaac.

WYNN   19      Q    Okay.  Turning now to tab four which is the

20  status report that counsel referred to a minute or two

21  ago, turning to page 2, beginning at line five.  The

22  status report there talks about how GGW Brands is a sub

23  licensor of IP used by the three other companies.  Is

24  that accurate or inaccurate?

25      A    I don't know.

78

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    Q    Okay.

2         ROBERT YASPAN:  That was wrong.  You can say

3    it.  Who's the guy over there?

4         THE WITNESS:  I don't know.  I think Wynn

5    counsel also, but I'm not certain.

6         MR. PAGAY:  Again, I'm pausing to make sure I

7    don't duplicate what Ms. Law's already asked.

8         ROBERT YASPAN:  I think that's (inaudible) GGW

9    Direct is a licensee so it lets GGW Brands use it so

10   GGW Brands would be a sub license (inaudible) --

11   BY MR. PAGAY:

12    Q    Mr. Dale, do you ever speak with Joseph

13   Francis about the business of GGW Brands?

14         ROBERT YASPAN:  That's a broad question.

15   He's -- he's been an employee there or a manager for

16   two years.

17         MR. PAGAY:  So I asked has he ever.

18         ROBERT YASPAN:  Just.

19         MR. PAGAY:  Spoken with -- with Joe Francis

20   regarding the business of GGW Brands.

21         ROBERT YASPAN:  That goes back to your HR time

22   the way the question was writ -- is posed.

23         THE WITNESS:  I would ask to just clarify the

24   business in what respect.

25   BY MR. PAGAY:

79

BARKLEY
Court Reporters

1      Q    Okay.  First let's go beyond your HR time.

2  Let's start when you were appointed the manager.  Did

3  you have any discussions regarding the business of GGW

4  Brands since you've been manager?

5      A    No.

6      Q    Not one?

7           DARE LAW:  You need to speak up.  It doesn't

8  pick up shakes of head.

9           MR. PAGAY:  Yeah.

10           THE WITNESS:  I said no.

11           DARE LAW:  Okay.

12           MR. PAGAY:  No.

13  BY MR. PAGAY:

WYNN    14      Q    So in managing GGW Brands, who do you speak to

15  on a regular basis?

16      A    Accounting department, a couple of the VPs.

17      Q    Anybody else?

18      A    No.

19      Q    Okay.  So in managing GGW Brands, you speak

20  with Ms. Isaac and people in her department; is that

21  correct?

22      A    Yes.

23           ROBERT YASPAN:  Go ahead.

24  BY MR. PAGAY:

25      Q    And you said other VPs.  Do you mean

80

BARKLEY
Court Reporters

1    Mr. Villanueva and I'm sorry, the head of production is

2    Mr. --

3         A    Lord.

4         Q    -- Lord.  Is that who you mean?

WYNN    5         A    Yes.

6         Q    Anybody else?

7         A    Mr. Tym.

8         Q    And one last thing, and this may be just a --

9    a miswritten note on my part, are there any other

10   people in management other than Mr. Villanueva,

11   Mr. Lord, and Ms. Isaac?  I have a note here something

12   about additional VPs above them.  Are there such

13   people?

14        A    No.

15        Q    No.  So that's a negative.  That's all I have

16   on GGW Brands.

17             DARE LAW:  I think I have a few more

18   questions.

19   BY DARE LAW:

WYNN    20        Q    Are you familiar with the name all Blue Horse

21   transactions?

22        A    No.

23        Q    You don't know who that is?  Or might be also

24   known as Blue Horse?

25        A    Blue Horse trading I believe, yeah.

81

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    Q    Blue Horse trading?

2    A    Yeah.

3    Q    What is that?

4    A    It's another entity that I believe has

5   something to do with Joe Francis.

6    Q    So you think it might be a Joe Francis entity?

7    A    Maybe, I don't know.

8    Q    Do you know if that entity has any dealings

9   with the GGW Brands or entities?

10   A    Dealings in what respect.

11        ROBERT YASPAN:  That's a broad question

12   beyond --

13   BY DARE LAW:

WYNN

14   Q    Does -- does business with them.  Does -- does

15   Brands do business with Blue Horse trading?

16   A    I don't believe so.

17   Q    Okay.  So it's not this endeavor.  Are you

18   familiar with the name Robert Kluger?

19   A    Yes.

20   Q    Who is that gentleman?

21   A    I believe he's former counsel for the entities

22   in some capacity.

23   Q    Is he still working for any of the entities

24   including brand?

25   A    No.

82

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    Contracts?

2       A    Like a kind of general legal services.  Would

3    have included those things though.  It would have

4    included litigation and contracts I believe.

WYNN

5       Q    Almost done.  On the venue disclosure form, it

6    says the principle office of the debtor currently on

7    file with the secretary of state, it uses a Canoga Park

8    address.  What is that address?  It's got a unit number

9    263.

10      A    I believe it's Mr. Tym's address.

11           DARE LAW:  Is that your address, Mr. Tym?  Is

12   that your office?

13           RONALD TYM:  Yes.

14   BY DARE LAW:

15      Q    Why would the debtor use your office as its

16   principle address office with the secretary of state?

17           RONALD TYM:  That's just a legal address with

18   the secretary of state.  It's mainly where people can

19   come, there are certain filings that need to be made by

20   adult entertainment organizations, so we want to make

21   sure the people come to me for those filings and I have

22   those rather than come to the business itself.

23           DARE LAW:  Now, I thought you said earlier

24   you're probably going to be phasing out of representing

25   the debtor, so what's going to happen with the address?

84

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   of the other ones?

2            THE WITNESS:  Yes.

WYNN   3   Q    So who is providing the compensation to you?

4    A    I believe it's been three Perfect Science

5   Labs, but I'm not certain.

6    Q    And who's funding Perfect Science Labs for

7   your compensation?

