1  David M. Stern (Cal. Bar No. 67697)
   Michael L. Tuchin (Cal. Bar No. 150375)
2  Robert J. Pfister (Cal. Bar No. 241370)
   Jonathan M. Weiss (Cal. Bar No. 281217)
3  KLEE, TUCHIN, BOGDANOFF & STERN LLP
   1999 Avenue of the Stars, Thirty-Ninth Floor
4  Los Angeles, California 90067
   Telephone:    310-407-4000
5  Facsimile:    310-407-9090
   Email:        dstern@ktbslaw.com
6                mtuchin@ktbslaw.com
                 rpfister@ktbslaw.com
7                jweiss@ktbslaw.com

8  *Attorneys for R. Todd Neilson, Chapter 11 Trustee and*
   *GGW Marketing, LLC*

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                 **LOS ANGELES DIVISION**

13  In re                          | Case No. 2:13-bk-15130-SK

14  GGW BRANDS, LLC,               | Jointly Administered
    GGW DIRECT, LLC,
15  GGW EVENTS, LLC,               | Chapter 11
    GGW MAGAZINE, LLC, and
16  GGW MARKETING, LLC,            | **CHAPTER 11 TRUSTEE'S
                                   | DISCLOSURE STATEMENT AND PLAN
17        Debtors.                 | OF LIQUIDATION FOR GGW BRANDS,
                                   | LLC, GGW DIRECT, LLC, GGW
18                                 | EVENTS, LLC, GGW MAGAZINE, LLC
    This pleading affects:         | & GGW MARKETING, LLC DATED AS
19  All Debtors              ☒     | OF NOVEMBER 12, 2014**
    GGW Brands, LLC          ☐
20  GGW Direct, LLC          ☐
    GGW Events, LLC          ☐
21  GGW Magazine, LLC        ☐
    GGW Marketing, LLC       ☐
22

23

24

25

26

27

28

152788.1

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION .................................................................................................. 1

II. GENERAL DISCLAIMER AND VOTING PROCEDURE ....................................... 2

III. DEFINITIONS AND RULES OF CONSTRUCTIONS ............................................ 3

    A.    Definitions. ................................................................................ 3

    B.    Rules of Construction. ................................................................ 9

IV. WHO MAY OBJECT TO CONFIRMATION OF THE PLAN ............................... 10

V. WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN .................................. 10

VI. VOTES NECESSARY TO CONFIRM THE PLAN .............................................. 12

VII. INFORMATION REGARDING VOTING IN THIS CASE .................................... 13

VIII. DESCRIPTION OF DEBTORS' PAST BUSINESS, EVENTS PRECIPITATING
    BANKRUPTCY FILING, and Events During Bankruptcy Cases ........................ 13

    A.    Description of Debtors' Past Business. ....................................... 13

    B.    Events Precipitating the Debtors' Bankruptcy. ........................... 14

    C.    The Debtors Bankruptcy Cases ................................................. 16

IX. CRITICAL PLAN PROVISIONS ....................................................................... 31

X. DESCRIPTION AND TREATMENT OF CLAIMS .............................................. 31

    A.    Summary and Classification of Claims ...................................... 31

    B.    Allowance and Treatment of Unclassified Claims (Administrative Claims
    and Priority Tax Claims). .......................................................... 34

    C.    Classification and Treatment of Classified Claims ..................... 38

XI. SOURCE OF MONEY TO PAY CLAIMS AND MEANS OF EXECUTION AND
    IMPLEMENTATION OF PLAN ..................................................................... 41

    A.    Cash Flows ............................................................................... 41

    B.    Substantive Consolidation ........................................................ 43

    C.    Vesting of Assets and Liabilities Generally. .............................. 43

    D.    Funding of the Plan. ................................................................. 43

    E.    Vesting of Causes of Action in GGW Creditor Trust. ................ 43

    F.    Objections to Claims. ............................................................... 44

G.    Distribution of Property Under the Plan. ................................................. 44

H.    Setoff, Recoupment and Other Rights.................................................. 46

I.    The Effective Date .................................................................................. 47

J.    Cancellation of Interests........................................................................ 48

K.    Termination of Services of Debtors' Officers and Directors. ................ 48

L.    Dissolution of Debtors .......................................................................... 48

XII. FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED
PAYMENTS ARE FEASIBLE.................................................................... 48

XIII. ASSETS AND LIABILITIES OF THE ESTATES; Risk Factors Related Thereto ............ 49

A.    Assets ................................................................................................... 49

B.    Liabilities............................................................................................... 50

C.    Summary ............................................................................................... 50

XIV. TREATMENT OF NON-CONSENTING CLASSES .................................................. 50

XV. TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASSES
(CHAPTER 7 LIQUIDATION ANALYSIS) .................................................. 51

XVI. FUTURE DEBTORS .......................................................................................... 52

A.    Management of Debtors ........................................................................ 52

B.    Creation of the GGW Creditor Trust; Appointment of GGW Creditor
Trustee; Powers and Duties ................................................................. 52

C.    Future Financial Outlook ...................................................................... 57

XVII. SALE OR TRANSFER OF PROPERTY; CONTRACTS AND LEASES; OTHER
PROVISIONS ........................................................................................ 57

A.    Sale of Estate Property ......................................................................... 57

B.    Rejection of Executory Contracts and Unexpired Leases ..................... 58

XVIII. BANKRUPTCY PROCEEDINGS .......................................................................... 59

XIX. TAX CONSEQUENCES OF PLAN ....................................................................... 60

**A.    Certain U.S. Federal Income Tax Consequences of the Plan to the
Debtor and Reorganized Debtor.**.................................................. 61

**B.    Certain U.S. Federal Income Tax Consequences of the Plan to the
Holders of Claims.**........................................................................ 61

XX. EFFECT OF CONFIRMATION OF PLAN ............................................................ 64

A.    General Comments ...................................................................... 64

B.    No Discharge of Liability for Payment of Debts. .................................... 64

C.    Modification of the Plan ............................................................... 65

D.    Post-Confirmation Causes of Action ................................................. 65

E.    Retention of Jurisdiction ............................................................... 65

F.    Final Decree .............................................................................. 67

XXI. MISCELLANEOUS PROVISIONS ........................................................ 67

A.    Exculpation Re: Solicitation and Prosecution of Plan Confirmation. ................. 67

B.    Revocation of Plan/No Admissions. .................................................. 67

C.    Exemption from Certain Transfer Taxes. ............................................ 68

D.    Payment of U.S. Trustee Fees. ........................................................ 68

E.    Successors and Assigns. ................................................................ 68

F.    Saturday, Sunday or Legal Holiday. .................................................. 68

G.    Headings. ................................................................................. 69

H.    Severability of Plan Provisions. ....................................................... 69

I.    Governing Law. .......................................................................... 69

XXII. DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN ............. 70

# LIST OF EXHIBITS

**Exhibit 1**      GGW Creditor Trust Agreement

**Exhibit 2**      Preserved Claims

**Exhibit 3**      List of Individuals and Entities Not Entitled to the Benefit of Limited Subordination of Stephen A. Wynn, Wynn LV, Favazza, Rayment, Heath, and Judgment Creditors

**Exhibit 4**      Allowed Class 1 Claims

**Exhibit 5**      Allowed Class 2 Claims

**Exhibit 6**      Projected Distributions to Allowed Class 2 Claims

**Exhibit 7**      Allowed Class 3 Claims

**Exhibit 8**      Debtors' Financial Statements

**Exhibit 9**      Estates' Assets

**Exhibit 10**     Estates' Liabilities

152788.1

## I. INTRODUCTION

On February 27, 2013, GGW Brands, LLC ("GGW Brands"), GGW Direct, LLC ("GGW Direct"), GGW Events, LLC ("GGW Events"), and GGW Magazine, LLC ("GGW Magazine" and, collectively with GGW Brands, GGW Direct, and GGW Events, the "Original Debtors") each filed a voluntary bankruptcy petition under chapter 11 of the Bankruptcy Code.  On April 12, 2013, the United States Bankruptcy Court for the Central District of California (the "Court") entered its order approving the appointment of R. Todd Neilson as Chapter 11 Trustee (the "Trustee" or the "Proponent") for the Original Debtors.

On May 20, 2013, the Court entered its order authorizing the Trustee to revoke the cancellation of GGW Marketing, LLC ("GGW Marketing"), a wholly-owned subsidiary of GGW Brands, and cause it to file a voluntary bankruptcy petition.  On May 20, 2013, the Trustee revoked the cancellation of GGW Marketing and, on May 22, 2013, he caused it to file a voluntary bankruptcy petition under chapter 11 of the Bankruptcy Code.  Pursuant to orders of the Court, the bankruptcy cases of GGW Brands, GGW Direct, GGW Events, GGW Magazine, and GGW Marketing (collectively, the "Debtors") are being jointly administered under case number 2:13-bk-15130-SK (the "Bankruptcy Cases").

The document you are reading is both the Plan of Liquidation (the "Plan") and the Disclosure Statement (the "Disclosure Statement").  The Trustee has proposed the Plan to treat the claims of the Debtors' creditors.  A Disclosure Statement describes the assumptions that underlie the Plan, and how the Plan will be executed.  The Court has approved the form of this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone.

The Trustee has reserved _____, 2014 at _____ in Courtroom 1575 in the Court at 255 East Temple Street, Los Angeles, California for a hearing to determine whether the Court will confirm the Plan.  Any party that desires further information about this Plan and Disclosure Statement should contact Jonathan M. Weiss at Klee, Tuchin, Bogdanoff & Stern LLP, 1999

1   Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, California 90067, Telephone: 310-407-

2   4000, Email: jweiss@ktbslaw.com.

3               **II.  GENERAL DISCLAIMER AND VOTING PROCEDURE**

4           PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS,

5   CAREFULLY.  IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN.  IT

6   EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  IT ALSO

7   TELLS ALL CREDITORS AND ANY EQUITY HOLDERS WHAT TREATMENT THEY CAN

8   EXPECT TO RECEIVE UNDER THE PLAN, SHOULD THE PLAN BE CONFIRMED BY

9   THE COURT.

10          THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS

11  DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XXII BELOW.  ALL

12  REPRESENTATIONS ARE TRUE AND CORRECT TO THE PROPONENT'S KNOWLEDGE.

13          NO REPRESENTATIONS CONCERNING THE DEBTORS THAT ARE

14  INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT

15  TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

16          After carefully reviewing this document and the attached exhibits, please vote on the

17  enclosed Ballot and return it in the enclosed envelope.

18          The Proponent has reserved a hearing date for a hearing to determine whether the Court

19  will confirm the Plan.  Please refer to Section I above for the specific hearing date.  If, after

20  receiving the ballots, it appears that the Proponent has the requisite number of votes required by

21  the Bankruptcy Code, the Proponent will file a Motion for an Order Confirming the Plan (the

22  "Motion to Confirm"), which will be served on all impaired creditors and equity holders who

23  reject the Plan, the Office of the United States Trustee, and others.  Any Opposition to the Motion

24  to Confirm shall be filed and served on the Proponent no later than fourteen days prior to the date

25  of the Confirmation Hearing.  Failure to oppose the confirmation of the Plan may be deemed

26  consent to the Plan's confirmation.

27

28

152788.1                                    2

## III.  DEFINITIONS AND RULES OF CONSTRUCTIONS

**A.      Definitions.**

In addition to such other terms as are defined elsewhere herein, the following terms (which appear herein as capitalized terms) have the following meanings as used herein:

**"Administrative Claim"** means a Claim against the Estates for administrative costs or expenses entitled to priority under Bankruptcy Code section 507(a)(2) or (b).

**"Allowed"** or **"Allowed _____ Claim"** means:

    (a)     with respect to a Claim against the Debtors arising prior to the Petition Date, either: (1) a proof of claim was timely Filed, pursuant to the Bar Date Order; or (2) a proof of claim is deemed timely Filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a Final Order; provided, however, that with respect to any such Claim, such Claim shall be considered Allowed only if (i) no objection to the allowance thereof has been interposed by the Claims Objection Deadline or (ii) an objection to the Claim has been interposed and a Final Order has been entered allowing the Claim.

    (b)     with respect to a Claim against the Estates arising on or after the Petition Date, a Claim that has been allowed pursuant to Section X.B.1.d.

Unless otherwise specified in the Plan, an Allowed Claim does not include interest on the Claim accruing after the Petition Date.  Moreover, any Claim or portion of a Claim that is or was satisfied, released or waived during the Bankruptcy Cases, including by payment from any of the Trustee, the Debtors, or GGWA as a "cure amount" pursuant to the APA, is not an Allowed Claim.

**"APA"** means that certain Asset Purchase Agreement by and between the Debtors and GGWA, dated as of February 10, 2014.

**"Ballot"** means the ballot to vote to accept or reject the Plan.

**"Ballot Deadline"** means the deadline established by the Court for the delivery of executed Ballots to the Ballot Tabulator.

**"Ballot Tabulator"** means Shanda D. Pearson, a paralegal with KTB&S, or any other person or entity designated by KTB&S to tabulate Ballots.

1   **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

2   **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

3   **"Bar Date Notice"** means the *Notice of Bar Dates for Filing Proofs of Claim, Proofs of*

4   *Interest, and Certain Administrative Expense Requests; Ramifications for Failure to Comply*

5   *Therewith; and Other Case-Related Procedures* [Docket No. 281], which sets forth, *inter alia*,

6   certain dates, deadlines and procedures relevant to filing proofs of Claim and proofs of Interest in

7   these Bankruptcy Cases pursuant to the Bar Date Order.

8   **"Bar Date Order"** means the *Order Granting Motion for Order (1) Fixing Deadlines for*

9   *Filing Proofs of Claim, Proofs of Interest, and Certain Administrative Expense Requests; (2)*

10   *Establishing Ramifications for Failure to Comply Therewith; and (3) Approving Form and*

11   *Manner of Notice Thereof* [Docket No. 273].

12   **"BRG"** means Berkeley Research Group, LLC, in its capacity as accountant and financial

13   advisor to the Trustee and to GGW Marketing.

14   **"Business Day"** means a day that is not a Saturday, Sunday, or legal holiday.

15   **"Claim"** means a claim, as defined in Bankruptcy Code section 101(5).

16   **"Claims Objection Deadline"** means the last day by which the Trustee or GGW Creditor

17   Trust may File objections to Claims, which day shall be, except with respect to Administrative

18   Claims, as set forth in Section X.B.1.d, the later of (a) 180 days after the Effective Date, unless

19   extended by the Court, and (b) 180 days after the date on which a proof of claim in respect of a

20   Claim against the Debtors has been Filed, unless extended by the Court.  The filing of a motion to

21   extend the Claims Objection Deadline by any party shall automatically extend the Claims

22   Objection Deadline.  If such motion to extend the Claims Objection Deadline is denied by the

23   Court, or approved by the Court and reversed on appeal, the Claims Objection Deadline shall be

24   the later of the then-current Claims Objection Deadline (as previously extended, if applicable) or

25   30 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

26   **"Class"** means a category of holders of Claims or Interests as classified in Article X.

27   **"Confirmation Date"** means the date of entry of the Confirmation Order.

28   **"Confirmation Hearing"** means the hearing by the Court on confirmation of the Plan.

1    **"Confirmation Order"** means the Court order confirming the Plan.

2    **"Disallowed Claim"** means a Claim against the Debtors that: (a) is not listed on the

3    Schedules, or is listed therein as contingent, unliquidated, disputed, subject to adjustment,

4    unknown, or in an amount equal to zero, and whose holder has failed to timely File a proof of

5    Claim; or (b) the Court has disallowed pursuant to an order of the Court.

6    **"Disputed Claim"** means any Claim that is not an Allowed Claim, if any.

7    **"Effective Date"** means the first Business Day on which the conditions set forth in Section

8    XI.I have been satisfied or waived and on which no stay of the Confirmation Order is in effect.

9    **"Estates"** means the estates of the Debtors created in the Bankruptcy Cases under

10    Bankruptcy Code section 541.

11    **"Filed"** means duly and properly filed with the Court and reflected on the Court's official

12    docket.

13    **"Final Order"** means an order or judgment of the Court entered on the Court's official

14    docket:

15    (a)    that has not been reversed, rescinded, stayed, modified, or amended;

16    (b)    that is in full force and effect; and

17    (c)    with respect to which: (1) the time to appeal or to seek review, remand, rehearing,

18    or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review,

19    rehearing, remand, or writ of certiorari is pending; or (2) any such appeal or petition has been

20    dismissed or resolved by the highest court to which the order or judgment was appealed or from

21    which review, rehearing, remand, or a writ of certiorari was sought.

22    **"General Unsecured Claim"** means a Claim against the Debtors that is not an

23    Administrative Claim, a Priority Claim, a Late-Filed Claim, or a Voluntarily Subordinated

24    Punitive Damage Claim.

25    **"GGW Creditor Trust"** means that certain trust to be established on the Effective Date

26    pursuant to the GGW Creditor Trust Agreement and this Plan.

27

28

**"GGW Creditor Trust Agreement"** means the agreement pursuant to which the GGW Creditor Trust will be formed and implemented, the substantially final version of which is attached as <u>Exhibit 1</u> hereto.

**"GGW Creditor Trust Assets"** means (i) the Preserved Claims and any other claims, rights and causes of action vested in the GGW Creditor Trust, and (ii) all other property of the Estates as of the Effective Date, which property shall vest in the GGW Creditor Trust on the Effective Date pursuant to the GGW Creditor Trust Agreement and this Plan and Disclosure Statement.

**"GGW Creditor Trust Interest(s)"** means a beneficial interest in the GGW Creditor Trust entitling the holder thereof to the applicable treatment provided for under the Plan.  All GGW Creditor Trust Interests shall be governed by the terms of this Plan and Disclosure Statement and the GGW Creditor Trust Agreement, shall not be evidenced by any type of certificate or other instrument, and shall not be transferable, except by operation of law.

"**GGW Creditor Trust Liabilities**" means unpaid Professional Fee Claims owing from the Debtors' Estates to the Professionals pursuant to Section X.B.1.c hereof, which shall vest in the GGW Creditor Trust on the Effective Date pursuant to the GGW Creditor Trust Agreement and this Plan and Disclosure Statement.