8    A    That, I don't know.

9    Q    Do you know if it's any of the GGW Direct,

10   Brand, Events, or Magazine entities?

11    A    I'm not certain.

12    Q    That I want to know, who is --

13            ROBERT YASPAN:  That's not being funded

14   through any of the GGW entities.  That's a cost by

15   Perfect Science Labs itself.

16            DARE LAW:  I'd like a declaration with respect

17   to where Mr. Dale's compensation is coming from, the

18   source of that compensation so --

19            ROBERT YASPAN:  Science Labs.

20            DARE LAW:  So I'd like the source and the

21   amount.  Okay.  Any other last minute opportunities to

22   ask questions before I close?  No.  Okay.  Mr. Dale, I

23   want to remind you that you need to file your monthly

24   operating reports on time.  If they are not filed on

25   time, the U.S. trustee will file a motion to dismiss or

89

BARKLEY
Court Reporters

1      Q     What happened to them?

2      A     I believe he left on his own volition.

3      Q     Now, according to the bankruptcy schedules,

4    the debtor also owns no real property; is that correct?

5      A     Correct.

6      Q     I'm looking at Schedule A?

7            ROBERT YASPAN:  Let me give him a minute to

8    get there.

9            DARE LAW:  Okay.

10           ROBERT YASPAN:  That's B.

11   BY DARE LAW:

12     Q     It says no?

13     A     Correct.

14     Q     Okay.  If you'll turn the page and look at

15   Schedule B.  At the time of filing which was

16   February 27th, it said that there was cash with

17   attorney.

18           Which attorney are we speaking of on that cash

19   with attorney?

20     A     David Houston.

21     Q     Why would money be deposited with David

22   Houston in the amount of just over 1.8 million?

23     A     I believe it was set aside for potential costs

24   related to the defense of one or more of the aspects of

25   the Steve Wynn case I believe.

WYNN

102

BARKLEY
Court Reporters

WYNN

1     Q    So you -- did I hear you say it was set aside

2    for costs of legal fees?

3     A    I believe -- I -- I believe so but I'm not

4    certain.

5     Q    Do you know what the money was deposited with

6    Attorney Houston?

7     A    No.

8     Q    Was it before you became manager?

9     A    I believe so, yeah.

10    Q    Is Mr. Houston still holding the money?

11    A    I believe it's still being held, yeah.

12         DARE LAW:  Counsel; is that right?

13         ROBERT YASPAN:  Yes.

14         DARE LAW:  He's still holding the money?  Why

15   hasn't it been turned over to the estate to deposit

16   into the (inaudible) accounts?

17         ROBERT YASPAN:  He wants a court order because

18   it is subject to a state court injunction and there is

19   a dispute as to whether or not the injunction restrains

20   him in the bankruptcy over the turn over of the funds;

21   however, we -- we -- I think we may even have put into

22   the status conference report, we expect today or

23   tomorrow to file a motion to have a turn over leaving

24   all rights in tact for the present time.

25         DARE LAW:  So if it's turned over to the

103

BARKLEY
Court Reporters

1          ROBERT YASPAN:  But it may not be that we used

2     a current balance sheet.

3          DARE LAW:  Okay.

4          ROBERT YASPAN:  We used the best one

5     available, but we'll give you the answer.

6          DARE LAW:  Yeah, if the number is different,

7     then I'd like to know.

8          ROBERT YASPAN:  Well, by now we may find out

9     to be different because it's a month or two later.

10         DARE LAW:  But they shouldn't have off set or

11    incurred --

12         ROBERT YASPAN:  Yeah, but money could have

13    been spent in the month of February, for example.

14         DARE LAW:  Yes, I understand.  So I'm saying

15    if at the time of filing of the 27th it was $16,000,

16    then I need to know the identity of the attorney and

17    how much each one has and something to tell me that

18    they, in fact, still have it because no one's

19    employment application has been approved, nor has any

20    fees been applied for.  So if at the time of filing

21    this was the deposit for legal fees, then it should

22    still be there; right?

23    BY DARE LAW:

WYNN  24    Q    Okay.  Accounts receivable, $523,879, who

25    would it receivable from since it says from affiliates?

109

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    A    I believe this is for various affiliates from

2  some online deals to some pay per view networks and

3  that kind of thing.  I believe that's what this is

4  referring to.

5    Q    Well, when you say "affiliates," what do you

6  mean by "affiliates"?

7    A    I'm not sure how the accounting department's

8  defining this precisely, but I believe this is

9  referring to like a Direct TV that has -- we have a

10  deal with.

11    Q    So --

12    A    That type of thing.

13    Q    -- it's not necessarily referring to Events,

14  Magazines --

15    A    Huh-uh.

16    Q    -- or Brands?

17    A    I don't think so.  I'm not certain.

18    Q    So how would they be affiliates of the debtor?

19       ROBERT YASPAN:  Well, we have the resource

20  here available to answer the question.  It may be --

21       DARE LAW:  But I want to know what Mr. Dale

22  knows.

23       ROBERT YASPAN:  But he already -- you've

24  already established he probably doesn't know.

25  ///

110

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1      Q    Do you get involved at all in reviewing those

2    contracts and deciding whether it's actually a good

3    deal for the company or not?

4      A    I don't believe a contract has come up in my

5    time.

6      Q    And do you know if the prior manager had been

7    involved in -- in the negotiation and review of those

8    contracts and authorization to go ahead with them?

9      A    I don't know.

10      Q    So you don't know who the signatory to those

11    contracts are?

12      A    Right.

13          ROBERT YASPAN:  However the contracts are in

14    the company offices and we can get you that

15    information.

16          DARE LAW:  Okay.  But I just want to sit here

17    today whether he knew or not.

18          ROBERT YASPAN:  Correct.

19    BY DARE LAW:

WYNN    20      Q    Intellectual property.  What intellectual

21    property does Direct own that's worth $37,420?

22      A    I believe that is referring to the Girls Gone

23    Wild, the use of that name.

24          ROBERT YASPAN:  Actually, that number came

25    from the books so we don't quite know what that is.