**"GGW Creditor Trustee"** means R. Todd Neilson, in his capacity as the trustee of the GGW Creditor Trust, pursuant to the GGW Creditor Trust Agreement, or any successor thereto as trustee of the GGW Creditor Trust.

**"GGWA"** means GGW Acquisition, LLC, a Delaware limited liability company.

**"GGWA Sale"** means the sale of substantially all of the Debtors' operating assets to GGWA, pursuant to the APA and the Sale Order.

**"Humboldt Reserves"** means $151,148 in reserves currently held by Humboldt Merchant Services, the Debtors' credit card processing vendor, which the Trustee expects the Debtors to receive on or about the end of 2014.

**"Interest"** means any interest, whether or not asserted, of any holder of an equity security of the Debtors, as defined in Bankruptcy Code section 101(16).

**"KTB&S"** means Klee, Tuchin, Bogdanoff & Stern LLP, legal counsel to the Trustee and GGW Marketing.

**"Late-Filed Claim"** means a Claim against any of the Debtors or the Debtors' Estates, (i) proof of which was filed subsequent to the date designated by the Court, either pursuant to the Bar Date Order or otherwise, as the last date for filing such proof of claim against any such Debtor or such Debtor's Estate, and which is not merely amending or superseding a Claim that was filed prior to such date, and (ii) which has not been listed by such Debtor in its Schedules as liquidated in amount and not disputed, contingent, subject to adjustment or unknown.

**"Local Bankruptcy Rules"** means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California.

**"Net Trust Assets"** means all cash comprising and/or cash proceeds recovered in respect of the GGW Creditor Trust Assets, minus (i) all expenses of the GGW Creditor Trust incurred in generating any cash proceeds, including all attorneys' fees and expenses, expert witness fees and expenses and court costs, (ii) all expenses of the GGW Creditor Trust incurred in prosecuting objections to Claims and administering the GGW Creditor Trust, including all attorneys' fees and expenses, expert witness fees and expenses and court costs, (iii) all amounts distributed or to be distributed to the holders of Administrative Claims pursuant to Section X.B.1 hereof, (iv) all amounts to be paid to the holders of Priority Tax Claims and Allowed Class 1 Claims pursuant to Sections X.B.2 and X.C.1, respectively, hereof, (v) $435,240.81 paid to holders of Allowed Class 2 Claims pursuant to Section X.C.2 hereof, and (vi) the GGW Creditor Trust Liabilities.

**"Petition Date"** means February 27, 2013, unless the context requires that the term refers to the date of the filing of GGW Marketing's chapter 11 petition, in which case the term "Petition Date" means May 22, 2013.

**"Preserved Claims"** means the claims and causes of action held by the Debtors or their Estates, including as may arise under chapter 5 of the Bankruptcy Code, as set forth on <u>Exhibit 2</u> hereto, as such exhibit may be amended prior to the Effective Date, against the parties identified thereon, which Preserved Claims are to be transferred to the GGW Creditor Trust on the Effective Date.

**"Priority Claim"** means an Allowed Claim entitled to priority under Bankruptcy Code sections 507(a)(4), 507(a)(5), 507(a)(7) or 507(a)(8).  Priority Claims do not include any Claims that accrue after the Petition Date.

**"Priority Non-Tax Claim"** means a Priority Claim other than a Priority Tax Claim.

**"Priority Tax Claim"** means an Allowed Claim entitled to priority under Bankruptcy Code section 507(a)(8).  Priority Tax Claims do not include any Claims that accrue after the Petition Date.

**"Professionals"** means, collectively, the Trustee, KTB&S and BRG.

**"Pro Rata"** means proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the Allowed Claim, is the same as the ratio of (x) the amount of consideration available for distribution on account of Allowed Claims in the Class in which the particular Allowed Claim is included to (y) the amount of all Allowed Claims in that Class.

**"Professional Fee Claim"** means a Claim under Bankruptcy Code sections 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred for which the Estates are liable for payment.

**"Rejection Damage Claim"** means a Claim against the Debtors arising under Bankruptcy Code section 365 from the rejection by the Debtors of an unexpired lease or executory contract.

**"Sale Order"** means the *Order: (1) Approving Asset Purchase Agreement Between the Debtors and the Buyer, (2) Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (3) Approving Assumption, Assignment and Sale of Certain Executory Contracts Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 363 and 365, (4) Determining the Amounts Necessary to Cure Such Executory Contracts, and Granting Related Relief* [Docket No. 552], entered by the Court on April 23, 2014.

**"Schedules"** means, collectively, the Schedules of Assets and Liabilities Filed by each Debtor as such Schedules may have been, or may subsequently be, amended before the Effective Date.

1    **"Trade Claims"** means all Allowed Class 2 Claims other than (i) Class 2 Claims held by

2    the Debtors, insiders of the Debtors, or the individuals and entities listed on <u>Exhibit 3</u> hereto;

3    (ii) the Allowed Class 2 Claims held by Stephen A. Wynn, Wynn LV, and the Judgment Creditors;

4    (iii) the Favazza Compensatory Claim, provided, however, that pursuant to the Favazza Settlement

5    Order, the Favazza Compensatory Claim shall be treated as a Trade Claim until such time as

6    $100,000 has been distributed on account of such Claim, (iv) the Heath Allowed Claim, provided,

7    however, that the Heath Allowed Claim shall be treated as a Trade Claim until such time as

8    $12,500 has been distributed on account of such Claim and (v) the Rayment Compensatory Claim,

9    provided, however, that the Rayment Compensatory Claim shall be treated as a Trade Claim until

10    such time as $100,000 has been distributed on account of such Claim.

11    **"U.S. Trustee"** means the Office of the United States Trustee for the Central District of

12    California.

13    **"U.S. Trustee Fees"** means fees or charges assessed against the Estates pursuant to 28

14    U.S.C. § 1930.

15    **"Voluntarily Subordinated Punitive Damage Claim"** means a Claim for any fine,

16    penalty, or forfeiture, or for multiple, exemplary, or punitive damages held by any of Wynn Las

17    Vegas, LLC, Stephen A. Wynn, Tamara Favazza, or Brian J. Rayment, which persons or entities

18    have agreed to voluntarily subordinate such Claims to other Allowed General Unsecured Claims.

19    **B.    Rules of Construction.**

20    1.    The rules of construction in Bankruptcy Code section 102 apply herein to the extent

21    not inconsistent herewith.

22    2.    Bankruptcy Rule 9006(a) applies when computing any time period hereunder.

23    3.    A term that is used herein and that is not defined herein has the meaning attributed

24    to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules.

25    4.    Whenever it is appropriate from the context, each term, whether stated in the

26    singular or the plural, includes both the singular and the plural.

27    5.    Any reference to a document or instrument being in a particular form or on

28    particular terms means that the document or instrument will be substantially in that form or on

152788.1                                                    9

those terms.  No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially negatively affected.

6.     Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

7.     Unless otherwise indicated, the phrase "under the Plan" or "under this Disclosure Statement" and similar words or phrases refer to this Plan and Disclosure Statement in its entirety rather than to only a portion hereof.

8.     Unless otherwise specified, all references to Sections or Exhibits are references to this Plan and Disclosure Statement's Sections or Exhibits.

9.     The words "herein," "hereto," "hereunder," and other words of similar import refer to this Plan and Disclosure Statement in its entirety rather than to only a particular portion hereof.

## IV.  WHO MAY OBJECT TO CONFIRMATION OF THE PLAN

Any party in interest may object to confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.

## V.  WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

A party can vote to accept or reject the Plan only if the party has an allowed and impaired Claim or Interest that is in a class that would receive or retain property.  A Claim is defined by the Code to include a right to payment from the Debtors.  An Interest represents an ownership stake in the Debtors.

In order to vote, a creditor or interest-holder must first have an <u>allowed Claim or Interest</u>. With the exceptions explained below, a Claim or Interest is allowed if proof of the Claim or Interest is properly filed before the applicable bar date and no party in interest has objected, or if the Court has entered an order allowing the Claim or Interest.  Please refer to Section VII below for specific information regarding bar dates in these Bankruptcy Cases.

Under certain circumstances a creditor may have an allowed Claim even if a proof of Claim was not filed and the bar date for filing a proof of Claim has passed.  A Claim is deemed allowed if the Claim is listed on the Debtors' Schedules and is not scheduled as disputed, contingent, unliquidated, subject to adjustment, or unknown, or in an amount equal to zero.

1   Similarly, an Interest is deemed allowed if it is shown on the list of equity security holders filed by

2   the Debtors with the Court and is not scheduled as disputed.  Exhibits 4, 5 and 7 contain a list of

3   allowed Claims, including (i) those that are scheduled by the Debtors not as disputed, contingent,

4   unliquidated, subject to adjustment, unknown, or in an amount equal to zero, and (ii) those that

5   have been filed in the case of one or more Debtors and which the Court has not disallowed.

6        In order to vote, a holder of an allowed Claim or Interest must also have such Claim or

7   Interest be impaired by the Plan.  Impaired creditors include those creditors and Interest holders

8   whose legal, equitable, and contractual rights are altered by the Plan, even if the alteration is

9   beneficial to the creditor or Interest holders.  A contract provision that entitles a creditor to

10  accelerated payment upon default does not, however, necessarily render the claimant impaired,

11  even if the Debtors defaulted and the Plan does not provide the creditor with accelerated payment.

12  The creditor is deemed unimpaired so long as the Plan cures the default, reinstates the maturity of

13  such Claim as it existed before default, compensates for any damages incurred as a result of

14  reasonable reliance upon the acceleration clause, and (except for a default arising from failure to

15  operate a nonresidential lease subject to 11 U.S.C. § 365(b)(1)(A)) compensates for any actual

16  pecuniary loss incurred as a result of any failure to perform a non-monetary obligation.  Impaired

17  Interest holders include those whose legal, equitable, and contractual rights are altered by the Plan,

18  even if the alteration is beneficial to the Interest holder.  The Plan impairs all Interest holders.

19       Finally, even if a Claim or Interest is allowed and impaired under the Plan, if the Claim or

20  Interest is in a class that does not receive or retain any property under the Plan, the holder of that

21  Claim or Interest is deemed to have rejected the Plan and cannot vote.

22       There are also some types of Claims that the Bankruptcy Code requires be treated a certain

23  way.  For that reason they are considered unimpaired and, therefore, holders of these Claims

24  cannot vote.

25       To summarize, there are three prerequisites to voting:  a Claim or Interest must be both

26  allowed and impaired under the Plan, and must be in a class that receives or retains property under

27  the Plan.

28

1    If a creditor or Interest holder has an allowed and impaired Claim or Interest that is in class

2    that receives or retains property under the Plan, then he or she may vote either to accept or reject

3    the Plan (unimpaired claimants or Interest holders are deemed to have accepted the Plan, and

4    holders of Claims or Interests in classes that do not receive or retain property under the Plan are

5    deemed to have rejected the Plan).  Impaired Claims or Interests are placed in classes and it is the

6    class that must accept the Plan.  Members of unimpaired classes do not vote, although, as stated

7    above, they may object to confirmation of the Plan.  Even if all classes do not vote in favor of the

8    Plan, the Plan may nonetheless be confirmed if the dissenting classes are treated in a manner

9    prescribed by the Bankruptcy Code.  Please refer to Section VII below for information regarding

10    impaired and unimpaired classes in these Bankruptcy Cases.

11    Section X sets forth which claims are in which class.  Secured claims (of which none exist

12    in these Bankruptcy Cases) are generally placed in separate classes from unsecured claims.  Fed.

13    R. Bankr. P. 3018(d) provides: "A creditor whose claim has been allowed in part as a secured

14    claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both

15    capacities."

16    ## VI.  VOTES NECESSARY TO CONFIRM THE PLAN

17    The Court may confirm the Plan if at least one non-insider impaired class of Claims has

18    accepted the Plan and certain statutory requirements are met as to both nonconsenting members

19    within a consenting class and as to dissenting classes.  A class of Claims has accepted the Plan

20    when more than one-half in number and at least two-thirds in amount of the allowed Claims

21    actually voting vote in favor of the Plan.  A class of Interests has accepted the Plan when at least

22    two-thirds in amount of the allowed Interests of such class actually voting have accepted it.  It is

23    important to remember that even if the requisite number of votes to confirm the Plan are obtained,

24    the Plan will not bind the parties unless and until the Court makes an independent determination

25    that confirmation is appropriate.  That is the subject of any upcoming confirmation hearing.

26

27

28

## VII.  INFORMATION REGARDING VOTING IN THIS CASE

The bar date for filing proofs of Claim and proofs of Interest in these Bankruptcy Cases passed on September 12, 2013.[1]  Under the Plan the last day for objecting to proofs of claim is the Claims Objection Deadline, as defined in Article III above.

In these Bankruptcy Cases, the Trustee believes that Class 2 is impaired and therefore entitled to vote.  Class 1 is unimpaired and therefore does not vote.  In addition, Classes 3 and 4, although impaired, are not entitled to vote, because holders of Claims or Interests in those Classes receive or retain no value under the Plan and are therefore deemed to reject the Plan.  Ballots must be received by the Trustee by the Ballot Deadline, which is [_____], 2015, and must be addressed to the Ballot Tabulator, Shanda D. Pearson, at Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, California 90067.

## VIII.  DESCRIPTION OF DEBTORS' PAST BUSINESS, EVENTS PRECIPITATING BANKRUPTCY FILING, AND EVENTS DURING BANKRUPTCY CASES

### A.    Description of Debtors' Past Business.

The Debtors are each Delaware limited liability companies that operated as a joint enterprise producing and distributing "Girls Gone Wild" and "Guys Gone Wild" adult

---

[1]   There are four relevant exceptions to this bar date.

First, November 18, 2013 was fixed as the last date on which a governmental unit could timely assert a claim against GGW Marketing, LLC.

Second, October 14, 2013 was fixed as the last date on which a proof of claim may be timely filed by any entity—such as a guarantor, surety, indorser, or other co-debtor—that is authorized to file a claim under Bankruptcy Code section 501(b) and Bankruptcy Rule 3005 (the "Co-Debtor Bar Date") or the Trustee or GGW Marketing could timely file proofs of claim on behalf of creditors who have failed to file proofs of claim on their own behalf.

Third, for claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the date by which the entity asserting the claim may timely file a proof of that claim is hereby fixed as the later of (a) November 18, 2013 or (b) the first business day that is 30 calendar days after entry of the order authorizing avoidance of the transfer.

Finally, for claims arising from the rejection of an executory contract or unexpired lease, the date by which the entity asserting the claim may timely file a proof of that claim is hereby fixed as the later of (a) November 18, 2013 and (b) the first business day that is 30 calendar days after the entry of the order approving the rejection of the executory contract or unexpired lease.

1    entertainment through various pay-per-view outlets and directly via DVDs, websites, and a

2    magazine.  GGW Brands is the sole member of each of the other Debtors.  The sole member of

3    GGW Brands is Pablo Holdings, LLC, a limited liability company organized under the laws of

4    Nevis.  The following illustration depicts the Debtors' organizational structure.



11    In the months before they filed for bankruptcy, the Debtors employed approximately 30

12    employees and operated at 10940 Wilshire Blvd, Suite 1000, in Los Angeles, California.  The

13    Debtors' assets included the rights to use certain trademarks and Uniform Resource Locators, *i.e.*,

14    web addresses, (collectively, the "Trademarks") that were formerly under the disputed ownership

15    of Path Media Holdings, LLC ("Path Media"), having been transferred by GGW Brands and

16    GGW Marketing to Path Media in or around November 2011.

17    The Debtors do not have future business plans because the Debtors completed a Court-

18    approved sale of substantially all of their operating assets on April 28, 2014, and the Debtors have

19    not operated since that time.

20    What follows is (i) a brief summary of the dates and circumstances that led the Debtors to

21    file bankruptcy and (ii) a summary of the events that occurred during these bankruptcy cases that

22    impact the Plan.  Details relating to the Debtors' financial condition are found in Sections XI

23    through XVI.

24    **B.      Events Precipitating the Debtors' Bankruptcy.**

25    It appears that the Debtors' Bankruptcy Cases were precipitated by the actions of litigation

26    claimants to recover from the Debtors on certain judgments held against the Debtors' founder,

27    Joseph R. Francis ("Francis"), in his personal capacity, or entities controlled by Francis.

28

1    For example, on April 18, 2012, Wynn Las Vegas, LLC ("Wynn LV") commenced a

2    lawsuit (the "Alter Ego Litigation") in the District Court for Clark County, Nevada (the "Clark

3    County District Court") against several of the Debtors, Francis, and certain other individuals and

4    entities, seeking a declaratory judgment that the Debtors and other entities were liable, on an alter

5    ego theory, on over $30 million in judgments that Wynn LV and Stephen A. Wynn ("Mr. Wynn"

6    and with Wynn LV, "Wynn") held against Francis.  Wynn LV alleged, among other things, that

7    Francis controlled the Debtors and used them to pay his personal expenses in order to prevent

8    Wynn LV from collecting its judgments.  On August 17, 2012, the Clark County District Court

9    issued a preliminary injunction finding that Wynn LV had a substantial likelihood of success on

10   the merits of its claim for declaratory relief related to alter ego.

11   On October 2, 2009, Wynn LV filed its *Petition for Judgment Based on Sister-State*

12   *Judgment* in the Los Angeles County Superior Court, thereby registering one of Wynn LV's

13   judgments and commencing case number BS123009 (the "California Marker Judgment

14   Litigation").  On November 16, 2012, Wynn LV filed a *Motion for Appointment of Limited*

15   *Receiver* in the California Marker Judgment Litigation (the "Limited Receiver Motion"),

16   requesting that the Superior Court appoint a limited receiver over GGW Direct to review its

17   records and determine what payments GGW Direct was making to or for the benefit of Francis.