118

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

```
 1                THE WITNESS:  Which -- which one?

 2                ROBERT YASPAN:  The 37.

 3                THE WITNESS:  I think that's why it's saying

 4     subject issues regarding (inaudible).

 5                ROBERT YASPAN:  This is a book number.

 6     BY DARE LAW:

 7          Q    What does it mean on the debtor's books that

 8     this number's there?

 9                ROBERT YASPAN:  I can ask the accountant.

10                DARE LAW:  Well (inaudible) --

11                ROBERT YASPAN:  But I can't ask --

12                THE WITNESS:  I -- I don't know.

13     BY DARE LAW:

14          Q    Okay.  Does Direct have any intellectual

15     property agreement with Path Media or any other

16     companies for use of Girls Gone Wild name or any other

17     name it might use to promote its materials?

18          A    I think -- I believe it does today.  That's

19     the agreement we were referring to.

20          Q    So Direct now has the agreement?

21          A    I believe so.

22          Q    And who negotiated that agreement?

23          A    I would say Mr. Tym if anybody, I'm not

24     certain though.

25          Q    And did he run it by you for approval before
```

WYNN

119

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1   it was ultimately signed?

2        A    Yes.

3        Q    And was it you who signed that agreement?

4        A    Yes.

5        Q    And it only goes to May?

6        A    That's what I recall, yes.

7        Q    So what happens if Path Media pulls it in May?

8   What does the debtor have to sell or to use if it

9   doesn't have the rights to its name?

10       A    That would be a significant issue.

11       Q    Is there a game plan if -- if Path Media

12  decides to not renew the use of the Girls Gone Wild

13  name?

14            ROBERT YASPAN:  The answer is yes, there's a

15  game plan; however, it may not be as effective as we

16  want.

17  BY DARE LAW:

18       Q    Well, Mr. Dale; is that true.

19       A    I think it's an evolving game plan.  I can't

20  say that, you know, I can hand you a book that has A to

21  Z precisely what the company's going to do though.

22       Q    But there is some sort of strategy -- I'm not

23  going to ask you what the strategy is.  I'm just

24  saying, is there a strategy that if Path Media says,

25  you know what, I don't really want you to use Girls

120

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    provided in Brands?

2        A    I believe so, yes.

WYNN    3        Q    And then it says here, Path Media is owed

4    1.5 million.  What is that for?  It says unpaid

5    licensing fee?

6        A    I believe it is for that reason.

7        Q    How long of a period does this cover?  It says

8    incurred 2010 to 2012.  That's a long time.

9        A    I believe it's for that period of time.  I

10   don't know the exact dates.

11       Q    Were any licensing fees paid to Path Media

12   holding?

13       A    I don't know.

14       Q    Who would know that answer?

15            ROBERT YASPAN:  Well, the answer is the

16   accounting department would, but let me check

17   something.

18   BY DARE LAW:

WYNN    19       Q    Did Path Media file any collection action for

20   the 1.5 million?

21       A    I don't know.

22       Q    You don't know if they've ever filed any

23   collection action for that?

24       A    I'm not certain.

25       Q    Do you want me to wait, Counsel?

130

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          ROBERT YASPAN:  Yeah, if you could.

2          DARE LAW:  While you look.

3          ROBERT YASPAN:  What I'm thinking -- here it

4    is.  Brands.  What I'm thinking is, is that Path

5    Media's on the wrong chapter.  It should be listed in

6    Brands rather than Direct, Mr. Tym?

7          DARE LAW:  Was Brands the license holder

8    before?

9          RONALD TYM:  My understanding it was Direct,

10   but could be wrong.

11         ROBERT YASPAN:  It was Direct?  Okay.  That's

12   an accounting question, not a legal one.  I'll have to

13   research where that Path Media belongs.

14   BY DARE LAW:

WYNN   15      Q     Is the debtor the exclusive rights' holder to

16   use the Girls Gone Wild brand?

17      A     I don't know.

18      Q     So when you negotiate a new licensing contract

19   to use it, don't you want to know whether you're the

20   100 percent rights' holder or something else could be

21   using the name as well?

22         ROBERT YASPAN:  Counsel, why don't you just

23   show him the agreement that we've provided to you.  If

24   he doesn't remember, he doesn't remember.

25         DARE LAW:  I don't have the agreement with me.

131

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1  productions, Events, and that kind of thing.  Kind of

2  on a case-by-case basis.

3      Q    When they were not filming and producing an

4  event on location, were those people then brought

5  in-house to do post production?

6      A    No.

7      Q    Is that the same crew?

8      A    No.

9      Q    Different crew?

10     A    Different crew typically.

11     Q    And how many W-2 employees did the debtor have

12  in the year prior to going to use Perfect Science Lab?

13     A    Maybe 20ish, 21, 22, something like that.

14     Q    So there were some regular W-2 employees?

15     A    Certainly, yeah.

16     Q    There's a personal injury claim by Michael --

17  Alan Michael Wade.  What is that -- the nature of that

18  claim?

19     A    That's the one we talked about a half a dozen

20  times and I don't know.

21     Q    Okay.  And then Clayton Mc Kinley versus -- Mc

22  Kinney, labor and wage.  Is that hourly or also the

23  1099 issue?

24     A    Hourly, more of a -- as far as I recall.

WYNN     25     Q    What is VCI, they were paid prepetition within

135

WYNN

1    the 90-day period?

2        A    VCI is a payroll company in Mexico.

3        Q    What sort of filming was done in Mexico?

4        A    Some of the -- a TV show, some of the spring

5    break type of videos.

6        Q    What is Equity Office?

7        A    I believe that's the --

8            ROBERT YASPAN:  Oh, that's the name of the

9    landlord.

10           THE WITNESS:  I think that's the landlord,

11   yeah.