18   The Limited Receiver Motion was granted on March 6, 2013.

19   Wynn LV was not alone in seeking to hold the Debtors liable for large judgments against

20   Francis or entities controlled by Francis.  On March 5, 2012, Tamara Favazza ("Favazza")

21   obtained a judgment against Mantra Films, Inc. and MRA Holding, LLC, two entities controlled

22   by Francis (the "Mantra Entities"),  in the amount of $5,772,558 in the Circuit Court of the City of

23   St. Louis ("St. Louis Circuit Court") in Case Nos. 0822-CC-01561 and 0822-CC-01561-01,

24   arising from the Mantra Entities' unauthorized videotaping of Favazza and subsequent

25   distribution of such video footage (the "Favazza Judgment").  On June 21, 2012, Favazza

26   commenced an action in the St. Louis Circuit Court, Case No. 1222-CC09045 (the "Favazza Alter

27   Ego Litigation"), against the Debtors, Francis, and other entities.  On August 29, 2012, the

28   Favazza Alter Ego Litigation was removed to the United States District Court for the Eastern

152788.1                                    15

1    District of Missouri and assigned Case No. 4:12-CV-01561-TCM.  In the Favazza Alter Ego

2    Litigation, Favazza sought to hold the Debtors and other entities jointly and severally liable for the

3    Favazza Judgment along with the Mantra Entities under theories of alter ego and fraudulent

4    transfer.

5            In order to stay the foregoing litigation, on February 27, 2013, the Original Debtors each

6    filed voluntary petitions under chapter 11 of the Bankruptcy Code.[2]

7    **C.    The Debtors Bankruptcy Cases**

8            **1.    Appointment of a Trustee.**

9            On March 21, 2013, Wynn LV filed a motion in the Court seeking the appointment of a

10   chapter 11 trustee, citing, among other things, evidence of Francis's misuse of the Debtors' funds

11   for his own personal expense and his general control over each of the Debtors.  (Docket No. 28.)

12           The Trustee has independently investigated these allegations made by Wynn LV and has

13   determined that the Debtors regularly paid Francis's credit card bills or other similar personal

14   expenses.  In addition, Francis caused the Debtors to incur large debts to pay for services related to

15   Francis's Mexican resort, known as Casa Aramara, located near Puerto Vallarta, Mexico.  This

16   resort appears to be controlled by Francis and provides no benefit to any of the Debtors.  Francis

17   also misdirected the Debtors' funds to attorneys representing Francis in matters relating solely to

18   Francis in his personal capacity, without any connection to the Debtors.  There was no evidence of

19   any control over Francis's misdirection of funds other than by Francis himself.  Specifically, the

20   credit cards on which Francis incurred large personal debts were addressed either to GGW Brands

21   and Francis together or to Francis alone.  In addition, the Debtors had given Francis check-signing

22   authority, which Francis exercised.

23           On April 9, 2013, the United States Trustee filed his own motion to appoint a chapter 11

24   trustee, citing irregular payments that the Debtors made for the benefit of Francis.  (Docket No.

25   _____

26   [2]    The Trustee's belief that the Original Debtors' Bankruptcy Cases were commenced primarily
     to stay the foregoing litigation is based on a status report filed by the Debtors' former counsel,
27   Robert Yaspan, before the Trustee's appointment.  That report states that the cases were filed
     "in order to protect the assets of the Debtors from certain creditor liabilities relating to
28   litigation matters."  (Docket No. 49.)

1    63.)  On April 11, 2013, the Court entered an order granting Wynn LV's motion to appoint a

2    trustee and, on April 12, 2013, the Trustee was appointed.  (Docket Nos. 78, 79, 82.)

3           **2.**    **Complaint and Temporary Restraining Order Against Joseph R. Francis**

4           Shortly after the Trustee's appointment, the Trustee was informed that Francis was

5    intimidating employees rendering services to the Debtors and otherwise interfering with the

6    Trustee's control over the Debtors' assets and operations.  Accordingly, on April 23, 2013, the

7    Trustee commenced an adversary proceeding against Francis by filing a *Complaint for Injunction*

8    *and Damages* (the "Francis Complaint").  Adv. No. 2:13-ap-01468-SK (the "Francis Adversary").

9    (Francis Adversary, Docket No. 1.)  Concurrently with the Francis Complaint, the Trustee filed an

10    emergency motion seeking a temporary restraining order enjoining Francis and those acting in

11    concert with him from, among other things, contacting any employees rendering services to the

12    Debtors, and coming within 100 feet of the Debtors' offices or any employees rendering services

13    to the Debtors.  (Francis Adversary, Docket No. 3.)

14          After a hearing on April 24, 2013, the Court granted the Trustee's emergency motion and,

15    on April 25, 2013, issued a temporary restraining order (the "TRO") and order to show cause why

16    a preliminary injunction should not issue against Francis enjoining Francis and those acting in

17    concert with him from, among other things, communicating with employees rendering services to

18    the Debtors, coming within 100 feet of the Debtors' offices, interfering with the Trustee's control

19    of the Debtors' assets, and threatening or harassing any employees rendering services to the

20    Debtors.  (Francis Adversary, Docket No. 16.)

21          On April 30, 2013, the Trustee became aware of actions by Francis that violated the TRO,

22    including actions by Francis by and through Abbey Wilson (Francis's girlfriend), Perfect Science

23    Labs, LLC ("Perfect Science"), and Argyle Online, LLC, persons and entities working in concert

24    with Francis (the "Additional Parties").  Among other things, Francis and the Additional Parties,

25    as representatives of Perfect Science, had instructed the landlord of the Debtors' office space to no

26    longer grant the Trustee, the Trustee's Professionals, and certain of the Debtors' employees access

27    to their office space.  Accordingly, the Trustee filed a motion to enforce and, to the extent

28

1   necessary, clarify and expand the TRO to specifically name the Additional Parties as restrained

2   parties along with Francis.

3        In order to resolve their differences, the Trustee, Francis, and the Additional Parties

4   executed a stipulation (the "Injunction Stipulation") under which Francis and the Additional

5   Parties, among other things, (i) stipulated that they had violated the Court's prior TRO (ii) agreed

6   to be bound by the Court's TRO and to abide by it and its terms and (iii) agreed to return two

7   vehicles owned by GGW Events[3] once the Trustee ceased to occupy the Debtors' premises.  On

8   May 2, 2013 the Court entered an order (the "Consent Order") adopting the Injunction Stipulation

9   as an order of the Court.

10       On October 22, 2013, the Court entered a preliminary injunction (the "Preliminary

11  Injunction"), which extends the relevant terms of the TRO and the Consent Order until the earlier

12  of (i) the time that the Preliminary Injunction is modified or dissolved or (ii) the conclusion of the

13  Francis Adversary.  (Francis Adversary, Docket No. 86.)  Neither of those events has occurred.

14       The Debtors vacated their premises on May 28, 2014, and made prior demand on Francis

15  and Perfect Science to promptly return the Cadillac and the Bentley.  Francis and Perfect Science

16  did not do so, and the Trustee therefore sought to hold Francis and Perfect Science in contempt

17  based (among other things) on this failure to comply with the Court's Preliminary Injunction.

18  (Docket No. 570.)  Francis and Perfect Science opposed the Trustee's contempt motion, claiming

19  that they are incapable of returning the Cadillac and the Bentley because the Cadillac and the

20  Bentley were taken against their will in Mexico by an individual purporting to be a creditor of the

21  Debtors.  (Docket No. 601.)  The Court nevertheless found Francis and Perfect Science to be in

22  contempt, finding that story to be "both difficult to believe and insufficient to demonstrate

23  impossibility."  (Docket Nos. 629 & 631.)  The Court has issued a report and recommendation to

24  the United States District Court for the Central District of Los Angeles (the "District Court")

25
26
27
28

---

[3]     The vehicles that Francis is required to return under the Injunction Stipulation are (i) a 2007
Cadillac Escalade with a VIN ending 5603 (the "Cadillac") and (ii) a 2012 Bentley Continental
GT Coup with a VIN ending 0815 (the "Bentley").  The Debtors' records reflect ownership of
a third vehicle, a 2008 Mercedes Benz S-550 with a VIN ending 0237, which the Trustee has
not been able to locate (collectively, the "Vehicles").

1    recommending that Francis and Abbey Wilson, as Perfect Science's manager, be incarcerated until

2    they return the Cadillac and the Bentley and pay certain monetary sanctions.  (Docket No. 645.)

3    The District Court has not yet issued a ruling.

4          **3.**      **Trustee's Investigation of the Debtors' Financial Affairs.**

5          Shortly after his appointment, the Trustee learned that the Debtors' right to use the

6    Trademarks—which constituted the lifeblood of the Debtors' business—would purportedly expire

7    on May 31, 2013, under the terms of a short-term license agreement (the "License Agreement")

8    between Path Media and GGW Direct, purportedly entered into on February 25, 2013, just two

9    days before the Original Debtors' Petition Date.  Accordingly, the Trustee's Professionals

10   immediately began investigating the Debtors' affairs and taking steps to maintain the value of the

11   Debtors' business beyond the May 31, 2013 expiration date of the License Agreement.  With the

12   Court's authorization,[4] the Trustee's Professionals issued subpoenas to over a dozen witnesses (in

13   addition to conducting informal interviews), and reviewed email files on the Debtors' computers

14   that were sent to or from certain key employees.

15         Through their investigation of the Debtors' affairs and assets, the Trustee's Professionals

16   discovered that, in November 2011, Francis caused the Debtors to transfer—for no

17   consideration—various assets, including the Trademarks, to Path Media, an offshore entity in

18   Nevis.  (Adv. Proc. No. 2:13-ap-01552-SK (the "Argyle Adversary"), Docket No. 100, at ¶¶ 20-

19   21.)  From the time of that transfer in November 2011 until February 25, 2013, the Debtors used

20   the Trademarks pursuant to a royalty-free license granted by Path Media.  (Argyle Adversary,

21   Docket No. 100, at ¶ 35.)  However, on or about February 25, 2013, two days before the Original

22   Debtors' Petition Date, Path Media purported to terminate that royalty-free license.  (Argyle

23   Adversary, Docket No. 100, at ¶ 47.)  In its place, Path Media and GGW Direct purported to enter

24   into the new License Agreement that granted GGW Direct, supposedly in exchange for

25

26   [4]   *See Order Authorizing the Chapter 11 Trustee to Issue Subpoenas for the Production of
     Documents and to Examine Persons and Entities* [Docket No. 105]; *Order Authorizing the*

27        *Chapter 11 Trustee to Issue Additional Subpoenas for the Production of Documents and to
     Examine Entities* [Docket No. 111]

28

1    $274,350.52, a license to use the Trademarks until May 31, 2013, at which point the License

2    Agreement would terminate—and the Debtors would be left without either ownership of the

3    Trademarks or the right to use them—unless both Path Media and GGW Direct agreed to renew

4    the license.  (Argyle Adversary, Docket No. 100, at ¶¶ 54, 57.)

5        **4.    Trustee's Prosecution of the Fraudulent Transfer Lawsuit**

6        To ensure the continued ability of the Debtors to use the Trademarks beyond May 31,

7    2013, the Trustee took two steps to recover the Trademarks.  First, pursuant to a motion (Docket

8    No. 120, the "Marketing Motion") and Court approval, the Trustee revoked the corporate

9    cancellation of GGW Marketing and filed a chapter 11 petition on its behalf.  (Case No. 2:13-bk-

10    23452, Docket No. 1.)  Second, on May 23, 2013, the Trustee, along with GGW Marketing, filed a

11    *Counterclaim and Third-Party Complaint to Avoid and Recover Fraudulent Transfers and for*

12    *Conversion* against Francis, Path Media, Argyle Online, LLC ("Argyle Online"), Argyle Media

13    Sales, LLC, and Fab Films, LLC, as successor to Argyle Media Sales, LLC (collectively, the

14    "Counterclaim Defendants").  (Argyle Adversary, Docket No. 4 (as subsequently amended at

15    Docket No. 63, the "Counterclaims").)[5]  The Counterclaims sought, among other things, to

16    recover the Trademarks from Path Media as having been fraudulently transferred by the Debtors

17    and GGW Marketing.

18        After completing discovery in the Argyle Adversary, the Trustee moved for summary

19    judgment, filing the *Notice of Motion and Motion for Partial Summary Judgment* [Argyle

20    Adversary, Docket No. 96] (the "MSJ") and voluminous supporting documents.  The MSJ

21    asserted that there was no genuine issue of material fact with respect to the fraudulent transfers of

22    the Trademarks and that, as a matter of law, the Trustee was entitled to judgment on his

23    Counterclaims.  In granting the MSJ, the Court issued a 57-page ruling and a judgment (the "Final

24    Judgment"), finding that the transfers of the Trademarks constituted both actual-intent and

---

[5]    The Trustee styled the Counterclaims as a "counterclaim" and "third-party complaint" because
one day earlier, Argyle Online had commenced an adversary proceeding against the Trustee,
alleging slander of title and conversion in respect of ownership of the Trademarks, which
Argyle Online later voluntarily dismissed, and in respect of which the Trustee recovered
attorneys' fees under California's "Anti-SLAPP" statute.  (Argyle Adversary, Docket No. 78.)

1    constructive fraudulent transfers, and ordering that the Trademarks be recovered for the benefit of

2    the Debtors' Estates.  (Ruling at Argyle Adversary, Docket No. 137; Final Judgment at Argyle

3    Adversary, Docket No. 142.)[6]

4          After entry of the Final Judgment, the Trustee requested that Path Media comply with the

5    terms of the Final Judgment and assign the Trademarks back to the Trustee for the benefit of the

6    Debtors' Estates.  Despite repeated requests, Path Media did not do so.  Accordingly, the Trustee

7    filed the *Notice of Motion and Motion to Direct Act to be Done on Behalf of Disobedient Party*

8    (the "Rule 70 Motion"), by which the Trustee sought the Court's authorization to execute and file

9    an assignment of the Trademarks in the United States Patent and Trademark Office on behalf of

10   Path Media, in light of Path Media's refusal to do so.  (Argyle Adversary, Docket No. 160.)

11   Despite opposition from Path Media, the Court granted the Rule 70 Motion, and the Trustee's

12   counsel promptly prepared and filed assignments of the Trademarks with the U.S. Patent and

13   Trademark Office to reflect the Trustee's ownership of the Trademarks for the benefit of the

14   Debtors' Estates.

15         The District Court affirmed the Final Judgment on its merits on March 6, 2014.  (Case No.

16   2:13-cv-07666-ABC (C.D. Cal.), Docket No. 46.)  Path Media appealed that affirmance to the

17   Ninth Circuit Court of Appeals, but failed to file an opening brief in that appeal or otherwise

18   prosecute the appeal.  Accordingly, on September 30, 2014, the Ninth Circuit dismissed the

19   appeal.  (Case No. 14-55381 (9th Cir.), Docket No. 12.)

20         **5.    Global Brands' Motion to Dismiss**

21         On July 15, 2013, Francis, through the purported revival of an entity known as GGW

22   Global Brands, Inc. ("Global Brands"), filed a *Motion to Dismiss Bankruptcy Case of GGW*

23   *Marketing, LLC* (the "Marketing MTD"), claiming that GGW Marketing's bankruptcy case should

24   be dismissed because Global Brands—rather than GGW Brands—was the sole member and

25

26   _____

     [6]   Path Media requested a stay of the effectiveness of the Final Judgment pending appeal
         multiple times in multiple courts, and each such motion was denied.  *See* Argyle Adversary,
27       Docket No. 176; Docket Nos. 16 & 30 in Case No. 2:13-cv-07666-ABC (C.D. Cal.); Docket
         No. 10 in Case No. 13-57127 (9th Cir.); Docket No. 10 in Case No. 14-55381 (9th Cir.).
28

1 manager of GGW Marketing, and never gave its consent to GGW Marketing's bankruptcy

2 petition.  (Docket No. 222.)

3       On September 24, 2013, the Trustee filed the *Opposition to GGW Global Brands, Inc.'s*

4 *Motion to Dismiss Bankruptcy Case of GGW Marketing, LLC*, which argued that not only did the

5 weight of the evidence support the conclusion that GGW Brands—and not Global Brands—was

6 the sole member and manager of GGW Marketing (and thus authorized to file a bankruptcy

7 petition on its behalf), but that Global Brands was barred from re-litigating the issue—which had

8 been decided by the Court when it granted the Marketing Motion—because of rules of issue

9 preclusion, which rules generally prohibit the re-litigation of issues that have previously been

10 litigated.  (Docket No. 364.)  The Court denied the Marketing MTD at a hearing on October 22,

11 2013, and issued an order (the "<u>MTD Denial Order</u>") and a 35-page ruling carefully explaining its

12 reasoning.  (Docket Nos. 372, 374.)

13       On October 30, 2013, Global Brands appealed this Court's MTD Denial Order to the

14 District Court.  (Docket No. 381.)  The appeal was assigned to the Honorable Fernando M. Olguin

15 and was numbered civil case number 2:13-cv-08255-FMO.  Shortly thereafter, Judge Olguin

16 issued an *Order to Show Cause Re: Dismissal for Lack of Jurisdiction* (the "<u>OSC</u>"), ordering

17 Global Brands to show cause in writing by November 27, 2013 why the appeal of the MTD Denial

18 Order should not be dismissed as an improper appeal from an interlocutory order (and inviting the

19 Trustee to respond).  (Case No. 2:13-cv-08255-FMO, Docket No. 5.)  The Trustee filed a brief

20 response expressing his concurrence with the District Court's reasoning.  (Case No. 2:13-cv-

21 08255-FMO, Docket No. 6.)  Global Brands failed to file a response.  Citing this failure, the Court

22 dismissed the appeal.  (Case No. 2:13-cv-08255-FMO, Docket Nos. 7, 8.)  After the District Court

23 entered its dismissal order, Global Brands filed a *Notice of Motion and Motion for Relief Pursuant*

24 *to FRCP 60(b) from Order of Dismissal* (the "<u>Rule 60 Motion</u>"), claiming that its failure to

25 respond to the OSC was due to excusable neglect, and that the MTD Denial Order was a final,

26 appealable order.  (Case No. 2:13-cv-08255-FMO; Docket No. 9.)  On January 13, 2014, the

27 District Court granted the Rule 60 Motion in part and ordered the parties to meet and confer

28 regarding the merits of the appeal, including whether the MTD Denial Order is an appealable

1    order.  (Case No. 2:13-cv-08255-FMO, Docket Nos. 12 & 13.)  In accordance with the Court's

2    briefing order, the parties submitted a joint brief on April 22, 2014.  (Case No. 2:13-cv-08255-

3    FMO, Docket No. 22.)  On September 24, 2014, the District Court dismissed Global Brands'

4    appeal.  (Case No. 2:13-cv-08255-FMO, Docket Nos. 31, 32.)