12   BY DARE LAW:

13       Q    I'm sorry, who?

14       A    The landlord, the owner of the space or the --

15       Q    Landlord for the offices on Wilshire?

16       A    Correct, I believe so.

17       Q    And who or what is rt law?

18           RONALD TYM:  That's me.

19           DARE LAW:  Is that you?  Okay.

20   BY DARE LAW:

21       Q    What is the transfer of GGW Direct to

22   University of Dermatology and then it says savings?

23   What is that?  It's on January 2nd, 2013?

24       A    $300?  I'm not certain.

25       Q    And then D. Houston, is that Attorney Houston

                            136

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    that got $10,000 on 1/9?

2        A    Most likely.

WYNN

3        Q    Were you in production in January in Mexico?

4    Because I see several VCI payments.

5        A    I don't recall.  I don't remember.

6             ROBERT YASPAN:  Well, they may have been in

7    production in December.

8    BY DARE LAW:

9        Q    Okay.  In December, January, that time period,

10   do you recall whether you were filming in Mexico?

11       A    I don't remember.

12            DARE LAW:  Counsel, can you find out and let

13   me know?

14            ROBERT YASPAN:  Yes.

15   BY DARE LAW:

16       Q    PR Law, who is that or what is that?

17            ROBERT YASPAN:  Where are you looking?

18            DARE LAW:  On 1/13/2013.

19            THE WITNESS:  I -- I'm not certain.  I think

20   it may be Pross Kower Law Firm.

21   BY DARE LAW:

22       Q    And what is PM Tax on 1/31?

23       A    PM Tax.

24            ROBERT YASPAN:  Where is it?

25            THE WITNESS:  Here, PM Tax.

137

BARKLEY
Court Reporters

1    BY DARE LAW:

2        Q    1/31/2013, like a (inaudible) maybe two inches

3    up.

4        A    I do not know.

5            ROBERT YASPAN:  I would -- I'd point out that

6    that's the date the (inaudible) taxes are due for 941s,

7    but I have no idea if that's relevant.

8            DARE LAW:  I don't know.  I'm asking.

9            THE WITNESS:  It might be.  Yeah, I'm not

10   certain.

11           DARE LAW:  Okay.  Can you find out what that

12   is and let me know?

13   BY DARE LAW:

14       Q    And then let's see.  What is Argyle online?

WYNN

15           ROBERT YASPAN:  And you are at?

16   BY DARE LAW:

17       Q    219 and the amount is $209,250 and then

18   another one for $500,000 -- I'm sorry, 50 -- $5,000.

19       A    I believe that Argyle is a company that's

20   doing some production work for the company now, but I'm

21   not certain.  I don't remember exactly.

22       Q    So am I to infer correctly that if they're

23   doing some production work, that you have something in

24   production?

25           ROBERT YASPAN:  Your questions earlier were

138

TRANSCRIPT OF PROCEEDINGS

1    related to whether or not Direct was producing.

2             DARE LAW:  Yeah.  But if this is a current

3    something to produce --

4    BY DARE LAW:

WYNN    5        Q     Was this for license fees?  What does that

6    mean?

7        A    I don't remember exactly.  I can ask -- if I

8    may ask Mr. Tym?

9        Q    I wanted to know if you knew.

10       A    Yeah, I'm not certain.

11       Q    Do you know who JG Marzen, $100,000, is that a

12   person or is that an entity?

13       A    I believe it's an attorney in Mexico.

14       Q    What are you using an attorney in Mexico for?

15       A    I believe it was a settlement of a case in

16   Mexico.

17            ROBERT YASPAN:  The judge asked about this too

18   so it's on the report that we filed on Friday.

19            DARE LAW:  So I'll say see status report, but

20   if you could just let me know briefly, what was the

21   underlying litigation.

22            RONALD TYM:  Did you want to know what the

23   Argyle online payment was or you just wanted to know if

24   he knew?

25            DARE LAW:  Well, I wanted to know if Mr. Dale

139

BARKLEY
Court Reporters

1    knew or not.  I will come back to the Argyle and yes I

2    do want to know, but I wanted to know what he knew.

3              RONALD TYM:   Okay.

4    BY DARE LAW:

5         Q    And what was the underlying litigation in

6    Mexico that the company paid $100,000?

WYNN

7         A    I believe it was a claim of individuals that

8    claimed to have worked for a property in Mexico, some

9    sort of like labor claim.

10         Q    What do you mean worked for a property?

11         A    Well, there's a property in Mexico that's used

12    for filming and corporate retreat and that kind of

13    thing and I believe these individuals claimed to have

14    worked there at one time.

15         Q    Who owns the property?

16         A    I believe it's owned by a couple of Mexican

17    corporations.  I don't know.

18         Q    And is there a fee paid when the debtor uses

19    it for filming or corporate retreats?

20         A    Yes.

21         Q    Mr. Martin got paid two days in a row.  He got

22    paid -- it looks -- he got paid $100,000 on

23    February 20th and then he got another 46277 -- $46,277

24    on February 21st.  What was that payment for?

25         A    I believe it was related to the settlement.

140

BARKLEY
Court Reporters

1   Q   Okay.  And I definitely want to know what

2   Argyle online is because there's another licensing fee

3   for $60,000 about a week after the first two payments

4   that I see?

5        MR. TYM:   Those -- the trademark agreement

6   with Path Media says that the license fees due to Path

7   Media are paid argyle so these three are for the

8   three-month license agreement fees.

9   BY DARE LAW:

WYNN   10   Q   What is KiKi Entertainment for film location

11   specialists and spent $65,000 on 2/27?

12        ROBERT YASPAN:   That was again asked by the

13   judge and you have the accounting department figure

14   that out and it's part of the declaration of Mr. Tym.

15   BY DARE LAW:

16   Q   Okay.  Mr. Dale, do you know what it is?

17   A   I believe it was an expense that -- that PSL

18   requested payment.  I don't remember the nature of it

19   exactly.

20   Q   Now, there were a number of American Express

21   cards which I referred to earlier that were issued to

22   brand but looked like -- my understanding was most of

23   it was used for Direct in -- in production and other

24   expenses.  So I want to ask a few questions about that.