5          **6.      Sale Process**

6          On February 13, 2014, following extensive efforts to market the Debtors' assets, the

7    Trustee and GGW Marketing filed their *Motion for Order: (1) Scheduling an Auction and Sale*

8    *Hearing in Connection with the Sale of Substantially all of the Debtors' Assets [Etc.]* (the "Sale

9    Motion").  (Docket No. 494.)  Among other things, the Sale Motion sought approval of a sale of

10   substantially all of the Debtors' operating assets (including but not limited to the Trademarks) to

11   GGWA for $1.825 million in cash and the assumption of certain liabilities, subject to overbid.

12   Despite weeks of efforts to market the Debtors' assets, the Trustee received no overbids.

13         On April 23, 2014, the Court granted the Sale Motion and entered the Sale Order.  (Docket

14   No. 552.)  The sale closed on April 28, 2014, and GGWA paid the balance of the $1.825 million

15   purchase price and assumed certain of the Debtors' liabilities.  In exchange, the Debtors

16   transferred substantially all of their operating assets (including the Trademarks recovered from

17   Path Media, as well as other intellectual property, inventory, and equipment) to GGWA.  The

18   GGWA Sale excluded certain assets including, primarily, (i) any automobiles owned by the

19   Debtors, including the Vehicles, (ii) customer security deposits, (iii) the Debtors' cash and

20   accounts receivable, and (iv) causes of action held by the Debtors' Estates, other than those

21   against Path Media, Argyle Online, Argyle Media Sales, Fab Films and Francis relating to the

22   recovery of intellectual property rights.

23         **7.      Analysis of Claims and Settlements With Claimants**

24         On September 12, 2013, the general bar date for filing proofs of Claim or Interest against

25   or in the Debtors' Estates expired.  Approximately 60 proofs of Claim were filed against the

26   Debtors' Estates.  Since that time, the Trustee has analyzed the proofs of Claim and has made

27   determinations regarding payment and allowability.  The Trustee successfully prosecuted

28   numerous objections to Claims with which he disagreed (either in full or in part), thereby

1   disallowing in excess of $15,000,000 of Claims asserted against the Debtors' estates.  (Docket

2   Nos. 739-744, 762.)  In addition, the Trustee amended the Schedules of GGW Direct, which had

3   initially been filed by the Debtors' former counsel before the Trustee's appointment, to remove

4   alleged Claims in favor of Francis-related persons or entities which the Trustee deemed invalid.

5   (Case No. 2:13-bk-15132-SK, Docket No. 152.)  Moreover, the Trustee consummated several

6   settlements with large claimants against the Estates, which settlements have paved the way for the

7   Trustee to propose a Plan that provides substantial recoveries to holders of Trade Claims.

8              **a.      Wynn Settlement**

9              Soon after his appointment, the Trustee learned that Wynn held judgments of more than

10  $31.4 million against Francis and that, at the time the Debtors filed for bankruptcy, Wynn LV was

11  prosecuting the Alter Ego Litigation in the Clark County District Court.  Specifically, the claims

12  asserted by Wynn against the Debtors were in respect of the following:

13           • On August 18, 2009, Wynn LV obtained a judgment against Francis in the Clark

14              County District Court in Case No. A566286, arising from unpaid gambling debts

15              (the "Nevada Marker Judgment").  As of the Petition Date, Wynn LV was owed

16              $3,937,124.36 on account of the Nevada Marker Judgment.

17           • On April 9, 2012, Wynn obtained a judgment against Francis in the Clark County

18              District Court, Case No. A577548, on account of claims of defamation (the

19              "Nevada Defamation Judgment").  The Clark County District Court awarded Wynn

20              LV $2,500,000 in compensatory damages and $1,250,000 in punitive damages and

21              also awarded Mr. Wynn $2,500,000 in compensatory damages and $1,250,000 in

22              punitive damages.  As of the Petition Date, Wynn LV and Mr. Wynn were each

23              owed $3,924,760.74 on account of the Nevada Defamation Judgment (hereinafter,

24              the "Wynn LV Nevada Defamation Judgment" as to Wynn LV and the "Stephen

25              Wynn Nevada Defamation Judgment" as to Mr. Wynn).

26           • On December 10, 2012, Mr. Wynn obtained a judgment against Francis in the

27              Superior Court of California, County of Los Angeles, Case No. BC438884, on

28              account of claims for slander (the "California Slander Judgment").  As of the

1    Petition Date, Mr. Wynn was owed $19,411,232.92 on account of the California

2    Slander Judgment.

3    In the course of the Alter Ego Litigation, the Clark County District Court mandated that a

4    Nevada lawyer, David Houston, hold approximately $1.8 million in trust (the "Trust Funds") for

5    Wynn LV, if the Debtors were found liable for Francis's debts.  The Trustee negotiated and

6    consummated a settlement agreement (the "Wynn Settlement") that, among other things, favorably

7    resolved Wynn's claims against the Debtors and recovered $800,000 of the Trust Funds for the

8    benefit of the Debtors' Estates, subject to the Wynn Administrative Claim described below.

9    On August 7, 2013, the Court held a hearing on and subsequently approved the Wynn

10    Settlement.  Among other things, the Court's order approving the Wynn Settlement [Docket No.

11    296] (the "Wynn Approval Order") granted Wynn the following allowed claims against the

12    Debtors' Estates:

13    First, Wynn LV was granted an allowed, non-interest bearing administrative expense (the

14    "Wynn Administrative Claim") in the amount of $250,000 against the Debtors in consideration of

15    the release of $800,000 of Trust Funds to the Debtors.

16    Second, Wynn LV was granted an allowed general unsecured claim on account of the

17    Nevada Marker Judgment in the amount of $3,543,412 (hereinafter the "Marker Claim"),

18    provided, however, that any distribution that would otherwise be made on the Marker Claim out of

19    the first $400,000 to be distributed to allowed general unsecured creditors of all the Debtors (*i.e.*,

20    not $400,000 per Debtor) shall instead be made to the Debtors' other allowed general unsecured

21    creditors; provided, however, that this subordination does not apply as to any insiders of the

22    Debtors or the persons or entities listed on Exhibit 3 hereto.

23    Third, Wynn LV was granted a general unsecured claim on account of the Wynn LV

24    Nevada Defamation Judgment in the amount of $2,354,856 (hereinafter the "Wynn LV

25    Defamation General Unsecured Claim") provided, however, that any distribution that would

26    otherwise be made on the Wynn LV Defamation General Unsecured Claim out of the first

27    $400,000 to be distributed to allowed general unsecured creditors of all the Debtors (*i.e.*, not

28    $400,000 per Debtor) shall instead be made to the Debtors' other allowed general unsecured

1 creditors; provided, however, that this subordination does not apply as to any insiders of the

2 Debtors or the persons or entities listed on Exhibit 3 hereto.

3       Fourth, Wynn LV was granted a general unsecured claim, subordinated to all other allowed

4 general unsecured claims whose allowed claims are not otherwise subordinated, on account of the

5 Wynn LV Nevada Defamation Judgment in the amount of $1,177,428 (hereinafter the "Wynn LV

6 Defamation Subordinated Claim").

7       Fifth, Mr. Wynn was granted a general unsecured claim on account of the Stephen Wynn

8 Nevada Defamation Judgment in the amount of $2,354,856 (hereinafter the "Stephen Wynn

9 Defamation General Unsecured Claim") provided, however, that any distribution that would

10 otherwise be made on the Stephen Wynn Defamation General Unsecured Claim out of the first

11 $400,000 to be distributed to allowed general unsecured creditors of all the Debtors (*i.e.*, not

12 $400,000 per Debtor) shall instead be made to the Debtors' other allowed general unsecured

13 creditors; provided, however, that this subordination does not apply as to any insiders of the

14 Debtors or the persons or entities listed on Exhibit 3 hereto.

15       Sixth, Mr. Wynn was granted a general unsecured claim, subordinated to all other allowed

16 general unsecured claims whose allowed claims are not otherwise subordinated, on account of the

17 Stephen Wynn Nevada Defamation Judgment in the amount of $1,177,428 (hereinafter the

18 "Stephen Wynn Defamation Subordinated Claim").

19       Seventh, Mr. Wynn was granted a general unsecured claim on account of the California

20 Slander Judgment in the amount of $17,470,110 (hereinafter the "California Slander Claim")

21 provided, however, that any distribution that would otherwise be made on the California Slander

22 Claim out of the first $400,000 to be distributed to allowed general unsecured creditors of all the

23 Debtors (*i.e.*, not $400,000 per Debtor) shall instead be made to the Debtors' other allowed

24 general unsecured creditors; provided, however, that this subordination does not apply as to any

25 insiders of the Debtors or the persons or entities listed on Exhibit 3 hereto.

26         **b.**    **Tamara Favazza**

27       Favazza filed proofs of claim in each Debtor's case in the amount of $5,971,653.96

28 alleging that the Debtors shared alter ego and successor liability on the Favazza Judgment.  The

Trustee reached an agreement with Favazza, which was approved by the Court.  The Court's order

approving the settlement [Docket No. 514] (the "Favazza Approval Order") provided that

(i)  Favazza was granted an allowed general unsecured claim on account of the compensatory

portion of the Favazza Judgment in the amount of $3,977,926.97 (the "Favazza Compensatory

Claim"), provided that the first $100,000 in distributions from any or all of the Debtors on account

of the Favazza Compensatory Claim (the "Favazza Compensatory Claim Non-Subordinated

Amount") shall be an allowed general unsecured claim that is not subordinated to the claims of

any other allowed general unsecured creditor of the Debtors, and provided further that after taking

into account payment to Favazza by any or all of the Debtors on account of the Favazza

Compensatory Claim Non-Subordinated Amount, any further distribution that would otherwise be

made on account of the Favazza Compensatory Claim out of the first $500,000 to be distributed to

allowed general unsecured creditors of all the Debtors (*i.e.*, not $500,000 per Debtor) shall instead

be made to the Debtors' other allowed general unsecured creditors; provided, however, that this

subordination does not apply as to any insiders of the Debtors or the persons or entities listed on

Exhibit 3 hereto; and (ii) Favazza was granted an allowed general unsecured claim, subordinated

to all other allowed general unsecured claims whose allowed claims are not otherwise

subordinated, on account of the punitive portion of the Favazza Judgment in the amount of

$1,396,561.60 (the "Favazza Punitive Claim").

### c.    Judgment Creditors

On July 24, 2013, certain purported creditors calling themselves the "Judgment Creditors"

commenced an adversary proceeding against the Debtors, asserting a claim in the amount of

$1,139,190.99 against the Debtors' Estates, based on a final and non-appealable order (the

"Attorneys' Fees Order") that the Judgment Creditors hold against the Mantra Entities and

Francis.  The Attorneys' Fees Order arises from a class action filed by the Judgment Creditors, as

class counsel, on behalf of a class of consumers alleging that Francis and the Mantra Entities

violated California's consumer protection laws.  On September 16, 2013, the Judgment Creditors

filed a notice of voluntary dismissal of the adversary proceeding, without prejudice, and instead

pursued their claim against the Debtors by filing a proof of Claim.

The Trustee entered into a settlement with the Judgment Creditors that favorably resolved the Judgment Creditors' claim against the Debtors.  The Court's order approving the settlement [Docket No. 604] (the "Judgment Creditors Approval Order") provided that the Judgment Creditors' Claim should be discounted to 25% of the amount asserted, or $284,797.74 (the "Judgment Creditors' Allowed Claim"), and (ii) any distribution that would otherwise be made on account of the Judgment Creditors' Allowed Claim out of the first $500,000 to be distributed to allowed general unsecured creditors of all the Debtors (*i.e.*, not $500,000 per Debtor) shall instead be made to the Debtors' other allowed general unsecured creditors; provided, however, that this subordination does not apply as to any insiders of the Debtors or the persons or entities listed on Exhibit 3 hereto.

### d.    Chelsea Heath

On February 4, 2013, Chelsea Heath ("Heath") obtained a default judgment against GGW Brands, Inc. in the Superior Court of the State of California, County of Los Angeles in Case No. SC110539, arising from allegations of unpaid wages and other labor violations (the "Heath Judgment").  Heath contended that the amount owing on the Heath Judgment as of the date of the bankruptcy filing is $67,926.36, and that, for a variety of reasons, the Debtors are liable on the Heath Judgment.  The Trustee entered into a settlement with Heath (the "Heath Settlement") that favorably resolved Heath's claim against the Debtors.  Per the terms of Heath Settlement, Heath was granted an allowed general unsecured claim on account of the Heath Judgment in the amount of $46,000 (the "Heath Allowed Claim"), provided that (i) the first $12,500 in distributions from any or all of the Debtors on account of the Heath Allowed Claim (the "Heath Non-Subordinated Amount") shall be an allowed general unsecured claim that is not subordinated to the claims of any other allowed general unsecured creditor of the Debtors, and provided further that (ii) after taking into account payment to Heath by any or all of the Debtors on account of the Heath Non-Subordinated Amount, any further distribution that would otherwise be made on account of the Heath Allowed Claim out of the first $600,000 to be distributed to allowed general unsecured creditors of all the Debtors (*i.e.*, not $600,000 per Debtor) shall instead be made to the Debtors' other allowed general unsecured creditors, provided, however, that this subordination does not

1  apply as to any insiders of the Debtors or the persons or entities listed on Exhibit 3 hereto.  The

2  Court entered an order approving the Heath Settlement on October 28, 2014.  (Docket No. 765.)

3                    **e.    Brian Rayment**

4        On November 1, 2012, Brian Rayment ("Rayment") obtained a default judgment against

5  Mantra Films, Inc. in the Superior Court of the State of California, County of Riverside in Case

6  No. INC1201525, arising from allegations of unpaid legal services (the "Rayment California

7  Judgment").   Rayment contended that the amount owed on the Rayment California Judgment as

8  of the date of the bankruptcy filing, including post-judgment interest, was $450,027.74.  On July

9  9, 2013, Rayment obtained a judgment against, among others, several of the Debtors in the Tulsa

10 County District Court, State of Oklahoma (the "Oklahoma Court") in Case No. CJ-2012-01321, arising

11 from several counts, including breach of contract, malicious prosecution, abuse of process,

12 disparagement, and intentional infliction of emotional distress (the "Rayment Oklahoma

13 Judgment").  The Oklahoma Court awarded Rayment $4,246,380.40 in compensatory damages

14 and $24,944.89 in costs (the "Rayment Compensatory Award") and $4,044,943.00 in punitive

15 damages (the "Rayment Punitive Award").  Rayment filed identical proofs of claim in the

16 Debtors' cases asserting a secured claim $450,027.74 and an unsecured claim in the amount of

17 $7,866,242.20.

18       The Trustee entered into a settlement with Rayment (the "Rayment Settlement") that

19 favorably resolved Rayment's claim against the Debtors.  Per the terms of the settlement, Rayment

20 was granted an allowed general unsecured claim on account of the Rayment Compensatory Award

21 in the amount of $3,844,193.58 (the "Rayment Compensatory Claim"), provided that (i) the first

22 $100,000 in distributions from any or all of the Debtors on account of the Rayment Compensatory

23 Claim (the "Rayment Compensatory Claim Non-Subordinated Amount") shall be an allowed

24 general unsecured claim that is not subordinated to the claims of any other allowed general

25 unsecured creditor of the Debtors, and provided further that (ii) after taking into account payment

26 to Rayment by any or all of the Debtors on account of the Rayment Compensatory Claim Non-

27 Subordinated Amount, any further distribution that would otherwise be made on account of the

28 Rayment Compensatory Claim out of the first $500,000 to be distributed to allowed general

1  unsecured creditors of all the Debtors (*i.e.*, not $500,000 per Debtor) shall instead be made to the

2  Debtors' other allowed general unsecured creditors; provided, however, that this subordination

3  does not apply as to any insiders of the Debtors or the persons or entities listed on Exhibit 3

4  hereto.  In addition, Rayment was granted an allowed general unsecured claim, subordinated to all

5  other allowed general unsecured claims whose allowed claims are not otherwise subordinated, on

6  account of the Rayment Punitive Award in the amount of $3,640,448.70 (the "Rayment Punitive

7  Claim"). The Trustee filed a motion to approve the Rayment Settlement on November 4, 2014.

8  (Docket No. 771.)  That motion is pending.

9              **f.        Chapter 7 Trustee of Mantra Films and MRA Holding**

10             Howard Ehrenberg, as chapter 7 trustee of the bankruptcy estates of Mantra Films, Inc. and

11  MRA Holding, LLC (the "Mantra Trustee"), filed a proof of claim in each Debtor's case,

12  claiming, among other things, that the Debtors sold, licensed and/or distributed videos and other

13  content owned by the Mantra Entities.  The Mantra Trustee's proofs of claim alleged a large

14  liability against the Debtors' Estates, and disputed the ownership of certain "Girls Gone Wild"

15  intellectual property that could have impaired the value of any sale of the Debtors' assets.  The

16  Trustee consummated a settlement (the "Mantra Settlement") with the Mantra Trustee that

17  favorably resolved the Mantra Trustee's proofs of claim by: (i) transferring to the Trustee any

18  "Girls Gone Wild" intellectual property that had been owned by the Mantra Entities;

19  (ii) transferring to the Trustee certain litigation rights to recover additional "Girls Gone Wild"

20  intellectual property; (iii) compensating the Mantra Trustee for the foregoing through a small

21  percentage of the net proceeds of a sale of the Debtors' business operating assets; and

22  (iv) providing that the foregoing contingent payment is in full and final satisfaction of the Mantra

23  Trustee's proofs of claim and all other claims potentially assertable by the Mantra Trustee against

24  the Debtors' Estates.  On December 4, 2013, the Court approved the Mantra Settlement.  The

25  Debtors have paid to the Mantra Trustee all sums required to be paid pursuant to the Mantra

26  Settlement.

27

28

## IX.  CRITICAL PLAN PROVISIONS

The primary assets of the Estates are cash, the Humboldt Reserves, the Vehicles, and the Preserved Claims.  Unsecured creditors holding Priority Tax Claims will receive a distribution of $14,935.85, 100% of the Priority Tax Claims, in one lump-sum distribution on or shortly after the Effective Date.  Unsecured creditors holding Allowed Class 1 Claims (Priority Non-Tax Claims) will receive a distribution of $22,475.00, 100% of the Allowed Class 1 Claims, in one lump-sum distribution on or shortly after the Effective Date.  Unsecured creditors holding Allowed Class 2 Claims will share, Pro Rata (subject to adjustment in accordance with the conditions set forth in Section X.C.2), in a distribution of $435.240.81 in one lump-sum distribution on or shortly after the Effective Date, plus their share of the Net Trust Assets (which, per the GGW Creditor Trust Agreement, will only be available for distribution to holders of Allowed Class 2 Claims once all Professional Fee Claims—which will constitute the GGW Creditor Trust Liabilities—have been paid), provided, however, that holders of Trade Claims will receive larger percentage distributions than will holders of Allowed Class 2 Claims that are not Trade Claims by virtue of the settlement agreements described in Section VIII.C.7.