25        How is it determined who gets an American

141

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    Express card?

2        A    Case by case basis, but there are very few

3    cards.

4        Q    How many cards do you think were issued the

5    year prior to filing?

6        A    Maybe three, something like that.

7        Q    Three?  Would you be surprised to know that

8    there is, let's see, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

9    12, 14 cards?

10            ROBERT YASPAN:  Well, you asked him what was

11   issued prior year, not how many were outstanding.

12   BY DARE LAW:

13       Q    Okay.  Do you know that there were 14 cards

14   that were issued and open accounts with American

15   Express?

16       A    At one time or another in the company's

17   history essentially, is that what you're asking?

18       Q    Yes.  Who reviews those American Express bills

19   when -- when the bills come in?

20       A    The card holder and then the accounting

21   department.

22       Q    Do you ever review those American Express

23   bills to make sure that they're actually used for

24   company purposes?

25       A    Very rarely if at all.

142

BARKLEY
Court Reporters

1      A      Correct.

2      Q      Okay.

3             RONALD TYM:  Well --

4             MR. PAGAY:  Any other --

5             RONALD TYM:  It's not that company per se, but

6      companies that do pay per view.

7             MR. PAGAY:  I'm not sure I understand the

8      clarification.  What do you mean?  Not the -- not the

9      company called pay per view, but companies that perform

10     that service.  I understand.  Thank you for the

11     clarification.

12     BY MR. PAGAY:

13     Q      Any other categories of contracts other than

14     membership interest, possibly employment contracts and

15     pay per view contracts?

16     A      No.

WYNN    17     Q      Turning to the next page, Schedule H, I think

18     we've already gone over with respect to GGW Brands how

19     you have listed Wynn and Ms. Favazah on -- with respect

20     to being a liability owed by all the debtors; right?

21     A      Correct, yeah.

22     Q      Okay.  If tab seven, the statement of

23     financial affairs, item 19, it says there are no

24     bookkeepers or accountants that kept or supervised the

25     books of the account.  Is that accurate?  GGW Direct

167

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN



1    has no outside bookkeepers or accountants of any kind?

2         A    Not to my knowledge.

3         Q    So in your capacity as manager, you don't deal

4    with any accounting firms whatsoever?

5         A    Not related to Direct, no.

6         Q    Related to what then?

7         A    None of these entities I would say.

8         Q    Okay.  Well, I asked how you dealt with them

9    in your capacity as manager for this entity.

10        A    Oh, yeah, sorry, so I do not.

11        Q    So --

12        A    I don't.

13        Q    So there are none?

14        A    Yeah; correct.

15        Q    Okay.

16        A    Sorry.

17        Q    In item 19B it asks about all individuals who

18   have either audited or prepared a financial statement

19   to the debtor.  With respect to GGW Direct's vendor and

20   other business relationships, have they ever had to

21   provide a financial statement?

22        A    I don't know.

23             ROBERT YASPAN:  Well, during your period of

24   time.

25             THE WITNESS:  Not to my knowledge. 

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters



WYNN

1    BY MR. PAGAY:

2        Q    Okay.  19C, asking for individuals and firms

3    that are in possession of the books to the account of

4    the debtor.  I believe with respect to Brands, you

5    indicated Ms. Isaacs.  Is that the same answer for this

6    debtor?

7        A    Yes.

8        Q    Is there anybody else?

9             ROBERT YASPAN:  Anybody else who?

10            MR. PAGAY:  Anybody else who qualifies as an

11   individual who is in possession of the books of account

12   of the debtors.

13            THE WITNESS:  I don't think so.

14   BY MR. PAGAY:

15       Q    Okay.  And where are those books and records

16   kept, at what address?

17       A    At the Wilshire address.

18       Q    The 10940; correct?

19       A    Correct, yeah.

20       Q    Thanks.  Turning now to attachment 3B to the

21   statement of financial affairs just a few pages down,

22   do you know how this report was produced?

23            ROBERT YASPAN:  Wait a minute.

24            MR. PAGAY:  Sorry.

25            ROBERT YASPAN:  3B.  Okay.  He's there.

169

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1    director?

2        A    Yes.

WYNN

3        Q    And then when you changed to your manager

4    position, your pay was dramatically cut it looks like;

5    is that accurate?

6        A    Yes.

7        Q    And how would you -- why would you get a

8    thousand versus 2000 versus 500?  Do you know what

9    would determine your payments?

10       A    I don't remember exactly why.  It should

11   generally be a thousand.  I don't know if maybe they're

12   recorded in a different fashion in here for some

13   reason.

14       Q    So you should be receiving $1,000 every two

15   weeks, is that --

16       A    Correct, yeah.

17       Q    I'm sorry?

18       A    Yes.

19       Q    Okay.  We turn another tab number nine, it's

20   the status report, this one filed on the GGW Direct

21   case.  It says at the bottom at lines 26 to 28 that GGW

22   Direct was distributed on the internet and otherwise

23   such as Dish TV and the hospitality industry.

24           Are there any other distribution channels

25   besides the internet, Dish, and hotels for GGW Direct

173

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   decision to exclude it and you said it was this boiler

2   plate information?

3        ROBERT YASPAN:  Right, it had to do with this

4   instructions from the judge.

5   BY MR. PAGAY:

6      Q    Okay.  So turning to Exhibit 1 to that

7   declaration, the first page of that is the opening page

8   of a statement that says GGW Brands, LLC Joseph R.

9   Francis with a closing date of November 23rd, 2012.

10  And then it shows on that page, says payments slash

11  credits, negative 124304.34.

12       How does GGW Brands pay these bills without

13  revenues?

14       ROBERT YASPAN:  Objection.  Calls for a fact

15  not in evidence.

16  BY MR. PAGAY:

17     Q    Okay.  Who paid these bills?

18     A    I'm not certain.

19     Q    Did -- so you don't know whether GGW Brands

20  paid these bills or I'm sorry, paid this bill?