## X.  DESCRIPTION AND TREATMENT OF CLAIMS

**A.      Summary and Classification of Claims**

**1.      Overview of Plan Payments**

Below is a summary of which creditors get paid what amounts, when, and from what source.  The identity of members within a particular Class is explained in the following sections. The second column in the following chart lists the total amount that will be paid to each Class of claimant.  <u>The Trustee is usually not required by law to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy case not commenced.</u>  The "Payment Date" column states the frequency with which payments will be made and the starting and ending dates.  Look at the starting date to figure out who will be paid before and after you and in what amount.  The "Source of Payment" column describes the expected source of payment. Further details regarding the source of payment are found in sections XI, XII, and XIII.

The timing of payments to many creditors is determined by the "<u>Effective Date</u>." Administrative claims, unless otherwise stated, must be paid by the Effective Date. The timing of payments to impaired creditors is measured from the Effective Date. In this case, the Effective Date will occur as set forth in Section XI.I.

| Payment Recipient | Amount of Payment | Payment Date | Source of Payment |
|---|---|---|---|
| 1. Wynn Administrative Claim | $250,000.00 | One Payment on Effective Date | Cash on hand |
| 2. Priority Tax Claims | $14,935.85 | One Payment on or shortly after the Effective Date | Cash on hand |
| 3. Class 1 (Priority Non-Tax Claims) | $22,475.00 | One payment on or shortly after the Effective Date | Cash on hand |
| 4. Class 2 (General Unsecured Claims) | $435,240.81 | One payment on or shortly after the Effective Date | Cash on hand |
| 5. Professional Fee Claims | Up to amounts approved in timely filed final fee applications, less $50,000 used to fund GGW Creditor Trust | Payments as determined by Trustee or GGW Creditor Trustee beginning after the date on which the Court determines such Professional Fee Claim is an Allowed Claim | Cash on hand; Humboldt Reserves; and liquidation of Vehicles and Preserved Claims |
| 6. Class 2 (General Unsecured Claims) | Up to total amount of Allowed Class 2 Claims in excess of $435,240.81 | Payments as determined by GGW Creditor Trustee | Liquidation of Preserved Claims |

### a.    Classification of Claims

This Section classifies Claims against the Debtors—except for Administrative Claims and Priority Tax Claims, which are not classified—for all purposes, including voting, confirmation, and distribution under the Plan. A Claim against the Debtors is classified in a particular Class only to the extent that the Claim falls within the Class description. To the extent that part of a

Claim against the Debtors falls within a different Class description, the Claim is classified in that different Class. The following table summarizes the Classes of Claims under the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|-------|-------------|----------------------|---------------|
| None | Administrative Claims and Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote Deemed to Accept |
| Class 2 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 3 | Voluntarily Subordinated Punitive Damage Claims | Impaired | Not Entitled to Vote Deemed to Reject |
| Class 4 | Interests | Impaired | Not Entitled to Vote Deemed to Reject |

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM AGAINST THE DEBTORS OR THE ESTATES THAT IS NOT AN ALLOWED CLAIM.**

The treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any liens) that each entity holding a Claim may have against the Debtors or the Estates. This treatment supersedes and replaces any agreements or rights that any holder of a Claim may have with or against the Debtors, the Estates, or their respective property. All distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter to the remaining portion of such Allowed Claim, if any.

All Claims listed in Section X.B below are undisputed. No claimant or Interest holder is an affiliate of any of the Debtors.

The Trustee is aware of one disputed Claim. Travelers Property Casualty Company of America ("Travelers") has asserted that it is owed $5,858 (the "Travelers Claim") by the Debtors in respect of postpetition insurance coverage provided by Travelers to the Debtors. The Trustee

disputes that any amounts are owing in respect of the Travelers Claim.  If the Travelers Claim remains in dispute on the Effective Date, then on or shortly after the Effective Date, the Trustee will deposit into the GGW Creditor Trust an amount of cash equal to 100% of the Travelers Claim.  Cash together with interest accruing thereon will be held in trust on account of the Travelers Claim.  If the Travelers Claim becomes Allowed in whole or in part pursuant to the procedures set forth in Section X.B.1.d hereof, the Trustee or the GGW Creditor Trustee will distribute to Travelers the Allowed amount of the Travelers Claim plus accrued interest thereon.  If all or part of the Travelers Claim is withdrawn or otherwise does not become an Allowed Claim, the amount held in reserve shall be distributed on account of other Claims in accordance with this Plan and the GGW Creditor Trust Agreement to the extent the Travelers Claim is not Allowed.

<u>Below is a detailed description and treatment of Administrative Claims, Priority Claims, General Unsecured Claims, Voluntarily Subordinated Punitive Damage Claims, and Interests</u>.

**B.      Allowance and Treatment of Unclassified Claims (Administrative Claims and Priority Tax Claims).**

**1.      Administrative Claims**

These include the "actual, necessary costs and expenses of preserving the estate" as determined by the Court after notice to creditors of a request for payment and after a hearing thereon.  The Bankruptcy Code requires that allowed Administrative Claims be paid on the Effective Date unless the party holding the Administrative Claim agrees otherwise.  In these Bankruptcy Cases, certain professionals holding Administrative Claims have agreed to subordinate certain of their Administrative Claims, as detailed below.  Wynn LV has not agreed to alternative treatment for the Wynn Administrative Claim.

**a.      Administrative Expense #1: U.S. Trustee Fees**

U.S. Trustee Fees shall be allowed in accordance with 28 U.S.C. § 1930.  The Trustee or GGW Creditor Trustee will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 in cash on or before the Effective Date.  The Trustee estimates that, on the Effective Date, $8,125 will be owing on account of U.S. Trustee Fees.

1

**b.      Administrative Expense #2: Wynn Administrative Claim**

2      Pursuant to Paragraph 11 of the Wynn Settlement Order, Wynn LV holds an Allowed

3 Administrative Claim in the amount of $250,000.  Unless Wynn LV agrees to different treatment,

4 the Trustee or GGW Creditor Trustee will pay to Wynn LV cash in the full amount of the Wynn

5 Administrative Claim, without interest, on or before the Effective Date; provided, however, that

6 any amounts paid to Wynn LV on account of the Wynn Administrative Claim shall be credited

7 against the Nevada Marker Judgment and shall reduce the Marker Claim as provided in

8 Paragraphs 3(b) and 11 of the Wynn Settlement Order.

9      **c.      Administrative Expense #3: Professional Fee Claims**

10      As of October 31, 2014, the aggregate amount of accrued and unpaid Professional Fee

11 Claims is $1,515,202.42.  Unless otherwise expressly provided in the Plan, a Professional Fee

12 Claim will be Allowed only if:

13      (i)      On or before 60 days after the Effective Date, the entity holding such Professional

14 Fee Claim both Files with the Court a final fee application or a motion requesting allowance of the

15 Professional Fee Claim and serves the application or motion on the GGW Creditor Trust and the

16 U.S. Trustee; and

17      (ii)      The Court determines it is an Allowed Claim.

18      The GGW Creditor Trust or any other party in interest may File an objection to such

19 application or motion within the time provided by the Bankruptcy Rules or within any other period

20 that the Court establishes.  Entities holding Professional Fee Claims that do not timely File and

21 serve a fee application or motion for payment will be forever barred from asserting those

22 Professional Fee Claims against the Debtors, the Estates, the GGW Creditor Trust, or their

23 respective property.

24      Unless otherwise agreed or provided in the Plan, an Allowed Professional Fee Claim will

25 be paid, without interest, by the Trustee or GGW Creditor Trustee after the date on which the

26 Court determines such Claim is an Allowed Claim.  Notwithstanding the foregoing, the

27 Professionals have agreed to (A)(i) voluntarily subordinate hereunder their rights of distribution

28 on account of their Professional Fee Claims to permit payment of Priority Tax Claims in the

1    amount of $14,935.85, Allowed Class 1 Claims in the amount of $22,475.00, and Allowed Class 2

2    Claims in the amount of $435,240.81, and (ii) to the extent of such subordination, subrogate to the

3    rights of distribution under the Plan of the holders of Priority Tax Claims, Allowed Class 1

4    Claims, and Allowed Class 2 Claims, and (B) voluntarily subordinate hereunder their rights of

5    distribution on account of their Professional Fee Claims to permit initial funding for the GGW

6    Creditor Trust in the amount of $50,000, provided that all unpaid Professional Fee Claims shall

7    become GGW Creditor Trust Liabilities and must be paid in full (including the repayment of the

8    $50,000 in initial funding) by the GGW Creditor Trust before any Net Trust Assets may be

9    distributed to holders of Allowed Class 2 Claims.

10                    **d.        Other Administrative Expense Claims**

11            Except with respect to Administrative Claims that are Professional Fee Claims and the

12   Wynn Administrative Claim, unless otherwise expressly provided herein, Administrative Claims

13   will be Allowed only if:

14            (i)      On or before 60 days after the Effective Date, the entity holding such

15   Administrative Claim both Files with the Court a motion requesting allowance of the

16   Administrative Claim and serves the motion on the GGW Creditor Trust and the U.S. Trustee; and

17            (ii)     The Court determines it is an Allowed Claim.

18            The Trustee or GGW Creditor Trust or any other party in interest may File an objection to

19   such motion within 60 days after the expiration of the deadline for the filing of an Administrative

20   Claim set forth in clause (i) above (i.e., within 120 days after the Effective Date), unless such time

21   period for filing such objection is extended by the Court.  Entities holding Administrative Claims

22   that do not timely File and serve a request for payment will be forever barred from asserting those

23   Claims against the Debtors, the Estates, the GGW Creditor Trust, or their respective property.  The

24   Trustee or GGW Creditor Trust will pay to each entity that holds an Administrative Claim that is

25   not a Professional Fee Claim or the Wynn Administrative Claim cash in the full amount of such

26   Allowed Administrative Claim, without interest, on or before the later of: (i) 10 days after the

27   Effective Date, or (ii) 10 days after the date any order determining such Claim to be an Allowed

28   Administrative Claim becomes a Final Order.

2.      **Unsecured Priority Tax Claims**

Unsecured Priority Tax Claims include certain types of property, sales, and income taxes. The Bankruptcy Code requires that the holders of such Claims receive regular installment payments in cash over a period ending not later than five years after the date of the order for relief, unless agreed otherwise.  The only holder of Priority Tax Claims has not agreed otherwise.  The total cash payments must have a present value equal to the amount of the Allowed Claims.  The treatment of these Claims is in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided in this Plan.  The amount of the Allowed Claims includes the amount of tax owed as of the Effective Date.

In these cases, the only claimant asserting Priority Tax Claims is the Franchise Tax Board. The Franchise Tax Board has asserted Priority Tax Claims in each Debtor's case in the aggregate amount of $14,935.85, as set forth below.  The Franchise Tax Board will receive payment in full in cash, in one installment, on account of each of its Priority Tax Claims on or shortly after the Effective Date.

| Debtor | Proof of Claim No. | Amount of Claim | Amount of Priority Tax Portion of Claim |
|---|---|---|---|
| GGW Brands | 12-1 | $1,235.22 | $860.63 |
| GGW Direct | 7-3 | $13,857.68 | $8,392.93 |
| GGW Events | 3-2 | $412.41 | $57.82 |
| GGW Magazine | 3-2 | $412.41 | $57.82 |
| GGW Marketing | 3-1 | $7,242.44 | $5,566.65 |
| Total | | $23,160.16 | **$14,935.85** |

Pursuant to Section X.B.1.c hereof, holders of Allowed Professional Fee Claims shall be subrogated to the rights of distribution hereunder of holders of Priority Tax Claims to the extent of the subordination set out therein.

**C.      Classification and Treatment of Classified Claims**

  **1.      Class 1 (Priority Non-Tax Claims)**

  <u>Classification</u>:   Class 1 consists of Priority Non-Tax Claims against the Debtors.   The aggregate amount of Allowed Class 1 Claims is $22,475.00.  See <u>Exhibit 4</u> for a list of holders of Allowed Class 1 Claims and the amount owed each.

  <u>Treatment</u>:  Class 1 is unimpaired under the Plan, and the legal, equitable, and contractual rights of holders of Allowed Class 1 Claims are unaltered by the Plan.  Unless a particular entity holding an Allowed Class 1 Claim agrees otherwise, the Trustee or the GGW Creditor Trustee shall pay to each holder of an Allowed Class 1 Claim, in one installment and in full satisfaction of such Claim, cash in the full amount of the Allowed Class 1 Claim on or shortly after the Effective Date.

  Pursuant to Section X.B.1.c hereof, holders of Allowed Professional Fee Claims shall be subrogated to the rights of distribution hereunder of holders of Allowed Class 1 Claims to the extent of the subordination set out therein.

  **2.      Class 2 (General Unsecured Claims)**

  <u>Classification</u>:  Class 2 consists of General Unsecured Claims.  The aggregate amount of Allowed Class 2 Claims is $34,179,273.15.  See <u>Exhibit 5</u> for a list of holders of Allowed Class 2 Claims and the amount owed each.

  <u>Treatment</u>:  Class 2 is impaired under the Plan.  Allowed Class 2 Claims shall receive, in full satisfaction of such Claim, without interest, a share of $435,240.81 as set forth on <u>Exhibit 6</u> on or shortly after the Effective Date, plus their Pro Rata share of the Net Trust Assets, if any, distributed in accordance with the terms of this Plan and the GGW Creditor Trust Agreement.

  Recoveries from the Net Trust Assets are premised on the Trustee's or GGW Creditor Trustee's successful recovery of the Vehicles and/or prosecution of the Preserved Claims.  For the reasons set forth in Section XIII.A, there is a significant risk that the Trustee or GGW Creditor Trustee will be unsuccessful in obtaining any significant recoveries with respect to the Vehicles or the Preserved Claims.  In addition, even if the Trustee or GGW Creditor Trustee does obtain valuable recoveries, outstanding unpaid Professional Fee Claims (which are expected to be in

1    excess of $1,000,000 after the initial Plan payments) will constitute GGW Creditor Trust

2    Liabilities and must be paid in full before any Net Trust Assets will be available for distribution to

3    holders of Allowed Class 2 Claims.  Accordingly, in voting on the Plan, creditors should not

4    assume that the Vehicles or the Preserved Claims will result in any additional recoveries to holders

5    of Allowed Class 2 Claims.

6         Distributions on account of the Allowed Class 2 Claims are subject to the following

7    conditions:

8         (i)     Any distributions that would otherwise be made on the Marker Claim, the Wynn

9    LV Defamation General Unsecured Claim, the Stephen Wynn Defamation General Unsecured

10    Claim, and/or the California Slander Claim out of the first $500,000 to be distributed to holders of

11    Allowed Class 2 Claims shall instead be made on a Pro Rata basis to the holders of Trade Claims;

12         (ii)     Pursuant to the Favazza Settlement Order, (i) until such time as Favazza has

13    received $100,000 in distributions on account of the Favazza Compensatory Claim, Favazza shall

14    receive her Pro Rata share of all distributions made to holders of Allowed Class 2 Claims, and

15    (ii) any further distribution that would otherwise be made on account of the Favazza

16    Compensatory Claim out of the first $500,000 to be distributed to holders of Allowed Class 2

17    Claims shall instead be made on a Pro Rata basis to the holders of Trade Claims;

18         (iii)     Pursuant to the Judgment Creditors Settlement Order, any distribution that would

19    otherwise be made on the Judgment Creditors' Allowed Claim out of the first $500,000 to be

20    distributed to holders of Allowed Class 2 Claims shall instead be made on a Pro Rata basis to the

21    holders of Trade Claims;

22         (iv)     Pursuant to the Heath Settlement Order, (i) until such time as Heath has received

23    $12,500 in distributions on account of the Heath Allowed Claim, Heath shall receive her Pro Rata

24    share of all distributions made to holders of Allowed Class 2 Claims, and (ii) any further

25    distribution that would otherwise be made on account of the Heath Allowed Claim out of the first

26    $600,000 to be distributed to holders of Allowed Class 2 Claims shall instead be made on a Pro

27    Rata basis to the holders of Trade Claims;

28

1  (v)  Pursuant to the Rayment Settlement Order, (i) until such time as Rayment has

2  received $100,000 in distributions on account of the Rayment Compensatory Claim, Rayment

3  shall receive his Pro Rata share of all distributions made to holders of Allowed Class 2 Claims,

4  and (ii) any further distribution that would otherwise be made on account of the Rayment

5  Compensatory Claim out of the first $500,000 to be distributed to holders of Allowed Class 2

6  Claims shall instead be made on a Pro Rata basis to the holders of Trade Claims;

7  (vi)  Pursuant to Section X.B.1.c hereof, holders of Allowed Professional Fee Claims

8  have agreed to subordinate their Allowed Professional Fee Claims to the first $435,240.81 in

9  distributions to Allowed Class 2 Claims, and shall be subrogated to the rights of distribution

10  hereunder of holders of Allowed Class 2 Claims to the extent of such subordination.

11  The limited subordination by Wynn, Favazza, Heath, Rayment, and the Judgment

12  Creditors applies only to Trade Claims.  Trade Claims do not include, among other Claims,

13  Claims filed by, or scheduled in favor of, persons or entities listed on Exhibit 3 hereto.

14  **3.  Class 3 (Voluntarily Subordinated Punitive Damage Claims)**

15  **Classification**:  Class 3 consists of Voluntarily Subordinated Punitive Damage Claims.