21     A    I'm not sure.

22     Q    Okay.  It says at the bottom that the address

23  for this statement is P.O. Box 150 Hollywood,

24  California.  Is this P.O. Box used by any of the other

25  debtors?

                        176

TRANSCRIPT OF PROCEEDINGS

1      Q    Do you know if any of the other debtors keep

2    track of how these points are used?

3      A    I don't know.

4      Q    Okay.  Same with handwritten payable 63, I

5    note that it's page 18 of 19 of the statement closing

6    January 24th, 2013, and it looks like page 19 is again

7    omitted.  I assume it's boiler plate or something else.

8           And if I could ask Ms. Law to confirm, page 2

9    I assume is boiler plate?  There's no other substantive

10   information on --

11          DARE LAW:  On the November statement?

12          MR. PAGAY:  On any statement.  They're missing

13   page 2s from all -- all of the documents filed with the

14   court.

15          DARE LAW:  Let me see.  Page 2 just has a name

16   on the left-hand corner, account ending number, and the

17   rest is boiler plate.  It actually looks like it has a

18   chain of address form.

19          MR. PAGAY:  Okay.

20          DARE LAW:  So yes, that's pretty much boiler

21   plate.

22   BY MR. PAGAY:

WYNN   23      Q    So looking at handwritten bottom of page 66,

24   document page 4 of 46, which is a statement at the top

25   says Joseph R. Francis and it relates to a closing date

187

BARKLEY
Court Reporters

WYNN

1    of February 21, 2013, so just prior to the bankruptcy

2    being filed, on page 66 there are two Alaska Airline

3    charges, one for Joseph Francis, one for an Abby

4    Wilson.

5            Do you know what -- whether or not those

6    charges relate to the business of GGW Brands?

7        A    I don't know.

8        Q    Do you know what the purpose of those changes?

9        A    No.

10       Q    Do you know whether they relate to the

11   business of any of the debtors?

12       A    I don't know.

13       Q    Okay.  And same on handwritten page 86.  It's

14   24 of 25, page 25 is missing of the February 21, 2013,

15   statement.

16           Now, looking at Exhibit 5 which begins on

17   handwritten page 87 and that's document page 26 of 46,

18   this states that business green reward cards Perfect

19   Science Labs Joseph R. Francis.  What does this have to

20   do with the business of GGW Direct?

21           ROBERT YASPAN:  Excuse me?

22   BY MR. PAGAY:

23       Q    What does this -- this charge account have to

24   do with the business of GGW Direct?

25           ROBERT YASPAN:  Nothing.

188

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1          THE WITNESS:  No thanks.

2          DARE LAW:  Oh, we're going to break soon

3    anyway so -- regardless, so go ahead.

4    BY MR. PAGAY:

5      Q    Okay.  I think the last question I asked you

6    and I can't remember was whether or not you were aware

7    of what type of business Perfect Science Labs was

8    engaged in?

9      A    I believe it's sold or sells skin care

10   products.

11     Q    And you'll see on the statement has a

12   statement address of P.O. Box 25000, Beverly Hills

13   90210.  To your knowledge, does any other -- do any of

14   the debtors use that address?

15     A    No.

16     Q    Do you know any other businesses that use that

17   address?

18     A    No.

WYNN    19     Q    Do you know why GGW Direct would have paid a

20   charge on a Perfect Science Lab statement?

21     A    No.

22     Q    Okay.  Turning now to Exhibit 6 to the

23   declaration.  Do you recognize Exhibit 6?

24     A    Yes.

25     Q    What is it?

192

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1        A    I believe it is the license agreement that

2   takes the license of the (inaudible) up through May of

3   this year that we referred to earlier.

4        Q    And you're looking at handwritten page 96 at

5   the bottom which is the last page at least of the

6   agreement part of this license.  Is that your

7   signature?

8        A    Yes.

9        Q    Do you remember when you signed this?

10       A    I don't recall exactly.  I think it was early

11   February.  I don't remember exactly though.

12       Q    You think it was early February?

13       A    I don't know.  Probably around the time that

14   the agreement went into effect.  February 25th.

15       Q    Are you guessing or do you remember?

16       A    I'm guessing.

17       Q    Okay.

18            DARE LAW:  Do you know if it was before or

19   after the filing of the bankruptcy?

20            THE WITNESS:  I think before if the filing was

21   on the 27th.

22   BY MR. PAGAY:

23       Q    Okay.  Looking at page of the agreement which

24   is handwritten page 91, it says in consideration for

25   such license, licensee has paid argyle online, LLC a

193

BARKLEY
Court Reporters

WYNN

1    license fee in the amount of 274250.52.  Do you see

2    where it says that?

3         A    Yes.

4         Q    Do you know how that license fee was

5    calculated?

6         A    No.

7         Q    Did you have a role in setting that license

8    fee?

9         A    No.

10        Q    Do you know what it's based on?

11        A    No.

12        Q    Did you authorize the payment of that license

13   fee?

14        A    I believe so.

15        Q    And I apologize if I asked you this before, do

16   you have any role or responsibilities with respect to

17   argyle online, LLC?

18        A    You did ask before and I said no.

19        Q    Okay.  Do you have the names of any persons

20   affiliated with argyle online, LLC?

21        A    No.

22        Q    So you've never dealt with anybody in

23   connection with argyle online, lack?

24        A    I don't think so.

25        Q    Okay.  So going back to the signature page,

194

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1   page 96, handwritten page 96, have you ever had any

2   communications with Asia Trust Limited since you've

3   become manager of the debtor?

4        A    No.

5        Q    Do you know the names of any individuals

6   associated with Asia Trust Limited?

7        A    I've seen that name of the individual that

8   signed this before, but that's it.

9        Q    I'm sorry, what's that individual's name?

10       A    Angela Pope.

11       Q    Is that P-o-p-e?

12       A    I believe so.

13       Q    Okay.  Because you can hardly read it.  That

14   says -- and there's a second name.  Do you know who

15   that second name is?