16  The aggregate amount of Allowed Class 3 Claims is $7,391,866.30.  See Exhibit 7 for a list of

17  holders of Allowed Class 3 Claims and the amount owed each.  There are no Claims for punitive

18  damages in Class 3 other than Claims whose holders have voluntarily agreed that their Claims

19  would be subordinated.

20  **Treatment**:  Class 3 is impaired under the Plan.  Allowed Class 3 Claims shall receive and

21  retain no value and no distribution under the Plan.  Any Claims that are classified as other than

22  Allowed Class 3 Claims on the Effective Date, but which are subsequently determined by a Final

23  Order of the Court to be Allowed Class 3 Claims, shall be deemed to be reclassified as Allowed

24  Class 3 Claims as of the Effective Date.

25  **4.  Class 4 (Interests)**

26  **Classification**:  Class 4 consists of Interests in the Debtors.  No proofs of Interest have

27  been filed in these Cases.  The Debtors' Lists of Equity Security Holders reflect that the only

28

holder of an Interest in GGW Brands, LLC is Pablo Holdings LLC, and the only holder of an

Interest in each of the other Debtors is GGW Brands, LLC.

**Treatment**: Class 4 is impaired under the Plan. Class 4 Interests will receive and retain

no value under the Plan, and all Class 4 Interests will be cancelled on the Effective Date without

payment of any consideration or retention of any property of the Estates or the GGW Creditor

Trust.

## XI.  SOURCE OF MONEY TO PAY CLAIMS AND MEANS OF EXECUTION AND IMPLEMENTATION OF PLAN

**A.     Cash Flows**

The Plan cannot be confirmed unless the Court finds that it is "feasible," which means that

the Trustee has timely submitted evidence establishing that the Debtors will have sufficient funds

available to satisfy all expenses, including the scheduled creditor payments discussed above.

What follows is a statement showing projected cash flows for the period during which Plan

payments will be made. A positive number reflects a source of cash; a (negative number) reflects

a use of cash.

| | |
|---|---|
| Cash on Hand | $1,292,371.80[7] |
| Expected Collections from Humboldt Reserves | $151,148 |
| U.S. Trustee Fees | ($8,125) |
| Wynn Administrative Claim | ($250,000) |
| Travelers Claim Reserve | ($5,858) |
| Priority Tax Claims | ($14,935.85) |

---

[7]  This amount includes (i) $290,000 expected to be received pursuant to the Trustee's settlement with Proskauer Rose LLP. The Trustee has filed a motion seeking the Court's approval of that settlement. (Docket No. 774.); (ii) approximately $94,350 in "disputed funds" regarding which the Trustee has filed a motion (Argyle Adversary, Docket No. 188), to be heard on November 13, 2014, to deem property of the Estates and with respect to which motion no opposition has been filed; (iii) $1,165 in cash held by Wild HD, LLC, a non-Debtor wholly-owned subsidiary of GGW Brands, LLC that is not currently conducting any business. The Trustee is not aware of any liabilities owing from Wild HD, LLC, and intends to dissolve Wild HD, LLC and distribute its cash to GGW Brands, LLC, its sole shareholder; and (iv) $13,180 in deposits that the Trustee expects to be refunded to the Debtors.

| | |
|---|---|
| Allowed Class 1 Claims | ($22,475.00) |
| Allowed Class 2 Claims | ($435,240.81) |
| Initial Funding of GGW Creditor Trust | ($50,000) |
| Professional Fee Claims | <u>($656,885.14)</u> |
| Net cash available in Debtors' Estates after all initial Plan payments made: | $0 |

On the Effective Date, the Plan pays the Wynn Administrative Claim, in the amount of $250,000, outstanding U.S. Trustee Fees, estimated at $8,125, and, on or shortly after the Effective Date, establishes a reserve for the Travelers Claim (to the extent that such Claim remains disputed) in an amount not to exceed $5,858.  The foregoing statement of projected cash flows does not provide for the payment in full of Professional Fee Claims.  As set forth in section X.B.1.c, as of October 31, 2014, accrued and unpaid Professional Fee Claims totaled $1,515,202.42, and additional fees have continued to accrue since that date.  To the extent that the Trustee or the GGW Creditor Trustee obtains additional assets through the recovery and liquidation of the Vehicles or the Preserved Claims or otherwise, those assets will also be available for the payment, without interest, of outstanding Professional Fee Claims, and, once all outstanding Professional Fee Claims have been paid (including repayment of the $50,000 in initial GGW Creditor Trust funding to which the Professionals have voluntarily subordinated), for additional Pro Rata payment, without interest, to holders of unpaid Allowed Class 2 Claims.  Based on the financial information set forth in Section XIII and on <u>Exhibits 8-10</u>, the Trustee does not believe that additional assets will be recovered that will be sufficient to allow any distribution to Class 3 or Class 4.

The Debtors have certain remaining accounts receivable, but the Trustee believes that those accounts receivable are uncollectable.  Insofar as any such amounts are collected, recoveries obtained from such accounts will be distributed in accordance with this Plan and the GGW Creditor Trust Agreement.

**B.      Substantive Consolidation**

On the Effective Date, the assets, liabilities, and corporate entities of the Debtors shall be substantively consolidated under the Plan, pursuant to Bankruptcy Code section 105(a).  As a consequence of the substantive consolidation: (i) all of the property and interests in property of the Debtors and their respective Estates, and all of the Claims against the Debtors and their respective Estates shall be deemed pooled for all purposes under the Plan; (ii) all of the Claims between and among the Debtors shall be cancelled; (iii) all Interests in the Debtors shall be cancelled; and (iv) U.S. Trustee Fees following the Effective Date shall be calculated based on one consolidated entity.  A holder of a Claim shall be entitled to only one satisfaction on account of such Claim, and any duplicative Claims (including a Claim on account of the same transaction against any other Debtor) shall be disallowed.

**C.      Vesting of Assets and Liabilities Generally.**

All property of the Debtors and the Estates, including all cash held by the Debtors as of the Effective Date and all rights to payment held by the Debtors as of the Effective Date, shall vest in the GGW Creditor Trust on the Effective Date, free and clear of all Claims, liens, encumbrances, and interests, pursuant to this Plan and the GGW Creditor Trust Agreement, other than the GGW Creditor Trust Liabilities, which shall be transferred to the GGW Creditor Trust.  Additional information regarding the GGW Creditor Trust can be found in the GGW Creditor Trust Agreement and in Section XVI.B hereof.

**D.      Funding of the Plan.**

Obligations required to be satisfied under the Plan on and after the Effective Date, including distributions on account of Allowed classified and unclassified Claims, shall be funded by the GGW Creditor Trust Assets.

**E.      Vesting of Causes of Action in GGW Creditor Trust.**

The following shall be preserved and vest in the GGW Creditor Trust on the Effective Date, pursuant to Bankruptcy Code section 1123(b), to the extent not released pursuant to the Plan, the Confirmation Order or any other order of the Court: (i) all Claims, rights, and causes of action of the Debtors and the Estates against any person or entity arising from or relating to the

1  real property, if any, and personal property vested in and/or retained by the GGW Creditor Trust

2  under the Plan, including the Preserved Claims; (ii) all Claims, rights, and causes of action of the

3  Debtors and the Estates against any person or entity arising from or relating to the APA and all

4  other contracts and leases entered into postpetition by the Trustee, the Debtors and/or the Estates

5  that have not been assigned, if any; (iii) all defenses, offsets, rights of recoupment, rights of

6  disallowance, recharacterization and/or equitable subordination of the Debtors and the Estates with

7  respect to Claims against the Debtors, and (iv) all rights of the Debtors, the Estates, and the GGW

8  Creditor Trust arising from the Plan itself.

9  **F.    Objections to Claims.**

10      Except as otherwise provided in Section X.B (regarding allowance of Administrative

11  Claims), any objection to a Claim shall be Filed and served upon the holder of such Claim no later

12  than the Claims Objection Deadline.  After the Effective Date, the GGW Creditor Trust, through

13  the GGW Creditor Trustee, shall have the sole right and authority to File, settle, compromise,

14  withdraw or litigate to judgment objections to Claims, except for Professional Fee Claims, as to

15  which any party in interest may object.

16  **G.    Distribution of Property Under the Plan.**

17      The following procedures set forth in the Plan apply to all distributions made pursuant to the

18  Plan.

19      **1.    Manner of Cash Payments Under the Plan.**

20      Cash payments to domestic entities holding Allowed Claims will be tendered in United

21  States dollars and will be made by checks drawn on a United States domestic bank or by wire

22  transfer from a United States domestic bank.  Payments made to foreign creditors holding Allowed

23  Claims may be paid, at the option of the Trustee or GGW Creditor Trustee, in such funds and by

24  such means as are necessary or customary in a particular foreign jurisdiction.

25      **2.    No Distributions with Respect to Disputed Claims.**

26      No payments of cash or distributions of other property or other consideration of any kind

27  shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed

28  Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim

becomes, or is deemed to be for distribution purposes, an Allowed Claim. The presence of a Disputed Claim in any Class will not be a cause to delay distribution to Allowed Claims in that Class or in other Classes, so long as a reserve is created for the Disputed Claim in accordance herewith. Any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive any distribution that it would have received had its Allowed Claim been Allowed as of the Effective Date within ten (10) days from the date that such Claim becomes an Allowed Claim.

### 3. Delivery of Distributions and Undeliverable/Unclaimed Distributions.

#### a. Delivery of Distributions in General.

The Trustee or GGW Creditor Trustee shall make distributions to each holder of an Allowed Claim by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to the Trustee or GGW Creditor Trustee after the date of any related proof of Claim; and (c) at the address reflected in the Schedules if no proof of Claim is filed and neither the Trustee nor the GGW Creditor Trustee has received a written notice of a change of address.

#### b. Undeliverable and Unclaimed Distributions.

If the distribution to the holder of any Allowed Claim is returned as undeliverable, no further distribution shall be made to such holder unless and until the Trustee or GGW Creditor Trustee is notified in writing of such holder's then current address. Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Trustee or GGW Creditor Trustee pursuant to this Section until such time as a distribution becomes deliverable. All undeliverable cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions. These entities will be entitled to any interest actually earned on account of the undeliverable distributions. The bank account will be maintained in the name of the Trustee or GGW Creditor Trustee.

Any holder of an Allowed Claim who does not assert a claim in writing for an undeliverable distribution within ninety (90) days after the date of the first attempted distribution shall no longer have any claim to or interest in such undeliverable distribution, until such time as it notifies the GGW Creditor Trustee in writing of its correct address, at which point is shall only be entitled to share in

distributions from the GGW Creditor Trust made after the date of such notice, which distributions shall be calculated as if the holder of the Allowed Claim had received all prior distributions.

Any undeliverable distributions that are not claimed under this Section will be transferred to the GGW Creditor Trust to be distributed to the holders of Allowed Claims in accordance with Article X hereof.

**4.      Estimation of Disputed Claims for Distribution Purposes.**

The Trustee or GGW Creditor Trust may move for a Court order estimating any Disputed Claim.  The estimated amount of any Disputed Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the holder thereof may recover after the ultimate liquidation of its Disputed Claim, irrespective of the actual amount ultimately allowed.

**5.      No Recourse to GGW Creditor Trust.**

Notwithstanding that the Allowed amount of any particular Disputed Claim(s) is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which there is insufficient cash to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no Claim holder shall have recourse to the Debtors, the Estates, the GGW Creditor Trust, or any of their respective Professionals, or their successors or assigns, or the holder of any other Claim, or any of their respective property.  However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.  THUS, THE COURT'S ENTRY OF AN ESTIMATION ORDER MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

**H.      Setoff, Recoupment and Other Rights.**

Notwithstanding anything to the contrary contained in the Plan, the Trustee or GGW Creditor Trust may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the distributions to be made pursuant to this Plan on account of any claims that the Trustee, the Debtors, the Estates, or the GGW Creditor Trust may have against the entity holding an Allowed Claim; provided, however, that neither the failure to effect such a setoff or

recoupment, nor the allowance of any Claim against the Debtors or the GGW Creditor Trust, nor any partial or full payment during the Cases or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by the Trustee, the Debtors, the Estates, or the GGW Creditor Trust of any Claim that any or all of them may possess against such holder.

**I.      The Effective Date**

The Plan shall not become binding unless and until the Effective Date occurs.  The Effective Date is the first Business Day, on which no stay of the Confirmation Order is in effect, on which all of the following conditions have been satisfied or waived.

**1.      Conditions to the Effective Date.**

(a)      The Confirmation Order shall have become a Final Order; and

(b)      All other agreements, writings and undertakings required under the Plan shall be executed.

**2.      Waiver of Conditions.**

The requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part, and the time within which any such conditions must be satisfied may be extended, by mutual agreement of the Trustee and GGW Marketing.  The failure to timely satisfy or waive any of such conditions may be asserted by the Trustee or GGW Marketing regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Trustee or GGW Marketing.  The failure of the Trustee or GGW Marketing to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right shall be deemed ongoing and subject to assertion at any time.

**3.      Notice of the Effective Date.**

As soon as is reasonably practicable, but in no event later than 10 days after the occurrence of the Effective Date, the Trustee or GGW Creditor Trustee shall File and mail a "Notice of Occurrence of Effective Date" to all creditors of record as of the date of entry of the Confirmation Order.  The Notice of Occurrence of Effective Date shall include a notice that the bar date for filing Rejection Damage Claims (or other Claims for damages) arising from the rejection under the Plan of

1    executory contracts or unexpired leases, if any, shall be 30 days after the mailing of notice of the

2    Effective Date.

3    **J.        Cancellation of Interests.**

4              On the Effective Date, all Interests in the Debtors are cancelled, annulled, and extinguished

5    and of no further force or effect without any further action by any party.

6    **K.        Termination of Services of Debtors' Officers and Directors.**

7              On the Effective Date, and without further action by any party: (A) the Debtors have no

8    right to operate a business; and (B) the services of the Debtors' officers and directors

9    automatically are terminated; provided, however, that notwithstanding the foregoing, the Trustee

10   and GGW Creditor Trustee shall have and retain such authority as set forth in the Plan and the

11   GGW Creditor Trust Agreement to dispose of the GGW Creditor Trust Assets and otherwise

12   implement the Plan in accordance with its terms.

13   **L.        Dissolution of Debtors**

14             On the Effective Date, the Debtors shall be deemed liquidated and dissolved as legal

15   entities, for all purposes, pursuant to applicable federal and state law, without further action by any

16   entity, and the Confirmation Order shall contain a provision to such effect.  Notwithstanding the

17   foregoing, without the need of any further approval, the Trustee or GGW Creditor Trustee in his

18   discretion may execute and file documents and take all other actions as it deems appropriate

19   relating to the dissolution of the Debtors under the applicable laws of any states, and in such event,

20   all applicable regulatory or governmental agencies shall take all steps necessary to allow and

21   effect the prompt dissolution of the Debtors as provided herein, without the payment of any fee,

22   tax, or charge and without need for the filing of reports or certificates.  Any actions by the Trustee

23   or GGW Creditor Trustee pursuant to the preceding sentence shall not modify, alter, or otherwise

24   affect the deemed dissolution of the Debtors as of the Effective Date pursuant to this Section.

25   **XII.  FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED
          PAYMENTS ARE FEASIBLE**

26             Attached as Exhibit 8 are the following financial documents: a balance sheet as of October

27   31, 2014, a cash flow statement and an income and expense statement for the period from March

28

2013 until April 2014, and a cash flow statement and an income and expense statement for the period from May 2014 until October 2014.[8]

### XIII.  ASSETS AND LIABILITIES OF THE ESTATES; RISK FACTORS RELATED THERETO

**A.    Assets**

The identity and fair market value of the Estates' assets are listed in <u>Exhibit 9</u> so that the reader can assess and evaluate what assets are at least theoretically available to satisfy Claims. The Debtors have certain remaining accounts receivable, but the Trustee believes that those accounts receivable are uncollectable.  Insofar as any such amounts are collected, recoveries obtained from such accounts will be distributed in accordance with this Plan and the GGW Creditor Trust Agreement.  As discussed in Section XVII.A, the Plan contemplates the sale of the Vehicles if the Trustee or GGW Creditor Trustee successfully recovers the Vehicles, and the potential prosecution of the Preserved Claims.

Although the Trustee believes there is value to be obtained from the Vehicles and the Preserved Claims, there is risk that there will be no significant recovery from the Vehicles or the Preserved Claims.  The Vehicles have never been in the Trustee's possession.  The Trustee is attempting to recover the Vehicles but may be unsuccessful, or the Trustee or GGW Creditor Trustee may determine in his business judgment to cease efforts to recover the Vehicles.  In addition, the Preserved Claims are speculative and may ultimately have no value.  The Trustee or GGW Creditor Trustee may determine in his business judgment not to pursue some or all of the Preserved Claims, or may be required to retain contingency counsel to pursue such claims, which counsel may not be available.  Even if contingency counsel is retained, such counsel may be

---

[8]    This Plan and Disclosure Statement does not attach financial documents for the full year 2013 because certain of those months occurred prior to the Petition Date and the individuals who formerly controlled the Debtors effected several suspect payments and transactions during that time that were not for the Debtors' benefit and do not accurately portray the Debtors' financial position.  This Plan and Disclosure Statement instead attaches financial statements for two periods: (i) March 2013 through April 2014, during which period the Debtors were operating, and (ii) May 2014 through October 2014, during which period the Debtors were no longer operating in light of the sale of substantially all of the Debtors' operating assets.

49

1  unsuccessful in pursuing the Preserved Claims.  In voting on the Plan, creditors should not assume

2  that the Vehicles or the Preserved Claims will result in any significant recovery.

3  **B.      Liabilities**

4       Exhibit 10 shows the Allowed Claims against the Estates, Claims whose treatment is

5  explained in detail by Article X.  The Trustee is unaware of any pending litigation matters against

6  the Debtors that could potentially diminish the Estates' assets.