16       A    No.

17       Q    Have you ever dealt with Ms. Pope?

18       A    No.

19       Q    Have you ever dealt with anybody else

20   representing Asia Trust Limited?

21       A    No.

22       Q    What about Hammer Smith Trust?  Do you see it

23   says by Asia trust limited as trustee of the hammer

24   Smith trust manager?

25       A    Yes.

195

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1     Q    But only through the girlsgonewild.com

2   website, no other means?

3     A    I don't think so, not with Direct.

4          MR. PAGAY:  That's all I have.

5   BY DARE LAW:

6     Q    Who manages the Girls Gone Wild website?

7     A    There's an online team, but the VP of online

8   would be the main person if you're asking for an

9   individual.

10    Q    Is that for Direct?

11    A    Yes.

12    Q    Done in-house?

13    A    Uh-huh.

14         ROBERT YASPAN:  Yes?  No.

15         THE WITNESS:  Yes.

16  BY DARE LAW:

WYNN  17    Q    I believe you testified earlier that Blue

18  Horse is a Joe Francis entity?

19    A    I -- I think so.  I don't really know about

20  that Blue Horse.

21    Q    In reviewing the debtor's books and records,

22  there was a number of transfers to Blue Horse.  For

23  example, May 2012 there was a $50,000 transfer.

24  June 2012 there was $120,000 transfer.  July of 2012

25  there was a $20,000 transfer.  August 2012 there was a

197

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    $50,000 transfer.  September 2012, there was a $50,000

2    transfer and October 2012 there was a $40,000 transfer.

3    Why would those sums be transferred to Blue Horse?

4        A    I believe Blue Horse owns a property in Bel

5    Air and I would imagine those may be related to

6    expenses at that property or something along those

7    lines.

8        Q    Does somebody live at that property?

9        A    Mr. Francis uses the property, Joe Francis.

10       Q    Do you know if he lives there full time?

11       A    I don't know.

12       Q    I'm sorry?

13       A    I don't know whether he lives there full time

14   or not.

15       Q    Does anybody else to your knowledge use that

16   property?

17       A    I don't know.

18       Q    And what, if any, purpose does the debtor

19   entities of the Girls Gone Wild entities have to do

20   with that Bel Air property?

21       A    I think it's been used as a film location at

22   times.

23       Q    So for example, in 2012 to your knowledge how

24   many times, if any, has that location been used for

25   filming?

198

BARKLEY
Court Reporters

WYNN

1    A    I don't know.  I mean, if we're talking

2    November, December, I don't know whether it was -- and

3    I don't know before that.

4        Q    Is there some sort of formula to arrive at how

5    much should be paid to Blue Horse for use of their

6    property?

7        A    I don't know of one.

8        Q    Do you know if there's any formal agreement

9    with Blue Horse written for some calculation of

10   compensation for use of the property?

11       A    I don't believe so.

12       Q    Who approves these transfers of funds to Blue

13   Horse?

14           ROBERT YASPAN:  Are there any after November?

15           DARE LAW:  Well, there's one October and

16   Mr. Dale says he came in somewhere around October,

17   November, so there's one at least in October.

18           THE WITNESS:  Yeah, I don't remember.

19   BY DARE LAW:

20       Q    Do you know if there's been any payments since

21   to Blue Horse?

22       A    I don't know.

23       Q    Is any of the debtor entities still using the

24   Bel Air property for any purposes?

25       A    Not the entities I don't think.

199

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1   Q    So none of the Girls Gone Wild entities are

2   still using Bel Air house for any purpose?

3   A    I don't think so unless there's been filming

4   recently that I'm not aware of, but I don't think so.

5   Q    And is there any intent to use the Bel Air

6   property going forward for any purpose?

7   A    Potentially, yeah.

8   Q    I'm sorry?

9   A    I mean, potentially, but you know, nothing

10  set.

WYNN

11  Q    And if the property is used going forward, how

12  would any monies, if any, be determined to be paid to

13  Blue Horse or any other entity who uses that property?

14       ROBERT YASPAN:  I have no idea what that

15  question means.  Could I ask that you rephrase?

16  BY DARE LAW:

17  Q    Yeah, sure.  If the debtor is going to use the

18  Bel Air property for any purposes going forward, do you

19  expect them to have to pay for the usage of that

20  property?

21  A    Potentially.

22  Q    And so if -- if monies were to be paid to be

23  used for that property, how would that be determined?

24       ROBERT YASPAN:  How would the amount be

25  determined?

200

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

```
 1   BY DARE LAW:
 2       Q    Yes, how would the dollar amount be
 3   determined?
 4       A    I don't know.
 5       Q    So --
 6            ROBERT YASPAN:  You're asking about something
 7   that might occur in the future, so it'll be determined
 8   when it gets determined.
 9   BY DARE LAW:
10       Q    Has the debtor used the Bel Air property since
11   October 2012 to your knowledge?
12       A    I don't know.
13       Q    Has it used the property since the filing?
14       A    Don't know.
15            ROBERT YASPAN:  Well, we can find out if there
16   are any payments since the filing because we have that
17   resource here, but you don't want to ask that question
18   so I'll get you the information.
19            RONALD TYM:  And there have been no payments.
20            DARE LAW:  Yes, but if they used the property
21   and there's an expectation of payment, I want to know
22   that too.
23            RONALD TYM:  There's been no use, no payments,
24   and just because of the nature of it and trying to, you
25   know, stay as far away from the line as possible,
```

201

BARKLEY
Court Reporters

1   there's no intend to use or pay anything to people post

2   bankruptcy.

3   BY DARE LAW:

WYNN   4   Q   Do you know what Blue Horse does?  I mean you

5   said it's a Joe Francis entity, but I don't -- that's

6   all I know about it.

7   A   I believe it's a Joe Francis entity.  I don't

8   know what it does.