7  **C.      Summary**

8       The fair market value of all assets other than Vehicles, Preserved Claims, and accounts

9  receivable that are likely uncollectable, as of October 31, 2014, equals $1,443,519.80.[9]  Total

10  undisputed liabilities, as of October 31, 2014, equal $43,329,239.60.  Total disputed liabilities, as

11  of October 31, 2014, equal $5,858.00.

12  ### XIV.  TREATMENT OF NON-CONSENTING CLASSES

13       As stated above, even if all classes do not consent to the proposed treatment of their claims

14  under the Plan, the Plan may nonetheless be confirmed if the dissenting classes are treated in a

15  manner prescribed by the Bankruptcy Code.  The process by which dissenting classes are forced to

16  abide by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code

17  allows dissenting classes to be crammed down if the Plan does not "discriminate unfairly" and is

18  "fair and equitable."  The Bankruptcy Code does not define discrimination, but it does provide a

19  minimum definition of "fair and equitable."  The term can mean that secured claimants retain their

20  liens and receive cash payments whose present value equals the value of their security interest.

21  For example, if a creditor lends the Debtors $100,000 and obtains a security interest in property

22  that is worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled

23  to cash payments whose present value equals $80,000 and not $100,000.  The term means that

24  unsecured claimants whose claims are not fully satisfied at least know that no claim or interest that

25  is junior to theirs will receive anything under the Plan, except where the Debtor is an individual,

26  has elected to retain property included in the Estate under 11 U.S.C. § 1115 and has satisfied 11

27  ────────────────

[9]    Including the Debtors' rights to payment set forth in footnote 7.

28

U.S.C.§ 1129(b)(2)(B)(ii).  "Fair and equitable" means that each holder of an interest must receive the value of such interest or else no junior interest is entitled to receive anything.

Therefore, if a class of holders of general unsecured claims votes against the Plan, the Plan cannot be confirmed where the Debtor or a class of interest holders (e.g. shareholders or partners) will receive or retain any property under the Plan, unless the Plan provides that the class of general unsecured claims shall be paid in full with interest.  If a class of interest holders votes against the Plan, the Plan cannot be confirmed where the Debtor will receive or retain any property under the Plan, unless the Plan provides that the class of interest holders shall be paid in full with interest. These are complex statutory provisions and the preceding paragraphs do not purport to state or explain all of them.

## XV.  TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASSES (CHAPTER 7 LIQUIDATION ANALYSIS)

The Plan must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.  In a chapter 7 case the general rule is that the debtor's assets are sold by a trustee. Unsecured creditors generally share in the proceeds only after secured creditors and administrative claimants are paid.  Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

In these Bankruptcy Cases, Administrative Claims exceed the Debtors' assets that are available for distribution.  Accordingly, were the Debtors' Estates distributed in strict accordance with Chapter 7, all of the Debtors' assets would be paid to administrative claimants, leaving $0 in liquidated assets for distribution to unsecured creditors.  This represents a payment of 0% of Priority Tax Claims, 0% of Allowed Class 1 Claims, and 0% of Allowed Class 2 Claims.

This Plan provides for distribution of assets substantially pursuant to the distribution scheme that would be applicable in a Chapter 7 case.  However, because of the limited voluntary subordination of Professional Fee Claims described in Section X.B.1.c of this Plan, Priority Tax Claims will be paid in full, Allowed Class 1 Claims will be paid in full, and there will be at least

1    $435,240.81 available for distribution to holders of Allowed Class 2 Claims.  This represents a

2    payment of 100% of all Allowed Class 2 Claims (other than those owing to Wynn, Favazza,

3    Heath, Rayment, and the Judgment Creditors, who have each agreed to less favorable treatment,

4    and to holders of Allowed Class 2 Claims listed on Exhibit 3 hereto, to which Wynn, Favazza,

5    Heath, Rayment, and the Judgment Creditors have expressly not subordinated their Claims).  This

6    voluntary limited subordination would not be available to creditors in a Chapter 7 case.  Moreover,

7    it is possible that conversion to a Chapter 7 case would result in increased fees and expenses to the

8    Debtors' estates.  Accordingly, the Trustee believes that no creditor will receive less under this

9    Plan than such creditor would have received in a Chapter 7 case.

10                 **XVI.  FUTURE DEBTORS**

11    **A.**       **Management of Debtors**

12         Because this is a liquidating plan and the Debtors will be dissolved pursuant to Section

13    XI.L hereof, the Debtors will not continue to operate or exist.  The GGW Creditor Trust will be

14    managed by R. Todd Neilson as the GGW Creditor Trustee.

15    **B.**       **Creation of the GGW Creditor Trust; Appointment of GGW Creditor Trustee;
Powers and Duties**

16

17         As set forth in Section XI.D hereof, obligations required to be satisfied under the Plan on

and after the Effective Date, including distributions on account of Allowed classified and

18    unclassified Claims, shall be funded by the GGW Creditor Trust Assets.

19

20            **1.**       **Appointment of the GGW Creditor Trustee**

        The Confirmation Order shall approve, effective on the Effective Date, the GGW Creditor

21    Trust Agreement, which agreement shall provide for the appointment of a GGW Creditor Trustee

22    to administer the GGW Creditor Trust.  The GGW Creditor Trustee shall serve without any bond

23    and shall act in accordance with the GGW Creditor Trust Agreement and the Plan.  The GGW

24    Creditor Trustee may be compensated for his service, as agreed upon in the GGW Creditor Trust

25    Agreement.  The initial GGW Creditor Trustee will be R. Todd Neilson.  Mr. Neilson currently

26    serves as the Trustee in these Bankruptcy Cases.  Mr. Neilson's qualifications are set forth in detail

27    on the Court's docket in connection with his appointment as Trustee.  (Docket No. 81.)  The GGW

28

Creditor Trustee's address is 2049 Century Park East, Suite 2525, Los Angeles, California 90067, and his telephone number is (310) 499-4934.

The GGW Creditor Trust may engage counsel and other professionals as it deems appropriate, and compensate such professionals from the corpus of the GGW Creditor Trust for reasonable fees and expenses incurred by such professionals, in accordance with the GGW Creditor Trust Agreement and without approval of the Court. The GGW Creditor Trustee shall serve for the duration of the GGW Creditor Trust, subject to earlier death, resignation, incapacity, or removal as specifically provided in the GGW Creditor Trust Agreement.

**2.      Effectiveness of the GGW Creditor Trust**

On the Effective Date, the GGW Creditor Trust Agreement shall become effective, and, if not previously signed, the Debtors and the GGW Creditor Trustee shall execute the GGW Creditor Trust Agreement. The GGW Creditor Trust will be organized and established as a trust for the benefit of the Trust Beneficiaries, as defined below, and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d). The GGW Creditor Trust shall have no objective to continue or engage in the conduct of a trade or business and shall not be deemed a successor-in-interest of the Debtors or their Estates for any purpose other than as specifically set forth herein.

The GGW Creditor Trust will be funded initially by $50,000 that would otherwise be distributed on account of Professional Fee Claims. The Professionals have voluntarily subordinated hereunder their rights of distribution on account of their Professional Fee Claims to permit this initial funding for the GGW Creditor Trust, provided that all unpaid Professional Fee Claims shall become GGW Creditor Trust Liabilities and must be paid in full by the GGW Creditor Trust (including repayment of the $50,000 in initial funding provided hereunder) before any Net Trust Assets become available for distribution to holders of Allowed Class 2 Claims.

**3.      Trust Beneficiaries**

In accordance with Treasury Regulation Section 301.7701-4(d), the beneficiaries (the "Trust Beneficiaries") of the GGW Creditor Trust are the holders of Allowed Class 2 Claims that have not been paid in full (excluding interest) from the initial $435,240.81 distributed on account

of Allowed Class 2 Claims.  The Trust Beneficiaries shall receive, on account of their respective

unpaid Allowed Class 2 Claims, an allocation of GGW Creditor Trust Interests as provided for in

the GGW Creditor Trust Agreement, in order to implement the distributions provided for herein,

and shall receive on account of their respective GGW Creditor Trust Interests, in full and complete

satisfaction, discharge, exchange, and release thereof, from the GGW Creditor Trust, distributions

in compliance with the Plan.

### 4.    Transfer of the GGW Creditor Trust Assets and Liabilities

On the Effective Date, pursuant to the Plan and sections 1123, 1141, and 1146(a) of the

Bankruptcy Code, the Trustee, the Debtors, and the Debtors' Estates are authorized and directed to

transfer, grant, assign, convey, set over, and deliver to the GGW Creditor Trustee, for the benefit

of the GGW Creditor Trust, all of the Debtors' and the Estates' right, title, and interest in and to

the GGW Creditor Trust Assets, free and clear of all liens, Claims, encumbrances, and interests of

any kind in such property, except for outstanding Professional Fee Claims, which shall be

transferred to the GGW Creditor Trust and shall constitute GGW Creditor Trust Liabilities.  To

the extent required to implement the transfer of the GGW Creditor Trust Assets from the Debtors

and their Estates to the GGW Creditor Trust and the GGW Creditor Trustee as provided for

herein, all persons shall cooperate with the Trustee, the Debtors and the Estates to assist in

implementing said transfers.

### 5.    Powers and Duties of the GGW Creditor Trustee

On and after the Effective Date, the GGW Creditor Trustee shall be appointed as a

representative of the Estates pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy

Code and as such shall be the duly authorized representative of the Estates for the purpose of

implementing the Plan.  Among other things, the GGW Creditor Trust, acting through the GGW

Creditor Trustee, shall have the following rights, powers and duties:

(a)    Hold and distribute, in accordance with the Plan, all assets transferred to the

GGW Creditor Trust;

(b)    Manage the affairs of the GGW Creditor Trust;

(c)    Collect and marshal all assets of the Debtors' Estates, reduce such assets to

cash, and make interim and final distributions in accordance with the Plan;

(d)    Monitor and enforce the implementation of the Plan;

(e)    File all tax and regulatory forms, returns, reports and other documents required with respect to the GGW Creditor Trust;

(f)    In the GGW Creditor Trustee's reasonable business judgment, investigate, prosecute and/or settle actions or litigation of the Debtors, the Estates, or the GGW Creditor Trust, including, without limitation, the Preserved Claims;

(g)    In the GGW Creditor Trustee's reasonable business judgment, investigate and prosecute objections to Claims, pursuant to the Plan and the GGW Creditor Trust Agreement.

(h)    Preserve and maintain, at the expense of the GGW Creditor Trust, the Debtors' books and records, provided that the GGW Creditor Trust, in its reasonable business judgment, may destroy any and all books and records of the Debtors if they are no longer of any value to the GGW Creditor Trust.

(i)    Submit all required U.S. Trustee and Court reports and pay all required U.S. Trustee Fees until the Bankruptcy Cases are closed.

(j)    Take all actions necessary and create any documents necessary to wind up the affairs of the GGW Creditor Trust and implement the Plan.

(k)    Take all necessary actions and File all appropriate motions to obtain an order closing the Bankruptcy Cases.

As a representative of the Estates, the GGW Creditor Trustee shall succeed to all of the rights and powers of the Trustee, the Debtors and the Estates with respect to all GGW Creditor Trust Assets, GGW Creditor Trust Liabilities and Preserved Claims, and the GGW Creditor Trustee shall be substituted and shall replace the Trustee, the Debtors and the Estates, as applicable, as the party in interest in any litigation pending as of the Effective Date.  The GGW Creditor Trustee, on behalf of the GGW Creditor Trust, shall be authorized to execute any documents that implement or are in aid of this Section, in particular, and the Plan in general.

6.     **Termination of the GGW Creditor Trust.**

The GGW Creditor Trust shall be irrevocable.  The GGW Creditor Trust shall terminate on December 31, 2019; provided, however, that the Court may upon good cause shown order the GGW Creditor Trust to remain open so long as it may be necessary to liquidate and distribute all of its property.

7.     **Compliance With Tax Requirements**

The GGW Creditor Trust shall comply with all applicable withholding, payment and reporting requirements imposed on it by governmental units, and all distributions pursuant to the Plan shall be subject to such withholding, payment and reporting requirements.  The GGW Creditor Trustee (on behalf of the GGW Creditor Trust) shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from distributions to the holder of an Allowed Claim and paid over to the applicable governmental unit on account of such holder shall be treated as part of the distributions to such holder.

For example, with respect to any employee-related withholding, if the Debtors are obligated by law to withhold amounts from distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the GGW Creditor Trustee may withhold a portion of the distributions allocated to the Allowed Claim of such present or former employee.

Each person holding an Allowed Claim is required to provide any information necessary to effect the necessary information reporting and withholding of applicable taxes with respect to distributions to be made under the Plan.  The GGW Creditor Trustee shall be entitled in its sole discretion to withhold any distributions to a holder of an Allowed Claim that fails to provide tax identification or social security information upon written request.

Notwithstanding any other provision of this Plan, (a) each holder of an Allowed Claim that is to receive a distribution on account thereof pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such

distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the GGW Creditor Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the GGW Creditor Trust in connection with such distribution. Any property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as an Unclaimed Distribution pursuant to Section XI.G.3.

**8.      Additional Provisions of the GGW Creditor Trust Agreement.**

In addition to the provisions in the Plan with respect to the GGW Creditor Trust, the GGW Creditor Trust Agreement will provide for, among other things, the replacement of the GGW Creditor Trustee in the event of death, incapacity, or resignation, the liability of the GGW Creditor Trustee, the effect of actions by the GGW Creditor Trustee, and the indemnification of the GGW Creditor Trustee. The GGW Creditor Trustee will serve without bond and make all distributions under the Plan, except where otherwise provided.

To the extent not set forth in the Plan, the functions and procedures applicable to the GGW Creditor Trust and the powers and duties of the GGW Creditor Trustee and the rights of the holders of beneficial interests in the GGW Creditor Trust shall be governed by the provisions of the GGW Creditor Trust Agreement; provided, however, that if there is any conflict, the terms of the Plan shall govern.

**C.      Future Financial Outlook**

The Debtors are no longer operating and will not operate postpetition. The only contingency is the pursuit of the Vehicles and the Preserved Claims, which is speculative, as set forth in Section XIII.A.

**XVII.  SALE OR TRANSFER OF PROPERTY; CONTRACTS AND LEASES; OTHER PROVISIONS**

**A.      Sale of Estate Property**

As set forth in Section VIII.C.6, the Trustee has already sold substantially all of the Debtors' operating assets in a Court-approved sale pursuant to 11 U.S.C. § 363. The proceeds of that sale comprise the majority of the Debtors' cash on hand that will be distributed pursuant to

1   this Plan.  The only other property of the Debtors that the Trustee is hopeful can be profitably sold

2   are the Vehicles.  As described in Section VIII.C.2, the Debtors own certain luxury vehicles, at

3   least two of which were being used by Francis and Perfect Science per the Court's Preliminary

4   Injunction, and which Francis and Perfect Science were required to return to the Trustee on or

5   before May 28, 2014.  Francis and Perfect Science failed to return those vehicles, and the Trustee

6   is in the process of seeking sanctions against Francis and Perfect Science to coerce them to return

7   those vehicles.  Per the Debtors' books and records as they existed before the Trustee was

8   appointed in these cases, the aggregate value of the Vehicles is $339,036.   If and when the

9   Trustee recovers the Vehicles, the Trustee (or the GGW Creditor Trustee, as the case may be) will

10  sell the Vehicles at one or more auctions.  The Vehicles are both unencumbered; accordingly, any

11  sale of the Vehicles will not impact the rights of any lienholders.  The Court has already issued an

12  order approving any such sale at auction.  (Docket No. 704.)

13  **B.      Rejection of Executory Contracts and Unexpired Leases**

14          **1.      Rejected Agreements.**

15          On the Effective Date, all executory contracts and unexpired leases, if any, entered into

16  before the Petition Date—except for any agreements that were previously assumed, assumed and

17  assigned, or rejected either by a Final Order or under Bankruptcy Code section 365, including

18  those assumed and assigned in connection with the GGWA Sale—will be rejected to the extent

19  they were not previously rejected by the Sale Order or otherwise.  The Court must make certain

20  findings of fact before approving the aforementioned provision as part of the Plan.  The Trustee

21  will request that the Court make the appropriate findings at the confirmation hearing, and the

22  Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date,

23  of the executory contracts and unexpired leases to be rejected under the Plan.

24          **2.      Bar Date for Rejection Damages Claims.**

25          Any Rejection Damage Claim or other Claim for damages arising from the rejection under

26  the Plan of an executory contract or unexpired lease must be Filed and served on the GGW

27  Creditor Trust within 30 days after the mailing of the "Notice of Occurrence of Effective Date"

28  (nothing herein shall extend the deadline for the filing of claims with respect to contracts or leases

1  previously rejected).  Any such Claims that are not timely Filed and served will be entitled to no

2  distribution under the Plan on account of such Claim and will be unenforceable against the

3  Debtors, the Estates, the GGW Creditor Trust, and their respective property, and entities holding

4  these Claims will be barred by the Confirmation Order from receiving any distributions under the

5  Plan on account of such untimely Claims.

6  ### XVIII.  BANKRUPTCY PROCEEDINGS

7  The motions, adversary proceedings, and orders that have occurred during the Bankruptcy

8  Cases and that are relevant to this Plan, and, in particular, those that relate to the Trustee's

9  settlement of large claims against the Debtors' Estates, are described in detail in Section VIII.C.

10  Employment of each of the Professionals in these Bankruptcy Cases has been approved by the

11  Court.

12  The motions and adversary proceedings that are pending are as follows:

13  (a)    *Motion for Approval of Settlement With Brian Rayment* [Docket No. 771; filed

14  November 4, 2014].  *See* Section VIII.C.7.e for a description of the Rayment Settlement.

15  (b)    *Motion to Deem Funds in "Joint Account" Property of the Debtors' Estates*

16  [Argyle Adversary, Docket No. 188; filed October 15, 2014].  By this motion, the Trustee seeks

17  authority to deem certain "disputed funds" that have been held in a joint account with Argyle

18  Online pending the resolution of the Argyle Adversary to be property of the Debtors' Estates.

19  (c)    *Motion for Approval of Settlement With Proskauer Rose LLP* [Docket No. 774;

20  filed November 10, 2014].  This Motion seeks approval of the Trustee's settlement with Proskauer

21  Rose LLP, by which the Trustee has settled all claims against Proskauer Rose LLP in exchange for

22  $290,000.