9   MR. PAGAY:  Can I ask once follow-up?

10   DARE LAW:  Yeah, go ahead.

11   MR. PAGAY:  (Inaudible).

12   BY MR. PAGAY:

WYNN   13   Q   Were you involved at all in -- in discussions

14   regarding agreements between any of the debtors and

15   Bell, one of the pay per view distributors?

16   A   No.

17   Q   Were you involved in any discussions

18   between -- regarding the relationship between any of

19   the debtors and Direct TV?

20   A   No.

21   Q   And what about --

22   ROBERT YASPAN:  He's already testified to

23   this.  He said nothing has come up since he started in

24   terms of a new agreement, these were all in place.

25   BY MR. PAGAY:

202

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

WYNN

1    Q    So same answer, you weren't involved in any

2    discussions regarding the relationship with the debtors

3    and Dish Network, Lodge Net, or Viewer's Choice Canada?

4    A    Correct.

5    Q    Have you negotiated any transactions on behalf

6    of the debtors since becoming manager?

7    A    No new substantive contracts of any kind.

8    Q    I'm sorry, say that again.  I didn't hear you?

9    A    Nothing of substance in terms of a contract

10   that I would put against these things listed on

11   handwritten page 90.

12   Q    No, I'm not -- I'm talking about anything.

13   A    Oh.

14   Q    No?

15   A    Nothing substantive.

16   Q    Well, what do you -- what is non substantive

17   then?

18   A    Well, yeah, I'd say no.

19   Q    I'm sorry?

20   A    No, I have not.

21   Q    Nothing.  Okay.  Got it.

22        ROBERT YASPAN:  All right.  I really do have

23   to call.

24        DARE LAW:  I just have two names and then I'm

25   going to take a break whether we conclude or whether we

203

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

1   do something else.

2   BY DARE LAW:

3        Q     Who is Abby Wilson?

4        A     I believe she -- there's a TV show called "The

5   Hottest Girl in America" and I think she won a season

6   of that TV show.

7        Q     And who is Anatoli Pogorela?

8        A     An IT person for the company.

9        Q     Okay.  Since we're in the middle and

10  Mr. Yaspan needs to go, I'm actually going to continue

11  this.  I need to get a date so I need my calendar, and

12  then we will reconvene at that same date for the other

13  two debtors which we didn't get to.

14          Do you want to come back today or do you want

15  to come back another day?

16          ROBERT YASPAN:  There's no way I can come back

17  today.

18          DARE LAW:  Okay.  So if you give me two

19  minutes, I will actually go get my calendar, and I will

20  give you a date that will work for everybody.  Okay.

21  Okay.  Let me just get my --

22          (Pause in recording.)

23          DARE LAW:  Okay.  Back on the record.  The

24  341(a) meeting for GGW Direct case number 213BK15132SK

25  is continued to April 22nd at 9:00 and then GGW Events

204

BARKLEY
Court Reporters

1  will be continued to April 22nd at 9:00, case number

2  213BK15134SK.  GGW Magazines will be continued to

3  August (sic) 22nd at 9:00.  We're going to go

4  consecutive on the cases.  GGW Magazine is case number

5  13 -- 213Bk13 -- sorry, 15137SK.  So they're all

6  continued to February (sic) 22nd at 9:00.

7          ROBERT YASPAN:  April.

8          DARE LAW:  I will put the continuance on --

9          ROBERT YASPAN:  April.

10          DARE LAW:  Sorry, I don't know why I keep on

11  doing that.  April 22nd at 9:00 and I will put the

12  continuance on the docket.  Thank you.

13          (End of recording.)

14

15

16

17

18

19

20

21

22

23

24

25

205

TRANSCRIPT OF PROCEEDINGS

**BARKLEY**
Court Reporters

1                    COURT REPORTERS CERTIFICATE

2    STATE OF CALIFORNIA        )
                                )   ss.
3    COUNTY OF ORANGE           )
     _____)

4

5

6         I, LISA DAY, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate Number CSR 12960 issued by the Court

10   Reporters Board of California and which is in full

11   force and effect.

12        I am not financially interested in this

13   action and am not a relative or employee of any

14   attorney of the parties, or of any of the parties.

15        I am the reporter that stenographically

16   recorded the testimony in the foregoing

17   proceeding and the foregoing transcript is a true

18   record of the testimony given.

19

20   Dated: April 8, 2013

21

22

23   _____
                                     Lisa Day
24

25

                          206

TRANSCRIPT OF PROCEEDINGS

BARKLEY
Court Reporters

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:   10100 Santa Monica Blvd., Ste. 1300, Los Angeles, CA  90067

A true and correct copy of the foregoing documents entitled (*specify*): **EX PARTE EMERGENCY APPLICATION FOR ORDER AUTHORIZING WYNN LAS VEGAS, LLC D/B/A WYNN LAS VEGAS TO FILE (I) SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE; (II) NOTICE OF LODGMENT OF TRANSCRIPT OF 341(A) MEETING OF CREDITORS OF DEBTORS; AND (III) PERTINENT EXCERPTS OF THE 341(A) MEETING OF CREDITORS OF DEBTORS; DECLARATION OF MALHAR S. PAGAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document was served by the court via NEF and hyperlink to the document. On (*date*) **April 9, 2013**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **April 9, 2013**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Via Personal Delivery**
The Honorable Sandra R. Klein
United States Bankruptcy Court
255 E. Temple St., Ste. 1582 / Courtroom 1575
Los Angeles, CA  90012

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 9, 2013 | Megan J Wertz | /s/ Megan J Wertz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:266456.1 93837/001

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Dare Law     dare.law@usdoj.gov
- Malhar S Pagay     mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ronald N Richards     ron@ronaldrichards.com
- Ronald D Tym     RTym@Tymfirm.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Andy C Warshaw awarshaw@lawcenter.com, mstevens@lawcenter.com
- Robert M Yaspan     court@yaspanlaw.com, tmenachian@yaspanlaw.com


**2.    SERVED BY PERSONAL DELIVERY**

Robert M Yaspan
Law Offices of Robert M Yaspan
21700 Oxnard St Ste 1750
Woodland Hills, CA 91367

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.