23  (d)    The District Court has not yet ruled on the Report and Recommendation issued by

24  the Bankruptcy Court regarding incarceration of Francis and Abbey Wilson as a sanction for their

25  failure to return the Vehicles.  *See* Section VIII.C.2.

26  (e)    The Trustee's adversary proceeding against Francis, *Neilson v. Francis*, Adv. No.

27  2:13-ap-01468-SK, filed April 23, 2013, is pending.  The Court's Preliminary Injunction remains

28  in effect.  *See* Section VIII.C.2.

### XIX.  TAX CONSEQUENCES OF PLAN

The following is a summary of certain anticipated U.S. federal income tax consequences of the Plan.  This summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date hereof and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and Plan and the receipt of a final distribution under the Plan.  Events occurring after the date hereof, including changes in law and changes in administrative positions, could affect the U.S. federal tax consequences of the Plan.  No opinion of counsel has been obtained, and the Trustee does not intend to seek a ruling from the Internal Revenue Service ("IRS") as to any of such tax consequences, and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not United States persons for U.S. federal income tax purposes or that are otherwise subject to special treatment under U.S. federal income tax law.  This summary does not purport to cover all aspects of U.S. federal income taxation that may apply.  Additionally, this summary does not discuss any tax consequences that may arise under state, local or foreign tax law.

**The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each creditor.  All creditors are urged to consult their own tax advisors as to the U.S. federal income tax consequences, as well as any applicable state, local and foreign tax consequences, of the Plan.**

**To ensure compliance with requirements imposed by the IRS, you must be informed that any tax advice contained in this Disclosure Statement and Plan is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the Code.  The tax advice contained in this Disclosure Statement and Plan was written to support the promotion of the transactions described in this Disclosure**

1  **Statement and Plan.  Each taxpayer should seek advice based on the taxpayer's particular**

2  **circumstances from an independent tax advisor.**

3  **A.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor and
        Reorganized Debtor.**

4

5        The Trustee is unaware of any material federal tax consequences of the Plan to the

   Debtors.  Each of the Debtors is a single-member LLC.  Unless it elects to be treated otherwise

6  (the Trustee believes that the Debtors have not), a single-member LLC is disregarded as an entity

7  separate from the owner for federal tax purposes. Treas. Reg. § 301.7701-3(b)(1)(ii).

8  **B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Holders of Claims.**

9      **1.      General**

10       A holder of a Claim (not constituting a tax security) should generally recognize gain or

11 loss equal to the amount realized in satisfaction of the Claim minus the holder's tax basis in the

12 Claim.  The holder's amount realized for this purpose generally will equal the holder's pro rata

13 portion of the sum of cash and the fair market value of other property transferred to the GGW

14 Creditor Trust, if any, on the Effective Date, less any amount allocable to interest on the holder's

15 Claim.

16       Pursuant to the Plan, on the Effective Date, the GGW Creditor Trust Assets will be vested

17 in the GGW Creditor Trust.  The holders of Allowed Class 2 Claims whose Class 2 Claims have

18 not been paid in full (excluding interest) from the initial $435,240.81 payment to Class 2

19 Claimants will be the beneficiaries of the GGW Creditor Trust and will be entitled to distributions

20 from the Net Trust Assets in accordance with the GGW Creditor Trust Agreement.  The GGW

21 Creditor Trust is intended to qualify as, and the discussion below assumes that the GGW Creditor

22 Trust will be respected as, a liquidating trust for U.S. federal income tax purposes.  In general, a

23 liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead

24 treated as a grantor trust, *i.e.*, a pass-through entity.  For U.S. federal income tax purposes, all

25 parties (including the Debtors and the Trust Beneficiaries) must treat the transfer of the GGW

26 Creditor Trust Assets to the Creditor Trust as a transfer of such assets directly to the Trust

27 Beneficiaries, followed by the Trust Beneficiaries' transfer of such assets to the GGW Creditor

28

Trust.  Consistent therewith, all parties must treat the GGW Creditor Trust as a grantor trust of which the Trust Beneficiaries are the owners and grantors.  Subject to the terms of the GGW Creditor Trust Agreement, the GGW Creditor Trustee will determine the fair market value of the GGW Creditor Trust Assets as soon as possible after the Effective Date, and the Trust Beneficiaries and the GGW Creditor Trustee must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.  Assuming the GGW Creditor Trust qualifies as a liquidating trust for U.S. federal income tax purposes, each Trust Beneficiary generally should be required to report on such Trust Beneficiary's U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit, recognized or incurred by the GGW Creditor Trust, in accordance with such Trust Beneficiary's relative beneficial interest in the GGW Creditor Trust.  The character of the items of income, gain, loss, deduction or credit to any Trust Beneficiary, and such Trust Beneficiary's ability to benefit from any deductions or losses, may depend on such Trust Beneficiary's particular situation.

Any gain or loss recognized by a holder of a Claim (not constituting a tax security) will be capital or ordinary depending on the status of the Claim in the holder's hands.

**2.    Accrued Interest**

To the extent that any amount received by a holder of an Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the holder's gross income, such amount should be taxable to the holder as ordinary interest income. Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a holder of an Allowed Claim will be attributable to accrued interest on the debts constituting the Allowed Claim is unclear.  Certain U.S. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to

the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes) and thereafter, to the remaining portion of such Allowed Claims, if any.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

### 3.    Bad Debt and/or Worthless Securities Deduction.

A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under Code § 166(a) or a worthless securities deduction under Code § 165(g).  The rules governing the character, timing and amount of the bad debt and/or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims against the Debtors, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 4.    Information Reporting and Backup Withholding.

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding.  The Internal Revenue Code imposes "backup" withholding on certain "reportable" payments to certain taxpayers, including payments of interest.  Under the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

1    **5.    Importance of Obtaining Professional Tax Assistance.**

2    THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF

3    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A

4    SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE

5    ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX

6    ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

7    VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.

8    ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR

9    TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND

10    OTHER TAX CONSEQUENCES OF THE PLAN.

11    **XX.  EFFECT OF CONFIRMATION OF PLAN**

12    **A.    General Comments**

13    The provisions of a confirmed Plan bind a Debtor, any entity acquiring property under the

14    Plan, and any creditor, Interest holder, or general partner of a Debtor, even those who do not vote

15    to accept the Plan.

16    The confirmation of this Plan vests all property of the Estates in the GGW Creditor Trust,

17    as set forth in Section XI.C.   The automatic stay is lifted upon confirmation as to property of the

18    Estates.  However, the stay continues to prohibit collection or enforcement of prepetition claims

19    against the Debtors or the Debtors' property until the date the Debtors receive a discharge, if any.

20    If the Debtors do not seek or are ineligible to receive a discharge, the discharge is deemed denied,

21    and the stay as to the Debtors and the Debtors' property terminates upon entry of the order

22    confirming the Plan.

23    **B.    No Discharge of Liability for Payment of Debts.**

24    Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with

25    respect to the Plan and the Plan shall be binding on all parties to the fullest extent permitted by

26    Bankruptcy Code section 1141(a).  In accordance with Bankruptcy Code section 1141(d)(A)(3),

27    the Plan does not discharge the Debtors.  Bankruptcy Code section 1141 nevertheless provides,

28    among other things, that the property dealt with by the Plan is free and clear of all Claims and

152788.1                                    64

1    Interests of creditors and equity security holders.  Accordingly, no entity holding a Claim against

2    or Interest in the Debtors may receive any payment from, or seek recourse against, any assets that

3    are to be distributed under the Plan other than assets required to be distributed to that entity under

4    the Plan.  As of the Effective Date, all parties are precluded from asserting against any property

5    that is to be distributed under the Plan any Claims, rights, causes of action, liabilities, or Interests

6    based upon any act, omission, transaction, or other activity that occurred before the Effective Date

7    except as expressly provided in the Plan or the Confirmation Order.

8    **C.    Modification of the Plan**

9         Subject to the restrictions set forth in Bankruptcy Code section 1127, the Trustee reserves

10    the right to alter, amend, or modify the Plan before its substantial consummation.

11    **D.    Post-Confirmation Causes of Action**

12         To the best of the Trustee's knowledge, the Estates' causes of action are as set forth on

13    Exhibit 2.  As stated in Section XI.E, such causes of action are vested in the GGW Creditor Trust

14    and may be pursued by the GGW Creditor Trustee.

15    **E.    Retention of Jurisdiction**

16         Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

17    Date, the Court shall retain jurisdiction over the Bankruptcy Cases after the Effective Date to the

18    fullest extent provided by law, including the jurisdiction to:

19         1.    Allow, disallow, determine, liquidate, classify, establish the priority or secured or

20    unsecured status of, estimate, limit, or subordinate any Claim;

21         2.    Grant or deny any and all applications for allowance of compensation or

22    reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods

23    ending on or before the Effective Date;

24         3.    Resolve any motions pending on the Effective Date to assume, assume and assign,

25    or reject any executory contract or unexpired lease to which any of the Debtors is a party or with

26    respect to which any of the Debtors may be liable and to hear, determine and, if necessary,

27    liquidate, any and all Claims arising therefrom;

28

4.      Resolve any and all other applications, motions, adversary proceedings, and other matters involving the Debtors that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan or the GGW Creditor Trust Agreement;

5.      Ensure that distributions to holders of Allowed Claims, including but not limited to Allowed Administrative Claims, are accomplished pursuant to the provisions of the Plan;

6.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

7.      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan and Confirmation Order, or any entity's rights or obligations under the Plan and Confirmation Order;

8.      Modify the Plan and Disclosure Statement before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify any contract, instrument, release, or other agreement or document created in connection with the Plan and Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Court, the Plan and Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan and Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan and the Confirmation Order;

10.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

11.     Determine any other matters that may arise in connection with or relate to the Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan; and

12.     Enter a final decree closing these Bankruptcy Cases.

1    If the Court abstains from exercising jurisdiction or is otherwise without jurisdiction over

2   any matter, this Section shall have no effect upon and shall not control, prohibit, or limit the

3   exercise of jurisdiction by any other court having competent jurisdiction with respect to such

4   matter.

5   **F.    Final Decree**

6    Once the Plan has been consummated, a final decree may be entered upon motion of the

7   Trustee pursuant to Bankruptcy Code section 350.  The effect of the final decree is to close the

8   Bankruptcy Cases.  After such closure, a party seeking any type of relief relating to a Plan

9   provision can seek such relief in a state court of general jurisdiction.

10   **XXI.  MISCELLANEOUS PROVISIONS**

11   **A.    Exculpation Re: Solicitation and Prosecution of Plan Confirmation.**

12    None of the Trustee, the Estates, the GGW Creditor Trust or any of the foregoing parties'

13   respective members, officers, directors, employees, affiliates, advisors, professionals or agents

14   shall have or incur any liability to any holder of a Claim or Interest for any act or omission

15   occurring on or after the Petition Date in connection with, related to, or arising out of the

16   Bankruptcy Cases, the pursuit of confirmation of the Plan, the consummation or administration of

17   the Plan, or property to be distributed under the Plan, except for willful misconduct, and in all

18   respects, the Debtors, the Estates, the Trustee, the GGW Creditor Trust or any of the foregoing

19   parties' respective members, officers, directors, employees, affiliates, advisors, professionals or

20   agents shall be entitled to rely on the advice of their respective counsel with respect to their duties

21   and responsibilities in connection with the Bankruptcy Cases and the Plan.

22   **B.    Revocation of Plan/No Admissions.**

23    The Trustee reserves the right to revoke or withdraw the Plan prior to the Confirmation

24   Date.  Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the

25   Effective Date does not occur, the Plan will be null and void, and nothing contained in this Plan

26   and Disclosure Statement will: (a) be deemed to be an admission by the Trustee or GGW

27   Marketing with respect to any matter set forth in the Plan, including liability on any Claim or the

28   propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any

Claims against the Debtors, or of any Claims of the Debtors; or (c) prejudice in any manner the rights of any party in any further proceedings.

**C.    Exemption from Certain Transfer Taxes.**

In accordance with Section 1146(c) of the Bankruptcy Code, the making, delivery, or recording of a deed or other instrument of transfer under this Plan shall not be subject to any stamp tax or similar tax and the appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax.

**D.    Payment of U.S. Trustee Fees.**

All fees payable under 28 U.S.C. § 1930(a)(6) shall be paid by the Trustee in the amounts and at the times such fees may become due up to and including the Effective Date.  Thereafter, the Trustee or GGW Creditor Trust shall pay all fees payable under 28 U.S.C. § 1930(a)(6) until the Bankruptcy Cases are closed, dismissed, or converted.  Upon the Effective Date, the GGW Creditor Trust shall be relieved from the duty to make the reports and summaries required under Bankruptcy Rule 2015(a).  Notwithstanding the foregoing, the GGW Creditor Trust shall File and serve the status reports required by Local Bankruptcy Rule 3020-1(b) at such times and for such period as may be set forth in the Confirmation Order.

**E.    Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**F.    Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**G.    Headings.**

The headings used in the Plan are inserted for convenience only and do not constitute a portion of this Plan or in any manner affect the provisions of this Plan or their meaning.

**H.    Severability of Plan Provisions.**

If, before the Confirmation Date, the Court holds that any Plan term or provision is invalid, void, or unenforceable, the Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.    That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.

**I.    Governing Law.**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof.

1

2 **XXII. DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN**

3     I, R. Todd Neilson, solely in my capacity as chapter 11 Trustee of the GGW Brands, LLC,

4 GGW Direct, LLC, GGW Events, LLC, and GGW Magazine, LLC, and authorized representative

5 of GGW Marketing, LLC, declare under penalty of perjury under the laws of the United States of

6 America that the following statements are true and correct based upon my personal knowledge.

7     1.    KTB&S, my bankruptcy counsel, prepared this document. I have reviewed and

8 provided my comments to this document.

9     2.    The source of all financial data is the Debtors' books and records.

10     3.    All facts and representations in the Plan and Disclosure Statement are true to the best

11 of my knowledge.

12     4.    No fact material to a claimant or equity security holder in voting to accept or reject

13 the proposed Plan has been omitted.

14     5.    The name of the person(s) who prepared the cash flow projections and the other

15 financial documents are Thomas Jeremiassen and Nicholas Troszak. They were acting within their

16 capacity as accountants and financial advisors for the Debtors.

17     6.    The accounting method(s) used to prepare the financial documents is cash basis.

18

19 Signature: _____ Print Name: _R. TODD NEILSON_

20 Title: _CHAPTER 11 TRUSTEE_ Date: _11/12/14_

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067


A true and correct copy of the foregoing document entitled **CHAPTER 11 TRUSTEE'S DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION FOR GGW BRANDS, LLC, GGW DIRECT, LLC, GGW EVENTS, LLC, GGW MAGAZINE, LLC & GGW MARKETING, LLC DATED NOVEMBER 12, 2014**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 12, 2014 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On November 12, 2014 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 12, 2014 I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

TO BE SERVED VIA PERSONAL DELIVERY
Hon. Sandra R. Klein
United States Bankruptcy Court
255 E. Temple Street, Suite 1575
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 11/12/14 | Jonathan M. Weiss | /s/ Jonathan M. Weiss |
| *Date* | *Printed Name* | *Signature* |

## TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):

- **James E Armstrong**    jearmstrong@scif.com
- **Martin R Barash**    mbarash@ktbslaw.com, lbogdanoff@ktbslaw.com
- **Brendt C Butler**    brendt.butler@gmail.com
- **Anne-Marie J DeBartolomeo**    ajd@girardgibbs.com, jiv@girardgibbs.com,jar@girardgibbs.com
- **Richard K Diamond**    rdiamond@dgdk.com, DanningGill@gmail.com;rdiamond@ecf.inforuptcy.com
- **Brian D Hefelfinger**    brian@palaylaw.com
- **Matthew Heyn**    mheyn@ktbslaw.com, mcheyn@outlook.com
- **Matthew C. Heyn**    Matthew.Heyn@doj.ca.gov, mcheyn@outlook.com
- **Lance N Jurich**    ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com
- **Samuel M Kidder**    skidder@ktbslaw.com
- **Michael D Kolodzi**    mdk@mdklawfirm.com
- **Dare Law**    dare.law@usdoj.gov
- **John F Medler**    JOHN@MEDLERLAWFIRM.COM, JMEDLER@MEDLERROITHER.COM
- **Kelly L Morrison**    kelly.l.morrison@usdoj.gov
- **Morris Nazarian**    monazarian@yahoo.com
- **R. Todd Neilson (TR)**    tneilson@brg-expert.com, sgreenan@brg-expert.com;tneilson@ecf.epiqsystems.com;ntroszak@brg-expert.com
- **Malhar S Pagay**    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- **Robert J Pfister**    rpfister@ktbslaw.com
- **Ronald N Richards**    ron@ronaldrichards.com, nick@ronaldrichards.com
- **Ronald N Richards**    ron@ronaldrichards.com, nick@ronaldrichards.com
- **Steven J Schwartz**    sschwartz@dgdk.com, DanningGill@gmail.com;sschwartz@ecf.inforuptcy.com
- **David M Stern**    dstern@ktbslaw.com
- **Ronald D Tym**    RTym@Tymfirm.com
- **Ronald D Tym**    RTym@Tymfirm.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Andy C Warshaw**    awarshaw@lawcenter.com, ecf@lawcenter.com,intake@lawcenter.com
- **Jonathan M Weiss**    jweiss@ktbslaw.com
- **Jonathan M Weiss**    jweiss@ktbslaw.com
- **Robert M Yaspan**    court@yaspanlaw.com, tmenachian@yaspanlaw.com
- **Robert M Yaspan**    court@yaspanlaw.com, tmenachian@yaspanlaw.com

<u>TO BE SERVED VIA U.S. MAIL</u>

U.S. Trustee
United States Trustee (LA)
915 Wilshire Blvd., Suite 1850
Los Angeles, California 90017

GGW Brands, LLC, et al.
R. Todd Neilson, Trustee
BRG, LLP
2049 Century Park East, Ste 2525
Los Angeles, CA 90067

Securities and Exchange Commission
Michele Wein Layne, Regional Director
444 South Flower Street, Suite 900
Los Angeles, CA 90071

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**